IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
* * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA      *
                              *    Case No. 8:21-cr-342
vs.                           *
                              *    January 18, 2023
PLAMEN GEORGIEV VELINOV       *
* * * * * * * * * * * * * * * *
```

### JURY TRIAL - DAY 1

Heard in Courtroom 14B
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
January 18, 2023

### BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON

### UNITED STATES DISTRICT JUDGE

Official Court Reporter:        Tana J. Hess, CRR, FCRR, RMR
                                U.S. District Court Reporter
                                Middle District of Florida
                                Tampa Division
                                801 N. Florida Avenue
                                Tampa, FL  33602
                                813.301.5207
                                tana_hess@flmd.uscourts.gov

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:


FOR THE GOVERNMENT:

          Kyle P. Reynolds
          U.S. Department of Justice, Criminal Division
          Child Exploitation and Obscenity Section
          1301 New York Ave. NW
          Washington, DC  20530
          202.616.2842
          kyle.reynolds@usdoj.gov

          Karyna Valdes
          U.S. Attorneys Office
          400 North Tampa Street
          Suite 3200
          Tampa,FL  33602
          813.274.6000
          karyna.valdes@usdoj.gov

FOR THE DEFENDANT:

          Christophir A. Kerr
          13801 Walsingham Road
          #A-154
          Largo, FL  33774
          727.492.2551
          christophirkerr@gmail.com

**INDEX**

**NAME**                                              **PAGE**

Allison Boos

    Direct Examination by Mr. Reynolds            32

    Cross-Examination by Mr. Kerr                 52

    Proffer                                       71

Gibran Ali

    Direct Examination by Mr. Reynolds            85

    Cross-Examination by Mr. Kerr                203

    Redirect Examination by Mr. Reynolds         210

    Recross-Examination by Mr. Kerr              211

Tatiana Power

    Direct Examination by Ms. Valdes             213

**EXHIBITS**

| NUMBER | ADMITTED |
|--------|----------|
| Government Exhibit 4 | 159 |
| Government Exhibit 7 | 89 |
| Government Exhibit 100 | 46 |
| Government Exhibit 101 | 48 |
| Government Exhibit 102 | 42 |
| Government Exhibit 103 | 44 |
| Government Exhibit 104 | 44 |
| Government Exhibit 105 | 44 |
| Government Exhibit 300 | 96 |
| Government Exhibit 301 | 104 |
| Government Exhibit 302 | 116 |
| Government Exhibit 303 | 119 |
| Government Exhibit 306 | 132 |
| Government Exhibit 307 | 126 |
| Government Exhibit 309 | 133 |
| Government Exhibit 312 | 136 |
| Government Exhibit 313 | 136 |
| Government Exhibit 342 | 139 |
| Government Exhibit 343 | 142 |
| Government Exhibit 344 | 145 |
| Government Exhibit 346 | 146 |
| Government Exhibit 347 | 148 |
| Government Exhibit 348 | 150 |
| Government Exhibit 349 | 154 |
| Government Exhibit 350 | 165 |
| Government Exhibit 351 | 167 |
| Government Exhibit 359 | 169 |
| Government Exhibit 364 | 170 |
| Government Exhibit 364 | 173 |
| Government Exhibit 365 | 186 |
| Government Exhibit 371 | 173 |
| Government Exhibit 382 | 173 |
| Government Exhibit 383 | 189 |
| Government Exhibit 385 | 173 |
| Government Exhibit 386 | 189 |
| Government Exhibit 388 | 173 |
| Government Exhibit 389 | 189 |
| Government Exhibit 391 | 173 |
| Government Exhibit 392 | 189 |
| Government Exhibit 393 | 175 |
| Government Exhibit 394 | 176 |
| Government Exhibit 399 | 182 |
| Government Exhibit 400 | 191 |

| | |
|---|---|
| 9:07AM | 1 |

**<u>EXHIBITS</u>**

| NUMBER | ADMITTED |
|---|---|

| | |
|---|---|
| 9:07AM | 3 |
| 9:07AM | |
| 9:07AM | 4 |
| 9:07AM | |
| 9:07AM | 5 |
| 9:07AM | |
| 9:07AM | 6 |
| 9:07AM | |
| 9:07AM | 7 |
| 9:07AM | |
| 9:07AM | 8 |
| 9:07AM | |
| 9:07AM | 9 |
| 9:07AM | |
| 9:07AM | 10 |
| 9:07AM | |

| NUMBER | ADMITTED |
|---|---|
| Government Exhibit 401 | 196 |
| Government Exhibit 402 | 199 |
| Government Exhibit 403 | 200 |
| Government Exhibit 420 | 230 |
| Government Exhibit 420A | 230 |
| Government Exhibit 420B | 230 |
| Government Exhibit 420C | 230 |
| Government Exhibit 420D | 230 |
| Government Exhibit 700 | 234 |
| Government Exhibit 700A | 234 |
| Government Exhibit 700B | 234 |
| Government Exhibit 700C | 234 |
| Government Exhibit 700F | 234 |
| Government Exhibit 700G | 234 |
| Government Exhibit 700H | 234 |
| Government Exhibit 700I | 234 |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| | | |
|---|---|---|
| 9:07AM | 1 | (Call to order of the Court.) |
| 9:07AM | 2 | **THE COURT:**  All right.  Good morning.  I think we're |
| 9:08AM | 3 | still waiting for some.  We're still waiting for two jurors. |
| 9:08AM | 4 | Okay. |
| 9:08AM | 5 | **MR. REYNOLDS:**  Your Honor? |
| 9:08AM | 6 | **THE COURT:**  Yes.  I'm sorry. |
| 9:08AM | 7 | **MR. REYNOLDS:**  While we're waiting, may I address |
| 9:08AM | 8 | just a few preliminary items? |
| 9:08AM | 9 | **THE COURT:**  Yeah, I want to make sure everybody is |
| 9:08AM | 10 | here, present, and accounted for.  Okay.  Go ahead. |
| 9:08AM | 11 | **MR. REYNOLDS:**  We also have -- Chancey Davis with the |
| 9:08AM | 12 | U.S. Department of Justice is assisting us with trial |
| 9:08AM | 13 | presentation.  She's a bit hidden behind the screen, but I |
| 9:08AM | 14 | wanted to introduce her. |
| 9:08AM | 15 | **THE COURT:**  Okay.  Well, thank you very much. |
| 9:08AM | 16 | **MR. REYNOLDS:**  The first item, the parties will be |
| 9:08AM | 17 | invoking the rule of witnesses, and we have agreed that the |
| 9:08AM | 18 | rule will not apply to expert witnesses. |
| 9:08AM | 19 | **THE COURT:**  Okay.  So expert witnesses may be in the |
| 9:09AM | 20 | courtroom during the testimony of other witnesses, and you are |
| 9:09AM | 21 | free to discuss the testimony of one witness with your expert |
| 9:09AM | 22 | witness; is that it? |
| 9:09AM | 23 | **MR. REYNOLDS:**  Correct. |
| 9:09AM | 24 | **THE COURT:**  Of any witness with your expert witness? |
| 9:09AM | 25 | Okay.  That's fine. |

9:09AM  1          **MR. REYNOLDS:**  Great.  Thank you.  And then the other

9:09AM  2   item is I just wanted to make a very brief record on an issue

9:09AM  3   in the event that there is a 2255 filed later in this case.

9:09AM  4          **THE COURT:**  Uh-huh.

9:09AM  5          **MR. REYNOLDS:**  I think the cold record as it exists

9:09AM  6   right now gives a misleading view of the work that Mr. Kerr has

9:09AM  7   put into this case.  There hasn't been much in the way of

9:09AM  8   pretrial motions practice, but I think what is not reflected on

9:09AM  9   the record is that Mr. Kerr has repeatedly -- there's

9:09AM  10  contraband evidence.  It can't be produced.  Mr. Kerr has

9:09AM  11  repeatedly come in to Government facilities to review this

9:09AM  12  evidence.  He's come in with his witnesses.  He has arranged

9:09AM  13  for the contraband evidence to be made available to his client

9:10AM  14  at Citrus County Detention Facility, which is not a -- not an

9:10AM  15  easy logistical feat.  And the parties have had ongoing

9:10AM  16  discussions about the evidence in this case, and Mr. Kerr has

9:10AM  17  repeatedly raised concerns about the admissibility and the

9:10AM  18  appropriateness of some of the Government's evidence.

9:10AM  19         **THE COURT:**  Uh-huh.

9:10AM  20         **MR. REYNOLDS:**  I think it's going too far to say that

9:10AM  21  we agree with his concerns, but after taking them into

9:10AM  22  consideration, the Government has chosen not to introduce

9:10AM  23  several fairly probative pieces of evidence that includes a

9:10AM  24  recorded -- a recorded -- recorded statements taken in Bulgaria

9:10AM  25  by Bulgarian authorities of this Defendant in which he made

| | |
|---|---|
| 9:10AM | 1 |
| 9:10AM | 2 |
| 9:10AM | 3 |
| 9:10AM | 4 |
| 9:10AM | 5 |

1 incriminating statements.  Mr. Kerr raised concerns that even
2 though it was fully compliant with Bulgarian law, it may not be
3 admissible in U.S. courts.  He presented his arguments to us.
4 We considered it.  We don't agree that it's not admissible, but
5 we agreed not to put that evidence before the jury.
6         Several other pieces of evidence, more explicit
7 images that were advertised over these websites, Mr. Kerr
8 raised concerns about whether they were really part of the
9 conspiracy charged in the indictments, several categories of
10 evidence that after discussions with Mr. Kerr, we have decided
11 not to put before the jury that item.
12         And we're not asking the Court for anything.  I
13 just want to make sure there's a record.  Years down the line,
14 no one looks at the docket and says, "Well, Mr. Kerr didn't
15 move to suppress.  He hasn't tried to exclude any evidence."
16 That is not -- that is not a true restatement of the facts.
17 Mr. Kerr has gone to great lengths successfully to persuade the
18 Government not to introduce many categories of evidence in this
19 case.
20         **THE COURT:**  Mr. Kerr, is there anything you wish to
21 say?
22         **MR. KERR:**  Just that, you know, counsel has acted in
23 good faith so far, and I have chosen not to file motions where
24 I thought it was unnecessary, where I could reach agreement
25 with the Government on these issues.  We have emails back and

9:12AM  1   forth documenting our agreements.  I didn't think it was

9:12AM  2   appropriate to file motions.

9:12AM  3          THE COURT:  All right.  Thank you, Mr. Kerr.  I think

9:12AM  4   all the jurors are here now, so we're going to go ahead and get

9:12AM  5   started.  We'll bring in the jury.  Thank you.

        6          (Jury in at 9:14 a.m.)

9:14AM  7          THE COURT:  Thank you, everybody.

9:14AM  8          All right.  A couple of things as we get

9:14AM  9   started.  Please remember you are free to have coffee in here,

9:14AM  10  water, soft drinks.  If you feel you need a little bit more

9:14AM  11  space, if you're the kind of person that doesn't like to have

9:14AM  12  people right on top of you -- excuse me -- we can always put a

9:14AM  13  chair here to the side.  I know some people feel -- I don't

9:14AM  14  want to say claustrophobic, but they don't like to have people

9:14AM  15  right on top of them, so I've made those accommodations for

9:14AM  16  individuals in the past.

9:14AM  17         Just so you know, we're going to go until about

9:14AM  18  10:30-ish, take about a 10-minute break, and then go 'til noon,

9:14AM  19  take a one-hour break.  Magaly, did you tell them about lunch

9:14AM  20  already?

9:14AM  21         COURTROOM DEPUTY:  Yes.

9:14AM  22         THE COURT:  So you've been able to order lunch?

9:14AM  23  Okay.  And as I said, my beloved former CRD, courtroom deputy,

9:14AM  24  has left for greener pastures, so I will have -- I think Magaly

9:15AM  25  will be filling in during this trial.

| | | |
|---|---|---|
| 9:15 AM | 1 | **COURTROOM DEPUTY:**  Yes, Your Honor. |
| 9:15 AM | 2 | **THE COURT:**  So I'll be having the great services of |
| 9:15 AM | 3 | Magaly here, so I appreciate her filling in. |
| 9:15 AM | 4 | So a couple of things this morning.  We're going |
| 9:15 AM | 5 | to swear you in as jurors in just a moment, and then I will |
| 9:15 AM | 6 | read to you preliminary jury instructions.  Then the Court |
| 9:15 AM | 7 | security officer will pass out notepads -- or do you have them |
| 9:15 AM | 8 | already?  The notepads.  Okay.  He's a step ahead of me.  So |
| 9:15 AM | 9 | you've got the notepads and the pens to take notes, and then we |
| 9:15 AM | 10 | will begin with opening statements. |
| 9:15 AM | 11 | Each side will give opening statements.  I've |
| 9:15 AM | 12 | given them up to 30 minutes each.  I don't think they'll take |
| 9:15 AM | 13 | 30 minutes each, but they have up to 30 minutes each, and then |
| 9:15 AM | 14 | we'll begin with our first witness, all right?  So that's what |
| 9:15 AM | 15 | will happen. |
| 9:15 AM | 16 | If at any point, anybody needs to use the |
| 9:15 AM | 17 | restroom or take a break for any reason, just let me know. |
| 9:15 AM | 18 | This happens, you know.  Just please don't sit here in agony |
| 9:15 AM | 19 | because it's not break time.  You know, we're not on an |
| 9:16 AM | 20 | airplane and, you know, nobody can leave their seats.  It's not |
| 9:16 AM | 21 | that.  You are -- you have to use the restroom, the Court |
| 9:16 AM | 22 | security officer, he's here.  He's all eyes.  He will see that. |
| 9:16 AM | 23 | All right.  If you are tired, you know, |
| 9:16 AM | 24 | sometimes -- I hate to say this.  I have jurors who you will |
| 9:16 AM | 25 | see them, maybe they've had a rough night, somebody is going to |

| | | |
|---|---|---|
| 9:16AM | 1 | see you, and we're going to have -- I'll try not to embarrass |
| 9:16AM | 2 | anybody, but I will say, "Let's take a standing break," or, |
| 9:16AM | 3 | "Let's stand up," or, "Let's get a cup of coffee." You know, |
| 9:16AM | 4 | sometimes the testimony can be tedious. I get it. I mean, |
| 9:16AM | 5 | this is what I've done for -- trying to think how many years |
| 9:16AM | 6 | now. I've been a judge in total for 20 years. You know, it's |
| 9:16AM | 7 | tedious sometimes. Please try to do whatever you can to not |
| 9:16AM | 8 | nod off. I mean, sometimes that happens, especially when the |
| 9:17AM | 9 | testimony can be tedious. |
| 9:17AM | 10 | All right. So we're going to go ahead and swear |
| 9:17AM | 11 | you in now. Magaly will go ahead and do that. |
| 9:17AM | 12 | COURTROOM DEPUTY: Will you all please rise and raise |
| 9:17AM | 13 | your right hand? Your Honor, can you give me a second? I |
| 9:17AM | 14 | think this is the wrong one. |
| 9:17AM | 15 | THE COURT: Sure. That's all right, Magaly. Go |
| 9:17AM | 16 | ahead. Take your time. |
| 9:17AM | 17 | COURTROOM DEPUTY: There we go. Okay. Let's do this |
| 9:17AM | 18 | again. |
| 9:17AM | 19 | (Jury sworn.) |
| 9:18AM | 20 | COURTROOM DEPUTY: Thank you all. You may be seated. |
| 9:18AM | 21 | THE COURT: All right. Thank you, Magaly. |
| 9:18AM | 22 | All right. I will now read to you the |
| 9:18AM | 23 | preliminary instructions. Now that you've been sworn in, I |
| 9:18AM | 24 | need to explain some basic principles about a criminal trial |
| 9:18AM | 25 | and your duty as jurors. These are preliminary instructions. |

9:18AM  1  At the end of the trial, I will give you more detailed

9:18AM  2  instructions.

9:18AM  3          It will be your duty to decide what happened so

9:18AM  4  you can determine whether the Defendant is guilty or not guilty

9:18AM  5  of the crime charged in the indictment.  At the end of the

9:18AM  6  trial, I will explain the law that you must follow to reach

9:18AM  7  your verdict.  You must follow the law as I explain it to you,

9:18AM  8  even if you do not agree with the law.

9:18AM  9          You must decide the case solely on the evidence

9:18AM  10 presented here in the courtroom.  Evidence can come in many

9:18AM  11 forms.  It can be testimony about what someone saw or heard or

9:19AM  12 smelled.  It can be an exhibit admitted into evidence.  It can

9:19AM  13 be someone's opinion.  Some evidence proves a fact indirectly,

9:19AM  14 such as a witness who saw wet grass outside and people walking

9:19AM  15 into the courthouse carrying wet umbrellas.  Indirect evidence,

9:19AM  16 sometimes called circumstantial evidence, is simply a chain of

9:19AM  17 circumstances that proves a fact.  As far as the law is

9:19AM  18 concerned, it makes no difference whether evidence is direct or

9:19AM  19 indirect.  You may choose to believe or disbelieve either kind

9:19AM  20 and should give every piece of evidence whatever weight you

9:19AM  21 might think.

9:19AM  22         Certain things are not evidence and must not be

9:19AM  23 considered.  I will list them for you now.  Statements and

9:19AM  24 arguments of the lawyers.  In their open statements and closing

9:19AM  25 arguments, the lawyers will discuss the case, but their remarks

9:19AM  1    are not evidence.  I want you to remember that.  What the

9:19AM  2    lawyers say is not evidence.  Their questions, not evidence.

9:19AM  3    It's the answers.  That is the evidence that you can consider.

9:20AM  4              Questions and objections of the lawyers.  The

9:20AM  5    lawyers' questions are not evidence.  Only the witnesses'

9:20AM  6    answers are evidence.  You should not think that something is

9:20AM  7    true just because a lawyer's question suggests that it is.  For

9:20AM  8    instance, if a lawyer asks a witness, "You saw the defendant

9:20AM  9    hit his sister; didn't you?"  That question is no evidence

9:20AM  10   whatsoever of what the witness saw or what the witness did

9:20AM  11   unless the witness agrees with it.

9:20AM  12             There are rules of evidence that control what

9:20AM  13   can be received into evidence.  When a lawyer asks a question

9:20AM  14   or offers an exhibit and a lawyer on the other side thinks that

9:20AM  15   it is not permitted by the rules of evidence, that lawyer may

9:20AM  16   object.  If I overrule the objection, then the question may be

9:20AM  17   answered or the exhibit received.  If I sustain the objection,

9:20AM  18   then the question cannot be answered and the exhibit cannot be

9:20AM  19   received.  Whenever I sustain an objection to a question, you

9:20AM  20   must ignore the question and not try to guess what the answer

9:21AM  21   would have been.

9:21AM  22             Sometimes I may order that evidence be stricken

9:21AM  23   and that you disregard or ignore the evidence.  That means when

9:21AM  24   you are deciding the case, you must not consider that evidence.

9:21AM  25   And that's because sometimes, you know, I let -- I let evidence

9:21 AM  1    in, and once I see it, I realize that it should not have come

9:21 AM  2    in.  That doesn't happen very often, but it has happened.  Or a

9:21 AM  3    lawyer doesn't object in time, the evidence is received, and

9:21 AM  4    then the realization -- come to the realization that an

9:21 AM  5    objection should have been made.  So sometimes you'll see that

9:21 AM  6    happen.  As I said, it doesn't happen that often, but it does

9:21 AM  7    periodically happen.

9:21 AM  8          Sometimes evidence is admitted only for a

9:21 AM  9    limited purpose.  When I instruct you that an item of evidence

9:21 AM  10   has been admitted for a limited purpose, you must consider it

9:21 AM  11   only for that limited purpose and no other.  And so usually I

9:21 AM  12   will give an instruction when that occurs, so usually you'll

9:22 AM  13   understand when that happens, or you can rely on the

9:22 AM  14   instructions that are given at the end of the case.

9:22 AM  15         In reaching your verdict, you may have to decide

9:22 AM  16   what testimony to believe and what testimony not to believe.

9:22 AM  17   You may believe everything a witness says or part of it or none

9:22 AM  18   of it.  In considering the testimony of any witness, you may

9:22 AM  19   take into account the opportunity and ability of the witness to

9:22 AM  20   see or hear or know the things testified to; the witness's

9:22 AM  21   memory; the witness's manner while testifying; the witness's

9:22 AM  22   interest in the outcome of the case and any bias or prejudice;

9:22 AM  23   whether other evidence contradicted the witness's testimony;

9:22 AM  24   the reasonableness of the witness's testimony in light of all

9:22 AM  25   the evidence; and any other factors that bear on believability.

9:22AM   1    I will give you additional guidelines for determining

9:22AM   2    credibility of witnesses at the end of the case.

9:22AM   3                As you know, this is a criminal case.  There are

9:22AM   4    three basic rules about a criminal case that you must keep in

9:23AM   5    mind.

9:23AM   6                First, the Defendant is presumed innocent until

9:23AM   7    proven guilty.  The indictment against the Defendant brought by

9:23AM   8    the Government is only an accusation, nothing more.  It is not

9:23AM   9    proof of guilt or anything else.  The Defendant, therefore,

9:23AM  10    starts out with a clean slate.

9:23AM  11                Second, the burden of proof is on the Government

9:23AM  12    until the very end of the case.  The Defendant has no burden to

9:23AM  13    prove his innocence or to present any evidence or to testify.

9:23AM  14    Since the Defendant has the right to remain silent and may

9:23AM  15    choose whether to testify, you cannot legally put any weight on

9:23AM  16    a defendant's choice not to testify.  It is not evidence.

9:23AM  17                Third, the Government must prove the Defendant's

9:23AM  18    guilt beyond a reasonable doubt.  I will give you further

9:23AM  19    instructions on this point later, but bear in mind the level of

9:23AM  20    proof required is high.

9:23AM  21                Our law requires jurors to follow certain

9:24AM  22    instructions regarding the personal conduct in order to help

9:24AM  23    assure a just and fair trial.  I will now give you those

9:24AM  24    instructions.

9:24AM  25                Do not talk, either among yourselves or with

|  |  |
|---|---|
| 9:24 AM | 1 |

anyone else, about anything related to this case.  You may tell
the people with whom you live and your employer that you are a
juror and give them information about when you will be required
to be in court, but you may not discuss with them or anyone
else anything related to the case.

Number 2.  Do not at any time during the trial
request, accept, agree to accept, or discuss with any person
any type of payment or benefit in return for supplying any
information about the trial.

Number 3.  You must promptly tell me about any
incident you know of involving an attempt by any person to
improperly influence you or any member of the jury.

Number 4.  Do not visit or view the premises or
places where the charged crime was allegedly committed or any
other premises or place involved in the case, and you must not
use internet maps or Google Earth or any other program or
device to search for a view of any location discussed in the
testimony.

Again, that's what happened where I had to
declare the mistrial several months ago.  Somebody used maps to
determine the distance between two places to verify what a
witness had said.  You can't do that.  Even though, you know,
you do it in your everyday life -- how do I get from point A to
point B, you look at your maps, Google maps -- you can't do
that.  Everybody understands?  You just can't do that.  Okay.

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

9:25AM 1          Do not read, watch or listen to any accounts or

9:25AM 2    discussions related to the case which may be reported by

9:25AM 3    newspapers, televisions, radio, the internet or any other

9:25AM 4    social news media.  Do not attempt to research any fact, issue,

9:25AM 5    or law related to the case, whether by discussions with others,

9:25AM 6    by library or internet research, or by any other means or

9:26AM 7    source.

9:26AM 8          In this age of instant electronic communication

9:26AM 9    and research, I want to emphasize in addition to not talking

9:26AM 10   face to face with anyone about the case, you must not

9:26AM 11   communicate with anyone about the case by any other means,

9:26AM 12   including by telephone, text messages, email, internet chat,

9:26AM 13   chat rooms, blogs, or social networking websites and apps such

9:26AM 14   as Facebook, Instagram, Snapchat, YouTube, or Twitter.  You may

9:26AM 15   not use any similar technology of social media, even if I have

9:26AM 16   not specifically mentioned it here.  You must not provide any

9:26AM 17   information about the case to anyone by any means whatsoever,

9:26AM 18   and that includes posting information about the case or what

9:26AM 19   you are doing in the case on any device or internet site,

9:26AM 20   including blogs, chat rooms, social websites, or any other

9:26AM 21   means.  And that includes going on Facebook tonight and posting

9:26AM 22   a picture of yourself in front of the federal courthouse and

9:27AM 23   what you're doing.  Please do not do that.  That's in violation

9:27AM 24   of these directions.

9:27AM 25          You must not use Google or otherwise search for

|        |    |                                                                           |
|--------|----|---------------------------------------------------------------------------|
| 9:27AM | 1  | any information about the law or the law that applies to the              |
| 9:27AM | 2  | case or the people involved in the case, including the                    |
| 9:27AM | 3  | Defendant, the witnesses, the lawyers, or the judge.  It is                |
| 9:27AM | 4  | important that you understand why these rules exist and why               |
| 9:27AM | 5  | they are so important.  Our law does not permit jurors to talk            |
| 9:27AM | 6  | with anyone else about the case or to permit anyone to talk to            |
| 9:27AM | 7  | them about the case because only jurors are authorized to                 |
| 9:27AM | 8  | render a verdict.  Only you have been found to be fair, and               |
| 9:27AM | 9  | only you have promised to be fair.  No one else is so                     |
| 9:27AM | 10 | qualified.                                                                |
| 9:27AM | 11 |        Our law also does not permit jurors to talk            |
| 9:27AM | 12 | among themselves about the case until the Court tells them to             |
| 9:27AM | 13 | begin deliberations because premature discussions can lead to a           |
| 9:27AM | 14 | premature final discussion.  In other words, when you leave,              |
| 9:28AM | 15 | you know, for break, don't talk, "Oh, gosh, what did you think            |
| 9:28AM | 16 | about that testimony?"  Or, "Wasn't this this?  Wasn't that               |
| 9:28AM | 17 | that?"  You've got to wait until you hear it all so you can put           |
| 9:28AM | 18 | it in its proper perspective.                                             |
| 9:28AM | 19 |        Our law also does not permit you to visit a            |
| 9:28AM | 20 | place discussed in the testimony, and that means also by                  |
| 9:28AM | 21 | internet search.  First, you can't be sure that the place is in           |
| 9:28AM | 22 | the same condition as it was on the day in question.  Second,             |
| 9:28AM | 23 | even if it were in the same condition, once you go to a place             |
| 9:28AM | 24 | discussed in the testimony to evaluate the evidence in light of           |
| 9:28AM | 25 | what you see, you become a witness, not a juror.  As a witness,           |

9:28AM   1   you may have a mistaken view of the scene that neither party

9:28AM   2   may have a chance to correct.  That is not fair.

9:28AM   3            Finally, our law requires that you not read or

9:28AM   4   listen to any news accounts of the case and that you not

9:28AM   5   attempt to research any fact, issue, or law related to the

9:28AM   6   case.  Your decision must be based solely on the testimony and

9:29AM   7   other evidence presented in this courtroom.

9:29AM   8            Also the law often uses words and phrases in

9:29AM   9   special ways, so it's important that any definitions you hear

9:29AM  10   come only from me and not from any other source.  It wouldn't

9:29AM  11   be fair to the parties for you to base your decisions on some

9:29AM  12   reporter's view or opinion or other information you acquire

9:29AM  13   outside the courtroom.

9:29AM  14            These rules are designed to help guarantee a

9:29AM  15   fair trial, and our law accordingly sets forth serious

9:29AM  16   consequences if the rules are not followed.  I trust that you

9:29AM  17   understand and appreciate the importance of following these

9:29AM  18   rules in accord with your oath and promise.  I know you will do

9:29AM  19   so.

9:29AM  20            Taking notes.  Moving on now, if you wish, you

9:29AM  21   may take notes to help you remember what witnesses said.  If

9:29AM  22   you do take notes, please keep them to yourself until you and

9:29AM  23   your fellow jurors go to the jury room to decide the case.  Do

9:30AM  24   not let note taking distract you so that you do not hear other

9:30AM  25   answers by witnesses.  When you leave the courtroom, your notes

| | | |
|---|---|---|
| 9:30 AM | 1 | should be left in the jury room.  Whether or not you take |
| 9:30 AM | 2 | notes, you should rely on your own memory of what was said. |
| 9:30 AM | 3 | Notes are to assist your memory only.  They are not entitled to |
| 9:30 AM | 4 | any greater weight than your memory or impression about the |
| 9:30 AM | 5 | testimony. |
| 9:30 AM | 6 | The trial will now begin.  First, the Government |
| 9:30 AM | 7 | will make an opening statement, which is simply an outline to |
| 9:30 AM | 8 | help you understand the evidence as it comes in.  Next, the |
| 9:30 AM | 9 | Defendant's attorney may, but does not have to make an opening |
| 9:30 AM | 10 | statement.  Opening statements are neither evidence nor |
| 9:30 AM | 11 | argument.  The Government will then present its witnesses, and |
| 9:30 AM | 12 | counsel for the Defendant may cross-examine them. |
| 9:30 AM | 13 | Following the Government's case, the Defendant |
| 9:30 AM | 14 | may, if he wishes, present witnesses whom the Government may |
| 9:30 AM | 15 | cross-examine. |
| 9:30 AM | 16 | After all the evidence is in, the attorneys will |
| 9:30 AM | 17 | present their closing arguments to summarize and interpret the |
| 9:31 AM | 18 | evidence for you, and I will instruct you on the law.  After |
| 9:31 AM | 19 | that, you will go to the jury room and decide your verdict. |
| 9:31 AM | 20 | I talked yesterday a little bit about the |
| 9:31 AM | 21 | interpreter.  I will now give you an instruction about that. |
| 9:31 AM | 22 | We seek a fair trial for all, regardless of what |
| 9:31 AM | 23 | language they speak.  We have had an interpreter or two |
| 9:31 AM | 24 | interpreters assist us through these proceedings, and you |
| 9:31 AM | 25 | should know what they can do and what they cannot do. |

9:31AM  1   Basically the interpreter is here only to help us communicate
9:31AM  2   during the proceedings.  The interpreter is not a party to the
9:31AM  3   case, has no interest in the case, and will be completely
9:31AM  4   neutral.  Accordingly, the interpreter is not working for
9:31AM  5   either party.  The interpreter's sole responsibility is to
9:31AM  6   enable us to communicate with each other.  Treat the
9:31AM  7   interpreter of the witness's testimony as if the witness had
9:31AM  8   spoken English and no interpreter was present.  Do not allow
9:31AM  9   the fact that the testimony is given in a language other than
9:32AM  10  English influence you in any way.
9:32AM  11          If any of you understand the language of the
9:32AM  12  witness, disregard completely what the witness says in their
9:32AM  13  language.  Consider as evidence only what is provided by the
9:32AM  14  interpreter in English.
9:32AM  15          If you think an interpreter has made a mistake,
9:32AM  16  you may bring it to the attention of the Court, but you should
9:32AM  17  make your deliberations on the basis of the official
9:32AM  18  interpretation.
9:32AM  19          So we have two interpreters.  I can assure you
9:32AM  20  this is a very challenging job.  The interpreters are
9:32AM  21  interpreting from English to Bulgarian, and when -- there may
9:32AM  22  be some witnesses who speak Bulgarian, and so they will
9:32AM  23  interpret from Bulgarian to English so that you can understand
9:32AM  24  what the witness is saying.
9:32AM  25          At the beginning of the case yesterday, both

|         |    |                                                                         |
|---------|----|-------------------------------------------------------------------------|
| 9:32AM  | 1  | interpreters were sworn in to translate accurately and                  |
| 9:32AM  | 2  | correctly to the best of their ability, and that oath, just as          |
| 9:33AM  | 3  | your oath, needs to be adhered to during the pendency of the            |
| 9:33AM  | 4  | case.                                                                    |
| 9:33AM  | 5  | All right.  So those are the two interpreters                           |
| 9:33AM  | 6  | because it's very challenging work to translate.  So that's why         |
| 9:33AM  | 7  | we have two, so that it doesn't become overwhelming.                    |
| 9:33AM  | 8  | All right?  So we're getting ready to begin the                         |
| 9:33AM  | 9  | trial now.  I ask that you give the lawyers your attention as I         |
| 9:33AM  | 10 | recognize them in turn for purposes of opening statements.  I           |
| 9:33AM  | 11 | know you probably won't take the full 30 minutes, but if you            |
| 9:33AM  | 12 | do, when you have five minutes left, Magaly will try to warn            |
| 9:33AM  | 13 | you that you have five minutes left.                                    |
| 9:33AM  | 14 | Who will be making opening statements on behalf                         |
| 9:33AM  | 15 | of the Government?  Ms. Valdes?  Okay.  I now ask that you give         |
| 9:33AM  | 16 | Ms. Valdes your attention as I recognize her for opening                |
| 9:33AM  | 17 | statement.  Ms. Valdes?                                                 |
| 9:33AM  | 18 | **MS. VALDES:**  Thank you, Your Honor.                                  |
| 9:34AM  | 19 | For over a decade, Defendant, Mr. Plamen                                |
| 9:34AM  | 20 | Velinov, and his business partners worked together to exploit           |
| 9:34AM  | 21 | children for profit.  They created and sold sexually explicit           |
| 9:34AM  | 22 | images of children, some as young as 6, and most between the            |
| 9:34AM  | 23 | ages of 6 and 12.  They sold these images on the internet and           |
| 9:34AM  | 24 | made millions of dollars.                                               |
| 9:34AM  | 25 | The members of this enterprise were located                             |

across the globe, some right here in the Middle District of Florida.  Many have never met in person, but all of them played a role in creating dozens of what we will refer to as the Newstar websites.

The websites charged its customers to view photographs and videos of little girls.  Thousands of these images were of young provocatively dressed children hiking up their skirts and spreading their legs for the camera.  These little girls were frequently only covered by lacy, see-through underwear, small bathing suits, bizarre costumes, and other revealing clothing.

One video is of a 9- to 11-year-old girl sitting on the bathroom counter wearing high heels and panties that have been pulled so tightly you can see the outline of her vagina.  In this video, she rubs and spreads her legs for the camera.

Another photograph is of a 6- to 8-year-old girl lying on her back with her skirt hiked up and her legs spread open.  You can see part of her vagina through her lacy underwear.  The Newstar websites were loaded with these types of pictures and videos.

The Defendant, Mr. Plamen Velinov, knew about these images, and he made sure they sold well.  He was the right-hand man of the head guy, Mr. Ken Power.  The Defendant and Mr. Power made most of the website business decisions.

9:36AM  1   They communicated almost daily about the websites, and you will

9:36AM  2   see the Defendant made clear in their communications these

9:36AM  3   children were just objects that they used to make money.

9:36AM  4           In one communication to Mr. Power, the Defendant

9:36AM  5   refers to a child as quote "nuclear sexy."  In another

9:36AM  6   communication to Mr. Power, the Defendant was again referring

9:36AM  7   to a video of a child when he said, "This one's okay because at

9:36AM  8   least it shows some panties."

9:36AM  9           The Defendant had access and control of what was

9:36AM  10  placed on these websites.  He edited and uploaded sexually

9:36AM  11  explicit photographs and videos to the Newstar websites.  He

9:36AM  12  launched these websites.  He checked to see what images sold

9:36AM  13  well, and when they did, he increased their price.

9:37AM  14          Defendant has been charged with conspiracy to

9:37AM  15  advertise and distribute sexually explicit images of these

9:37AM  16  children.  The federal government conducted a multinational,

9:37AM  17  multiyear investigation into the Newstar websites, including

9:37AM  18  into the Defendant, Mr. Plamen Velinov.

9:37AM  19          During the course of this trial, you will see

9:37AM  20  screenshots from the Newstar websites.  You will learn that the

9:37AM  21  Government seized the servers hosting the websites.  They

9:37AM  22  recreated the websites and analyzed them.

9:37AM  23          You will see email communications and chats

9:37AM  24  between the Defendant and other members of the enterprise.  You

9:37AM  25  will learn how the money got from the Newstar websites and

| | |
|---|---|
| 9:37AM | 1 |
| 9:37AM | 2 |
| 9:37AM | 3 |
| 9:37AM | 4 |
| 9:38AM | 5 |
| 9:38AM | 6 |
| 9:38AM | 7 |
| 9:38AM | 8 |
| 9:38AM | 9 |

1   ended into the hands of those involved, including the

2   Defendant's.  You will see evidence collected from search

3   warrants executed on Newstar enterprise members' homes,

4   including the Defendant's in Sofia, Bulgaria.

5            Members of the jury, the evidence will show the

6   Defendant committed these crimes.  Once you have seen and heard

7   all the evidence in this case, I submit to you there will be no

8   reasonable doubt that the Defendant is guilty of these charges.

9   Thank you.

10           THE COURT:  All right.  Thank you, Ms. Valdes,

11   Mr. Kerr, do you wish to make an opening statement?

12           MR. KERR:  Yes, thank you, Your Honor.

13           THE COURT:  You're welcome.

14           MR. KERR:  Good morning, everyone.  You're here today

15   because the Government chose to charge Mr. Plamen Velinov with

16   producing and distributing child pornography.  Mr. Velinov is

17   not guilty of these charges for one very simple reason.  These

18   pictures are not child pornography.  Why?  The evidence, the

19   evidence of the images you will see -- and you will see many

20   images -- will show no nudity, none.  In all the pictures,

21   every model is wearing clothing.  The evidence will also show

22   no sexually explicit conduct.  Nothing you don't see during one

23   of those child pageantry swimsuit competitions or elsewhere, in

24   movies, publicly available.  No sexually explicit conduct,

25   none.  And pornography, there is -- on all these pictures,

9:39AM  1   there's not one image of any minors having sex.  You'll see

9:39AM  2   this yourself.  No minors having sex, no nudity, no sexually

9:39AM  3   explicit conduct, no minors having sex.

9:39AM  4           Now, that doesn't mean that these pictures are

9:39AM  5   okay.  They're not okay.  I don't think you're going to think

9:40AM  6   they're okay.  You're going to see the worst of the pictures

9:40AM  7   that the Government can find on this website, and they're going

9:40AM  8   to make you feel uncomfortable.  Some of them are disturbing,

9:40AM  9   even creepy.

9:40AM  10          The evidence is going to show that a lot of

9:40AM  11  people who signed up for these websites, they're creepy and

9:40AM  12  disturbing too.  But creepy is not the same as criminal.  This

9:40AM  13  material is not unlawful.  You may think some of it should be

9:40AM  14  unlawful, maybe we all will, but it's not.

9:40AM  15          Now, child pornography is an awful thing, about

9:40AM  16  the worst thing that somebody can be charged with.  It's even

9:40AM  17  worse to be falsely accused of it.  Whether you approve of

9:40AM  18  these pictures or think they're okay or not okay, none of that

9:41AM  19  is the issue.  The issue that you, the judges of the facts in

9:41AM  20  this case, will have to decide, that you've taken an oath to

9:41AM  21  decide, is whether these pictures depict sexually explicit

9:41AM  22  conduct.

9:41AM  23          And I get it.  Nobody wants to be in the

9:41AM  24  position -- believe me, I get it -- of defending creepy

9:41AM  25  material, especially involving kids.  None of us do.  But as

| | | |
|---|---|---|
| 9:41 AM | 1 | judges of the facts in this case, you are what stands between a |
| 9:41 AM | 2 | person accused of a crime and the Government that sometimes |
| 9:41 AM | 3 | goes too far. |
| 9:41 AM | 4 | Now, much of you what you see will remind you of |
| 9:41 AM | 5 | what is all around us everywhere in children's underwear and |
| 9:41 AM | 6 | swimsuits ads, kids' beauty pageants -- some of us remember |
| 9:42 AM | 7 | JonBenét Ramsey -- and kids dressed up as adult women in -- in |
| 9:42 AM | 8 | revealing outfits.  Let's face it.  A lot of this is too much. |
| 9:42 AM | 9 | It's even creepy, but it's not unlawful.  And why not?  Because |
| 9:42 AM | 10 | none of it involves nudity, explicit sexual conduct, or minors |
| 9:42 AM | 11 | having sex. |
| 9:42 AM | 12 | So no matter how queasy some of this material |
| 9:42 AM | 13 | might make us, it's important to focus on what you actually |
| 9:42 AM | 14 | see.  Minors, sure.  Most of these models are under 18.  That |
| 9:42 AM | 15 | will be obvious.  But without showing minors engaged in |
| 9:42 AM | 16 | explicit sexual conduct, as both charges say, we do not have |
| 9:42 AM | 17 | child pornography. |
| 9:42 AM | 18 | Now, you know who else did not think that these |
| 9:42 AM | 19 | images were unlawful?  The Government.  At a minimum, they had |
| 9:43 AM | 20 | very serious doubts.  You won't hear them say that now, and |
| 9:43 AM | 21 | they act in good faith, and they may have convinced themselves |
| 9:43 AM | 22 | that these violate the law, these pictures violate the law, but |
| 9:43 AM | 23 | you don't have to -- you won't hear them say that here, and you |
| 9:43 AM | 24 | don't have to take my word for it.  I'm here to speak for |
| 9:43 AM | 25 | Mr. Velinov.  I understand.  But the evidence you will see |

9:43 AM  1    shows that the Government did not think that.  Not on for over

9:43 AM  2    four years.

9:43 AM  3              And how do we know this?  You'll hear that the

9:43 AM  4    Government has the means to shut down unlawful child

9:43 AM  5    pornography websites, and you'll hear how they do that.  In

9:43 AM  6    this case, the Government used an agent to sign on to this

9:43 AM  7    public website -- none of this stuff is on the dark web.  It's

9:43 AM  8    on a public website on the internet.  They saw all of this

9:43 AM  9    material that you're going to see in October 2015.  They didn't

9:44 AM  10   shut it down then.  They didn't shut it down the rest of 2015.

9:44 AM  11   All of 2016, no.  2017, all of 2017, let it continue.  2018?

9:44 AM  12   Continued, no problem, all the way through the end of 2019.  So

9:44 AM  13   either they didn't really think this was child pornography for

9:44 AM  14   all those years and they just took their time allowing these

9:44 AM  15   children to be abused, or they didn't really think it was child

9:44 AM  16   pornography.  And I submit when you hear the evidence, you will

9:44 AM  17   decide that the Government really did not believe this was

9:44 AM  18   actual child pornography.

9:44 AM  19              This is where your common sense and your

9:44 AM  20   experience brings the real world into the courtroom, to all of

9:44 AM  21   this procedure.  Actions give a much truer intention, as we all

9:45 AM  22   know, a true review of our intentions and motives than what we

9:45 AM  23   say.  The Government -- people, organizations, the Government,

9:45 AM  24   they make all kinds of claims about their motives and

9:45 AM  25   intentions, and their actions here or their inaction for more

9:45AM    1    than four years says a lot more about what they actually

9:45AM    2    thought and what they actually believed.

9:45AM    3              Now, these types of Government investigations

9:45AM    4    going after actual child pornographers, they are a good thing.

9:45AM    5    They protect kids who are really being abused.  But like a lot

9:45AM    6    of things that the Government does, they sometimes take it too

9:45AM    7    far.  They don't know where to stop.  Here they went from

9:45AM    8    investigating and prosecuting unlawful child pornography, real

9:45AM    9    bad stuff, to going after creepy internet pictures -- lawful

9:45AM   10    pictures, creepy to be sure -- but not criminal.  They just

9:46AM   11    went too far here.  They did a lot of good with this

9:46AM   12    investigation.  They prosecuted, as you will hear, some real

9:46AM   13    bad guys who did abuse children, who were actual pedophiles.

9:46AM   14    None of this was known to Mr. Velinov, but you'll hear about

9:46AM   15    these people.  They're over here in the United States.  They

9:46AM   16    put this stuff together, and they were into this material.

9:46AM   17              But Mr. Velinov, you will hear, had no personal

9:46AM   18    interest in this.  He was not one of those.  His home and his

9:46AM   19    work place were searched in Bulgaria thoroughly.  None of this

9:46AM   20    material was found.  He had no personal interest.  The contrast

9:46AM   21    between Mr. Velinov and some of these Americans and others

9:46AM   22    you're going to hear about is night and day.  That's going to

9:46AM   23    become clear.

9:46AM   24              So when you hear all of the confusing facts and

9:46AM   25    the information in the Government's case, it's just important

| | |
|---|---|
| 9:46AM | 1 |
| 9:47AM | 2 |
| 9:47AM | 3 |
| 9:47AM | 4 |
| 9:47AM | 5 |
| 9:47AM | 6 |
| 9:47AM | 7 |

9:46AM  1  to remember that this case really boils down to one thing.

9:47AM  2  What do the pictures actually show?  Do they show sexually

9:47AM  3  explicit conduct?  Do you see minors involved in sex?  No

9:47AM  4  matter how inappropriate or creepy or unpleasant some of this

9:47AM  5  material is, I submit you will find that it's not unlawful

9:47AM  6  child pornography.  No nudity, no explicit sexual conduct, no

9:47AM  7  minors having sex.  That's it.

9:47AM  8       None of us wants to be in a position of

9:47AM  9  defending creepy stuff, especially when it involves kids, and

9:47AM  10  you may think this material should be illegal.  I get that too.

9:47AM  11  But doing the right thing here, even if it takes courage,

9:47AM  12  really means using your experience and your common sense and

9:47AM  13  your reason, and it's the reason we have juries make these

9:47AM  14  decisions, to tell the Government that they have to follow the

9:48AM  15  law like everybody else.  Even the Government -- no matter what

9:48AM  16  they say here today -- either did not believe or had very

9:48AM  17  serious doubts that this material was unlawful, or they would

9:48AM  18  not have let this public website continue as long as they did.

9:48AM  19       Now, this may be the last time you hear from me

9:48AM  20  speaking to you like this because these pictures will be worth

9:48AM  21  a thousand words, and they'll make the decision for you.  It

9:48AM  22  may not even be necessary to respond to the Government's

9:48AM  23  argument at the end of the case.  But we have to be clear on

9:48AM  24  this point, crystal clear.  This is the Government's case to

9:48AM  25  prove.  They brought these charges.  They made these

9:48AM  1    allegations.  They chose to make these allegations.  They

9:48AM  2    didn't have to bring their -- this case even given the lack of

9:48AM  3    evidence to support the charges, and don't feel sorry for them

9:49AM  4    when they come up short.  They brought us all here, and now

9:49AM  5    they have to present you with evidence of such quality and

9:49AM  6    quantity that you should be overwhelmed by it, and they won't

9:49AM  7    be able to do it.

9:49AM  8              Now, please don't take this as cockiness or

9:49AM  9    overconfidence on the defense part.  The evidence itself will

9:49AM 10    present you with the doubts that you need.  The lack of

9:49AM 11    evidence in the case, the conflicts and the inconsistencies in

9:49AM 12    the evidence, they will present you with the doubts.  And at

9:49AM 13    the end, I believe that after you've seen the evidence and

9:49AM 14    heard the testimony, you will confidently do the right thing

9:49AM 15    and the honest thing that's consistent with your oath and find

9:49AM 16    Mr. Velinov not guilty, not guilty of both charges.  Thank you.

9:49AM 17              **THE COURT:**  All right.  Thank you, Mr. Kerr.

9:50AM 18              Is the Government ready with its first witness?

9:50AM 19              **MR. REYNOLDS:**  We are, Your Honor.

9:50AM 20              **THE COURT:**  All right.

9:50AM 21              **MR. REYNOLDS:**  Your Honor, the United States calls

9:50AM 22    Allison Boos.

9:50AM 23              **COURTROOM DEPUTY:**  Please raise your right hand.

9:50AM 24                        (Witness sworn.)

9:50AM 25              **COURTROOM DEPUTY:**  Thank you.  Please state and spell

BOOS - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:50AM | 1 | your name for the record. |
| 9:50AM | 2 | THE WITNESS:  Allison Boos, A-l-l-i-s-o-n, B-o-o-s. |
| 9:50AM | 3 | COURTROOM DEPUTY:  Thank you.  You may take the |
| 9:50AM | 4 | stand. |
| 9:50AM | 5 | THE WITNESS:  Thank you. |
| 9:51AM | 6 | THE COURT:  You're going to be asked some questions |
| 9:51AM | 7 | by the Department of Justice lawyer.  If you don't understand |
| 9:51AM | 8 | the question, please say so, so we can state it a different |
| 9:51AM | 9 | way.  Wait until the question is finished before you begin |
| 9:51AM | 10 | answering so we don't have two people speaking at the same |
| 9:51AM | 11 | time.  If you have the tendency to speak quickly, slow down, |
| 9:51AM | 12 | and if you're soft spoken, please speak up. |
| 9:51AM | 13 | And, jurors, if you can't hear the witness, let |
| 9:51AM | 14 | me know so that I can direct her to speak up.  Okay.  Go ahead. |
| 9:51AM | 15 | ALLISON BOOS, |
| 9:51AM | 16 | a witness called on behalf of the Government, being first duly |
| 9:51AM | 17 | sworn, was examined and testified as follows: |
| 9:51AM | 18 | DIRECT EXAMINATION |
| 9:51AM | 19 | BY MR. REYNOLDS: |
| 9:51AM | 20 | Q.  Good morning, ma'am. |
| 9:51AM | 21 | A.  Good morning. |
| 9:51AM | 22 | Q.  Could you please state and spell your name for the record? |
| 9:51AM | 23 | A.  Allison Boos, A-l-l-i-s-o-n, sorry, Boos, B-o-o-s. |
| 9:51AM | 24 | Q.  Where do you work? |
| 9:51AM | 25 | A.  I work for the FBI, Federal Bureau of Investigation, in |

**BOOS - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 9:51AM | 1 | Sacramento. |
| 9:51AM | 2 | Q.   What is your title with the FBI in Sacramento? |
| 9:51AM | 3 | A.   I am a special agent, and I work cybercrime |
| 9:51AM | 4 | investigations. |
| 9:51AM | 5 | Q.   How long have you been a special agent with the FBI |
| 9:51AM | 6 | working cybercrime investigations? |
| 9:52AM | 7 | A.   About three and a half years. |
| 9:52AM | 8 | Q.   And when you say working cybercrime investigations, what |
| 9:52AM | 9 | type investigations are those? |
| 9:52AM | 10 | A.   Anything with kind of a cyber focus, so account |
| 9:52AM | 11 | intrusions, ransomware, email compromises, things like that. |
| 9:52AM | 12 | Q.   And generally speaking, what are your duties on those |
| 9:52AM | 13 | types of investigations? |
| 9:52AM | 14 | A.   So on those investigations, the FBI is the case agent on |
| 9:52AM | 15 | those, so I direct the investigation, request legal process, |
| 9:52AM | 16 | work with the U.S. Attorney's Office and further the |
| 9:52AM | 17 | investigations. |
| 9:52AM | 18 | Q.   What did you do before you joined the FBI? |
| 9:52AM | 19 | A.   So I was a digital investigative analyst at CEOS, the |
| 9:52AM | 20 | Child Exploitation and Obscenity Section, at the Department of |
| 9:52AM | 21 | Justice. |
| 9:52AM | 22 | Q.   Briefly speaking, what were your duties as a digital |
| 9:52AM | 23 | investigative analyst with the U.S. Department of Justice? |
| 9:52AM | 24 | A.   So I did digital forensics.  I helped with all the digital |
| 9:53AM | 25 | aspects of a case, doing investigation online into websites and |

BOOS - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:53 AM | 1 | things like that. |
| 9:53 AM | 2 | **THE COURT:**  Give us one second.  Sorry for that |
| 9:53 AM | 3 | feedback.  Sorry, just give it your best shot, and we'll try to |
| 9:53 AM | 4 | see if we can fix it during the break, but keep on going. |
| 9:53 AM | 5 | BY MR. REYNOLDS: |
| 9:53 AM | 6 | Q.   Special Agent Boos, back when you were a digital |
| 9:53 AM | 7 | investigative analyst at the U.S. Department of Justice, how |
| 9:53 AM | 8 | much of your work involved criminal investigations? |
| 9:53 AM | 9 | A.   All of it. |
| 9:53 AM | 10 | Q.   How much of your work involved criminal investigations |
| 9:53 AM | 11 | into alleged exploitation of children? |
| 9:53 AM | 12 | A.   All of it. |
| 9:53 AM | 13 | Q.   And how long did you serve as a digital investigative |
| 9:53 AM | 14 | analyst with the U.S. Department of Justice? |
| 9:53 AM | 15 | A.   About four and a half years. |
| 9:53 AM | 16 | Q.   Special Agent Boos, is it fair to say that you have been |
| 9:53 AM | 17 | investigating criminal activity that involves the internet and |
| 9:54 AM | 18 | high technology for approximately eight years now? |
| 9:54 AM | 19 | A.   That's correct. |
| 9:54 AM | 20 | Q.   And do you have any educational background that is |
| 9:54 AM | 21 | relevant to your work as an investigator of internet and high |
| 9:54 AM | 22 | technology crimes? |
| 9:54 AM | 23 | A.   Yes, I have a bachelor of science in computer science from |
| 9:54 AM | 24 | Ithaca College and a master from information technology from |
| 9:54 AM | 25 | Carnegie Mellon University. |

**BOOS - DIRECT EXAMINATION**

9:54AM  1    Q.    Have you received training, either on the job or formally,

9:54AM  2    in the preservation of electronic evidence?

9:54AM  3    A.    Yes.  I received training at school.  That was part of

9:54AM  4    some of the classes I took, was in digital forensics; then on

9:54AM  5    the job at CEOS.  We did a lot of, you know, work trying to

9:54AM  6    keep best practices on that.  And then at FBI, I also am

9:54AM  7    certified to do -- collect digital evidence, which again the

9:54AM  8    practices match what we did at CEOS.

9:54AM  9    Q.    And at the FBI or when you were a digital investigative

9:55AM  10   analyst with CEOS at the Department of Justice, did you

9:55AM  11   participate in the investigation of websites?

9:55AM  12   A.    Yes, I did.

9:55AM  13   Q.    All right.  Special Agent Boos, back when you were a

9:55AM  14   digital investigative analyst with Department of Justice, were

9:55AM  15   you ever asked to assist with an investigation into a group of

9:55AM  16   websites that included the name Newstar?

9:55AM  17   A.    Yeah.

9:55AM  18   Q.    In the course of your investigation, did you access those

9:55AM  19   websites?

9:55AM  20   A.    Yes, I did.

9:55AM  21   Q.    Generally speaking, what were the Newstar websites?

9:55AM  22   A.    So the Newstar websites were a series of websites kind of

9:55AM  23   under some different names, either "Newstar," "Tiny Model," or

9:55AM  24   "Sweet" whatever, and it would be the name of a child, so

9:55AM  25   "Sweet ███████   "Sweet ██████   "Newstar ██████  things like

**BOOS - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 9:55AM | 1 | that.  Each one of these websites would feature a different |
| 9:55AM | 2 | individual and galleries of photos of them in different |
| 9:55AM | 3 | outfits, and those would all be then connected to each other. |
| 9:56AM | 4 | We connected them via links they had to each other as it had on |
| 9:56AM | 5 | each other linking to the other. |
| 9:56AM | 6 | Q.   So was there more than one Newstar website? |
| 9:56AM | 7 | A.   Yes. |
| 9:56AM | 8 | Q.   Do you recall approximately how many they were? |
| 9:56AM | 9 | A.   At time I was looking at them, I recall over a dozen at |
| 9:56AM | 10 | least, but I feel we were always finding new ones. |
| 9:56AM | 11 | Q.   And you referred to some as "Sweet" and "Tiny Model."  Is |
| 9:56AM | 12 | the case that not all of them had the word "Newstar" in the |
| 9:56AM | 13 | title? |
| 9:56AM | 14 | A.   Yes. |
| 9:56AM | 15 | Q.   You also referred to "Newstar ███ or "Sweet ███  In |
| 9:56AM | 16 | those examples, what does the word "███ or "███ refer to? |
| 9:56AM | 17 | A.   That would be the name of the individual in the pictures. |
| 9:56AM | 18 | Q.   When you refer to an individual, how old are you talking |
| 9:56AM | 19 | about? |
| 9:56AM | 20 | A.   Children, I would say approximately between about 8 and 12 |
| 9:56AM | 21 | years old, most common. |
| 9:56AM | 22 | Q.   Were there some older than 12? |
| 9:56AM | 23 | A.   Probably, yes. |
| 9:56AM | 24 | Q.   Some younger than 8? |
| 9:56AM | 25 | A.   Yes. |

BOOS - DIRECT EXAMINATION

9:56AM   1   Q.   And for the websites that were not called Newstar, how --

9:57AM   2   how do you know that they were connected to the Newstar

9:57AM   3   websites?

9:57AM   4   A.   All the websites pretty much had the same format and

9:57AM   5   layout, just like maybe a different colored background and then

9:57AM   6   the different name on them.  They looked very similar to each

9:57AM   7   other and, again, there were links kind of back and forth

9:57AM   8   between each other or pages that had links to a bunch of

9:57AM   9   different ones and grouped them all together.

9:57AM   10  Q.   And Special Agent Boos, when you were accessing these

9:57AM   11  websites, did you view the images on them?

9:57AM   12  A.   Yes, I did.

9:57AM   13  Q.   Would you say that any of them were sexual in nature?

9:57AM   14  A.   Yes.

9:57AM   15  Q.   Why would you say that?

9:57AM   16  A.   There were images of the children posed in what I would

9:57AM   17  call sexually suggestive poses that were not natural for kids

9:57AM   18  to be in with their legs spread wide open and their genitals

9:57AM   19  kind of displayed towards the camera and then wearing clothes

9:57AM   20  that would not be what you would typically think is appropriate

9:57AM   21  for children.  Lacy underwear, bras, high heels, things like

9:57AM   22  that.

9:57AM   23  Q.   And were any of the children ever depicted nude?

9:58AM   24  A.   No.

9:58AM   25  Q.   So when you said their genitals were exposed to the

BOOS - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:58AM | 1 | camera, could you say more about what you mean by that? |
| 9:58AM | 2 | A.   So it would be -- they would be covered genitals, but |
| 9:58AM | 3 | some -- sometimes very tight underwear, lacy underwear, things |
| 9:58AM | 4 | like that. |
| 9:58AM | 5 | Q.   All right.  Special Agent Boos, was every single image on |
| 9:58AM | 6 | the Newstar website sexual in nature? |
| 9:58AM | 7 | A.   No. |
| 9:58AM | 8 | Q.   Were there some that were not sexual at all? |
| 9:58AM | 9 | A.   Yes. |
| 9:58AM | 10 | Q.   That having been said, would you say that there were a |
| 9:58AM | 11 | large number of images on these websites that were sexual in |
| 9:58AM | 12 | nature? |
| 9:58AM | 13 | A.   Yes, I would say. |
| 9:58AM | 14 | Q.   And when a user -- at least at the time that you accessed |
| 9:58AM | 15 | them, when a user connected to one of these websites, is there |
| 9:58AM | 16 | any portion of the website they could see without paying any |
| 9:58AM | 17 | money? |
| 9:58AM | 18 | A.   Yes, there was a free section. |
| 9:58AM | 19 | Q.   Was there also a section of the Newstar websites that a |
| 9:58AM | 20 | user would have to pay to see? |
| 9:58AM | 21 | A.   Yes, then there would be like a Members Only section where |
| 9:59AM | 22 | you had to pay in order to access more of the galleries of the |
| 9:59AM | 23 | same individual. |
| 9:59AM | 24 | MR. REYNOLDS:  Your Honor, may I move the television |
| 9:59AM | 25 | closer to the jury? |

**BOOS - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 9:59AM | 1 | THE COURT:  You may do so. |
| 9:59AM | 2 | MR. REYNOLDS:  Thank you. |
| 9:59AM | 3 | BY MR. REYNOLDS: |
| 9:59AM | 4 | Q.   Special Agent Boos, I'd like to -- Special Agent Boos, I'd |
| 9:59AM | 5 | like to take you back to approximately September of 2015.  Did |
| 9:59AM | 6 | you perform any work on the Newstar investigation in that time? |
| 9:59AM | 7 | A.   Yes, I did. |
| 9:59AM | 8 | Q.   What did you do? |
| 9:59AM | 9 | A.   So we were examining the sites.  I was looking through the |
| 9:59AM | 10 | sites trying to kind of find all the ones that we had, looking |
| 9:59AM | 11 | through the images, and then we wanted to access the Members |
| 9:59AM | 12 | Only section, so I did some undercover buys, some purchases on |
| 10:00AM | 13 | those sites in order to access the Members Only sections. |
| 10:00AM | 14 | Q.   Was this in the context of a criminal investigation? |
| 10:00AM | 15 | A.   Yes. |
| 10:00AM | 16 | Q.   Was all your work done in furtherance of a criminal |
| 10:00AM | 17 | investigation? |
| 10:00AM | 18 | A.   Yes. |
| 10:00AM | 19 | Q.   You used the term "undercover."  Can you describe what |
| 10:00AM | 20 | that means in investigating internet crime? |
| 10:00AM | 21 | A.   Yes.  So when a person accesses the sites, I obviously |
| 10:00AM | 22 | didn't want to use a credit card in my name, so we had an |
| 10:00AM | 23 | undercover credit card in a name that was, you know, not my |
| 10:00AM | 24 | own, and then I used that in order to purchase access to the |
| 10:00AM | 25 | sites. |

**BOOS - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 10:00AM | 1 | Q.   Do you recall which Newstar sites you purchased access to? |
| 10:00AM | 2 | A.   Yes.  I believe it was Sweet ████ Sweet ██████ Tiny |
| 10:00AM | 3 | Model ████ and Newstar ████ if I recall. |
| 10:00AM | 4 | Q.   And you said you paid with a credit card; is that correct? |
| 10:00AM | 5 | A.   Yes, that's correct. |
| 10:00AM | 6 | Q.   At some point when you were going through the process, |
| 10:01AM | 7 | were you prompted to enter a credit card number? |
| 10:01AM | 8 | A.   Yes. |
| 10:01AM | 9 | Q.   And what happened when you were on the site and you were |
| 10:01AM | 10 | prompted to enter a credit card number? |
| 10:01AM | 11 | A.   So I entered the credit card number and the name that |
| 10:01AM | 12 | matched the credit card, and then I made the purchase, and I |
| 10:01AM | 13 | was presented with a receipt and a link to then the Members |
| 10:01AM | 14 | Only section. |
| 10:01AM | 15 | Q.   All right.  Special Agent Boos, you testified that it |
| 10:01AM | 16 | wasn't your name on the credit card.  Whose name was on it? |
| 10:01AM | 17 | A.   The name was James Fossett. |
| 10:01AM | 18 | Q.   Is that F-O-S-S-E-T-T? |
| 10:01AM | 19 | A.   Correct. |
| 10:01AM | 20 | Q.   And is James Fossett a real person? |
| 10:01AM | 21 | A.   No. |
| 10:01AM | 22 | Q.   When you were purchasing access to the Members Only |
| 10:01AM | 23 | sections of these websites that you mentioned, did you have to |
| 10:01AM | 24 | enter your name or any other identifying information? |
| 10:01AM | 25 | A.   Yes.  I entered a name that matched the credit card, James |

**BOOS - DIRECT EXAMINATION**

10:01AM  1    Fossett.

10:01AM  2    Q.   And Special Agent Boos, I believe you testified that you

10:01AM  3    received a receipt; is that correct?

10:01AM  4    A.   Yes, that's correct.

10:01AM  5    Q.   And what sort of receipt did you receive?

10:01AM  6    A.   So after I submitted the payment, I kind of -- I went

10:02AM  7    almost immediately to a confirmation page, you know, receipt of

10:02AM  8    payment to show that I had made that purchase and a link then

10:02AM  9    to the site.

10:02AM  10           MR. REYNOLDS:  Your Honor, may I approach the witness

10:02AM  11   to hand her some exhibits?

10:02AM  12           THE COURT:  You may.

10:02AM  13           MR. REYNOLDS:  Thank you.

10:02AM  14   BY MR. REYNOLDS:

10:02AM  15   Q.   Special Agent Boos, can I direct your attention to

10:02AM  16   Government Exhibit 102?  Have you seen this exhibit before?

10:02AM  17   A.   Yes, I have.

10:02AM  18   Q.   What is it?

10:02AM  19   A.   So this is a printout of the receipt for one of the

10:02AM  20   purchases that I made.  This one looks like specifically for

10:02AM  21   Sweet ███████

10:02AM  22   Q.   And how soon after you made the purchase did you receive

10:02AM  23   this receipt?

10:02AM  24   A.   Almost immediately.

10:02AM  25   Q.   Was there enough time for a human being to compile this

**BOOS - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 10:02AM | 1 | information and send it to you? |
| 10:02AM | 2 | A.   No, it appeared to be automated. |
| 10:02AM | 3 | Q.   Special Agent Boos, is Government Exhibit 102 a true and |
| 10:02AM | 4 | correct copy of the receipt you received upon purchasing a |
| 10:03AM | 5 | membership to the Sweet ▮▮▮ website? |
| 10:03AM | 6 | A.   Yes, it is. |
| 10:03AM | 7 | MR. REYNOLDS:  Your Honor, at this time we offer |
| 10:03AM | 8 | Government Exhibit 102 into evidence. |
| 10:03AM | 9 | THE COURT:  All right.  Government Exhibit 102 is |
| 10:03AM | 10 | received into evidence, may be published to the jury. |
| 10:03AM | 11 | MR. REYNOLDS:  Thank you.  Ms. Davis, may we publish |
| 10:03AM | 12 | Government Exhibit 102, please? |
| 10:03AM | 13 | BY MR. REYNOLDS: |
| 10:03AM | 14 | Q.   Special Agent Boos, at the top of this -- at the top of |
| 10:03AM | 15 | this Government Exhibit 102, do you see the words "CyberPay |
| 10:03AM | 16 | Receipt Page"? |
| 10:03AM | 17 | A.   Yes. |
| 10:03AM | 18 | Q.   And do you recall what CyberPay is? |
| 10:03AM | 19 | A.   I think it was the website kind of or the company through |
| 10:03AM | 20 | which the payments were made. |
| 10:03AM | 21 | Q.   And when you say the payments were made, do you mean the |
| 10:03AM | 22 | website on which you entered your credit card information? |
| 10:03AM | 23 | A.   Yes. |
| 10:03AM | 24 | Q.   Now, Government Exhibit 102 has a date that reads |
| 10:03AM | 25 | September 21, 2015; is that -- is that the date on which you |

BOOS - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:04AM | 1 | made your purchase? |
| 10:04AM | 2 | A.   Yes, the date's accurate. |
| 10:04AM | 3 | Q.   And is -- do you see the name "James Fossett" on |
| 10:04AM | 4 | Government Exhibit 102? |
| 10:04AM | 5 | A.   Yes, that's the name that I entered. |
| 10:04AM | 6 | Q.   It is the name that you entered.  And then at the bottom |
| 10:04AM | 7 | of Government Exhibit 102, Special Agent Boos, do you see an |
| 10:04AM | 8 | email address that says customersupport@cyber-pay.net? |
| 10:04AM | 9 | A.   Yes. |
| 10:04AM | 10 | Q.   Did you ever email that email? |
| 10:04AM | 11 | A.   No, I did not. |
| 10:04AM | 12 | Q.   Thank you.  Special Agent Boos, could you also look at |
| 10:04AM | 13 | Government Exhibit 103, 104, and 105? |
| 10:04AM | 14 | A.   All right. |
| 10:04AM | 15 | Q.   Have you seen these exhibits before? |
| 10:04AM | 16 | A.   Yes. |
| 10:04AM | 17 | Q.   What are they? |
| 10:04AM | 18 | A.   These are the receipts for three other purchases made for |
| 10:04AM | 19 | Sweet ▮▮▮▮▮▮ for Tiny Model ▮▮▮▮▮ and Newstar ▮▮▮▮▮ |
| 10:05AM | 20 | Q.   Did you receive these receipts in the same manner that you |
| 10:05AM | 21 | received Government Exhibit 102? |
| 10:05AM | 22 | A.   Yes, it was the same process. |
| 10:05AM | 23 | Q.   And as you testified with Government Exhibit 102, did |
| 10:05AM | 24 | Government Exhibits 103, 104, and 105 all appear to be |
| 10:05AM | 25 | electronically generated? |

**BOOS - DIRECT EXAMINATION**

10:05AM 1    A.    Yes.

10:05AM 2    Q.    Are Government Exhibits 103 through 105 true and correct

10:05AM 3    copies of receipts you received upon purchasing memberships to

10:05AM 4    these websites?

10:05AM 5    A.    Yes, they are.

10:05AM 6            MR. REYNOLDS:  Your Honor, we offer Government

10:05AM 7    Exhibits 103, 104, and 105 into evidence.

10:05AM 8            MR. KERR:  No objection.

10:05AM 9            THE COURT:  All right.  103, 104, 105 are received

10:05AM 10   into evidence, may be published to the jury.

10:05AM 11   BY MR. REYNOLDS:

10:05AM 12   Q.    Special Agent Boos, did all of your undercover purchases

10:05AM 13   take place over the course of September 21st and 22nd, 2015?

10:05AM 14   A.    Yes.

10:05AM 15   Q.    And when you purchased this -- when you purchased these

10:05AM 16   memberships, did you do anything to preserve the evidence that

10:05AM 17   you viewed on the screen?

10:05AM 18   A.    Yes, I captured the contents of the website in order to

10:05AM 19   preserve that.

10:06AM 20   Q.    Could you take a look at Government Exhibit 100, please?

10:06AM 21   A.    Yes.

10:06AM 22   Q.    What is Government Exhibit 100?

10:06AM 23   A.    So it is a thumb drive that contains the captures of the

10:06AM 24   websites that I made on -- in September 2015.

10:06AM 25   Q.    How do you know that that thumb drive contains that

**BOOS - DIRECT EXAMINATION**

10:06AM  1  material?

10:06AM  2  A.   Because I reviewed it the other day.

10:06AM  3  Q.   Is there anything that distinguishes this thumb drive from

10:06AM  4  any other?

10:06AM  5  A.   Yes, it is a tag with my signature and the date that I

10:06AM  6  reviewed it.

10:06AM  7  Q.   When you were capturing the material that you viewed on

10:06AM  8  the Newstar websites, did you individually screenshot or

10:06AM  9  individually download these images?

10:06AM  10  A.   No.  There were thousands of pages, so I used a tool

10:06AM  11  called Teleport Pro.

10:06AM  12  Q.   And what is Teleport Pro?

10:06AM  13  A.   So it was a tool that we used a lot to capture websites.

10:06AM  14  At the time worked really good on kind of old school style

10:06AM  15  websites that were very simple.  You would give it a URL or a

10:06AM  16  domain, like Amazon.com, and you would enter that in, and then

10:07AM  17  the tool would kind of click on all the links to try to

10:07AM  18  navigate to all the pages within that website and download each

10:07AM  19  of those and all the content associated with it, all the

10:07AM  20  pictures, all the files, things like.

10:07AM  21  Q.   Have you used Teleport Pro multiple times?

10:07AM  22  A.   Yes.

10:07AM  23  Q.   And using Teleport Pro, have you found it to be reliable?

10:07AM  24  A.   Yes, I have.

10:07AM  25  Q.   When you used Teleport Pro to capture this material from

BOOS - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:07AM | 1 | the Newstar websites, did you do anything to make sure what you |
| 10:07AM | 2 | were capturing matched what you were seeing on the screen? |
| 10:07AM | 3 | A.    Yeah.  So I review the selection of the files, kind of |
| 10:07AM | 4 | navigate through it to make sure that what it was capturing |
| 10:07AM | 5 | looked the same as what I was seeing on the website, the live |
| 10:07AM | 6 | website. |
| 10:07AM | 7 | Q.    Special Agent Boos, does Government Exhibit 100 contain |
| 10:07AM | 8 | true and correct copies of the images and the web pages you |
| 10:07AM | 9 | captured from the four websites you mentioned? |
| 10:07AM | 10 | A.    Yes, it does. |
| 10:07AM | 11 | MR. REYNOLDS:  Your Honor, we offer Government |
| 10:07AM | 12 | Exhibit 100 into evidence. |
| 10:07AM | 13 | THE COURT:  100? |
| 10:07AM | 14 | MR. KERR:  No objection. |
| 10:07AM | 15 | THE COURT:  All right.  It's received into evidence, |
| 10:08AM | 16 | may be published to the jury. |
| 10:08AM | 17 | BY MR. REYNOLDS: |
| 10:08AM | 18 | Q.    Special Agent Boos, could you please take a look at |
| 10:08AM | 19 | Government Exhibit 101?  Have you seen this exhibit before? |
| 10:08AM | 20 | A.    Yes. |
| 10:08AM | 21 | Q.    How many pages is it? |
| 10:08AM | 22 | A.    11 pages. |
| 10:08AM | 23 | Q.    What is it? |
| 10:08AM | 24 | A.    So this is a selection of images that were found on those |
| 10:08AM | 25 | four different Newstar websites that we -- that I captured. |

BOOS - DIRECT EXAMINATION

10:08AM 1   Q.   Does Government Exhibit 101 contain true and correct

10:08AM 2   copies of images that you captured in the course of your

10:08AM 3   undercover sessions on the Newstar websites?

10:08AM 4   A.   Yes, it does.

10:08AM 5   Q.   Special Agent Boos, for the first four pages of Government

10:08AM 6   Exhibit 101, can I ask you to describe each image for the jury,

10:08AM 7   paying particular attention to the child's clothing, pose, and

10:08AM 8   the age that you view the child to be?

10:08AM 9   A.   Yes.  So the first one is a child, a female, I would say

10:08AM 10  around eight years old.  She is wearing a red T-shirt that is

10:09AM 11  cropped and a pair of white lace underwear and a red skirt

10:09AM 12  maybe that is pulled up right on her hips so you can see her

10:09AM 13  underwear underneath.  She is laying kind of on her back side

10:09AM 14  with her legs splayed open.

10:09AM 15  Q.   If you could do the first four pages, please.

10:09AM 16  A.   All right.  And then the next one, there's the same child,

10:09AM 17  about eight years old.  She is wearing the same outfit, the

10:09AM 18  cropped top and the underwear and the skirt pulled up to her

10:09AM 19  hips.  She is again lying on her back in a slightly different

10:09AM 20  position, but again with her legs spread open.

10:09AM 21       The next one is a different minor.  This one has

10:09AM 22  Sweet ████ in the corner.  The other one had Sweet ████████

10:10AM 23  So the Sweet ████ image is a blonde female, maybe like nine

10:10AM 24  years old.  She is wearing a pink tank top and a pair of

10:10AM 25  flowery underwear.  She is, again, laying on her back with her

BOOS - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:10AM | 1 | legs spread open, and she is wearing what appear to be high |
| 10:10AM | 2 | healed platform stiletto shoes. |
| 10:10AM | 3 | Q.   That's fine.  Special Agent Boos, every other page of |
| 10:10AM | 4 | Government Exhibit 101 beyond those that you've already |
| 10:10AM | 5 | testified to, are they similar in nature to the three pages |
| 10:10AM | 6 | you've testified about? |
| 10:10AM | 7 | A.   Yes. |
| 10:10AM | 8 | Q.   Special Agent Boos, looking at the images that are |
| 10:10AM | 9 | contained in Government Exhibit 101, do they look like |
| 10:10AM | 10 | something you would see in a children's underwear catalog? |
| 10:10AM | 11 | A.   No. |
| 10:10AM | 12 | Q.   Do they look like something you might see on TV during a |
| 10:11AM | 13 | children's beauty pageant? |
| 10:11AM | 14 | A.   No. |
| 10:11AM | 15 | Q.   Why do you say that? |
| 10:11AM | 16 | A.   Just the way that they're laying, again, is very sexually |
| 10:11AM | 17 | suggestive and awkward.  It doesn't appear natural, what a |
| 10:11AM | 18 | child would be doing.  It looked awkward. |
| 10:11AM | 19 | MR. REYNOLDS:  Your Honor, at this time we move |
| 10:11AM | 20 | Government Exhibit 101 into evidence. |
| 10:11AM | 21 | THE COURT:  10 -- I'm sorry. |
| 10:11AM | 22 | MR. KERR:  No objection. |
| 10:11AM | 23 | THE COURT:  101 is received into evidence, may be |
| 10:11AM | 24 | published to the jury. |
| 10:11AM | 25 | MR. REYNOLDS:  Your Honor, may we publish each page |

**BOOS - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 10:11AM | 1 | of Government's Exhibit 101, holding it on the screen for |
| 10:11AM | 2 | approximately two seconds only? |
| 10:11AM | 3 | **THE COURT:**  That would be fine. |
| 10:11AM | 4 | **MR. REYNOLDS:**  Thank you. |
| 10:11AM | 5 | (Displaying Government Exhibit 101.) |
| 10:12AM | 6 | **MR. REYNOLDS:**  Thank you. |
| 10:12AM | 7 | BY MR. REYNOLDS: |
| 10:12AM | 8 | Q.   Special Agent Boos, the content contained within |
| 10:12AM | 9 | Government Exhibit 101, are these the only images you |
| 10:12AM | 10 | downloaded from these websites? |
| 10:12AM | 11 | A.   No, they were not. |
| 10:12AM | 12 | Q.   Are these the only sexually explicit images -- or sexually |
| 10:12AM | 13 | provocative images you downloaded? |
| 10:12AM | 14 | A.   No, they were not. |
| 10:12AM | 15 | Q.   Were there more? |
| 10:12AM | 16 | A.   Yes, a lot more. |
| 10:12AM | 17 | Q.   Special Agent Boos, I'd like to ask you a series of |
| 10:12AM | 18 | questions.  2015 was a long time ago; wasn't it? |
| 10:12AM | 19 | A.   Yes. |
| 10:12AM | 20 | Q.   And at the time that you conducted these undercover |
| 10:12AM | 21 | sessions in 2015, did you determine where these websites were |
| 10:12AM | 22 | located? |
| 10:12AM | 23 | A.   No.  We did not know where they were located. |
| 10:12AM | 24 | Q.   Did you determine who was behind these websites? |
| 10:12AM | 25 | A.   No, we did not know who was behind them at the time. |

BOOS - DIRECT EXAMINATION

10:12AM 1   Q.   Special Agent Boos, at the time that you were a digital

10:12AM 2   investigative analyst with the U.S. Department of Justice, did

10:12AM 3   you have the authority to go to other countries and seize and

10:12AM 4   take down websites?

10:12AM 5   A.   No, I couldn't just do that.

10:12AM 6   Q.   Special Agent Boos, now that you are a special agent with

10:13AM 7   the Federal Bureau of Investigation, do you currently have the

10:13AM 8   authority to go to other countries and seize and take down

10:13AM 9   websites?

10:13AM 10  A.   No, we can't do that.  It's a long process coordinating

10:13AM 11  with other countries in order to do things like that.

10:13AM 12  Q.   Have you participated in international investigations

10:13AM 13  before?

10:13AM 14  A.   Yes.

10:13AM 15  Q.   Have you participated in investigations where evidence is

10:13AM 16  located in foreign countries?

10:13AM 17  A.   Yes.

10:13AM 18  Q.   Have you participated in investigations involving

10:13AM 19  websites?

10:13AM 20  A.   Yes.

10:13AM 21  Q.   And generally speaking, would you say that those are

10:13AM 22  simple investigations that move quickly?

10:13AM 23  A.   No, they are complex investigations that take a long time

10:13AM 24  and a lot of work.

10:13AM 25  Q.   Special Agent Boos, upon conducting these undercover

**BOOS - DIRECT EXAMINATION**

| | |
|---|---|
| 10:13AM | 1 |
| 10:13AM | 2 |
| 10:13AM | 3 |
| 10:13AM | 4 |
| 10:13AM | 5 |
| 10:13AM | 6 |
| 10:13AM | 7 |
| 10:13AM | 8 |
| 10:13AM | 9 |
| 10:13AM | 10 |
| 10:13AM | 11 |
| 10:13AM | 12 |
| 10:13AM | 13 |
| 10:14AM | 14 |
| 10:14AM | 15 |
| 10:14AM | 16 |
| 10:14AM | 17 |
| 10:14AM | 18 |
| 10:14AM | 19 |
| 10:14AM | 20 |
| 10:14AM | 21 |
| 10:14AM | 22 |
| 10:14AM | 23 |
| 10:14AM | 24 |
| 10:14AM | 25 |

1  sessions in 2015, did you make a decision to leave these

2  websites up for four more years?

3  A.   No.

4  Q.   Did anyone you worked with make a decision to leave these

5  websites up for four more years?

6  A.   No.

7  Q.   Did any person at the DOJ make such a decision?

8  A.   No.

9  Q.   FBI?

10  A.   No.

11  Q.   Department of Homeland Security?

12  A.   No.

13  Q.   How long would you say that you spent on these websites

14  when you were conducting these undercover sessions?

15  A.   Probably dozens of hours over months.

16  Q.   Over months?  Once you access one of the websites,

17  approximately how long did it take you before you encountered

18  an image that is similar to the ones that are depicted in

19  Government Exhibit 101?

20  A.   Within minutes, if not immediately.

21  Q.   Do you think that it's possible for someone to spend a day

22  on the websites without encountering any such images?

23  A.   No, I do not believe it's possible.

24        MR. REYNOLDS:  Your Honor, we'll pass the witness.

25        THE COURT:  Thank you.  Any cross-examination of this

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:14AM | 1 | witness? |
| 10:14AM | 2 | MR. KERR:  Yes, Your Honor. |
| 10:14AM | 3 | THE COURT:  You may proceed. |
| 10:14AM | 4 | CROSS-EXAMINATION |
| 10:14AM | 5 | BY MR. KERR: |
| 10:15AM | 6 | Q.   Good morning, Special Agent Boos. |
| 10:15AM | 7 | A.   Good morning. |
| 10:15AM | 8 | Q.   Boos, right? |
| 10:15AM | 9 | A.   Sure. |
| 10:15AM | 10 | Q.   Now, you testified that you did the undercover work on |
| 10:16AM | 11 | this website back in 2015? |
| 10:16AM | 12 | A.   Yes. |
| 10:16AM | 13 | Q.   Now, when you signed on to the website, did you receive a |
| 10:16AM | 14 | warning? |
| 10:16AM | 15 | A.   It's possible, yes. |
| 10:16AM | 16 | Q.   Okay.  If I showed you the warning, might you recognize |
| 10:16AM | 17 | it? |
| 10:16AM | 18 | A.   Sure. |
| 10:16AM | 19 | MR. KERR:  May I approach the witness, Your Honor? |
| 10:16AM | 20 | THE COURT:  You may do so. |
| 10:16AM | 21 | BY MR. KERR: |
| 10:16AM | 22 | Q.   I'm showing you what's been marked for identification as |
| 10:16AM | 23 | Defense Exhibit 1. |
| 10:16AM | 24 | MR. KERR:  Your Honor, I have a copy for the Court, |
| 10:16AM | 25 | if you'd like one now. |

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:16AM | 1 | **THE COURT:** Yes, that would be fine. Thank you, if |
| 10:16AM | 2 | you have an extra copy. |
| 10:16AM | 3 | **MR. KERR:** Yes. I have one for the courtroom deputy. |
| 10:17AM | 4 | BY MR. KERR: |
| 10:17AM | 5 | Q. Do you recognize that? |
| 10:17AM | 6 | A. It's possible they were up. I know these were on the |
| 10:17AM | 7 | sites later. I don't recall if they were on the time that I |
| 10:17AM | 8 | captured them. |
| 10:17AM | 9 | Q. Okay. And what does that -- you did see that -- |
| 10:17AM | 10 | A. Yes, I've seen this before, yes. |
| 10:17AM | 11 | Q. And what exactly does it say? Let me ask you, does it |
| 10:17AM | 12 | warn would-be subscribers about the content? |
| 10:17AM | 13 | A. It says -- would you like me to read it specifically? It |
| 10:17AM | 14 | says that it contains non-nude child modeling. |
| 10:17AM | 15 | Q. Does it say, "If you are offended by non-nude child |
| 10:18AM | 16 | modeling, leave"? |
| 10:18AM | 17 | A. Yes, that's what it specifically says. |
| 10:18AM | 18 | Q. And then it also tells a would-be subscriber that it |
| 10:18AM | 19 | claims -- obviously it's a claim -- |
| 10:18AM | 20 | A. Exactly. |
| 10:18AM | 21 | Q. -- that they are "100 percent legal non-nude website that |
| 10:18AM | 22 | has no nudity, sexual or erotic photos, no lewd photography or |
| 10:18AM | 23 | photos designed to arouse anyone. We're not designed for |
| 10:18AM | 24 | pedophiles. So we're solely to introduce young models to the |
| 10:18AM | 25 | world." |

BOOS - CROSS-EXAMINATION

10:18AM   1   A.   That is what it says.

10:18AM   2   Q.   And then on the second page, it has a legal disclaimer

10:18AM   3   about compliance with U.S. law.

10:18AM   4   A.   Yes.

10:18AM   5   Q.   So before someone signs up for the website, they're warned

10:18AM   6   that it's non-nude, no sexual content?

10:18AM   7   A.   That's what they're told, yes.

10:18AM   8   Q.   Okay.  Before they sign up.  So that would tend to

10:19AM   9   discourage some subscribers; wouldn't you think?

10:19AM   10  A.   I couldn't say.

10:19AM   11  Q.   Pardon me?

10:19AM   12  A.   I couldn't say.

10:19AM   13  Q.   Okay.  And also I was provided with some material, some

10:19AM   14  reports that I would like to show you and see if you can

10:19AM   15  identify them.

10:19AM   16        MR. KERR:  May I approach?

10:19AM   17        THE COURT:  Yes, you may.

10:19AM   18  BY MR. KERR:

10:19AM   19  Q.   Do you recognize that?

10:19AM   20  A.   Yes, this would be a series of status reports that I wrote

10:19AM   21  while I was at CEOS as a digital investigative analyst.

10:19AM   22  Q.   Okay.  So these are reports that you wrote after you did

10:20AM   23  the undercover purchase?

10:20AM   24  A.   Yes.  These are status reports, just, you know, where the

10:20AM   25  status of the investigation was; not reports on things.

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:20AM | 1 | **Q.**   And I see there's only a date on the first page there. |
| 10:20AM | 2 | What does that indicate? |
| 10:20AM | 3 | **A.**   The first page is July 13th, 2017. |
| 10:20AM | 4 | **Q.**   And what does that indicate? |
| 10:20AM | 5 | **A.**   That this particular report at least was written on -- or |
| 10:20AM | 6 | submitted on July 13th, 2017. |
| 10:20AM | 7 | **Q.**   So are these reports in date order that you wrote? |
| 10:20AM | 8 | **A.**   I do not know how this was turned over, but most likely. |
| 10:20AM | 9 | **Q.**   Okay.  So they -- that's when these reports, these status |
| 10:20AM | 10 | reports started, in July of 2017? |
| 10:20AM | 11 | **A.**   Yes, that's likely. |
| 10:20AM | 12 | **Q.**   And just so you know, I've omitted the pages that were |
| 10:20AM | 13 | blacked out entirely because there were a number of pages that |
| 10:20AM | 14 | were completely blacked out, so just the pages with writing on |
| 10:21AM | 15 | them. |
| 10:21AM | 16 | **A.**   Yes, focusing on the Newstar investigation. |
| 10:21AM | 17 | **Q.**   So do you recognize those as your status reports? |
| 10:21AM | 18 | **A.**   Yes. |
| 10:21AM | 19 | **Q.**   And are they true and correct to the best of your |
| 10:21AM | 20 | knowledge? |
| 10:21AM | 21 | **A.**   As far as I remember, yes. |
| 10:21AM | 22 | **Q.**   Okay.  And I'd like to ask you, they -- and I understand |
| 10:21AM | 23 | how Government works, and a lot of them have the same language. |
| 10:21AM | 24 | So would these be the preambles to your status reports that |
| 10:21AM | 25 | have the basic background of the investigation? |

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:21AM | 1 | A.   Yes, I would kind of keep the same description and status |
| 10:21AM | 2 | and leave that the same if nothing had changed. |
| 10:21AM | 3 | Q.   Okay.  And it seems like every one of them, and there may |
| 10:21AM | 4 | be -- there's 45 pages here of status reports.  How frequently |
| 10:21AM | 5 | did you do these status reports? |
| 10:21AM | 6 | A.   I do not recall. |
| 10:21AM | 7 | Q.   But there's 45 pages of -- |
| 10:22AM | 8 | A.   Yes, I would have -- I left in March of 2019.  So -- |
| 10:22AM | 9 | Q.   Okay.  But there are a lot of status reports? |
| 10:22AM | 10 | A.   Yes. |
| 10:22AM | 11 | Q.   And they all seem to read the same -- correct me if I'm |
| 10:22AM | 12 | wrong -- targets Ken Powers, Mark Bjorkman, Keith Baggs |
| 10:22AM | 13 | (phonetic), Patrice Wilowski, Power Trading are running and |
| 10:22AM | 14 | facilitating commercial child erotica websites? |
| 10:22AM | 15 | A.   Yes, that is what we were describing them at the time. |
| 10:22AM | 16 | Q.   Okay.  At least two of the website administrators have |
| 10:22AM | 17 | prior convictions for sexual abuse of minors, right? |
| 10:22AM | 18 | A.   Yes, looks like we knew that. |
| 10:22AM | 19 | Q.   And who were those? |
| 10:22AM | 20 | A.   I -- I don't recall. |
| 10:22AM | 21 | Q.   But they weren't -- one of them wasn't Mr. Velinov? |
| 10:22AM | 22 | A.   No. |
| 10:22AM | 23 | Q.   In fact, he's not mentioned here? |
| 10:22AM | 24 | A.   We were not aware of him at the time. |
| 10:22AM | 25 | Q.   And it says that -- HTIU.  What does that stand for? |

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:23AM | 1 | **A.**   So the high technology investigative unit.  That's the |
| 10:23AM | 2 | sub-unit within CEOS where the digital investigative analysts |
| 10:23AM | 3 | work, the forensics unit. |
| 10:23AM | 4 | **Q.**   Okay.  "Has purchased access to the websites and retained |
| 10:23AM | 5 | the content, and the images depict clothed minors, some clearly |
| 10:23AM | 6 | pre-pubescent, and many are posed in a sexually suggestive |
| 10:23AM | 7 | manner"? |
| 10:23AM | 8 | **A.**   Yes. |
| 10:23AM | 9 | **Q.**   It doesn't say sexually explicit manner, sexually explicit |
| 10:23AM | 10 | conduct? |
| 10:23AM | 11 | **MR. REYNOLDS:**  Objection, Your Honor.  Calls for a |
| 10:23AM | 12 | legal conclusion. |
| 10:23AM | 13 | **MR. KERR:**  It doesn't say that. |
| 10:23AM | 14 | **THE COURT:**  I'll let you rephrase it. |
| 10:23AM | 15 | BY MR. KERR: |
| 10:23AM | 16 | **Q.**   Okay.  Would you please read the last sentence from |
| 10:23AM | 17 | every -- you know, the first paragraph of every status report |
| 10:23AM | 18 | of the 45 status reports? |
| 10:23AM | 19 | **A.**   Sure.  "The images depict clothed minors, some clearly |
| 10:23AM | 20 | pre-pubescent, and many are posed in a sexually suggestive |
| 10:24AM | 21 | manner." |
| 10:24AM | 22 | **Q.**   Sexually suggestive manner.  And child erotica, you know, |
| 10:24AM | 23 | you say commercial child erotica websites, those are lawful, |
| 10:24AM | 24 | right? |
| 10:24AM | 25 | **MR. REYNOLDS:**  Objection, Your Honor.  Calls for a |

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:24AM | 1 | legal conclusion. |
| 10:24AM | 2 | THE COURT:  What's your response to that, Mr. Kerr? |
| 10:24AM | 3 | MR. KERR:  I've reviewed many cases last night here |
| 10:24AM | 4 | in the Eleventh Circuit where child erotica was used as -- as a |
| 10:24AM | 5 | distinguishing legal -- |
| 10:24AM | 6 | THE COURT:  Right, but he's objected to it based on |
| 10:24AM | 7 | it's calling for a legal conclusion on the part of the witness. |
| 10:24AM | 8 | And so I'm just wondering what your response to that is, |
| 10:24AM | 9 | whether -- is that an appropriate question is what I'm trying |
| 10:24AM | 10 | to get at. |
| 10:24AM | 11 | MR. KERR:  Okay.  Just that -- this is what she |
| 10:24AM | 12 | wrote.  Whether it's accurate or not, she's -- you're not an |
| 10:24AM | 13 | attorney; are you? |
| 10:24AM | 14 | THE WITNESS:  I'm not an attorney. |
| 10:24AM | 15 | THE COURT:  Hold on a second.  Why don't you rephrase |
| 10:24AM | 16 | the question, Mr. Kerr?  All right? |
| 10:24AM | 17 | MR. KERR:  Okay. |
| 10:24AM | 18 | BY MR. KERR: |
| 10:24AM | 19 | Q.  Can you read -- just read the first sentence of that first |
| 10:25AM | 20 | paragraph that's repeated in these 45 pages? |
| 10:25AM | 21 | A.  Yes.  "Targets Ken Powers, Mark Bjorkman, Keith Baggs, |
| 10:25AM | 22 | Patrice Wilowski, Power Trading are running and facilitating |
| 10:25AM | 23 | commercial child websites." |
| 10:25AM | 24 | Q.  Thank you.  And these are accurate copies of reports that |
| 10:25AM | 25 | you wrote? |

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:25AM | 1 | A.   Yes.  Status reports. |
| 10:25AM | 2 | MR. KERR:  Okay.  And then I would like to move for |
| 10:25AM | 3 | admission of this exhibit. |
| 10:25AM | 4 | MR. REYNOLDS:  Objection, Your Honor.  This is Jencks |
| 10:25AM | 5 | material.  This is not substantive evidence. |
| 10:25AM | 6 | THE COURT:  I'm not going to receive it into |
| 10:25AM | 7 | evidence. |
| 10:25AM | 8 | MR. KERR:  Okay. |
| 10:25AM | 9 | THE COURT:  During the break time -- we're about |
| 10:25AM | 10 | ready to take a break at 10:30 -- I'm happy to hear additional |
| 10:25AM | 11 | argument at that time, but I'm going to deny its receipt at |
| 10:25AM | 12 | this moment. |
| 10:25AM | 13 | MR. KERR:  Okay.  Thank you. |
| 10:25AM | 14 | BY MR. KERR: |
| 10:25AM | 15 | Q.   And you said that -- you testified that you did not see |
| 10:25AM | 16 | any nudity on the websites? |
| 10:25AM | 17 | A.   I did not. |
| 10:25AM | 18 | Q.   And you didn't see any minors having sex? |
| 10:26AM | 19 | A.   No, I did not. |
| 10:26AM | 20 | MR. KERR:  Thank you.  No further questions. |
| 10:26AM | 21 | THE COURT:  Thank you.  Is there any redirect for |
| 10:26AM | 22 | this witness? |
| 10:26AM | 23 | MR. REYNOLDS:  No, Your Honor. |
| 10:26AM | 24 | THE COURT:  Okay.  All right.  So we'll go ahead and |
| 10:26AM | 25 | take our morning break.  I'm going to go ahead and hear further |

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:26AM | 1 | argument, Mr. Kerr, so I'm not going to excuse the witness just |
| 10:26AM | 2 | yet, you know -- depending on what happens during the break, so |
| 10:26AM | 3 | ladies and gentlemen, we're going to take about a 10-minute |
| 10:26AM | 4 | break.  Don't discuss the case or form any opinions until |
| 10:26AM | 5 | you've heard all the evidence.  We'll see you back here in |
| 10:26AM | 6 | about 10 minutes. |
| | 7 | (Jury out at 10:26 a.m.) |
| 10:27AM | 8 | THE COURT:  All right.  Thank you.  Couple of things. |
| 10:27AM | 9 | The witness can stay there. |
| 10:27AM | 10 | Let me just talk to the Government.  Normally |
| 10:27AM | 11 | reports don't come in.  I mean, that's just -- whether it's a |
| 10:27AM | 12 | 302 or whether it's a DEA report or regardless, even though, |
| 10:27AM | 13 | you know, other settings -- in other settings, you might |
| 10:27AM | 14 | receive a report prepared in the ordinary course of business. |
| 10:27AM | 15 | It's the witness's own statement.  Generally speaking, you do |
| 10:27AM | 16 | receive it, except when it's a law enforcement officer's |
| 10:27AM | 17 | report.  That's just standard operating procedure in the -- at |
| 10:27AM | 18 | least in Federal Courts for as long as I can remember. |
| 10:27AM | 19 | These are status reports prepared by the law |
| 10:27AM | 20 | enforcement officer.  So generally speaking, I wouldn't receive |
| 10:28AM | 21 | it.  But Mr. Kerr has asked that they be received, and then I'm |
| 10:28AM | 22 | going to need a response from you, Mr. Reynolds, other than |
| 10:28AM | 23 | this is Jencks Act, just so that I feel satisfied that I'm |
| 10:28AM | 24 | doing the right thing here as opposed to, "Well, we just never |
| 10:28AM | 25 | received them."  So you're going to need to come up with a good |

BOOS - CROSS-EXAMINATION

| | |
|---|---|
| 10:28AM | 1 | reason why this should not be received, but I'm going to come |
| 10:28AM | 2 | back to you in a moment.  You can think about that. |
| 10:28AM | 3 | Mr. Kerr? |
| 10:28AM | 4 | MR. KERR:  Your Honor, I just wanted to provide a |
| 10:28AM | 5 | legal basis for this, and I did some research last night. |
| 10:28AM | 6 | Rule 801, under definitions of hearsay, in the advisory |
| 10:28AM | 7 | committee notes, it says under subdivision D, "Several types of |
| 10:28AM | 8 | statements which would otherwise literally fall within the |
| 10:28AM | 9 | definition of hearsay are expressly excluded from it.  Prior |
| 10:29AM | 10 | statements by a witness.  If the witness admits on the stand |
| 10:29AM | 11 | that he made the statement and it was true, he adopts the |
| 10:29AM | 12 | statement, and there is no hearsay problem." |
| 10:29AM | 13 | THE COURT:  That's why I said what I said. |
| 10:29AM | 14 | Ordinarily if this were a different situation -- the witness |
| 10:29AM | 15 | said she prepared the report, true and correct at the time she |
| 10:29AM | 16 | prepared it, she's the author of the report, prepared in the |
| 10:29AM | 17 | ordinary course of business, generally speaking it comes in. |
| 10:29AM | 18 | But traditionally we have not received agents' notes in this |
| 10:29AM | 19 | fashion.  We just haven't in federal court, so that's why I |
| 10:29AM | 20 | told Mr. Reynolds to please be ready for why I should not |
| 10:29AM | 21 | receive it, even though -- because traditionally we don't.  I |
| 10:29AM | 22 | need to be able to explain this correctly on the record here. |
| 10:29AM | 23 | So, Mr. Reynolds, why should this not come in? |
| 10:30AM | 24 | MR. REYNOLDS:  Your Honor, initially, as I've said |
| 10:30AM | 25 | already, we would submit that this is being offered for |

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:30 AM | 1 | improper purpose.  Special Agent Boos, in the course of |
| 10:30 AM | 2 | updating her supervision about the matters that she was working |
| 10:30 AM | 3 | on wrote a description of what these websites are.  She is not |
| 10:30 AM | 4 | a lawyer.  She's not a prosecutor.  She doesn't make charging |
| 10:30 AM | 5 | decisions.  She wrote a blurb copied from month to month that |
| 10:30 AM | 6 | described the -- that described the investigation that she |
| 10:30 AM | 7 | worked on and the websites that she investigated in a |
| 10:30 AM | 8 | particular way.  I think the character and the direction of the |
| 10:30 AM | 9 | examination and the point for which this is offered is that |
| 10:30 AM | 10 | Mr. Kerr is trying to characterize this as some kind of |
| 10:30 AM | 11 | official pronounce of the United States Government, not only -- |
| 10:30 AM | 12 | which it is not and there is no foundation for so finding, but |
| 10:30 AM | 13 | also that Special Agent Boos' report contains a legal |
| 10:30 AM | 14 | conclusion, and that this is somehow child erotica which is not |
| 10:30 AM | 15 | child pornography.  Special Agent Boos is not a lawyer.  She is |
| 10:31 AM | 16 | does not make decisions about what is and is not legal.  She is |
| 10:31 AM | 17 | a highly trained, highly effective investigator who receives |
| 10:31 AM | 18 | evidence and presents it to lawyers. |
| 10:31 AM | 19 | On that basis, Your Honor, we would also say |
| 10:31 AM | 20 | it's prejudicial and confusing to the jury in light of the |
| 10:31 AM | 21 | questions that have been asked because it creates that |
| 10:31 AM | 22 | impression. |
| 10:31 AM | 23 | MR. KERR:  Your Honor, may I -- |
| 10:31 AM | 24 | THE COURT:  Sure.  Of course. |
| 10:31 AM | 25 | MR. KERR:  I think this is an important document for |

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:31AM | 1 | our defense, and I think that it is not hearsay.  It's |
| 10:31AM | 2 | precisely not hearsay under the rule since the witness has |
| 10:31AM | 3 | adopted this as her statement as true and correct under |
| 10:31AM | 4 | Rule 801.  It is clearly not hearsay, and it's also -- the |
| 10:31AM | 5 | Government was permitted to ask this witness -- the |
| 10:31AM | 6 | Government's arguments go to weight rather than admissibility |
| 10:31AM | 7 | in my opinion.  He's free to argue that they're not her |
| 10:31AM | 8 | conclusions.  However, he was given the permission or the |
| 10:31AM | 9 | leeway to ask this witness about all kinds of opinions about |
| 10:32AM | 10 | the pictures that she saw and what they looked like and whether |
| 10:32AM | 11 | they were proper or improper and so forth.  So her reports, her |
| 10:32AM | 12 | contemporaneous reports that she's adopted as true and correct |
| 10:32AM | 13 | at the time for over a period of years that this material was |
| 10:32AM | 14 | child erotica are useful evidence for the defense, important to |
| 10:32AM | 15 | the defense, and the Government is free to argue that she's not |
| 10:32AM | 16 | a lawyer and those are not conclusions that the jury should |
| 10:32AM | 17 | respect, but they are her statements. |
| 10:32AM | 18 | THE COURT:  I'm going to look at this during the |
| 10:32AM | 19 | break time.  I'm just going to say a couple of things. |
| 10:32AM | 20 | Under 801(d)(1), Mr. Kerr's argument is -- is a |
| 10:32AM | 21 | good argument.  I'm just looking, Mr. Reynolds, for the reason |
| 10:32AM | 22 | why this shouldn't come in other than what you've told me. |
| 10:32AM | 23 | You've told me the -- you know, basically a balancing test, |
| 10:32AM | 24 | that it's overly prejudicial.  There are things -- let me just |
| 10:33AM | 25 | say -- that you can correct, even though you said you didn't |

BOOS - CROSS-EXAMINATION

10:33AM 1   want to do redirect, things that you can correct on redirect.

10:33AM 2   For instance, to have the witness explain why it's -- she may

10:33AM 3   have had said child erotica.  She's not a lawyer, et cetera, et

10:33AM 4   cetera.  I just go back to these reports normally don't come

10:33AM 5   in.  Law enforcement officers' reports normally don't come in,

10:33AM 6   so I'm asking you for the reason why they don't come in.

10:33AM 7           And generally speaking, it's not the situation

10:33AM 8   that we've described now with a status report, which is in

10:33AM 9   essence what this is.  It's a report where the law enforcement

10:33AM 10  officer is impeached with his report or her report when he says

10:33AM 11  something differently on the stand than what he said in the

10:33AM 12  report that was prepared, you know, years ago or months ago.

10:33AM 13  That's normally when I have an issue.

10:34AM 14          This is -- this is different.  This is a

10:34AM 15  different situation.  I want to make certain that I'm treating

10:34AM 16  it correctly and fairly to both sides, and I'm just a little

10:34AM 17  bit troubled here because what Mr. Kerr says is, you know,

10:34AM 18  801(d)(1).  If there were any other case, there's no issue, no

10:34AM 19  issue that it would be received.

10:34AM 20          So I'm trying to find the reason why it

10:34AM 21  shouldn't be received here, and things that you can't -- that

10:34AM 22  you should be able to explain away with redirect, the concerns

10:34AM 23  that you have, the 403 -- you know, its prejudicial value

10:34AM 24  outweighs its probative value.  That's what you're telling me.

10:34AM 25  I haven't heard anything as to why this is not an exception to

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:34AM | 1 | the hearsay rule, why this shouldn't be -- I'm still waiting |
| 10:34AM | 2 | for that, and I haven't heard it.  I've heard other things. |
| 10:34AM | 3 | I've heard it's Jencks Act.  I've heard it's this.  I've heard |
| 10:35AM | 4 | it's that.  So I want to -- I'm trying very hard to get it |
| 10:35AM | 5 | correct here, but I'm still waiting to hear something. |
| 10:35AM | 6 | I'll tell you what.  Let's take a short break, |
| 10:35AM | 7 | all right?  Tell the jury it's going to be a little bit longer, |
| 10:35AM | 8 | not 10 minutes.  It'll probably be in total 15 minutes.  Why |
| 10:35AM | 9 | don't you go ahead and look at this and tell me what I need to |
| 10:35AM | 10 | focus on to not receive it, Mr. Reynolds.  Mr. Kerr, I've |
| 10:35AM | 11 | already heard your argument.  If there's anything else you want |
| 10:35AM | 12 | to say, you can certainly, you know, say it, but I hear what |
| 10:35AM | 13 | you're saying. |
| 10:35AM | 14 | Were you trying to move into evidence -- because |
| 10:35AM | 15 | I didn't hear that -- with respect to Exhibit Number 1?  Are |
| 10:35AM | 16 | you trying to move that one in too? |
| 10:35AM | 17 | **MR. KERR:**  Yes, Your Honor.  That's in the |
| 10:35AM | 18 | Government's list of exhibits already. |
| 10:35AM | 19 | **THE COURT:**  This is in your exhibit list? |
| 10:35AM | 20 | **MR. REYNOLDS:**  It is in our exhibit list, and it will |
| 10:35AM | 21 | be introduced through the next witness. |
| 10:35AM | 22 | **THE COURT:**  Do you have an objection to it coming in? |
| 10:35AM | 23 | Because I didn't hear you move it into evidence, Mr. Kerr.  I |
| 10:35AM | 24 | didn't hear those words, "I'm moving this into evidence." |
| 10:36AM | 25 | Mr. Kerr.  I didn't hear you say that. |

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:36AM | 1 | **MR. KERR:**  I thought I did.  If I didn't, I'm sorry. |
| 10:36AM | 2 | **THE COURT:**  You did not.  You did not. |
| 10:36AM | 3 | **MR. KERR:**  Okay. |
| 10:36AM | 4 | **THE COURT:**  Is the Government going to object to |
| 10:36AM | 5 | Government -- I mean, to Defense Exhibit Number 1? |
| 10:36AM | 6 | **MR. REYNOLDS:**  The only thing that I would say is I |
| 10:36AM | 7 | don't think Special Agent Boos herself has authenticated |
| 10:36AM | 8 | Government Exhibit 1.  This item will be in evidence.  We'll |
| 10:36AM | 9 | put it in.  There's no dispute about that.  I do think that |
| 10:36AM | 10 | there's -- I apologize, Your Honor. |
| 10:36AM | 11 | **THE COURT:**  That's all right.  I don't think you |
| 10:36AM | 12 | fully -- she fully authenticated it, Mr. Kerr. |
| 10:36AM | 13 | **MR. KERR:**  Okay. |
| 10:36AM | 14 | **THE COURT:**  I didn't hear the words that I needed to |
| 10:36AM | 15 | receive it into evidence.  But let's just take a break.  We'll |
| 10:36AM | 16 | come back, and we'll need to touch on these things and deal |
| 10:36AM | 17 | with these things during break time.  Yes? |
| 10:36AM | 18 | **MR. REYNOLDS:**  Your Honor, if I could just add one |
| 10:36AM | 19 | thing.  May we reopen redirect pending the outcome of this |
| 10:36AM | 20 | discussion? |
| 10:36AM | 21 | **THE COURT:**  Yes, you may.  I'll tell you, I'm really |
| 10:36AM | 22 | concerned about this exhibit and coming up with the reason why |
| 10:37AM | 23 | it shouldn't be received as an exception to the hearsay rules. |
| 10:37AM | 24 | **MR. REYNOLDS:**  Thank you, Your Honor. |
| 10:37AM | 25 | **THE COURT:**  All right.  You're welcome.  We're in |

BOOS - CROSS-EXAMINATION

| | |
|---|---|
| 10:37AM | 1 |
| | 2 |
| 10:49AM | 3 |
| 10:49AM | 4 |
| 10:49AM | 5 |
| 10:49AM | 6 |
| 10:49AM | 7 |
| 10:49AM | 8 |
| 10:49AM | 9 |

recess.

                (Recess from 10:37 a.m. to 10:49 a.m.)

        THE COURT:  Let's get back to this then.  Everybody
can be seated.  The witness can stay there.  Thank you so much.

                Mr. Reynolds, do you have anything to add to the
reason why this report should not be admitted as an exception
to hearsay?  Sorry.

        MR. REYNOLDS:  No, I apologize, Your Honor.  I do --
I spent the break looking at Rule 801(d)(1).  I note that the
comment that Mr. Kerr quoted from the advisory committee notes
is from the 1974 version.  I now have the 1974 version in front
of me, but I think it's fair to say that it is not the same as
the current version.  I mean, I'm looking at -- I'm looking at
Rule 801(d)(1), and I think it's fair to say that this rule
sets particular limits on the introduction -- in the
introduction as hearsay of the -- of prior statements, and
there are two broad exceptions or two broad categories.
Number 1 is that it is inconsistent with the declarant's
testimony given under penalty of perjury at trial, which I do
not think is applicable here.

        THE COURT:  Okay.  Hold on a second because that's an
important point.  The statement was not made under penalty of
perjury at another trial, hearing, or proceeding.  It was just
a report, a status report that she prepared, correct?

        MR. REYNOLDS:  That's correct, Your Honor.  And if I

BOOS - CROSS-EXAMINATION

10:50AM 1     can clarify the word "report," we're talking about a law

10:50AM 2     enforcement officer.  We're using the term "report," and I just

10:50AM 3     want the record to be clear, what we're not talking about is

10:50AM 4     the sort of FBI 302 reports or HSI reports of investigation

10:50AM 5     that memorialize critical moments, critical moments in the

10:50AM 6     investigation that the agent has personal knowledge of that can

10:50AM 7     be memorialized later, used to reconstruct the investigation if

10:50AM 8     necessary and provide to the defense.  This is internal status

10:50AM 9     report.  What I would say that this is the equivalent of -- and

10:51AM 10    if you'd like me to lay a foundation with Special Agent Boos, I

10:51AM 11    could.  I don't think there's a foundation in evidence of

10:51AM 12    exactly what this is, but it's sort of in the nature if Your

10:51AM 13    Honor has ever emailed law clerk and say, "What are you working

10:51AM 14    on," and they say, "A, B, and C."  It's sort of in the nature

10:51AM 15    of that.

10:51AM 16            THE COURT:  Why don't we this do this?  Outside the

10:51AM 17    presence of the jury, why don't you lay a predicate or just do

10:51AM 18    a proffer.  That's what I'm thinking.  Why don't you proffer

10:51AM 19    through the agent what a status report is so that we're clear

10:51AM 20    and whether it's under penalty of perjury or not because that's

10:51AM 21    what you're telling me.

10:51AM 22            The witness is here.  Yes, Mr. Kerr?

10:51AM 23            MR. KERR:  Just, Your Honor, I just have to say that

10:51AM 24    this witness said -- adopted as true and correct what she

10:51AM 25    wrote, the same thing 45 times over the course of this time

BOOS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 10:51AM | 1 | period, and if -- and this was -- sure, it was a prior |
| 10:52AM | 2 | out-of-court statement, but by a person now available for |
| 10:52AM | 3 | cross-examination concerning it, which is a key fact, in the |
| 10:52AM | 4 | presence of the trier of fact, and if the witness admits on the |
| 10:52AM | 5 | stand that he made the statement and it was true -- which she |
| 10:52AM | 6 | did -- he adopts the statement, and there is no hearsay |
| 10:52AM | 7 | problem.  So it's not even hearsay. |
| 10:52AM | 8 | THE COURT:  Well -- |
| 10:52AM | 9 | MR. KERR:  It's very relevant to the defense that at |
| 10:52AM | 10 | least this Government agent thought this was child erotica, 45 |
| 10:52AM | 11 | times reported it to her superiors, and that's an important -- |
| 10:52AM | 12 | you know, we don't have much to go on here.  That's an |
| 10:52AM | 13 | important thing for us to get in, and I think the Government, |
| 10:52AM | 14 | as they've indicated, can easily explain that and do redirect |
| 10:52AM | 15 | and get all kinds of explanations. |
| 10:52AM | 16 | THE COURT:  Here's the difference.  You used that |
| 10:52AM | 17 | report to impeach her, right?  I let you ask questions ad |
| 10:53AM | 18 | nauseam, and she testified.  Now you're trying to get the |
| 10:53AM | 19 | report received into evidence.  Those are two different things. |
| 10:53AM | 20 | And I'm looking here at 801(d)(1)(a), statements that are not |
| 10:53AM | 21 | hearsay, and it says, "Is inconsistent with the declarant's |
| 10:53AM | 22 | testimony and was given under penalty of perjury at a trial, |
| 10:53AM | 23 | hearing, or other proceeding or in a deposition."  Doesn't |
| 10:53AM | 24 | qualify.  That's why we're -- I'm having it be crystal clear |
| 10:53AM | 25 | what we're talking about. |

BOOS - CROSS-EXAMINATION

10:53AM  1          Mr. Kerr, you'll get the opportunity to talk in
10:53AM  2  a few minutes.  I'm going to hear that now.  Go ahead,
10:53AM  3  Mr. Reynolds.
10:53AM  4          MR. REYNOLDS:  Your Honor, may I just add one thing
10:53AM  5  before I begin my --
10:53AM  6          THE COURT:  Sure.
10:53AM  7          MR. REYNOLDS:  I would like to reiterate, I'll lay a
10:53AM  8  foundation for the hearsay, but I think what Mr. Kerr just said
10:53AM  9  absolutely encapsulates why this evidence is improper.  He said
10:53AM  10 this Government witness thought this was child erotica.  That's
10:53AM  11 an improper question.  It's an improper conclusion.  He's
10:54AM  12 asking a non-lawyer to provide a legal opinion about this
10:54AM  13 matter.  It invades the province of the jury.  She is not
10:54AM  14 qualified to provide it.  It is not her job to provide it.
10:54AM  15 This is improper purpose, and I think that in addition to -- I
10:54AM  16 will address the Court's questions about 801, but I think
10:54AM  17 however the Court resolves the 801 question, this is absolutely
10:54AM  18 an improper purpose to treat this witness.
10:54AM  19         THE COURT:  All right.  So -- in any event, I think
10:54AM  20 that unless we've got it here under 801(d)(1), it's hearsay.
10:54AM  21 So I'll let you -- I want you to establish that so the record
10:54AM  22 is clear here based on what Mr. Kerr said, but I'm giving you
10:54AM  23 the opportunity now outside the presence of the jury to
10:54AM  24 establish whatever you want to establish so the record is
10:54AM  25 clear.

BOOS - PROFFER

| | | |
|---|---|---|
| 10:54AM | 1 |        MR. REYNOLDS:  Thank you, your Honor. |
| 10:54AM | 2 | BY MR. REYNOLDS: |
| 10:54AM | 3 | Q.   Special Agent Boos, you're an employee of the FBI? |
| 10:54AM | 4 | A.   Yes, currently. |
| 10:54AM | 5 | Q.   Have you ever heard of a 302? |
| 10:54AM | 6 | A.   Yes, I have. |
| 10:54AM | 7 | Q.   What is a 302? |
| 10:54AM | 8 | A.   302 are reports that we write based on interviews or |
| 10:54AM | 9 | searches or, you know, actions that we take to record the facts |
| 10:55AM | 10 | of what happened during an event in order to further the |
| 10:55AM | 11 | investigation.  They're reviewed.  They are submitted into our |
| 10:55AM | 12 | evidence system.  Then they are produced for discovery later. |
| 10:55AM | 13 | Q.   Have you ever written a 302? |
| 10:55AM | 14 | A.   Yes. |
| 10:55AM | 15 | Q.   Have you ever received training on how to write a 302? |
| 10:55AM | 16 | A.   Yes, I have. |
| 10:55AM | 17 | Q.   Is there a special format, like a letterhead in which 302s |
| 10:55AM | 18 | must be written? |
| 10:55AM | 19 | A.   Yes, there's a lot of stuff that's involved in writing the |
| 10:55AM | 20 | 302 and getting it right, especially with interviews. |
| 10:55AM | 21 | Q.   What sort of -- tell us a little more about the training |
| 10:55AM | 22 | you receive to be able to write 302s. |
| 10:55AM | 23 | A.   So I went to the FBI Academy.  There were multiple classes |
| 10:55AM | 24 | that we had on the format and structure of 302s.  We were |
| 10:55AM | 25 | graded on 302s for our interviews, and there was a lot of red |

BOOS - PROFFER

| | | |
|---|---|---|
| 10:55AM | 1 | marks on some people's 302s.  So there was a lot of stuff that |
| 10:55AM | 2 | was right or wrong about those. |
| 10:56AM | 3 | Q.   And generally speaking -- are you careful about what you |
| 10:56AM | 4 | put in 302s? |
| 10:56AM | 5 | A.   Yes, I'm very careful. |
| 10:56AM | 6 | Q.   Are you -- is the point of them to document the |
| 10:56AM | 7 | investigation? |
| 10:56AM | 8 | A.   Yes. |
| 10:56AM | 9 | Q.   And generally speaking, is what you've put in 302s things |
| 10:56AM | 10 | that you have personally observed or are able to testify to? |
| 10:56AM | 11 | A.   Yes, they are. |
| 10:56AM | 12 | Q.   All right.  And you've been handed -- do you have a copy |
| 10:56AM | 13 | of what's been marked as Government's Exhibit 2? |
| 10:56AM | 14 | A.   Yes. |
| 10:56AM | 15 | Q.   Is this a 302? |
| 10:56AM | 16 | A.   No, it is not. |
| 10:56AM | 17 | Q.   Is this an FBI document? |
| 10:56AM | 18 | A.   No, it is not. |
| 10:56AM | 19 | Q.   What is this? |
| 10:56AM | 20 | A.   So this is a status report that I wrote while still an |
| 10:56AM | 21 | investigative analyst at CEOS.  It was a report that was just |
| 10:56AM | 22 | sent to my supervisor.  It was intended to be just seen by my |
| 10:56AM | 23 | supervisor in order to update him on what I was working on, |
| 10:56AM | 24 | kind of remind him about just a general description of what the |
| 10:56AM | 25 | cases were, you know, because he had a lot of people that he |

BOOS - PROFFER

| | | |
|---|---|---|
| 10:56AM | 1 | was supervising; just like, "Oh, hey, it's this case," and this |
| 10:56AM | 2 | was kind of a general description to just spark your memory on |
| 10:56AM | 3 | what this was about. |
| 10:56AM | 4 | Q.   So before you became an FBI agent in the field, did you go |
| 10:56AM | 5 | to Quantico? |
| 10:57AM | 6 | A.   Yes. |
| 10:57AM | 7 | Q.   Was there sort of like a Quantico for HTIU? |
| 10:57AM | 8 | A.   No, it was a lot of on-the-job training for that. |
| 10:57AM | 9 | Q.   Did you go into -- take classes for -- how long was your |
| 10:57AM | 10 | training at Quantico? |
| 10:57AM | 11 | A.   Was about five or six months. |
| 10:57AM | 12 | Q.   Five or six months.  Did you go five or six months of |
| 10:57AM | 13 | training to become a digital investigative analyst at HTIU? |
| 10:57AM | 14 | A.   No, there was not a separate training for that. |
| 10:57AM | 15 | Q.   Did you receive training on how to write status reports? |
| 10:57AM | 16 | A.   On-the-job training, just kind of a summary of what it |
| 10:57AM | 17 | takes.  "Hey, this is what we want from you," just informally |
| 10:57AM | 18 | from the supervisor, but nothing formal or like a structure of |
| 10:57AM | 19 | exactly what the wording needed to be. |
| 10:57AM | 20 | Q.   I believe you testified that at Quantico, you'd submit |
| 10:57AM | 21 | mock -- is it accurate to say you'd submit mock 302s, and you |
| 10:57AM | 22 | were graded on it? |
| 10:57AM | 23 | A.   Yes. |
| 10:57AM | 24 | Q.   Did that happen with your status reports at CEOS? |
| 10:57AM | 25 | A.   No. |

BOOS - PROFFER

| | | |
|---|---|---|
| 10:57AM | 1 | Q.   Is the purpose of the status report to encapsulate |
| 10:57AM | 2 | everything you've done in the investigation? |
| 10:57AM | 3 | A.   No, it was not. |
| 10:57AM | 4 | Q.   Is the purpose of the status report to include only things |
| 10:58AM | 5 | that you personally observed and are available to testify to? |
| 10:58AM | 6 | A.   No.  Again, it was just a summary of -- kind of a reminder |
| 10:58AM | 7 | of what the case was all about. |
| 10:58AM | 8 | Q.   Special Agent Boos, where did you go to law school? |
| 10:58AM | 9 | A.   I did not. |
| 10:58AM | 10 | Q.   Special Agent Boos, have you received training on how to |
| 10:58AM | 11 | draw legal conclusions in your status reports at CEOS? |
| 10:58AM | 12 | A.   No. |
| 10:58AM | 13 | Q.   Were you ever asked to make legal decisions as to whether |
| 10:58AM | 14 | or not certain images were legal or illegal? |
| 10:58AM | 15 | A.   No. |
| 10:58AM | 16 | Q.   If someone asked you to do that, would you think you would |
| 10:58AM | 17 | be qualified to do that? |
| 10:58AM | 18 | A.   No, I would not. |
| 10:58AM | 19 | Q.   Would you say this status report is a purely informal |
| 10:58AM | 20 | document? |
| 10:58AM | 21 | A.   Yes. |
| 10:58AM | 22 | Q.   Did you submit it under oath?  Did you submit your status |
| 10:58AM | 23 | report -- |
| 10:58AM | 24 | A.   Oh, the status report, no. |
| 10:58AM | 25 | Q.   Did you submit it to a notary? |

BOOS - PROFFER

| | | |
|---|---|---|
| 10:58AM | 1 | **A.**   No. |
| 10:58AM | 2 | **Q.**   Have you ever been cross-examined on a status report? |
| 10:58AM | 3 | **A.**   No. |
| 10:58AM | 4 | **Q.**   Is the purpose of the status report to document the |
| 10:58AM | 5 | investigation to provide to the defense in a case? |
| 10:58AM | 6 | **A.**   No, it is not. |
| 10:58AM | 7 | **MR. REYNOLDS:**  Nothing further, Your Honor. |
| 10:59AM | 8 | **THE COURT:**  Okay.  Thank you. |
| 10:59AM | 9 | **MR. KERR:**  May I ask a few questions? |
| 10:59AM | 10 | **THE COURT:**  Yes, of course.  And you're proceeding |
| 10:59AM | 11 | Mr. Kerr, under 801, right, Rule 801? |
| 10:59AM | 12 | **MR. KERR:**  Yes, that it is not hearsay. |
| 10:59AM | 13 | **THE COURT:**  Just wanted to double-check we were |
| 10:59AM | 14 | talking about the same rule.  Go ahead. |
| 10:59AM | 15 | **BY MR. KERR:** |
| 10:59AM | 16 | **Q.**   Special Agent Boos, you called this material commercial |
| 10:59AM | 17 | child erotica websites approximately 45 times in these reports, |
| 10:59AM | 18 | right? |
| 10:59AM | 19 | **A.**   This was the phrasing I used in -- |
| 10:59AM | 20 | **Q.**   Yeah. |
| 10:59AM | 21 | **A.**   -- the description. |
| 10:59AM | 22 | **Q.**   Okay.  And where did that description come from? |
| 10:59AM | 23 | **A.**   I believe I wrote it. |
| 10:59AM | 24 | **Q.**   Pardon me? |
| 10:59AM | 25 | **A.**   I believe I wrote it. |

BOOS - PROFFER

| | | |
|---|---|---|
| 10:59AM | 1 | **Q.**   But how did you come up with that? |
| 10:59AM | 2 | **A.**   It was -- |
| 10:59AM | 3 | **THE COURT:**  What does that have to do with receiving |
| 10:59AM | 4 | this document into evidence, Mr. Kerr? |
| 10:59AM | 5 | **MR. KERR:**  Oh, excuse me.  Okay.  I'm sorry, Judge. |
| 10:59AM | 6 | BY MR. KERR: |
| 10:59AM | 7 | **Q.**   You testified to this under oath a few minutes ago that |
| 11:00AM | 8 | these were your statements? |
| 11:00AM | 9 | **A.**   (Witness nodding head affirmatively.) |
| 11:00AM | 10 | **Q.**   You adopted them as true, right? |
| 11:00AM | 11 | **A.**   Yes, they were statements that I wrote. |
| 11:00AM | 12 | **Q.**   Available here for cross-examination under oath before the |
| 11:00AM | 13 | jury? |
| 11:00AM | 14 | **A.**   Uh-huh. |
| 11:00AM | 15 | **MR. KERR:**  No further questions. |
| 11:00AM | 16 | **THE COURT:**  Okay. |
| 11:00AM | 17 | **MR. REYNOLDS:**  May I briefly just ask one or two more |
| 11:00AM | 18 | questions? |
| 11:00AM | 19 | **THE COURT:**  All right.  Yeah. |
| 11:00AM | 20 | BY MR. REYNOLDS: |
| 11:00AM | 21 | **Q.**   Special Agent Boos, the statements made in your status |
| 11:00AM | 22 | report, did you personally observe all these matters? |
| 11:00AM | 23 | **A.**   Not in all of them, no. |
| 11:00AM | 24 | **Q.**   So, for example, your status report begins, "Targets Ken |
| 11:00AM | 25 | Powers, Mark Bjorkman, Keith Baggs, Patrice Wilowski," etc., do |

BOOS - PROFFER

| | | |
|---|---|---|
| 11:00AM | 1 | you know who Keith Baggs is? |
| 11:00AM | 2 | A.   I don't remember. |
| 11:00AM | 3 | Q.   Have you ever known who Keith Baggs is? |
| 11:00AM | 4 | A.   I don't recall that name. |
| 11:00AM | 5 | Q.   Was this information provided to you by someone else? |
| 11:00AM | 6 | A.   Most likely part of the investigation, yes. |
| 11:00AM | 7 | MR. REYNOLDS:  Thank you. |
| 11:00AM | 8 | THE COURT:  Go ahead, Mr. Kerr.  You can ask -- since |
| 11:00AM | 9 | I let them ask questions, go ahead.  You can ask anything else |
| 11:01AM | 10 | you might like, even what I -- |
| 11:01AM | 11 | MR. KERR:  Nothing further, Your Honor. |
| 11:01AM | 12 | THE COURT:  Okay.  All right.  So just so I'm clear, |
| 11:01AM | 13 | you're proceeding under 801 because I don't think this comes in |
| 11:01AM | 14 | under 801.  You know, you're not relying on another exception |
| 11:01AM | 15 | to hearsay.  You're just -- you're relying on 801(d)(1).  This |
| 11:01AM | 16 | is -- |
| 11:01AM | 17 | MR. KERR:  Under the advisory committee notes that |
| 11:01AM | 18 | say this is not hearsay. |
| 11:01AM | 19 | THE COURT:  Right.  So how do you get around the fact |
| 11:01AM | 20 | that this needs to be given under penalty of perjury at a |
| 11:01AM | 21 | trial, hearing, or other proceeding or in a deposition?  How do |
| 11:01AM | 22 | you get around that? |
| 11:01AM | 23 | MR. KERR:  Well, it's because this is -- this is |
| 11:01AM | 24 | not -- it's -- the notes, the advisory committee notes define |
| 11:01AM | 25 | it as not hearsay at all, so there is no problem because the |

BOOS - PROFFER

| | | |
|---|---|---|
| 11:01AM | 1 | person is here under oath adopting it as her true and correct |
| 11:02AM | 2 | statement.  She's not disputing that it was true and saying, |
| 11:02AM | 3 | "No, that wasn't right."  That would be a different story. |
| 11:02AM | 4 | She's saying, "I made those statements.  That's a true and |
| 11:02AM | 5 | correct account of the statements that I made," and therefore, |
| 11:02AM | 6 | the committee notes say there is no hearsay problem.  So it's |
| 11:02AM | 7 | not hearsay, so it -- it doesn't apply -- because the preamble |
| 11:02AM | 8 | there says, "Considerable controversy has attended the question |
| 11:02AM | 9 | of whether a prior out-of-court statement by a person now |
| 11:02AM | 10 | available for cross-examination concerning it under oath should |
| 11:02AM | 11 | be classed as hearsay."  And the advisory committee says, "No, |
| 11:02AM | 12 | it's not hearsay."  So it doesn't need to fall in that, you |
| 11:02AM | 13 | know, (d)(1) -- |
| 11:02AM | 14 | THE COURT:  Right. |
| 11:02AM | 15 | MR. KERR:  -- exception. |
| 11:02AM | 16 | THE COURT:  So I'm looking at the rule.  I understand |
| 11:02AM | 17 | what you're saying, but I'm looking at the rule, 801(d)(1)(A), |
| 11:02AM | 18 | statements that are not hearsay.  "A statement that meets the |
| 11:02AM | 19 | following conditions is not hearsay.  1.  A declarant witness's |
| 11:03AM | 20 | prior statement.  The declarant testifies and is subject to |
| 11:03AM | 21 | cross-examination about a prior statement, and the statement is |
| 11:03AM | 22 | inconsistent with the declarant's testimony and was given under |
| 11:03AM | 23 | penalty of perjury at a trial, hearing, or other proceeding or |
| 11:03AM | 24 | in a deposition." |
| 11:03AM | 25 | Her notes do not qualify pursuant to Section A. |

BOOS - PROFFER

| | | |
|---|---|---|
| 11:03AM | 1 | It was not given under penalty of perjury at a trial, hearing, |
| 11:03AM | 2 | or other proceeding, or in a deposition, and as asked by the |
| 11:03AM | 3 | Department of Justice lawyer, Mr. Reynolds, it wasn't even |
| 11:03AM | 4 | under oath, right?  There was no notary there.  This isn't |
| 11:03AM | 5 | under oath.  It's not even to the best of my knowledge and |
| 11:03AM | 6 | belief.  It's none of that.  It's just somebody's notes. |
| 11:03AM | 7 |     MR. KERR:  But it's not inconsistent.  It's |
| 11:03AM | 8 | consistent with her testimony.  That's what's different and |
| 11:04AM | 9 | that's why it's not hearsay at all.  It's outside the |
| 11:04AM | 10 | definitions here.  It's not hearsay according to the advisory |
| 11:04AM | 11 | committee.  Anyway, I've made my record. |
| 11:04AM | 12 |     THE COURT:  Well, then it doesn't qualify.  That's |
| 11:04AM | 13 | why I asked you what are you going under here?  What rule are |
| 11:04AM | 14 | you going on here so that I can focus on it, and you have |
| 11:04AM | 15 | continuously told me 801(d) is what you're going under.  You're |
| 11:04AM | 16 | not going under another rule that I can focus on because I |
| 11:04AM | 17 | would look at another rule if I needed to focus on another |
| 11:04AM | 18 | rule.  So let's be crystal clear.  You're going under 801, |
| 11:04AM | 19 | and -- I'm sorry.  Yeah, you said you're relying on 801(d)(1), |
| 11:04AM | 20 | that it's not hearsay at all as opposed to an exception on the |
| 11:04AM | 21 | prohibition on hearsay.  So you're saying it's not hearsay at |
| 11:04AM | 22 | all, and I'm trying to see how it qualifies -- |
| 11:04AM | 23 |     MR. KERR:  According to the advisory committee, it's |
| 11:04AM | 24 | not hearsay.  There is no hearsay problem. |
| 11:04AM | 25 |     THE COURT:  I'm looking at the rules.  I'm looking at |

BOOS - PROFFER

| | | |
|---|---|---|
| 11:04AM | 1 | the rules, and you don't qualify.  What else should I look at? |
| 11:05AM | 2 | You don't qualify -- or the statement doesn't qualify because |
| 11:05AM | 3 | it was not given under penalty of perjury at a trial, hearing, |
| 11:05AM | 4 | or other proceeding.  There are other ways -- you know, other |
| 11:05AM | 5 | courts, other decisions that talk about other things, but, you |
| 11:05AM | 6 | know, like, for instance, I looked at United States v. |
| 11:05AM | 7 | Ettinger, 344 F.3d 1149, Eleventh Circuit 203, where you have |
| 11:05AM | 8 | statements of witnesses, and Court lets in the statement under |
| 11:05AM | 9 | 801(d)(1)(B).  There are other ways of getting statements in. |
| 11:05AM | 10 | But what you're focusing on, 801(d)(1), I just don't see it.  I |
| 11:05AM | 11 | don't see how it qualifies.  So I'm all ears here trying to |
| 11:05AM | 12 | figure out a way, but I don't see it. |
| 11:05AM | 13 | MR. KERR:  Under (A), (1)(A), it doesn't meet the |
| 11:05AM | 14 | first condition there that it's -- it's not inconsistent with |
| 11:06AM | 15 | her testimony.  That's what -- that's a precondition there. |
| 11:06AM | 16 | And -- |
| 11:06AM | 17 | THE COURT:  So what -- I'm sorry.  It's an |
| 11:06AM | 18 | out-of-court statement.  Let's just start with that. |
| 11:06AM | 19 | MR. KERR:  Okay. |
| 11:06AM | 20 | THE COURT:  It's an out-of-court statement offered |
| 11:06AM | 21 | for the truth of the matter asserted.  Now, we need to see an |
| 11:06AM | 22 | exception, or we need to say that it's not hearsay, and that's |
| 11:06AM | 23 | what I'm asking you. |
| 11:06AM | 24 | MR. KERR:  If the agent said, "I told Mr. Reynolds X, |
| 11:06AM | 25 | Y, and Z," on the witness stand here and is subject to |

BOOS - PROFFER

| | | |
|---|---|---|
| 11:06AM | 1 | cross-examination, that's not hearsay.  It's the same thing |
| 11:06AM | 2 | here.  She's saying, "I wrote these reports, and they are true |
| 11:06AM | 3 | and correct, and I stand by them," and that makes it not |
| 11:06AM | 4 | hearsay at all according to the advisory committee.  That's my |
| 11:06AM | 5 | authority. |
| 11:06AM | 6 | THE COURT:  It's -- |
| 11:06AM | 7 | MR. KERR:  It's just not -- it's a -- it's not |
| 11:06AM | 8 | hearsay.  There is no hearsay problem. |
| 11:07AM | 9 | THE COURT:  Yes, there is.  There's a hearsay |
| 11:07AM | 10 | problem, looking to see an exception.  You are focusing on, you |
| 11:07AM | 11 | know, 801, and that's -- so consequently, that's what I'm |
| 11:07AM | 12 | focusing on.  I'm looking also at (D), statements that are not |
| 11:07AM | 13 | hearsay.  You know, it's -- it's inconsistent or if it's |
| 11:07AM | 14 | consistent, it's offered to rebut an expressed or implied |
| 11:07AM | 15 | charge, that the declarant recently fabricated it, to |
| 11:07AM | 16 | rehabilitate the declarant's credibility.  I mean, I don't see |
| 11:07AM | 17 | any of that and how it comes in under the rules that you've |
| 11:07AM | 18 | cited to me. |
| 11:07AM | 19 | So that's why I've said what rule is there? |
| 11:07AM | 20 | What do I need to look at?  And I don't think that you've |
| 11:07AM | 21 | really attacked her credibility.  She's not denying that she |
| 11:07AM | 22 | said it -- I mean, or that she wrote it. |
| 11:07AM | 23 | So -- |
| 11:07AM | 24 | MR. KERR:  Well -- |
| 11:07AM | 25 | THE COURT:  I'm back at I don't think it comes in |

BOOS - PROFFER

| | |
|---|---|
| 11:08AM | 1 |

under what you've cited to me.  So it's time to move on.  I've

ruled.  It does not -- it will not be received into evidence.

       All right.  So -- because it is hearsay, and it

does -- I haven't heard an exception to the hearsay rule or why

this isn't hearsay that would permit me to receive it into

evidence.

       I also don't think that you laid a foundation

for Defendant's Exhibit Number 1.  You went around and around

on it, but you didn't quit hit the nail on the head with

respect to Exhibit Number 1.

       So, you know, I didn't hear you say, "I move it

into evidence."  Let's just start with that.  I didn't hear you

say that.  You may have thought you did, and I guess in an

abundance of fairness, I'll let you try to do that, just to be

abundantly fair to you there, Mr. Kerr, but I didn't hear you

say that.

       Does the Government object to 1 coming in with

this witness since you're going to move it in anyway with

somebody else?

       **MR. REYNOLDS:**  No, Your Honor.  We don't object to

this coming into evidence.  I do not believe that Special Agent

Boos has the knowledge sufficient.  We don't object to it

coming into evidence.  It's coming into evidence anyway.

       **THE COURT:**  Well, because I don't think he laid a

proper foundation, I'm going to give him the opportunity to do

BOOS - PROFFER

| | | |
|---|---|---|
| 11:09AM | 1 | it now, and I don't see why we're going to take a up a lot of |
| 11:09AM | 2 | time if you don't mind, if you don't object to it coming in. |
| 11:09AM | 3 | Mr. Kerr, you want to move this in with this witness? |
| 11:09AM | 4 | **MR. KERR:** I'd like to, yes, Your Honor. |
| 11:09AM | 5 | **THE COURT:** Okay. Well, do you mind waiting later |
| 11:09AM | 6 | on, or what do you -- because you're going to need foundation. |
| 11:09AM | 7 | **MR. KERR:** If the Government is going to -- |
| 11:09AM | 8 | **THE COURT:** Then I won't receive it. That's fine. |
| 11:09AM | 9 | I'll make it easier. I won't receive it now either because it |
| 11:09AM | 10 | wasn't moved into evidence and a foundation wasn't laid. |
| 11:09AM | 11 | All right. So is there anything else? Do you |
| 11:09AM | 12 | need now, Mr. Reynolds, to cover anything else with this |
| 11:09AM | 13 | witness, or may I excuse her? |
| 11:09AM | 14 | **MR. REYNOLDS:** No, the Government believes she can be |
| 11:10AM | 15 | excused. |
| 11:10AM | 16 | **THE COURT:** Okay. I will do that in front of the |
| 11:10AM | 17 | jury. Just be ready with your next witness. Okay. So we'll |
| 11:10AM | 18 | bring the jury in. |
| | 19 | (Jury in at 11:10 a.m.) |
| 11:11AM | 20 | **THE COURT:** All right. Thank you, ladies and |
| 11:11AM | 21 | gentlemen. Sorry that this took longer than anticipated. |
| 11:11AM | 22 | There being nothing from else this witness, the |
| 11:11AM | 23 | witness is excused. Thank you for having come in today to |
| 11:11AM | 24 | testify. |
| 11:11AM | 25 | (Witness excused.) |

| | | |
|---|---|---|
| 11:11 AM | 1 | THE COURT:  And, Mr. Reynolds, you can call your next |
| 11:11 AM | 2 | witness. |
| 11:11 AM | 3 | MR. REYNOLDS:  Thank you, Your Honor.  The United |
| 11:11 AM | 4 | States calls Gibran Ali.  Your Honor, may we bring the exhibit |
| 11:11 AM | 5 | tubs up to the witness stand in advance? |
| 11:11 AM | 6 | THE COURT:  I'm sorry, say that again. |
| 11:11 AM | 7 | MR. REYNOLDS:  May we bring the witness tubs up to |
| 11:11 AM | 8 | the witness stand in advance? |
| 11:11 AM | 9 | THE COURT:  Yes, you may. |
| 11:11 AM | 10 | MR. REYNOLDS:  Thank you. |
| 11:12 AM | 11 | COURTROOM DEPUTY:  Please raise your right hand. |
| 11:12 AM | 12 | (Witness sworn.) |
| 11:12 AM | 13 | COURTROOM DEPUTY:  Thank you.  Please state and spell |
| 11:12 AM | 14 | your name for the record. |
| 11:12 AM | 15 | THE WITNESS:  Gibran Ali, G-i-b-r-a-n, last name Ali, |
| 11:12 AM | 16 | A-l-i. |
| 11:12 AM | 17 | COURTROOM DEPUTY:  Thank you.  You may take the |
| 11:12 AM | 18 | stand. |
| 11:12 AM | 19 | THE COURT:  You're going to be asked some questions |
| 11:12 AM | 20 | by the prosecutors in the case.  If you don't understand it, |
| 11:12 AM | 21 | please say so, so they can state it a different way.  Wait |
| 11:12 AM | 22 | until the question is finished before you begin answering.  If |
| 11:12 AM | 23 | you're soft spoken, speak up so that we can hear you, and if |
| 11:12 AM | 24 | you have the tendency to speak quickly, please slow down so we |
| 11:13 AM | 25 | can understand you, all right?  Go ahead. |

ALI - DIRECT EXAMINATION

|  |  |
|---|---|
| 11:13AM | 1 |

                          GIBRAN ALI,

a witness called on behalf of the Government, being first duly

sworn, was examined and testified as follows:

                        DIRECT EXAMINATION

                       BY MR. REYNOLDS:

Q.    Good morning, sir.

A.    Good morning.

Q.    Could you please state your name and spell it for the

record?

A.    Gibran Ali, G-i-b-r-a-n, A-l-i.

Q.    Who do you work for?

A.    I work as a digital investigative analyst at the United

States Department of Justice, and I work at a section known as

the Child Exploitation and Obscenity Section.

Q.    And, Mr. Ali, speaking briefly, what you are your duties

as digital investigative analyst at the Child Exploitation and

Obscenity Section at the Department of Justice?

A.    As a digital investigative analyst, my job is to conduct

forensic analysis on cases pertaining to child exploitation

crimes.  I deal with digital evidence such as computers,

servers, laptops, mobile devices and tablets, and also storage

media such as hard drives and USB flash drives.  Part of my job

is to also write forensic reports on my findings, and I also

provide technical assistance to our partner federal law

enforcement agencies, such as the FBI and the HSI.

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:14AM | 1 | Q.   Mr. Ali, is it fair to say you are sort of like a crime |
| 11:14AM | 2 | scene examiner when the crime scene is a computer? |
| 11:14AM | 3 | A.   Yes. |
| 11:14AM | 4 | Q.   How many cases have you worked on since you joined the |
| 11:14AM | 5 | U.S. Department Justice? |
| 11:14AM | 6 | A.   So we work about maybe like 10, 15 cases every year.  I've |
| 11:14AM | 7 | been there for a little over five years, so I would estimate |
| 11:14AM | 8 | maybe about 60, 70 cases. |
| 11:14AM | 9 | Q.   And in the course of working those 60 to 70 cases, how |
| 11:14AM | 10 | many computers or digital devices have you analyzed |
| 11:14AM | 11 | approximately? |
| 11:14AM | 12 | A.   I would say a thousand or more. |
| 11:14AM | 13 | Q.   And does that include -- well, let me take a step back. |
| 11:14AM | 14 | Mr. Ali, when you access a computer and you see |
| 11:14AM | 15 | information on the screen, does that information come from a |
| 11:14AM | 16 | computer -- or excuse me.  When you access a website and you |
| 11:14AM | 17 | see information on the screen, does that information come from |
| 11:14AM | 18 | a computer? |
| 11:15AM | 19 | A.   Yes. |
| 11:15AM | 20 | Q.   And is it fair to say that every website relies on data |
| 11:15AM | 21 | that's just sitting on a computer in a building somewhere? |
| 11:15AM | 22 | A.   Yes. |
| 11:15AM | 23 | Q.   Is there a special name for a computer that makes website |
| 11:15AM | 24 | data available over the internet? |
| 11:15AM | 25 | A.   That would be a server. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:15AM | 1 | Q.   A server?  So, Mr. Ali, in the course of examining more |
| 11:15AM | 2 | than a thousand devices in your current position at the U.S. |
| 11:15AM | 3 | Department of Justice, have you ever analyzed website servers? |
| 11:15AM | 4 | A.   Yes. |
| 11:15AM | 5 | Q.   How much of your work is spent on criminal investigations? |
| 11:15AM | 6 | A.   That is my primary job, so all of it, all of my work. |
| 11:15AM | 7 | Q.   And how much of your work is spent on criminal |
| 11:15AM | 8 | investigations that involve the sexual exploitation of |
| 11:15AM | 9 | children? |
| 11:15AM | 10 | A.   All of it. |
| 11:15AM | 11 | Q.   Mr. Ali, as a digital investigative analyst with the |
| 11:15AM | 12 | Department of Justice, were you at some point assigned to |
| 11:15AM | 13 | assist with the investigation of what we're calling the Newstar |
| 11:16AM | 14 | websites? |
| 11:16AM | 15 | A.   Yes. |
| 11:16AM | 16 | Q.   And we're going to talk about this in a fair amount of |
| 11:16AM | 17 | detail, but you could you provide the jury with a -- just a |
| 11:16AM | 18 | one- or two-sentence overview of the role you played in that |
| 11:16AM | 19 | investigation? |
| 11:16AM | 20 | A.   Yes.  My job was to recreate the websites that were coming |
| 11:16AM | 21 | from the server, and my job was to recreate them in a |
| 11:16AM | 22 | stand-alone environment in our office so that investigators and |
| 11:16AM | 23 | analysts working on the case could access them in this offline |
| 11:16AM | 24 | stand-alone environment. |
| 11:16AM | 25 | Q.   In this offline environment, did you take screenshots of |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:16AM | 1 | the websites? |
| 11:16AM | 2 | A.    Yes. |
| 11:16AM | 3 | Q.    Did you preserve images of the websites? |
| 11:16AM | 4 | A.    Yes. |
| 11:16AM | 5 | Q.    Are you prepared to testify about those screenshots and |
| 11:16AM | 6 | those images today? |
| 11:16AM | 7 | A.    Yes. |
| 11:16AM | 8 | Q.    All right.  Mr. Ali, first a little bit more about you. |
| 11:16AM | 9 | Do you have any educational background that's relevant to your |
| 11:16AM | 10 | work as a digital investigative analyst? |
| 11:16AM | 11 | A.    Yes.  I have a computer science degree from the University |
| 11:16AM | 12 | of Maryland, and before I started working for the Department of |
| 11:17AM | 13 | Justice, I was working as a systems administrator and a web |
| 11:17AM | 14 | developer for a private firm in Washington, D.C. for about |
| 11:17AM | 15 | seven and a half years.  I also have various in-house trainings |
| 11:17AM | 16 | at the DOJ in computer forensics.  I have also given multiple |
| 11:17AM | 17 | presentations on computer forensics, mobile forensics, and |
| 11:17AM | 18 | prosecuting child exploitation crimes. |
| 11:17AM | 19 | Q.    I believe you testified that you were a systems |
| 11:17AM | 20 | administrator before you joined the Department of Justice. |
| 11:17AM | 21 | What is that? |
| 11:17AM | 22 | A.    Systems administrator is a person whose job is to manage, |
| 11:17AM | 23 | configure, and just deal with the general upkeep of computer |
| 11:17AM | 24 | systems, especially servers or multiple servers.  In my job as |
| 11:17AM | 25 | a systems administrator, I was managing multiple websites for |

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

ALI - DIRECT EXAMINATION

11:17AM  1   the company.  I was dealing with database systems, web servers,

11:18AM  2   email servers, and my job was also to manage multiple customer

11:18AM  3   accounts and generate statistics based on customers.

11:18AM  4   Q.   Mr. Ali, I believe you've said you've been at your current

11:18AM  5   position for approximately five years?

11:18AM  6   A.   Yes.

11:18AM  7   Q.   And were you a systems administrator for approximately

11:18AM  8   seven and a half years?

11:18AM  9   A.   Yes.

11:18AM  10  Q.   So is it fair to say that sitting here today, you have

11:18AM  11  more than 12 years of experience working with websites and

11:18AM  12  website servers?

11:18AM  13  A.   Yes.

11:18AM  14          MR. REYNOLDS:  All right.  Your Honor, may we publish

11:18AM  15  a stipulation between the parties and move it into evidence?

11:18AM  16  This is Government Exhibit 7.

11:18AM  17          THE COURT:  All right.  Mr. Kerr, is that all right?

11:18AM  18          MR. KERR:  No objection.

11:18AM  19          THE COURT:  All right.  Go ahead, please.

11:18AM  20          MR. REYNOLDS:  Ms. Davis, can you publish Government

11:19AM  21  Exhibit 7, please?  Your Honor, may I just read this to the

11:19AM  22  jury?

11:19AM  23          THE COURT:  You may do so.

11:19AM  24          MR. REYNOLDS:  Thank you.

11:19AM  25  BY MR. REYNOLDS:

ALI - DIRECT EXAMINATION

| 11:19AM | 1 | Q.   All right, Mr. Ali, can you see this document on the |
| 11:19AM | 2 | screen in front of you? |
| 11:19AM | 3 | A.   Yes. |
| 11:19AM | 4 | Q.   All right.  Reading the document that is entitled "First |
| 11:19AM | 5 | Stipulation of the Parties," it reads, "It is hereby stipulated |
| 11:19AM | 6 | and agreed by and between the United States of America, the |
| 11:19AM | 7 | Defendant, Plamen Georgiev Velinov, and his attorney, |
| 11:19AM | 8 | Christophir Kerr, that the United States has established the |
| 11:19AM | 9 | following facts beyond a reasonable doubt:  In 2019, law |
| 11:19AM | 10 | enforcement authorities in the United States determined that |
| 11:19AM | 11 | the Newstar websites were predominantly hosted or made |
| 11:19AM | 12 | available from computers located in the Netherlands.  In |
| 11:19AM | 13 | particular, they were hosted at computers controlled by |
| 11:19AM | 14 | Leaseweb BV and Novogara BV, also known as Ecatel, which are |
| 11:19AM | 15 | both data-hosting companies located in the Netherlands.  The |
| 11:20AM | 16 | Newstar website hosted by these companies included the |
| 11:20AM | 17 | following, among others:  Newstar-███.net." |
| 11:20AM | 18 | Ms. Davis, can we see page 2, please?  Thank you |
| 11:20AM | 19 | very much. |
| 11:20AM | 20 | "Newstar-███.net.  Newstar-███.com. |
| 11:20AM | 21 | Newstar-███.net.  Newstar-███.net.  Tinymodel-███.com. |
| 11:20AM | 22 | Sweet-███.com.  Sweet-███.com.  Sweet-███.com. |
| 11:20AM | 23 | Sweet-███.com, and Sweet-███.com." |
| 11:20AM | 24 | "On November 7th, 2019, law enforcement officers |
| 11:20AM | 25 | in the Netherlands traveled to Leaseweb BV and seized the |

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:20AM | 1 | servers hosting and facilitating the Newstar websites." |
| 11:20AM | 2 | "On November 7th, 2019, law enforcement officers |
| 11:20AM | 3 | in the Netherlands also traveled to Novogara BV and seized the |
| 11:20AM | 4 | servers hosting and facilitating the Newstar websites." |
| 11:20AM | 5 | "After seizing these servers, law enforcement |
| 11:20AM | 6 | officers in the Netherlands created full forensic copies of |
| 11:21AM | 7 | these servers and provided them to law enforcement officers in |
| 11:21AM | 8 | the United States.  A forensic copy is an identical copy of an |
| 11:21AM | 9 | electronic device." |
| 11:21AM | 10 | "The forensic copies of the devices provided to |
| 11:21AM | 11 | the United States, which are exact copies of the servers seized |
| 11:21AM | 12 | in the Netherlands as described above, included the following |
| 11:21AM | 13 | hash values."  And what follows is four subparagraphs, each of |
| 11:21AM | 14 | which contains the text MD5 followed by a long string of |
| 11:21AM | 15 | letters and numbers, and SHA1 followed by a long string of |
| 11:21AM | 16 | letters and numbers. |
| 11:21AM | 17 | BY MR. REYNOLDS: |
| 11:21AM | 18 | Q.   Mr. Ali, help us understand this.  Have you heard the term |
| 11:21AM | 19 | hash value before? |
| 11:21AM | 20 | A.   Yes. |
| 11:21AM | 21 | Q.   What does it mean? |
| 11:21AM | 22 | A.   A hash value is an alphanumeric value that is generated by |
| 11:21AM | 23 | a computer algorithm.  When this computer algorithm is applied |
| 11:21AM | 24 | on any block of data -- this block of data could be a file, a |
| 11:22AM | 25 | bunch of files, or it could be even evidence items or devices |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:22AM | 1 | such as computers or servers.  We use hash values for the |
| 11:22AM | 2 | purpose of maintaining and confirming the integrity of the |
| 11:22AM | 3 | evidence.  So let's say if we receive any evidence from any |
| 11:22AM | 4 | other law enforcement agencies, they would compute the hash |
| 11:22AM | 5 | value for specific evidence item or device, and when we receive |
| 11:22AM | 6 | the evidence item, we recompute the hash value using the same |
| 11:22AM | 7 | computer algorithm.  If the two hash values are the same, then |
| 11:22AM | 8 | I am able to establish the fact that both the evidence items |
| 11:22AM | 9 | are identical, they're exactly the same, and that they haven't |
| 11:22AM | 10 | been modified or tampered with in any way. |
| 11:22AM | 11 | Q.   So is it the case that if you have two digital devices, |
| 11:22AM | 12 | let's say two hard drives that have exactly the same data, will |
| 11:22AM | 13 | they have the exact same hash value? |
| 11:22AM | 14 | A.   Yes. |
| 11:22AM | 15 | Q.   If you have two hard drives that are exactly the same |
| 11:23AM | 16 | except for one tiny bit -- let's say one has an email on it |
| 11:23AM | 17 | that has a frowny face instead of a smiley face, will those two |
| 11:23AM | 18 | hard drives have the same hash value? |
| 11:23AM | 19 | A.   No. |
| 11:23AM | 20 | Q.   Is it fair to say that a hash value is sort of like a |
| 11:23AM | 21 | fingerprint or DNA for a digital device? |
| 11:23AM | 22 | A.   Yes. |
| 11:23AM | 23 | Q.   Mr. Ali, this -- the first stipulation of the parties on |
| 11:23AM | 24 | page 3 refers to the acronyms MD5 and SHA1.  Very briefly, what |
| 11:23AM | 25 | does that mean? |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:23AM | 1 | A.   These are two different standards that we use to compute |
| 11:23AM | 2 | these hash values.  MD5 refers to something called |
| 11:23AM | 3 | message-digest.  SHA1, or Sha-one as we call it, stands for the |
| 11:23AM | 4 | secure hash algorithm.  Essentially there are two different |
| 11:23AM | 5 | standards to compute the hash value of a device.  So let's say |
| 11:23AM | 6 | if you are measuring your weight, for example, you may measure |
| 11:23AM | 7 | it in pounds, or you may measure it in kilograms.  It gives you |
| 11:23AM | 8 | two different numbers, but essentially refers to your weight. |
| 11:24AM | 9 | Similarly here, these are two different values, but they -- if |
| 11:24AM | 10 | you compute the hash algorithm of an evidence item or device |
| 11:24AM | 11 | using the MD5 algorithm, it will give you the same value every |
| 11:24AM | 12 | time.  If you use the SHA1 standard to compute the hash value, |
| 11:24AM | 13 | it will give you the same SHA1 value every time. |
| 11:24AM | 14 | Q.   Mr. Ali, as part of your work on the investigation into |
| 11:24AM | 15 | the Newstar websites, did you receive files that had the exact |
| 11:24AM | 16 | same hash values as those that are listed on page 3 of the |
| 11:24AM | 17 | parties' first stipulation? |
| 11:24AM | 18 | A.   Yes. |
| 11:24AM | 19 | Q.   And do you have an understanding of where those files came |
| 11:24AM | 20 | from? |
| 11:24AM | 21 | A.   Yes. |
| 11:24AM | 22 | Q.   Did you analyze the file -- those files? |
| 11:24AM | 23 | A.   Yes. |
| 11:24AM | 24 | Q.   What does it mean to you that the files you analyzed had |
| 11:24AM | 25 | the same hash value as those listed in Government Exhibit 7, |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:24AM | 1 | the first stipulation of the parties? |
| 11:24AM | 2 | A.   So, again, it confirms the integrity of the evidence, and |
| 11:24AM | 3 | I'm able to tell that the files are exactly the same.  They |
| 11:24AM | 4 | were not modified.  They were not tampered with. |
| 11:24AM | 5 | Q.   I'm going to refer to these files that you received with |
| 11:24AM | 6 | these hash values as the forensic copies.  Will you understand |
| 11:25AM | 7 | what I mean? |
| 11:25AM | 8 | A.   Yes. |
| 11:25AM | 9 | Q.   Mr. Ali, once you obtained and analyzed the forensic |
| 11:25AM | 10 | copies, what did you find on them? |
| 11:25AM | 11 | A.   So I found evidence of multiple websites on these forensic |
| 11:25AM | 12 | copies which was the server that was hosting these websites.  I |
| 11:25AM | 13 | found evidence of files that suggested that the server was |
| 11:25AM | 14 | running a web server.  I also found evidence of a MySQL |
| 11:25AM | 15 | database management system on the server, and I also found |
| 11:25AM | 16 | evidence of an operating system known as the Linux operating |
| 11:25AM | 17 | system.  I also found evidence of programming files that were |
| 11:25AM | 18 | needed to serve and build these websites on the server. |
| 11:25AM | 19 | Q.   Now, all of these digital files that you found that you've |
| 11:25AM | 20 | just testified to, are those all characteristics of running |
| 11:25AM | 21 | websites? |
| 11:25AM | 22 | A.   Yes. |
| 11:25AM | 23 | Q.   Did the forensic copies you analyzed contain the names of |
| 11:26AM | 24 | the websites? |
| 11:26AM | 25 | A.   Yes. |

ALI - DIRECT EXAMINATION

11:26AM  1    Q.   And where on the forensic copies was this information

11:26AM  2    located?

11:26AM  3    A.   So there was a sun folder, s-u-n folder, and within the

11:26AM  4    folder you had multiple other sub folders.  The naming

11:26AM  5    convention for each of these folders were the names of the

11:26AM  6    websites themselves.

11:26AM  7    Q.   I'd like you to take a look at -- Mr. Ali, there are some

11:26AM  8    tubs of binders next to you, not those right in front of you,

11:26AM  9    but on the stand next to you.  Could you please take a look at

11:26AM 10    Government Exhibit 300?

11:26AM 11    A.   Yes.

11:26AM 12    Q.   Have you seen Government Exhibit 300 before?

11:26AM 13    A.   Yes.

11:26AM 14    Q.   What is it?

11:26AM 15    A.   This is a list of different Newstar websites that I found

11:26AM 16    and recreated on the Newstar server.

11:27AM 17    Q.   Were these the websites that were contained on the

11:27AM 18    forensic copies that you received from the Netherlands?

11:27AM 19    A.   Yes.

11:27AM 20    Q.   Government Exhibit 300, did you create this exhibit?

11:27AM 21    A.   Yes.

11:27AM 22    Q.   And how did you create it?

11:27AM 23    A.   So once I had found all of these websites, I exported a

11:27AM 24    list of the websites on an Excel sheet, and I made two columns.

11:27AM 25    The first column shows us the different domain names for the

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:27AM | 1 | website.  The second column is a description of the website or |
| 11:27AM | 2 | the title for the website as it would appear if you were to |
| 11:27AM | 3 | browse the website in your web browser. |
| 11:27AM | 4 | Q.   Does Government Exhibit 300 truly and accurately reflect |
| 11:27AM | 5 | computer data that you encountered or extracted from the |
| 11:27AM | 6 | forensic copies? |
| 11:27AM | 7 | A.   Yes. |
| 11:27AM | 8 | Q.   And the information located within Government's |
| 11:27AM | 9 | Exhibit 300, was it found in multiple different locations on |
| 11:27AM | 10 | the forensic copies? |
| 11:27AM | 11 | A.   Yes. |
| 11:27AM | 12 | Q.   In more than 50 different files? |
| 11:27AM | 13 | A.   Yes. |
| 11:27AM | 14 | MR. REYNOLDS:  Your Honor, we offer Government |
| 11:27AM | 15 | Exhibit 300 into evidence. |
| 11:28AM | 16 | MR. KERR:  No objection. |
| 11:28AM | 17 | THE COURT:  All right.  300 is received into |
| 11:28AM | 18 | evidence, may be published to the jury. |
| 11:28AM | 19 | MR. REYNOLDS:  Thank you, Your Honor.  Ms. Davis, can |
| 11:28AM | 20 | we publish Government Exhibit 300, please? |
| 11:28AM | 21 | BY MR. REYNOLDS: |
| 11:28AM | 22 | Q.   All right.  Mr. Ali, again, could you explain the |
| 11:28AM | 23 | difference between the left-hand column and the right-hand |
| 11:28AM | 24 | column now that it's up on the screen? |
| 11:28AM | 25 | A.   So on the left-hand column, you will see the domain name |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:28AM | 1 | of the website.  This is what you type in on your web browser |
| 11:28AM | 2 | when you're navigating to the website.  On the right side, you |
| 11:28AM | 3 | have the title of the website that would appear on your tab on |
| 11:28AM | 4 | the top of the browser when the website has loaded in your |
| 11:28AM | 5 | browser. |
| 11:28AM | 6 | Q.    Mr. Ali, Special Agent Boos testified about accessing |
| 11:28AM | 7 | certain websites.  Can you tell me if they appear on your list? |
| 11:28AM | 8 | A.    Yes, sir. |
| 11:28AM | 9 | Q.    Newstar-█████ |
| 11:28AM | 10 | A.    Yes. |
| 11:28AM | 11 | Q.    Sweet-██████ |
| 11:28AM | 12 | A.    Yes. |
| 11:28AM | 13 | Q.    Sweet-█████ |
| 11:28AM | 14 | A.    Yes. |
| 11:28AM | 15 | Q.    TinyModel-█████ |
| 11:29AM | 16 | A.    Yes. |
| 11:29AM | 17 | Q.    Those are not the only websites on Government Exhibit 300; |
| 11:29AM | 18 | is that correct? |
| 11:29AM | 19 | A.    Correct. |
| 11:29AM | 20 | Q.    According to this information -- Mr. Ali, just a few more. |
| 11:29AM | 21 | Did you reconstruct a website called Newstar-██████ |
| 11:29AM | 22 | A.    Yes. |
| 11:29AM | 23 | Q.    Sweet-██████ |
| 11:29AM | 24 | A.    Yes. |
| 11:29AM | 25 | Q.    Sweet-█████ |

ALI - DIRECT EXAMINATION

| 11:29AM | 1 | A. Yes. |
| 11:29AM | 2 | Q. Sweet-████ |
| 11:29AM | 3 | A. Yes. |
| 11:29AM | 4 | Q. Newstar-████ |
| 11:29AM | 5 | A. Yes. |
| 11:29AM | 6 | Q. Now, looking at the left-hand column of Government |
| 11:29AM | 7 | Exhibit 300, Mr. Ali, some of these URLs end in .com. Some of |
| 11:29AM | 8 | them end in .net. Some of them end in .info; is that right? |
| 11:29AM | 9 | A. Yes. |
| 11:29AM | 10 | Q. Is there a -- is there a technical name for that, what |
| 11:29AM | 11 | comes after the dot in the end of a website address? |
| 11:29AM | 12 | A. Yeah, this is knowns as the suffix of a domain name. |
| 11:29AM | 13 | Q. Domain name suffix? |
| 11:29AM | 14 | A. Yes. |
| 11:29AM | 15 | Q. Mr. Ali, back when these websites were still live before |
| 11:29AM | 16 | November 7th, 2019, did you visit some of them? |
| 11:29AM | 17 | A. Yes. |
| 11:29AM | 18 | Q. How much time would you say you spent on them? |
| 11:30AM | 19 | A. A few hours. |
| 11:30AM | 20 | Q. A few hours? Was the only way to access these websites |
| 11:30AM | 21 | through the exact domain suffix listed on Government |
| 11:30AM | 22 | Exhibit 300? |
| 11:30AM | 23 | A. There were several other domain names with different |
| 11:30AM | 24 | suffixes that would go back to the same website. |
| 11:30AM | 25 | Q. So just speaking hypothetically taking |

11:30AM  1   Newstar-████.net, is it possible that Newstar-████.net

11:30AM  2   could also be accessed from Newstar-████.info?

11:30AM  3   A.   Yes.

11:30AM  4   Q.   That sort of thing?

11:30AM  5   A.   Yes.

11:30AM  6   Q.   Do you know that from the forensic work you did on the

11:30AM  7   forensic copies, or do you know that from visiting the websites

11:30AM  8   or through some other means?

11:30AM  9   A.   So a little bit of both.  When I was visiting the website,

11:30AM  10  you could see that some of the logos of the website would, for

11:30AM  11  example, say Newstar-████ but then alternatively, they would

11:30AM  12  also be using the name NS████.net, .com, .info.  If you scroll

11:30AM  13  all the way down on the website on the footer area, it would

11:31AM  14  give you a different domain name for the website.

11:31AM  15  Q.   Mr. Ali, have you ever heard of the concept of a proxy

11:31AM  16  with a website?

11:31AM  17  A.   Yes.

11:31AM  18  Q.   What does that mean?

11:31AM  19  A.   So a proxy is a mechanism that you use -- it's mostly used

11:31AM  20  to hide the identity of the server that is serving the website.

11:31AM  21  The proxy sort of acts like a middleman, so it sits in between

11:31AM  22  the user who is accessing the website and the server itself.

11:31AM  23  So say, for example, if you go on your web browser, type in

11:31AM  24  Google.com, if there's a proxy in the middle, your request will

11:31AM  25  go to the proxy which will process the request, and then it

ALI - DIRECT EXAMINATION

| | |
|---|---|
| 11:31AM | 1 |
| 11:31AM | 2 |
| 11:31AM | 3 |
| 11:31AM | 4 |
| 11:31AM | 5 |
| 11:31AM | 6 |
| 11:31AM | 7 |
| 11:31AM | 8 |
| 11:32AM | 9 |

11:31AM  1  will send that request to the server.  So essentially by doing

11:31AM  2  this, you think that you're communicating with the proxy and

11:31AM  3  not with the server, so the identity of the server is hidden

11:31AM  4  from you, and all your communication is going through the

11:31AM  5  proxy.

11:31AM  6  Q.   Why might someone want to use a proxy in the context of a

11:31AM  7  website?

11:31AM  8  A.   Hide the identity of the server.

11:32AM  9  Q.   Other reasons?

11:32AM  10  A.   Yeah, it could be used, you know, to anonymize a server,

11:32AM  11  to keep its location private.

11:32AM  12  Q.   Based on the work you did on the Newstar websites,

11:32AM  13  Mr. Ali, do you personally know if this websites were -- used

11:32AM  14  proxies or were hidden behind proxies?

11:32AM  15  A.   No.

11:32AM  16  Q.   Do you know that they weren't?

11:32AM  17  A.   No.

11:32AM  18  Q.   All right.  You earlier testified that you reconstructed

11:32AM  19  websites.  What does that mean?

11:32AM  20  A.   So reconstructing a website, like we said before, I would

11:32AM  21  bring up the website on a stand-alone computer, which would be

11:32AM  22  running in our office, in our forensic lab, and we make it

11:32AM  23  available to investigators and analysts working within our

11:32AM  24  office.  They're able to browse the website, navigate through

11:32AM  25  different pages of the website as if you're navigating the

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:32AM | 1 | website live, but the website is not on the internet.  It's on |
| 11:32AM | 2 | an offline environment.  So that essentially allows |
| 11:32AM | 3 | investigators to do their work as if in the state of the |
| 11:33AM | 4 | website that it was in before law enforcement seized it, but |
| 11:33AM | 5 | the website itself is offline.  It's not on the internet. |
| 11:33AM | 6 | Q.   Did you reconstruct every website that is listed in |
| 11:33AM | 7 | Government Exhibit 300? |
| 11:33AM | 8 | A.   Yes. |
| 11:33AM | 9 | Q.   And when you received the forensic copies from the |
| 11:33AM | 10 | Netherlands, were all of the websites listed in the first |
| 11:33AM | 11 | columns, the websites URLs listed in the first column of |
| 11:33AM | 12 | Government Exhibit 300, were they all fully functional? |
| 11:33AM | 13 | A.   Yes. |
| 11:33AM | 14 | Q.   Did you need to do anything to them to make them operate? |
| 11:33AM | 15 | A.   No. |
| 11:33AM | 16 | Q.   Could they all be accessed from the URLs listed in the |
| 11:33AM | 17 | first column of Government Exhibit 300? |
| 11:33AM | 18 | A.   Yes. |
| 11:33AM | 19 | Q.   When you reconstructed these websites, Mr. Ali, how do you |
| 11:33AM | 20 | know you did it right? |
| 11:33AM | 21 | A.   So as soon as I reconstructed the websites, I could see |
| 11:33AM | 22 | the websites displayed properly.  I could browse the different |
| 11:33AM | 23 | pages on the website.  I could see all the images and text |
| 11:33AM | 24 | rendering on the website, and also there were no errors that |
| 11:34AM | 25 | were being generated by the web server.  So if there are no |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:34AM | 1 | errors, I'm able to browse the website, I am able to tell that |
| 11:34AM | 2 | I have successfully recreated these websites. |
| 11:34AM | 3 | Q.   If you had not done it correctly, would you have seen |
| 11:34AM | 4 | errors? |
| 11:34AM | 5 | A.   Yes. |
| 11:34AM | 6 | Q.   Mr. Ali, were you aware that Special Agent Boos captured |
| 11:34AM | 7 | screenshots and images from the live websites back in 2015? |
| 11:34AM | 8 | A.   Yes. |
| 11:34AM | 9 | Q.   Now, did you review the captures that she created when she |
| 11:34AM | 10 | did so? |
| 11:34AM | 11 | A.   Yes. |
| 11:34AM | 12 | Q.   Did you compare those against the versions of the websites |
| 11:34AM | 13 | that you reconstructed? |
| 11:34AM | 14 | A.   Yes. |
| 11:34AM | 15 | Q.   What, if anything, did you find when you compared the two? |
| 11:34AM | 16 | A.   They were exactly the same. |
| 11:34AM | 17 | Q.   When you reconstructed these websites, Mr. Ali, did you |
| 11:34AM | 18 | change their functionality in any respect? |
| 11:34AM | 19 | A.   For some of the websites, I had to, you know, reconfigure |
| 11:34AM | 20 | some of the configuration files when it comes to the |
| 11:34AM | 21 | functionality of the website, but the content of the website, |
| 11:35AM | 22 | the way the websites were delivered stayed exactly the same. |
| 11:35AM | 23 | Q.   So is -- in the case that in their original form, some of |
| 11:35AM | 24 | the websites required a password to access, did you alter the |
| 11:35AM | 25 | password functionality in any way? |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:35AM | 1 | A. Right. So there was a members area on the website which |
| 11:35AM | 2 | would give me this log-in box prompting me to enter the user |
| 11:35AM | 3 | name and password for the website. So I disabled that log-in |
| 11:35AM | 4 | box that I could access the members area of the website. |
| 11:35AM | 5 | Q. And in the process of this reconstruction, Mr. Ali, did |
| 11:35AM | 6 | you add any images to the websites that weren't already there? |
| 11:35AM | 7 | A. No. |
| 11:35AM | 8 | Q. Did you alter any images? |
| 11:35AM | 9 | A. No. |
| 11:35AM | 10 | Q. Did you alter the appearance of any web pages? |
| 11:35AM | 11 | A. No. |
| 11:35AM | 12 | Q. Once you reconstructed these websites, did you spend time |
| 11:35AM | 13 | navigating them? |
| 11:35AM | 14 | A. Yes. |
| 11:35AM | 15 | Q. How much time? |
| 11:35AM | 16 | A. I would say dozens of hours. |
| 11:35AM | 17 | Q. Did you find that the websites were entirely in the |
| 11:36AM | 18 | English language? |
| 11:36AM | 19 | A. Yes. |
| 11:36AM | 20 | Q. Did you see any other languages on them? |
| 11:36AM | 21 | A. No. |
| 11:36AM | 22 | Q. Mr. Ali, when someone visited one of these websites, was |
| 11:36AM | 23 | there -- was there a portion of it they could see without |
| 11:36AM | 24 | paying any money? |
| 11:36AM | 25 | A. Yes. |

| | | |
|---|---|---|
| 11:36AM | 1 | **Q.**   All right.  I'd like to walk through the structure of the |
| 11:36AM | 2 | websites in a little bit more detail, starting with the website |
| 11:36AM | 3 | entitled -- called Newstar-███████    If you could take a look |
| 11:36AM | 4 | at Government Exhibit 301, please. |
| 11:37AM | 5 | **A.**   Yes. |
| 11:37AM | 6 | **Q.**   Mr. Ali, have you seen Government Exhibit 301 before? |
| 11:37AM | 7 | **A.**   Yes. |
| 11:37AM | 8 | **Q.**   What is it? |
| 11:37AM | 9 | **A.**   These are screenshots from the Newstar-███████ website as |
| 11:37AM | 10 | it was recreated. |
| 11:37AM | 11 | **Q.**   How many pages -- excuse me.  How many pages is this |
| 11:37AM | 12 | exhibit? |
| 11:37AM | 13 | **A.**   12 pages. |
| 11:37AM | 14 | **Q.**   And does Government Exhibit 301 truly and accurately |
| 11:37AM | 15 | reflect screenshots taken from the website Newstar-███████ as |
| 11:37AM | 16 | you reconstructed it? |
| 11:37AM | 17 | **A.**   Yes. |
| 11:37AM | 18 | **MR. REYNOLDS:**  Your Honor, we offer Government |
| 11:37AM | 19 | Exhibit 301 into evidence. |
| 11:37AM | 20 | **MR. KERR:**  No objection. |
| 11:37AM | 21 | **THE COURT:**  301 is received into evidence, may be |
| 11:37AM | 22 | published to the jury. |
| 11:37AM | 23 | **MR. REYNOLDS:**  Thank you, Your Honor.  Ms. Davis, can |
| 11:37AM | 24 | you publish that first page of Government Exhibit 301? |
| 11:37AM | 25 | **BY MR. REYNOLDS:** |

**ALI - DIRECT EXAMINATION**

11:37AM  1   Q.   Mr. Ali, what is the first page of Government Exhibit 301

11:37AM  2   that is now being shown on the screen?

11:37AM  3   A.   So this is the page you would see if you go to the

11:37AM  4   Newstar-███████ website.  This is the first page that would

11:37AM  5   show up.

11:38AM  6   Q.   And could you read the text that appears on the screen to

11:38AM  7   the jury, please?

11:38AM  8   A.   Yes.  It says, "Warning:  Before you enter, if you are

11:38AM  9   offended by non-nude child modeling, leave.  We are a hundred

11:38AM  10  percent legal non-nude website that has no nudity, sexual or

11:38AM  11  erotic poses, no lewd photography.  No photos are designed to

11:38AM  12  arouse anyone.  We were not designed for pedophiles.  We are

11:38AM  13  solely to introduce new young models to the world.  We comply

11:38AM  14  hundred percent with the U.S. Code Title 18 and are not child

11:38AM  15  porn.  Use the buttons below to enter if you agree to the

11:38AM  16  above."

11:38AM  17  Q.   Mr. Ali, are there any images of children on the first

11:38AM  18  page of Government Exhibit 301?

11:38AM  19  A.   No.

11:38AM  20  Q.   What would happen if you pushed the -- excuse me.  The

11:38AM  21  three yellow boxes at the bottom of the blown-up screen here,

11:38AM  22  what would happen -- are those links?

11:38AM  23  A.   Yes.

11:38AM  24  Q.   What would happen if you clicked those links?

11:39AM  25  A.   So there are three links here.  The first one says "leave

| | |
|---|---|
| 11:39AM | 1 |
| 11:39AM | 2 |
| 11:39AM | 3 |
| 11:39AM | 4 |
| 11:39AM | 5 |
| 11:39AM | 6 |
| 11:39AM | 7 |
| 11:39AM | 8 |
| 11:39AM | 9 |
| 11:39AM | 10 |
| 11:39AM | 11 |
| 11:39AM | 12 |
| 11:39AM | 13 |
| 11:39AM | 14 |
| 11:39AM | 15 |
| 11:40AM | 16 |
| 11:40AM | 17 |
| 11:40AM | 18 |
| 11:40AM | 19 |
| 11:40AM | 20 |
| 11:40AM | 21 |
| 11:40AM | 22 |
| 11:40AM | 23 |
| 11:40AM | 24 |
| 11:40AM | 25 |

1   now".  That makes you exit the website and takes you to

2   Google.com.  The second link which says "legal" takes you to a

3   legal page that had as a legal disclaimer on it.  The third

4   link says "continue", and that takes you into the

5   Newstar-████████ website.

6   Q.   Mr. Ali, you testified that this Government Exhibit 301,

7   page 1, stated that there are quote "no sexual or erotic poses"

8   end quote on this website.  Do you agree with that?

9   A.   No.

10   Q.   All right.  If you could go to page 2 of Government

11   Exhibit 301, please?

12   A.   Yes.

13   Q.   And what is this?

14   A.   This is the legal disclaimer page, so a user would end up

15   here if he or she clicked on the "legal" button on the previous

16   page.

17   Q.   And the -- at the very top, the top right, does this read

18   as follows:  "Legal information, all artistic work contained on

19   this website abides by U.S. and international laws and does not

20   contain nudity or lascivious poses nor anything sexually

21   explicit"?

22   A.   Yes.

23   Q.   And would hitting the "continue" button allow the person

24   to proceed into the Newstar-████████ website?

25   A.   Yes.

ALI - DIRECT EXAMINATION

11:40AM   1          MR. REYNOLDS:  Thank you.  Ms. Davis, could we go to

11:40AM   2   page 3 of Government Exhibit 301?

11:40AM   3   BY MR. REYNOLDS:

11:40AM   4   Q.   Mr. Ali, what are we looking at here on page 3 of

11:40AM   5   Government's Exhibit 301?

11:40AM   6   A.   This is the page that you would see if you clicked on the

11:40AM   7   "continue" button, and it sends the user to the main page of

11:40AM   8   the Newstar-████████ website.

11:40AM   9   Q.   Very briefly, could you just describe what is on the

11:40AM  10   screen?

11:40AM  11   A.   Yes.  So we see there's a young child.  She's wearing a

11:40AM  12   skirt and a top with her belly exposed.  You see a few more

11:41AM  13   thumbnail images of the same child in the background in various

11:41AM  14   costumes.  You see multiple links on the page that takes you to

11:41AM  15   other areas on the website.  One of them is the "members" link.

11:41AM  16   One of them is the "contacts" link.  There's a link that says

11:41AM  17   "buy new videos," "buy old videos."  There's a "photo preview"

11:41AM  18   link and a "join now" link, and also at the bottom of the

11:41AM  19   website you can see some of the banners that would pop up on

11:41AM  20   the website.

11:41AM  21   Q.   Mr. Ali, is there a -- is there a portion of this website

11:41AM  22   approximately -- web page on the left side approximately in the

11:41AM  23   middle that says, "Updated 30/07/2022.  Next update 6/8/2022"?

11:41AM  24   A.   Yes.

11:41AM  25   Q.   Mr. Ali, didn't the parties' first stipulation state that

ALI - DIRECT EXAMINATION

11:41AM 1    the parties websites were seized and taken down in 2019?

11:41AM 2    A.   Yes.

11:41AM 3    Q.   Then why does this web page refer to the year 2022?

11:42AM 4    A.   Well, when I was analyzing the code for the website, there

11:42AM 5    were some pieces of the code that was telling the website to

11:42AM 6    update at regular intervals, and it would just take whatever is

11:42AM 7    the next interval put it on the website.  So at the time when

11:42AM 8    the screenshot was taken, the website was programmed to say

11:42AM 9    that the next update will be pushed on 6/8/2022, and the last

11:42AM 10   update was on 30/07/2022.

11:42AM 11   Q.   The code that you just referred to, did that continue to

11:42AM 12   update after you reconstructed the websites in the stand-alone

11:42AM 13   environment?

11:42AM 14   A.   Yes.

11:42AM 15   Q.   All right.  If you could scroll down to page 4 of

11:42AM 16   Government Exhibit 301, Mr. Ali, is this part of the same web

11:42AM 17   page as page 3?

11:42AM 18   A.   Yes, this is what you would see if you scroll down on the

11:42AM 19   website.

11:42AM 20   Q.   What are these rectangles on this page 4 of Government's

11:43AM 21   Exhibit 301?

11:43AM 22   A.   These are the different banners that would pop up on the

11:43AM 23   bottom of the website.

11:43AM 24   Q.   I'd like to ask you some more questions about that, but

11:43AM 25   we're going to save that for just one moment.

ALI - DIRECT EXAMINATION

| 11:43AM | 1 | Going back to page 3 of Government Exhibit 301, |
| 11:43AM | 2 | Mr. Ali, what would happen on this page if you clicked on the |
| 11:43AM | 3 | link at the bottom that reads "photo preview"? |
| 11:43AM | 4 | A.   So that would take the user to a photo preview section of |
| 11:43AM | 5 | the website which would show some of the thumbnail preview |
| 11:43AM | 6 | images from some of the galleries that existed on the website. |
| 11:43AM | 7 | Q.   What do you mean by gallery? |
| 11:43AM | 8 | A.   Gallery is like a photo album.  It's a combination of two |
| 11:43AM | 9 | or more images that belong to the same series of images and |
| 11:43AM | 10 | shows the same child in the same pose or outfit. |
| 11:43AM | 11 | MR. REYNOLDS:  Ms. Davis, can we proceed to page 8 of |
| 11:43AM | 12 | Government's 301? |
| 11:43AM | 13 | BY MR. REYNOLDS: |
| 11:43AM | 14 | Q.   Mr. Ali, what does this depict? |
| 11:43AM | 15 | A.   So this is one of the free preview pages, and the user |
| 11:44AM | 16 | would end up on this page if they clicked on the free preview |
| 11:44AM | 17 | button. |
| 11:44AM | 18 | Q.   And does it read "free preview" in the top left of the |
| 11:44AM | 19 | screen? |
| 11:44AM | 20 | A.   Yes. |
| 11:44AM | 21 | Q.   So if a user was navigating this website and clicked on |
| 11:44AM | 22 | one of these images, what would happen? |
| 11:44AM | 23 | A.   That would take the user to a -- the "join now" page where |
| 11:44AM | 24 | the user will be prompted with multiple options on making a |
| 11:44AM | 25 | payment, subscribing to the website, or becoming a member of |

110

| | | |
|---|---|---|
| 11:44AM | 1 | the website, and then accessing the images that are in the |
| 11:44AM | 2 | members area. |
| 11:44AM | 3 | Q.   So to be clear, clicking on one of these images would not |
| 11:44AM | 4 | show the inside of the gallery; would it? |
| 11:44AM | 5 | A.   Correct, it wouldn't. |
| 11:44AM | 6 | Q.   It wouldn't show more pictures? |
| 11:44AM | 7 | A.   No. |
| 11:44AM | 8 | Q.   It would take you to what you called the "join" page? |
| 11:44AM | 9 | A.   Correct. |
| 11:44AM | 10 | Q.   If we could turn to page 11 of Government Exhibit 301. |
| 11:44AM | 11 | Mr. Ali, what is page 11 of Government Exhibit 301? |
| 11:45AM | 12 | A.   So this is the join page.  The user can reach this page by |
| 11:45AM | 13 | either clicking on the join page link at the bottom of the main |
| 11:45AM | 14 | page, or if the user clicks on any of the free preview images, |
| 11:45AM | 15 | they will end up on this page.  This page gives the user the |
| 11:45AM | 16 | option to put in their credit card and become a member. |
| 11:45AM | 17 | Q.   And could you read the text above where it says "join by |
| 11:45AM | 18 | credit card"? |
| 11:45AM | 19 | A.   Yes.  It says, "If you join this site, you will get full |
| 11:45AM | 20 | access to all photo series with all three ▬▬▬ models plus |
| 11:45AM | 21 | weekly updates.  Now with easy dot zip download.  Join by |
| 11:45AM | 22 | credit card, instant access." |
| 11:45AM | 23 | Q.   And do you see a text in the box below the box that says |
| 11:45AM | 24 | "join by credit card, instant access"? |
| 11:45AM | 25 | A.   Yes. |

11:45AM 1   Q.   Could you read that to the jury, please?

11:45AM 2   A.   It says, "While non-nude -- while non-nude and legal, some

11:45AM 3   countries have begun to challenge your right to view non-nude

11:46AM 4   websites.  By joining, you certify that you are 18 years old,

11:46AM 5   that you're aware of laws in your country and/or state, and

11:46AM 6   that viewing non-nude child modeling is legal from your

11:46AM 7   location."

11:46AM 8   Q.   Thank you.  Mr. Ali, the text that you just read, would

11:46AM 9   you describe that text as large?

11:46AM 10  A.   It's very small.

11:46AM 11  Q.   All right.  And what would happen if you clicked on the

11:46AM 12  button "join by credit card"?

11:46AM 13  A.   So clicking on that button gives the user multiple options

11:46AM 14  on subscribing to the website or buying different packages on

11:46AM 15  the website.

11:46AM 16  Q.   And turning to the next page, the final page of Government

11:46AM 17  Exhibit 301, page 12, if a user had clicked on the "join by

11:46AM 18  credit card," is this the option that they would see?

11:46AM 19  A.   Yes.

11:46AM 20  Q.   How is this different from the previous page?

11:46AM 21  A.   So the previous page shows us just one option that says

11:46AM 22  "click here to join."  This then gives you four different ways

11:46AM 23  in which you can purchase a membership for the website.

11:47AM 24  Q.   And what are those different ways that you could purchase

11:47AM 25  a membership?

ALI – DIRECT EXAMINATION

11:47AM  1   A.   So there are four options.  The user can either pay $49.99

11:47AM  2   for 30 days, no rebill.  The user can pay $49.99 for 30 days,

11:47AM  3   rebilling at 35.99.  The user can pay 69.99 for 60 days, no

11:47AM  4   rebilling.  And 95.99 for 90 days, no rebilling.

11:47AM  5   Q.   Do you have an understanding of what the word "rebilling"

11:47AM  6   means?

11:47AM  7   A.   Yes.

11:47AM  8   Q.   What does that mean?

11:47AM  9   A.   So the process of rebilling is like subscribing to a

11:47AM  10  subscription service, sort of like Netflix where you would

11:47AM  11  subscribe to a service.  They would take your credit card, and

11:47AM  12  then they will charge you on a monthly or recurring basis so

11:47AM  13  that the user doesn't have to go back to the website every 30

11:47AM  14  or so days and put their credit card information again.  So

11:47AM  15  they will just charge your website, and you remain a member of

11:47AM  16  the website.

11:47AM  17  Q.   Mr. Ali, have you ever heard of the concept of a paywall

11:48AM  18  when it comes to websites?

11:48AM  19  A.   Yes.

11:48AM  20  Q.   What is a paywall?

11:48AM  21  A.   So a paywall is what protects a user from accessing

11:48AM  22  content behind the paywall unless the user pays and becomes a

11:48AM  23  member or subscribes to a service.

11:48AM  24  Q.   Did the Newstar websites have a paywall?

11:48AM  25  A.   Yes.

ALI - DIRECT EXAMINATION

11:48AM 1   Q.   Now, everything we've seen so far in Government

11:48AM 2   Exhibit 301, Mr. Ali, would this be inside or outside the

11:48AM 3   paywall?

11:48AM 4   A.   This is outside the paywall.

11:48AM 5   Q.   So would a user have to pay any money to see any of the

11:48AM 6   content in Government Exhibit 301?

11:48AM 7   A.   No.

11:48AM 8   Q.   Is there a portion of the Newstar-████ website that is

11:48AM 9   inside the paywall?

11:48AM 10  A.   Yes.

11:48AM 11  Q.   All right.  I want to talk about that next.

11:48AM 12       MR. REYNOLDS:  But first, Ms. Davis, if you could put

11:48AM 13  page 12 of 301 back on the screen, please?

11:48AM 14  BY MR. REYNOLDS:

11:48AM 15  Q.   Mr. Ali, you've testified about these bubbles, these

11:48AM 16  payment options that appear in the center of page 12.  So what

11:49AM 17  would happen if a user clicked on one of those?

11:49AM 18  A.   So if the user clicks on one of them, it takes you to a

11:49AM 19  website that prompts you for your payment details, your credit

11:49AM 20  card details.  Once you have entered those details, you can

11:49AM 21  become a member of the website, and then you can access the

11:49AM 22  content behind the paywall or in the members area of the

11:49AM 23  website.

11:49AM 24  Q.   And that website where you enter your payment information,

11:49AM 25  is that the same website as Newstar-████

**ALI - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 11:49AM | 1 | A.   No. |
| 11:49AM | 2 | Q.   What website is that? |
| 11:49AM | 3 | A.   It was the CyberPay website. |
| 11:49AM | 4 | Q.   Is CyberPay the title of the website? |
| 11:49AM | 5 | A.   Yes. |
| 11:49AM | 6 | Q.   Did you reconstruct in CyberPay website? |
| 11:49AM | 7 | A.   No. |
| 11:49AM | 8 | Q.   How do you know what it was? |
| 11:49AM | 9 | A.   So when we were doing our investigation, I found URL and |
| 11:49AM | 10 | links that were leading to the CyberPay website, and then we |
| 11:49AM | 11 | had also found code of the CyberPay websites on the servers |
| 11:49AM | 12 | which confirms that yes, these links were going to the CyberPay |
| 11:49AM | 13 | website, which was processing the payments and then letting the |
| 11:49AM | 14 | user become a member of the website. |
| 11:50AM | 15 | Q.   So, Mr. Ali, if a user on -- person goes on |
| 11:50AM | 16 | Newstar-█████ clicks one of these options on page 12, enters |
| 11:50AM | 17 | his credit card information into the CyberPay website, what |
| 11:50AM | 18 | happens then? |
| 11:50AM | 19 | A.   Then you'll get an email that gives you your membership |
| 11:50AM | 20 | confirmation, and from there on you can then get a user name |
| 11:50AM | 21 | and password, log into the Newstar-█████ website and access |
| 11:50AM | 22 | the members area. |
| 11:50AM | 23 | Q.   Would a person have access to all the content available |
| 11:50AM | 24 | within the members area? |
| 11:50AM | 25 | A.   Yes. |

ALI - DIRECT EXAMINATION

| | |
|---|---|
| 11:50AM | 1 |
| 11:50AM | 2 |
| 11:50AM | 3 |
| 11:50AM | 4 |
| 11:50AM | 5 |
| 11:50AM | 6 |
| 11:50AM | 7 |
| 11:51AM | 8 |
| 11:51AM | 9 |
| 11:51AM | 10 |
| 11:51AM | 11 |
| 11:51AM | 12 |
| 11:51AM | 13 |
| 11:51AM | 14 |
| 11:51AM | 15 |
| 11:51AM | 16 |
| 11:51AM | 17 |
| 11:51AM | 18 |
| 11:51AM | 19 |
| 11:51AM | 20 |
| 11:51AM | 21 |
| 11:51AM | 22 |
| 11:51AM | 23 |
| 11:51AM | 24 |
| 11:51AM | 25 |

Q.   Now, you said that one of these options on page 12 calls for rebilling.  Mr. Ali, if they have -- if someone has access to everything within the members area for a certain price, why would they want to maintain a month-by-month subscription?

A.   Because like we discussed before, this website was pushing out weekly or biweekly updates for the content, so there were new galleries or images being added to the website on a regular basis.  So the incentive given here was if you rebill, you will have continuous access to the website.  You can access old images of children.  You can access any new images of children that have been posted in the future.

Q.   If we could go back to page 3 of Government's 301, please? Mr. Ali, the red link at the bottom on the far left, does that read "members"?

A.   Yes.

Q.   What would happen if a user clicked on the "members" clink?

A.   So if the user doesn't have a subscription to the website, that would pop up a user name and password log-in box asking the user to put in the user name and password and then logging into the website.

Q.   And if a user had a user name and password, would he then proceed from outside the paywall to inside the paywall of Newstar-█████████

A.   Correct.

ALI - DIRECT EXAMINATION

11:52AM   1   Q.   Mr. Ali, if you could take a look at Government

11:52AM   2   Exhibit 302, please.

11:52AM   3   A.   Okay.

11:52AM   4   Q.   Have you seen Government Exhibit 302 before?

11:52AM   5   A.   Yes.

11:52AM   6   Q.   What is it?

11:52AM   7   A.   These are screenshots of the members area of the

11:52AM   8   Newstar-███████ website as we recreated them from the server.

11:52AM   9   Q.   Does Government Exhibit 302 truly and accurately reflect

11:52AM  10   screenshots that you created from the Newstar-███████ website?

11:52AM  11   A.   Yes.

11:52AM  12        MR. REYNOLDS:   All right.  Your Honor, we offer

11:52AM  13   Government Exhibit 302 into evidence.

11:52AM  14        MR. KERR:   No objection.

11:52AM  15        THE COURT:   All right.  It is -- you said 302?  It's

11:52AM  16   received into evidence, may be published to the jury.

11:52AM  17        MR. REYNOLDS:   Thank you.  Ms. Davis, could we see

11:52AM  18   page 1 of Government's 302?

11:53AM  19   BY MR. REYNOLDS:

11:53AM  20   Q.   All right.  Mr. Ali, this looks a bit similar to the

11:53AM  21   preview photos that we looked at in Government Exhibit 301; is

11:53AM  22   that correct?

11:53AM  23   A.   Yes.

11:53AM  24   Q.   How is it different?

11:53AM  25   A.   So it is different from the sense that if you click on any

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:53 AM | 1 | of these preview images, it takes you inside the gallery, and |
| 11:53 AM | 2 | then the user is able to see all the images within that |
| 11:53 AM | 3 | particular gallery. |
| 11:53 AM | 4 | Q.   Now, the page that we -- the page that we're looking for |
| 11:53 AM | 5 | now -- looking at now, Government Exhibit 302, is this inside |
| 11:53 AM | 6 | or outside the paywall? |
| 11:53 AM | 7 | A.   This is inside the paywall. |
| 11:53 AM | 8 | Q.   Would a user be able to see this without paying? |
| 11:53 AM | 9 | A.   No. |
| 11:53 AM | 10 | Q.   Does it read "members area" in the lower -- the upper |
| 11:53 AM | 11 | left-hand corner? |
| 11:53 AM | 12 | A.   Yes. |
| 11:53 AM | 13 | Q.   Now, Mr. Ali, are these the same photographs that a user |
| 11:53 AM | 14 | could see in the preview photos outside the paywall? |
| 11:53 AM | 15 | A.   Yes. |
| 11:53 AM | 16 | Q.   And I believe you testified that if you clicked on this, |
| 11:53 AM | 17 | you would see the inside of a gallery; is that correct? |
| 11:54 AM | 18 | A.   Yes. |
| 11:54 AM | 19 | MR. REYNOLDS:  Ms. Davis, could you blow up the |
| 11:54 AM | 20 | preview photo for 465?  Thank you. |
| 11:54 AM | 21 | BY MR. REYNOLDS: |
| 11:54 AM | 22 | Q.   Mr. Ali, next to gallery 465, do you see a small icon and |
| 11:54 AM | 23 | a word that appears to read "zip"? |
| 11:54 AM | 24 | A.   Yes. |
| 11:54 AM | 25 | Q.   What's that? |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:54AM | 1 | **A.**   So this was a functionality of the website that allowed |
| 11:54AM | 2 | the user to download all of the images of the website as one |
| 11:54AM | 3 | zip file on to their local computer, and then they were able to |
| 11:54AM | 4 | access all of the images within this gallery on their local |
| 11:54AM | 5 | computer without visiting the website again. |
| 11:54AM | 6 | **Q.**   What does the word "zip" mean? |
| 11:54AM | 7 | **A.**   So zip is a compressed archive.  It's a mechanism that |
| 11:54AM | 8 | allows you to put multiple files in one file, essentially zip |
| 11:54AM | 9 | up the files -- |
| 11:54AM | 10 | **THE COURT:**  Can you slow down?  Can you slow down, |
| 11:54AM | 11 | please?  Thank you. |
| 11:54AM | 12 | **THE WITNESS:**  Yes, Your Honor.  So it allows the user |
| 11:54AM | 13 | to put a bunch of files in one container and then the user can |
| 11:55AM | 14 | download it to their system and then unzip that container and |
| 11:55AM | 15 | extract the contents of that container. |
| 11:55AM | 16 | BY MR. REYNOLDS: |
| 11:55AM | 17 | **Q.**   So is it the case, Mr. Ali, that a user of the -- a |
| 11:55AM | 18 | visitor to the Newstar website could -- Newstar-██████ could |
| 11:55AM | 19 | both view the content on his screen and download it to his own |
| 11:55AM | 20 | computer for later use? |
| 11:55AM | 21 | **A.**   Correct. |
| 11:55AM | 22 | **Q.**   All right.  Showing you what has been previously marked as |
| 11:55AM | 23 | Government's Exhibit 303, have you seen this before, Mr. Ali? |
| 11:55AM | 24 | **A.**   Hasn't been published yet. |
| 11:55AM | 25 | **Q.**   Oh, it should be in your tub. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:55AM | 1 | A.   Let me grab that. |
| 11:55AM | 2 | Q.   I'm sorry, I did not signal the exhibit change. |
| 11:55AM | 3 | A.   Yes, I have. |
| 11:55AM | 4 | Q.   What is it? |
| 11:55AM | 5 | A.   So this is the details of one of the galleries on the |
| 11:55AM | 6 | members area, so if you would visit gallery 278, you would see |
| 11:56AM | 7 | those details on your page. |
| 11:56AM | 8 | Q.   So you previously testified with -- I believe you |
| 11:56AM | 9 | previously testified with Government 302.  If you clicked on |
| 11:56AM | 10 | one of the smaller images in the member's area, you'd be |
| 11:56AM | 11 | directed to a gallery? |
| 11:56AM | 12 | A.   Yes. |
| 11:56AM | 13 | Q.   Is this such a gallery? |
| 11:56AM | 14 | A.   Yes. |
| 11:56AM | 15 | Q.   Which gallery does this depict? |
| 11:56AM | 16 | A.   This is gallery 278. |
| 11:56AM | 17 | Q.   And does Government Exhibit 303 truly and accurately |
| 11:56AM | 18 | reflect screenshots of this gallery from the Newstar website -- |
| 11:56AM | 19 | or excuse me, from Newstar-████ as you reconstructed it? |
| 11:56AM | 20 | A.   Yes. |
| 11:56AM | 21 |        MR. REYNOLDS:  Your Honor, we offer Government |
| 11:56AM | 22 | Exhibit 303 into evidence. |
| 11:56AM | 23 |        MR. KERR:  No objection. |
| 11:56AM | 24 |        THE COURT:  All right.  303 is received into |
| 11:56AM | 25 | evidence, may be published to the jury. |

ALI - DIRECT EXAMINATION

11:56AM  1          MR. REYNOLDS:  May we see page 1 of Government's 303,
11:56AM  2   please?
11:56AM  3   BY MR. REYNOLDS:
11:56AM  4   Q.   Mr. Ali, now that it's up on the screen, could you
11:56AM  5   describe what we're looking at, please?
11:56AM  6   A.   Yes.  So this is the page you would see when the user has
11:56AM  7   entered gallery 278.  It shows 12 different images that are
11:57AM  8   within the gallery.  It shows you the same little child who was
11:57AM  9   featured on this website in various different poses.
11:57AM 10   Q.   And you previously testified about a zip icon.  Does that
11:57AM 11   appear on this page as well?
11:57AM 12   A.   Yes.
11:57AM 13   Q.   Could you read the text that follows at the top the word
11:57AM 14   "published" and the word "contains"?
11:57AM 15   A.   Yes.  It says, "Published September 20th, 2014.  Contains
11:57AM 16   70 photos."
11:57AM 17          MR. REYNOLDS:  Now, Ms. Davis, could we just briefly
11:57AM 18   scroll through pages 1 through 6 of Government Exhibit 303?
11:57AM 19   And back to page 1, please?  Back to page 1.
11:58AM 20   BY MR. REYNOLDS:
11:58AM 21   Q.   Mr. Ali, looking at page 1 of Government's 303, what would
11:58AM 22   happen if you clicked on one of these images?
11:58AM 23   A.   So clicking on one of these images would show the user the
11:58AM 24   full size render of that image.
11:58AM 25   Q.   Now, you previously testified that there was a preview

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:58AM | 1 | photo that was accessible from outside the -- outside the |
| 11:58AM | 2 | paywall; is that correct? |
| 11:58AM | 3 | A.   Yes. |
| 11:58AM | 4 | Q.   Are any of the images on the first page of Government |
| 11:58AM | 5 | Exhibit 303 viewable as a preview photo from outside the |
| 11:58AM | 6 | paywall? |
| 11:58AM | 7 | A.   Yes. |
| 11:58AM | 8 | Q.   Which one? |
| 11:58AM | 9 | A.   The very first one. |
| 11:58AM | 10 | Q.   Is the first image in a gallery always the preview photos? |
| 11:58AM | 11 | A.   Yes. |
| 11:58AM | 12 | Q.   All right.  Mr. Ali, looking at -- looking at the pages -- |
| 11:58AM | 13 | at least the first -- primarily the first page, but also the |
| 11:58AM | 14 | following few pages of Government Exhibit 303, does preview -- |
| 11:59AM | 15 | does photo Number 1 appear different to you in any way from the |
| 11:59AM | 16 | photos that follow? |
| 11:59AM | 17 | A.   Yes. |
| 11:59AM | 18 | Q.   How so? |
| 11:59AM | 19 | A.   It sort of stands out in the sense that it is usually the |
| 11:59AM | 20 | most sexually explicit photo in the entire gallery. |
| 11:59AM | 21 | Q.   Is it always the most sexually explicit photo? |
| 11:59AM | 22 | A.   No. |
| 11:59AM | 23 |        MR. REYNOLDS:  And turning to page 6 of Government |
| 11:59AM | 24 | Exhibit 303, Ms. Davis if you could blow up photos 69 and 70. |
| 11:59AM | 25 | BY MR. REYNOLDS: |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:59AM | 1 | Q.   First of all, are 69 and 70 the last two images of the |
| 11:59AM | 2 | gallery depicted in Government Exhibit 303? |
| 11:59AM | 3 | A.   Yes. |
| 11:59AM | 4 | Q.   What is the -- actually let me -- before you respond, how |
| 11:59AM | 5 | old would you describe the girl who's depicted in these photos |
| 11:59AM | 6 | on Government Exhibit 303? |
| 11:59AM | 7 | A.   I would say she is seven, eight years old. |
| 11:59AM | 8 | Q.   And what does she appear to be doing in photos 69 and 70 |
| 12:00PM | 9 | on page 6 of 303? |
| 12:00PM | 10 | A.   She is blowing a kiss for the camera. |
| 12:00PM | 11 | Q.   And have you seen other images on the Newstar websites |
| 12:00PM | 12 | that appear to depict children blowing kisses for the camera? |
| 12:00PM | 13 | A.   Yes. |
| 12:00PM | 14 | Q.   Is it common? |
| 12:00PM | 15 | A.   Yes. |
| 12:00PM | 16 | MR. REYNOLDS:  Court's indulgence for one moment, |
| 12:00PM | 17 | please. |
| 12:00PM | 18 | (Pause.) |
| 12:00PM | 19 | BY MR. REYNOLDS: |
| 12:00PM | 20 | Q.   We're going to take Government Exhibit 303 off the screen, |
| 12:00PM | 21 | but, Mr. Ali, please keep it in front of you.  Not all the |
| 12:00PM | 22 | images in Government Exhibit 303 are sexual; are they? |
| 12:00PM | 23 | A.   Correct, they're not. |
| 12:00PM | 24 | Q.   Not all of them depict a young girl spreading her legs for |
| 12:00PM | 25 | the camera? |

ALI - DIRECT EXAMINATION

123

| | | |
|---|---|---|
| 12:00PM | 1 | A.    Correct. |
| 12:00PM | 2 | Q.    Could you describe the images that appear on pages 10 |
| 12:00PM | 3 | through 11 of Government Exhibit 303? |
| 12:01PM | 4 | A.    Yes.  So on page 10, we see the same little child who is |
| 12:01PM | 5 | on the Newstar-██████ website.  She is lying down wearing a |
| 12:01PM | 6 | T-shirt and a skirt.  Her skirt is tucked up.  Her legs are |
| 12:01PM | 7 | also spread apart.  We can see her translucent underwear |
| 12:01PM | 8 | exposed, and also partial outline of her genitals are also |
| 12:01PM | 9 | exposed. |
| 12:01PM | 10 | Q.    And are pages 10 and 11 -- excuse me, 9, 10, and 11 |
| 12:01PM | 11 | similar in nature in Government Exhibit 303? |
| 12:01PM | 12 | A.    Yes. |
| 12:01PM | 13 | MR. REYNOLDS:  Ms. Davis, for one to two seconds |
| 12:01PM | 14 | each, could we display images pages 9, 10, and 11 of Government |
| 12:01PM | 15 | Exhibit 303? |
| 12:02PM | 16 | BY MR. REYNOLDS: |
| 12:02PM | 17 | Q.    Thank you.  Mr. Ali, this is a gallery of 70 photos, |
| 12:02PM | 18 | correct? |
| 12:02PM | 19 | A.    Yes. |
| 12:02PM | 20 | Q.    And would you say that the sexually explicit images in |
| 12:02PM | 21 | this are -- there are only a handful? |
| 12:02PM | 22 | A.    Yes. |
| 12:02PM | 23 | Q.    Is that typical of the galleries within the Newstar |
| 12:02PM | 24 | websites? |
| 12:02PM | 25 | A.    Yes. |

**ALI – DIRECT EXAMINATION**

| | | |
|---|---|---|
| 12:02PM | 1 | **MR. REYNOLDS:**  Your Honor, I'm at a good stopping |
| 12:02PM | 2 | point for the lunch break if Your Honor wishes to take it now. |
| 12:02PM | 3 | **THE COURT:**  All right.  It's about 5 after 12:00, so |
| 12:02PM | 4 | I think that makes sense, almost 5 after 12:00. |
| 12:02PM | 5 | So, ladies and gentlemen, we're going to go |
| 12:02PM | 6 | ahead and take our lunch break now.  And, Magaly, the lunch has |
| 12:02PM | 7 | been delivered? |
| 12:02PM | 8 | **COURTROOM DEPUTY:**  Yes, Your Honor. |
| 12:02PM | 9 | **THE COURT:**  Okay.  So the lunch should be there.  We |
| 12:02PM | 10 | will resume at 5 after 1:00.  Please remember not to discuss |
| 12:02PM | 11 | the case or form any opinions until you've heard all the |
| 12:02PM | 12 | evidence.  We'll see you back here at 5 after 1:00. |
| | 13 | (Jury out at 12:02 p.m.) |
| 12:03PM | 14 | **THE COURT:**  All right.  And is there anything to take |
| 12:03PM | 15 | up now during the break time? |
| 12:03PM | 16 | **MR. REYNOLDS:**  Not from the Government, Your Honor. |
| 12:03PM | 17 | **THE COURT:**  All right.  I'll see you back here at 5 |
| 12:03PM | 18 | after 1:00.  We're in recess.  I'm just going to stay here for |
| 12:03PM | 19 | a few minutes.  Thank you. |
| | 20 | (Recess from 12:03 p.m. to 1:02 p.m.) |
| 1:02PM | 21 | **THE COURT:**  All right.  Thank you.  Do we have all |
| 1:02PM | 22 | the jurors?  Okay.  I'll be right back.  I think we're still |
| 1:03PM | 23 | waiting for one juror. |
| 1:03PM | 24 | (Pause.) |
| 1:05PM | 25 | **THE COURT:**  Okay.  So we've got everybody here now. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:05PM | 1 | Okay.  Very good.  And we have all the jurors?  Okay.  Where is |
| 1:05PM | 2 | the other prosecutor? |
| 1:05PM | 3 | MS. VALDES:  Just heading back from the restroom, |
| 1:05PM | 4 | Your Honor. |
| 1:06PM | 5 | THE COURT:  All right.  We're going to go ahead and |
| 1:06PM | 6 | get started.  Then we'll bring the jury in.  Thank you. |
| 1:06PM | 7 | MR. REYNOLDS:  Your Honor, I apologize for my |
| 1:06PM | 8 | lateness.  I tried use the restroom on a different floor so as |
| 1:06PM | 9 | to try to not run into the jurors. |
| | 10 | (Jury in at 1:06 p.m.) |
| 1:07PM | 11 | THE COURT:  Welcome, ladies and gentlemen.  You can |
| 1:07PM | 12 | be seated.  Thank you so much. |
| 1:07PM | 13 | All right.  Just affirming, ladies and gentlemen |
| 1:07PM | 14 | of the jury, nobody has discussed the case, done any |
| 1:07PM | 15 | independent research; is that correct?  All right.  Very good. |
| 1:07PM | 16 | All right.  The witness, we're in the middle of |
| 1:08PM | 17 | your direct examination.  Do you understand that you're still |
| 1:08PM | 18 | under oath? |
| 1:08PM | 19 | THE WITNESS:  Yes. |
| 1:08PM | 20 | THE COURT:  All right.  You may proceed with your |
| 1:08PM | 21 | direct examination of the witness. |
| 1:08PM | 22 | MR. REYNOLDS:  Thank you, Your Honor. |
| 1:08PM | 23 | BY MR. REYNOLDS: |
| 1:08PM | 24 | Q.  All right.  Mr. Ali, I believe we just discussed |
| 1:08PM | 25 | Government Exhibit 303 regarding the website Newstar-███████ |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:08PM | 1 | and we walked into -- we walked through Newstar-███ in some |
| 1:08PM | 2 | detail.  I'd like to ask you some questions about a different |
| 1:08PM | 3 | website.  I intend to ask you questions much more quickly about |
| 1:08PM | 4 | this website. |
| 1:08PM | 5 | Could you please direct your attention to Government |
| 1:08PM | 6 | Exhibit 307? |
| 1:08PM | 7 | A.   Yes. |
| 1:08PM | 8 | Q.   Mr. Ali, have you seen Government Exhibit 307 before? |
| 1:08PM | 9 | A.   Yes. |
| 1:08PM | 10 | Q.   What is it? |
| 1:09PM | 11 | A.   These are screenshots from the recreated version of the |
| 1:09PM | 12 | Sweet-███.com website. |
| 1:09PM | 13 | Q.   And is that a different Newstar website that you |
| 1:09PM | 14 | reconstructed? |
| 1:09PM | 15 | A.   Yes. |
| 1:09PM | 16 | Q.   Does Government Exhibit 307 truly and accurately reflect |
| 1:09PM | 17 | portions of the Sweet-███ website as you reconstructed |
| 1:09PM | 18 | it? |
| 1:09PM | 19 | A.   Yes. |
| 1:09PM | 20 | MR. REYNOLDS:  Your Honor, we offer Government |
| 1:09PM | 21 | Exhibit 307 into evidence. |
| 1:09PM | 22 | MR. KERR:  No objection. |
| 1:09PM | 23 | THE COURT:  307 received into evidence, may be |
| 1:09PM | 24 | published to the jury. |
| 1:09PM | 25 | MR. REYNOLDS:  Thank you, Your Honor.  Ms. Davis, |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:09PM | 1 | could we have page 1 of Government Exhibit 307? |
| 1:09PM | 2 | BY MR. REYNOLDS: |
| 1:09PM | 3 | Q.   Mr. Ali, is this the warning page for the Sweet-███ |
| 1:09PM | 4 | website, page 1 of Government Exhibit 307? |
| 1:09PM | 5 | A.   Yes. |
| 1:09PM | 6 | Q.   And is this substantially identical to the warning page on |
| 1:09PM | 7 | Newstar-███ |
| 1:09PM | 8 | A.   Yes. |
| 1:09PM | 9 | Q.   Again, is this the first thing that a user would see upon |
| 1:09PM | 10 | accessing the website, Sweet-███ |
| 1:09PM | 11 | A.   Correct. |
| 1:10PM | 12 | Q.   Is this -- this page 1 of Government Exhibit 307 inside or |
| 1:10PM | 13 | outside the paywall? |
| 1:10PM | 14 | A.   It is outside the paywall. |
| 1:10PM | 15 | Q.   Proceeding to page 2 of Government Exhibit 307, again, is |
| 1:10PM | 16 | this substantially similar to the legal disclaimer page on the |
| 1:10PM | 17 | website Newstar-███ |
| 1:10PM | 18 | A.   Yes. |
| 1:10PM | 19 | Q.   Would a user have to click "continue" in order to proceed |
| 1:10PM | 20 | into the main page of Sweet-███ |
| 1:10PM | 21 | A.   Yes. |
| 1:10PM | 22 | Q.   Proceeding to page 3 of Government Exhibit 307, Mr. Ali, |
| 1:10PM | 23 | what is this? |
| 1:10PM | 24 | A.   This is the main page of the Sweet-███ website as |
| 1:10PM | 25 | you would see if you were to click on the "continue" button on |

1:10PM  1    the website.

1:10PM  2    Q.   Does this -- does this page appear to depict an

1:10PM  3    individual?

1:10PM  4    A.   Yes.

1:10PM  5    Q.   Could you the estimate the age of the individual in page 3

1:11PM  6    of Government Exhibit 307?

1:11PM  7    A.   I would say maybe seven years old.

1:11PM  8    Q.   Do you see vertical text on the far left side of the

1:11PM  9    screen?

1:11PM  10   A.   Yes.

1:11PM  11   Q.   Would you read that to the jury, please?

1:11PM  12   A.   It says, "███████ made in heaven."

1:11PM  13   Q.   And slightly to the right of that horizontal text, could

1:11PM  14   you read that to the jury as well?

1:11PM  15   A.   Yes.  It says, "Come see what she has in store for you

1:11PM  16   inside.  Ballet dancer, actress, model, and many, many other.

1:11PM  17   Her hobbies and interests she will share with you.  Come to

1:11PM  18   discover.  Join now."

1:11PM  19   Q.   All right.  And the text right at the top below the --

1:11PM  20   below the title Sweet-██████ could you read that to the

1:11PM  21   jury as well?

1:11PM  22   A.   Yes.  It reads, "███████ her look, attitude and style

1:11PM  23   are as special as her name."

1:11PM  24   Q.   Mr. Ali, you testified about certain rectangular banners

1:11PM  25   that appeared on Newstar-██████ Do you see any of those on

**ALI - DIRECT EXAMINATION**

1:12PM 1    page 3 of Government Exhibit 307?

1:12PM 2    A.   Yes.

1:12PM 3    Q.   Are those the same banners that appeared on -- the same or

1:12PM 4    similar banners that appeared on Newstar-████████

1:12PM 5    A.   Yes.

1:12PM 6    Q.   And, again, Mr. Ali, at the bottom of the page there are

1:12PM 7    words that say "members free preview" and "join now."  Do those

1:12PM 8    have similar functions as they did on the website

1:12PM 9    Newstar-██████

1:12PM 10   A.   Correct.

1:12PM 11   Q.   And could you just briefly mention what "free preview"

1:12PM 12   would take you to?

1:12PM 13   A.   Yes.  So that would take you to the free preview page of

1:12PM 14   the website where users would be able to look at some of the

1:12PM 15   free preview images of the different galleries on the website,

1:12PM 16   and clicking on any of those images would prompt the user to

1:12PM 17   join the website, make a payment, and when the user has made a

1:12PM 18   payment at some point, they can access the members area of the

1:12PM 19   website.

1:12PM 20   Q.   And proceeding to page 15 of Government Exhibit 307, you

1:13PM 21   were speaking about preview photos.  Is that what this depicts?

1:13PM 22   A.   Yes.

1:13PM 23   Q.   And would clicking on these preview photos have the

1:13PM 24   same -- lead a user to the credit card page as you just

1:13PM 25   described?

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

**ALI - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 1:13PM | 1 | **A.**   Yes. |
| 1:13PM | 2 | **Q.**   Proceeding to page 16, what is this, Mr. Ali? |
| 1:13PM | 3 | **A.**   This is the "join now" page of the Sweet-████ website |
| 1:13PM | 4 | that allows the user to -- it gives the user different options |
| 1:13PM | 5 | of purchasing a subscription or membership to the website. |
| 1:13PM | 6 | **Q.**   Is there a disclaimer that appears under -- or is there |
| 1:13PM | 7 | text that appears under the words "join by credit card, instant |
| 1:13PM | 8 | access"? |
| 1:13PM | 9 | **A.**   Yes. |
| 1:13PM | 10 | **Q.**   Could you read that to the jury as well? |
| 1:13PM | 11 | **A.**   Yes.  It reads, "while non-nude and legal, some countries |
| 1:13PM | 12 | have begun to challenge your right to view non-nude websites. |
| 1:14PM | 13 | By joining, you certify that you are 18 years old, that you are |
| 1:14PM | 14 | aware of laws in your country and/or state, and that viewing |
| 1:14PM | 15 | non-nude child modeling is legal from your location." |
| 1:14PM | 16 | **Q.**   Is that substantially the same text that appeared on the |
| 1:14PM | 17 | Newstar-████ website? |
| 1:14PM | 18 | **A.**   Yes. |
| 1:14PM | 19 | **Q.**   Proceeding to page 17, Mr. Ali.  On page 17 of Government |
| 1:14PM | 20 | Exhibit 307, again, what -- very briefly, what is depicted on |
| 1:14PM | 21 | this page? |
| 1:14PM | 22 | **A.**   So these are the different options that the user would be |
| 1:14PM | 23 | presented with to join the website.  As we can see, again there |
| 1:14PM | 24 | are four different options.  Sign up for 49.99 for 30 days, no |
| 1:14PM | 25 | rebilling; 49.99 for 30 days, rebilling at 35.99; 69.99 for 60 |

**ALI - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 1:14 PM | 1 | days, no rebilling; and 95.99 for 90 days, no rebilling. |
| 1:15 PM | 2 | Q.   Does this serve essentially the same function on the |
| 1:15 PM | 3 | website Sweet-████████ as it did on the website |
| 1:15 PM | 4 | Newstar-██████ |
| 1:15 PM | 5 | A.   Yes. |
| 1:15 PM | 6 | Q.   Again, Mr. Ali, what would happen if you clicked one of |
| 1:15 PM | 7 | these options? |
| 1:15 PM | 8 | A.   That would send you to the payment page where the user can |
| 1:15 PM | 9 | enter their credit card information, purchase a membership to |
| 1:15 PM | 10 | the website. |
| 1:15 PM | 11 | Q.   Could a user become a member of the website |
| 1:15 PM | 12 | Sweet-████████ just as he could a member of Newstar-████████ |
| 1:15 PM | 13 | A.   Yes. |
| 1:15 PM | 14 | Q.   Showing you what's been previously marked as Government |
| 1:15 PM | 15 | Exhibit 306, have you seen this -- sorry, Mr. Ali.  Have you |
| 1:15 PM | 16 | seen Government 306 before? |
| 1:15 PM | 17 | A.   Yes. |
| 1:15 PM | 18 | Q.   What is it? |
| 1:15 PM | 19 | A.   This is the members area of the Sweet-████████ website. |
| 1:15 PM | 20 | Q.   Does Government Exhibit 306 truly and accurately reflect |
| 1:16 PM | 21 | portions of the members area of the Sweet-████████ website as |
| 1:16 PM | 22 | you reconstructed it? |
| 1:16 PM | 23 | A.   Yes. |
| 1:16 PM | 24 |         MR. REYNOLDS:  Your Honor, we offer 306 into |
| 1:16 PM | 25 | evidence. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:16PM | 1 | **MR. KERR:**  No objection. |
| 1:16PM | 2 | **THE COURT:**  306 is received into evidence, may be |
| 1:16PM | 3 | published to the jury. |
| 1:16PM | 4 | **MR. REYNOLDS:**  Thank you.  Ms. Davis, could you put |
| 1:16PM | 5 | page 1 of Government's 306 on the screen?  Thank you. |
| 1:16PM | 6 | BY MR. REYNOLDS: |
| 1:16PM | 7 | Q.  Mr. Ali, you testified about the members area of the |
| 1:16PM | 8 | Newstar-███████ website.  Does this differ in any meaningful |
| 1:16PM | 9 | respect from the members area of -- does Government |
| 1:16PM | 10 | Exhibit 306, page 1, differ in any meaningful respect from the |
| 1:16PM | 11 | members area of Newstar-███████ |
| 1:16PM | 12 | A.  No.  It shares the same structure as the previous website. |
| 1:16PM | 13 | The only thing different here is the child that is on this |
| 1:16PM | 14 | website is different from the one on Newstar-███████ |
| 1:16PM | 15 | Q.  And clicking on one of these images would lead to what? |
| 1:16PM | 16 | A.  That would take you to that gallery that you're trying to |
| 1:16PM | 17 | access.  It would give you a full version of that image, and |
| 1:16PM | 18 | the user would also be able to access other images in that |
| 1:17PM | 19 | gallery. |
| 1:17PM | 20 | Q.  Is there any meaningful difference -- with regard to the |
| 1:17PM | 21 | Sweet-███████ website, is there any meaningful difference |
| 1:17PM | 22 | with how a user would do that on Sweet-███████ versus on |
| 1:17PM | 23 | Newstar-███████ |
| 1:17PM | 24 | A.  No. |
| 1:17PM | 25 | Q.  All right.  Mr. Ali, showing you what's been previously |

ALI - DIRECT EXAMINATION

1:17PM 1    marked as Government Exhibit 309.

1:17PM 2    A.   Yes.

1:17PM 3    Q.   Have you seen this exhibit before?

1:17PM 4    A.   Yes.

1:17PM 5    Q.   What is it?

1:17PM 6    A.   These are some of the images that are accessible on the

1:17PM 7    Sweet-████████ website's member area.  It shows us some of the

1:17PM 8    full sized images in different galleries on the website.

1:17PM 9    Q.   Mr. Ali, could you briefly describe the age of the child

1:18PM 10   depicted and the pose and clothing she's wearing on pages 2 and

1:18PM 11   3 of Government Exhibit 309?

1:18PM 12   A.   Yes.  We see the same seven-year-old child as featured on

1:18PM 13   the Sweet-████████ website.  On page 2, she is lying down

1:18PM 14   wearing underwear and a cropped T-shirt with her belly exposed.

1:18PM 15   Her leg is up exposing her underwear.

1:18PM 16        Page 3 we see the same child in a similar pose.

1:18PM 17   She's lying on the ground.  Her underwear is visible, wearing a

1:18PM 18   top exposing her belly, and her legs are stretched up.

1:18PM 19        MR. REYNOLDS:  Thank you.  Your Honor, we offer

1:18PM 20   Government Exhibit 309 into evidence.

1:18PM 21        MR. KERR:  No objection.

1:18PM 22        THE COURT:  309 is received into evidence, may be

1:18PM 23   published to the jury.

1:18PM 24        MR. REYNOLDS:  Thank you.

1:18PM 25   BY MR. REYNOLDS:

**ALI - DIRECT EXAMINATION**

1:18 PM  1   Q.   Mr. Ali -- Mr. Ali, today you've testified about

1:19 PM  2   screenshots, about -- that depicted the Newstar-███████

1:19 PM  3   website, correct?

1:19 PM  4   A.   Yes.

1:19 PM  5   Q.   Is it fair to say that the Newstar-██████ website had an

1:19 PM  6   inside and outside the paywall?

1:19 PM  7   A.   Yes.

1:19 PM  8   Q.   Is it fair to say that it had preview photos and a credit

1:19 PM  9   card page?

1:19 PM  10  A.   Yes.

1:19 PM  11  Q.   Is the same -- essentially the same structure for the

1:19 PM  12  website Newstar-███████

1:19 PM  13  A.   Correct.

1:19 PM  14  Q.   And, Mr. Ali, the structure of these two websites that

1:19 PM  15  you've testified about, do they share a similar structure to

1:19 PM  16  the remaining Newstar websites?

1:19 PM  17  A.   Yes.

1:19 PM  18  Q.   Why do you say that?

1:19 PM  19  A.   All these pages and websites are structured in a similar

1:19 PM  20  fashion.  They all depict little children dressed up in various

1:19 PM  21  costumes.  They all have a "join now" area.  They all have a

1:19 PM  22  "free preview" area outside the paywall.  They all have a

1:19 PM  23  "members" area which allows you to access images inside the

1:20 PM  24  paywall.

1:20 PM  25  Q.   Do they all have a disclaimer at the outset that this is

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:20 PM | 1 | 100 percent legal and does not contain any sexual or erotic |
| 1:20 PM | 2 | poses? |
| 1:20 PM | 3 | A.   Yes. |
| 1:20 PM | 4 | Q.   The preview images outside the paywall, on all the other |
| 1:20 PM | 5 | Newstar websites, when you try to click on those, do they |
| 1:20 PM | 6 | prompt a user to enter his credit card? |
| 1:20 PM | 7 | A.   Yes. |
| 1:20 PM | 8 | Q.   Do they all contain advertising banners that link to other |
| 1:20 PM | 9 | websites? |
| 1:20 PM | 10 | A.   Yes. |
| 1:20 PM | 11 | Q.   Do they all use the CyberPay website to process credit |
| 1:20 PM | 12 | cards? |
| 1:20 PM | 13 | A.   Yes. |
| 1:20 PM | 14 | Q.   And on the other Newstar websites, are galleries and |
| 1:20 PM | 15 | images regularly added to the website? |
| 1:20 PM | 16 | A.   Yes. |
| 1:20 PM | 17 | Q.   And are there sexually suggestive images on the other |
| 1:20 PM | 18 | Newstar websites as well, Mr. Ali? |
| 1:20 PM | 19 | A.   Yes. |
| 1:20 PM | 20 | Q.   And, for example, did you reconstruct a website called |
| 1:20 PM | 21 | Sweet-███████████ |
| 1:20 PM | 22 | A.   Yes. |
| 1:20 PM | 23 | Q.   Could you look at Government Exhibit 312 and 313, please? |
| 1:21 PM | 24 | A.   Yes. |
| 1:21 PM | 25 | Q.   Have you seen these exhibits before? |

ALI - DIRECT EXAMINATION

1:21PM    1    A.    Yes.

1:21PM    2    Q.    What are they?

1:21PM    3    A.    They are the reconstructed versions of the Sweet-█████

1:21PM    4    website featuring some of the images found on the website, the

1:21PM    5    galleries, and some other sample images on the website.

1:21PM    6    Q.    Do Government Exhibits 312 and 313 truly and accurately

1:21PM    7    depict screenshots from the Sweet-█████ websites as you

1:21PM    8    reconstructed them?

1:21PM    9    A.    Yes.

1:21PM   10         MR. REYNOLDS:  Your Honor, we offer Government

1:21PM   11    Exhibits 312 and 313 into evidence.

1:21PM   12         MR. KERR:  No objection.

1:21PM   13         THE COURT:  All right.  312 and 313 are received into

1:21PM   14    evidence, may be published to the jury.

1:21PM   15    BY MR. REYNOLDS:

1:21PM   16    Q.    Mr. Ali, you've previously testified that image 1 in the

1:21PM   17    galleries are the same as the preview photos that appear both

1:22PM   18    outside and inside the paywall; is that correct?

1:22PM   19    A.    Yes.

1:22PM   20    Q.    And I believe you testified that those -- image 1 is often

1:22PM   21    a sexually explicit photo; is that correct?

1:22PM   22    A.    Yes.

1:22PM   23         MR. REYNOLDS:  Ms. Davis, could we briefly publish

1:22PM   24    page 1 of Government Exhibit 312?

1:22PM   25    BY MR. REYNOLDS:

1:22PM   1    Q.   Is this an example of that phenomenon, Mr. Ali?

1:22PM   2    A.   Yes.

1:22PM   3    Q.   Is this the only example?

1:22PM   4    A.   No.

1:22PM   5    Q.   And, Mr. Ali, directing your attention to pages 7 and 8 of

1:22PM   6    Government Exhibit 313, could you describe those images, with

1:22PM   7    particular attention to how the child is dressed and how she is

1:22PM   8    posed and the age she appears to be?

1:23PM   9    A.   Yes.  We see a little girl, a child who's approximately

1:23PM   10   seven, eight years old.  She is in this police officer costume

1:23PM   11   lying on the ground.  She has her legs spread up, stretched up.

1:23PM   12   Her belly is exposed, and her underwear is also exposed.

1:23PM   13   Q.   And page 8?

1:23PM   14   A.   Page 8 we see the same young child as depicted on the

1:23PM   15   website.  She is wearing the same police officer costume lying

1:23PM   16   on the floor with her legs up in the air and stretched.  Her

1:23PM   17   underwear is visible, and she is touching her underwear near

1:23PM   18   the genital area.

1:23PM   19        MR. REYNOLDS:  Thank you.  Ms. Davis, could we

1:23PM   20   publish pages 7 and 8 of Government's 313 for approximately two

1:23PM   21   seconds each?

1:24PM   22   BY MR. REYNOLDS:

1:24PM   23   Q.   All right.  Mr. Ali, I want to follow up on some things

1:24PM   24   that you've testified about.  We've put some images on the

1:24PM   25   screen during your testimony, correct?

ALI - DIRECT EXAMINATION

1:24PM 1   A.   Yes.

1:24PM 2   Q.   Would you describe those images as sexual?

1:24PM 3   A.   Yes.

1:24PM 4   Q.   And are these representative of other images that appear

1:24PM 5   on the Newstar websites?

1:24PM 6   A.   Yes.

1:24PM 7   Q.   Are these the only ones that appear on the Newstar

1:24PM 8   websites?

1:24PM 9   A.   No.

1:24PM 10  Q.   I'd like to show you what's been marked as Government

1:24PM 11  Exhibit 342.

1:25PM 12  A.   You said 342, right?

1:25PM 13  Q.   342, yes, sir.

1:25PM 14  A.   Yes.

1:25PM 15  Q.   Have you seen this exhibit before?

1:25PM 16  A.   Yes.

1:25PM 17  Q.   What is it?

1:25PM 18  A.   These are some of the selections of images from various

1:25PM 19  Newstar websites depicting different children in sexually

1:25PM 20  explicit poses.

1:25PM 21  Q.   Who put this exhibit together?

1:25PM 22  A.   Myself.

1:25PM 23  Q.   And how did you put it together?

1:25PM 24  A.   So we had selected a small sample of different sexually

1:26PM 25  explicit images.  We put them on one page, all of their

ALI – DIRECT EXAMINATION

1:26PM   1   thumbnail images, using a computer software, and we displayed

1:26PM   2   file names under these images and then displayed them in a PDF

1:26PM   3   format.

1:26PM   4   Q.   And do all of the images that are depicted in Government

1:26PM   5   Exhibit 302 (verbatim) appear on the Newstar websites?

1:26PM   6   A.   Yes.

1:26PM   7   Q.   How many images appear on each page?

1:26PM   8   A.   We have four images per page.

1:26PM   9   Q.   And how many pages are in this exhibit?

1:26PM   10  A.   A little over 200.

1:26PM   11  Q.   Do all of the images on Government Exhibit 342 truly and

1:26PM   12  accurately reflect images that you encountered on the forensic

1:26PM   13  images when you reconstructed the Newstar websites?

1:26PM   14  A.   Yes.

1:27PM   15        MR. REYNOLDS:   Your Honor, we offer Government's 342

1:27PM   16  into evidence.

1:27PM   17        MR. KERR:   No objection.

1:27PM   18        THE COURT:   342 is received into evidence, may be

1:27PM   19  published to the jury.

1:27PM   20        MR. REYNOLDS:   All right.  Ms. Davis, could we very

1:27PM   21  quickly, maybe one or two seconds each, go through the first

1:27PM   22  four pages of Government's 342?

1:27PM   23                    (Pause.)

1:27PM   24        MR. REYNOLDS:   That's plenty.

1:27PM   25  BY MR. REYNOLDS:

**ALI - DIRECT EXAMINATION**

1:27PM 1   Q.   Mr. Ali, does it go on like that for 200 more pages?

1:27PM 2   A.   Yes.

1:27PM 3   Q.   Are these the only sexually explicit images you -- is

1:27PM 4   Government's 342 a full and complete compendium of the sexually

1:27PM 5   suggested images you found on the Newstar websites?

1:27PM 6   A.   No.

1:27PM 7   Q.   I believe you testified that you -- after you

1:27PM 8   reconstructed the Newstar websites, you examined them for

1:27PM 9   dozens of hours; is that correct?

1:27PM 10   A.   Yes.

1:27PM 11   Q.   Did you count how many sexually suggestive images were on

1:27PM 12   those websites?

1:28PM 13   A.   There were hundreds of thousands, too many to count.

1:28PM 14   Q.   Did you count them --

1:28PM 15   A.   No.

1:28PM 16   Q.   -- individually?

1:28PM 17   A.   Too many to count.

1:28PM 18   Q.   Too many to count?  Is it fair to say that there are many

1:28PM 19   more than are depicted in Government Exhibit 342?

1:28PM 20   A.   Yes.

1:28PM 21   Q.   Many more than what we've seen today in court?

1:28PM 22   A.   Yes.

1:28PM 23   Q.   All right.  We also talked about some of the preview

1:28PM 24   photos for the Newstar websites.  Could you review what has

1:28PM 25   been marked as Government Exhibit 343?

1:28PM  1    A.    Yes.

1:28PM  2    Q.    Have you seen this before?

1:28PM  3    A.    Yes.

1:28PM  4    Q.    What is it?

1:28PM  5    A.    This is a sample of some of the preview images that we

1:28PM  6    added on this exhibit.  And, again, this shows us some of the

1:28PM  7    preview images from various Newstar websites.

1:28PM  8    Q.    Who put this -- who put this exhibit together?

1:29PM  9    A.    Myself.

1:29PM  10   Q.    How did you do it?

1:29PM  11   A.    So, again, we took a small sample of preview images from

1:29PM  12   the Newstar websites.  We put them together on one page using

1:29PM  13   the special computer software.  The software also allows us to

1:29PM  14   display the file name for these images under the image, and

1:29PM  15   then we put them on one PDF document.

1:29PM  16   Q.    Why these particular images?

1:29PM  17   A.    These were some of the more sexually explicit preview

1:29PM  18   images that we found on the website.

1:29PM  19   Q.    Mr. Ali, does the content, both the images and the file

1:29PM  20   names, of Government Exhibit 343 truly and accurately reflect

1:29PM  21   content from the Newstar websites as you reconstructed them?

1:29PM  22   A.    Yes.

1:29PM  23         MR. REYNOLDS:  Your Honor, we move Government's 343

1:29PM  24   into evidence.

1:29PM  25         MR. KERR:  No objection.

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:29PM | 1 | THE COURT:  343 is received into evidence, may be |
| 1:29PM | 2 | published to the jury. |
| 1:29PM | 3 | MR. REYNOLDS:  Thank you. |
| 1:29PM | 4 | THE COURT:  You're welcome. |
| 1:29PM | 5 | MR. REYNOLDS:  Your Honor -- excuse me. |
| 1:29PM | 6 | BY MR. REYNOLDS: |
| 1:29PM | 7 | Q.   Mr. Ali, does Government Exhibit 343 include all of the |
| 1:30PM | 8 | sexually suggestive preview images on the Newstar websites? |
| 1:30PM | 9 | A.   No. |
| 1:30PM | 10 | Q.   Are there more? |
| 1:30PM | 11 | A.   Yes. |
| 1:30PM | 12 | Q.   Many more? |
| 1:30PM | 13 | A.   Yes. |
| 1:30PM | 14 | Q.   Now, I want to focus you on the disclaimer.  We looked at |
| 1:30PM | 15 | a disclaimer that appeared on page 1 of Government Exhibit 301. |
| 1:30PM | 16 | Do you recall this disclaimer? |
| 1:30PM | 17 | A.   Yes. |
| 1:30PM | 18 | Q.   And did it say that these websites are quote "solely to |
| 1:30PM | 19 | introduce new young models to the world"? |
| 1:30PM | 20 | A.   Yes. |
| 1:30PM | 21 | Q.   Mr. Ali, could a visitor to these websites purchase the |
| 1:30PM | 22 | swimsuits that the children are wearing? |
| 1:30PM | 23 | A.   No. |
| 1:30PM | 24 | Q.   Could they purchase the lingerie that the children are |
| 1:30PM | 25 | wearing? |

ALI - DIRECT EXAMINATION

1:30PM  1    A.   No.

1:30PM  2    Q.   Could they purchase any of the clothing that the children

1:30PM  3    are wearing in the images on these websites?

1:30PM  4    A.   No.

1:30PM  5    Q.   Could a visitor to the website purchase the props that the

1:30PM  6    children are holding in these images?

1:30PM  7    A.   No.

1:30PM  8    Q.   Is there anything for sale on these websites other than

1:30PM  9    images of children?

1:30PM  10   A.   No.

1:31PM  11   Q.   Do the websites provide a way to contact the children to

1:31PM  12   book them for modeling jobs?

1:31PM  13   A.   No.

1:31PM  14   Q.   Are the children on these websites ever depicted in bulky

1:31PM  15   sweatshirts or sweatpants?

1:31PM  16   A.   No.

1:31PM  17   Q.   Ever in long coats that go down to their knees or their

1:31PM  18   feet?

1:31PM  19   A.   No.

1:31PM  20   Q.   Are they ever depicted in formal wear, the kind you might

1:31PM  21   wear to a wedding?

1:31PM  22   A.   No.

1:31PM  23   Q.   Do some of the images depict children wearing transparent

1:31PM  24   underwear?

1:31PM  25   A.   Yes.

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:31PM | 1 | Q.   In some of these images, can you see the children's |
| 1:31PM | 2 | genitals underneath the underwear? |
| 1:31PM | 3 | A.   Yes. |
| 1:31PM | 4 | Q.   Mr. Ali, showing you what has been marked as Government |
| 1:31PM | 5 | Exhibit 344. |
| 1:31PM | 6 | A.   Yes. |
| 1:31PM | 7 | Q.   Have you seen this exhibit before? |
| 1:31PM | 8 | A.   Yes. |
| 1:32PM | 9 | Q.   What is it? |
| 1:32PM | 10 | A.   This is a selection of some of the images from the Newstar |
| 1:32PM | 11 | websites that shows these little children in their translucent |
| 1:32PM | 12 | underwear and revealing clothing with their genitals visible. |
| 1:32PM | 13 | Q.   When you say genitals visible, what do you mean? |
| 1:32PM | 14 | A.   The general outline of their genitals can be seen through |
| 1:32PM | 15 | the translucent underwear. |
| 1:32PM | 16 | Q.   Does Government Exhibit 344 truly and accurately reflect |
| 1:32PM | 17 | images and file names that you extracted from the Newstar |
| 1:32PM | 18 | websites? |
| 1:32PM | 19 | A.   Yes. |
| 1:32PM | 20 | Q.   How was this exhibit put together? |
| 1:32PM | 21 | A.   So, again, we had a small sample of different images that |
| 1:32PM | 22 | we selected for this exhibit.  We put it through that computer |
| 1:32PM | 23 | software that allows us to put these thumbnails on one page |
| 1:32PM | 24 | with their file names right under them, and then it prints them |
| 1:32PM | 25 | out on a PDF document. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:32PM | 1 | **MR. REYNOLDS:**  Your Honor, we offer Government |
| 1:32PM | 2 | Exhibit 344 into evidence. |
| 1:33PM | 3 | **THE COURT:**  All right. |
| 1:33PM | 4 | **MR. KERR:**  No objection. |
| 1:33PM | 5 | **THE COURT:**  344 is received into evidence, may be |
| 1:33PM | 6 | published to the jury. |
| 1:33PM | 7 | **MR. REYNOLDS:**  Ms. Davis, could you publish page 16 |
| 1:33PM | 8 | and 19 for the jury for approximately two to three seconds |
| 1:33PM | 9 | apiece? |
| 1:33PM | 10 | Thank you. |
| 1:33PM | 11 | BY MR. REYNOLDS: |
| 1:33PM | 12 | Q.  Mr. Ali, when you were walking us through the |
| 1:33PM | 13 | Newstar-█████ websites, you referred to banners; didn't you? |
| 1:33PM | 14 | A.  Yes. |
| 1:33PM | 15 | Q.  And generally speaking, what were those banners? |
| 1:33PM | 16 | A.  These banners existed at the bottom of every website, and |
| 1:33PM | 17 | it was one of the ways of sending the user from one website to |
| 1:33PM | 18 | another website.  So like say, for example, you're on the |
| 1:33PM | 19 | Newstar-█████ website, it would show you banners from all of |
| 1:33PM | 20 | the other Newstar websites with some of the children in the |
| 1:34PM | 21 | banners and a small description about the website on the |
| 1:34PM | 22 | banners as well, so that the user can click on the banner and |
| 1:34PM | 23 | go to the other Newstar website. |
| 1:34PM | 24 | Q.  Showing you what's been marked as Government Exhibit 346, |
| 1:34PM | 25 | have you seen this exhibit before? |

ALI - DIRECT EXAMINATION

1:34PM   1   A.   Yes.

1:34PM   2   Q.   What is it?

1:34PM   3   A.   This is a small selection of some of the banners that we

1:34PM   4   selected from the Newstar websites.

1:34PM   5   Q.   Does Government Exhibit 346 truly and accurately reflect

1:34PM   6   some of the banners that you encountered when you reconstructed

1:34PM   7   the Newstar websites?

1:34PM   8   A.   Yes.

1:34PM   9        MR. REYNOLDS:  Your Honor, we offer 346, Government's

1:34PM  10   346 into evidence.

1:34PM  11        MR. KERR:  No objection.

1:34PM  12        THE COURT:  346 is received into evidence, may be

1:34PM  13   published to the jury.

1:34PM  14        MR. REYNOLDS:  Thank you.  Ms. Davis, could we see

1:34PM  15   page 1 and then page 2 and then back, please?  Thank you.

1:35PM  16   BY MR. REYNOLDS:

1:35PM  17   Q.   Mr. Ali, is there -- does this exhibit depict how this

1:35PM  18   would have looked on the Newstar websites, how a user would

1:35PM  19   have seen banners on the Newstar websites?

1:35PM  20   A.   Yes.

1:35PM  21   Q.   And, for example --

1:35PM  22        MR. REYNOLDS:  If we could put page 1 back up,

1:35PM  23   Ms. Davis?  Thank you.

1:35PM  24   BY MR. REYNOLDS:

1:35PM  25   Q.   And these -- does each of these banners refer to a

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:35PM | 1 | different Newstar website? |
| 1:35PM | 2 | A.   Yes. |
| 1:35PM | 3 | Q.   For example, is the top one for Sweet-██████ |
| 1:35PM | 4 | A.   Correct. |
| 1:35PM | 5 | Q.   Is this one of the websites that you've spoken about |
| 1:35PM | 6 | today? |
| 1:35PM | 7 | A.   Yes. |
| 1:35PM | 8 | Q.   And is there another one about a little more than halfway |
| 1:35PM | 9 | down called Newstar-████.com? |
| 1:35PM | 10 | A.   Yes. |
| 1:36PM | 11 | Q.   Could you read the yellow text on that banner to the jury, |
| 1:36PM | 12 | please? |
| 1:36PM | 13 | A.   It says, "10-year-old dream." |
| 1:36PM | 14 | Q.   And is there a girl depicted in the banner? |
| 1:36PM | 15 | A.   Yes. |
| 1:36PM | 16 | Q.   What is she doing? |
| 1:36PM | 17 | A.   She is touching her lips. |
| 1:36PM | 18 | Q.   How are the girls in these banners dressed? |
| 1:36PM | 19 | A.   So, again, they are dressed in different kind of |
| 1:36PM | 20 | swimwears, underwear, in some cases lingerie, exposing their |
| 1:36PM | 21 | bellies and the lower part of their chest. |
| 1:36PM | 22 | Q.   And would you say that their pubic areas are visible in |
| 1:36PM | 23 | some of these banners? |
| 1:36PM | 24 | A.   Yes. |
| 1:36PM | 25 | Q.   Were any of these banners animated, or did they change |

ALI - DIRECT EXAMINATION

1:36PM   1    colors?

1:36PM   2    A.   Yes.

1:36PM   3    Q.   Showing you what's been previously marked as Government

1:36PM   4    Exhibit 347.  Have you seen this exhibit before?

1:37PM   5    A.   Yes.

1:37PM   6    Q.   What is it?

1:37PM   7    A.   This is a CD containing those animated banners that we

1:37PM   8    extracted from the Newstar website.

1:37PM   9    Q.   How do you know that that CD contains those animated

1:37PM   10   banners?

1:37PM   11   A.   I put the banners there myself.

1:37PM   12   Q.   How do you know that that's the same CD you put it on?

1:37PM   13   A.   I reviewed it, I initialed it, and I dated it.

1:37PM   14   Q.   Mr. Ali, does Government -- does the content in Government

1:37PM   15   Exhibit 347 truly and accurately reflect the contents of the

1:37PM   16   banners that you extracted from the Newstar websites?

1:37PM   17   A.   Yes.

1:37PM   18        MR. REYNOLDS:  Your Honor, we offer Government's 347

1:37PM   19   into evidence.

1:37PM   20        MR. KERR:  No objection.

1:37PM   21        THE COURT:  347 is received into evidence, may be

1:37PM   22   published to the jury.

1:37PM   23        MR. REYNOLDS:  Thank you.

1:38PM   24   BY MR. REYNOLDS:

1:38PM   25   Q.   All right.  Mr. Ali, do some of these banners read "12YO?"

ALI - DIRECT EXAMINATION

| 1:38 PM | 1 | A.  Yes. |
| 1:38 PM | 2 | Q.  Do you have an understanding of what 12YO means? |
| 1:38 PM | 3 | A.  Yes, that is a common term we see in our child |
| 1:38 PM | 4 | exploitation investigations, and it means 12 years old. |
| 1:38 PM | 5 | Q.  Do some of the -- is the content of the banners in |
| 1:38 PM | 6 | Government Exhibit 347 similar in nature to the content of the |
| 1:38 PM | 7 | banners in Government Exhibit 346? |
| 1:38 PM | 8 | A.  Yes. |
| 1:38 PM | 9 | Q.  All right.  I'd like to talk about a different website. |
| 1:38 PM | 10 | Did you reconstruct a website entitled Tiny Model News? |
| 1:38 PM | 11 | A.  Yes. |
| 1:38 PM | 12 | Q.  What was Tiny Model News? |
| 1:38 PM | 13 | A.  So Tiny Model News was sort of like a -- a portal that |
| 1:38 PM | 14 | gave different bios for different Newstar models.  It showed a |
| 1:38 PM | 15 | small image for some of the Newstar models with their bio right |
| 1:38 PM | 16 | next to it, and it also linked the user to these different |
| 1:38 PM | 17 | Newstar websites. |
| 1:39 PM | 18 | Q.  If you could please look at Government Exhibit 348. |
| 1:39 PM | 19 | A.  Yes. |
| 1:39 PM | 20 | Q.  Have you seen this exhibit before, Mr. Ali? |
| 1:39 PM | 21 | A.  Yes. |
| 1:39 PM | 22 | Q.  What is it? |
| 1:39 PM | 23 | A.  This is a screenshot of the Tiny Model News website. |
| 1:39 PM | 24 | Q.  And does Government Exhibit 348 truly and accurately |
| 1:39 PM | 25 | reflect the Tiny Model News website as you reconstructed it? |

ALI - DIRECT EXAMINATION

1:39PM  1    A.   Yes.

1:39PM  2         MR. REYNOLDS:  Your Honor, we offer Government

1:39PM  3    Exhibit 348 into evidence.

1:39PM  4         MR. KERR:  No objection.

1:39PM  5         THE COURT:  348 is received into evidence, may be

1:39PM  6    published to the jury.

1:39PM  7         MR. REYNOLDS:  Thank you.

1:39PM  8    BY MR. REYNOLDS:

1:39PM  9    Q.   Mr. Ali, showing you Government's 348 that's been

1:39PM  10   projected on the screen, could you explain what we're looking

1:39PM  11   at here?

1:39PM  12   A.   Yeah, so this is the TinyModel News website that acts as

1:40PM  13   the portal.  As you can see on the left, it features some of

1:40PM  14   the young children that are featured on the other Newstar

1:40PM  15   websites.  So it lists Party Models, Tiny Model ███████

1:40PM  16   Newstar-█████ Tiny Model █████ and next to their images you

1:40PM  17   can also see a small description or bio of what you would see

1:40PM  18   when you enter that Newstar website.  And you can also see

1:40PM  19   links to those news websites right under the text.  You can

1:40PM  20   also see some of the sample banners that also link to these

1:40PM  21   other Newstar websites.

1:40PM  22   Q.   And does the top of this -- does the top of this

1:40PM  23   Government Exhibit 348 read "Tiny Model News Featuring

1:40PM  24   Newstar"?

1:40PM  25   A.   Yes.

| | | |
|---|---|---|
| 1:40PM | 1 | **Q.**   And could you read the updated date that appears above |
| 1:40PM | 2 | "Featuring Newstar"? |
| 1:40PM | 3 | **A.**   Yes.  It says July 2022. |
| 1:40PM | 4 | **Q.**   Again, Mr. Ali, why does it say 2022? |
| 1:40PM | 5 | **A.**   So, again, this is also one of those websites that had |
| 1:41PM | 6 | code in it that would just update this timer to whatever the |
| 1:41PM | 7 | last update date was, so in this case when we took the |
| 1:41PM | 8 | screenshot, it happened to be July 21st, 2022. |
| 1:41PM | 9 | **Q.**   All right. |
| 1:41PM | 10 |        **MR. REYNOLDS:**  Ms. Davis, could you highlight the box |
| 1:41PM | 11 | for ▮▮▮ on the left-hand side, please? |
| 1:41PM | 12 | **BY MR. REYNOLDS:** |
| 1:41PM | 13 | **Q.**   Mr. Ali, could you read this blurb that appears in the |
| 1:41PM | 14 | expanded section of the first page of Government Exhibit 348? |
| 1:41PM | 15 | **A.**   Yes.  It reads, "Come taste the ▮▮▮'s photo pieces.  Each |
| 1:41PM | 16 | piece has a whole had gallery of sweet photos for our members. |
| 1:41PM | 17 | Enjoy, sugar-free." |
| 1:41PM | 18 |        **MR. REYNOLDS:**  And, Ms. Davis, if it's possible to |
| 1:41PM | 19 | blow up the ▮▮▮▮▮ which I believe appears on both pages 1 |
| 1:41PM | 20 | and 2. |
| 1:41PM | 21 | **BY MR. REYNOLDS:** |
| 1:41PM | 22 | **Q.**   Mr. Ali, would you mind reading this text to the jury, |
| 1:41PM | 23 | please? |
| 1:41PM | 24 | **A.**   Yes.  It reads, "How can we describe the dream that is |
| 1:42PM | 25 | ▮▮▮▮▮   A dream that will haunt you with its beauty until |

ALI - DIRECT EXAMINATION

1:42 PM 1   you visit her again so she can keep you under her spell.  Join

1:42 PM 2   her today.  Check out the free previews."

1:42 PM 3   Q.   Mr. Ali, directing your attention to page 2 of Government

1:42 PM 4   Exhibit 348, do you see red text along the bottom of the

1:42 PM 5   page -- or taking up maybe two-thirds of the page?

1:42 PM 6   A.   Yes.

1:42 PM 7   Q.   Could you please read the first two paragraphs to the

1:42 PM 8   jury?

1:42 PM 9   A.   Yes.  It reads, "Remember for your safety, stay clear of

1:42 PM 10  all chans and boards.  People are getting arrested.  They also

1:42 PM 11  have caused several model sites to close during -- due to

1:42 PM 12  reposting."

1:42 PM 13  Q.   That's good.  Mr. Ali, do you have an understanding of

1:42 PM 14  what the word "chan" means?

1:42 PM 15  A.   Yes.

1:42 PM 16  Q.   What is a chan?

1:42 PM 17  A.   So chan is like a message board or a forum online on the

1:42 PM 18  internet where various users can come together and discuss

1:42 PM 19  different topics.  Chan boards are unique in the sense that

1:43 PM 20  users can interact on these websites usually anonymously.  So

1:43 PM 21  an anonymous user can go to a chan board and discuss various

1:43 PM 22  topics with different people.

1:43 PM 23  Q.   Mr. Ali, could you read the paragraph beginning with "all

1:43 PM 24  these chans"?

1:43 PM 25  A.   Yes.  It reads, "All these chans recently were shut down

**ALI - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 1:43 PM | 1 | and came back with new policies and domains.  They are now LEA |
| 1:43 PM | 2 | or FBI traps.  They are not safe.  Do not visit them.  Avoid |
| 1:43 PM | 3 | file hosts that want you to shut off ad blocking and/or follow |
| 1:43 PM | 4 | these link forwarders.  Why do they call it Captcha?  Because |
| 1:43 PM | 5 | it Captchas your ID.  Each one grabs much information about you |
| 1:43 PM | 6 | along the way.  Tour will not protect you.  It has been |
| 1:43 PM | 7 | infiltrated.  The Government just goes and follows the trail, |
| 1:43 PM | 8 | and then you have visited many websites, all with your |
| 1:44 PM | 9 | information.  I almost got four virus in one day from following |
| 1:44 PM | 10 | the links, and many of these chans have child porn on them or |
| 1:44 PM | 11 | link to it.  They are unmoderated.  One CD thumbnail auto |
| 1:44 PM | 12 | downloaded to temp is enough to get you arrested.  Stay clear |
| 1:44 PM | 13 | of them all.  If it's too good to be true, it is." |
| 1:44 PM | 14 | Q.    Have you ever heard the term "LEA" before, Mr. Ali? |
| 1:44 PM | 15 | A.    Yes. |
| 1:44 PM | 16 | Q.    And what is your understanding of what that means? |
| 1:44 PM | 17 | A.    It refers to law enforcement agency. |
| 1:44 PM | 18 | Q.    Could you read the last paragraph of page 2 of Government |
| 1:44 PM | 19 | Exhibit 348, please? |
| 1:44 PM | 20 | A.    "They are all unsafe and want you to allow cookies, turn |
| 1:44 PM | 21 | off ad block, and allow pop-ups.  They ask you to not use tour |
| 1:44 PM | 22 | to post.  Anything that makes you safe, they ask you to shut. |
| 1:44 PM | 23 | Please don't fall for this trap.  If you turn off ad block, you |
| 1:45 PM | 24 | may -- you might as well send your IP address and surf history |
| 1:45 PM | 25 | to the Government.  I will update the free sets soon so you can |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:45 PM | 1 | avoid getting arrested." |
| 1:45 PM | 2 | Q.   Thank you.  When you were reviewing the files underlying |
| 1:45 PM | 3 | the Newstar websites, did you -- did you see the name of any |
| 1:45 PM | 4 | company or organization that might be involved with them? |
| 1:45 PM | 5 | A.   Yes. |
| 1:45 PM | 6 | Q.   And what company or organization would that be? |
| 1:45 PM | 7 | A.   Power Trading. |
| 1:45 PM | 8 | Q.   Showing you what's been marked as Government Exhibit 349, |
| 1:45 PM | 9 | have you seen this exhibit before? |
| 1:45 PM | 10 | A.   Yes. |
| 1:45 PM | 11 | Q.   What is it? |
| 1:45 PM | 12 | A.   This is the Power Trading Inc. logo that I recovered from |
| 1:45 PM | 13 | the server. |
| 1:45 PM | 14 | Q.   Is this a true and accurate copy of a file you found in |
| 1:46 PM | 15 | the files that make up the Newstar websites? |
| 1:46 PM | 16 | A.   Yes. |
| 1:46 PM | 17 | MR. REYNOLDS:  Your Honor, we offer Government |
| 1:46 PM | 18 | Exhibit 349 into evidence. |
| 1:46 PM | 19 | THE COURT:  All right.  349 received into evidence |
| 1:46 PM | 20 | and may be published to the jury. |
| 1:46 PM | 21 | MR. REYNOLDS:  Thank you.  Ms. Davis, can we publish |
| 1:46 PM | 22 | 349, please? |
| 1:46 PM | 23 | BY MR. REYNOLDS: |
| 1:46 PM | 24 | Q.   Mr. Ali, where on the Newstar website server did you find |
| 1:46 PM | 25 | this exhibit? |

ALI - DIRECT EXAMINATION

1:46PM   1    A.   So this was in the same sun folder on the web server where

1:46PM   2    all the other Newstar websites existed.

1:46PM   3    Q.   What is a sun folder?

1:46PM   4    A.   Sun folder was just the name of a folder where all of the

1:46PM   5    other Newstar website folders were present.

1:46PM   6    Q.   Would this image have been visible to a visitor to any of

1:46PM   7    these websites?

1:46PM   8    A.   No.

1:46PM   9    Q.   All right.  Mr. Ali, so far we've only seen still images,

1:46PM  10    correct?

1:46PM  11    A.   Yes.

1:46PM  12    Q.   Did any of the websites that you've testified about so

1:46PM  13    far, did they feature videos?

1:46PM  14    A.   Yes.

1:47PM  15    Q.   Which websites?

1:47PM  16    A.   So all of the websites that we saw contained links to --

1:47PM  17    they contained links that said, "buy all videos," "buy my

1:47PM  18    videos," "buy new videos."  Clicking on those links would take

1:47PM  19    you to a website that would contain video content as well.

1:47PM  20         MR. REYNOLDS:  Ms. Davis, with Your Honor's

1:47PM  21    permission, if we could publish what has been previously

1:47PM  22    admitted as Government Exhibit 307, specifically page 3.

1:47PM  23    BY MR. REYNOLDS:

1:47PM  24    Q.   Mr. Ali, what you just referred to, is that presented on

1:47PM  25    the screen right now?

ALI - DIRECT EXAMINATION

1:47PM  1   A.   Yes.

1:47PM  2   Q.   Could you identify where it is and what it says?

1:47PM  3   A.   Yes.  So right at the bottom of the screen where you see,

1:47PM  4   "Buy my videos here," in red text, clicking on that link would

1:47PM  5   take you to a different website that featured videos as well.

1:47PM  6   Q.   What website was that?

1:47PM  7   A.   That was called ClipMonster.

1:47PM  8   Q.   Could customers purchase content from ClipMonster?

1:48PM  9   A.   Yes.

1:48PM  10  Q.   Does the way -- did the way that customers purchased

1:48PM  11  content from ClipMonster, did it differ in any way from the way

1:48PM  12  that they purchased from the websites you've testified about

1:48PM  13  already?

1:48PM  14  A.   Yes.

1:48PM  15  Q.   How so?

1:48PM  16  A.   So ClipMonster featured picture sets and video sets that

1:48PM  17  had the same children that you would see on the Newstar

1:48PM  18  websites, but instead of buying a subscription, you would be

1:48PM  19  purchasing individual sets of pictures or videos.

1:48PM  20       MR. REYNOLDS:  All right.  Your Honor, at this point

1:48PM  21  may we introduce the second stipulation and read a portion of

1:48PM  22  it into the -- to the jury?

1:48PM  23       THE COURT:  That would be fine.  You may do so.

1:48PM  24       MR. REYNOLDS:  Thank you.  Ms. Davis, could you

1:48PM  25  publish Government Exhibit 8, please?

ALI - DIRECT EXAMINATION

| | |
|---|---|
| 1:48PM | 1 |
| 1:48PM | 2 |
| 1:48PM | 3 |
| 1:48PM | 4 |
| 1:49PM | 5 |
| 1:49PM | 6 |
| 1:49PM | 7 |
| 1:49PM | 8 |
| 1:49PM | 9 |
| 1:49PM | 10 |
| 1:49PM | 11 |
| 1:49PM | 12 |
| 1:49PM | 13 |
| 1:49PM | 14 |
| 1:49PM | 15 |
| 1:49PM | 16 |
| 1:49PM | 17 |
| 1:49PM | 18 |
| 1:50PM | 19 |
| 1:50PM | 20 |
| 1:50PM | 21 |
| 1:50PM | 22 |
| 1:50PM | 23 |
| 1:50PM | 24 |
| 1:50PM | 25 |

BY MR. REYNOLDS:

Q.   All right.  Mr. Ali, I'm going to read this to you now.

     The second stipulation of the parties reads, "It is hereby stipulated and agreed by and between the United States of America, the Defendant, Plamen Georgiev Velinov, and his attorney, Christophir Kerr, that the United States has established the following facts beyond a reasonable doubt:"

     "In 2019, law enforcement agents from Homeland Security Investigations determined that the website ClipMonster.net was being hosted at SoftLayer Technologies, Incorporated in Dallas, Texas.  SoftLayer is a data-hosting company that offers cloud computing services and server space. Specifically, ClipMonster.net was being hosted on drives that were assigned to SoftLayer account SL-126549."

     "On approximately May 21st, 2019, law enforcement agents from Homeland Security Investigations executed a search warrant at SoftLayer and made full forensic copies of the drives assigned SoftLayer account SL-126549.  A forensic copy is an identical copy of an electronic device."

     "The forensic copies of these drives, which are exact copies of the electronic data stored within SoftLayer account SL-126549, including the -- included the following MD5 hash values:"  There are four subparagraphs that include a long string of numbers and letters.

     Mr. Ali, you've previously testified about hash

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:50 PM | 1 | values.  Do these hash values listed on page 2 of the parties' |
| 1:50 PM | 2 | second stipulation differ in any way from the ones you've |
| 1:50 PM | 3 | already testified about? |
| 1:50 PM | 4 | A.   No, they're hash values that represent a piece of |
| 1:50 PM | 5 | evidence. |
| 1:50 PM | 6 | Q.   Did you receive files with these exact hash values that |
| 1:50 PM | 7 | are listed on page 2 of the Government's second stipulation? |
| 1:50 PM | 8 | A.   Yes. |
| 1:50 PM | 9 | Q.   Did you analyze those files? |
| 1:50 PM | 10 | A.   Yes. |
| 1:50 PM | 11 | Q.   What did they contain? |
| 1:50 PM | 12 | A.   They contain a copy of the ClipMonster website. |
| 1:50 PM | 13 | Q.   And how do you know that? |
| 1:50 PM | 14 | A.   When I analyze the files, just like the Newstar websites, |
| 1:51 PM | 15 | I found evidence of programming files within the files that |
| 1:51 PM | 16 | made up the ClipMonster website.  I also found evidence of a |
| 1:51 PM | 17 | web server that was hosting the ClipMonster website, and also |
| 1:51 PM | 18 | database files associated with the ClipMonster website. |
| 1:51 PM | 19 | Q.   Mr. Ali, are you aware that U.S. law enforcement sent a |
| 1:51 PM | 20 | subpoena to SoftLayer Technologies asking for information about |
| 1:51 PM | 21 | the person or company that controlled SoftLayer account |
| 1:51 PM | 22 | SL-126549? |
| 1:51 PM | 23 | A.   Yes. |
| 1:51 PM | 24 | Q.   And are you aware that SoftLayer provided a business |
| 1:51 PM | 25 | record in response to that subpoena? |

1:51PM    1    A.    Yes.

1:51PM    2    Q.    Could you look at what has been previously marked as

1:51PM    3    Government's Exhibit 4?

1:51PM    4    A.    Yes.

1:51PM    5    Q.    Based on your understanding, Mr. Ali, is that the document

1:51PM    6    that SoftLayer provided in response?

1:51PM    7    A.    Yes.

1:51PM    8         MR. REYNOLDS:  Your Honor, we offer Government

1:51PM    9    Exhibit 4 into evidence, and also note that there is a 902(11)

1:52PM   10    certificate at docket number 83.

1:52PM   11         THE COURT:  What was the docket number?

1:52PM   12         MR. REYNOLDS:  Docket number 83.

1:52PM   13         THE COURT:  All right.  Any objection?

1:52PM   14         MR. KERR:  No objection.

1:52PM   15         THE COURT:  All right.  Government's Exhibit -- let's

1:52PM   16    see.

1:52PM   17         MR. REYNOLDS:  4.

1:52PM   18         THE COURT:  Okay.  4 is received into evidence, may

1:52PM   19    be published to the jury.

1:52PM   20    BY MR. REYNOLDS:

1:52PM   21    Q.    All right, Mr. Ali --

1:52PM   22         MR. REYNOLDS:  Ms. Davis, if you could do this again

1:52PM   23    with the very top --

1:52PM   24    BY MR. REYNOLDS:

1:52PM   25    Q.    All right.  Mr. Ali, according to this document, can you

ALI - DIRECT EXAMINATION

1:52PM   1   read the very, very top in the header?

1:52PM   2   A.   Yes.  It says, "SoftLayer account SL-126549.  Bjorkman

1:52PM   3   International Inc."

1:52PM   4   Q.   And according to this document, who is the account owner

1:52PM   5   of account SL-126549?

1:52PM   6   A.   It says Mark Bjorkman.

1:53PM   7   Q.   And is there an address provided?

1:53PM   8   A.   Yes, it is 18720 Chopin drive.

1:53PM   9   Q.   And in what city and state?

1:53PM  10   A.   It's Lutz, Florida.

1:53PM  11          MR. REYNOLDS:  And, Ms. Davis, if we could put on the

1:53PM  12   screen briefly what's been previously admitted as Government

1:53PM  13   Exhibit 7, the parties' first stipulation, already in evidence,

1:53PM  14   page 4?  My apologies, page 3.

1:53PM  15   BY MR. REYNOLDS:

1:53PM  16   Q.   All right.  Mr. Ali, do you recall me reading portions of

1:53PM  17   the first stipulation into evidence --

1:53PM  18   A.   Yes.

1:53PM  19   Q.   -- earlier today?  I did not read the sixth paragraph

1:53PM  20   which reads, "Dutch law enforcement also provided U.S. law

1:53PM  21   enforcement with a file entitled h16s18.tar.gz which included

1:53PM  22   the true and correct contents of an additional server seized

1:53PM  23   from Novogara BV."

1:54PM  24          Mr. Ali, did you receive a file from the

1:54PM  25   Netherlands that included that exact title?

ALI - DIRECT EXAMINATION

1:54 PM  1   A.   Yes.

1:54 PM  2   Q.   And what was contained on that -- within that file?

1:54 PM  3   A.   So it contained copy of the ClipMonster website and

1:54 PM  4   database and also the CyberPay database.

1:54 PM  5   Q.   How can it be that the website was hosted both in Texas

1:54 PM  6   and the Netherlands?

1:54 PM  7   A.   So at some point the website could have moved from one

1:54 PM  8   location to another location.  That is very common, or also the

1:54 PM  9   website could have been taking backups from one location to

1:54 PM  10  another location.

1:54 PM  11  Q.   When you analyzed the files that you received from

1:54 PM  12  SoftLayer Technologies in Texas and the files you received from

1:54 PM  13  Novogara in the Netherlands, did you find -- what did you find?

1:54 PM  14  Were the contents different?  Were they similar?

1:54 PM  15  A.   So when it comes to the earlier files, we were looking at

1:54 PM  16  the Newstar websites, and for this content, we were looking at

1:54 PM  17  the ClipMonster website contents.

1:55 PM  18  Q.   Specifically with respect to ClipMonster, did the files

1:55 PM  19  you received from the Netherlands, were they similar to the

1:55 PM  20  files you received from Texas?

1:55 PM  21  A.   Yes.

1:55 PM  22  Q.   Were they substantially identical?

1:55 PM  23  A.   Yes.

1:55 PM  24  Q.   All right.  Mr. Ali, generally speaking, what was

1:55 PM  25  ClipMonster?  Can you tell us more about ClipMonster?

**ALI - DIRECT EXAMINATION**

1:55PM    1    A.   So ClipMonster was a website very much similar to Newstar,

1:55PM    2    but it differed in the sense that it was -- it depicted the

1:55PM    3    same children from the Newstar websites, but it was selling

1:55PM    4    these image or picture sets and video sets that the user could

1:55PM    5    purchase, make a transaction on the website, and then they

1:55PM    6    could download those videos or images on their computer.

1:55PM    7    Q.   You've testified that individuals could buy memberships to

1:55PM    8    the Newstar websites.  Did individuals have to buy memberships

1:55PM    9    to ClipMonster?

1:55PM   10    A.   No.

1:55PM   11    Q.   How could they purchase the content then?

1:55PM   12    A.   They could just go to the ClipMonster website and make a

1:56PM   13    payment and download the content on their computer.

1:56PM   14    Q.   The images and videos that were depicted on ClipMonster,

1:56PM   15    were they similar in nature to the images and videos that

1:56PM   16    appeared on the Newstar websites?

1:56PM   17    A.   Yes.

1:56PM   18    Q.   How so?

1:56PM   19    A.   They depicted the same children as we could see on the

1:56PM   20    Newstar websites, and the same children were also depicted in

1:56PM   21    the videos that were being sold on the ClipMonster website.

1:56PM   22    Q.   And were there any identifying information or branding or

1:56PM   23    logos on the ClipMonster videos and images?

1:56PM   24    A.   Yes, you could see the same logos that you saw on the

1:56PM   25    Newstar websites on the images featured on the ClipMonster

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:56PM | 1 | website, and the videos featured on the ClipMonster website |
| 1:56PM | 2 | also had the same logos with the Newstar websites. |
| 1:56PM | 3 | Q.   All right.  Mr. Ali, let's talk about the images first. |
| 1:56PM | 4 | Could you turn to what has been marked as Government |
| 1:56PM | 5 | Exhibit 350? |
| 1:57PM | 6 | A.   Yes. |
| 1:57PM | 7 | Q.   Have you seen this exhibit before? |
| 1:57PM | 8 | A.   Yes. |
| 1:57PM | 9 | Q.   What is it? |
| 1:57PM | 10 | A.   These are of the sample images from the ClipMonster |
| 1:57PM | 11 | website. |
| 1:57PM | 12 | Q.   Are these true and accurate copies of the images that were |
| 1:57PM | 13 | available for sale on the ClipMonster website? |
| 1:57PM | 14 | A.   Yes. |
| 1:57PM | 15 | Q.   And, Mr. Ali, looking at page 1 of Government Exhibit 350, |
| 1:57PM | 16 | what does page 1 depict? |
| 1:57PM | 17 | A.   So this depicts one of the pictures on the ClipMonster |
| 1:57PM | 18 | website that shows us the same child that was featured on the |
| 1:57PM | 19 | Sweet-████.com website. |
| 1:57PM | 20 | Q.   And, Mr. Ali, could you just briefly describe what she's |
| 1:57PM | 21 | wearing and how old she appears to be? |
| 1:57PM | 22 | A.   Yes.  She appears to be seven or eight years old.  She is |
| 1:57PM | 23 | sitting on the ground on her feet.  She is wearing swimwear |
| 1:57PM | 24 | with a low top, her belly exposed. |
| 1:58PM | 25 | Q.   Can you see any portion of her genitals? |

**ALI - DIRECT EXAMINATION**

1:58PM   1   A.   Yes, we can see the outline of her genitals.

1:58PM   2   Q.   All right.  Mr. Ali, looking at page 5 of Government

1:58PM   3   Exhibit 350, is this a -- is this a girl who you have observed

1:58PM   4   on any Newstar websites?

1:58PM   5   A.   Yes.

1:58PM   6   Q.   Who -- what Newstar website does she appear to be

1:58PM   7   associated with?

1:58PM   8   A.   That would be the Sweet-███████ website.

1:58PM   9   Q.   And, again, can you describe what she's wearing and how

1:58PM   10  she's posed?

1:58PM   11  A.   Yes.  She is lying on the floor wearing a short skirt and

1:58PM   12  a very short top with her belly exposed.  Her shirt is -- her

1:58PM   13  skirt is tucked up.  She's wearing translucent underwear with

1:58PM   14  the outlines of her genitals visible.

1:58PM   15  Q.   And page 23 of Government Exhibit 350, Mr. Ali, have you

1:59PM   16  seen this exhibit before -- or excuse me, have you seen this

1:59PM   17  photo before?

1:59PM   18  A.   Yes.

1:59PM   19  Q.   Does this depict a model who also appears on a Newstar

1:59PM   20  website?

1:59PM   21  A.   Yes.

1:59PM   22  Q.   Which site?

1:59PM   23  A.   So that would be the Sweet-██████ website.

1:59PM   24  Q.   Can you describe what she's wearing and how she's posed?

1:59PM   25  A.   Yes.  So, again, she is standing, posing for the camera.

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 1:59PM | 1 | One of her arms are up.  She's wearing very, very short |
| 1:59PM | 2 | swimwear with her belly exposed, and you can see part of the |
| 1:59PM | 3 | side of her genitals also exposed. |
| 1:59PM | 4 | **MR. REYNOLDS:**  Your Honor, we offer Government |
| 1:59PM | 5 | Exhibit 350 into evidence. |
| 1:59PM | 6 | **THE COURT:**  Uh-huh.  350, received into evidence, may |
| 1:59PM | 7 | be published to the jurors. |
| 1:59PM | 8 | **MR. REYNOLDS:**  Thank you. |
| 1:59PM | 9 | **THE COURT:**  You're welcome. |
| 1:59PM | 10 | **MR. REYNOLDS:**  Ms. Davis, could we see pages 3, 5, |
| 1:59PM | 11 | and 23 for approximately two or three seconds each? |
| 2:00PM | 12 | Thank you.  Your Honor, may have the Court's |
| 2:00PM | 13 | indulgence for just one moment? |
| 2:00PM | 14 | **THE COURT:**  Of course.  No problem. |
| 2:00PM | 15 | **MR. REYNOLDS:**  Thank you. |
| 2:00PM | 16 | (Pause.) |
| 2:00PM | 17 | BY MR. REYNOLDS: |
| 2:00PM | 18 | Q.   All right.  Mr. Ali, those were the questions that I had |
| 2:00PM | 19 | for you about the images that were available over |
| 2:01PM | 20 | ClipMonster.net. |
| 2:01PM | 21 | I'd like to talk a bit about the videos that were |
| 2:01PM | 22 | available for purchase.  Generally speaking, if a customer |
| 2:01PM | 23 | wanted to purchase a video over ClipMonster.net, how would he |
| 2:01PM | 24 | know what the video depicted? |
| 2:01PM | 25 | A.   So every video was associated with a sample image, like a |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:01PM | 1 | preview image.  If you go on the ClipMonster website, you would |
| 2:01PM | 2 | see the preview image that would show you a small screenshot |
| 2:01PM | 3 | from what the video was. |
| 2:01PM | 4 | Q.   Mr. Ali, showing you what's been marked as Government |
| 2:01PM | 5 | Exhibit 351. |
| 2:01PM | 6 | A.   Yes. |
| 2:01PM | 7 | Q.   Have you seen this exhibit before? |
| 2:01PM | 8 | A.   Yes. |
| 2:01PM | 9 | Q.   What is it? |
| 2:01PM | 10 | A.   These are some of the preview images as we found them on |
| 2:01PM | 11 | the ClipMonster website associated with the videos. |
| 2:02PM | 12 | Q.   Did you create Government Exhibit 351? |
| 2:02PM | 13 | A.   Yes. |
| 2:02PM | 14 | Q.   How did you do that? |
| 2:02PM | 15 | A.   So we chose a small sample of preview images from the |
| 2:02PM | 16 | ClipMonster website, and we put them together on one page, four |
| 2:02PM | 17 | images per page using our special software.  We displayed the |
| 2:02PM | 18 | file names under the image and then printed them out on a PDF |
| 2:02PM | 19 | file. |
| 2:02PM | 20 | Q.   How many preview photos appear in Government Exhibit 351? |
| 2:02PM | 21 | A.   We have 16 preview photos. |
| 2:02PM | 22 | Q.   And are these the only preview photos that appear for the |
| 2:02PM | 23 | videos on the ClipMonster website? |
| 2:02PM | 24 | A.   No. |
| 2:02PM | 25 | Q.   Does Government Exhibit 351 truly and accurately reflect |

**ALI – DIRECT EXAMINATION**

| | | |
|---|---|---|
| 2:02PM | 1 | preview photos for videos as they appeared on the ClipMonster |
| 2:02PM | 2 | website? |
| 2:02PM | 3 | **A.**   Yes. |
| 2:02PM | 4 |       **MR. REYNOLDS:**  Your Honor, we offer Government |
| 2:02PM | 5 | Exhibit 351 into evidence. |
| 2:02PM | 6 |       **THE COURT:**  All right. |
| 2:03PM | 7 |       **MR. KERR:**  No objection. |
| 2:03PM | 8 |       **THE COURT:**  351, received into evidence, may be |
| 2:03PM | 9 | published to the jury. |
| 2:03PM | 10 |       **MR. REYNOLDS:**  Thank you Your Honor.  We have a very |
| 2:03PM | 11 | short technical question for the CRD.  Would it be possible to |
| 2:03PM | 12 | have a bench conference? |
| 2:03PM | 13 |       **THE COURT:**  Of course, uh-huh. |
| 2:03PM | 14 |       **MR. REYNOLDS:**  Thank you. |
| 2:03PM | 15 |            (At sidebar on the record.) |
| 2:03PM | 16 |       **MR. REYNOLDS:**  We were just asking for clarification. |
| 2:03PM | 17 | Our videotape capability was working this morning when we |
| 2:03PM | 18 | tested it.  Is there anything the CRD needs to do to prompt it? |
| 2:03PM | 19 |       **COURTROOM DEPUTY:**  It'll just play.  My only concern |
| 2:03PM | 20 | is -- |
| 2:03PM | 21 |       **MR. REYNOLDS:**  I don't believe it's muted.  There's |
| 2:03PM | 22 | music.  It doesn't contain any speech.  We've already done one |
| 2:04PM | 23 | that was supposed to be a video exhibit.  It did not play |
| 2:04PM | 24 | video, even though it was working this morning. |
| 2:04PM | 25 |       **THE COURT:**  We can try.  We could always call IT. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:04PM | 1 | COURTROOM DEPUTY:  Okay.  So let's -- and it's not |
| 2:04PM | 2 | going to be up here? |
| 2:04PM | 3 | MR. REYNOLDS:  No, it's going to be on the screen. |
| 2:04PM | 4 | COURTROOM DEPUTY:  We can try it, and then I'll let |
| 2:04PM | 5 | him know that he's expected to come up if it doesn't work. |
| 2:04PM | 6 | MR. REYNOLDS:  Thank you.  And we did test it this |
| 2:04PM | 7 | morning, and it was working.  I apologize. |
| 2:04PM | 8 | THE COURT:  Okay.  All right. |
| 2:04PM | 9 | (End of discussion at sidebar.) |
| 2:04PM | 10 | BY MR. REYNOLDS: |
| 2:04PM | 11 | Q.   All right.  Mr. Ali, you were testifying about Government |
| 2:04PM | 12 | Exhibit 351, which I believe you testified contained preview |
| 2:04PM | 13 | images; is that correct? |
| 2:04PM | 14 | A.   Yes. |
| 2:04PM | 15 | Q.   For each image on Government Exhibit 351, was there a full |
| 2:04PM | 16 | video contained within the ClipMonster server you received? |
| 2:04PM | 17 | A.   Yes. |
| 2:05PM | 18 | Q.   Were you able to create screenshots from those videos? |
| 2:05PM | 19 | A.   Yes. |
| 2:05PM | 20 | Q.   Were you able to create excerpts from those videos? |
| 2:05PM | 21 | A.   Yes. |
| 2:05PM | 22 | Q.   Did you create screenshots and excerpts from the videos |
| 2:05PM | 23 | that are associated with the preview photos in Government |
| 2:05PM | 24 | Exhibit 351? |
| 2:05PM | 25 | A.   Yes. |

**ALI - DIRECT EXAMINATION**

2:05PM  1  Q.   Mr. Ali, can I ask you to look at Government Exhibit 359?

2:05PM  2  A.   Yes.

2:05PM  3  Q.   Have you seen this exhibit before?

2:05PM  4  A.   Yes.

2:05PM  5  Q.   What is it?

2:05PM  6  A.   So it contains an excerpt from one of the videos on the

2:05PM  7  ClipMonster website.  The video was called ██████ 001.

2:05PM  8  Q.   Is this -- does it depict the same minor who was featured

2:05PM  9  on the Newstar website Sweet-████████

2:05PM  10  A.   Yes.

2:05PM  11  Q.   And, Mr. Ali, are you looking at a compact disk right now?

2:05PM  12  A.   Yes.

2:05PM  13  Q.   How do you know that the CD you are looking at depicts

2:06PM  14  the -- a video?

2:06PM  15  A.   I had put the video in there.

2:06PM  16  Q.   Does your signature appear on the CD?

2:06PM  17  A.   Yes, I initialed it, and I dated it.

2:06PM  18  Q.   Perfect.  Does -- the video contained on Government

2:06PM  19  Exhibit 359, is it a true and correct video, an excerpt of a

2:06PM  20  video that was contained within the ClipMonster data?

2:06PM  21  A.   Yes.

2:06PM  22          MR. REYNOLDS:  Your Honor, we offer Government

2:06PM  23  Exhibit 359 into evidence.

2:06PM  24          MR. KERR:  No objection.

2:06PM  25          THE COURT:  359 is received into evidence, may be

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:06 PM | 1 | published to the jury. |
| 2:06 PM | 2 | MR. REYNOLDS:  Thank you. |
| 2:06 PM | 3 | (Whereupon Government Exhibit Number 359 was |
| 2:06 PM | 4 | published to the jury.) |
| 2:06 PM | 5 | MR. REYNOLDS:  Thank you. |
| 2:06 PM | 6 | BY MR. REYNOLDS: |
| 2:06 PM | 7 | Q.   Mr. Ali, if you could take a look at what has been |
| 2:06 PM | 8 | previously marked as Government Exhibit 364? |
| 2:07 PM | 9 | A.   You said 364? |
| 2:07 PM | 10 | Q.   364, yes.  Have you seen this exhibit before? |
| 2:07 PM | 11 | A.   Yes. |
| 2:07 PM | 12 | Q.   What is it? |
| 2:07 PM | 13 | A.   These are some of the screenshots from the ███ 15 video |
| 2:07 PM | 14 | on the ClipMonster website. |
| 2:07 PM | 15 | Q.   And is this the same model that appeared in the |
| 2:07 PM | 16 | Sweet-███ or ██ model website on the Newstar websites? |
| 2:07 PM | 17 | A.   Yes. |
| 2:07 PM | 18 | Q.   Are these screenshots true and correct screenshots from a |
| 2:07 PM | 19 | video you recovered from the ClipMonster server data? |
| 2:07 PM | 20 | A.   Yes. |
| 2:07 PM | 21 | MR. REYNOLDS:  Your Honor, we offer Government 364 |
| 2:07 PM | 22 | into evidence. |
| 2:07 PM | 23 | MR. KERR:  No objection. |
| 2:07 PM | 24 | THE COURT:  364 is received into evidence, may be |
| 2:07 PM | 25 | published to the jury. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:07PM | 1 | BY MR. REYNOLDS: |
| 2:07PM | 2 | Q.   And, Mr. Ali, directing your attention to Government |
| 2:07PM | 3 | Exhibit 371 -- |
| 2:08PM | 4 | A.   Yes. |
| 2:08PM | 5 | Q.   -- have you seen Government Exhibit 371 before? |
| 2:08PM | 6 | A.   Yes. |
| 2:08PM | 7 | Q.   What is it? |
| 2:08PM | 8 | A.   This is a compact disk that contains the Diana 008 video |
| 2:08PM | 9 | from the ClipMonster website. |
| 2:08PM | 10 | Q.   And, again, how do you know that that CD contains that |
| 2:08PM | 11 | video? |
| 2:08PM | 12 | A.   I put the video on there.  I initialed it, and I dated it. |
| 2:08PM | 13 | Q.   Does the -- the content of that disk contain a true and |
| 2:08PM | 14 | correct excerpt of a video you recovered from the ClipMonster |
| 2:08PM | 15 | server data? |
| 2:08PM | 16 | A.   Yes. |
| 2:08PM | 17 | Q.   All right.  Directing your attention to Government |
| 2:08PM | 18 | Exhibit 382 -- |
| 2:09PM | 19 | A.   Yes. |
| 2:09PM | 20 | Q.   -- have you seen this exhibit before? |
| 2:09PM | 21 | A.   Yes. |
| 2:09PM | 22 | Q.   What is it? |
| 2:09PM | 23 | A.   These are some of the images depicting the child in the |
| 2:09PM | 24 | Sweet-███████ website that we found on the ClipMonster |
| 2:09PM | 25 | website. |

**ALI - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 2:09PM | 1 | Q.   Does Government Exhibit 382 contain true and correct |
| 2:09PM | 2 | screenshots of a video you recovered from ClipMonster data? |
| 2:09PM | 3 | A.   Yes. |
| 2:09PM | 4 | Q.   Mr. Ali, I'm going to ask you a question about three more |
| 2:09PM | 5 | exhibits, and I'll give them to you now so you can get them all |
| 2:09PM | 6 | at once.  385, 388, and the 391. |
| 2:09PM | 7 | A.   Yes. |
| 2:09PM | 8 | Q.   Mr. Ali, starting with Exhibit 385, have you seen this |
| 2:10PM | 9 | exhibit before? |
| 2:10PM | 10 | A.   Yes. |
| 2:10PM | 11 | Q.   What is it? |
| 2:10PM | 12 | A.   These are screenshots for one of the videos recovered from |
| 2:10PM | 13 | the ClipMonster website featuring the child from the |
| 2:10PM | 14 | Newstar-███ website. |
| 2:10PM | 15 | Q.   Are these true and correct screenshots from a video you |
| 2:10PM | 16 | recovered from the ClipMonster server? |
| 2:10PM | 17 | A.   Yes. |
| 2:10PM | 18 | Q.   With regard to Government Exhibit 388, have you seen this |
| 2:10PM | 19 | exhibit before? |
| 2:10PM | 20 | A.   Yes. |
| 2:10PM | 21 | Q.   What is it? |
| 2:10PM | 22 | A.   Screenshots from a video we found on the ClipMonster |
| 2:10PM | 23 | website that depicted the child on the Tiny Model ███ |
| 2:10PM | 24 | website. |
| 2:10PM | 25 | Q.   And, again, Mr. Ali, do the screenshots truly and |

| | | |
|---|---|---|
| 2:10 PM | 1 | accurately depict a video that you recovered from the |
| 2:10 PM | 2 | ClipMonster server? |
| 2:10 PM | 3 | A.   Yes. |
| 2:10 PM | 4 | Q.   And finally, 391, Mr. Ali, have you seen this exhibit |
| 2:10 PM | 5 | before? |
| 2:10 PM | 6 | A.   Yes. |
| 2:10 PM | 7 | Q.   What is it? |
| 2:10 PM | 8 | A.   These are screenshots taken from a video we found on the |
| 2:10 PM | 9 | ClipMonster website depicting the same child that we saw on the |
| 2:10 PM | 10 | Sweet-██████.com website. |
| 2:11 PM | 11 | Q.   And once again, Mr. Ali, do the screenshots in Government |
| 2:11 PM | 12 | Exhibit 391 truly and accurately reflect the contents of the |
| 2:11 PM | 13 | video you recovered from the ClipMonster server? |
| 2:11 PM | 14 | A.   Yes. |
| 2:11 PM | 15 | MR. REYNOLDS:  Your Honor, we offer the following |
| 2:11 PM | 16 | exhibits into evidence:  364, 371, 382, 385, 388, and 391. |
| 2:11 PM | 17 | MR. KERR:  No objection. |
| 2:11 PM | 18 | THE COURT:  They will be received into evidence, may |
| 2:11 PM | 19 | be published to the jury. |
| 2:11 PM | 20 | BY MR. REYNOLDS: |
| 2:11 PM | 21 | Q.   Mr. Ali, in addition to images and videos, did you also |
| 2:11 PM | 22 | find database files in the ClipMonster server? |
| 2:11 PM | 23 | A.   Yes. |
| 2:11 PM | 24 | Q.   Did you find any files that contained a database of the |
| 2:11 PM | 25 | products that were for sale over at ClipMonster? |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:11 PM | 1 | A.   Yes. |
| 2:11 PM | 2 | Q.   Showing you what has been previously marked as |
| 2:12 PM | 3 | Government's Exhibit 393 -- |
| 2:12 PM | 4 | A.   Yes. |
| 2:12 PM | 5 | Q.   -- have you seen this exhibit before, Mr. Ali? |
| 2:12 PM | 6 | A.   Yes. |
| 2:12 PM | 7 | Q.   What is it? |
| 2:12 PM | 8 | A.   This is an export from the products table on the |
| 2:12 PM | 9 | ClipMonster website.  It showed the different product IDs that |
| 2:12 PM | 10 | referred to the different products or videos or images being |
| 2:12 PM | 11 | sold on the website.  It also shows the different file names |
| 2:12 PM | 12 | for those -- for the content being sold on the website.  It |
| 2:12 PM | 13 | also showed the title for the content being sold and the price |
| 2:12 PM | 14 | of the items on the website. |
| 2:12 PM | 15 | Q.   Based on your understanding, does Government Exhibit 393 |
| 2:12 PM | 16 | contain a full listing of the products that were available for |
| 2:12 PM | 17 | sale at ClipMonster? |
| 2:12 PM | 18 | A.   Yes. |
| 2:12 PM | 19 | Q.   Mr. Ali, how many pages is Government Exhibit 393? |
| 2:12 PM | 20 | A.   195. |
| 2:13 PM | 21 | Q.   And how many individual entries are there -- do there |
| 2:13 PM | 22 | appear to be on Government Exhibit 393? |
| 2:13 PM | 23 | A.   I think more than 35 per page.  Don't try and test my math |
| 2:13 PM | 24 | here, but -- |
| 2:13 PM | 25 | Q.   Fair enough.  Mr. Ali, is Government Exhibit 393 a true |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:13 PM | 1 | and accurate copy of data you extracted from database files |
| 2:13 PM | 2 | making up the ClipMonster website? |
| 2:13 PM | 3 | A.   Correct. |
| 2:13 PM | 4 |       MR. REYNOLDS:  Your Honor, we offer Government |
| 2:13 PM | 5 | Exhibit 393 into evidence. |
| 2:13 PM | 6 |       THE COURT:  All right.  Any objection? |
| 2:13 PM | 7 |       MR. KERR:  No objection. |
| 2:13 PM | 8 |       THE COURT:  393?  Is that what you said? |
| 2:13 PM | 9 |       MR. REYNOLDS:  393, yes. |
| 2:13 PM | 10 |       THE COURT:  393 is received into evidence and may be |
| 2:13 PM | 11 | published to the jury. |
| 2:13 PM | 12 | BY MR. REYNOLDS: |
| 2:13 PM | 13 | Q.   Mr. Ali, directing your attention to Government |
| 2:13 PM | 14 | Exhibit 394 -- |
| 2:13 PM | 15 | A.   Yes. |
| 2:13 PM | 16 | Q.   -- have you seen Government Exhibit 394 before? |
| 2:13 PM | 17 | A.   Yes. |
| 2:13 PM | 18 | Q.   What is it? |
| 2:14 PM | 19 | A.   These are some of the selected products from the exhibit |
| 2:14 PM | 20 | that we saw before, and again, it shows us the product ID of |
| 2:14 PM | 21 | the item that was being sold on the ClipMonster website.  It |
| 2:14 PM | 22 | shows us the file name that was being sold on the website and a |
| 2:14 PM | 23 | title or a small description of the items that were being sold |
| 2:14 PM | 24 | on the ClipMonster website. |
| 2:14 PM | 25 | Q.   How -- did you create Government Exhibit 394? |

| | | |
|---|---|---|
| 2:14PM | 1 | **A.**   Yes. |
| 2:14PM | 2 | **Q.**   How did you do it? |
| 2:14PM | 3 | **A.**   We -- we took some samples and selections out of the |
| 2:14PM | 4 | products table, and I put them in an Excel sheet, and I printed |
| 2:14PM | 5 | them out on a piece of paper. |
| 2:14PM | 6 | **Q.**   Is the information that's contained within Government |
| 2:14PM | 7 | Exhibit 394 selected from what has been introduced as 393? |
| 2:14PM | 8 | **A.**   Yes. |
| 2:14PM | 9 | **Q.**   Is it a true and accurate excerpt of data contained within |
| 2:14PM | 10 | Government Exhibit 393? |
| 2:14PM | 11 | **A.**   Yes. |
| 2:14PM | 12 | **MR. REYNOLDS:**  Your Honor, we offer 394 into |
| 2:14PM | 13 | evidence. |
| 2:14PM | 14 | **MR. KERR:**  No objection. |
| 2:14PM | 15 | **THE COURT:**  394, received into evidence, may be |
| 2:15PM | 16 | published to the jury. |
| 2:15PM | 17 | **BY MR. REYNOLDS:** |
| 2:15PM | 18 | **Q.**   All right.  Mr. Ali, can you explain what the columns in |
| 2:15PM | 19 | this exhibit signify? |
| 2:15PM | 20 | **A.**   Yes.  So we see three columns there.  The first column is |
| 2:15PM | 21 | the product ID, which is the ID of the product that you will |
| 2:15PM | 22 | see on the website.  The second column is the file name, which |
| 2:15PM | 23 | is the video file that you would download if you had -- if you |
| 2:15PM | 24 | would have purchased the product.  And the third is the title |
| 2:15PM | 25 | or a description of the item as it existed on the website. |

ALI - DIRECT EXAMINATION

```
2:15PM   1   Q.   And based on your review of this material, are the product
2:15PM   2   IDs unique to that product?
2:15PM   3   A.   Yes.
2:15PM   4   Q.   Is it sort of like a SKU or a hard coded identifier?
2:15PM   5   A.   Yes.
2:15PM   6   Q.   Mr. Ali, the videos of -- excuse me.  Mr. Ali, in column
2:16PM   7   number 2 under "file", all these files end with .AVI.  What
2:16PM   8   does that signify?
2:16PM   9   A.   Those are all video files.
2:16PM  10   Q.   And the videos that are listed on Government Exhibit 394,
2:16PM  11   are some of these videos -- did you just now look at them and
2:16PM  12   were they entered into evidence?
2:16PM  13   A.   Yes.
2:16PM  14   Q.   Do you recall the exhibit numbers associated with some of
2:16PM  15   these exhibits?
2:16PM  16   A.   Some of them, but not all of them.
2:16PM  17   Q.   Is there anything that would refresh your recollection as
2:16PM  18   to which video is associated with which exhibit number?
2:16PM  19   A.   Yes.  I had taken notes with exhibit numbers next to the
2:16PM  20   product ID.
2:16PM  21        MR. REYNOLDS:  Your Honor, may I hand Mr. Ali the
2:16PM  22   notes to refresh his recollection?
2:16PM  23        THE COURT:  Yes, you may do so.
2:16PM  24        MR. REYNOLDS:  Thank you.
2:16PM  25        THE COURT:  I'm glad you're showing Mr. Kerr what
```

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:16PM | 1 | that is. |
| 2:16PM | 2 | So since you're just using those to refresh your |
| 2:16PM | 3 | recollection, take a look at it, and then put it done. |
| 2:17PM | 4 | THE WITNESS:  Yes. |
| 2:17PM | 5 | THE COURT:  All right.  Thank you. |
| 2:17PM | 6 | BY MR. REYNOLDS: |
| 2:17PM | 7 | Q.   All right.  Mr. Ali, is your recollection refreshed as to |
| 2:17PM | 8 | the exhibit numbers? |
| 2:17PM | 9 | A.   Yes.  There are a lot, but I'll try my best. |
| 2:17PM | 10 | THE COURT:  Well, if he needs to testify using his |
| 2:17PM | 11 | notes, it's different.  Do you need to use your notes to |
| 2:17PM | 12 | testify? |
| 2:17PM | 13 | THE WITNESS:  Yes. |
| 2:17PM | 14 | THE COURT:  Okay.  All right.  I'm going to allow him |
| 2:17PM | 15 | to use it to testify.  Then you've already given a copy to |
| 2:17PM | 16 | Mr. Kerr.  So, Mr. Kerr, you have in front of you what the |
| 2:17PM | 17 | witness is using.  That's fine then.  You can use it then to |
| 2:17PM | 18 | testify. |
| 2:17PM | 19 | THE WITNESS:  Thank you. |
| 2:17PM | 20 | MR. REYNOLDS:  Thank you. |
| 2:17PM | 21 | BY MR. REYNOLDS: |
| 2:17PM | 22 | Q.   Mr. Ali, do you see an entry on Government Exhibit 394 |
| 2:17PM | 23 | that begins with 4616████████15.AVI, Sweet-████ Little Red |
| 2:17PM | 24 | Riding Hood HD? |
| 2:17PM | 25 | A.   Yes. |

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:17PM | 1 | **Q.**   What exhibit is that associated with? |
| 2:17PM | 2 | **A.**   That would be Exhibit 365. |
| 2:18PM | 3 | **Q.**   And going -- moving down slightly to -- I suppose in the |
| 2:18PM | 4 | title column, there's a video entitled "Snow White."  Can you |
| 2:18PM | 5 | read the rest of the information and specify what exhibit that |
| 2:18PM | 6 | is? |
| 2:18PM | 7 | **A.**   Yes, so the title is Snow White.  The file name is |
| 2:18PM | 8 | Diana008.AVI.  The product ID is 168, and the exhibit number is |
| 2:18PM | 9 | 371. |
| 2:18PM | 10 | **Q.**   All right.  Mr. Ali, do you see a video titled |
| 2:18PM | 11 | Sweet-███████ Monkey Part 2 HD? |
| 2:18PM | 12 | **A.**   Yes. |
| 2:18PM | 13 | **Q.**   Could you read the exhibit number associated with that? |
| 2:18PM | 14 | **A.**   It is 383. |
| 2:18PM | 15 | **Q.**   Same with -- excuse me.  Three from the bottom, Newstar |
| 2:18PM | 16 | ██████ and ██████ nostalgia? |
| 2:18PM | 17 | **A.**   386. |
| 2:19PM | 18 | **Q.**   Right below, Tiny Model ██████ Meshy? |
| 2:19PM | 19 | **A.**   389. |
| 2:19PM | 20 | **Q.**   And finally Sweet ██████ Glamour HD? |
| 2:19PM | 21 | **A.**   392. |
| 2:19PM | 22 | **Q.**   Thank you, Mr. Ali.  You've testified about a database |
| 2:19PM | 23 | file you recovered from the ClipMonster site.  Did you find any |
| 2:19PM | 24 | database files associated with transactions on the ClipMonster |
| 2:19PM | 25 | site? |

ALI - DIRECT EXAMINATION

2:19 PM  1   A.    Yes.

2:19 PM  2   Q.    You also testified that you found some material -- you

2:19 PM  3   seized some material from the Netherlands containing databases

2:19 PM  4   from the cyber-pay.net website, correct?

2:20 PM  5   A.    Yes.

2:20 PM  6   Q.    Did that also contain information about transactions

2:20 PM  7   through CyberPay?

2:20 PM  8   A.    Yes.

2:20 PM  9   Q.    And what sorts of transactions were reflected in the

2:20 PM  10  transaction information from ClipMonster?

2:20 PM  11  A.    So there were different transactions involving different

2:20 PM  12  videos or image sets that had been purchased.

2:20 PM  13  Q.    And what about for CyberPay?

2:20 PM  14  A.    So similarly, same thing.  Different transactions

2:20 PM  15  highlighting different videos and image sets that were

2:20 PM  16  purchased; different kind of user; metadata was recorded such

2:20 PM  17  as their names and their home addresses.

2:20 PM  18  Q.    It also contained information about transactions?

2:20 PM  19  A.    Yes.

2:20 PM  20  Q.    On these databases regarding transactions, could you

2:20 PM  21  determine from your review of the material how the information

2:20 PM  22  in those transaction databases was generated?

2:20 PM  23  A.    Yeah.  So when the user made a purchase on the website, it

2:20 PM  24  would process the purchase, and it would save this metadata

2:21 PM  25  into the transactions table in the database.  It would then

ALI - DIRECT EXAMINATION

2:21PM  1    save that to the database.

2:21PM  2    Q.   Did it contain specific information regarding the amounts

2:21PM  3    of transactions?

2:21PM  4    A.   Yes.

2:21PM  5    Q.   And did that information appear to be computer-generated?

2:21PM  6    A.   Yes.

2:21PM  7    Q.   Mr. Ali, from these -- these transaction database files,

2:21PM  8    were you able to learn ballpark approximately how much money

2:21PM  9    was transacted through the websites cyber-pay.net and

2:21PM  10   ClipMonster.net?

2:21PM  11   A.   Yes.

2:21PM  12   Q.   How much?

2:21PM  13   A.   It was millions of dollars.  I would say over $2 million.

2:21PM  14   Q.   And the transaction database, did it list out individual

2:21PM  15   transactions by customer?

2:21PM  16   A.   Yes.

2:21PM  17   Q.   Showing you what's been previously marked as Government

2:21PM  18   Exhibit 399 --

2:22PM  19   A.   Yes.

2:22PM  20   Q.   -- have you seen this before?

2:22PM  21   A.   Yes.

2:22PM  22   Q.   What is it?

2:22PM  23   A.   These are some of the CyberPay transactions that we

2:22PM  24   extracted from the transactions table on the CyberPay database

2:22PM  25   that shows transactions that have been processed for the user

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:22PM | 1 | James Fossett. |
| 2:22PM | 2 | Q.   Have you ever heard the name James Fossett before? |
| 2:22PM | 3 | A.   Yes. |
| 2:22PM | 4 | Q.   Who is that? |
| 2:22PM | 5 | A.   This is an undercover identity that we use to make |
| 2:22PM | 6 | undercover purchases in our department. |
| 2:22PM | 7 | Q.   Mr. Ali, does Government Exhibit 399 contain true and |
| 2:22PM | 8 | correct excerpts from the transaction database file from |
| 2:22PM | 9 | CyberPay.net? |
| 2:22PM | 10 | A.   Yes. |
| 2:22PM | 11 | THE COURT:  Your Honor, we offer Government |
| 2:22PM | 12 | Exhibit 399 into evidence. |
| 2:22PM | 13 | MR. KERR:  No objection. |
| 2:22PM | 14 | THE COURT:  Any objection?  All right.  399, received |
| 2:22PM | 15 | into evidence, may be published to the jury. |
| 2:22PM | 16 | MR. REYNOLDS:  Thank you. |
| 2:22PM | 17 | THE COURT:  You're welcome. |
| 2:23PM | 18 | BY MR. REYNOLDS: |
| 2:23PM | 19 | Q.   All right.  Mr. Ali, could you explain what is the content |
| 2:23PM | 20 | of the columns charge total, code, and date, please? |
| 2:23PM | 21 | A.   Yes.  So charge total shows you the total dollar amount |
| 2:23PM | 22 | that was charged in that transaction.  In the code field, you |
| 2:23PM | 23 | can see multiple different metadata items that were saved when |
| 2:23PM | 24 | the transaction took place on the website.  So you can see the |
| 2:23PM | 25 | first and last name of the user.  You can see the P.O. box, |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:23 PM | 1 | city and the state, the zip code, and also part of the credit |
| 2:23 PM | 2 | card number and the credit card company. |
| 2:23 PM | 3 | Q.   And the date column as well? |
| 2:23 PM | 4 | A.   The date column would show you the date and time that the |
| 2:23 PM | 5 | transaction took place. |
| 2:23 PM | 6 | Q.   Mr. Ali, I believe you testified earlier that you were |
| 2:23 PM | 7 | aware that Special Agent Allison Boos conducted undercover |
| 2:23 PM | 8 | purchases on the Newstar websites? |
| 2:23 PM | 9 | A.   Yes. |
| 2:23 PM | 10 | Q.   Does Government Exhibit 399 reflect those purchases? |
| 2:23 PM | 11 | A.   Yes. |
| 2:23 PM | 12 | Q.   And is this information you recovered from the inside of |
| 2:24 PM | 13 | the CyberPay server? |
| 2:24 PM | 14 | A.   Yes. |
| 2:24 PM | 15 | Q.   Government Exhibit 399 contains the name of a customer. |
| 2:24 PM | 16 | Was there any other information from either within the |
| 2:24 PM | 17 | ClipMonster or the CyberPay transaction or other databases that |
| 2:24 PM | 18 | contain customer names and information? |
| 2:24 PM | 19 | A.   Can you ask that question again, please? |
| 2:24 PM | 20 | Q.   Sure.  I'll ask it more simply.  My apologies.  Did you |
| 2:24 PM | 21 | find any databases, either within the ClipMonster server or the |
| 2:24 PM | 22 | CyberPay server, that listed customer names and addresses? |
| 2:24 PM | 23 | A.   Yes. |
| 2:24 PM | 24 | Q.   Could you determine how the information -- well, strike |
| 2:24 PM | 25 | the question. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:24PM | 1 | What files contained this information? |
| 2:24PM | 2 | A.   So on the -- on the Newstar website, we had -- everybody |
| 2:24PM | 3 | who had signed up as members on the website, their details were |
| 2:25PM | 4 | being stored in the members table in the database.  That would |
| 2:25PM | 5 | allow us to see the first name, last name, and different other |
| 2:25PM | 6 | metadata associated with the user. |
| 2:25PM | 7 | Q.   And could you determine from this information how the -- |
| 2:25PM | 8 | could you determine how the information in this database file |
| 2:25PM | 9 | was generated? |
| 2:25PM | 10 | A.   Yes. |
| 2:25PM | 11 | Q.   How was it generated? |
| 2:25PM | 12 | A.   It was generated during the time of the sign up. |
| 2:25PM | 13 | Q.   I'm sorry?  Can you say that one more time? |
| 2:25PM | 14 | A.   It was generated during the time the user signed up on the |
| 2:25PM | 15 | website. |
| 2:25PM | 16 | Q.   And did ClipMonster and CyberPay retain all those records |
| 2:25PM | 17 | in database files? |
| 2:25PM | 18 | A.   Yes. |
| 2:25PM | 19 | Q.   Did they retain those records on an ongoing basis? |
| 2:25PM | 20 | A.   Yes. |
| 2:25PM | 21 | Q.   Mr. Ali, according to these database tables, approximately |
| 2:25PM | 22 | how many customers were there for both ClipMonster and |
| 2:25PM | 23 | CyberPay? |
| 2:25PM | 24 | A.   I would say in the thousands. |
| 2:25PM | 25 | Q.   Would you say tens of thousands? |

ALI – DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:25PM | 1 | A.    Yes. |
| 2:25PM | 2 | Q.    Where were they located according to the information in |
| 2:25PM | 3 | these database tables? |
| 2:25PM | 4 | A.    They were around the world. |
| 2:26PM | 5 | Q.    Were they in the United States? |
| 2:26PM | 6 | A.    Yes. |
| 2:26PM | 7 | Q.    Florida? |
| 2:26PM | 8 | A.    Yes. |
| 2:26PM | 9 | Q.    Any in the Tampa Bay area? |
| 2:26PM | 10 | A.    Yes. |
| 2:26PM | 11 | Q.    Tampa? |
| 2:26PM | 12 | A.    Yes. |
| 2:26PM | 13 | Q.    St. Petersburg? |
| 2:26PM | 14 | A.    Yes. |
| 2:26PM | 15 | Q.    Clearwater? |
| 2:26PM | 16 | A.    Yes. |
| 2:26PM | 17 | Q.    All right.  Mr. Ali, you previously testified on the basis |
| 2:26PM | 18 | of your notes that certain -- certain entries on Government |
| 2:26PM | 19 | Exhibit 394 was -- were associated with exhibits already in |
| 2:26PM | 20 | evidence, correct? |
| 2:26PM | 21 | A.    Yes. |
| 2:26PM | 22 | Q.    And are some of these exhibits video files? |
| 2:26PM | 23 | A.    Yes. |
| 2:26PM | 24 | Q.    Are some of these screenshots from -- are some of these |
| 2:26PM | 25 | screenshots from video files? |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:26PM | 1 | A.   Yes. |
| 2:26PM | 2 | Q.   All right.  Let me just run through a few more of those |
| 2:26PM | 3 | with you.  All right.  Mr. Ali, showing you what's been marked |
| 2:27PM | 4 | as Government 365, have you seen this -- have you seen this |
| 2:27PM | 5 | before? |
| 2:27PM | 6 | A.   Yes. |
| 2:27PM | 7 | Q.   What is it? |
| 2:27PM | 8 | A.   It is a CD containing the ███████ 15 video file that was |
| 2:27PM | 9 | found on the ClipMonster website. |
| 2:27PM | 10 | Q.   How do you know that's what that contains? |
| 2:27PM | 11 | A.   I put the file in the CD, and I initialed it, and I dated |
| 2:27PM | 12 | it. |
| 2:27PM | 13 | Q.   Does this CD contain a true and correct copy of video |
| 2:27PM | 14 | content you extracted from the ClipMonster database? |
| 2:27PM | 15 | A.   Yes. |
| 2:27PM | 16 | MR. REYNOLDS:  Your Honor, we offer Government |
| 2:27PM | 17 | Exhibit 365 into evidence. |
| 2:27PM | 18 | THE COURT:  All right. |
| 2:27PM | 19 | MR. KERR:  No objection. |
| 2:27PM | 20 | THE COURT:  All right.  365 received into evidence, |
| 2:28PM | 21 | may be published to the jury. |
| 2:28PM | 22 | MR. REYNOLDS:  Your Honor, may I have the Court's |
| 2:28PM | 23 | indulgence for a moment to confer with co-counsel? |
| 2:28PM | 24 | THE COURT:  Of course. |
| 2:28PM | 25 | MR. REYNOLDS:  Thank you. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:28PM | 1 | (Pause.) |
| 2:29PM | 2 | MR. REYNOLDS:  Thank you, Your Honor. |
| 2:29PM | 3 | BY MR. REYNOLDS: |
| 2:29PM | 4 | Q.   Mr. Ali, I'm going to ask you questions about four other |
| 2:29PM | 5 | exhibits.  It might be efficient for you to get them all out at |
| 2:29PM | 6 | once.  Government Exhibit 383, 386, 389, and 392. |
| 2:29PM | 7 | A.   Yes. |
| 2:29PM | 8 | Q.   All right.  First Government Exhibit 383, have you seen |
| 2:29PM | 9 | this exhibit before? |
| 2:29PM | 10 | A.   Yes. |
| 2:29PM | 11 | Q.   What is it? |
| 2:29PM | 12 | A.   It is a CD containing the ███████ 24 video file that we |
| 2:29PM | 13 | recovered from the ClipMonster website. |
| 2:29PM | 14 | Q.   Does that CD contain a true and correct copy of a video |
| 2:30PM | 15 | excerpt that you recovered from ClipMonster? |
| 2:30PM | 16 | A.   Yes. |
| 2:30PM | 17 | Q.   Have you seen Government 386 before? |
| 2:30PM | 18 | A.   Yes. |
| 2:30PM | 19 | Q.   What is it? |
| 2:30PM | 20 | A.   It is a CD containing the █████ 78 video file from the |
| 2:30PM | 21 | ClipMonster website. |
| 2:30PM | 22 | Q.   Does it contain true and correct excerpt of a video that |
| 2:30PM | 23 | you obtained from the ClipMonster website? |
| 2:30PM | 24 | A.   Yes. |
| 2:30PM | 25 | Q.   Exhibit 389, same question.  Have you seen this before? |

ALI - DIRECT EXAMINATION

2:30PM   1   A.   Yes.

2:30PM   2   Q.   What is it?

2:30PM   3   A.   It is a CD containing the ███ 66 video as recovered from

2:30PM   4   the ClipMonster website.

2:30PM   5   Q.   Does Government Exhibit 389 contain true and accurate

2:30PM   6   excerpt from a video you recovered from ClipMonster?

2:30PM   7   A.   Yes.

2:30PM   8   Q.   And Government Exhibit 392, could you -- have you seen

2:30PM   9   that before?

2:30PM   10  A.   Yes.

2:30PM   11  Q.   What is it?

2:30PM   12  A.   It is a CD containing the ████ 002 video as extracted

2:30PM   13  from the ClipMonster website.

2:31PM   14  Q.   Dos it contain true and correct -- a true and correct copy

2:31PM   15  of video excerpts that you recovered from the ClipMonster

2:31PM   16  website?

2:31PM   17  A.   Yes.

2:31PM   18  Q.   All right.  Mr. Ali, for each of the videos that you've

2:31PM   19  testified, are there also screenshots in evidence?

2:31PM   20  A.   Yes.

2:31PM   21  Q.   And for each of the screenshots you testified, is there

2:31PM   22  also a video in evidence?

2:31PM   23  A.   Yes.

2:31PM   24  Q.   And do they correspond with each other?

2:31PM   25  A.   Correct.

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:31 PM | 1 | **MR. REYNOLDS:**  Thank you.  Your Honor, we would offer |
| 2:31 PM | 2 | the following four exhibits into evidence:  383, 386, 389, and |
| 2:31 PM | 3 | 392. |
| 2:31 PM | 4 | **MR. KERR:**  No objection. |
| 2:31 PM | 5 | **THE COURT:**  Thank you.  383, 386, 389, and 392, are |
| 2:31 PM | 6 | received into evidence and may be published to the jury. |
| 2:31 PM | 7 | **MR. REYNOLDS:**  Thank you, Your Honor. |
| 2:31 PM | 8 | **THE COURT:**  You're welcome. |
| 2:31 PM | 9 | BY MR. REYNOLDS: |
| 2:31 PM | 10 | **Q.**   All right.  Mr. Ali, are you familiar with the concept of |
| 2:31 PM | 11 | a configuration file? |
| 2:31 PM | 12 | **A.**   Yes. |
| 2:32 PM | 13 | **Q.**   What's a configuration file? |
| 2:32 PM | 14 | **A.**   A configuration file when used in the web server world is |
| 2:32 PM | 15 | a file that contains instructions that the web server would |
| 2:32 PM | 16 | fetch, and these instructions would tell the web server what to |
| 2:32 PM | 17 | do when it receives a request from the user. |
| 2:32 PM | 18 | **Q.**   Did you -- I mean, could you give me an example of how |
| 2:32 PM | 19 | that might work on a website like Facebook or any newspaper |
| 2:32 PM | 20 | website? |
| 2:32 PM | 21 | **A.**   For example, if you go to Facebook.com, when you type in |
| 2:32 PM | 22 | Facebook.com in your browser, the request goes to Facebook's |
| 2:32 PM | 23 | web servers where it would go to a configuration file.  The web |
| 2:32 PM | 24 | server then uses instructions in this configuration file to |
| 2:32 PM | 25 | determine how to route your request.  So say if you're trying |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:32PM | 1 | to log into Facebook using your user name and password, the |
| 2:32PM | 2 | configuration file would tell the web server how to handle your |
| 2:32PM | 3 | request, log you into the account, and then serve you the main |
| 2:32PM | 4 | page of Facebook back. |
| 2:33PM | 5 | Q.   Can a configuration file also control what users are able |
| 2:33PM | 6 | to access, certain parts of certain websites? |
| 2:33PM | 7 | A.   Yes. |
| 2:33PM | 8 | Q.   All right.  Mr. Ali, did you find a configuration file |
| 2:33PM | 9 | from the data you recovered from the ClipMonster servers? |
| 2:33PM | 10 | A.   Yes. |
| 2:33PM | 11 | Q.   Showing you what's been previously marked as Government's |
| 2:33PM | 12 | Exhibit 400, have you seen this exhibit before? |
| 2:33PM | 13 | A.   Yes. |
| 2:33PM | 14 | Q.   What is this? |
| 2:33PM | 15 | A.   This is the configuration file found on the |
| 2:33PM | 16 | ClipMonster.net web server. |
| 2:33PM | 17 | Q.   How do you know this is the configuration file for |
| 2:33PM | 18 | ClipMonster.net? |
| 2:33PM | 19 | A.   It has the same format as a configuration file, and also |
| 2:33PM | 20 | on the top, you can see that it says ClipMonster.net.  It also |
| 2:33PM | 21 | mentions the working directory of the web server as |
| 2:33PM | 22 | ClipMonster/public html. |
| 2:33PM | 23 | Q.   Mr. Ali, is Government Exhibit 400 a true and correct copy |
| 2:33PM | 24 | of the configuration file for ClipMonster.net? |
| 2:34PM | 25 | A.   Yes. |

ALI - DIRECT EXAMINATION

2:34 PM   1          MR. REYNOLDS:  Your Honor, we offer Government's 400
2:34 PM   2   into evidence.
2:34 PM   3          MR. KERR:  No objection.
2:34 PM   4          THE COURT:  400 is received into evidence and may be
2:34 PM   5   published to the jury.  I'm assuming there's no objection,
2:34 PM   6   Mr. Kerr, unless I hear differently from you.
2:34 PM   7          MR. KERR:  No objection.
2:34 PM   8          THE COURT:  Okay.  All right.  Thank you.
2:34 PM   9   BY MR. REYNOLDS:
2:34 PM  10   Q.   All right.  Mr. Ali, are you able to understand the
2:34 PM  11   information within this file?
2:34 PM  12   A.   Yes.
2:34 PM  13   Q.   All right.  Scrolling down to -- it's a little bit faint
2:34 PM  14   on my screen, but approximately lines 39 through 42 --
2:34 PM  15          MR. REYNOLDS:  Ms. Davis, can I have that blown up?
2:34 PM  16   BY MR. REYNOLDS:
2:34 PM  17   Q.   All right.  Mr. Ali, what is the purpose of this text
2:34 PM  18   here?  What does it do?
2:34 PM  19   A.   So these lines are giving some of the directives to the
2:34 PM  20   web server as to how to handle requests coming in for the admin
2:34 PM  21   area on the ClipMonster website.  So essentially these lines
2:34 PM  22   are telling the web server to reject all requests from any IP
2:34 PM  23   addresses except for any requests that come from the IP
2:35 PM  24   addresses that follow.  So by default, nobody would be allowed
2:35 PM  25   to enter the admin area of the ClipMonster website except for

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:35 PM | 1 | the -- except for the IP addresses that follow in the following |
| 2:35 PM | 2 | lines. |
| 2:35 PM | 3 | Q.   What's an admin area? |
| 2:35 PM | 4 | A.   An admin area of a website is an area -- it's like a |
| 2:35 PM | 5 | backstage area where only the admins or administrators of a |
| 2:35 PM | 6 | website might enter.  So, like, say if you have a website that |
| 2:35 PM | 7 | is serving as a store front selling products, the admin can |
| 2:35 PM | 8 | then log into this admin area and manage different |
| 2:35 PM | 9 | configurations of their products, add a product, edit a |
| 2:35 PM | 10 | product, remove a product, and they can also look at other user |
| 2:35 PM | 11 | data such as other user statistics. |
| 2:35 PM | 12 | Q.   So how does a configuration file identify users to the |
| 2:35 PM | 13 | website? |
| 2:35 PM | 14 | A.   So when -- there are certain areas in the configuration |
| 2:36 PM | 15 | file which determines which part of the instructions are |
| 2:36 PM | 16 | managed for which part of the website.  If you look at this |
| 2:36 PM | 17 | configuration file, it says that for the admin area, allow the |
| 2:36 PM | 18 | following users in, and block every other user. |
| 2:36 PM | 19 | Q.   How does if identify the users? |
| 2:36 PM | 20 | A.   It does that using IP addresses. |
| 2:36 PM | 21 | Q.   What's an IP address? |
| 2:36 PM | 22 | A.   An IP address is a numerical value that is assigned to any |
| 2:36 PM | 23 | device that accesses the internet.  So you can think of it as |
| 2:36 PM | 24 | like a home address or a phone number.  Just like a phone |
| 2:36 PM | 25 | number or a home address is unique to every individual, IP |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:36 PM | 1 | addresses are also unique to the individuals and devices that |
| 2:36 PM | 2 | are accessing the website. |
| 2:36 PM | 3 | MR. REYNOLDS:  Ms. Davis, if you could blow up |
| 2:36 PM | 4 | lines 39 through 57, please?  Thank you. |
| 2:36 PM | 5 | BY MR. REYNOLDS: |
| 2:36 PM | 6 | Q.   Mr. Ali, there are certain entries in Government |
| 2:36 PM | 7 | Exhibit 400 that are preceded by a hash or a pound sign.  What |
| 2:36 PM | 8 | does that mean? |
| 2:37 PM | 9 | A.   So, when it comes to configuration files, you can -- for |
| 2:37 PM | 10 | the most part, the configuration file consists of instructions, |
| 2:37 PM | 11 | but you can also make some notes or comments on the file for |
| 2:37 PM | 12 | yourself.  For example, anything that follows a hash or a pound |
| 2:37 PM | 13 | is not processed by the file, but it's only there as like a |
| 2:37 PM | 14 | placeholder, a note or comment to yourself or whoever made the |
| 2:37 PM | 15 | configuration file. |
| 2:37 PM | 16 | Q.   Does that mean that what follows the hashes in Government |
| 2:37 PM | 17 | Exhibit 400, that's not computer-generated information? |
| 2:37 PM | 18 | Someone physically typed that in there? |
| 2:37 PM | 19 | A.   Correct. |
| 2:37 PM | 20 | Q.   All right.  Do you see a line that says "hash Ken"? |
| 2:37 PM | 21 | A.   Yes. |
| 2:37 PM | 22 | Q.   And then below that that "allow from certain numbers"? |
| 2:37 PM | 23 | A.   Yes. |
| 2:37 PM | 24 | Q.   Are those IP addresses, those numbers that appear below |
| 2:37 PM | 25 | hash Ken? |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:37PM | 1 | A.   Yes, those are prefixes of IP addresses. |
| 2:37PM | 2 | Q.   What do you mean prefix? |
| 2:37PM | 3 | A.   So an IP address has four parts to it.  These are the |
| 2:37PM | 4 | first two parts of an IP address.  Essentially what this would |
| 2:38PM | 5 | say is any request that is coming from an IP address that |
| 2:38PM | 6 | begins in let's say 78.142, allow that user into the admin area |
| 2:38PM | 7 | of the website. |
| 2:38PM | 8 | Q.   Wouldn't that a lot of people whose IP addresses start |
| 2:38PM | 9 | with those two numbers? |
| 2:38PM | 10 | A.   Yes.  This certainly narrows down your pool of people who |
| 2:38PM | 11 | have access to the website. |
| 2:38PM | 12 | Q.   So anyone with -- is it the case, Mr. Ali, that anyone |
| 2:38PM | 13 | with 78.142 dot anything could just get into the admin area and |
| 2:38PM | 14 | make changes though the website? |
| 2:38PM | 15 | A.   Correct. |
| 2:38PM | 16 | Q.   Is there any kind of password function that is restricting |
| 2:38PM | 17 | people from getting inside? |
| 2:38PM | 18 | A.   Yes.  So once -- if you are a user coming in from the |
| 2:38PM | 19 | 78.142 address, you will be able to access the admin area, but |
| 2:38PM | 20 | you would still need a user name and password to access the |
| 2:38PM | 21 | contents behind that area. |
| 2:38PM | 22 | Q.   And a few lines down, Mr. Ali, line 55, could you read |
| 2:38PM | 23 | that to the jury, please? |
| 2:38PM | 24 | A.   Yes.  It reads "Plamen." |
| 2:38PM | 25 | Q.   Is this a hash in front of Plamen? |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:39PM | 1 | A.   Yes. |
| 2:39PM | 2 | Q.   Does that mean the same thing, that somebody wrote this in |
| 2:39PM | 3 | there? |
| 2:39PM | 4 | A.   Yes. |
| 2:39PM | 5 | Q.   And below, "allow from 78.159," does that also mean that |
| 2:39PM | 6 | IP addresses with those -- with that prefix would be able to |
| 2:39PM | 7 | access the admin area as long as they have the right password? |
| 2:39PM | 8 | A.   Correct. |
| 2:39PM | 9 | Q.   All right.  Mr. Ali, showing you what has been marked as |
| 2:39PM | 10 | Government Exhibit 401 -- |
| 2:39PM | 11 | A.   Yes. |
| 2:39PM | 12 | Q.   -- have you seen this exhibit before? |
| 2:39PM | 13 | A.   Yes. |
| 2:39PM | 14 | Q.   What is it? |
| 2:39PM | 15 | A.   This is the web server configuration file for the |
| 2:39PM | 16 | cyber-pay.net website. |
| 2:39PM | 17 | Q.   And how do you know it's the configuration file from |
| 2:39PM | 18 | cyber-pay.net? |
| 2:39PM | 19 | A.   So, again, you can see cyber-pay.net at Heather, and you |
| 2:39PM | 20 | can also say the working directory labeled as /home/CyberPay. |
| 2:39PM | 21 | Q.   Is this a true and correct copy of the configuration file |
| 2:39PM | 22 | for cyber-pay.net? |
| 2:40PM | 23 | A.   Yes. |
| 2:40PM | 24 | MR. REYNOLDS:  Your Honor, we offer Government |
| 2:40PM | 25 | Exhibit 401 into evidence. |

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:40PM | 1 | THE COURT:  All right.  401 is received into |
| 2:40PM | 2 | evidence, may be published to the jury. |
| 2:40PM | 3 | MR. REYNOLDS:  Thank you. |
| 2:40PM | 4 | THE COURT:  You're welcome. |
| 2:40PM | 5 | BY MR. REYNOLDS: |
| 2:40PM | 6 | Q.   Mr. Ali, same question.  Can you understand this? |
| 2:40PM | 7 | A.   Yes. |
| 2:40PM | 8 | Q.   All right.  Turning to page 2 -- turning to page 2 of |
| 2:40PM | 9 | Government Exhibit 401 -- |
| 2:40PM | 10 | MR. REYNOLDS:  Ms. Davis, could you highlight lines |
| 2:40PM | 11 | 53 through 71?  All right. |
| 2:40PM | 12 | BY MR. REYNOLDS: |
| 2:40PM | 13 | Q.   Mr. Ali, does this look similar to the information we saw |
| 2:40PM | 14 | in Government Exhibit 400? |
| 2:40PM | 15 | A.   Yes. |
| 2:40PM | 16 | Q.   And does this have the same function as Government |
| 2:40PM | 17 | Exhibit 400, the information we're looking at in Government's |
| 2:40PM | 18 | 401? |
| 2:40PM | 19 | A.   Yes. |
| 2:41PM | 20 | Q.   And, again, you see a line that says "hash Ken"? |
| 2:41PM | 21 | A.   Yes. |
| 2:41PM | 22 | Q.   And another "hash Plamen"? |
| 2:41PM | 23 | A.   Yes. |
| 2:41PM | 24 | Q.   "Allow from," these lines below that, does this again |
| 2:41PM | 25 | allow users who have those IP addresses to log into the admin |

ALI - DIRECT EXAMINATION

2:41PM   1    area of cyber-pay.net?

2:41PM   2    A.   Correct.

2:41PM   3    Q.   All right.  Mr. Ali, this is not the same IP prefix that

2:41PM   4    preceded Plamen -- the IP prefix that falls under the line of

2:41PM   5    hash Plamen in Government Exhibit 401 is not the same IP prefix

2:41PM   6    that came under Plamen in Government Exhibit 400; is it?

2:41PM   7    A.   It is not.

2:41PM   8    Q.   Do IP addresses, do they change over time?

2:41PM   9    A.   Yes.

2:41PM   10   Q.   Why is that?

2:41PM   11   A.   Every internet service provider will give you -- works off

2:41PM   12   of a pool of IP addresses, just keep on refreshing after a

2:41PM   13   certain interval.  For instances, like say, for example, if you

2:42PM   14   reset your router, or like say every 60 days the IP -- the ISP

2:42PM   15   will issue you a new IP address.

2:42PM   16   Q.   Mr. Ali, does a website -- when -- when a website is live

2:42PM   17   on the internet and people visit it, does a website store any

2:42PM   18   information about those visitors?

2:42PM   19   A.   Yes.

2:42PM   20   Q.   Generally speaking, what sorts of information does it

2:42PM   21   store?

2:42PM   22   A.   So it stores this information, what's called the web

2:42PM   23   access logs.  It can store all sorts of information, like what

2:42PM   24   is the IP address that the user used to visit the website?

2:42PM   25   What kind of browser was being used to visit the website?  What

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:42PM | 1 | time and day the user visited the website?  And what link or |
| 2:42PM | 2 | URL that the user visited on the website? |
| 2:42PM | 3 | Q.   Did the ClipMonster website contain web access logs? |
| 2:42PM | 4 | A.   Yes. |
| 2:42PM | 5 | Q.   Did those web access logs store IP addresses of visitors |
| 2:42PM | 6 | to ClipMonster? |
| 2:42PM | 7 | A.   Yes. |
| 2:42PM | 8 | Q.   Did you search those web access logs for the two IP |
| 2:43PM | 9 | prefixes that followed the word "Plamen" in Government |
| 2:43PM | 10 | Exhibit 400 and 401? |
| 2:43PM | 11 | A.   Yes. |
| 2:43PM | 12 | Q.   Mr. Ali, showing you what's been marked as Government |
| 2:43PM | 13 | Exhibit 402, have you seen this exhibit before? |
| 2:43PM | 14 | A.   Yes. |
| 2:43PM | 15 | Q.   What is it? |
| 2:43PM | 16 | A.   This shows us the web access logs from the ClipMonster |
| 2:43PM | 17 | website that were extracted from the web access log files. |
| 2:43PM | 18 | Q.   Is this a full copy of the web access logs, or is it an |
| 2:43PM | 19 | excerpted copy? |
| 2:43PM | 20 | A.   It's an excerpt that shows web access logs and access |
| 2:43PM | 21 | activity only from one IP address. |
| 2:43PM | 22 | Q.   What IP address is that? |
| 2:43PM | 23 | A.   It is 78.159.142.158. |
| 2:43PM | 24 | Q.   And does that correspond with the IP prefix that appeared |
| 2:43PM | 25 | under the word "Plamen" in Government Exhibit 400? |

ALI - DIRECT EXAMINATION

| 2:43 PM | 1 | A.   Yes. |
| 2:43 PM | 2 | Q.   Does Government Exhibit 402, is it a true and correct copy |
| 2:43 PM | 3 | of excerpts from the IP web access logs from ClipMonster.net? |
| 2:44 PM | 4 | A.   Yes. |
| 2:44 PM | 5 |      MR. REYNOLDS:  Your Honor, we offer Government |
| 2:44 PM | 6 | Exhibit 402 into evidence. |
| 2:44 PM | 7 |      THE COURT:  All right.  402 is received into |
| 2:44 PM | 8 | evidence, may be published to the jury. |
| 2:44 PM | 9 | BY MR. REYNOLDS: |
| 2:44 PM | 10 | Q.   Mr. Ali, what are we looking at here in Government |
| 2:44 PM | 11 | Exhibit 402? |
| 2:44 PM | 12 | A.   So this is an excerpt from the web access logs for the |
| 2:44 PM | 13 | ClipMonster website.  You see several columns here.  The first |
| 2:44 PM | 14 | column is the URL that was being visited by the user.  The |
| 2:44 PM | 15 | referral column tells you which website or link this URL |
| 2:44 PM | 16 | originated from.  Then it shows you the IP address of the user |
| 2:44 PM | 17 | visiting the website.  It shows you the operating system or OS |
| 2:44 PM | 18 | that the user was using.  It shows you the kind of browser that |
| 2:44 PM | 19 | the user was using; the user age and string has some more |
| 2:44 PM | 20 | information about what the browser was, and then it also shows |
| 2:44 PM | 21 | us the date and time that the user visited the website. |
| 2:45 PM | 22 | Q.   And does this show access by the IP address that begins |
| 2:45 PM | 23 | with 78.159? |
| 2:45 PM | 24 | A.   Correct. |
| 2:45 PM | 25 | Q.   And what portion of ClipMonster.net is that individual or |

ALI - DIRECT EXAMINATION

2:45 PM   1   the user of that IP address visiting in Government Exhibit 402?

2:45 PM   2   A.   So that was the admin area, which was known as the

2:45 PM   3   admin.ClipMonster.net domain name.

2:45 PM   4   Q.   Does this individual visit that area on multiple areas or

2:45 PM   5   just one?

2:45 PM   6   A.   Multiple occasions.

2:45 PM   7   Q.   And are these in chronological order?

2:45 PM   8   A.   Yes.

2:45 PM   9   Q.   Scrolling down to page 7 of Government Exhibit 402, what

2:45 PM  10   was the last date of access to the admin area of

2:45 PM  11   ClipMonster.net by the user of this IP address?

2:45 PM  12   A.   It was January 7th, 2019.

2:45 PM  13   Q.   Mr. Ali, could you look at what has been marked as

2:45 PM  14   Government Exhibit 403, please?

2:46 PM  15   A.   Yes.

2:46 PM  16   Q.   What is this exhibit?

2:46 PM  17   A.   This exhibit, again, it shows us the web access logs from

2:46 PM  18   the ClipMonster website.

2:46 PM  19   Q.   Is this a true and correct copy of excerpts from the web

2:46 PM  20   access logs for ClipMonster.net?

2:46 PM  21   A.   Yes.

2:46 PM  22         MR. REYNOLDS:  Your Honor, we offer 403 into

2:46 PM  23   evidence.

2:46 PM  24         THE COURT:  All right.  403 is received into evidence

2:46 PM  25   and may be published to the jury.

ALI - DIRECT EXAMINATION

| | | |
|---|---|---|
| 2:46PM | 1 | BY MR. REYNOLDS: |
| 2:46PM | 2 | Q.   Mr. Ali, is this -- does Government Exhibit 403 contain |
| 2:46PM | 3 | the same columns and information that appeared in Government |
| 2:46PM | 4 | Exhibit 402? |
| 2:46PM | 5 | A.   Yes. |
| 2:46PM | 6 | Q.   And does it provide that information for the -- for visits |
| 2:46PM | 7 | by the IP address 91.92.44.77? |
| 2:46PM | 8 | A.   Yes. |
| 2:46PM | 9 | Q.   Does that IP address -- does that IP address fall within |
| 2:47PM | 10 | the IP prefix that's listed in Government Exhibit 401? |
| 2:47PM | 11 | A.   Yes. |
| 2:47PM | 12 | Q.   And, again, Mr. Ali, what portion of ClipMonster is being |
| 2:47PM | 13 | accessed by the user of this IP address? |
| 2:47PM | 14 | A.   It is the admin area of ClipMonster, also known as |
| 2:47PM | 15 | admin.ClipMonster.net. |
| 2:47PM | 16 | Q.   Does this -- does Government Exhibit 403 show multiple |
| 2:47PM | 17 | visits to the admin area of ClipMonster or just one? |
| 2:47PM | 18 | A.   Multiple visits. |
| 2:47PM | 19 | Q.   And scrolling down to page 4 of Government Exhibit 403, |
| 2:47PM | 20 | when was the date of last access to the admin area by the user |
| 2:47PM | 21 | of that IP address? |
| 2:47PM | 22 | A.   It was on May 11th, 2019. |
| 2:47PM | 23 | Q.   And, Mr. Ali, was May 2019 also the month in which |
| 2:47PM | 24 | Homeland Security agents seized the ClipMonster servers from |
| 2:47PM | 25 | SoftLayer in Dallas? |

ALI - DIRECT EXAMINATION

2:47PM 1    A.    Yes.

2:47PM 2              MR. REYNOLDS:  Your Honor, may I have one moment to

2:47PM 3    confer?

2:47PM 4              THE COURT:  Sure.

2:47PM 5                        (Pause.)

2:48PM 6              MR. REYNOLDS:  Thank you, Your Honor.  We'll pass the

2:48PM 7    witness.

2:48PM 8              THE COURT:  Okay.  Probably we'll take our break.

2:48PM 9    It's a little bit earlier than I normally do, but it's a good

2:48PM 10   breaking point.  So, ladies and gentlemen, we're going to take

2:48PM 11   our 10-minute afternoon break.  We'll resume around 3:00.  Just

2:48PM 12   so you know, we'll go probably until about 4:30-ish, so we'll

2:48PM 13   resume at 3:00-ish, go to about 4:30-ish.  Please don't discuss

2:48PM 14   the case or form any opinions until you've heard all the

2:48PM 15   evidence.  We'll see you back here in 10 minutes.

16                    (Jury out at 2:48 p.m.)

2:49PM 17             THE COURT:  All right.  Thank you.  We're in recess

2:49PM 18   then.  All right.  I'll remind the -- we're in the middle of

2:49PM 19   your testimony.  Mr. Witness there, we're in the middle of your

2:49PM 20   testimony, so please don't discuss your testimony with anybody,

2:49PM 21   including the prosecutors, okay?  All right.  We're in recess.

22                    (Recess from 2:49 p.m. to 3:15 p.m.)

3:15PM 23             THE COURT:  Thank you.  All right.  We've got the

3:15PM 24   witness there.  We have all our jurors ready?  Is everybody

3:15PM 25   ready to go?  Okay.  Very good.

1                    (Jury in at 3:16 p.m.)

3:16PM   2            THE COURT:  Okay.  Welcome back, ladies and

3:17PM   3   gentlemen.

3:17PM   4            I remind the witness you're still under oath.

3:17PM   5   Do you understand that?

3:17PM   6            THE WITNESS:  Yes.

3:17PM   7            THE COURT:  If the Government has finished its direct

3:17PM   8   examination of the witness, Mr. Kerr, do you wish to

3:17PM   9   cross-examine the witness?

3:17PM   10           MR. KERR:  Yes, I do.  Thank you, Your Honor.

3:17PM   11           THE COURT:  All right.  You may proceed, Mr. Kerr.

3:17PM   12                    CROSS-EXAMINATION

3:17PM   13                    BY MR. KERR:

3:17PM   14   Q.   Good afternoon, Mr. Ali.

3:17PM   15   A.   Good afternoon.

3:17PM   16   Q.   We've never spoken before; have we?

3:17PM   17   A.   No.

3:17PM   18   Q.   Okay.  You're testifying as an expert in this case, and

3:17PM   19   you've used some terms that have meaning in this area,

3:17PM   20   referring to sexually suggestive and explicit.  I think we've

3:17PM   21   discussed erotic or erotica.  Those terms have specific

3:18PM   22   meanings in this area, correct?

3:18PM   23   A.   Right.

3:18PM   24   Q.   Okay.  And you have training and experience in this area?

3:18PM   25   A.   Yes.

ALI - CROSS-EXAMINATION

3:18PM 1  Q.   Okay.  I just want to flesh this out a little bit, because

3:18PM 2  there's a difference in these terms.  So something that's

3:18PM 3  sexually suggestive is, you would agree, different from

3:18PM 4  something that is sexually explicit?

3:18PM 5       MR. REYNOLDS:  Objection, Your Honor.  Calls for a

3:18PM 6  legal conclusion.

3:18PM 7       THE COURT:  All right.  Do you wish to respond to

3:18PM 8  that, Mr. Kerr?

3:18PM 9       MR. KERR:  There's been a lot of testimony about

3:18PM 10  what's suggestive on the website and what's explicit and what's

3:18PM 11  erotic, and I think I have a right to inquire, cross-examine

3:18PM 12  this witness about it.

3:18PM 13       THE COURT:  I'm going to agree with the Government.

3:18PM 14  The objection is sustained.  You can ask it a different way.

3:18PM 15  BY MR. KERR:

3:18PM 16  Q.   Okay.  Mr. Ali, do you watch movies, Netflix, HBO, TV,

3:19PM 17  cable?

3:19PM 18  A.   Yes.

3:19PM 19  Q.   Okay.  Now, when you see a warning on a movie coming on

3:19PM 20  that says it's suggestive, sexually suggestive material or it's

3:19PM 21  PG or even R, that means one thing to you, right?

3:19PM 22  A.   Right.

3:19PM 23  Q.   And when a warning comes on that tells you it's mature

3:19PM 24  audiences only, strong sexual content, explicit sex or X, that

3:19PM 25  means something else to you, right?

ALI - CROSS-EXAMINATION

3:19PM    1    A.    Yes.

3:19PM    2    Q.    You expect nudity and explicit sex?

3:19PM    3    A.    Yes.

3:19PM    4    Q.    Okay.  I just wanted to get these terms sorted out.

3:19PM    5          Also you discussed -- you testified about proxy

3:19PM    6    servers?

3:19PM    7    A.    Yes.

3:19PM    8    Q.    Okay.  And if I -- now, I don't understand this stuff, so

3:20PM    9    you're going to have to help me out here because I really don't

3:20PM   10    have command of this part of the -- of science or computer

3:20PM   11    technology, but a proxy server, the way I understood your

3:20PM   12    testimony, can be used to hide the location of a server?

3:20PM   13    A.    Correct.

3:20PM   14    Q.    But there are other uses for proxy servers also, right?

3:20PM   15    A.    Yes.

3:20PM   16    Q.    Can you identify some of those?

3:20PM   17    A.    You can hide the identity of the user also.  Since I --

3:20PM   18    the proxy server is acting as a middle agent, so any requests

3:20PM   19    coming from the user to the server have to pass through the

3:20PM   20    proxy server before it goes to the server itself.

3:20PM   21    Q.    Well, let me ask you, does a VPN that we all use to -- for

3:20PM   22    internet security in our home computers, does that employ proxy

3:20PM   23    servers?

3:20PM   24    A.    In some sense, yes, but proxy servers are applied on a

3:20PM   25    server, whereas VPNs can be applied on individual clients

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

ALI - CROSS-EXAMINATION

3:21PM   1    connecting to the server.

3:21PM   2    Q.   How about big websites?  Don't they use proxy servers to,

3:21PM   3    like, balance the load?

3:21PM   4    A.   You can use proxy servers for load balancing.  It can --

3:21PM   5    Q.   Load balancing?

3:21PM   6    A.   It can act as a middle agent where it receives all the

3:21PM   7    requests, prioritizes the requests, puts them in a queue, and

3:21PM   8    then serves them to the website, yes.

3:21PM   9    Q.   So there are legitimate big operations that use proxy

3:21PM   10   servers?

3:21PM   11   A.   Yes.

3:21PM   12   Q.   Also you testified -- I think it was Government's

3:21PM   13   Exhibit 348 that was introduced, admitted into evidence, and so

3:21PM   14   I'd like to display the warning in red on there.  Remember

3:21PM   15   testifying about the warning in red about the websites?

3:21PM   16   A.   Yes.

3:21PM   17        MR. KERR:  May I display this, Your Honor?  May I

3:21PM   18   publish the 348 that's been admitted?

3:21PM   19        THE COURT:  Yes.  That would be fine, sure.  And it's

3:21PM   20   always okay.  If it's been admitted, you can always display it

3:22PM   21   to the jury without having to ask, but thank you, Mr. Kerr.

3:22PM   22        MR. KERR:  Will that the show up on there?

3:22PM   23        COURTROOM DEPUTY:  If this is muted -- if it's muted,

3:22PM   24   no.

3:22PM   25                    (Pause.)

ALI - CROSS-EXAMINATION

3:22 PM   1          THE COURT:  We're going to -- it's on that screen.

3:22 PM   2   Okay.  That's where it's showing as opposed to the major

3:22 PM   3   screen.

3:22 PM   4   BY MR. KERR:

3:22 PM   5   Q.   Now, do you have any idea from the work that you did who

3:22 PM   6   posted this on that -- on that website?

3:22 PM   7   A.   No, it was a text that I recovered as it was on this

3:22 PM   8   website when I reconstructed it.

3:22 PM   9   Q.   So you would have no reason to dispute that Ken Power

3:23 PM  10   posted this -- you have no reason to believe that Plamen

3:23 PM  11   Velinov posted this?

3:23 PM  12   A.   No.  Whoever made this website, whoever typed in the text

3:23 PM  13   as it existed on the server, that is how it is being displayed

3:23 PM  14   here.

3:23 PM  15   Q.   And it discusses stolen material.  Now, that's a common

3:23 PM  16   problem, isn't it, on internet websites?

3:23 PM  17   A.   Stolen material?

3:23 PM  18   Q.   Pardon me?  Stolen material; that it's downloaded from --

3:23 PM  19   websites that have pictures of any kind are stolen off of and

3:23 PM  20   used and resold by thieves; is that right?

3:23 PM  21   A.   Do you mean, like, copyright violations?

3:23 PM  22   Q.   Yes.

3:23 PM  23   A.   Copyrighted material, yes.

3:23 PM  24   Q.   Okay.  So all of these websites have those kind of

3:23 PM  25   concerns, right?

ALI - CROSS-EXAMINATION

3:23PM   1   A.   Websites like these or --

3:23PM   2   Q.   Any kind of website that produces material that has a

3:23PM   3   value.

3:23PM   4   A.   Well, a website can be serving stolen material from --

3:23PM   5   taken from other sources, yes.

3:23PM   6   Q.   So this warning talks about stolen files, and from the

3:24PM   7   other material that you've reviewed, there was concern about

3:24PM   8   stealing of the material, right?

3:24PM   9   A.   Stealing of the materials from other websites, you mean?

3:24PM   10   Q.   Right.  From the ICQ chats and other things that you --

3:24PM   11   A.   I did not review any of the ICQ chats, so I can't comment

3:24PM   12   on that.

3:24PM   13   Q.   But that's what this is -- that's part of what this is

3:24PM   14   discussing, right, stolen material on its sites?

3:24PM   15   A.   That's what the claim is made, that it contains stolen

3:24PM   16   material.

3:24PM   17   Q.   Okay.  And from -- at least from my reading of the

3:24PM   18   warning, it's warning customers about being led into traps

3:24PM   19   where they will have child pornography unknowingly put on their

3:24PM   20   computers.  Don't you understand that to be the case?

3:24PM   21   A.   That is what it is warning you about, yes.

3:25PM   22   Q.   But just to be sure, you have no indication from what you

3:25PM   23   researched that this was even placed on the website by

3:25PM   24   Mr. Velinov?

3:25PM   25   A.   No.  Like I said, whoever created this website posted this

ALI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 3:25 PM | 1 | on the website. |
| 3:25 PM | 2 | Q.   Okay.  And then you testified about some erotic poses |
| 3:25 PM | 3 | that -- on some of the images that you viewed. |
| 3:25 PM | 4 | A.   Sexually explicit poses, yes. |
| 3:25 PM | 5 | Q.   I think I used -- did you not use the phrase "erotic |
| 3:25 PM | 6 | poses"? |
| 3:25 PM | 7 | A.   I didn't say erotic.  I said sexually explicit, various |
| 3:25 PM | 8 | sexually explicit poses were found on the Newstar and |
| 3:25 PM | 9 | ClipMonster websites. |
| 3:25 PM | 10 | Q.   There was no nudity on the website, correct? |
| 3:25 PM | 11 | A.   There was no nudity, correct. |
| 3:25 PM | 12 | Q.   And no sex acts displayed? |
| 3:25 PM | 13 | A.   There were no sex acts.  However, there were images where |
| 3:26 PM | 14 | you could see two individuals, a little boy and a little girl |
| 3:26 PM | 15 | in close proximity in various sexual poses.  You can see the |
| 3:26 PM | 16 | videos found on the ClipMonster website, can see two littles |
| 3:26 PM | 17 | girls hugging, kissing each other in inappropriate costumes. |
| 3:26 PM | 18 | Q.   You did not see minors involved in sex? |
| 3:26 PM | 19 | A.   No. |
| 3:26 PM | 20 | Q.   Having sex? |
| 3:26 PM | 21 | A.   No. |
| 3:26 PM | 22 | Q.   And no explicit sex? |
| 3:26 PM | 23 | A.   No. |
| 3:26 PM | 24 | **MR. KERR:**  Thank you.  No further questions. |
| 3:26 PM | 25 | **THE COURT:**  Any redirect for this witness? |

ALI - REDIRECT EXAMINATION

| | | |
|---|---|---|
| 3:26PM | 1 | MR. REYNOLDS:  Very briefly, Your Honor. |
| 3:26PM | 2 | THE COURT:  Sure. |
| 3:26PM | 3 | MR. REYNOLDS:  Ms. Davis, could you put up page 1 of |
| 3:26PM | 4 | Government's Exhibit 301? |
| 3:26PM | 5 | REDIRECT EXAMINATION |
| 3:26PM | 6 | BY MR. REYNOLDS: |
| 3:26PM | 7 | Q.   Mr. Ali, defense counsel asked you if you're familiar with |
| 3:26PM | 8 | Netflix and movies and the like, correct? |
| 3:26PM | 9 | A.   Yes. |
| 3:26PM | 10 | Q.   And you've seen disclaimers on these sort of things? |
| 3:27PM | 11 | A.   Yes. |
| 3:27PM | 12 | Q.   Sort of things that say "mature audiences only"? |
| 3:27PM | 13 | A.   Correct. |
| 3:27PM | 14 | Q.   Have you ever seen anything on Netflix that said, "We are |
| 3:27PM | 15 | not child porn"? |
| 3:27PM | 16 | A.   No. |
| 3:27PM | 17 | Q.   Have you ever seen anything on Netflix that had to say, |
| 3:27PM | 18 | "We were not designed for pedophiles"? |
| 3:27PM | 19 | A.   No. |
| 3:27PM | 20 | Q.   Mr. Ali, if you were watching Netflix and you saw a banner |
| 3:27PM | 21 | that said "mature audiences only," and the movie depicted an |
| 3:27PM | 22 | eight-year-old girl with see-through underwear where you could |
| 3:27PM | 23 | see her vagina through her underwear, would you be surprised? |
| 3:27PM | 24 | A.   Yes. |
| 3:27PM | 25 | MR. REYNOLDS:  Thank you.  Nothing further. |

ALI - RECROSS-EXAMINATION

| | | |
|---|---|---|
| 3:27PM | 1 | THE COURT:  Any recross for this witness? |
| 3:27PM | 2 | MR. KERR:  Just one question, Your Honor. |
| 3:27PM | 3 | THE COURT:  Sure. |
| 3:27PM | 4 | RECROSS-EXAMINATION |
| 3:27PM | 5 | BY MR. KERR: |
| 3:27PM | 6 | Q.  Have you -- are you familiar with the movie that's been |
| 3:27PM | 7 | displayed on Netflix called "Cuties"? |
| 3:27PM | 8 | A.  Yes. |
| 3:28PM | 9 | Q.  Okay.  And that's -- has anybody been prosecuted or |
| 3:28PM | 10 | arrested for displaying that movie? |
| 3:28PM | 11 | A.  Well, I know that it was being investigated on a federal |
| 3:28PM | 12 | level, yes. |
| 3:28PM | 13 | Q.  So you expect there to be some sort of follow up on that, |
| 3:28PM | 14 | some prosecution? |
| 3:28PM | 15 | A.  Well, that was a movie that was of concern because it |
| 3:28PM | 16 | depicted minors in the movie.  However, I don't -- I don't |
| 3:28PM | 17 | think there was any content in the movie that depicted minors |
| 3:28PM | 18 | in, you know, sexually explicit poses or translucent underwear |
| 3:28PM | 19 | or any other explicit poses.  It was all about dancing. |
| 3:28PM | 20 | Q.  Have you seen it? |
| 3:28PM | 21 | A.  I have partially watched the movie, yes. |
| 3:28PM | 22 | Q.  I'm sorry? |
| 3:28PM | 23 | A.  I have partially watched the movie, yes. |
| 3:28PM | 24 | MR. KERR:  Okay.  Thank you. |
| 3:28PM | 25 | THE COURT:  All right.  I'll excuse -- may I excuse |

ALI - RECROSS-EXAMINATION

| | | |
|---|---|---|
| 3:28 PM | 1 | the witness then?  We're finished with the gentleman? |
| 3:28 PM | 2 | MR. REYNOLDS:  Yes, Your Honor.  Thank you. |
| 3:28 PM | 3 | THE COURT:  You are excused.  Thank you for having |
| 3:28 PM | 4 | come in today to testify. |
| 3:28 PM | 5 | (Witness excused.) |
| 3:28 PM | 6 | THE COURT:  And the Government can call its next |
| 3:28 PM | 7 | witness. |
| 3:29 PM | 8 | MS. VALDES:  The Government calls Tatiana Power. |
| 3:29 PM | 9 | MR. REYNOLDS:  Your Honor, may we return the |
| 3:29 PM | 10 | television screen? |
| 3:29 PM | 11 | THE COURT:  Yes. |
| 3:29 PM | 12 | MS. VALDES:  And may I approach the witness area to |
| 3:29 PM | 13 | remove some of the exhibits and put up some exhibits, Your |
| 3:29 PM | 14 | Honor? |
| 3:29 PM | 15 | THE COURT:  Yes. |
| 3:29 PM | 16 | MS. VALDES:  Thank you. |
| 3:30 PM | 17 | COURTROOM DEPUTY:  Ms. Power? |
| 3:31 PM | 18 | (Witness sworn.) |
| 3:31 PM | 19 | COURTROOM DEPUTY:  Thank you.  Please state your name |
| 3:31 PM | 20 | and spell it for the record. |
| 3:31 PM | 21 | THE WITNESS:  Tatiana Power, P-o-w-e-r. |
| 3:31 PM | 22 | COURTROOM DEPUTY:  Thank you.  You may be seated. |
| 3:31 PM | 23 | THE WITNESS:  Thank you. |
| 3:31 PM | 24 | THE COURT:  All right.  Ms. Power, you're going to be |
| 3:31 PM | 25 | asked some questions by Karyna Valdes, the Assistant United |

TATIANA POWER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 3:31PM | 1 | States Attorney assigned to the case.  If you don't understand |
| 3:31PM | 2 | the question, please say so, so she can state it differently. |
| 3:31PM | 3 | Wait until the question is finished before you |
| 3:31PM | 4 | begin answering so we don't have two people speaking at the |
| 3:31PM | 5 | same time. |
| 3:31PM | 6 | If you're soft spoken -- I can't quite tell, but |
| 3:31PM | 7 | I want to make certain we can hear you and understand you, so |
| 3:31PM | 8 | please speak loudly and speak into the microphone, but don't |
| 3:31PM | 9 | put it so close that it's muffled. |
| 3:31PM | 10 | THE WITNESS:  Okay. |
| 3:31PM | 11 | THE COURT:  And if you have the tendency to speak |
| 3:31PM | 12 | quickly, slow down so we can understand you. |
| 3:31PM | 13 | THE WITNESS:  Okay. |
| 3:31PM | 14 | THE COURT:  All right.  Very good.  Thank you. |
| 3:31PM | 15 | MS. VALDES:  Thank you, Your Honor.  May I inquire? |
| 3:31PM | 16 | THE COURT:  Yes. |
| 3:32PM | 17 | TATIANA POWER, |
| 3:32PM | 18 | a witness called on behalf of the Government, being first duly |
| 3:32PM | 19 | sworn, was examined and testified as follows: |
| 3:32PM | 20 | DIRECT EXAMINATION |
| 3:32PM | 21 | BY MS. VALDES: |
| 3:32PM | 22 | Q.  Good afternoon, Ms. Power. |
| 3:32PM | 23 | A.  Good afternoon. |
| 3:32PM | 24 | Q.  You and I have met on three separate occasions; is that |
| 3:32PM | 25 | correct? |

TATIANA POWER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 3:32PM | 1 | A.   That is correct. |
| 3:32PM | 2 | Q.   And what was the purpose of those meetings? |
| 3:32PM | 3 | A.   To discuss my case and the possibility of me testifying. |
| 3:32PM | 4 | Q.   Have you also met with Special Agent Tavey Garcia and |
| 3:32PM | 5 | other members of law enforcement? |
| 3:32PM | 6 | A.   Yes. |
| 3:32PM | 7 | Q.   What was the purpose of those meetings? |
| 3:32PM | 8 | A.   Same thing.  We discussed my case.  They had questions |
| 3:32PM | 9 | regarding my case. |
| 3:32PM | 10 | Q.   Why are you dressed like that today? |
| 3:32PM | 11 | A.   Because I'm incarcerated. |
| 3:32PM | 12 | Q.   Are you currently serving a prison sentence? |
| 3:32PM | 13 | A.   Yes, ma'am. |
| 3:32PM | 14 | Q.   Did you plead guilty to a crime? |
| 3:32PM | 15 | A.   Yes. |
| 3:32PM | 16 | Q.   What was the crime? |
| 3:32PM | 17 | A.   Conspiracy to commit money laundering. |
| 3:32PM | 18 | Q.   The money laundering crime, was that in regards to the |
| 3:32PM | 19 | Newstar websites? |
| 3:32PM | 20 | A.   Yes, ma'am. |
| 3:32PM | 21 | Q.   And when I say Newstar websites, do you know what I'm |
| 3:32PM | 22 | referring to? |
| 3:32PM | 23 | A.   Yes, ma'am. |
| 3:32PM | 24 | Q.   What am I referring to? |
| 3:32PM | 25 | A.   Website -- it's a website -- websites of the -- of |

TATIANA POWER - DIRECT EXAMINATION

3:32 PM   1   non-nude child modeling.

3:33 PM   2   Q.   Did you plead to the money laundering charge pursuant to a

3:33 PM   3   plea agreement?

3:33 PM   4   A.   Yes.

3:33 PM   5   Q.   Does that plea agreement call for your cooperation?

3:33 PM   6   A.   Yes.

3:33 PM   7   Q.   For example, if you were asked to testify, would you have

3:33 PM   8   to do so?

3:33 PM   9   A.   Yes.

3:33 PM   10   Q.   Are you hoping in testifying today to get a reduction in

3:33 PM   11   your sentence?

3:33 PM   12   A.   Yes, I do.

3:33 PM   13   Q.   Has anyone promised you anything, including a reduction in

3:33 PM   14   sentence?

3:33 PM   15   A.   No, ma'am.  Nobody promised me anything.

3:33 PM   16   Q.   Do you even know today after testifying if you will

3:33 PM   17   receive a reduction in sentence?

3:33 PM   18   A.   No.  I don't know.

3:33 PM   19   Q.   Do you know if the Government will ask for a reduction in

3:33 PM   20   your sentence?

3:33 PM   21   A.   I don't know that.

3:33 PM   22   Q.   Do you have any prior convictions except for the one that

3:33 PM   23   you are -- for the crime you're currently serving?

3:33 PM   24   A.   I do not have, no.

3:33 PM   25   Q.   The websites, the Newstar websites, did they sell images

TATIANA POWER - DIRECT EXAMINATION

3:33PM  1   and pictures of the children?

3:33PM  2   A.   Yes, ma'am.

3:33PM  3   Q.   When I say Newstar enterprise members, do you know who I'm

3:34PM  4   referring to?

3:34PM  5   A.   Yes, I do.

3:34PM  6   Q.   Did you sometimes referring to them as something else?

3:34PM  7   A.   By names, yes.

3:34PM  8   Q.   If I say employees or members, is that the same?

3:34PM  9   A.   Employees, partners, I would say, yeah.

3:34PM  10  Q.   How many partners or members of the Newstar enterprise

3:34PM  11  were there?

3:34PM  12  A.   Five to seven.

3:34PM  13  Q.   Is it true that you're not aware of everybody that was

3:34PM  14  involved?

3:34PM  15  A.   That is true, I'm not.

3:34PM  16  Q.   Are you aware -- do you have a -- a significant amount of

3:34PM  17  knowledge of some of those members?

3:34PM  18  A.   Yes, I do.

3:34PM  19  Q.   Were you yourself involved in running the Newstar

3:34PM  20  websites?

3:34PM  21  A.   Yes, I did.

3:34PM  22  Q.   And could you explain what your involvement was?

3:34PM  23  A.   My involvement was I was managing the financial

3:35PM  24  information.  Also I was assisting wiring international wires

3:35PM  25  with my husband.

TATIANA POWER - DIRECT EXAMINATION

3:35PM  1   Q.   Did you assist in paying members of the Newstar

3:35PM  2   enterprise?

3:35PM  3   A.   Yes, ma'am.

3:35PM  4   Q.   How so?

3:35PM  5   A.   I don't understand the question.

3:35PM  6   Q.   How did you -- how did they get paid?  How did you assist

3:35PM  7   in paying them?

3:35PM  8   A.   By sending international wires.

3:35PM  9   Q.   Who is Kenneth Power?

3:35PM  10  A.   He is my husband.

3:35PM  11  Q.   Was he involved in the Newstar websites?

3:35PM  12  A.   Yes, ma'am.

3:35PM  13  Q.   How was he involved?

3:35PM  14  A.   He was the owner, the primary owner of Newstar websites.

3:35PM  15  Q.   When I say Power Trading, do you know what I'm talking

3:35PM  16  about?

3:35PM  17  A.   Yes, the company.

3:35PM  18  Q.   Can you explain what Power Trading is or was?

3:35PM  19  A.   Power Trading Inc. is the company that my husband and I

3:35PM  20  registered in 2009, 2009.

3:36PM  21  Q.   Did you and your husband have conversations about the

3:36PM  22  Newstar websites and the work you were doing for the websites?

3:36PM  23  A.   Yes, ma'am, starting when I moved in with him in my

3:36PM  24  country.

3:36PM  25  Q.   And how often did you discuss the Newstar websites?

TATIANA POWER - DIRECT EXAMINATION

3:36PM 1    A.    Almost every other day, especially when he was getting

3:36PM 2    angry, frustrated, when he had problems with running it.

3:36PM 3    Q.    And by "it," do you mean the websites?

3:36PM 4    A.    The websites, yeah.

3:36PM 5    Q.    Did you need to communicate with each other in order to

3:36PM 6    work on the websites?

3:36PM 7    A.    Yes, absolutely.

3:36PM 8    Q.    Where did you work from?

3:36PM 9    A.    From home, him and I from home.

3:36PM 10   Q.    Together?

3:36PM 11   A.    Yes.

3:36PM 12   Q.    Did you share an office at some points?

3:36PM 13   A.    In my country primarily when I got married, yes.  He used

3:36PM 14   his living room as office, and he's got -- he had a long desk

3:37PM 15   where he had a desktop and a laptop, so that laptop I was

3:37PM 16   using, and he was using the desktop, so I could visually see

3:37PM 17   what he was doing.  And he would also speak out loud when he

3:37PM 18   was frustrated or -- he would put his minds out there for me to

3:37PM 19   here.

3:37PM 20   Q.    And you've said "from my country" a couple of times.

3:37PM 21   Where are you from and where were you referring when you're

3:37PM 22   talking about the office setup?

3:37PM 23   A.    The Republic of Moldova.

3:37PM 24   Q.    Did you and Mr. Power at some point move from Moldova to

3:37PM 25   the United States?

TATIANA POWER - DIRECT EXAMINATION

3:37PM     1    A.    Yes, ma'am.

3:37PM     2    Q.    Go ahead.

3:37PM     3    A.    In 2005.

3:37PM     4    Q.    And at that point, were you still working on the Newstar

3:37PM     5    websites?

3:37PM     6    A.    Yes, ma'am.

3:37PM     7    Q.    And were you working together at home on the Newstar

3:37PM     8    websites?

3:37PM     9    A.    When we moved to the United States, we rented a

3:37PM    10    three-bedroom townhouse.  One of the bedrooms we used it as

3:37PM    11    office, and yes, we shared the office.  We had separate desks,

3:38PM    12    but we had different computers.

3:38PM    13    Q.    Did you move once again when you were in the United

3:38PM    14    States?

3:38PM    15    A.    Yes, in 2009 we moved to the house that we purchased two

3:38PM    16    years later in 2011.

3:38PM    17    Q.    And in both of those homes, again, were you both working

3:38PM    18    from home and working together in the Newstar websites?

3:38PM    19    A.    Yes, ma'am.

3:38PM    20    Q.    Were you easily able to communicate during the workday?

3:38PM    21    A.    Yes, even -- even though our offices were separate at this

3:38PM    22    time, it was one door away, but yes, we could communicate any

3:38PM    23    time.

3:38PM    24    Q.    And did you communicate during the -- while you were

3:38PM    25    working on the websites?

TATIANA POWER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 3:38PM | 1 | A.   Yes. |
| 3:38PM | 2 | Q.   About the websites? |
| 3:38PM | 3 | A.   Yes. |
| 3:38PM | 4 | Q.   Is Mr. Power still around? |
| 3:38PM | 5 | A.   No, ma'am.  He's deceased. |
| 3:38PM | 6 | Q.   In the course of working on the Newstar websites and from |
| 3:38PM | 7 | your conversations with Mr. Power, did you learn who the other |
| 3:38PM | 8 | members of the Newstar enterprise were? |
| 3:38PM | 9 | A.   Yes, ma'am, I did. |
| 3:38PM | 10 | Q.   Who were the main decision makers? |
| 3:39PM | 11 | A.   Kenneth Powers. |
| 3:39PM | 12 | Q.   Were there other persons that you're aware of that made |
| 3:39PM | 13 | decisions in regards to the website, the content, et cetera? |
| 3:39PM | 14 | A.   Yes, he also cared about the opinion of his workers. |
| 3:39PM | 15 | Q.   Do you know who Mark Bjorkman was? |
| 3:39PM | 16 | A.   Yes, he was the -- the owner of the billing company that |
| 3:39PM | 17 | was used for the websites. |
| 3:39PM | 18 | Q.   What was your relationship with Mark Bjorkman? |
| 3:39PM | 19 | A.   Acquaintances. |
| 3:39PM | 20 | Q.   Is Mark Bjorkman still around? |
| 3:39PM | 21 | A.   No, as I know of now, no.  He's deceased. |
| 3:39PM | 22 | Q.   Did you know someone by the name of Plamen Velinov? |
| 3:39PM | 23 | A.   Yes, I have. |
| 3:39PM | 24 | Q.   What was your relationship? |
| 3:39PM | 25 | A.   Acquaintances. |

TATIANA POWER - DIRECT EXAMINATION

3:39 PM  1  Q.   How would you describe his role in the Newstar enterprise?

3:39 PM  2  A.   Primarily when I moved in with my husband, he introduced

3:39 PM  3  me to many of his partners or employees, and he explained to me

3:40 PM  4  that he was building scripts or he was working on programming

3:40 PM  5  to make sure that the websites were running smoothly and right.

3:40 PM  6  Q.   Did Mr. Plamen Velinov, did he have access to the content,

3:40 PM  7  the images that were available on the website?

3:40 PM  8  A.   From my husband, he told me that yes, he did.

3:40 PM  9  Q.   Did he communicate with clients?

3:40 PM 10  A.   Yes, via emails.  For instance, if we were to travel --

3:40 PM 11  because we used to travel a lot during summer -- he would ask

3:40 PM 12  him to answer the emails if he wasn't available or didn't have

3:40 PM 13  the access to the computer.

3:40 PM 14  Q.   And just to clarify, when you say "he would ask him" --

3:40 PM 15  A.   Kenneth Power, my husband.

3:40 PM 16  Q.   Would ask who to do that?

3:40 PM 17  A.   Kenneth Power, my husband, he would ask Plamen to answer

3:40 PM 18  the emails if he wasn't available.

3:41 PM 19  Q.   Were there other members of the Newstar enterprise

3:41 PM 20  involved on the financial side helping facilitate payments to

3:41 PM 21  the Newstar enterprise members?

3:41 PM 22  A.   Helping facilitate?

3:41 PM 23  Q.   Yes.

3:41 PM 24  A.   Means sent out or -- Kenneth Power, myself, Mark Bjorkman

3:41 PM 25  as I know of, because he would send the payments -- primarily

TATIANA POWER - DIRECT EXAMINATION

3:41PM  1   he would send the money that my husband was making on the

3:41PM  2   websites and from here, the company, Power Trading Inc., would

3:41PM  3   receive the money and then pay 10 percent to the employees, I

3:41PM  4   would say, or partners.

3:41PM  5   Q.   Do you know who Anton Klenin is?

3:41PM  6   A.   Yes, ma'am.

3:41PM  7   Q.   Who is Anton Klenin?

3:41PM  8   A.   He was the web designer of Newstar websites.

3:42PM  9   Q.   Did you know this person personally?  Have you ever met

3:42PM  10  this person?

3:42PM  11  A.   Yes, I personally met him.

3:42PM  12  Q.   What was your relationship?

3:42PM  13  A.   Acquaintances.

3:42PM  14  Q.   How many times would you say you've met him or seen him in

3:42PM  15  person?

3:42PM  16  A.   Twice.  He came to visit my husband twice.

3:42PM  17  Q.   Were there enterprise members who were responsible for

3:42PM  18  taking the photographs and videos?

3:42PM  19  A.   Yes.

3:42PM  20  Q.   To your knowledge, who were those persons?

3:42PM  21  A.   Yes.

3:42PM  22  Q.   What were their names?

3:42PM  23  A.   Daniel Luenberger.  I hope I pronounced that correctly.

3:42PM  24  Pavel Rohel, and there was somebody in Ukraine.  His name was

3:42PM  25  Sergei, and that's what I know.

TATIANA POWER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 3:42PM | 1 | Q.   Were there enterprise members who were responsible for |
| 3:42PM | 2 | editing the photographs and videos? |
| 3:42PM | 3 | A.   Yes. |
| 3:42PM | 4 | Q.   Who? |
| 3:42PM | 5 | A.   My husband, and sometimes he would ask Plamen to help him |
| 3:43PM | 6 | out. |
| 3:43PM | 7 | Q.   How did your husband, Mr. Power, edit the content? |
| 3:43PM | 8 | A.   By using Photoshop program. |
| 3:43PM | 9 | Q.   And are you aware of how Mr. Plamen Velinov edited the |
| 3:43PM | 10 | content? |
| 3:43PM | 11 | A.   No. |
| 3:43PM | 12 | Q.   Have you ever met the Defendant, Mr. Plamen Velinov, in |
| 3:43PM | 13 | person? |
| 3:43PM | 14 | A.   No, ma'am. |
| 3:43PM | 15 | Q.   How did you first learn of the person you knew to -- you |
| 3:43PM | 16 | knew to be Plamen Velinov? |
| 3:43PM | 17 | A.   When I moved in with my husband, he used to talk to lots |
| 3:43PM | 18 | of people via Skype, ICQ -- especially ICQ at that time, in |
| 3:43PM | 19 | about 2004, '5, and I noticed he was talking to about three |
| 3:43PM | 20 | people even at the same time. |
| 3:43PM | 21 | Q.   And when you're saying -- just to clarify, when you're |
| 3:43PM | 22 | saying "he," are you referring to Mr. Power? |
| 3:43PM | 23 | A.   Yes, ma'am. |
| 3:43PM | 24 | Q.   Please continue. |
| 3:43PM | 25 | A.   There was -- there were times when my husband -- and he -- |

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

TATIANA POWER - DIRECT EXAMINATION

3:44 PM  1  he would leave all that opened, and he would go and take a

3:44 PM  2  shower, and I was still there, so sometimes they would

3:44 PM  3  communicate to him, and I would hear the noise of ICQ, which is

3:44 PM  4  a social media platform of communication, and I noticed that

3:44 PM  5  when my husband wasn't there, he would receive the message,

3:44 PM  6  "Please answer.  I need -- I need an answer now."  And I

3:44 PM  7  would -- and I got involved, and I wrote down, "He's not

3:44 PM  8  available.  He's taking a shower.  He'll be -- he'll come

3:44 PM  9  later."

3:44 PM  10  Q.   Okay.  I want to unpack that a little bit.

3:44 PM  11  A.   Okay.

3:44 PM  12  Q.   Are you referring to a time -- the time when you were in

3:44 PM  13  Moldova and the laptop and the other computer were side by

3:44 PM  14  side --

3:44 PM  15  A.   Yes, ma'am.

3:44 PM  16  Q.   -- when you were working on the laptop?

3:44 PM  17  A.   Yes, ma'am.

3:44 PM  18  Q.   And you said ICQ chats were a platform you can communicate

3:44 PM  19  with other persons?

3:44 PM  20  A.   Yes, ma'am.

3:44 PM  21  Q.   Okay.  Were you able to see Mr. Power's computer?

3:45 PM  22  A.   Yes.

3:45 PM  23  Q.   Did you see ICQ chats open?

3:45 PM  24  A.   Yes.

3:45 PM  25  Q.   Did you see and hear messages coming through when he was

TATIANA POWER - DIRECT EXAMINATION

3:45PM  1   unavailable?

3:45PM  2   A.   Yes.

3:45PM  3   Q.   Did you see the name of the person displayed who was

3:45PM  4   communicating with him?

3:45PM  5   A.   Yes.  When you send the message on ICQ, you see who sends

3:45PM  6   it, and also when they respond, see the name who had -- who

3:45PM  7   sends it from the other side.  Yes, I did.

3:45PM  8   Q.   And in the situation you just described for the jury, what

3:45PM  9   was the name that was displayed?

3:45PM  10  A.   Plamen.

3:45PM  11  Q.   Have you reviewed -- in your time in helping pay the

3:45PM  12  enterprise members, did you review financial documents?

3:45PM  13  A.   Yes, ma'am, I did.

3:45PM  14  Q.   Did you see documents with a name Plamen on them?

3:45PM  15  A.   Yes.  I had the access to -- to the bank of Power Trading

3:45PM  16  Inc. that ran Newstar websites, and I could see vividly there

3:45PM  17  all the names that were sent the wires to.

3:45PM  18  Q.   And in looking at those financial documents, those bank

3:46PM  19  documents, did the name Plamen have a last name associated with

3:46PM  20  it?

3:46PM  21  A.   I don't understand the question.

3:46PM  22  Q.   Was there a full name?

3:46PM  23  A.   Yes.

3:46PM  24  Q.   Did you get a full name?

3:46PM  25  A.   Yes, ma'am.

TATIANA POWER - DIRECT EXAMINATION

3:46PM  1   Q.   What was the full name?

3:46PM  2   A.   Plamen Velinov I believe from my memory.

3:46PM  3   Q.   Was it -- I'm sorry, could you say that again?

3:46PM  4   A.   Plamen Velinov.

3:46PM  5   Q.   Was there an address associated with Plamen Velinov?

3:46PM  6   A.   Yes, but I do not recall.  It was a consistent address and

3:46PM  7   all the banking information where my husband and I would send

3:46PM  8   the wires to.

3:46PM  9   Q.   Do you remember a city or country that was associated with

3:46PM  10  Plamen Velinov?

3:46PM  11  A.   Bulgaria.

3:46PM  12  Q.   Did your husband, Mr. Power, and Plamen speak frequently?

3:46PM  13  A.   Yes, almost every day.  However, there was a period when

3:46PM  14  it wasn't as often because my husband told me that Plamen was

3:47PM  15  busy because he was in school, so he --

3:47PM  16  Q.   Besides that period -- do you know how long that period of

3:47PM  17  time was?

3:47PM  18  A.   I don't recall.  Maybe about two years.

3:47PM  19  Q.   Besides that period of time, that two-year period of time,

3:47PM  20  did your husband and Mr. Plamen Velinov communicate frequently?

3:47PM  21  A.   Yes, ma'am.

3:47PM  22  Q.   Would you talk to your husband about his role in the

3:47PM  23  enterprise and running the websites?

3:47PM  24  A.   Yes, ma'am.

3:47PM  25  Q.   Were there other platforms besides ICQ that you're aware

TATIANA POWER - DIRECT EXAMINATION

3:47PM 1   of that your husband and Plamen Velinov communicated on?

3:47PM 2   A.   I do believe it was Skype later on, but I'm not certain.

3:47PM 3   Skype --

3:47PM 4   Q.   I'm sorry.  Go ahead.

3:47PM 5   A.   And email, because my husband would say out loud, "Wait, I

3:47PM 6   cannot go anywhere until I send an email to -- I need to leave

3:48PM 7   an email for Plamen to do this, this or that."

3:48PM 8   Q.   Do you know the email addresses or names that were used?

3:48PM 9   A.   I do, but I don't know if that's what it was used to

3:48PM 10  contact him.

3:48PM 11  Q.   If you're not sure, then we'll move on.

3:48PM 12        Turning back to your involvement, did you use a

3:48PM 13  program to help you keep track of the financial records?

3:48PM 14  A.   Yes, ma'am, I used -- frozen.  QuickBooks program.

3:48PM 15  Q.   What is QuickBooks?

3:48PM 16  A.   QuickBooks is a program that manages and holds all the

3:48PM 17  financial information of the company or companies.

3:48PM 18  Q.   And you said companies.  Did you use QuickBooks in regards

3:48PM 19  to your work for the Newstar enterprise?

3:48PM 20  A.   Yes, ma'am.  I was responsible to manage QuickBooks and

3:49PM 21  all financial information for Power Trading Inc. to make sure

3:49PM 22  that all the finances are correct and get ready for the

3:49PM 23  accountant and taxes time.

3:49PM 24  Q.   Did you use it to help you organize financial information

3:49PM 25  so that you could pay Newstar enterprise members?

TATIANA POWER - DIRECT EXAMINATION

3:49 PM    1    A.    Not necessarily.  This program was used to send the wires.

3:49 PM    2    Q.    Sure.

3:49 PM    3    A.    That program wasn't -- wouldn't allow me to do that, but

3:49 PM    4    that program would connect directly to the bank, retrieve all

3:49 PM    5    the information, which is incoming money and all the expenses,

3:49 PM    6    and I would -- it would be saved in the QuickBooks in the right

3:49 PM    7    order.

3:49 PM    8    Q.    And when you say the bank accounts, what bank accounts are

3:49 PM    9    you referring to?  I can clarify if that was confusing.

3:49 PM   10    A.    Yes, it is.

3:49 PM   11    Q.    You said the QuickBooks was connected or tied to bank

3:50 PM   12    accounts.  Could you clarify what bank accounts you're

3:50 PM   13    referring to?

3:50 PM   14    A.    First when we moved to the United States, we -- we opened

3:50 PM   15    the bank account with Wells Fargo, and then when Wells Fargo

3:50 PM   16    closed the bank account for Power Trading Inc., we opened

3:50 PM   17    another one in SunTrust.  And when SunTrust closed the bank

3:50 PM   18    account, my husband himself only opened another bank account,

3:50 PM   19    but I don't recall the name of the bank.

3:50 PM   20    Q.    Were all the bank accounts opened under the Power Trading

3:50 PM   21    Incorporated name?

3:50 PM   22    A.    Yes, ma'am.

3:50 PM   23    Q.    And was -- the money that ran through the QuickBooks was

3:50 PM   24    attached to the bank accounts that went to the Newstar

3:50 PM   25    members --

TATIANA POWER - DIRECT EXAMINATION

3:50PM  1    A.   Yes.

3:50PM  2    Q.   -- did all that money come from the Newstar websites?

3:50PM  3    A.   Yes, ma'am.  All income that was coming to Power Trading

3:50PM  4    Inc. was coming from Newstar websites.

3:50PM  5    Q.   Could you please -- I've placed some evidence folders in

3:50PM  6    front of you.  Could you please look at Government's

3:50PM  7    Exhibit 420 and all the sub exhibits?  So it's 420A, B, C, and

3:51PM  8    D.  And take your time.  When you've reviewed them, please look

3:51PM  9    up at me.

3:53PM  10   A.   I just reviewed 420.

3:53PM  11   Q.   Could you also look at Sub Exhibits A, B, C, and D?

3:54PM  12   A.   All right.

3:54PM  13   Q.   Do you recognize these exhibits?

3:54PM  14   A.   Yes, ma'am.

3:54PM  15   Q.   What are they?

3:54PM  16   A.   These files are retrieved from QuickBooks, all of the

3:54PM  17   financial information.

3:54PM  18   Q.   Is this the QuickBooks you just testified about that you

3:54PM  19   used in your connection with your work on the Newstar

3:54PM  20   enterprise?

3:54PM  21   A.   That's correct.

3:54PM  22   Q.   Are they a fair and accurate copy of the QuickBooks

3:54PM  23   information you had logged into QuickBooks?

3:54PM  24   A.   Seems to be.  That's correct.

3:54PM  25          MS. VALDES:  Your Honor, the Government requests to

TATIANA POWER - DIRECT EXAMINATION

3:54 PM   1   enter into evidence Government Exhibits 420 and Sub Exhibits A

3:54 PM   2   through D; that would be A, B, C, and D.

3:54 PM   3          THE COURT:  420, no objection?

3:54 PM   4          MR. KERR:  May I have just a moment, Your Honor?

3:54 PM   5          THE COURT:  Sure.

3:54 PM   6          MR. KERR:  No objection.

3:54 PM   7          THE COURT:  All right.  It's received into evidence,

3:54 PM   8   may be published to the jury.

3:54 PM   9          MS. VALDES:  Thank you, Your Honor.  If we could

3:55 PM  10   please publish 420A?

3:55 PM  11   BY MS. VALDES:

3:55 PM  12   Q.   Ms. Power, the information I'm going to ask you about is

3:55 PM  13   going to be displayed on the screen right next to you.

3:55 PM  14   A.   Oh, sure.

3:55 PM  15   Q.   If you wouldn't mind taking a look, what are we looking

3:55 PM  16   at?

3:55 PM  17   A.   All the -- some people or companies that we paid the money

3:55 PM  18   to from web -- from Power Trading Inc.

3:55 PM  19   Q.   And did you assist in paying -- sorry, let me back up a

3:55 PM  20   little bit.

3:55 PM  21          All the money -- again, to clarify, all the money in

3:55 PM  22   this QuickBooks that was tied to the Power Trading accounts,

3:56 PM  23   all that money came from the Newstar websites, correct?

3:56 PM  24   A.   That's correct.

3:56 PM  25   Q.   And does this display the persons that were paid, the

TATIANA POWER - DIRECT EXAMINATION

3:56 PM  1   members that were paid?

3:56 PM  2   A.   Yes.

3:56 PM  3   Q.   Does it include Plamen Velinov?

3:56 PM  4   A.   Yes.

3:56 PM  5   Q.   Did you assist in paying Plamen Velinov for his

3:56 PM  6   involvement in the Newstar websites?

3:56 PM  7   A.   Yes, ma'am.

3:56 PM  8   Q.   What is his vendor name?

3:56 PM  9   A.   CompuTech.

3:56 PM  10  Q.   Why is that listed CompuTech under vendor name?

3:56 PM  11  A.   Because I had to insert a company's name, and my husband

3:56 PM  12  suggested and told me to put this name.

3:56 PM  13  Q.   When payments were made to CompuTech, were those payments

3:56 PM  14  made to Plamen Velinov?

3:56 PM  15  A.   Yes, ma'am.

3:56 PM  16       MS. VALDES:   If you could show Government's

3:56 PM  17  Exhibit 420B, please.

3:56 PM  18  BY MS. VALDES:

3:56 PM  19  Q.   What are we looking at here?

3:56 PM  20  A.   All the wires, international wires that were sent to

3:57 PM  21  Plamen.

3:57 PM  22  Q.   If we could look at 420C.  And this information?

3:57 PM  23  A.   This is all the income, money coming from Newstar

3:57 PM  24  websites.

3:57 PM  25  Q.   We see some names there under customer.  Could you

TATIANA POWER - DIRECT EXAMINATION

3:57PM    1    explain?

3:57PM    2    A.   These are, again, not -- not true names.

3:57PM    3    Q.   Can you explain what you mean by that, not true names?

3:57PM    4    A.   My husband told me to put these names just for the

3:57PM    5    company.  However, the income would come from -- from Mark

3:57PM    6    Bjorkman, from the merchant accounts of -- and all the money

3:58PM    7    that would come from customers that joined the websites.

3:58PM    8    Q.   Would these names, these company names, were they owned by

3:58PM    9    members of the Newstar enterprise?

3:58PM   10    A.   I don't understand the question.

3:58PM   11    Q.   Mark Bjorkman and the other persons that -- who owned

3:58PM   12    these companies?

3:58PM   13    A.   They're not true companies, but yeah, they are under those

3:58PM   14    companies.

3:58PM   15    Q.   Okay.  So were they registered or opened by members that

3:58PM   16    were involved in running the Newstar websites?

3:58PM   17    A.   Right.  Yes, that's correct.

3:58PM   18         MS. VALDES:  If we could show 420D, please?  This is

3:58PM   19    the -- I apologize.  It's difficult to see.  Thank you.

3:58PM   20    BY MS. VALDES:

3:58PM   21    Q.   What are we looking at here?

3:58PM   22    A.   These are all the incoming money wire transfers from the

3:58PM   23    websites to Power Trading Inc.

3:58PM   24    Q.   And does this relate back to 420C where you listed --

3:58PM   25    showed who was sent -- who was depositing the money into Power

TATIANA POWER - DIRECT EXAMINATION

3:58PM   1    Trading?

3:58PM   2    A.   Yes, ma'am, yes.

3:59PM   3    Q.   Is this just a list of that money as it's coming in for a

3:59PM   4    transaction?

3:59PM   5    A.   That's right.  That's correct.

3:59PM   6    Q.   Did federal agents execute a search warrant on your home

3:59PM   7    in 2019?

3:59PM   8    A.   Yes, ma'am.

3:59PM   9    Q.   Could you please take a look at Government's Exhibit 700

3:59PM   10   and all of the sub exhibits?

4:00PM   11   A.   I'm done.

4:00PM   12   Q.   Thank you.

4:00PM   13        MS. VALDES:  And for the record, I had Ms. Power look

4:01PM   14   at Government's Exhibits 700 and sub exhibits, which are 700A,

4:01PM   15   B, and C, F, G, H, and I.

4:01PM   16   BY MS. VALDES:

4:01PM   17   Q.   Do you recognize these exhibits?

4:01PM   18   A.   Yes, ma'am.

4:01PM   19   Q.   What are they?

4:01PM   20   A.   This is my -- the -- the desktop from my office, the

4:01PM   21   computer from my office.

4:01PM   22   Q.   Generally speaking, are these photographs of your home?

4:01PM   23   A.   Yes, ma'am, they are.

4:01PM   24   Q.   Were they taken around the time the search warrant was

4:01PM   25   executed that we just talked about?

TATIANA POWER - DIRECT EXAMINATION

4:01PM  1   A.   Yes, they look correct.

4:01PM  2   Q.   Do they fairly and accurately depict your home at that

4:01PM  3   point in time?

4:01PM  4   A.   Yes, ma'am.

4:01PM  5        MS. VALDES:  Your Honor, Government requests to enter

4:01PM  6   into evidence Government's 700 and 700A, B, C, F, G, H, and I.

4:01PM  7        MR. KERR:  No objection.

4:01PM  8        THE COURT:  Okay.  Those exhibits are received into

4:01PM  9   evidence, may be published to the jury.

4:01PM  10       MS. VALDES:  Thank you, Your Honor.  If we could

4:02PM  11  please pull up Government's 700A.

4:02PM  12  BY MS. VALDES:

4:02PM  13  Q.   Can you please explain what we are looking at?

4:02PM  14  A.   This is the desktop from my office.

4:02PM  15  Q.   700B, what are we looking at here?

4:02PM  16  A.   This tower wasn't used at that time, but it was in my

4:02PM  17  husband's office.

4:02PM  18  Q.   700C, could you please describe this photo?

4:02PM  19  A.   This is the tower or the computer that my husband was

4:02PM  20  using at that time.

4:02PM  21  Q.   Could we please go to page 2 of 700C?  Can you explain

4:02PM  22  this device?

4:02PM  23  A.   This is the external hard drive where my husband was

4:02PM  24  keeping a copy of what was on the server.

4:02PM  25  Q.   What's -- and the server for the Newstar websites?

TATIANA POWER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 4:02 PM | 1 | A.   Yes, ma'am. |
| 4:03 PM | 2 | Q.   700F, can you explain what we're looking at here? |
| 4:03 PM | 3 | A.   This is in my office.  I kept organizing all the financial |
| 4:03 PM | 4 | paperwork for Power Trading Inc. |
| 4:03 PM | 5 | Q.   If we could look at page 2?  Can you please explain what |
| 4:03 PM | 6 | we're looking at here? |
| 4:03 PM | 7 | A.   This is the checkbook where -- from where we would write |
| 4:03 PM | 8 | out equity distributions and pay ourselves from. |
| 4:03 PM | 9 | Q.   Can you please -- it might be a little bit difficult for |
| 4:03 PM | 10 | the jurors to read.  Can you please read the name of the |
| 4:03 PM | 11 | company associated with these checks? |
| 4:03 PM | 12 | A.   Power Trading Inc. |
| 4:03 PM | 13 | Q.   And were those checks -- how do these checks relate to the |
| 4:03 PM | 14 | first picture we looked at?  Were they contained in the drawer |
| 4:03 PM | 15 | that we just looked at? |
| 4:03 PM | 16 | A.   Excuse me? |
| 4:03 PM | 17 | Q.   The -- if we could go back to page 1. |
| 4:04 PM | 18 | A.   There is a folder, a black folder that I kept down there, |
| 4:04 PM | 19 | if you can see.  That was the checkbook -- |
| 4:04 PM | 20 | Q.   Thank you. |
| 4:04 PM | 21 | A.   -- that I used, yeah. |
| 4:04 PM | 22 | Q.   700 -- |
| 4:04 PM | 23 | A.   And my husband. |
| 4:04 PM | 24 | Q.   I'm sorry? |
| 4:04 PM | 25 | A.   I used and my husband.  We both used it. |

TATIANA POWER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 4:04 PM | 1 | Q.   700G?  Can you please explain what we're looking at here? |
| 4:04 PM | 2 | A.   This is my husband's driver's license and concealed |
| 4:04 PM | 3 | weapons permit. |
| 4:04 PM | 4 | MS. VALDES:  Is it possible, Your Honor, to dim the |
| 4:04 PM | 5 | lights a little bit so we can see -- |
| 4:04 PM | 6 | THE COURT:  Sure. |
| 4:04 PM | 7 | MS. VALDES:  Thank you. |
| 4:04 PM | 8 | THE COURT:  We'll do that. |
| 4:04 PM | 9 | BY MS. VALDES: |
| 4:04 PM | 10 | Q.   If you could look at 700H, what is this a photograph of? |
| 4:04 PM | 11 | A.   That is my purse and my wallet and my phone in the car. |
| 4:04 PM | 12 | Q.   Go to page 2. |
| 4:05 PM | 13 | A.   This is my ID, my driver's license. |
| 4:05 PM | 14 | Q.   Were both your ID and your husband's ID located within |
| 4:05 PM | 15 | your home? |
| 4:05 PM | 16 | A.   Yes, yes, absolutely. |
| 4:05 PM | 17 | Q.   And did you reside there at that time? |
| 4:05 PM | 18 | A.   Yes, ma'am. |
| 4:05 PM | 19 | Q.   And finally 700I, what are we looking at here? |
| 4:05 PM | 20 | A.   This is the software QuickBooks that I used to manage the |
| 4:05 PM | 21 | financial information of Power Trading Inc. |
| 4:05 PM | 22 | Q.   And where were these boxes located within your home? |
| 4:05 PM | 23 | A.   This box was in my office. |
| 4:05 PM | 24 | MS. VALDES:  May I have a moment to confer, Your |
| 4:05 PM | 25 | Honor? |

TATIANA POWER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 4:05PM | 1 | **THE COURT:**  You may. |
| 4:05PM | 2 | **MS. VALDES:**  No further questions. |
| 4:05PM | 3 | **THE COURT:**  Any cross-examination for this witness, |
| 4:05PM | 4 | Mr. Kerr? |
| 4:05PM | 5 | **MR. KERR:**  Yes, Your Honor.  And may we approach |
| 4:05PM | 6 | or -- |
| 4:05PM | 7 | **THE COURT:**  Sure. |
| 4:05PM | 8 | (At sidebar on the record.) |
| 4:05PM | 9 | **MR. KERR:**  Late this afternoon, Ms. Valdes just got |
| 4:06PM | 10 | me some late discovery related to -- some Jencks related to |
| 4:06PM | 11 | this witness that I haven't even got a chance to open yet, and |
| 4:06PM | 12 | just -- |
| 4:06PM | 13 | **THE COURT:**  Let me begin by asking why did you give |
| 4:06PM | 14 | that this afternoon? |
| 4:06PM | 15 | **MS. VALDES:**  There was one -- I turned over Jencks |
| 4:06PM | 16 | days ago.  There was one document.  It was a PSR.  It was filed |
| 4:06PM | 17 | under seal in Judge Scriven's docket.  I had to file a motion |
| 4:06PM | 18 | with the Court to have it unsealed.  The judge ruled on it |
| 4:06PM | 19 | today. |
| 4:06PM | 20 | **THE COURT:**  Why did you wait so long to request that? |
| 4:06PM | 21 | **MS. VALDES:**  I requested it -- |
| 4:06PM | 22 | **MR. KERR:**  I didn't ask for it.  I have to defend her |
| 4:06PM | 23 | on this one. |
| 4:06PM | 24 | **THE COURT:**  Then you're kind of stuck with it.  So it |
| 4:06PM | 25 | is what it is.  Okay? |

TATIANA POWER - DIRECT EXAMINATION

4:06 PM 1      MR. KERR:  Well, there is one other issue.  You've

4:06 PM 2 already ruled on the issue of whether or not I can get into the

4:06 PM 3 maximum sentence that she's facing, okay?  But I've received

4:07 PM 4 some additional information on that issue that I think is

4:07 PM 5 relevant.

4:07 PM 6      THE COURT:  Uh-huh.

4:07 PM 7      MR. KERR:  This weekend I got -- or just a day or two

4:07 PM 8 ago, I got the transcript of her detention hearing down in Fort

4:07 PM 9 Lauderdale, and it was made clear on the record to her that if

4:07 PM 10 she proceeded and went to trial on her indictment, she would

4:07 PM 11 receive life in prison, and I think that puts that in the

4:07 PM 12 exception of a case, the Eleventh Circuit that was cited by the

4:07 PM 13 Government in -- as an exception that they mentioned in their

4:07 PM 14 decision.  In other words, in that case, if that -- if the

4:07 PM 15 witness had been facing something like life in prison, they

4:07 PM 16 might reach a different result; that if it's substantially more

4:07 PM 17 than what -- you know, what the -- what the Defendant received.

4:07 PM 18      THE COURT:  You're talking about the sentence that

4:07 PM 19 they're looking at?

4:07 PM 20      MR. KERR:  The sentence that she was looking at, so I

4:08 PM 21 think that's a very substantial incentive that she's had, and

4:08 PM 22 she's also doing 12 years, and also I think I've been forbidden

4:08 PM 23 from bringing that out also on my cross.  I think I need to be

4:08 PM 24 able to do that to flesh out what her incentives are.

4:08 PM 25      THE COURT:  Well, I'm going to need to look at this.

TATIANA POWER - DIRECT EXAMINATION

4:08 PM   1   I need to go back and look at your -- the order that I entered

4:08 PM   2   on that because I didn't know this was coming up with this

4:08 PM   3   witness, so I need to go back and look at it.  So, in essence,

4:08 PM   4   what you're asking for, to go back to your original request, is

4:08 PM   5   you need more time because of the --

4:08 PM   6         MR. KERR:  I would like at least until tomorrow

4:08 PM   7   morning.

4:08 PM   8         THE COURT:  We may -- it's 4:10.  It's earlier than

4:08 PM   9   what I break.  We'll break now, hear argument on that, and

4:08 PM   10   that'll give you time.  How about that?

4:08 PM   11         MR. KERR:  Thank you, Judge.

4:08 PM   12               (End of discussion at sidebar.)

4:08 PM   13         THE COURT:  So, ladies and gentlemen of the jury,

4:08 PM   14   we're going to take our afternoon break -- I mean, we're going

4:08 PM   15   to recess for the day, so we'll be finished for the day.  That

4:09 PM   16   way I can take this up, and you don't have to sit there.  So we

4:09 PM   17   will resume the trial tomorrow morning at 9:00 a.m.  Please

4:09 PM   18   remember, don't do any independent research, don't discuss the

4:09 PM   19   case either amongst yourselves or with anybody else, and I'll

4:09 PM   20   see you here tomorrow morning at 9:00 a.m.  We're in recess.

          21               (Jury out at 4:09 p.m.)

4:10 PM   22         THE COURT:  All right.  Thank you.  Everybody please

4:10 PM   23   be seated.  Counsel, you can return to your seats.  The witness

4:10 PM   24   needs to stay there.

4:10 PM   25               So just give me a moment to look up this

TATIANA POWER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 4:10 PM | 1 | information.  So, Mr. Kerr, with respect to that matter you |
| 4:10 PM | 2 | discussed at sidebar, you'll have until tomorrow begin your |
| 4:10 PM | 3 | cross-examination of the witness.  All right, Mr. Kerr?  You'll |
| 4:10 PM | 4 | have until tomorrow morning to begin your cross-examination of |
| 4:10 PM | 5 | the witness.  I suppose I can excuse her then so that I can |
| 4:10 PM | 6 | take up argument on that other matter.  How about that? |
| 4:10 PM | 7 | MR. KERR:  Thank you, Your Honor. |
| 4:10 PM | 8 | THE COURT:  Is there any reason to keep her here?  I |
| 4:10 PM | 9 | don't see any reason. |
| 4:10 PM | 10 | MS. VALDES:  No, Your Honor. |
| 4:10 PM | 11 | THE COURT:  Okay.  All right.  So you're excused. |
| 4:10 PM | 12 | We'll see you here tomorrow morning at 9:00 a.m. |
| 4:10 PM | 13 | (Witness excused.) |
| 4:10 PM | 14 | THE COURT:  Just give me five minutes here to go |
| 4:10 PM | 15 | through my notes, and then we'll take up that other issue. |
| 4:10 PM | 16 | (Pause.) |
| 4:12 PM | 17 | THE COURT:  Okay.  So the witness has been excused. |
| 4:12 PM | 18 | I think, Mr. Kerr, you were talking about the Rushin case; is |
| 4:12 PM | 19 | that right? |
| 4:12 PM | 20 | MR. KERR:  Yes, Your Honor. |
| 4:12 PM | 21 | THE COURT:  And there the Court said, "The widespread |
| 4:12 PM | 22 | view that District Courts may limit cross-examination into |
| 4:12 PM | 23 | potential sentences is constrained.  For example, in United |
| 4:12 PM | 24 | States v. Larson, the Ninth Circuit found a violation of |
| 4:12 PM | 25 | Defendant's rights when the District Court's limitation |

4:12 PM   1   prohibited questioning about a mandatory minimum life sentence.
4:12 PM   2   The Third Circuit requires an examination of whether the
4:12 PM   3   magnitude of reduction would likely have changed the jury's
4:13 PM   4   mind regarding a witness's motive for testifying."
4:13 PM   5            All right.  So in Rushin, which is an Eleventh
4:13 PM   6   Circuit case, it drew a distinction with Larson, which was the
4:13 PM   7   Ninth Circuit case under Rushin's facts.  "This is not to say
4:13 PM   8   that the magnitude of a potential sentence could not ever shift
4:13 PM   9   this balance.  However, this is not a case like Larson where
4:13 PM  10   discussion of a mandatory minimum life sentence was prohibited.
4:13 PM  11   Here, to the contrary, Defendants were able to ask if the
4:13 PM  12   cooperators faced a severe penalty prior to cooperating,
4:13 PM  13   whether they expected to receive a lesser sentence as a result
4:13 PM  14   of their cooperation, and whether the plea was one of the most
4:13 PM  15   important documents the cooperating witness had every signed.
4:14 PM  16   Defense counsel were thus able to explore how the plea
4:14 PM  17   agreement could have impacted the witness's testimony,
4:14 PM  18   including the impact the witnesses expected it to have on their
4:14 PM  19   sentences, lives, and careers as well as the magnitude of that
4:14 PM  20   impact.  Given the scope of the questioning, that was allowed
4:14 PM  21   in this case.  The risk of jury nullification and the
4:14 PM  22   complications associated with the questions defense counsel
4:14 PM  23   wished to ask, the District's Court's limitation on
4:14 PM  24   cross-examination was not improper."  So that's the Rushin
4:14 PM  25   case, 844 F.3d 933, 940, Eleventh Circuit, 2016.

4:14 PM  1          All right.  So let me hear your additional

4:14 PM  2   argument now outside the presence of the jury.  The witness is

4:14 PM  3   not here.  What else would you like to say, Mr. Kerr, with

4:14 PM  4   respect to that matter?

4:14 PM  5          MR. KERR:  Thanks, Judge.  I'm just pulling the case

4:14 PM  6   up now.

4:14 PM  7          THE COURT:  Sure.  Go ahead.

4:14 PM  8          MR. KERR:  The distinction that the Court drew

4:15 PM  9   there -- in that case, the Defendants -- or the witnesses were

4:15 PM  10  both facing 20-year sentences, and the concern was that the

4:15 PM  11  defense attorney was trying to indirectly bring out the

4:15 PM  12  potential sentence of the Defendant and create sympathy and

4:15 PM  13  jury nullification.  That's not -- that's not my issue here.  I

4:15 PM  14  would like the jury to know exactly what incentives she has to

4:15 PM  15  twist her testimony, particularly when she's discussing

4:15 PM  16  statements that are being introduced from her dead husband.

4:15 PM  17  And I understand why those come in, that they're hearsay in

4:15 PM  18  furtherance of the conspiracy, and researched that.  I don't

4:15 PM  19  have a problem with that, but I think they are less reliable

4:15 PM  20  since her husband is dead and can't contradict her claims.

4:15 PM  21  She's never met the Defendant in person, she's testified, and

4:15 PM  22  she has a tremendous incentive to embellish what she says her

4:15 PM  23  husband, her dead husband said about my client.

4:16 PM  24          And she's -- the incentive she has is different

4:16 PM  25  from what I thought from just reading her plea agreement

4:16 PM  1    originally because I saw the sentence -- the detention hearing

4:16 PM  2    she had in Fort Lauderdale, and the prosecutor here and the

4:16 PM  3    case agent was present I guess by Zoom.  They went into great

4:16 PM  4    detail with the magistrate there to get detention saying that

4:16 PM  5    she was facing -- her guidelines were life in prison if she was

4:16 PM  6    convicted on this case, and that's why she should not be

4:16 PM  7    released.  So she was told by the prosecutor in front of the

4:16 PM  8    magistrate judge down there --

4:16 PM  9            THE COURT:  I'm sorry, who was told, the witness?

4:16 PM  10           MR. KERR:  The witness, yeah.

4:16 PM  11           THE COURT:  Okay.

4:16 PM  12           MR. KERR:  So she knew what she was facing right then

4:16 PM  13   and there, that she was facing a certain life sentence.  And,

4:16 PM  14   in fact, I just look a glance at the report that Ms. Valdes was

4:16 PM  15   kind enough to get for me, and it's -- her guidelines were life

4:17 PM  16   on the case, the way they were calculated by the probation

4:17 PM  17   office if she had not gotten a deal to the 20 years.

4:17 PM  18   Therefore, they recommended a 20-year sentence since she was --

4:17 PM  19   her guidelines were life, and she got half of that for her

4:17 PM  20   cooperation.  She got -- she got 12 years instead of 20.  So

4:17 PM  21   she's really obtained a substantial benefit already and has a

4:17 PM  22   lot to gain from making her testimony as useful as possible.

4:17 PM  23           And I really think that -- that on behalf of

4:17 PM  24   Mr. Velinov, I really need to get into some of that more than I

4:17 PM  25   had anticipated.

4:17 PM  1      Also the case itself indicates -- <u>Rushin</u>, the

4:17 PM  2  authority that the Government used, does say that -- well, this

4:17 PM  3  might be a different story if this witness were facing life,

4:17 PM  4  like I think the Ninth Circuit case that they referenced.  You

4:17 PM  5  know, that witness was facing a life sentence and was getting a

4:18 PM  6  really big benefit, so the magnitude of the benefit might

4:18 PM  7  change their calculation.  I know it's just dicta and that's

4:18 PM  8  not what they ruled.  They said it was okay.  The

4:18 PM  9  restrictions -- you know, in retrospect, what the District

4:18 PM  10  Court did in that case, restricting it, but again, that witness

4:18 PM  11  was only facing 20 years in prison.  So I think it makes it a

4:18 PM  12  different situation, and I should be able to get into it on

4:18 PM  13  cross.

4:18 PM  14      THE COURT:  Well, let me hear from the Government

4:18 PM  15  then.

4:18 PM  16      MR. REYNOLDS:  Your Honor, I think there is a -- a

4:18 PM  17  very serious distinction between Ms. Power's case and this

4:18 PM  18  supposed exception that I think the Eleventh Circuit alluded

4:18 PM  19  may exist, but did not invoke.  The case that they're referring

4:18 PM  20  to involved a mandatory life sentence.  They're referring to a

4:18 PM  21  Ninth Circuit case in which it was a mandatory life sentence.

4:18 PM  22  Defendant was facing a mandatory life sentence, and the Ninth

4:18 PM  23  Circuit case evidently held that it was a violation to -- not

4:19 PM  24  to allow defense counsel to inquire that the defendant was

4:19 PM  25  released from the benefit of a mandatory life sentence.

4:19PM  1          Ms. Power had guidelines recommendations that

4:19PM  2   recommended life.  She had a high statutory maximum, but she

4:19PM  3   was -- she was far, far from facing a mandatory life sentence.

4:19PM  4          I also don't think that she received a 9- to

4:19PM  5   10-year break on her sentence.  If I'm recalling correctly, the

4:19PM  6   Government moved for a 5K motion in her case, asking for a

4:19PM  7   two-level reduction in her offense level to reflect the

4:19PM  8   cooperation that she had given to date.  That's very far from

4:19PM  9   the kind of break of releasing someone from the kind of

4:19PM  10  sentence that requires them to spend life imprisonment.  During

4:19PM  11  her sentencing, she did not receive -- you know, she received

4:19PM  12  far below the sentence that the Government asked for in that

4:19PM  13  case.

4:19PM  14         The circumstances here, I think we're still in

4:20PM  15  the territory that Rushin was concerned about.  Sentencing is

4:20PM  16  the Court's job.  It is not the jury's job.  Shedding lights on

4:20PM  17  the kind of penalties that might be at issue invites jury

4:20PM  18  nullification.  It invites confusion.  It invites prejudice,

4:20PM  19  and I think that's even more so in this case given that --

4:20PM  20  speaking from the statutory maximum, Ms. Power was facing more

4:20PM  21  years on a statutory maximum than Mr. Velinov is.  I understand

4:20PM  22  they're both very high, and they're both natural life

4:20PM  23  sentences, may not be that meaningful of a distinction, but if

4:20PM  24  Mr. Kerr is allowed to get into the idea that Ms. Power was

4:20PM  25  facing life guidelines, possibly up to a hundred-year sentence

| | | |
|---|---|---|
| 4:20 PM | 1 | if I'm recalling correctly, I think the jury will very |
| 4:20 PM | 2 | reasonably look at that and think to themselves, "Wow, that is |
| 4:20 PM | 3 | at least what this Defendant must be facing."  All of the |
| 4:20 PM | 4 | concerns and the prejudice that the Eleventh Circuit was |
| 4:20 PM | 5 | concerned about in Rushin will then be introduced in this case. |
| 4:21 PM | 6 | We ask the Court not to deviate from its |
| 4:21 PM | 7 | previous ruling on this matter. |
| 4:21 PM | 8 | THE COURT:  All right.  Let me just -- I probably |
| 4:21 PM | 9 | need to look at the presentence report.  Do we know what the |
| 4:21 PM | 10 | statutory maximum was? |
| 4:21 PM | 11 | MR. REYNOLDS:  On the count to which she pleaded? |
| 4:21 PM | 12 | THE COURT:  Yes. |
| 4:21 PM | 13 | MR. REYNOLDS:  It was 20 years, Your Honor, one count |
| 4:21 PM | 14 | of conspiracy to commit money laundering. |
| 4:21 PM | 15 | THE COURT:  It was 20 years? |
| 4:21 PM | 16 | MR. REYNOLDS:  20 years.  And her guidelines, I don't |
| 4:21 PM | 17 | recall exactly what they were, but I recall them being well |
| 4:21 PM | 18 | above 43. |
| 4:21 PM | 19 | MR. KERR:  Excuse me, I think the guidelines were |
| 4:21 PM | 20 | life.  Level 43. |
| 4:21 PM | 21 | THE COURT:  She was charged with a different -- she |
| 4:21 PM | 22 | was charged with money laundering right? |
| 4:22 PM | 23 | MR. REYNOLDS:  She was charged with conspiracy to |
| 4:22 PM | 24 | commit money laundering, and then she was charged with |
| 4:22 PM | 25 | individual substantive counts of money laundering that were |

| | | |
|---|---|---|
| 4:22PM | 1 | acts in furtherance of that conspiracy. |
| 4:22PM | 2 | THE COURT:  And what was the underlying criminal |
| 4:22PM | 3 | charge in the money laundering?  What was the illegal activity, |
| 4:22PM | 4 | the specified unlawful activity? |
| 4:22PM | 5 | MR. REYNOLDS:  It was trafficking in child |
| 4:22PM | 6 | pornography and defrauding banks. |
| 4:22PM | 7 | THE COURT:  Which was she also charged with that as |
| 4:22PM | 8 | well or just money laundering? |
| 4:22PM | 9 | MR. REYNOLDS:  She was not charged with any bank |
| 4:22PM | 10 | fraud.  She was not charged with any child pornography offense. |
| 4:22PM | 11 | THE COURT:  But that was the specified unlawful |
| 4:22PM | 12 | activity? |
| 4:22PM | 13 | MR. REYNOLDS:  If I'm recalling correctly, yes, Your |
| 4:22PM | 14 | Honor. |
| 4:22PM | 15 | THE COURT:  Uh-huh.  Well, you know, I probably have |
| 4:22PM | 16 | less concern about the confrontation rights than I do -- you |
| 4:22PM | 17 | know, that I can see in these other cases.  I'll tell you what. |
| 4:22PM | 18 | Let me look at this tonight.  I'll look at it tonight and study |
| 4:22PM | 19 | it.  Like I said, I'm less concerned about it quite frankly, |
| 4:23PM | 20 | Mr. Kerr, but I'll look at it, and I'll let you know tomorrow |
| 4:23PM | 21 | morning. |
| 4:23PM | 22 | So when we resume tomorrow morning, you're going |
| 4:23PM | 23 | to begin with your cross-examination of the witness, so at |
| 4:23PM | 24 | least you'll have -- you'll have the time to study the |
| 4:23PM | 25 | presentence report.  I'm going to look at it myself now.  What |

| | | |
|---|---|---|
| 4:23 PM | 1 | is the number of the case, the case number?  Her last name |
| 4:23 PM | 2 | is -- what is it, Powell? |
| 4:23 PM | 3 |       **MR. REYNOLDS:**  Power, Your Honor. |
| 4:23 PM | 4 |       **THE COURT:**  Powers.  I'm sorry. |
| 4:23 PM | 5 |       **MR. REYNOLDS:**  Tatiana. |
| 4:23 PM | 6 |       **MR. KERR:**  244.  8:21-CR-244. |
| 4:23 PM | 7 |       **THE COURT:**  I'm sorry, say that again. |
| 4:23 PM | 8 |       **MR. KERR:**  8:21-CR-244. |
| 4:23 PM | 9 |       **THE COURT:**  244.  Okay.  All right.  I'll take a look |
| 4:23 PM | 10 | at it as I'm sitting here.  I'm still confused on something. |
| 4:23 PM | 11 | How could she have been looking at a life sentence if the |
| 4:23 PM | 12 | statutory maximum was 20 years? |
| 4:24 PM | 13 |       **MR. KERR:**  The -- the way I read it quickly was that |
| 4:24 PM | 14 | her guidelines -- she was level 43 when they totaled everything |
| 4:24 PM | 15 | up and -- which was a life sentence -- guidelines life sentence |
| 4:24 PM | 16 | capped out at this statutory max of 20.  So they -- |
| 4:24 PM | 17 |       **THE COURT:**  I see.  I'll look at it, and I'll be able |
| 4:24 PM | 18 | to understand it better when I have it in front of me.  Okay. |
| 4:24 PM | 19 |       All right.  Well, we're in recess then.  I'm |
| 4:24 PM | 20 | just going to stay here so I can look at that, and I will see |
| 4:24 PM | 21 | you tomorrow at 9:00 a.m.  Thank you. |
| 4:24 PM | 22 |       (End of proceedings.) |
| | 23 | |
| | 24 | |
| | 25 | |

```
* * * * * * * * * * * * * * * * * * * *

              UNITED STATES DISTRICT COURT

              MIDDLE DISTRICT OF FLORIDA


              REPORTER TRANSCRIPT CERTIFICATE

    I, Tana J. Hess, Official Court Reporter for the United
States District Court, Middle District of Florida, certify,
pursuant to Section 753, Title 28, United States Code, that the
foregoing is a true and correct transcription of the
stenographic notes taken by the undersigned in the
above-entitled matter (Pages 1 through 249 inclusive) and that
the transcript page format is in conformance with the
regulations of the Judicial Conference of the United States of
America.



              _____
              Tana J. Hess, CRR, RMR, FCRR
              Official Court Reporter
              United States District Court
              Middle District of Florida
              Tampa Division
              Date:  August 13, 2023
```

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida