IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
UNITED STATES OF AMERICA         \*
                                 \*     Case No. 8:21-cr-342
vs.                              \*
                                 \*     January 19, 2023
PLAMEN GEORGIEV VELINOV          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


### JURY TRIAL – DAY 2

Heard in Courtroom 14B
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
January 19, 2023


### BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON

### UNITED STATES DISTRICT JUDGE




Official Court Reporter:        Tana J. Hess, CRR, FCRR, RMR
                                U.S. District Court Reporter
                                Middle District of Florida
                                Tampa Division
                                801 N. Florida Avenue
                                Tampa, FL  33602
                                813.301.5207
                                tana_hess@flmd.uscourts.gov

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:


FOR THE GOVERNMENT:

          Kyle P. Reynolds
          U.S. Department of Justice, Criminal Division
          Child Exploitation and Obscenity Section
          1301 New York Ave. NW
          Washington, DC  20530
          202.616.2842
          kyle.reynolds@usdoj.gov

          Karyna Valdes
          U.S. Attorneys Office
          400 North Tampa Street
          Suite 3200
          Tampa,FL  33602
          813.274.6000
          karyna.valdes@usdoj.gov

FOR THE DEFENDANT:

          Christophir A. Kerr
          13801 Walsingham Road
          #A-154
          Largo, FL  33774
          727.492.2551
          christophirkerr@gmail.com

**INDEX**

| **NAME** | **PAGE** |
|---|---|
| Tatiana Power | |
|     Cross-Examination by Mr. Kerr | 12 |
|     Redirect Examination by Ms. Valdes | 25 |
|     Recross-Examination by Mr. Kerr | 26 |
| Gregory Schuster | |
|     Direct Examination by Ms. Valdes | 28 |
| Joshua Storey | |
|     Direct Examination by Mr. Reynolds | 34 |
|     Cross-Examination by Mr. Kerr | 64 |
|     Redirect Examination by Mr. Reynolds | 67 |
|     Recross-Examination by Mr. Kerr | 73 |
| Vanessa Juede | |
|     Direct Examination by Ms. Valdes | 75 |
|     Cross-Examination by Mr. Kerr | 81 |
| Dero Tucker | |
|     Direct Examination by Mr. Reynolds | 83 |
|     Cross-Examination by Mr. Kerr | 156 |
| Laura Ziegler | |
|     Direct Examination by Ms. Valdes | 159 |
|     Cross-Examination by Mr. Kerr | 177 |
| Chavdar Angelov | |
|     Direct Examination by Mr. Reynolds | 188 |
|     Cross-Examination by Mr. Kerr | 215 |

## INDEX

**NAME**                                                      **PAGE**

Justin Gaertner

    Direct Examination by Ms. Valdes                220


## EXHIBITS

**NUMBER**                                                    **ADMITTED**

Government Exhibit 3                                           163
Government Exhibit 11                                          195
Government Exhibit 200                                          31
Government Exhibit 200A                                         31
Government Exhibit 200B                                         31
Government Exhibit 200C                                         31
Government Exhibit 200D                                         31
Government Exhibit 200E                                         31
Government Exhibit 200F                                         31
Government Exhibit 200G                                         31
Government Exhibit 200H                                         31
Government Exhibit 200I                                         31
Government Exhibit 420                                         164
Government Exhibit 420A                                        164
Government Exhibit 420B                                        164
Government Exhibit 420C                                        164
Government Exhibit 420D                                        164
Government Exhibit 421                                         166
Government Exhibit 501                                          47
Government Exhibit 502                                          49
Government Exhibit 503                                          51
Government Exhibit 504                                          54
Government Exhibit 505                                          56
Government Exhibit 506                                          58
Government Exhibit 601                                          95
Government Exhibit 602                                         102
Government Exhibit 605                                         105
Government Exhibit 606                                         110
Government Exhibit 608                                         125
Government Exhibit 608A                                        126
Government Exhibit 609                                         150
Government Exhibit 610                                         153

## EXHIBITS

**NUMBER**                                                          **ADMITTED**

| | |
|---|---|
| Government Exhibit 610A | 153 |
| Government Exhibit 611 | 93 |
| Government Exhibit 700 | 79 |
| Government Exhibit 700A | 79 |
| Government Exhibit 700B | 79 |
| Government Exhibit 700C | 79 |
| Government Exhibit 700F | 79 |
| Government Exhibit 700G | 79 |
| Government Exhibit 700H | 79 |
| Government Exhibit 700I | 79 |
| Government Exhibit 801 | 211 |
| Government Exhibit 804 | 212 |
| Government Exhibit 805A | 214 |
| Government Exhibit 805B | 214 |
| Government Exhibit 805C | 214 |
| Government Exhibit 805D | 214 |
| Government Exhibit 805E | 214 |
| Government Exhibit 806 | 194 |
| Government Exhibit 806T | 196 |
| Government Exhibit 807T | 196 |
| Government Exhibit 807 | 199 |
| Government Exhibit 808T | 196 |
| Government Exhibit 808 | 200 |
| Government Exhibit 809T | 196 |
| Government Exhibit 809 | 201 |
| Government Exhibit 810T | 196 |
| Government Exhibit 810 | 204 |
| Government Exhibit 810A | 205 |
| Government Exhibit 810AT | 207 |
| Government Exhibit 900 | 228 |

```
1                    (Call to order of the Court.)
2              THE COURT:  Good morning.  Thank you.  I don't know
3     if we have all the jurors.
4              COURTROOM DEPUTY:  Yes, Your Honor.
5              THE COURT:  They're all here.  Terrific, wonderful.
6                    Okay.  Let's see.  We were -- before we bring
7     the jury in, we were looking at the issue as to
8     cross-examination of this witness.  I don't know if you want
9     the witness in the courtroom.  She's here.  I don't know if
10    I -- you know, I don't know.  If there's anything else you wish
11    to say because -- I don't want it to be a problem.
12             MR. KERR:  Your Honor, I think I made all of my
13    arguments already.
14             THE COURT:  You made your arguments yesterday.  Okay.
15             MR. REYNOLDS:  Your Honor, if we may, there's one
16    thing the Government would add to the arguments.
17             THE COURT:  Yeah, sure.
18             MR. REYNOLDS:  So last night, I reread the Rushin
19    case that Mr. Kerr referred to yesterday, and this -- this
20    exception that he referred to, which I would say was not
21    recognized in the Rushin case --
22             THE COURT:  Okay.
23             MR. REYNOLDS:  -- concerns a -- and I'm on page 940
24    of Rushin.
25             THE COURT:  Give me one second to bring that up.
```

1          **MR. REYNOLDS:**  Absolutely.

2          **THE COURT:**  Can you hold on one quick second?

3          **MR. REYNOLDS:**  Absolutely.

4          **THE COURT:**  Okay.  I have it go ahead.

5          **MR. REYNOLDS:**  So I'm on page -- I believe it's 940.

6          **THE COURT:**  Okay.

7          **MR. REYNOLDS:**  And I think that the exception that

8    Mr. Kerr was referring to yesterday comes from the paragraph

9    that begins with, "This is not to say," and it reads, "This is

10   not to say the magnitude of a potential sentence could not ever

11   shift this balance.  However, this is not a case like <u>Larson</u>

12   where discussion of a mandatory minimum life sentence was

13   prohibited."

14          <u>Larson</u> is a Ninth Circuit case that involved a

15   mandatory minimum life sentence.  I also read that case, and I

16   think that -- I'm not at all convinced that the Ninth Circuit

17   and the Eleventh Circuit are on the same page about this issue,

18   but even if they were, looking at <u>Larson</u>, it is clearly

19   distinguished from our facts here.  The Ninth Circuit held,

20   "We've previously held that it is not error for the District

21   Court to prohibit cross-examination regarding the potential

22   maximum statutory sentence that the witness faces."  Further

23   down, "The potential maximum statutory sentence that a

24   cooperating witness might receive, however, is fundamentally

25   different from the mandatory minimum sentence that the witness

1    will receive in the absence of a motion by the Government.  The
2    former lacks significant probative force because a defendant
3    seldom receives the maximum penalty permissible under the
4    statute of conviction.  In contrast, the fact that here a
5    cooperating witness faced a mandatory life sentence without the
6    possibility of release in the absence of a Government motion is
7    highly relevant to the witness's credibility.  It is a sentence
8    that the witness knows with certainty that he will receive
9    unless he satisfies the Government with substantial and
10   meaningful cooperation so that it will move to reduce his
11   sentence."
12          Your Honor, that's United States v. Larson, 495
13   F.3d 1094 at 1106, and I think this language squarely
14   distinguishes this fact.  The Ninth Circuit is signaling and
15   ruling that it is talking about mandatory minimum sentences.
16          THE COURT:  All right.  Let me ask you something.  As
17   part of a plea agreement, there were four charges, four counts
18   of the indictment were dismissed.  Those were substantive money
19   laundering counts.
20          MR. REYNOLDS:  Right.
21          THE COURT:  She pled to the conspiracy, which carried
22   a 20-year statutory maximum; is that correct?
23          MR. REYNOLDS:  Yes.
24          THE COURT:  That's my understanding.  So had she not
25   cooperated, let's say had she gone to trial, been convicted,

1    she would have been convicted of those five -- in theory of
2    those -- in theory of those five counts, right?  It was four
3    substantive, one conspiracy.
4          MR. REYNOLDS:  Correct.
5          THE COURT:  So in theory, she could have been looking
6    at a hundred years, a life sentence, right?
7          MR. REYNOLDS:  In theory.
8          THE COURT:  In theory.  So doesn't that kind of put
9    it in that same category?  I will note this, though, before you
10   answer that.  She was looking at 240 months, right?  240
11   months, because it's the statutory maximum.  She was sentenced
12   by the sentencing judge to I think it was 150 months?  Is that
13   what it was?  153, something like that.
14         MR. KERR:  151.
15         THE COURT:  151 months.  There was no -- there was no
16   mandatory minimum.  I get it, but if she was facing statutory
17   maximum of what's in theory life -- she's 40 something, life,
18   right?  Is that how -- I don't know how old the witness is.
19   You don't need to answer.  40 something I think I saw.
20   She's -- that's a life sentence.
21         So I'm going to -- if she was facing a statutory
22   maximum of life and a guideline range of life, I think I'm
23   going to allow one question, Mr. Kerr, on that, okay?  This
24   isn't drawn out forever and a day.  One question concerning the
25   possible sentence that she was looking at.  Okay?

```
 1              MR. KERR:  Thank you, Your Honor.  And may I ask her
 2    what sentence she received?
 3              THE COURT:  Sure.
 4              MR. KERR:  Okay.  Thank you.
 5              THE COURT:  I don't have a problem with that.  Do you
 6    have a problem with that?
 7              MR. REYNOLDS:  We stand by our position that we took
 8    earlier, Your Honor, and --
 9              THE COURT:  So what do you object -- you're going
10    to -- I don't have that in front of me.  What's your position
11    earlier as to what sentence -- your objection to having her be
12    asked what sentence she received?  Do you have an objection to
13    that?
14              MR. REYNOLDS:  We do, Your Honor, yes.
15              THE COURT:  And why do you object to that?
16              MR. REYNOLDS:  Because it necessarily reveals the
17    sentence that the Defendant is facing.  Given the fact that
18    this witness has been -- has been sentenced, facing specific
19    numbers, she was involved in the same conspiracy.
20              THE COURT:  Okay.
21              MR. REYNOLDS:  And I think it's highly prejudicial.
22              THE COURT:  Okay.  Okay.
23              MR. KERR:  Your Honor, if I may.
24              THE COURT:  Yes.
25              MR. KERR:  Just that I think it shows what -- in the
```

1    current state of play, what she has to gain --

2              **THE COURT:**  No.

3              **MR. KERR:**  -- it shows.

4              **THE COURT:**  No, I'm not going to let you ask another

5    question.  They convinced me.  Like I said, I don't have this

6    stuff in front of me, so if you say, "It's what I wrote three

7    months ago," and I ruled on two months ago, I've got to go back

8    and look at it.  You got to tell me exactly what it is.  Yes, I

9    understand that.  That question should not be asked, so I would

10   sustain that objection.  So don't ask her that, Mr. Kerr, but

11   you can ask her in theory what she was facing.  That I will

12   permit, even though I don't think I really have to do it.  I

13   think in an abundance of fairness, I'm going to permit it.

14              Okay.  That's it.  So let's see.  You had

15   finished your cross -- your direct examination, right?  We were

16   getting ready to do cross-examination with Mr. Kerr.  Is that

17   where we were?  Okay.  That's fine.  We'll bring the jury in

18   then.  Thank you.

19              (Jury in at 9:13 a.m.)

20              **THE COURT:**  Okay.  Welcome back, ladies and

21   gentlemen.

22              I remind the witness you are still under oath.

23   Do you understand that?

24              **THE WITNESS:**  Yes.

25              **THE COURT:**  Okay.  You had finished with your direct

TATIANA POWER - CROSS-EXAMINATION

```
1   examination over here on the Government's side, correct?
2          MS. VALDES:  Yes, Your Honor.
3          THE COURT:  Okay.  So we're now on the defense side.
4   Mr. Kerr, do you wish to cross-examine this witness?
5          MR. KERR:  Yes.  Thank you, Your Honor.
6          THE COURT:  You may proceed, sir.
7                         TATIANA POWER,
8   a witness called on behalf of the Government, being first duly
9   sworn, was examined and testified as follows:
10                      CROSS-EXAMINATION
11                       BY MR. KERR:
12  Q.   Good morning, Ms. Power.
13  A.   Good morning.
14  Q.   We've never spoken before, right?
15  A.   To you?
16  Q.   Right.
17  A.   Never spoke, no.
18  Q.   And you testified yesterday that you spoke to Ms. Valdes
19  three times?
20  A.   Yes.
21  Q.   And other prosecutors and agents more times than that?
22  A.   Exactly.
23  Q.   The Government called you here as a witness?
24  A.   Right.
25  Q.   You have a master's degree?
```

TATIANA POWER - CROSS-EXAMINATION

1   A.   I do.

2   Q.   Okay.  And you speak English with no problem?  You don't

3   need a translator?

4   A.   No, I do not.

5   Q.   And you testified that you never met Mr. Velinov?

6   A.   Yes, I did never -- I didn't meet him ever.

7   Q.   Or spoken with him?

8   A.   No, but --

9   Q.   Okay.  You were convicted of money laundering?

10  A.   That's exactly.

11  Q.   Okay.

12  A.   Conspiracy to commit --

13  Q.   Falsifying records about the transfers of money and that

14  sort of thing?

15  A.   Yes, that's correct.

16  Q.   Okay.

17  A.   But also me sending international wires as well.

18  Q.   Okay.  And when you sent -- you said that you saw or you

19  recorded money transfers to Mr. Velinov in Bulgaria as part of

20  the company, right?

21  A.   I assisted.

22  Q.   You assisted?

23  A.   Transfer, yes, sir.

24  Q.   And you -- in your case, you set up fictitious names of

25  companies?

TATIANA POWER - CROSS-EXAMINATION

1    A.    That's correct.

2    Q.    That was part of the offense?

3    A.    (Witness nodding head affirmatively.)

4    Q.    But all of the -- all of the wire transfers that you sent

5    to Mr. Velinov were to him in a bank account in his true name,

6    right?

7    A.    That's correct.

8    Q.    Now, when you -- when you were originally charged in this

9    case, you were charged by a grand jury with five criminal

10   charges, five counts of money laundering; is that right?

11   A.    That's correct, five counts.

12   Q.    Five counts.  So if you had gone trial and been convicted

13   of those five counts, you would have had faced a hundred years

14   in prison; is that correct?

15   A.    That's correct.

16   Q.    And you pled guilty to one of those charges?

17   A.    That's correct.

18   Q.    Now, let me ask you, being in prison has got to be one of

19   the worst experiences of your life; is that fair to say?

20   A.    Fair.  That's fair.

21   Q.    Being in jail in particular?

22   A.    It's not easy.  That's fair.

23   Q.    Losing your freedom is not a good thing?

24   A.    Not a good thing.

25   Q.    Also you have an autistic son at home?

TATIANA POWER - CROSS-EXAMINATION

1   A.   Yes, I do.

2   Q.   And so you're understandably interested in minimizing the

3   rest of your time in prison and getting out as soon as you can?

4   A.   Okay.  Yes.

5   Q.   Okay.  And the Government's called you here as a witness,

6   and it's your understanding, is it not, that the only -- the

7   only people who can ask for a reduction in your sentence are

8   the prosecutors here in this case if they're pleased with your

9   testimony?

10  A.   I hope so.

11  Q.   Okay.  But there's nobody else that can do it?

12  A.   No.

13  Q.   They're the only ones that have the power to ask for a

14  reduction?

15  A.   I do not know.  I didn't do my research.

16  Q.   The -- now, you were sentenced last April in this court --

17  in -- not by this judge, but in this courthouse; is that right?

18  A.   That's correct.

19  Q.   Now, prior to sentencing, the Government said some things

20  about you to Court in preparation for your sentencing, and they

21  indicated that you had lied to a federal judge during your bond

22  hearing prior to your sentencing.  Do you recall that?

23       MS. VALDES:  Objection, Your Honor.  If -- this is

24  improper impeachment, if he's even trying to go that route.

25       MR. KERR:  I'm sorry?

TATIANA POWER - CROSS-EXAMINATION

1        THE COURT:  What's your response, Mr. Kerr?

2        MR. KERR:  I didn't hear the objection actually.

3        THE COURT:  She said improper impeachment.

4        MR. KERR:  The Government called this witness.  They

5   told her sentencing judge that she had lied to another federal

6   judge.  I think that's -- goes to bias and credibility, and

7   it's perfectly appropriate.

8        THE COURT:  Well, just remember what the lawyers say

9   isn't evidence, ladies and gentlemen of the jury, so whatever

10  Mr. Kerr says is not evidence.  It's what the witness says, so

11  I'll let you ask.  I'm going to overrule the objection

12  Ms. Valdes.  You can ask the question.  You just need to ask it

13  in a different way, all right?

14  BY MR. KERR:

15  Q.   You appeared before a federal judge for your bond hearing?

16  A.   That's correct.

17  Q.   That was in August of 2021?

18  A.   I don't recall the month, but yeah, I remember that day.

19  Q.   And that was down in Fort Lauderdale?

20  A.   Yes.  I remember.

21  Q.   And during that hearing, you told the judge that you

22  didn't have any foreign bank accounts; is that not right?

23  A.   I -- that's correct, but I misunderstood the question,

24  because at that moment, at that time the bank account was

25  closed.  It was a long time closed, so as currently, I did say

TATIANA POWER - CROSS-EXAMINATION

1    I did not have it because it was closed.  So --
2    Q.   Well, nevertheless, you're aware that the Government told
3    your sentencing judge that you lied about that?
4    A.   They told me that -- they made the following statement,
5    that I do have the bank account in my country.  That's not
6    true.  I did have it.  I was the user of my -- with my husband,
7    and that bank account was closed, and the Government probably
8    knows about it too.
9    Q.   But you actually told a number of lies to the Government
10   agents and prosecutors before you were sentenced; is that not
11   right?
12   A.   I don't know what you're referring to.  That's the only
13   thing that I do remember that was misunderstood by me and --
14   Q.   Well, the Government at your sentencing -- prior to your
15   sentencing told Court in writing that you had obstructed
16   justice on multiple occasions.
17            MS. VALDES:  Objection, Your Honor.
18            THE COURT:  Overruled.  He can ask those questions.
19   Go ahead.  Remember though what the lawyers say isn't evidence.
20   It's what the witnesses say.  Ask your question, Mr. Kerr.
21   BY MR. KERR:
22   Q.   Do you disagree with that?
23   A.   I don't know what you're referring to.  I know -- I just
24   recall one thing about the bank account, that I made a
25   statement that I did not have an open bank account at that

TATIANA POWER - CROSS-EXAMINATION

1   time.

2   Q.   And at the bond hearing, you were trying to get out of

3   jail, right?  You wanted to be released on bond?

4   A.   Yes, that was the plan.

5   Q.   Okay.  Well, is it not true that you routinely counseled

6   your husband and co-conspirators on how to evade law

7   enforcement scrutiny; is that not true?

8   A.   I don't understand the question.

9   Q.   You -- you had experience -- is it not correct to say that

10  you had experience working with law enforcement?

11  A.   Yeah, I had an internship.  Yeah, I did do the internship

12  with -- with FDLE.

13  Q.   FDLE?

14  A.   Yes.

15  Q.   Did you also work with the FBI?

16  A.   No, never.  I mean, there maybe I were to be exposed to

17  it, but I -- one on one, we never worked with FBI, but we met

18  at the sites when they performed search warrants, but I never

19  was in contact with an FBI agent or none of that.

20  Q.   You're not aware of the communications that your husband

21  sent about your law enforcement experience?

22  A.   I do -- I'm aware the only thing that -- maybe this is

23  what you're referring to -- of Ann Dumpling (phonetic) writing

24  a letter to FBI?  Is that what it is?

25  Q.   No.  I'm asking if you're aware that your husband, Ken

TATIANA POWER - CROSS-EXAMINATION

1  Power, told others that you knew how to evade law enforcement?

2  A.   I -- I know about that.  I know that he used -- he would

3  say the following statement.  "My wife knows everything, and I

4  ask her a question if" -- if -- for instance, when authority

5  contacted somebody, I believe it was Patrice, Patrice, Mark's

6  girlfriend, ex-girlfriend, my husband came to me and asked,

7  "what should they do?  Should they answer?  Should they go and

8  communicate with them or not?"  And I say, "They don't have to

9  talk to them."  But that was not my intention to do -- I mean,

10  that wasn't my intention to change any -- that was their

11  choice.  We either cooperate or not.  Is that what you're

12  referring to?

13  Q.   So you would disagree with that?  You didn't tell your

14  husband how to evade law enforcement?

15  A.   One more time.

16  Q.   I said you disagree with what the Government said, that

17  you counseled them on how to evade law enforcement?

18  A.   If you say so, but that wasn't my intention.

19  Q.   Okay.  And also they told the Court that your interview

20  with the agents at the search warrant was full of half truths,

21  deceptive answers, false exculpatory statements, and outright

22  lies.  Do you disagree with that?

23  A.   Certain ways, yes.  I disagree with that.

24  Q.   You disagree with that?

25  A.   I didn't say -- I didn't -- I was not -- not saying

1  everything, but what I did -- I did.  I did.  Certain things I
2  did lie, yeah.
3  Q.   In fact, they caught you in quite a few lies ultimately;
4  didn't they?
5  A.   Would you specify which ones they were?
6  Q.   Well, you told them -- I'm going from what they told the
7  Court.  You claimed that you did not know the names of Power
8  Trading's 12 employees.  Did you not tell them that?  You did
9  not claim you didn't know that?
10 A.   I did claim that I worked with Quickbooks, and everything
11 that was there, it was -- I knew.  I did -- I did accept the
12 fact that -- I did tell them that I do run the financial --
13 everything that has to do with finances.  I did tell them that.
14 They knew it.  And everything was in QuickBook, I would not
15 deny that I knew.
16 Q.   The question is they told Court, your sentencing Court,
17 that you claimed you did not know the names of Power Trading's
18 12 employees.  Is that -- is that true or false?  You told them
19 that you did not know the names of those employees?
20 A.   12?  Maybe I don't know all of them, but whatever is in
21 QuickBooks, that's what it is.  Maybe there were more.  I don't
22 know.  I mean, it's not me only running the Power Trading Inc.
23 It was my husband too, so there might be certain people that I
24 don't know about.
25 Q.   The Government also said that you denied knowing the

1    Bjorkmans and Patrice Wilowski?

2    A.   They asked me by her last name, and I don't -- I do not

3    know her last name.  I do not know.

4    Q.   So that's not correct?

5    A.   I do -- I did meet with her, and if they were to ask me --

6    I confuse -- first of all, I confuse her name with Denise,

7    Patrice.  I did meet her, but we're not that close for me to

8    know her last name.  I just know her by last name, and even in

9    my QuickBooks, her name is not there.

10   Q.   So if the Government told your sentencing Court that those

11   statements were obviously false given your decade-long business

12   and personal relationship with both families, that's not a true

13   statement?

14   A.   If you say so, but I -- just like I explained, I don't

15   know her by last name, and they asked me the question, "Do you

16   know Ms. Such-and-Such," last name?  I do not know her, so

17   therefore, I said I do not know her, but I know her by her

18   proper first name.

19   Q.   But you realized that the Government told your sentencing

20   judge that you lied to them?

21   A.   I do realize that, yes, sir.  I understand.

22   Q.   Is that not true?  You did lie; didn't you?

23   A.   Technically, yes, but I explained what -- how this worked

24   out to be.

25   Q.   Well, technically -- I mean, you knew the Bjorkmans and

TATIANA POWER - CROSS-EXAMINATION

1   the Wilowskis, right?

2   A.   They didn't ask me if I know the Bjorkman.  They asked me

3   her last name.  I recall this very well.

4   Q.   Okay.  Now, in interviews with the agents, you told them

5   and others -- you told them that your husband, Ken Power, told

6   you that this material was legal; is that not right?

7   A.   Yes.

8   Q.   And also that -- and it was all on the open internet.  It

9   wasn't on the dark web, right?

10  A.   Right.

11  Q.   And, in fact, you also told agents -- you mentioned Daniel

12  Luenberger, a photographer, in your testimony?

13  A.   Right, right.

14  Q.   And you visited his studio at one time --

15  A.   Right.

16  Q.   -- his photo studio?  He was taking pictures of a young

17  girl?

18  A.   It wasn't only one time.  I visited in -- with my husband

19  his home as well.

20  Q.   Okay.  And where was that?  Where did you visit him,

21  Mr. Luenberger?

22  A.   In my country.

23  Q.   In Moldova?

24  A.   Yes.

25  Q.   Okay.  And he was taking pictures of children there?

TATIANA POWER - CROSS-EXAMINATION

1  A.   It wasn't necessarily him.  It was his assistant, which

2  was his wife.

3  Q.   Okay.  And were the children nude?

4  A.   Excuse me?

5  Q.   Were they nude?

6  A.   No, they were not nude.  They were dressed up.

7  Q.   Okay.  And you told the agents that you didn't think

8  anything of it, that that was culturally accepted there?

9  A.   Yes, that's correct.

10 Q.   Now, you were your husband's primary partner in this

11 business, right, in the Power Trading?

12 A.   Power Trading, yes.

13 Q.   Yeah.  But he -- you testified yesterday that he was the

14 main decision maker?

15 A.   He was, yes, sir.

16 Q.   I think you testified that he was angry about many things.

17 Can you describe some of those things that he was angry about?

18 A.   Yes.  He was angry about when the servers would go down or

19 maybe when he would lose -- had bad news from Mark Bjorkman.

20 One situation came to where he would -- Mark would lose

21 merchant accounts for people to join the websites and pay for

22 it.  Also he was angry with Plamen also for him being too lazy

23 and not work, answer email, or -- he was angry about our

24 marriage as well.

25 Q.   Okay.  You don't need to get into that, but the -- the

TATIANA POWER - CROSS-EXAMINATION

```
1   other people who -- the other partners, the other people that
2   participated in this business, you knew them personally,
3   Bjorkman and the rest of them, right?  You met them in person?
4   A.   Mark, yes.  His ex-girlfriend and his wife, yes.  I did
5   meet them personally.
6   Q.   And socialized with them, had dinner with them and talked
7   to them?
8   A.   With Mark and his ex-girlfriend, I would say not more than
9   four times we met, and they came to visit our home as well, and
10  we had our kids together with us.
11  Q.   But you never met Mr. Velinov?
12  A.   Never met him, no.
13  Q.   Never spoke to him?
14  A.   Never.
15  Q.   No further questions.
16  A.   Except --
17  Q.   I'm sorry?
18  A.   Except when I see -- when I answered, "He will be right
19  back from the shower."  That's the only thing, when I had the
20  access to answer to ICQ.
21  Q.   And when was that?
22  A.   Excuse me?
23  Q.   When was that?
24  A.   Early when I was in my -- in our country.  Between 2006,
25  '7.  I don't recall exactly the year, so don't hold this
```

TATIANA POWER - REDIRECT EXAMINATION

1    against me, please.

2    Q.   But you answered on the computer?

3    A.   I answered on my husband's computer.

4            MR. KERR:  Okay.  Thank you.

5            THE COURT:  Okay.  Thank you.  Anything else from the

6    Government?

7            MS. VALDES:  Briefly, Your Honor.

8            THE COURT:  Of course.

9                    REDIRECT EXAMINATION

10                   BY MS. VALDES:

11   Q.   Ms. Power, in the three times we spoke or the times you

12   spoke with other law enforcement, do you recall me stating what

13   your only job was today?

14   A.   Excuse me?  One more time.

15   Q.   Do you recall me stating what your only job was today,

16   what you had to do today?

17   A.   I don't understand the question.

18   Q.   Did I tell you that your only job today was to tell the

19   truth?

20   A.   Yes, ma'am.

21   Q.   Did I say -- if you didn't tell the truth today, would you

22   receive cooperation credit?

23   A.   I don't know.

24   Q.   Okay.

25   A.   I don't know what -- I don't know if I'm going to receive

TATIANA POWER - RECROSS-EXAMINATION

1   the cooperation credit.

2   Q.   If you took the stand today and you lied, would the

3   Government -- to your understanding, would the Government or

4   anyone ask for a reduction in your sentence?

5   A.   Repeat again the question.

6   Q.   If you took the stand today --

7   A.   Right.

8   Q.   -- and you lied on the stand --

9   A.   Right.

10  Q.   -- do you think that the Government or anyone else would

11  ask for your sentence to be reduced?

12  A.   No, absolutely not.

13           MS. VALDES:   Thank you.

14           THE COURT:   Yes, of course, Mr. Kerr.   Go ahead, sir.

15                    RECROSS-EXAMINATION

16                    BY MR. KERR:

17  Q.   Ms. Power, who will decide whether you lied or not?

18  A.   Jury.

19  Q.   The prosecutor will decide whether you lied or not and

20  whether to ask for a reduction in your sentence; is that not

21  correct?

22  A.   I do not know.

23  Q.   Okay.

24  A.   I really do not know the answer.

25           MR. KERR:   Okay.   Thank you.

TATIANA POWER - RECROSS-EXAMINATION

```
 1            THE COURT:  Thank you.  I will excuse the witness.
 2   So the marshals can take you out now.
 3                      (Witness excused.)
 4            THE COURT:  The Government can call its next witness,
 5   please.
 6            MS. VALDES:  Government calls Special Agent Greg
 7   Schuster.  May I approach the witness box, Your Honor, to place
 8   some exhibits?
 9            THE COURT:  Yes.
10            COURTROOM DEPUTY:  Please raise your right hand.
11                      (Witness sworn.)
12            COURTROOM DEPUTY:  Thank you.  Please state and spell
13   your name for the record.
14            THE WITNESS:  Gregory E. Schuster II.
15   S-c-h-u-s-t-e-r.
16            COURTROOM DEPUTY:  Thank you.  You may take the
17   stand.
18            THE COURT:  All right.  Mr. Schuster, you're going to
19   be asked some questions by the prosecutor on this case.  If you
20   don't understand the question, please say so, so it can be
21   stated a different way.  Wait until the question is finished
22   before you begin answering so we don't have two people speaking
23   at the same time.  If you have a tendency to speak quickly,
24   slow down, and if you're soft spoken, speak up so we can hear
25   you, all right?
```

SCHUSTER – DIRECT EXAMINATION

1          **THE WITNESS:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  Very good.  Go ahead.  You may

3     proceed.

4          **MS. VALDES:**  Thank you, Your Honor.

5                    **GREGORY SCHUSTER,**

6     a witness called on behalf of the Government, being first duly

7     sworn, was examined and testified as follows:

8                    **DIRECT EXAMINATION**

9                    **BY MS. VALDES:**

10    Q.   Good morning.

11    A.   Good morning.

12    Q.   Where do you work?

13    A.   Homeland Security Investigations.

14    Q.   And what is your position?

15    A.   I'm a special agent.

16    Q.   How long have you worked for Homeland Security

17    Investigations or HSI?

18    A.   I'm in my sixteenth year.

19    Q.   And in November of 2019, what was your position with HSI?

20    A.   I was assigned to the financial group as a special agent,

21    criminal investigator.

22    Q.   Did you also assist sometimes with other subject matters

23    such as child exploitation?

24    A.   I did.

25    Q.   Did you assist in executing search warrants?

SCHUSTER - DIRECT EXAMINATION

1    A.    I have, yes.

2    Q.    I want to briefly discuss your educational background.

3    Where did you go to school?

4    A.    I went to Florida State University.

5    Q.    And what type of training did you receive to become a

6    special agent with HSI?

7    A.    It's a six-month program broken up into two parts.  The

8    first part is called criminal investigator training program,

9    and then there's an add-on for -- specifically for HSI.

10   Q.    Have you received any certifications related to your work

11   as an agent for HSI?

12   A.    I have multiple.  The one that's -- that I use the most is

13   probably the special response team.  I'm an operator on the

14   special response team.

15   Q.    Could you explain that a little bit?

16   A.    We serve high risk search warrants and arrest warrants.

17   Q.    Special Agent Schuster, on November 7th, 2019, did you

18   assist with the execution of a search warrant at a residence

19   located at 18720 Chopin Drive in Lutz, Florida?

20   A.    Yes, I did.

21   Q.    What was your role during that search warrant?

22   A.    I was on the initial entry team, and then I was also to

23   interview any of the occupants and then to assist with the

24   search after the interviews.

25   Q.    Were you involved in the seizure of certain electronic

SCHUSTER - DIRECT EXAMINATION

```
 1   devices from that residence?
 2   A.   I was.
 3   Q.   Could you please take a look at Government's Exhibits 200
 4   and the sub exhibits?  They're placed right next to you on the
 5   stand.
 6            THE COURT:  I'm sorry, what were the numbers again?
 7            MS. VALDES:  Exhibit 200 and 200A, B, C, D, E, F, G,
 8   H, and I.
 9            THE COURT:  Okay.  Thank you.
10   BY MS. VALDES:
11   Q.   Have you taken a look?
12   A.   I have.
13   Q.   Do you recognize these exhibits?
14   A.   I do.
15   Q.   What are they?
16   A.   One of them is of the location itself, and the other ones
17   are evidence that was seized at the location.
18   Q.   You say the residence itself.  Are you referring to the
19   search warrant of the residence?
20   A.   Yes, ma'am.
21   Q.   Okay.  Are these photographs from that search warrant?
22   A.   They are.
23   Q.   Are they a fair and accurate depiction of the Chopin Drive
24   residence as you remember it on November 7th, 2019?
25   A.   Yes, ma'am.
```

SCHUSTER - DIRECT EXAMINATION

1           MS. VALDES:  Your Honor, the Government submits
2    Government's Exhibits 200 and Sub Exhibits 200A through I.
3           MR. KERR:  No objection.
4           THE COURT:  There's no objection, so I receive into
5    evidence Government's Exhibits 200 and Exhibits 200A through I,
6    received into evidence.
7           MS. VALDES:  Permission to publish, Your Honor?
8           THE COURT:  Yes, you may.
9           MS. VALDES:  Thank you.  If we could please display
10   200A?
11          THE COURT:  We're just going to -- well, some of
12   these others, do you not want them on the big board, or is it
13   too hard to go back and forth?  Are you okay with putting that
14   one on the big board?
15          MS. VALDES:  Yes, Your Honor.
16          THE COURT:  Okay.
17          MS. VALDES:  All exhibits will be up here for this
18   witness.
19          THE COURT:  Okay.  That's fine.
20          MS. VALDES:  Thank you.
21   BY MS. VALDES:
22   Q.   200A, can you tell us what's depicted here?
23   A.   This is Mr. Bjorkman's residence.
24   Q.   Okay.  If we could go to 200B, what's depicted here?
25   A.   This is the living room of Mr. Bjorkman's.

1    Q.   Does it appear to have been used for some other purpose?

2    A.   It looks like he has some sort of computer setup at

3    that -- at that area.

4    Q.   And can you explain what the silver box on the floor in

5    the -- towards the middle, but lower middle of this photograph

6    is?

7    A.   That -- it looks like an external -- some sort of external

8    storage drive.

9         MS. VALDES:   If we could go to page 2, 200B?  I'm

10   sorry, 200D.

11   BY MS. VALDES:

12   Q.   Can you explain what this -- what we're looking at here?

13   A.   That's the same thing that was on the ground.

14   Q.   Just a closer view?

15   A.   Yes, ma'am.

16   Q.   Can you read the name of this external drive?

17   A.   It's a Maxtell (verbatim) external drive.

18   Q.   Go to Government's 200E.  What's depicted here?

19   A.   It's a Toshiba laptop inside of a laptop case.

20   Q.   And this laptop and the Maxtor external drive that we just

21   looked at, were those both seized as part of the search

22   warrant?

23   A.   They were.

24   Q.   200F.  Might be a little difficult to read, but can you

25   see what's depicted here?

SCHUSTER - DIRECT EXAMINATION

1   A.   Yes, ma'am.

2   Q.   Can you please explain what we're looking at?

3   A.   These are various IDs of Mr. Bjorkman.

4   Q.   Can you see his first name?

5   A.   I'm sorry?

6   Q.   Could you read his first name also?

7   A.   Oh, Mark Bjorkman.

8   Q.   And was this person residing at this home, the Chopin

9   Drive address, when you executed the search warrant?

10  A.   Yes, ma'am.

11          MS. VALDES:  No further questions.

12          THE COURT:  Okay.  Thank you.  Any cross-examination

13  for this witness?

14          MR. KERR:  No questions, Your Honor.

15          THE COURT:  Okay.  I'll excuse the witness then.

16  Thank you.  Thank you for having come in today to testify.  All

17  right.

18                    (Witness excused.)

19          THE COURT:  Can the Government call its next witness,

20  please?

21          MR. REYNOLDS:  Yes, Your Honor.  The United States

22  calls Joshua Storey.

23          COURTROOM DEPUTY:  Please raise your right hand.

24                    (Witness sworn.)

25          COURTROOM DEPUTY:  Thank you.  Please state and spell

STOREY - DIRECT EXAMINATION

1   your name for the record.

2            THE WITNESS:  Joshua Storey, S-t-o-r-e-y.

3            COURTROOM DEPUTY:  Thank you.  You may take the

4   stand.

5            THE COURT:  All right.  You're going to be asked some

6   questions by the Department of Justice lawyer, Mr. Reynolds.

7   If you don't understand the question, please say so, so he can

8   state it a different way.  Wait until the question is finished

9   before you begin answering so we don't have two people speaking

10  at the same time.  If you speak quickly, like I do, slow down

11  so that we can understand you, and if you're soft spoken, speak

12  up so that we can hear you, all right?

13           THE WITNESS:  Yes.

14           THE COURT:  Okay.  You may proceed, Mr. Reynolds.

15                   JOSHUA STOREY,

16  a witness called on behalf of the Government, being first duly

17  sworn, was examined and testified as follows:

18                 DIRECT EXAMINATION

19                 BY MR. REYNOLDS:

20  Q.   Good morning, sir.

21  A.   Good morning.

22  Q.   I know you introduced yourself to the CRD, but I don't

23  know if that was in the mic, so could you introduce yourself to

24  the jury as well?

25  A.   Hi.  My name is Joshua Storey, S-t-o-r-e-y.

STOREY - DIRECT EXAMINATION

1  Q.   And where do you work, Mr. Storey?

2  A.   I work at the U.S. Department of Justice within the Child

3  Exploitation and Obscenity Section.

4  Q.   What is your title at the U.S. Department of Justice?

5  A.   I am a digital investigative analyst.

6  Q.   As a digital investigative analyst with the U.S.

7  Department of Justice, what are some of your primary duties?

8  A.   I primarily conduct forensic analysis on digital devices,

9  and I also investigate crimes of child exploitation on the

10 internet.

11 Q.   When you say forensic analysis of digital devices, what

12 does that mean?

13 A.   We conduct digital forensic analysis, which is essentially

14 the science of investigating digital devices to determine the

15 circumstances around those devices, such as who used the

16 devices, when, and what kinds of things they were used for.  In

17 addition, we write reports of our analysis in support of the

18 evidence that we find on those devices.

19 Q.   When you're analyzing these devices, do you extract

20 evidence from them?

21 A.   Yes, we do.

22 Q.   Is that evidence to be used in criminal investigations?

23 A.   That's correct.

24 Q.   How long have you been with the Department of Justice,

25 Mr. Storey?

STOREY - DIRECT EXAMINATION

1    A.    Almost eight and a half years.

2    Q.    And in the eight and a half years that you've been with

3    the Department of Justice, how many cases would you say you've

4    worked on, cases or investigations?

5    A.    Typically do a dozen or so cases a year for eight years.

6    I would say we also work on several investigations that are

7    separate from cases per year, so I would say anywhere between

8    80 and 150, I would feel comfortable saying.

9    Q.    What percentage of those cases involved criminal

10   investigations?

11   A.    100 percent.

12   Q.    What percentage of those criminal investigations pertain

13   to the sexual exploitation of children?

14   A.    All of them.  We only work on child exploitation.  I only

15   work on child exploitation cases within the section.

16   Q.    And, Mr. Storey, since you've been a digital investigative

17   analyst with the Department of Justice, approximately how many

18   digital devices would you say you've analyzed?

19   A.    Hundreds, if not thousands.  Each case has multiple

20   devices, and so easily hundreds, if not thousands.

21   Q.    Do you have any formal university level training that is

22   relevant or formal university level education that's relevant

23   to your work as a computer forensic analyst?

24   A.    Yes, I attended and graduated from the University of

25   Central Florida with a master's in digital forensics.

1    Q.   What about outside the academic context?  What sort of
2    special training, if any, have you received in computer
3    forensics?
4    A.   I typically do training or so a few trainings a year.
5    They're digital forensics related as well as digital forensics
6    tools that we use, so certifications associated with digital
7    forensics.
8    Q.   What sort of certifications do you hold, if any?
9    A.   I am EnCase certified.  EnCase is a digital forensics tool
10   that we use almost daily.  There's a certification for that.  I
11   am also Cellebrite certified, Cellebrite physical -- certified
12   physical analyst.  Cellebrite is a mobile forensics tool that
13   we use almost daily as well, so I have two certifications in
14   that tool as well.
15   Q.   Mr. Storey, in addition to receiving training on computer
16   forensic topics, have you provided any training to others on
17   the science of computer forensics?
18   A.   Yes.  I'd say almost yearly, I would present maybe two or
19   three times to different groups.  So I have trained local and
20   federal prosecutors as well as law enforcement on digital
21   forensics, specifically pertaining to child exploitation cases.
22   I've also traveled internationally to present and help teach
23   foreign law enforcement and prosecutors as well as judges to --
24   how we in the U.S. prosecute and conduct forensic analysis on
25   child exploitation crimes.

STOREY - DIRECT EXAMINATION

1  Q.   As a digital investigative analyst with the Department of
2  Justice, were you assigned to assist in the investigation of
3  the Newstar websites?
4  A.   Yes.
5  Q.   Speaking very briefly, just one or two sentences, what
6  role did you play in that investigation?
7  A.   It was my responsibility to conduct analysis, forensic
8  analysis on the devices that were seized from the residence of
9  Mark Bjorkman.
10 Q.   Mr. Storey, first of all, I want to ask you some questions
11 about how you -- how you conduct such a forensic analysis.  In
12 the course of a criminal investigation, do you receive physical
13 items that were seized from a defendant's home?
14 A.   Yes.
15 Q.   And what, if anything, do you need to do with those in
16 order to conduct a forensic examination?
17 A.   To conduct a forensic examination from a device, first you
18 would have to make a forensic copy, or we would call it a
19 forensic image, to make sure that we are working on an exact
20 copy of the device.  Part of computer forensics, really the
21 first and main part is to make sure that you are not -- you are
22 not changing any of the evidence on the device itself, and you
23 work to analyze a perfect copy of the device so that the
24 evidence stays intact.  And so we would make a forensic image
25 to start doing our analysis.

STOREY - DIRECT EXAMINATION

1  Q.   So practically what would happen if you seized a computer
2  from a -- if you received a computer that was seized from a
3  defendant's home, and you just turned it on and started looking
4  at it?
5  A.   In that case, the data would be changed, all types of data
6  within the computer.  Things would be changing, and so at that
7  time it would not be the same as if -- when it was seized.
8  Q.   Is it important to the science of computer forensics that
9  you're analyzing a device exactly how it was when a defendant
10 used it?
11 A.   That's correct.
12 Q.   All right.  Mr. Storey, you used the term "forensic
13 image."  Can you describe the process of creating a forensic
14 image?
15 A.   Sure.  So a forensic image -- to make a forensic image,
16 there's specialized digital forensics tools that essentially
17 allow you to connect to a device, that will let you connect to
18 a device, but it will tell the device not to write anything to
19 that device.  And so it can read all of the data and copy the
20 data without writing to the device.  And so we use digital
21 forensic tools such as -- so that we can make a forensic copy,
22 and then we would store the evidence away.
23 Q.   After a forensic copy is made, how can you be sure that
24 the data on the forensic copy is the exact same as it was on
25 the original device?

STOREY - DIRECT EXAMINATION

1   A.   Right.  So when you make the forensic image, technical
2   information associated with that image is generated by the
3   tools.  The main piece of evidence or information that you
4   would look to is called an MD5 hash or a hash value, and that
5   hash value would need to match the exact hash value of the
6   evidence itself, and in that process we can determine whether
7   or not an exact copy was made.
8   Q.   Mr. Storey, in the course of your work, do you create
9   forensic images from original evidence?
10  A.   Almost daily.
11  Q.   Do you also receive and analyze forensic images that other
12  people have created?
13  A.   That's correct.
14  Q.   All right.  Mr. Storey, did you conduct an examination of
15  a Maxtor external hard drive that was seized in the home of
16  Mark Bjorkman?
17  A.   Yes.
18  Q.   Did you make that forensic image?
19  A.   No.
20  Q.   How do you know that that forensic image that you analyzed
21  was the same as the data extracted from that device from
22  Mr. Bjorkman's home?
23  A.   As I mentioned, when I received the forensic image from
24  the agent who made the image, that image came with technical
25  information about the imaging process, including the MD5 hash

STOREY - DIRECT EXAMINATION

1  value, and I compared that MD5 hash value with -- once I was
2  working on the image, to determine that it was the same hash
3  value that we had and so I can make sure that the copy that we
4  are working on is the same as the copy that was made of the
5  device.
6  Q.   The individual who provided you this -- with this
7  information, was that Special Agent Steven Towe from Homeland
8  Security Investigations?
9  A.   Yes, that's correct.
10 Q.   What sort of form did the information he provided you
11 consist of?
12 A.   It's usually a simple text file that has all types of
13 information about the specific hard drive that is being copied.
14 So it would have all types of information such as how many --
15 how many sectors or bytes of data are within the drive, model,
16 serial number, time of acquisition or copying, and then very
17 importantly the hash values that have been produced once the
18 data has been copied.
19 Q.   Did you also review any signed and executed documents from
20 Mr. Towe containing information about the device he copied?
21 A.   Yes, I believe so.
22 Q.   All right.  Mr. Storey, based on the information that you
23 received from Special Agent Towe and the information that you
24 examined in the forensic -- forensic image that you -- that you
25 received, what's your confidence level that the forensic image

STOREY - DIRECT EXAMINATION

1   you received is the exact same data as the Maxtor external hard
2   drive seized from Mr. Bjorkman's home?
3   A.   There was no doubt.  The forensic images seemed to match.
4   The hash values were verified, so there's no reason for me to
5   believe there was any difference.
6   Q.   Mr. Storey, what did you do -- once you verified this,
7   what did you do to examine this device?
8   A.   I treated it like most of our other digital forensic cases
9   where I took the forensic images, and I processed them with
10  several different forensic tools.  One of them I mentioned
11  earlier, EnCase.  I may have processed with it a number of
12  different tools that allow us to investigate the drives and the
13  operating systems.  EnCase would be one.  We also use something
14  called AXIOM which just allows us to investigate the files
15  further.  I may have used a number of different tools.
16  Q.   And you mentioned EnCase.  Is that the program or tool in
17  which you have a certification?
18  A.   That's correct.
19  Q.   All right.  Mr. Storey, did you -- after conducting --
20  using these tools to examine this device, did you identify any
21  photographs on this device that contained a logo that included
22  the word "Newstar"?
23  A.   Yes, I did.
24  Q.   What did those images depict?
25  A.   The images that I found on the device had -- it seemed to

STOREY - DIRECT EXAMINATION

1  be a photo shoot.  It was a series of images.  It seemed to be
2  a photo shoot of a young finer -- excuse me, a young minor
3  female.  In the top of the corner of the images, it looked like
4  there was a logo that had the word "Newstar," as well I think
5  maybe a star, and the minor female was posed in different ways,
6  and I think she was wearing a top with some underwear, and it
7  was like -- like a photo shoot.
8  Q.   When you say she was posed in various ways, what do you
9  mean?
10 A.   She was in different -- her body was in different
11 positions.  Some of them she was looking at the camera.  Some
12 of them her legs were open.  Some of them her legs were closed.
13 Some of them she was turning around looking at the camera.  I
14 believe there was just a lot of different poses that she was
15 clearly posing for a camera.
16 Q.   Would you describe some of these images as sexual?
17 A.   Yes.
18 Q.   Mr. Storey, when you were conducting your analysis of this
19 Maxtor hard drive, did you identify any email content?
20 A.   Yes, I did.
21 Q.   What did you identify?
22 A.   So I identified DBX files which are archived files used
23 with the Microsoft Outlook Express program, and those files
24 would contain email messages or even entire email folders such
25 as inbox or sent box folders or even an entire email account,

STOREY - DIRECT EXAMINATION

1    and I found several DBX archived files on this hard drive.

2    Q.   So I want to be clear.  A DBX file -- and is that just the

3    letters DBX?

4    A.   Yes, that's correct, .DBX.

5    Q.   Does each DBX file contain a single email?

6    A.   No, it contains likely hundreds, if not thousands of

7    emails, or entire email folders.

8    Q.   Did you find more than one DBX file on this Maxtor

9    external hard drive image?

10   A.   Yes, I found hundreds.

11   Q.   Were you able to review the emails within those DBX files

12   you found on this Maxtor hard drive?

13   A.   Yes, I was.

14   Q.   How did you do that?

15   A.   Well, as I mentioned, DBX files are associated with the

16   Microsoft Outlook Express program.  However, Microsoft Outlook

17   Express is an outdated program.  Microsoft doesn't support it

18   anymore, and it stopped being included in the Microsoft

19   operating system I think around Windows XP era.  So I had to

20   take the DBX files and convert them to a more modern

21   contemporary format that's used in email clients that are more

22   common today.  So I converted those DBX files to MBOX format,

23   and then I was able to import those MBOX files into an email

24   client where I could easily read the emails just as the user

25   would have.

STOREY - DIRECT EXAMINATION

1   Q.   How did you convert the DBX files into MBOX files?
2   A.   I used an open source program that I was able to find.
3   It's called DBX converter.  It's sole job to so take these DBX
4   files because they're kind of antiquated and turn them into
5   common MBOX files.
6   Q.   Have you used this tool before?
7   A.   Yes, I have.
8   Q.   And in your experience, does it work accurately and
9   reliably?
10  A.   Yes.
11  Q.   Do you have any reason to believe that the process of
12  changing the DBX files into MBOX files changed the content of
13  the emails?
14  A.   No, I have no reason to believe.
15  Q.   When you were using this tool to convert the DBX files
16  into MBOX files, did you receive any error messages from the
17  program?
18  A.   No.
19  Q.   All right.  Mr. Storey, once you converted the files,
20  could you determine what email accounts or email addresses were
21  included within the files?
22  A.   Yes.  Most of the email -- I'm sorry, most of the emails
23  were associated with markb@ -- and then it would be a website.
24  So I think most of the emails were either from
25  markb@billingdirect.com or .net and then also

STOREY - DIRECT EXAMINATION

1   markb@cyber-pay.net.

2   **Q.**   Did you read some of those emails?

3   **A.**   Yes.

4   **Q.**   Were some of those emails sent from this individual with

5   the email prefix "markb"?

6   **A.**   That's correct.

7   **Q.**   And were some of them received by this person?

8   **A.**   Yes.

9   **Q.**   And based on your analysis of the emails, did you reach a

10  conclusion as to who the user was of the email addresses

11  markb@cyber-pay.net and markb@billingdirect.net?

12  **A.**   Yes, Mark Bjorkman.

13          **MR. REYNOLDS:**  Your Honor, may we dim the lights on

14  the projector, please?

15          **THE COURT:**  All right.

16          **MR. REYNOLDS:**  Thank you.  All right.  Mr. Storey --

17  and, Your Honor, may I approach the witness to hand him

18  exhibits?

19          **THE COURT:**  Yes, you may.

20  **BY MR. REYNOLDS:**

21  **Q.**   Mr. Storey, I'm handing you a bundle of exhibits.  Could

22  you please look at Government Exhibit 501?

23  **A.**   Okay.

24  **Q.**   Mr. Storey, have you seen this exhibit before?

25  **A.**   Yes, I have.

STOREY - DIRECT EXAMINATION

1   Q.   What is it?

2   A.   This is one of the emails that I reviewed that came from

3   the Maxtor external hard drive.

4   Q.   Who's this email sent to?

5   A.   The email was sent to markb@cyber-pay.net.

6   Q.   Does Government Exhibit 501 truly and accurately reflect

7   an email you extracted from the Maxtor external hard drive?

8   A.   Yes.

9            MR. REYNOLDS:  Your Honor, we offer Government

10  Exhibit 501 into evidence.

11           MR. KERR:  No objection.

12           THE COURT:  501 is received into evidence, may be

13  published to the jury.

14  BY MR. REYNOLDS:

15  Q.   All right.  Mr. Storey, are you -- are you familiar with

16  the concept of header information in emails?

17  A.   Yes.

18  Q.   What is header information?

19  A.   Header information is just technical information

20  associated with an email that describes some of the information

21  about the email.  So, for example, who the email was sent to,

22  who sent the email, the date and time the email was sent, those

23  are all header information.

24  Q.   Putting this in layman's terms, is the header information

25  the stuff that appears above the body of the email?

STOREY - DIRECT EXAMINATION

1   A.   Yeah, typically it appears at the body -- or I'm sorry,
2   above the body.
3   Q.   All right.  Could you identify and read the header
4   information in this email, please?
5   A.   Sure.  The subject is "Activation."  The email was sent
6   from webmaster@balerinka.com on March 23rd, 2006, and it was
7   sent to markb@cyber-pay.net.
8   Q.   Mr. Storey, could you read the first two lines of this
9   email into the record, please?
10  A.   "Hello, Mark.  I'm Plamen, and I work for Ken Power."
11  Q.   And do you see a sign-off line at the bottom of this
12  email?
13  A.   Yes.
14  Q.   Could you read that into the record, please?
15  A.   "Best regards, Plamen Velinov."
16  Q.   All right.  Thank you, Mr. Storey.
17          Could you take a look at what's provided to you as
18  Government Exhibit 502?  Have you seen this exhibit before?
19  A.   Yes.
20  Q.   What is it?
21  A.   This is another email that I reviewed while examining the
22  external hard drive.
23  Q.   And who is it to?
24  A.   This email appears to be to markb@billingdirect.net.
25  Q.   Does Government Exhibit 502 truly and accurately reflect

STOREY - DIRECT EXAMINATION

1   an email that you extracted from the Maxtor external hard
2   drive?
3   A.   That's correct, yes.
4        MR. REYNOLDS:  Your Honor, we move Government
5   Exhibit 502 into evidence.
6        MR. KERR:  No objection.
7        THE COURT:  502 is received into evidence, may be
8   published to the jury.
9   BY MR. REYNOLDS:
10  Q.   Mr. Storey, could you again read the header information on
11  this email, please?
12  A.   Sure.  The subject is "double billed case."  It was sent
13  from webmaster@newstar█████.net, on April 26th, 2006, and it
14  was sent to markb@billingdirect.net.
15  Q.   Let me ask you this.  Before we get to the body of the
16  email, let me ask you a couple of questions.  Are you familiar
17  with the term "webmaster"?  Have you ever heard that before?
18  A.   Yes, I have.
19  Q.   What does the term "webmaster" mean to you?
20  A.   A webmaster, the term is a slightly outdated term that
21  typically refers to somebody who would be the technical person
22  associated with running a website.  They would handle almost
23  all the technical troubleshooting problems.  They would
24  implement updates.  They may add or edit the content associated
25  with the website if that's a technical thing.  And so the

1    webmaster is really somebody who may deal with server or

2    hosting issues and really have control over the technical side

3    of a website.

4    Q.   If -- if -- if you saw an email address that consisted of

5    webmaster@ and then the URL of a website, would that tell you

6    that the user of that email address had anything to do with

7    that website?

8    A.   Yes.  It's a likely indication that they are the webmaster

9    of that website, and they handle almost all the technical

10   issues associated with that website.

11   Q.   All right.  Mr. Storey, could you read this email into the

12   record, including the beginning line and the ending line?

13   A.   Would you like me to read the entire email or just the

14   beginning and the ending?

15   Q.   Please, all the way through.

16   A.   "Hello, Mark.  It's me, Plamen.  We had one case where

17   person says it is double billed and that the charge is listed

18   twice in his credit card account.  The name is James Durbin

19   with email nate1a@excite.com."

20           "After we got the email, I checked at Billing Direct

21   and found that his purchase, which he made one month ago for

22   the website Newstar ██████ is disabled and refunded.  It is a

23   coincidence that both purchases have expired date of 25th of

24   May.  I don't know why it is refunded, but for sure we haven't

25   done it."

STOREY - DIRECT EXAMINATION

1              "I feel that some kind of mess happened.  Anyway, he

2    accessed the first site during one month and because now these

3    money are refunded, his credit card should get blocked, which

4    means his new purchase should be also blocked.  Best regards,

5    Plamen Velinov."

6    Q.   Mr. Storey, could you take a look at what's been provided

7    to you as Government Exhibit 503?

8    A.   Sure.  Okay.

9    Q.   Excuse me.  Have you seen Government Exhibit 503 before?

10   A.   Yes, I have.

11   Q.   What is it?

12   A.   This is another email that I reviewed while analyzing the

13   external hard drive.

14   Q.   What email address is this email sent to?

15   A.   This email appears to be sent to markb@billingdirect.net.

16   Q.   And does Government Exhibit 503 truly and accurately

17   reflect an email you extracted from the Maxtor external hard

18   drive seized in Mark Bjorkman's home?

19   A.   Yes.

20             MR. REYNOLDS:  Your Honor, we offer Government

21   Exhibit 503 into evidence.

22             MR. KERR:  No objection.

23             THE COURT:  Thank you.  503 is received into evidence

24   and may be published to the jury.

25   BY MR. REYNOLDS:

1   Q.   All right.  Mr. Storey, could you read the header

2   information for the email contained within Government

3   Exhibit 503?

4   A.   Sure.  The subject is "cheater case," from

5   webmaster@newstar-█████.com on April 29th, 2006, and it was

6   sent to markb@billingdirect.net.

7   Q.   And to be clear, this webmaster address, this is not the

8   same webmaster address that appeared in Government Exhibit 502;

9   is it?

10  A.   No, it's not.

11  Q.   All right.  Mr. Storey, could you read the first -- the

12  first large paragraph into evidence, please, into the record

13  starting with the address -- the initial line?

14  A.   Sure.  "Hello, Mark.  It's me, Plamen.  We have one

15  cheater here with email sleepy237@hotmail.com.  He requested

16  yesterday link to join two sites, Newstar █████ and Newstar

17  █████ and asked how secure his data are.  Just a few hours

18  later, he has joined and asked if he can get back his money.  I

19  checked at Pennywise and found that he has downloaded good

20  amount of data from both sites.  Today he asks for refund.  I

21  told him he won't get refund because he already downloaded."

22          MR. REYNOLDS:  Ms. Davis, could we highlight the next

23  two paragraphs, please?

24  BY MR. REYNOLDS:

25  Q.   Mr. Storey, what does this appear to be to you?

STOREY - DIRECT EXAMINATION

1    A.   It appears to be some sort of statistics associated with

2    maybe downloads, if I'm using the previous paragraph for

3    context.

4         MR. REYNOLDS:  Ms. Davis, could we highlight the

5    remainder of the email, please?

6    BY MR. REYNOLDS:

7    Q.   Mr. Storey, could you read this in the record as well?

8    A.   Sure.  "There are many users which download that amount of

9    data for 10 days.  Anyway, I believe that Kenny will want his

10   credit card blocked.  I know that he will get his refund from

11   you, but just wanted to let you know to block him.  Best

12   regards, Plamen."

13   Q.   Thank you.  Could we proceed to Government Exhibit 504?

14   A.   Okay.

15   Q.   Have you seen this exhibit before, Mr. Storey?

16   A.   Yes.

17   Q.   What is it?

18   A.   This is another email that I reviewed during my analysis

19   of the external hard drive.

20   Q.   Who is this -- what email addresses are involved in these

21   emails?

22   A.   This email appears to be from markb@billingdirect.net, and

23   sent to webmaster@newstar-█████.com.

24   Q.   And does Government Exhibit 504 truly and accurately

25   reflect email content that you extracted from the Maxtor

STOREY - DIRECT EXAMINATION

1  external hard drive?

2  A.   Yes.

3         MR. REYNOLDS:  Your Honor, we offer Government

4  Exhibit 504 into evidence.

5         MR. KERR:  No objection.

6         THE COURT:  Thank you.  504 is received into evidence

7  and may be published to the jury.

8  BY MR. REYNOLDS:

9  Q.   Mr. Storey, are you familiar with the concept of an email

10 chain?

11 A.   Yes.

12 Q.   What's an email chain?

13 A.   An email chain, or sometimes referred to as an email

14 thread, is simply a way to display the series of emails that

15 are all associated with the same topic or email conversation.

16 Usually the most recent received email is towards the top of

17 the thread or chain, and the originating email is at the

18 bottom.

19 Q.   Generally speaking, do email chains include back and forth

20 replies to the original email, that sort of thing?

21 A.   Yes, it's a way for the participants of the emails to look

22 back and see the entire conversation usually.

23 Q.   Does Government Exhibit 504 depict an email chain?

24 A.   It appears so, yes.

25         MR. REYNOLDS:  Ms. Davis, could we blow this up?

1  Thank you.

2  BY MR. REYNOLDS:

3  Q.   And, Mr. Storey, I believe you testified that the older

4  emails appear toward the bottom; is that correct?

5  A.   Yes, usually the originating emails are towards the bottom

6  of the chain.

7  Q.   The segment that is blown up on the screen, is that the --

8  does that appear to be -- to you to be the oldest email in this

9  chain?

10  A.   That's correct.

11  Q.   Could you read the header information and the content of

12  this email into the record, please?

13  A.   Sure.  This email was sent to markb@billingdirect.net on

14  April 30th, 2006.  The sender was webmaster@newstar-███.com,

15  and the subject is "Newstar Dolly activation."  The email

16  reads, "Hello, Mark.  Would you please activate our newest

17  sight www.newstar-███.com on both Billing Direct and

18  CyberPay?  Best regards, Plamen."

19  Q.   And could you go through the same exercise with the email

20  at the top?

21  A.   Sure.  The most recent email reads -- well, first of all,

22  the most recent email is a response.  It's from

23  markb@billingdirect.net on May 1st, 2006, sent to

24  webmaster@newstar-███.com.  And it reads, "Hi.  It should be

25  activated now.  Thanks, Mark."

STOREY - DIRECT EXAMINATION

1  Q.   Mr. Storey, could you take a look at what has been marked

2  as Government Exhibit 505?  Have you seen Government

3  Exhibit 505 before?

4  A.   Yes, I have.

5  Q.   What is it?

6  A.   This is another email that I was able to review during my

7  analysis of the external hard drive.

8  Q.   What -- who are the participants in this communication?

9  A.   The participants appear to be markb@cyber-pay.net as well

10 as webmaster@newstar█████.net.

11 Q.   Does Government Exhibit 505 truly and accurately reflect

12 an email that you extracted from the Maxtor external hard drive

13 from Mr. Bjorkman's home?

14 A.   Yes.

15      MR. REYNOLDS:  Your Honor, we offer Government

16 Exhibit 505 into evidence.

17      MR. KERR:  No objection.

18      THE COURT:  All right.  No objection?  It's received

19 into evidence.  505 may be published to the jury.

20 BY MR. REYNOLDS:

21 Q.   Mr. Storey, is this another email chain?

22 A.   Yes.

23      MR. REYNOLDS:  Ms. Davis, is it possible to highlight

24 just the bottom most email?

25 BY MR. REYNOLDS:

1  Q.  All right.  Mr. Storey, again, can you identify the

2  sender, the recipient and the date of this email according to

3  the header information?

4  A.  Yes.  The email was sent from webmaster@newstar███████.net.

5  It was sent to markb@cyber-pay.net.  It was sent on July 16th,

6  2006, and the subject was "Disabled Customer."

7  Q.  And could you read the sign off at the bottom of this

8  email?

9  A.  The sign off is, "Thank you, Plamen."

10        MR. REYNOLDS:  Ms. Davis, could we highlight the very

11  top email in Government Exhibit 505?

12  BY MR. REYNOLDS:

13  Q.  Again, Mr. Storey, could you identify what is in the

14  header information of this email?

15  A.  Sure.  It's a reply to the subject "Disabled Customer."

16  It was sent from markb@cyber-pay.net, was sent on July 16th,

17  2006, and it was sent to webmaster@newstar███████.net.

18  Q.  And could you read the email in the record, starting with

19  the second line beginning with "try"?

20  A.  Sure.  "Try to make the models 13 or older.  It's getting

21  harder and harder for the preteen models to be approved."

22  Q.  And the sign off?

23  A.  "Thanks, Mark, CyberPay."

24  Q.  Thank you, Mr. Storey.

25        The last -- the last item I'd like you to take a look

STOREY - DIRECT EXAMINATION

1  at has been marked as Government Exhibit 506.  Have you seen

2  Government Exhibit 506 before?

3  A.   Yes, I have.

4  Q.   What is it?

5  A.   This is another email that I examined while I was

6  analyzing the external hard drive.

7  Q.   What email addresses are involved in this communication?

8  A.   The email addresses are plamen@plaper.com, and

9  markb@billingdirect.net, and markb@cyber-pay.net is copied.

10  Q.   Does Government Exhibit 506 truly and accurately reflect

11  an email you extracted from the Maxtor external hard drive

12  seized from Mark Bjorkman's home?

13  A.   Yes.

14        MR. REYNOLDS:  Your Honor, we offer Government

15  Exhibit 506 into evidence.

16        MR. KERR:  No objection.

17        THE COURT:  All right.  506 is received into evidence

18  and may be published to the jury.

19  BY MR. REYNOLDS:

20  Q.   All right.  Mr. Storey, again, could you identify the

21  header information in this email to the jury?

22  A.   Sure.  The subject is "Ken Servers."  It's from

23  plamen@plaper.com.  It was sent on September 21st, 2006.  It

24  was sent to markb@billingdirect.net, and markb@cyber-pay.net is

25  copied.

STOREY - DIRECT EXAMINATION

1   Q.   Mr. Storey, in the "from" line, you identified this email
2   as being from plamen@plaper.com.  Is there any text that
3   appears in quotation marks right next to that email address?
4   A.   Yes, the email display name is Plamen Velinov.
5   Q.   Mr. Storey, are you familiar with how this text in
6   quotation marks may have been generated?
7   A.   Yes.  It's an email display name.  Email display names are
8   typically set by the sender of an email.  It's simply a way
9   for -- it's simply a way for a sender of an email to identify
10  themselves to their recipients.  Sometimes you can include --
11  it's customizable, and it's used for -- to add personal touch.
12  Sometimes you can add professional distinctions, such as doctor
13  or professor, and it's just something that is set by the sender
14  so that the recipient will see it.
15  Q.   All right.  Mr. Storey, could you read the content of this
16  email into the record, please?
17  A.   "Hello, Mark.  Leaseweb said that the servers are
18  suspended because they are not paid.  Well, at least the big
19  worry is over.  Anyway, we need him urgently, and I cannot find
20  him yet.  Thank you, Plamen."
21  Q.   Mr. Storey, I apologize if I already asked you this, but
22  could you read the subject line into the record, please?
23  A.   The subject is "Ken Servers."
24  Q.   Mr. Storey, you've testified today about Government
25  Exhibit 501 through 506.  Are these -- are these the only

STOREY - DIRECT EXAMINATION

1   emails you recovered from the Maxtor external hard drive?
2   A.   No.
3   Q.   Are these the only emails recovered from the Maxtor
4   external hard drive that contain the name Plamen?
5   A.   No.
6   Q.   How many emails would you say that you -- extracted or
7   recovered from the Maxtor external hard drive, approximately
8   how many emails did you review?
9   A.   I think it was hundreds of thousands.
10  Q.   And of those -- did you say hundreds of thousands?
11  A.   There were hundreds of thousands of emails.  I definitely
12  reviewed thousands of them, yeah.
13  Q.   Of those thousands of emails that you reviewed, did some
14  of them refer to Plamen Velinov by first name?
15  A.   Yes.
16  Q.   Did some of them refer just to the name Plamen?
17  A.   That's correct.
18  Q.   Do you recall ever reviewing an email -- of the thousands
19  of emails you reviewed from Mr. Bjorkman's devices, do you ever
20  recall reviewing an email that used the name of Plamen with a
21  last name other than Velinov?
22  A.   Not that I recall.
23  Q.   Do you recall -- other than email, did you review only
24  email from Mr. Bjorkman's devices, or did you review different
25  kinds of data?

STOREY - DIRECT EXAMINATION

1   A.    I reviewed lots of different types of data.

2   Q.    And other than email, including all other types of data,

3   did you ever encounter the name Plamen with a last name other

4   than Velinov?

5   A.    Not that I can recall.

6   Q.    Of all the work you did forensically analyzing

7   Mr. Bjorkman's devices, did you ever see any email, file, any

8   other kind of data suggesting that there may be more than one

9   person named Plamen involved in these emails?

10  A.    No.

11          MR. REYNOLDS:  Your Honor, we'll pass the witness.

12          THE COURT:  Okay.  Thank you.  We can take our break

13  now, our morning break.  Why don't we do that because it's

14  almost 10:30.  Ladies and gentlemen, we're going to take a

15  10-minute break.  Please don't discuss the case or form any

16  opinions until you've heard all the evidence.

17          (Jury out at 10:26 a.m.)

18          THE COURT:  Thank you.  Please be seated.  A couple

19  of things.  We're in the middle of your testimony, so you're

20  not to discuss your testimony with counsel, including the

21  prosecutors.

22          THE WITNESS:  Understood.

23          THE COURT:  All right?  Okay.  Anything to discuss

24  while the jury is out?

25          MR. REYNOLDS:  One item for the Court's information.

STOREY - DIRECT EXAMINATION

```
 1              THE COURT:  Sure.
 2              MR. REYNOLDS:  Your Honor, we've streamlined a lot of
 3    our trial presentation, and we're moving through our witnesses
 4    at I think a steadier clip than we originally planned to.  I
 5    just wanted the Court to be aware that it is conceivable that
 6    we will rest tomorrow.
 7              THE COURT:  Okay.
 8              MR. REYNOLDS:  Possibly more likely Monday, but I
 9    just wanted to make you aware of that for planning purposes.
10              THE COURT:  Okay.  Well, that's very nice of you to
11    let me know.  You know, it's hard to guess how long things
12    take.  You really never know until you're there, so possibly
13    tomorrow, Monday.  So this could go to the jury then on Monday,
14    right?
15              MR. REYNOLDS:  Possibly.
16              THE COURT:  Okay.  Well, we'll see what happens.
17    Thank you for the heads up.  We're in recess.  See you back
18    here in 10 minutes.
19              (Recess from 10:27 a.m. to 10:34 a.m.)
20              THE COURT:  We're still waiting for the Defendant to
21    come back.  All right.
22                           (Pause.)
23              THE COURT:  All right.  We'll bring the jury in,
24    then.
25              (Jury in at 10:35 a.m.)
```

STOREY - DIRECT EXAMINATION

1              THE COURT:  Sorry, we'll wait a minute.  We're
2    missing one juror.  So just -- everybody can be seated, and
3    we'll wait for the person to come.
4                          (Pause.)
5              THE COURT:  Ladies and gentlemen, I'm just going to
6    excuse you for a few minutes while we make certain everybody is
7    present and accounted for.  So we're going to have a short
8    break.  Please don't discuss the case or form any opinions
9    until you've heard all the evidence.  We'll see you back here
10   as soon as everybody is ready to go.
11             (Jury out at 10:40 a.m.)
12             THE COURT:  Sorry.  I didn't mean to lead them out
13   and lead them back in again.  I just didn't want them to sit --
14   so we'll try again.  All right.  Thank you.
15             (Jury in at 10:41 a.m.)
16             THE COURT:  All right.  Welcome back, ladies and
17   gentlemen.
18                  Let's see.  We're ready for cross-examination of
19   the witness.  I remind the witness you're still under oath.  Do
20   you understand that, sir?
21             THE WITNESS:  Yes, ma'am.
22             THE COURT:  Okay.  Very good.  You may proceed with
23   your cross-examination.
24             MR. KERR:  Thank you, Your Honor.
25

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | BY MR. KERR: |
| 3 | Q.   Good morning, Mr. Storey. |
| 4 | A.   Good morning. |
| 5 | Q.   You and I have never spoken before. |
| 6 | A.   That's correct. |
| 7 | Q.   I've looked over your CV or your resumé, and you have some |
| 8 | very impressive credentials.  You're very highly trained in |
| 9 | forensics and child exploitation. |
| 10 |        I notice on your resumé or your CV, you indicate that |
| 11 | you worked on an Operation Ebenezer in 2016 and 2019? |
| 12 | A.   That's correct. |
| 13 | Q.   And that dealt with an online child exploitation community |
| 14 | operating on an anonymous network, right? |
| 15 |        MR. REYNOLDS:  Objection, Your Honor.  Relevance. |
| 16 |        THE COURT:  What's your response to that? |
| 17 |        MR. KERR:  It's part of his qualifications, and it |
| 18 | deals with the topic of -- the question I'm about to ask I |
| 19 | think will -- |
| 20 |        THE COURT:  Okay.  I'll overrule the objection.  Go |
| 21 | ahead. |
| 22 | BY MR. KERR: |
| 23 | Q.   What does the term "anonymous network" mean?  What does |
| 24 | that refer to with respect to Operation Ebenezer? |
| 25 | A.   Well, an anonymous network generally -- there are |

STOREY - CROSS-EXAMINATION

```
 1   different types, but it's essentially a network that is
 2   designed in a way so that it is -- its identity is obfuscated
 3   or it's hidden.
 4   Q.   Is that what we mean by the dark web?  Is that one of the
 5   ways to do that?
 6   A.   The dark web is a type of anonymous network, yes.
 7   Q.   Is there a lot of child exploitation that goes on on the
 8   dark web?
 9   A.   Yes, there is.
10   Q.   Okay.  But this Newstar website was not on the dark web?
11   A.   No, it was not.
12   Q.   It was on the public -- public internet?
13   A.   Yes.  We refer to it as the clear net.
14   Q.   The clear net?
15   A.   Yeah, yeah.  Usually to distinguish between the dark web
16   and the public internet, sometimes we will refer to the public
17   internet as the clear net.
18   Q.   Okay.  And let me ask you, did you have the opportunity to
19   discuss Special Agent Boos' testimony in this case with the
20   attorneys from the Government or anybody?
21   A.   Discuss her?
22   Q.   Discuss her testimony.
23   A.   No, I have not discussed her testimony.
24   Q.   None of the issues.  Okay.  Now, are you familiar with the
25   term "child erotica"?
```

STOREY - CROSS-EXAMINATION

1   A.   I am familiar with that term, correct, yes.

2   Q.   Based on all your training?

3   A.   That's correct.

4   Q.   And is it fair to say that there is a lot of material in

5   the -- you know, on the public airwaves that would be

6   classified as child erotica?

7            MR. REYNOLDS:  Objection, Your Honor.  This calls for

8   a legal conclusion.

9            THE COURT:  Well, I mean, the question --

10           MR. KERR:  He's an expert.

11           THE COURT:  Hold on a second -- as to what child

12  erotica is?  Is that your objection on the Government's side,

13  as to what child erotica is?

14           MR. REYNOLDS:  Yes, Your Honor.

15           THE COURT:  Okay.  Sustained.

16  BY MR. KERR:

17  Q.   Now, you testified about a number of emails that were

18  recovered from a hard drive?

19  A.   That's correct.

20  Q.   And those came from -- your understanding is that hard

21  drive came from the Mark Bjorkman residence?

22  A.   That's correct.

23  Q.   And that's here in the Tampa area?

24  A.   I believe in Lutz.

25  Q.   Lutz.  And the -- there was -- to your knowledge, were

STOREY - REDIRECT EXAMINATION

1   there any devices or was there any equipment in the Bjorkman
2   residence that belonged to Mr. Velinov?
3   A.   I'm not aware of any.  I just analyzed the devices and the
4   images that came from the residence, and so I guess it's
5   actually also possible, but all of the devices I analyzed
6   appeared to be owned or operated by Mark Bjorkman.
7   Q.   And the emails that you read into the record between Mark
8   Bjorkman and Mr. Velinov, they appear to be -- would you agree
9   that they appear to be politely worded business emails about
10  billing issues?
11  A.   That's correct.
12  Q.   And they were exchanged and signed in Mr. Velinov's true
13  name?
14  A.   They were signed by an individual named Plamen or Plamen
15  Velinov, that's correct.
16  Q.   There were no assumed names used, no fake names?
17  A.   Not that I'm aware of.
18          MR. KERR:  Thank you.  No further questions.
19          THE COURT:  All right.  Thank you.  Any redirect for
20  this witness?
21          MR. REYNOLDS:  Very briefly, Your Honor.
22          THE COURT:  Sure.
23                    REDIRECT EXAMINATION
24                    BY MR. REYNOLDS:
25  Q.   Mr. Storey, you testified that a lot of child exploitation

STOREY - REDIRECT EXAMINATION

1    takes place on the dark net; is that correct?

2    A.   Yes.

3    Q.   Is that the only place where child exploitation material

4    can be found?

5    A.   Absolutely not.

6    Q.   Can child exploitation material also be found on the clear

7    net?

8    A.   Yes.

9    Q.   I believe you also testified that using the dark net

10   provides some kind of anonymity; is that correct?

11   A.   Yes, that's the way it's designed.

12   Q.   Can you explain what sort of anonymity it provides?

13   A.   It provides anonymity -- sorry, that word -- for the users

14   of the computer to get to the websites.  It hides their

15   identities, their IP addresses, and it also provides anonymity

16   for the websites themselves.  It hides the servers and their

17   identities.

18   Q.   When you say it hides the servers' identities, does it

19   also hide the location of the servers?

20   A.   Yes, exactly.

21   Q.   Is there a way to hide the location of servers on the

22   clear net as well?

23   A.   Yes.

24   Q.   Are proxies one way to hide the location of servers on the

25   clear net?

STOREY - REDIRECT EXAMINATION

1    A.   Yes, that is one way, yeah.

2         MR. REYNOLDS:  Nothing further, Your Honor.

3         THE COURT:  Okay.  Thank you.

4         MR. KERR:  Yes, Your Honor.  May we approach briefly

5    before we dismiss this witness?

6         THE COURT:  All right.

7              (At sidebar on the record.)

8         MR. KERR:  This is an expert witness in child

9    exploitation and digital recovery and so forth.

10        THE COURT:  Okay.  I didn't realize he had been

11   tendered as an expert, but okay.  All right.

12        MR. KERR:  That's why I thought it was fair to ask

13   him about the term "child erotica" because that's -- the cases,

14   Eleventh Circuit cases are filled with descriptions of child

15   erotica being legal and child pornography being illegal, and

16   that was used yesterday in those reports repeatedly, and that's

17   the point I'm trying to make.  I'm trying to get him to define

18   it as an expert.

19        THE COURT:  Okay.  You know, I know there are

20   multiple ways of having somebody testify as an expert.  I'm

21   used to the more traditional way where you ask the Court to

22   declare the person an expert, and then you go on and ask

23   questions.  So because I didn't hear that, I never --

24        MR. REYNOLDS:  I apologize for that, Your Honor.  I

25   understand that different districts have different practices.

STOREY – REDIRECT EXAMINATION

1   Some districts consider it bolstering to offer the expert as an
2   expert.  We can do that in the future.  May I just respond to
3   Mr. Kerr's comment?
4           THE COURT:  Maybe I would have handled it
5   differently, maybe not, but I didn't view him as an expert
6   quite frankly.  Go ahead.  Let's respond to what --
7           MR. REYNOLDS:  We would offer Mr. Storey as an expert
8   in computer forensic examination in the area of child
9   exploitation.  He is not a legal expert.  He's not a legal
10  expert in determining the content of Eleventh Circuit cases.
11  He's not a legal expert in determining what is legally child
12  pornography or legally child erotica under the law.  I have to
13  express concern on the record that Mr. Kerr has essentially
14  asked almost every single Government witness to provide a legal
15  opinion, which is why we've been objecting repeatedly.  I'd
16  like to say on the record that's totally improper.  These are
17  not legal experts.  There's no such thing as a legal expert.
18  The judge is a legal expert.  We can't call a legal expert.
19  It's highly prejudicial.  It's confusing to the jury.  You
20  should not be allowed to ask witnesses whether something is
21  child pornography or child erotica.
22          MR. KERR:  May I respond?
23          THE COURT:  Sure, of course.
24          MR. KERR:  These terms are the equivalent in the
25  child exploitation world of an agent coming in to a prosecutor

STOREY - REDIRECT EXAMINATION

1   and saying, "Listen, I think we have a good bank robbery case."
2   I mean, these are not technical legal terms that I'm asking.
3   And this expert is -- was tendered to me as an expert in --
4   he's given many presentations on prosecution of child
5   exploitation, for example.  He's listed -- there are listed --
6   they go on and on and on.  He's an expert -- he devotes a
7   hundred percent of his day to child exploitation cases.  That
8   was his testimony.  And if anybody would know the difference
9   between legal child erotica and illegal child pornography,
10  would be able to recognize that, it would be this expert.
11          THE COURT:  I don't think that this is the kind of
12  thing that people normally testify about.  Is there a case that
13  you can show me to give me further instruction where a judge
14  has permitted somebody like that to say, "This is child
15  pornography, this is child erotica"?  Can you give me a case,
16  or can you point to something?
17          MR. KERR:  I will look for one.
18          THE COURT:  Okay.
19          MR. KERR:  I have distinctions being made in cases
20  between legal child erotica and child pornography.
21          THE COURT:  Okay.  With an expert testifying to that,
22  or is it the Court making that decision?
23          MR. KERR:  I don't have that at the tip of my
24  fingers.  I just wanted to say that I will be -- I didn't want
25  to bring this up now, but at the charging conference, I plan to

STOREY - REDIRECT EXAMINATION

1    at least ask for an instruction on child erotica, the
2    definition of child erotica.
3         THE COURT:  Okay.  So for now, I'm going to -- I
4    forget.  Did you raise an objection?  You asked for a sidebar.
5    That's why we're here.  You asked for a sidebar, so I don't
6    think that these are appropriate questions to ask.  You have
7    law, call the case to my attention.  We can always fix it.  I
8    will before the jury excuse the witness, but have him stick
9    around in case I'm wrong and Mr. Kerr shows something to me.
10   There's nothing wrong with calling the witness back and telling
11   the jury, "We're going to permit him to ask a few more
12   questions," something along those lines, but you need to show
13   me something.  I normally don't permit that kind of testimony,
14   but I always, you know, want to make certain I get it right, so
15   if you've got something to show me, you can do it during the
16   lunch hour or, gosh, even later on.
17        MR. KERR:  Okay.
18        THE COURT:  Okay?
19        MR. REYNOLDS:  I'd just like to put defense counsel
20   on notice.  We have a witness sitting in the gallery who is
21   probably the foremost expert in child exploitation in the
22   entire country.  I think we should be permitted to call this
23   witness, show him the images in this case, and ask him if it's
24   child pornography.  I think that's totally improper, but I
25   think if he opens the door to this, I can respond.

STOREY - RECROSS-EXAMINATION

1          THE COURT:  I've told him he couldn't with this
2     witness.  This is somebody who's just watching right now?
3          MR. REYNOLDS:  He was disclosed as an expert witness.
4     We don't otherwise intend to call him.
5          THE COURT:  All right.  That's fine.  Thank you.
6               (End of discussion at sidebar.)
7          MR. KERR:  I just have one question briefly, Your
8     Honor.
9          THE COURT:  Okay.  Go ahead, Mr. Kerr.
10                   RECROSS-EXAMINATION
11                   BY MR. KERR:
12    Q.   You mentioned something about proxy servers, and that's --
13    that is a way of anonymizing a user or a site, but it's also --
14    it's used for others things too, right?  Proxy servers are used
15    for more than that on the internet, like balancing the loads
16    for various websites and that sort of thing?
17    A.   Is that a question?
18    Q.   Yes.
19    A.   Yes, they are.
20    Q.   This is cross-examination.  I get to do that.
21    A.   Yes, they can be, yes.
22         MR. KERR:  Thank you.
23         THE COURT:  Okay.  Anything else from this witness?
24         MR. REYNOLDS:  Not from the Government, Your Honor.
25         THE COURT:  All right.  So you are excused, sir.

STOREY - RECROSS-EXAMINATION

1    Thank you for having come in today --

2              THE WITNESS:  Thank you.

3              THE COURT:  -- to testify.

4                        (Witness excused.)

5              THE COURT:  Let's see.  Mr. Reynolds, do you have

6    another witness to call?  Or Ms. Valdes?

7              MS. VALDES:  Government calls Special Agent Vanessa

8    Juede, Your Honor.

9              THE COURT:  Okay.

10             MS. VALDES:  Your Honor, may I approach the witness

11   box to switch exhibits?

12             THE COURT:  Yes, you may do so.

13             MS. VALDES:  Thank you.

14             COURTROOM DEPUTY:  Good morning.  Please raise your

15   right hand.

16                        (Witness sworn.)

17             COURTROOM DEPUTY:  Thank you.  Please state and spell

18   your name for the record.

19             THE WITNESS:  Vanessa Juede, V-a-n-e-s-s-a, Juede, J

20   as in Juliette, u-e-d-e.

21             COURTROOM DEPUTY:  Thank you.  You may take the

22   stand.

23             THE COURT:  All right.  Good morning, you're going to

24   be asked some questions by the Assistant United States Attorney

25   assigned to the case.  If you don't understand the question,

JUEDE - DIRECT EXAMINATION

```
 1    please say so, so she can state it a different way.
 2                    Wait until the question is finished before you
 3    begin answering so we don't have two people speaking at the
 4    same time.  If you speak quickly, slow down so we can
 5    understand you, and if you're soft spoken, speak up so that we
 6    can hear you, all right?
 7                    Okay.  You may proceed, Ms. Valdes.
 8              MS. VALDES:  Thank you, Your Honor.
 9                          VANESSA JUEDE,
10    a witness called on behalf of the Government, being first duly
11    sworn, was examined and testified as follows:
12                        DIRECT EXAMINATION
13                        BY MS. VALDES:
14    Q.   Good morning.
15    A.   Good morning.
16    Q.   Where do you work?
17    A.   Department of Homeland Security.
18    Q.   And what is your position there?
19    A.   Special agent.
20    Q.   How long have you worked as a special agent for HSI?
21    A.   20 years.
22    Q.   In November of 2019, what was your position at HSI?
23    A.   Special agent.
24    Q.   Could you please discuss your educational and training
25    background as it relates to your job as a special agent?
```

**JUEDE - DIRECT EXAMINATION**

1    A.    I have a bachelor degree in poly tech systems in

2    University of Puerto Rico.  I have a master degree in criminal

3    justice, and I went to the Federal Law Enforcement Training

4    Center, Glynco, Georgia to be a special agent.

5    Q.    In 2019, what type of work were you doing for HSI as a

6    special agent?

7    A.    I work crimes with children.

8    Q.    Did you -- in that work, did you assist with executing

9    search warrants?

10   A.    Yes.

11   Q.    Special Agent Juede, did Special Agent Tavey Garcia from

12   HSI Tampa reach out to you -- to your office regarding a person

13   named Kenneth Power?

14   A.    Yes.

15   Q.    Did you assist HSI Tampa in that request?

16   A.    Yes.

17   Q.    What did HSI Tampa initially ask you to confirm for them?

18   A.    Verify the address where the subject were living.

19   Q.    Were you able to do so?

20   A.    Yes.

21   Q.    Do you recall the address where Kenneth Power was living?

22   A.    I know it was in Weston.

23   Q.    Did you create a report when you were helping HSI Tampa

24   locate the address of Kenneth Power?

25   A.    Yes.

JUEDE - DIRECT EXAMINATION

1  Q.   Would looking at your report refreshing your recollection
2  as to the exact address he was --
3  A.   Yes.
4          MS. VALDES:   Your Honor, may I approach the witness?
5          THE COURT:   You may.
6  BY MS. VALDES:
7  Q.   If you could take a look, and when your memory has been
8  refreshed, please turn it over.  Do you recall the address?
9  A.   Yes.
10 Q.   What was the address?
11 A.   1425 Lantana Drive, Weston, Florida.
12 Q.   Were you also able to confirm if another person was living
13 at that address?
14 A.   Yes.
15 Q.   Who was that other person?
16 A.   Tatiana Power.
17 Q.   Subsequent to confirming this information on November 7th,
18 2019, did you assist in the execution of a search warrant at
19 the Lantana Drive residence?
20 A.   Yes.
21 Q.   What was your role?
22 A.   I was a case agent because they were located in my area of
23 responsibility.
24 Q.   What was your role at the search warrant?
25 A.   I was the one that -- I was leading the search warrant, so

JUEDE - DIRECT EXAMINATION

1    I advised the agents what to look for.

2    Q.   Did you also assist in the seizure of electronic devices?

3    A.   Yes, I was the seizures agent.

4    Q.   Excuse me?

5    A.   I seized the electronics that we seized that day.

6    Q.   And were electronics seized that day from the search

7    warrant?

8    A.   Electronic devices, documents.

9    Q.   Okay.  Could you please take a look at Government's

10   Exhibits placed right there next to you in the witness stand

11   700 and Sub Exhibits 700A through C, and F through I?

12   A.   Which one you want me to look first?

13   Q.   If you could look at them all.

14   A.   Yes.

15   Q.   Do you recognize these exhibits?

16   A.   Yes.

17   Q.   What are they?

18   A.   They are photograph of the electronics that were found

19   during the search warrant.

20   Q.   Are they a fair and accurate depiction of the residence

21   and the electronics that you saw that day on November 7th, 2019

22   when you executed, helped -- assisted in executing the search

23   warrant?

24   A.   Yes.

25              MS. VALDES:  Your Honor, Government offers

1  Government's 700, 700A through C and F through I into evidence.

2          MR. KERR:  No objection.

3          THE COURT:  All right.  Those exhibits are received

4  into evidence and may be published to the jury.

5          MS. VALDES:  Thank you, Your Honor.

6  BY MS. VALDES:

7  Q.   Can you describe the Lantana residence for the jury?

8  A.   It's a two-story home, double garage.  When you enter to

9  the right, living room and see the stairwell in front.  Then if

10  you go to the left, you can see the dining room and kitchen,

11  and in the back, it is a terrace.

12  Q.   Did you walk through the home and become familiar with the

13  rooms inside the home?

14  A.   Yes.

15          MS. VALDES:  If I could please publish Government's

16  700A?

17          COURTROOM DEPUTY:  On the overhead?

18          MS. VALDES:  Yes, please.  Thank you.

19  BY MS. VALDES:

20  Q.   Can you please describe for the jury what we're looking at

21  here?

22  A.   Yeah, we're looking at the desktop computer, Sony, and

23  it's the photograph where it was found.

24  Q.   Was this item seized?

25  A.   Yes.

JUEDE - DIRECT EXAMINATION

1    Q.    If you could look at 700B, please?  What's depicted here?

2    A.    There you have a tower, computer tower.

3    Q.    Was this item seized?

4    A.    Yes.

5    Q.    700C, please?  What are we looking at here?

6    A.    You have here several things.  You have the tower, Lenovo

7    computer.  You have a hard drive and a thumb drive.

8    Q.    Were those items seized?

9    A.    Yes.

10   Q.    700F?

11   A.    Photograph of a drawer.  When you find this type of

12   photos, it's showing that the agents found something inside the

13   drawer.

14   Q.    If you can go to page 2, is this what was found inside?

15   A.    So the binder that you show there, it was a black binder.

16   If you notice in the photographs, you can see the rings, and

17   those are the checks of Power Trading Inc.

18   Q.    700I?

19   A.    That's the QuickBooks program that was insert in the

20   computers.

21   Q.    Thank you.  700G?

22   A.    Those is the wallet of the -- Kenneth Power, and that's

23   proof, you know, that -- his identifications and credit cards

24   under his name in the residence.

25   Q.    Did you find anyone else's identification at the home?

JUEDE - CROSS-EXAMINATION

1    A.    Yes.

2    Q.    700H.  H too, please.  Is this the other ID?

3    A.    Yes, Tatiana Power.

4              MS. VALDES:  Thank you.  No further questions.

5              THE COURT:  Okay.  All right.  Any cross-examination

6    for this witness?

7              MR. KERR:  Very briefly, Your Honor.

8                         CROSS-EXAMINATION

9                         BY MR. KERR:

10   Q.    Special Agent Juede, good morning.

11   A.    Good morning.

12   Q.    Did -- in all of the material that you seized and the

13   equipment that you seized, did you find anything that belonged

14   to Mr. Plamen Velinov, any property, devices or anything that

15   belonged to him?

16   A.    As far as I know that day, we were going to be executing a

17   search warrant to Power residence.  It was too preliminary to

18   know that anything else was owned to somebody else.

19             MR. KERR:  Okay.  Thank you.

20             THE WITNESS:  Okay.

21             THE COURT:  Anything else?

22             MS. VALDES:  No, Your Honor.

23             THE COURT:  All right.  I'll excused the witness.

24   Thank you for having come in today to testify.

25                    (Witness excused.)

```
1              THE COURT:  And the Government can call its next
2    witness.
3              MR. REYNOLDS:  Your Honor, the United States calls
4    Dero Tucker.  Your Honor, we'd ask that the exhibits through
5    this witness be shown by the monitor only.  May I move it over?
6              THE COURT:  Yes, so she will show those exhibits
7    through the monitor.  That's fine.
8              COURTROOM DEPUTY:  Good morning.  Please raise your
9    right hand.
10                        (Witness sworn.)
11             COURTROOM DEPUTY:  Thank you.  Please state and spell
12   your name for the record.
13             THE WITNESS:  My first name is Dero, last name
14   Tucker.  Spelled D-e-r-o.  Last name is spelled T-u-c-k-e-r.
15             COURTROOM DEPUTY:  Thank you.  You may take the
16   stand.
17             THE COURT:  All right.  You're going to be asked some
18   questions by the Department of Justice lawyer assigned to this
19   case, Mr. Reynolds.  If you don't understand the question,
20   please say so, so he can state it a different way.  Wait until
21   the question is finished before you begin answering so we don't
22   have two people speaking at the same time.
23             If you have the tendency to speak quickly, slow
24   down so we can understand you, and if you're soft spoken, speak
25   up so we can hear you, all right?
```

```
 1                  Okay.  Go ahead, Mr. Reynolds.
 2                         DERO TUCKER,
 3   a witness called on behalf of the Government, being first duly
 4   sworn, was examined and testified as follows:
 5                      DIRECT EXAMINATION
 6                      BY MR. REYNOLDS:
 7   Q.   Good morning, sir.
 8   A.   Good morning.
 9   Q.   You introduced yourself to the CRD, but I don't know if it
10   was on the mic.
11   A.   Yes.  My first name is Dero, spelled D-e-r-o.  Last name
12   is Tucker, spelled T-u-c-k-e-r.
13   Q.   What do you do for work, sir?
14   A.   I am a digital investigative analyst for the Department of
15   Justice in the Child Exploitation and Obscenity Section.
16   Q.   And as a digital investigative analyst with the Child
17   Exploitation and Obscenity Section of the Department of
18   Justice, what are some of your primary duties?
19   A.   Some of my primary duties are to assist with search and
20   seizures.  Also I conduct digital forensics on seized digital
21   evidence, such as laptops, desktop computers, mobile devices,
22   sometimes servers and, of course, cloud data that we receive
23   from different ISPs or internet service providers, and also I
24   help with other online investigations or -- yeah,
25   investigations.
```

1  Q.   How long have you been a digital investigative analyst
2  with the Department of Justice?
3  A.   I've been a digital investigative analyst for eight years.
4  Q.   How much of your work pertains to criminal investigations?
5  A.   All of my work.
6  Q.   How much of your work pertains to criminal investigations
7  that involve the sexual exploitation of children?
8  A.   All of my work.
9  Q.   Mr. Tucker, since you've been with the Department of
10 Justice, how many criminal investigations would you say you've
11 worked on?
12 A.   Over -- I've worked on over 50 criminal investigations.
13 Q.   In the course of those more than 50 criminal
14 investigations, approximately how many computers or other
15 digital devices would you say you've analyzed?
16 A.   Thousands.
17 Q.   Different types of devices?
18 A.   Different types of devices, thousands of different types
19 of devices.
20 Q.   What types of devices?
21 A.   Just different hard drives that are removed from laptop
22 computers, desktop computers, and a lot of mobile devices.
23 Q.   Do you have any formal educational background that's
24 relevant to your work as a digital investigative analyst?
25 A.   Yes.  I have a bachelor's degree in computer science.  I

TUCKER - DIRECT EXAMINATION

1   also have a master's degree in high technology crime
2   investigation, which is just a fancy name for computer
3   forensics.  I also have taken several trainings in the field.
4   Q.   What sorts of trainings?
5   A.   I've taken trainings by several of our digital forensics
6   tools, the vendors of our digital forensics tools such as
7   EnCase and Cellebrite.  I've also taken several other forensic
8   trainings such as advanced forensics incident response threat
9   hunting.
10  Q.   Do you have any certifications related to your work as a
11  computer forensic analyst?
12  A.   Yes.
13  Q.   Can you give us some examples of some of the
14  certifications you hold?
15  A.   Yes.  Some of the vendors of our forensics tools in
16  addition to providing trainings, they also provide
17  certifications, and so I've received what's called the ENCE or
18  the EnCase certification which is a certification showing
19  that -- proficiency in using our forensics tools.
20          I've also received certifications through Cellebrite,
21  which is also one of our forensics tools that we heavily use in
22  the field.
23  Q.   In addition to receiving training and certifications, have
24  you provided training to others?
25  A.   Yes.

TUCKER - DIRECT EXAMINATION

1   Q.   Who were in the audiences during those trainings, and what
2   were some of the subject matters?
3   A.   The audiences typically varies from law enforcement from
4   the United States or other international governments.  A lot of
5   sometimes judges and other digital forensic analysts or
6   investigators and trial -- and various different attorneys as
7   well.
8           MR. REYNOLDS:  Your Honor, the Government offers Dero
9   Tucker as an expert in the field of digital and computer
10  forensic analysis.
11          THE COURT:  All right.  Do you wish to cross-examine
12  on this, Mr. Kerr?
13          MR. KERR:  No objection.  No, I do not.
14          THE COURT:  Okay.  I find that he is qualified to
15  render an expert opinion in the field of digital computer as a
16  forensic analyst.  You may proceed.
17  BY MR. REYNOLDS:
18  Q.   All right.  Sir, as a digital investigative analyst with
19  the U.S. Department of Justice, were you assigned to assist in
20  the investigation of the Newstar websites?
21  A.   Yes.
22  Q.   Very briefly, just in a sentence or two, could you tell
23  the jury the role that you played in that investigation?
24  A.   Sure.  So my role initially was to assist with the search
25  and seizure of any digital evidence that was found in Kenneth

TUCKER - DIRECT EXAMINATION

```
1   Power's residence, and once -- after the search and seizure, my
2   role then became -- become -- became conducting a forensic
3   review of the seized evidence.
4   Q.   Mr. Tucker, Special Agent Juede testified that a search
5   warrant took place at the Powers' home in Weston, Florida on
6   November 7th, 2019.  Where were you that day?
7   A.   I was there as well.
8   Q.   Were you inside the Powers' home?
9   A.   Yes.
10  Q.   And did you participate in the execution of that search
11  warrant?
12  A.   Yes.
13            MR. REYNOLDS:  Your Honor, may we publish what has
14  been previously admitted as Government Exhibit 700,
15  specifically page 1?
16            THE COURT:  Is this one you're going to put on that
17  board there?
18            MR. REYNOLDS:  Yes.
19            THE COURT:  Yes, you may do so.
20  BY MR. REYNOLDS:
21  Q.   All right.  Mr. Tucker, could you identify -- have you
22  seen what is on this screen before?
23  A.   Yes.
24  Q.   What is it?
25  A.   That is the Sony All-in-One computer that was found in the
```

TUCKER - DIRECT EXAMINATION

1    residence, in Kenneth Power's residence.

2    Q.   When you were physically within Ken Power's residence, did

3    you see this item?

4    A.   Yes.

5              MR. REYNOLDS:  Could we see page 6 of this same

6    exhibit, Government Exhibit 700?

7    BY MR. REYNOLDS:

8    Q.   Mr. Tucker, do you recognize that item?

9    A.   Yes.

10   Q.   What is it?  And I'm sorry.  There are multiple items in

11   this -- in this -- on the screen right now.  I'm referring to

12   the silver rectangle that reads in part "WD MY PA," and the

13   rest is obscured.  Do you know what that item is?

14   A.   Yes, I do.

15   Q.   What is it?

16   A.   That's the Western Digital My Passport Slim external hard

17   drive.

18   Q.   Did you observe this device when you were in the Powers'

19   home on November 7th, 2019?

20   A.   Yes.

21   Q.   And did you observe it in essentially the condition that

22   it appears on page 6 of Government Exhibit 700?

23   A.   Yes.

24             MR. REYNOLDS:  Could we turn to page 4 of this

25   exhibit, please, Ms. Davis?

TUCKER - DIRECT EXAMINATION

1    BY MR. REYNOLDS:
2    Q.   Mr. Tucker, when you were in the Powers' home on that day,
3    did you see this device as well?
4    A.   Yes, I did.
5    Q.   Did this device contain a Seagate hard drive?
6    A.   Yes.
7    Q.   Mr. Tucker, the three digital items on the photos that
8    I've just shown you, the Sony VAIO All-in-One computer, the My
9    Passport external hard drive, and the Seagate hard drive
10   extracted from page -- the item described in page 4 of
11   Government Exhibit 700, did you conduct a computer forensic
12   analysis of all of those items?
13   A.   Yes, I did.
14   Q.   And Mr. Storey testified about forensic images.  Did you
15   create forensic images of all these devices?
16   A.   No, I did not.
17   Q.   Did you receive forensic images of these devices?
18   A.   Yes.
19   Q.   How do you know that the forensic images you received
20   were -- contained the exact same data as the items that you
21   encountered in Ken and Tatiana Powers' home?
22   A.   So when the -- the -- the -- when the HSI created the
23   forensic images of these devices that were seized from Kenneth
24   Power home, they provided us with an MD5 hash, and so when I
25   received the image copies, I matched the hashes -- the hash

TUCKER - DIRECT EXAMINATION

1   values that they provided me with the image copies that I
2   received.  And so once I determined that those hash values
3   matched, I determined that it was an exact copy or exact match
4   with the original evidence.
5   Q.   Do you recall the names of the HSI personnel who provided
6   you with those hash values?
7   A.   Yes.
8   Q.   What were their names?
9   A.   Justin and -- Justin, Richard Wilkins, and I believe
10  Special Agent Towe.
11  Q.   And is the person you referred to as Justin, is his last
12  name Gaertner?
13  A.   Yes, Justin Gaertner.  Sorry.
14  Q.   All right.  Mr. Tucker, what does it mean to you that the
15  hash values of the items -- of the forensic images you analyzed
16  contains the same hash values as the -- the same hash values
17  that were provided to you by those three HSI agents?
18  A.   Can you repeat for me, please?
19  Q.   Yes.  What does it mean to you that three HSI agents
20  provided you with hash values, and the digital forensic images
21  you analyzed had those exact same hash values?
22  A.   It tells me that the -- the forensics tools that created
23  the image copies created an accurate and exact copy of the hard
24  drives that were removed from the desktop computers.
25  Q.   All right.  Mr. Tucker, I'd first like to ask you some

TUCKER - DIRECT EXAMINATION

1   questions about your examination of the Sony VAIO All-in-One
2   computer that we saw a picture of first.  What, if anything,
3   did you do to analyze that device?
4   A.   Once I received the image copies, I began to import the
5   image copies into several of our forensics tools that I use
6   daily.
7   Q.   What sorts of tools do you use?
8   A.   Some of the tools I use is EnCase.  It's spelled
9   E-n-c-a-s-e.  I also use AXIOM, spelled A-x-i-o-m, and I also
10  heavily use Cellebrite, spelled C-e-l-l-e-b-r-i-t-e.
11  Q.   Mr. Tucker, do you know what QuickBooks is?
12  A.   Yes.
13  Q.   What is QuickBooks?
14  A.   It's a financial or a tax application used to -- to do
15  different operations regarding tax or balancing financial --
16  your financial needs.
17  Q.   When you were conducting your analysis of the Sony VAIO
18  All-in-One computer, did you find any files relating to
19  QuickBooks?
20  A.   Yes, I did.
21  Q.   What sorts of files did you find?
22  A.   There was three different types of files that relate to
23  QuickBooks.  They were all inside of the -- one of the folders,
24  one of the QuickBook folders.
25  Q.   And how did you know they were QuickBook files?

TUCKER - DIRECT EXAMINATION

1   A.   Due to the fact that they were, for one, inside of a

2   folder named "QuickBooks," and also some of the file extensions

3   were QuickBook formats.

4            MR. REYNOLDS:  Your Honor, may I approach the witness

5   to hand him some exhibits, please?

6            THE COURT:  Yes, you may.

7            MR. REYNOLDS:  Thank you.

8   BY MR. REYNOLDS:

9   Q.   Mr. Tucker, I'm handing you a stack of exhibits, and could

10  you please take a look at what has been marked as Government

11  Exhibit 611?  Have you seen Government Exhibit 611 before,

12  Mr. Tucker?

13  A.   Yes.

14  Q.   What is it?

15  A.   It is the -- it's a CD that contains the QuickBook files

16  that I found.

17  Q.   How do you know that that CD contains the QuickBook files?

18  A.   It's a CD that I checked, and also I signed the CD after

19  checking.

20  Q.   Does your signature appear on Government Exhibit 611?

21  A.   Yes, my initials.

22  Q.   Mr. Tucker, does Government Exhibit 611 truly and

23  accurately reflect QuickBook files that you extracted from the

24  forensic image of the Sony VAIO All-in-One computer seized in

25  from the Powers' home?

TUCKER - DIRECT EXAMINATION

1    A.   Yes.

2         MR. REYNOLDS:  Your Honor, we offer Government

3    Exhibit 611 into evidence.

4         THE COURT:  All right.

5         MR. KERR:  No objection.

6         THE COURT:  Thank you.  611 is received into evidence

7    and may be published to the jury.

8    BY MR. REYNOLDS:

9    Q.   All right.  Mr. Tucker, I'd like to turn to the My

10   Passport external hard drive that you mentioned.  How did you

11   get -- how did you conduct your forensic analysis of this

12   device?

13   A.   So I imported the forensic images that were sent -- or

14   provided to me into EnCase or one of the forensic tools that I

15   use and began to start -- to start my forensic analysis.

16   Q.   After you did that, what did you do?

17   A.   I browsed through the file system -- EnCase allows me to

18   identify, browse through the various files and folders on the

19   image copy, and I began to go through a large amount of the

20   files to identify any crimes or any digital evidence that could

21   potentially be related to child exploitation offenses.

22   Q.   Did you find any files or other materials that appear to

23   relate to the Newstar websites?

24   A.   Yes.

25   Q.   What sorts of things did you find?

TUCKER - DIRECT EXAMINATION

1   A.   The large majority of the files were images of minors.  I

2   also found some documents that contained log-in -- what

3   appeared to be log-in information, such as user name and

4   passwords to various websites or services, and also there were

5   a couple of files that relate to different programs or

6   applications.

7   Q.   Mr. Tucker, could you take a look at what has been

8   previously marked as Government Exhibit 601?  Have you seen

9   Government Exhibit 601 before?

10  A.   Yes, I have.

11  Q.   What is it?

12  A.   Government Exhibit 601 is the -- is an exhibit showing the

13  files and folders that are stored on the external hard drive

14  that was -- that was called the Western Digital My Passport

15  Slim.  This is the first list of files and folders that would

16  appear when the computer user accesses the external drive.

17  Q.   Who created Government Exhibit 601?

18  A.   I did.

19  Q.   And how did you create exhibit?

20  A.   Using other forensics tools, I'm able to view the external

21  drive or the image copy of the external drive in a way that a

22  normal computer user would if they were actually sitting at the

23  computer with the external hard drive plugged in.

24  Q.   Mr. Tucker, does Government Exhibit 601 truly and

25  accurately reflect content from the My Passport external hard

TUCKER - DIRECT EXAMINATION

1  drive recovered from Mr. Power's home?

2  A.   Yes.

3        MR. REYNOLDS:  Your Honor, we offer Government's

4  Exhibit 601 into evidence.

5        MR. KERR:  No objection.

6        THE COURT:  601?  All right.  601 is received into

7  evidence and may be published to the jury.

8        MR. REYNOLDS:  Ms. Davis, could we look at page 1 of

9  Government's 601?

10  BY MR. REYNOLDS:

11  Q.   All right.  Mr. Tucker, could you explain what's on the

12  screen on page 1 of Government Exhibit 601?

13  A.   Yes.  So this is the -- the -- so if the computer user was

14  to access the external hard drive, this is a list of files and

15  folders that would first appear.

16  Q.   Does everything within the files and folders on page 1 of

17  Government Exhibit 601 relate to the Newstar websites?

18  A.   No.

19  Q.   Is there any folder that appears on page 1 of Government

20  Exhibit 601 that was particularly relevant to your analysis?

21  A.   Yes.  The 000-bak folder.

22  Q.   Moving on to page 2 of Government Exhibit 601, Mr. Tucker,

23  what does page 2 depict?

24  A.   Page 2 depicts the list of files and folders that are

25  under the folder 000-bak.

**TUCKER - DIRECT EXAMINATION**

1  Q.   Now, Mr. Tucker, within the folder 000-bak, do the files

2  and folders in this -- in this directory primarily relate to

3  the Newstar websites?

4  A.   Primarily, yes.

5  Q.   And in all the subdirectories, do those files and folders

6  also primarily relate to the Newstar websites?

7  A.   Yes.

8         MR. REYNOLDS:  All right.  If we could scroll to

9  pages 4 and 5 of Government Exhibit 601.  And to 5.

10  BY MR. REYNOLDS:

11  Q.   Mr. Tucker, what appears on page 5 of Government

12  Exhibit 601?

13  A.   Page 5 shows a list of files and folders that were in the

14  folder named "Edit."

15  Q.   Is there a folder on this page entitled "████-████████

16  A.   Yes.

17  Q.   Is there a folder on this page entitled "████████

18  A.   Yes.

19  Q.   Is there a folder on this page entitled "█████

20  A.   Yes.

21  Q.   Are these all names that appear in the names of Newstar

22  websites, Mr. Tucker?

23  A.   Yes.

24  Q.   Is there a folder on page 5 of Government Exhibit 601

25  entitled "Casting"?

TUCKER - DIRECT EXAMINATION

1   A.   Yes.

2   Q.   All right.  I'd like to -- I'd like to ask you some more

3   questions about that "Casting" folder in a few minutes, but let

4   me proceed to some other items first.

5            All right.  Looking again at page 5 of Government

6   Exhibit 601, is there a file on this -- on this page entitled

7   2 -- excuse me, "2018.png"?

8   A.   Yes, there is.

9   Q.   Have you ever heard of a filed that ends with .png?

10  A.   Yes.

11  Q.   What is it?

12  A.   The .png is a -- a file extension that designates that

13  it's an image file, similar to a JPEG or JPG file.

14  Q.   By image, do you mean that's like a picture?

15  A.   A picture.

16  Q.   All right.

17           MR. REYNOLDS:  Could we proceed to page 6 of

18  Government Exhibit 061?

19  BY MRE. REY:

20  Q.   Mr. Tucker, what is depicted on page 6?

21  A.   Page 6 depicts a list of minors that were -- that are

22  related to the Newstar websites.

23  Q.   And does page 6 contain the contents of the file you just

24  described that was named "2018.png?

25  A.   Yes.

TUCKER - DIRECT EXAMINATION

1   Q.   Did you find other files on Mr. Power's external hard
2   drive that looked like this?
3   A.   Yes.
4   Q.   Were they all dated 2004 to 2018?
5   A.   Can you repeat the question, please?
6   Q.   Were they all -- di they all relate to the same year?  Did
7   they all look identical?
8   A.   Yes.
9   Q.   Were some of these other -- some of these other files,
10  were they contained within a folder entitled "Galaxy of Stars"?
11  A.   Yes.
12  Q.   All right.  If I refer to this -- this picture on page 6
13  of Government Exhibit 601 as the "Galaxy of Stars", will you
14  understand what I mean?
15  A.   Yes, I would.
16  Q.   All right.  Mr. Tucker, do you recognize the individual
17  minors that are -- appear in small bubbles on page 6 of
18  Government Exhibit 601?
19  A.   Yes, some of them.
20  Q.   Where have you seen them before?
21  A.   On the Newstar websites.
22  Q.   All right.  Proceeding to page 7, is this a blown-up
23  picture taken from the Galaxy of Stars on page 6 of
24  Government 601?
25  A.   Yes.

TUCKER - DIRECT EXAMINATION

1   Q.   And what does this depict?

2   A.   This shows one of the minor's names, one of their -- their

3   Newstar names, which is at the top right corner.  This is just

4   a blown-up or a larger zoomed-in view of the previous exhibit.

5   Q.   And proceeding to page 8, same question, Mr. Tucker.  What

6   is this?

7   A.   From the previous exhibit, which we are calling the Galaxy

8   of Stars, this is a larger view of the minor, which had the

9   stage -- the Newstar name Sweet ███████

10  Q.   And is there anything that appears under the minor's

11  picture on page 8 of Government Exhibit 601?

12  A.   Yes.

13  Q.   What is it?

14  A.   It's a set of numbers which reads 15.12.2011.

15  Q.   What do you understand that set of numbers to be?

16  A.   I believe it's a date.

17  Q.   All right.  Page 9?  Same question, Mr. Tucker.  Is there

18  also a blown-up picture from what we're calling the Galaxy of

19  Stars?

20  A.   Yes.

21  Q.   And what minor does this appear to relate to, or what

22  Newstar website does this appear to relate to, if any?

23  A.   Sweet ████████  or Sweet-███████.com.

24  Q.   Page 10, same question.

25  A.   Again, this is a zoomed-in or blown-up view of the Galaxy

Case 8:21-cr-00342-VMC-SPF   Document 172-2   Filed 11/15/23   Page 100 of 239 PageID 2198

100

TUCKER - DIRECT EXAMINATION

1  of Stars picture we saw in a previous exhibit.  This is zoomed
2  in or highlighting the minor named ███████ or Sweet
3  ███████
4  Q.   And I believe we have one more on page 11.  Can you
5  explain what this is, Mr. Tucker?
6  A.   Yes.  This is the minor with the Newstar name Sweet ███████
7  or Sweet-███.com.
8  Q.   Mr. Tucker, when you were conducting your forensic
9  analysis of the external hard drive recovered from Mr. Power's
10 home, did you find any sexually suggestive or sexually explicit
11 images of minors on that device?
12 A.   Yes, I did.
13 Q.   Proceeding to page 13 of Government Exhibit 601, all
14 right.  Mr. Tucker, is there a folder on this page 13 of
15 Government Exhibit 601 entitled Sweet-███████-001?
16 A.   Yes.
17 Q.   Is there also a -- excuse me, strike the question.
18        What does that -- what does that folder contain?
19 A.   The Sweet-███████-001 contains a number of pictures of a
20 particular minor with the name Sweet ███████
21 Q.   Proceeding to the next page, page 14, what does this
22 depict?
23 A.   So when you access or click on or view the folder with the
24 name Sweet-███████-001, this is the list of files and pictures
25 that were inside of that folder, Sweet-███████-001.

TUCKER - DIRECT EXAMINATION

1   Q.   Proceeding to page 15, could you leave it on for about

2   three seconds and then go back to 14, please?  Is that one of

3   the images that's contained within that Sweet ████ directory

4   on Mr. Power's external hard drive, Mr. Tucker?

5   A.   Yes.

6   Q.   And what Ms. Davis just showed briefly as page 15, is that

7   the same girl who -- does that appear to be the same girl who's

8   featured on the Newstar ████ website?

9   A.   Yes.

10  Q.   Is she also referred to on other Newstar websites as

11  ████

12  A.   Yes.

13  Q.   All right.  Thank you.  If you would, could you take a

14  look at what has been marked as Government Exhibit 602?

15  Mr. Tucker, have you seen Government Exhibit 602 before?

16  A.   I have.

17  Q.   What is it?

18  A.   This is a -- this file with the name 0000NewModels.xls is

19  a spreadsheet that I found on the external hard drive, the

20  Western Digital My Passport Slim hard drive.

21  Q.   Does Government Exhibit 602 truly and accurately reflect a

22  file that you extracted from Mr. Power's Western Digital My

23  Passport external hard drive?

24  A.   Yes.

25           MR. REYNOLDS:  Your Honor, we offer Government

TUCKER - DIRECT EXAMINATION

```
 1   Exhibit 602 into evidence.
 2           MR. KERR:  No objection.
 3           THE COURT:  602 is received into evidence and may be
 4   published to the jury.
 5   BY MR. REYNOLDS:
 6   Q.   Mr. Tucker, what was the name of this -- what was the name
 7   of this document that has been marked as Government
 8   Exhibit 602?
 9   A.   The name of this document is 0000NewModels.xls.
10   Q.   And could you read the -- at least the column headings
11   that have content?  Could you read the column headings to the
12   jury, please?
13   A.   Yes.  There are a number of different columns at the top
14   of this -- of this document.  Starting with the first column is
15   "Model".  The second column is "Site".  Third column is "Name".
16   And the fourth column is "Updates".
17           MR. REYNOLDS:  Ms. Davis, could you go back to the
18   first thing you had blown up, please?  All right.
19   BY MR. REYNOLDS:
20   Q.   Mr. Tucker, under the "Model" column, do you see the word
21   "█████████
22   A.   Yes.
23   Q.   Can you read the other fields that are in the row that
24   contain the word "████████ and specify in which column heading
25   they fall under?
```

TUCKER - DIRECT EXAMINATION

1    A.   Sure.  So the first column labeled "Models", I see the
2    name "████████   To the right of that is the -- under the
3    "Site" column reads Newstar-██████.info.  To the right of that
4    is -- which I believe is the name -- excuse my pronunciation --
5    "██████████████", and that name is under the "Name" column.
6    Q.   Mr. Tucker, could you go through the same exercise with
7    the row that contains the word "████████   in the "Model"
8    column, please?
9    A.   Yes.  So in the -- under the "Model" -- under the "Model"
10   column is the name "████████   To the right of that is the
11   site name, "Sweet-████████.com."  To the right of that is the
12   name "████████████████" which is under the "Name" column.
13   Q.   All right.  Two more quickly, Mr. Tucker.  Do you see the
14   word "████████   Could you go through the same exercise with
15   that one, please?
16   A.   Sure.  Under the "Model" column is the name "████████  To
17   the right of "██████ is -- I lost my place -- is the site Tiny
18   Model-██████.info.  To the right of the site is the "Name"
19   column, and that -- for ██████ that reads "████████████," and
20   in parentheses is the number 11.
21   Q.   Last one, second from the bottom, "████████
22   A.   Under the "Model" column is the name "████████  To the
23   right of the name "██████ is the site Newstar-██████.info.
24   To the right of the site is the name "████████████."
25   Q.   Thank you, Mr. Tucker.  Within the "Name" column, are

TUCKER - DIRECT EXAMINATION

1  there numbers that appear after some of the words that appear
2  in the "Name" column?
3  A.   Yes.
4  Q.   Are any of those numbers 18 or larger?
5  A.   No, not this document, no.
6  Q.   Are all of the numbers that appear after -- that appear in
7  the Name column in this document between 6 and 13?
8  A.   Yes.
9          MR. REYNOLDS:  And, Ms. Davis, if we could briefly go
10  to page 2 of this document?  I think we're having technical
11  difficulties expanding that.
12  BY MR. REYNOLDS:
13  Q.   But, Mr. Tucker, I don't think the jury can see this
14  clearly, but can you just briefly describe -- you don't have to
15  read the whole thing, but can you briefly describe what is
16  depicted on page 2 of Government Exhibit 602?
17  A.   Okay.  On page 2 of the document -- or the file
18  0000NewModels.xls, there are -- there is a -- what I believe is
19  a column named "Old Models," and under the column "Old Models"
20  is a number of rows, such as "███████ -- "Old ███████ "Old
21  ███████ "Old ███████ "Old ███████ and to the right of those
22  names it appears to be actual minors' first and last names, in
23  which some of those last names also have a digit behind it.
24  Q.   All right.  Thank you, Mr. Tucker.
25          If you could take a look at what has been marked as

TUCKER – DIRECT EXAMINATION

1    Government Exhibit 605, please?  Is it in front of you?

2    A.   Yes.

3    Q.   Oh, thank you.  Mr. Tucker, Government Exhibit 605.  Have

4    you seen this exhibit before?

5    A.   Yes, I have.

6    Q.   What is it?

7    A.   It is a document that I found on the external hard drive,

8    the Western Digital My Passport external hard drive named

9    BanksForPayingPeople2.rtf.

10   Q.   And what is an rtf file?

11   A.   It's another type of document file.

12   Q.   I'm sorry.  Go ahead.

13   A.   Sorry.  It stands for -- rtf stands for rich text format.

14   It's similar to a .doc or a .doc file that you will see if you

15   use Word, Microsoft Word.  It's another type of document file.

16   Q.   Can you use Microsoft Word to open up an rtf file?

17   A.   Yes, you can.

18   Q.   Mr. Tucker, does Government Exhibit 605 truly and

19   correctly reflect a document that you recovered from

20   Mr. Power's My Passport external hard drive?

21   A.   Yes.

22            MR. REYNOLDS:  Your Honor, we offer Government

23   Exhibit 605 into evidence.

24            MR. KERR:  No objection.

25            THE COURT:  All right.  605 is received into

1   evidence, may be published to the jury.

2   BY MR. REYNOLDS:

3   Q.   All right.  Mr. Tucker, again, what was the -- what was

4   the title of this document as you encountered it on Mr. Power's

5   hard drive?

6   A.   BanksForPayingPeople2.rtf.

7   Q.   And earlier you testified that Mr. Power's hard drive

8   contained a folder entitled I believe 000-bak; is that correct?

9   A.   A folder, yes.

10  Q.   And, again, did you testify that primarily the folders,

11  files and folders within that directory related to the Newstar

12  websites?

13  A.   Yes.

14  Q.   Where did you encounter the document that is marked as

15  Government Exhibit 605?

16  A.   I found this file in the same -- in the folders that were

17  also -- which -- I found this document in folders that also

18  contained some of the Newstar content files and folders.

19          MR. REYNOLDS:  All right.  All right.  Ms. Davis,

20  could you blow up the section, full paragraph from the top

21  beginning with "account number"?  Just further up.  Thank you.

22  All right.

23  BY MR. REYNOLDS:

24  Q.   Mr. Tucker, do you see a line that is currently blown up

25  on Government Exhibit 605, page 1, that reads "Legal Name"?

TUCKER - DIRECT EXAMINATION

1  A.   Yes.

2  Q.   Could you read that into the record, please?

3  A.   Yes.  Pardon if I pronounce this incorrectly.  After

4  "Legal Name" is the name "Klenin Anton Iurevich".

5  Q.   And at the very, very bottom of what is blown up, could

6  you read that as well?

7  A.   Postal code?

8  Q.   Just the last line.

9  A.   "Anton Klenin".

10          MR. REYNOLDS:  Thank you.  Ms. Davis, if we could go

11  to what you originally had blown up, please?

12  BY MR. REYNOLDS:

13  Q.   Okay.  Mr. Tucker, what has been blown up here, could you

14  read the first top -- top two lines that appear in the blown-up

15  segment?

16  A.   Yes.  This begins with "Plamen:"  Right below that is

17  "4:DSK Bank PLC, Sofia, Bulgaria."

18  Q.   And a little bit further down, do you see the line "in

19  favor"?

20  A.   Yes.

21  Q.   Could you read that as well and the next line?

22  A.   Yes.  After, "In favor," reads, "Plamen Georgiev Velinov."

23  Below that reads, "Town, Sofia."

24  Q.   And below that, does it -- what appears below that?

25  A.   It appears to be an address.

TUCKER - DIRECT EXAMINATION

1   Q.   And does it mention the country and city?

2   A.   Yes.

3   Q.   What are those?

4   A.   Sofia, Bulgaria.

5   Q.   Further down just a bit, do you see the line that says

6   "account"?

7   A.   Yes.

8   Q.   What appears after that?

9   A.   The number "12068793".

10       MR. REYNOLDS:  And then, Ms. Davis, if you could blow

11  up a little bit down, I believe there is a line that begins

12  with "Mobile" on page 2.

13  BY MR. REYNOLDS:

14  Q.   And can you read that into the record too, Mr. Tucker?

15  A.   Yes.  It reads, "Mobile 359885451245."

16  Q.   Mr. Tucker, have you reviewed this document, Government

17  Exhibit 605, in its entirety?

18  A.   Yes.

19  Q.   Is there anyone else named Plamen referred to in this

20  document other than Plamen Georgiev Velinov?

21  A.   No.

22       MR. REYNOLDS:  Your Honor, I'm at a natural stopping

23  point.  I'm happy to keep going.  I just want to --

24       THE COURT:  Well, we can stop.  It's a little bit

25  early.  I don't know if the jurors' lunch is here yet, so --

TUCKER - DIRECT EXAMINATION

1           MR. REYNOLDS:  I can keep going.

2           THE COURT:  So you need to keep going, yeah, because

3    it's normally 12:00.

4           MR. REYNOLDS:  All right.

5    BY MR. REYNOLDS:

6    Q.   Mr. Tucker, back when we were looking at Government

7    Exhibit 601, you identified folder on the My Passport external

8    hard drive entitled "Casting"; is that correct?

9    A.   Yes.

10   Q.   Would you take a look at Government Exhibit 606?  Have you

11   seen this exhibit before?

12   A.   Yes.

13   Q.   What is it?

14   A.   It is an exhibit showing the files and folders stored

15   under the folder "Edit", and this is, again, on the external

16   hard drive named Western Digital My Passport Slim.

17   Q.   Who created Government Exhibit 606?

18   A.   I did.

19   Q.   How did you create it?

20   A.   Using forensics tools, I was able to take the image files

21   that were provided to me and view the contents of the external

22   drive as a normal user -- normal user would if they were

23   sitting at the actual computer.

24   Q.   Mr. Tucker, does Government Exhibit 606 truly and

25   accurately reflect the contents of certain portions of that My

TUCKER - DIRECT EXAMINATION

1   Passport drive seized from Mr. Power's home?

2   A.   Yes.

3          **MR. REYNOLDS:**  Your Honor, we offer Government

4   Exhibit 606 into evidence.

5          **MR. KERR:**  No objection.

6          **THE COURT:**  All right.  It's received into evidence,

7   may be published to the jury.

8   BY MR. REYNOLDS:

9   Q.   All right.  Mr. Tucker, on page 1 of Government

10  Exhibit 606, what does this depict?

11  A.   This depicts the contents, the files and folders stored

12  under the folder "Edit" found on the external hard drive.

13  Q.   And do you see the "Castings" folder on page 1 of 606?

14  A.   Yes.

15  Q.   Can we turn to page 2 of Government Exhibit 606?  What

16  does page 2 of Government Exhibit 606 depict?

17  A.   Page 2 is -- so on our previous exhibit, there was a

18  folder named "Casting".  This is the contents of that folder

19  named "Casting".

20  Q.   Is there a folder that appears on page 2 of Government

21  Exhibit 606 entitled "!Castings"?

22  A.   Yes.

23  Q.   Is there another entitled "Old Castings"?

24  A.   Yes.

25  Q.   Is there another that appears to read "Newest

1    CSTINGS-School"?

2    A.    Yes.

3    Q.    How about "Next Models"?

4    A.    Yes.

5    Q.    Are there certain others that contain word "Casting" and

6    what appears to be a date?

7    A.    Yes.

8    Q.    All right.  Moving to page 3 of Government Exhibit 606 and

9    then page 4.  What is depicted on pages 3 and 4 of Government

10   Exhibit 606, Mr. Tucker?

11   A.    Pages 3 and 4 depicts the contents of the folders that

12   have the name "!Castings" and also "!New Castings".

13   Q.    And generally speaking, what appears -- what sorts of

14   files are contained within these folders that are viewable on

15   pages 3 and 4 of Government Exhibits 606?

16   A.    Pictures.

17   Q.    Pictures of what?

18   A.    Minors.

19   Q.    Could we turn to the page 5 of Government Exhibit 606?

20   All right.  Mr. Tucker, what is on page 5 of Government

21   Exhibit 606?

22   A.    So this is -- this exhibit is showing the files and

23   folders stored under the folder "Assigned".  In the previous

24   exhibit, there was a folder named "Castings", and within that

25   folder was an additional folder named "Old Castings", and

**TUCKER - DIRECT EXAMINATION**

1    within "Old Castings", there was another -- or additional

2    folder named "Assigned".  So this is the list of folders --

3    files and folders stored under the folder "Assigned".  At the

4    very top, you can see the file path.

5    Q.   Mr. Tucker, do you see a folder on page 5 of Government

6    Exhibit 606 entitled "███████████████"?

7    A.   Yes.

8    Q.   Do you see another one entitled "███████████████"?

9    A.   Yes.

10   Q.   Have you heard those names before?

11   A.   Yes, I have.

12   Q.   Where have you heard them?

13   A.   They were names that were listed and documented in the --

14   one of the previous exhibits, the 000NewModels.xls file.

15        MR. REYNOLDS:  Ms. Davis, could we switch back to

16   page 1 of Government Exhibit 602 already admitted?

17   BY MR. REYNOLDS:

18   Q.   Mr. Tucker, when you said one of the previous exhibits,

19   "000NewModels," is Government Exhibit 602 what you were

20   referring to?

21   A.   Yes.  I -- I believe I left off a 0 in the file name, but

22   this is the document I was referring to, 0000NewModels.xls.

23   Q.   Again, in the "Name" column, do you see "███████████

24   ██████"?

25   A.   Yes.

TUCKER - DIRECT EXAMINATION

1   Q.   Do you see "█████████████████"?

2   A.   Yes.

3              MR. REYNOLDS:  All right.  Ms. Davis, if we could go

4   back to page 5 of Government Exhibit 606, please, and then

5   forward to page 6.

6   BY MR. REYNOLDS:

7   Q.   Mr. Tucker, what is this?

8   A.   Within the "Assigned" folder that we were looking at in a

9   previous exhibit, there was an additional folder named

10  ███████ -- sorry -- "█████████████", and this exhibit is

11  showing the contents of that folder.

12  Q.   Could we proceed to page 7?  What is this?

13  A.   This is showing the one of the images that were located

14  and stored in the "████████████" folder from the previous

15  exhibit.

16  Q.   Does this appear to be the same girl who's featured on the

17  Newstar ██████ website?

18  A.   Yes.

19  Q.   And is she -- does it appear to be the same girl who's

20  referred to on certain Newstar websites as ████████

21  A.   Yes.

22  Q.   If we could proceed to page 7, please?  Same question,

23  Mr. Tucker.  What is this?

24  A.   Within the "Assigned" folder, there was also the folder

25  named "███████████████", and this is showing the contents

**TUCKER - DIRECT EXAMINATION**

1   of the folder "███████████████████".

2   Q.   And if we can proceed to the next page, page 9, please?

3   What is this?

4   A.   This is -- this exhibit is showing one of the photos or

5   one of the pictures that was stored under the folder "███████

6   ███████████████".

7   Q.   And does this appear to be the same girl who is featured

8   on the "Sweet ███████████ website?

9   A.   Yes.

10  Q.   Mr. Tucker, if we could proceed to -- sorry, Ms. Davis, if

11  we could proceed to page 10 of this Government Exhibit 606,

12  please?

13  BY MR. REYNOLDS:

14  Q.   Again, Mr. Tucker, what is this?

15  A.   This is a -- an exhibit showing the list of files and

16  folders stored under the folder "Girls".

17  Q.   And what are the -- what is the -- what is the -- could

18  you give us a fuller file name?  Could you read the folder

19  names that appear after "Edit" in the folder structure?

20  A.   Yes.  So there are several folders contained -- the folder

21  "Girls" was located in -- had several parent folders or folders

22  before it.  So after -- within the "Edit" folder, there was a

23  folder named "Casting".  Within that folder, was a folder named

24  "Newest STINGS-Schools", which I believe to -- may be a typo

25  for the word castings.  And within that folder was an

TUCKER - DIRECT EXAMINATION

1   additional folder name "Casting", and lastly within that folder
2   "Casting" was an additional folder named "Girls", which is what
3   we're looking at in this current exhibit.  This is the content
4   of the folder "Girls".
5           THE COURT:  Okay.  I know it's not a great time to
6   break, but it's noon, and the jurors' food is here, so we're
7   going to go ahead and take our lunch break, ladies and
8   gentlemen.  Please remember not to discuss the case or form any
9   opinions until you've heard all the evidence.  We'll see you
10  back here a little bit after 1:00.
11          (Jury out at 12:00 p.m.)
12          THE COURT:  Okay.  Thank you.  We'll see you back
13  here at 1:00.
14          (Recess from 12:00 p.m. to 1:00 p.m.)
15          THE COURT:  Okay.  Let's see.  I think we're still
16  waiting for the translators.
17          MR. REYNOLDS:  Your Honor, may I raise one issue
18  before we begin?
19          THE COURT:  Sure.  Of course.
20          MR. REYNOLDS:  My colleagues have noticed that some
21  of the jurors appear to be squinting at the screen.  When they
22  come back in, would it be possible for Your Honor to inquire
23  whether they can see the screen?  I'm not sure there's a lot we
24  can do, but I don't want to have evidence shown that they can't
25  see.

TUCKER - DIRECT EXAMINATION

```
 1            THE COURT:  Okay.
 2            MR. REYNOLDS:  Thank you.
 3            THE COURT:  Uh-huh.  Remind me if for some reason I
 4    forget.
 5                 Yes, Mr. Kerr?
 6            MR. KERR:  I'm going to forego that other issue about
 7    getting testimony from that expert.  When we get to the
 8    charging conference, I'll deal with it then.
 9            THE COURT:  Okay.
10            MR. KERR:  Okay.
11            THE COURT:  All right.  Let's see.  We've got the
12    witness there.  We've got the translators here.  We all ready
13    to go then?  And so when we resume -- let's see.  You finished
14    your direct exam?  I can't remember if you did or not.
15            MR. REYNOLDS:  No, Your Honor.
16            THE COURT:  You're still on it.  Okay.  All right.
17    So we'll bring the jury in.  Thank you.
18                 (Jury in at 1:02 p.m.)
19            THE COURT:  All right.  Welcome back, ladies and
20    gentlemen.  Couple of things.  I just want to make certain that
21    when an exhibit is put up, everybody can see it on the board
22    there, on that -- all right.  If you can't see it, please speak
23    up.
24                 And the lawyers are moving at a good clip, so
25    we'll be finished earlier than what we thought.  So I think
```

1   during the time of jury selection, I said around Thursday or

2   so.  We will be finished before that, all right?  Maybe -- you

3   know, my guess is Tuesday, if not sooner.  Okay?

4               All right.  So you may continue with your direct

5   examination of the witness.  I remind the witness you're still

6   under oath.  Do you understand that?

7               THE WITNESS:  Yes, I do.

8               THE COURT:  Okay.  You may proceed.

9               MR. REYNOLDS:  Thank you, Your Honor.

10  BY MR. REYNOLDS:

11  Q.   All right.  Mr. Tucker, I believe we were discussing

12  Government Exhibit 606.

13              MR. REYNOLDS:  And, Ms. Davis, could we put

14  Government Exhibit 606, page 10?  Government Exhibit 606 has

15  already been admitted.

16  BY MR. REYNOLDS:

17  Q.   Mr. Tucker, do you have Government Exhibit 606 in front of

18  you?

19  A.   Yes, I do.

20  Q.   And could you tell the jury what is depicted on page 6 of

21  Government Exhibit -- excuse me, page 10 of Government

22  Exhibit 606?

23  A.   Yes.  This is the contents of the folder "Girls", which

24  is -- the folder "Girls" is located under the "Casting" folder.

25  Q.   And as a reminder, Mr. Tucker, the other pages of

**TUCKER - DIRECT EXAMINATION**

```
1    Government's 606 that you've testified about so far, do they
2    appear to relate to issues related to casting?
3    A.    Yes.
4    Q.    All right.  Mr. Tucker, on page 10 of Government
5    Exhibit 606, do you see a folder entitled "███████  or "██████
6    ███████  11 New"?
7    A.    Yes.
8    Q.    How about a folder entitled "██████████████  8"?
9    A.    Yes.
10   Q.    And a folder "████████████████  New"?
11   A.    Yes.
12   Q.    All right.  Proceeding to the next page, page 11 of
13   Government Exhibit 606, what is depicted on this page,
14   Mr. Tucker?
15   A.    Within the folder "Girls" was an additional folder named
16   ███████ -- "████████████  11", and in parentheses is the word
17   "New", and this is the contents of that folder.
18   Q.    And generally speaking, what do the contents depict?
19   A.    The contents of the -- of this folder, the "████████████
20   11 New" folder, this folder contains 11 photos.
21   Q.    Can we proceed to page 12, the final picture in Government
22   Exhibit 606, the final page?  Mr. Tucker, what does page 12,
23   Government Exhibit 606 depict?
24   A.    Within that particular folder, the previous folder "Girls"
25   that we saw in the previous exhibit, there was a folder named
```

TUCKER - DIRECT EXAMINATION

1    "████████████" with a number 8, and this is the contents of

2    that folder named "████████████ 8" containing a number of

3    pictures and a zip file.

4    Q.   Terrific.  Thank you.

5         MR. REYNOLDS:  Ms. Davis, you can take that down.

6    BY MR. REYNOLDS:

7    Q.   Mr. Tucker, changing gears a bit with you, have you ever

8    heard of a computer program called ICQ, like the letters, ICQ?

9    A.   Yes.

10   Q.   What is it?

11   A.   ICQ is a messaging or a chat application that you can

12   install on your computer which allows you to communicate with

13   other users on the ICQ network.

14   Q.   Have you used it before?

15   A.   Yes.

16   Q.   Are you familiar with the way it works?

17   A.   Yes.

18   Q.   Is ICQ in common use today?

19   A.   No.  It's -- it was -- I would say ICQ was really popular

20   in the early 2000s.

21   Q.   Did you find any files associated with the ICQ program on

22   Mr. Power's My Passport external hard drive?

23   A.   Yes, sir.

24   Q.   How did you know they were ICQ files?

25   A.   I knew they were ICQ files due to personal experience of

TUCKER - DIRECT EXAMINATION

1    using the tool -- using the messaging application, and also due
2    to the fact that the files were in a folder under a folder
3    named "ICQ."
4    Q.   What sorts of files related to the program ICQ did you
5    locate on Mr. Power's external hard drive?
6    A.   There were a number of files under the folder "ICQ."  Most
7    of the -- a lot of the files relate to the functionality of the
8    program.  Additionally, there were -- there was a database file
9    on -- within the folder, the "ICQ" folder, which contained chat
10   messages.
11   Q.   When you're using the -- in your experience, Mr. Tucker,
12   when you're using the ICQ program and you're chatting or
13   texting with another person, are those -- are those
14   communications saved somewhere?
15   A.   Yes.
16   Q.   Where?
17   A.   They were -- the chat messages, or the ICQ chat messages
18   that you send and receive were saved or are saved in a database
19   file, ICQ database file.
20   Q.   Is that the same kind of database file that you located on
21   Mr. Power's My Passport external hard drive?
22   A.   Yes.
23   Q.   Did you open that database file up?
24   A.   I did.
25   Q.   What did it contain?

TUCKER - DIRECT EXAMINATION

1   A.   The database file contained primarily sent and received
2   messages or text messages or chat messages sent and received
3   use the ICQ program.
4   Q.   Did you need to do anything to review these ICQ messages
5   in this database file in a more easily readable format?
6   A.   Yes.  I had to find an application or a tool that
7   understands the way the ICQ program stores data within the
8   database and import or open that database, that ICQ database
9   file into the ICQ chat viewer program.
10  Q.   Did you, in fact, use this -- use this to create a more
11  easily readable version of these ICQ chats?
12  A.   Yes.
13  Q.   So, Mr. Tucker, how do you know that this more easily
14  readable version of the ICQ chats was a true and accurate
15  reflection of the ICQ chats in the database file on Mr. Power's
16  hard drive?
17  A.   So there were a number of applications that are able to
18  open ICQ database files and display the sent and received chat
19  messages.  I used multiple applications to do that.  I used
20  multiple applications to view the sent and received chat
21  images, and both applications presented the same amount of
22  data, the same sent and received messages.
23  Q.   When you used these applications to create a more easily
24  readable version of the ICQ chats, did you also compare them
25  against the open database file?

TUCKER - DIRECT EXAMINATION

1    A.    The messages, yes.

2    Q.    And what did you find?  Did you find any differences

3    between the two?

4    A.    No.  I picked random or a select number of messages and

5    compared those messages that I found using the ICQ viewer with

6    the actual database files, so I could open -- I could open a

7    database file in Notepad to view the chat messages as well.

8    It's just not as clean, which is the purpose of using a viewer,

9    a specialized viewer, but I was able to find the same messages

10   that -- that I identified using the ICQ viewer program.  I was

11   able to see some of those same messages in the database file

12   accessing it manually as well.

13   Q.    Mr. Tucker, once you finished all the work that you've

14   just testified to, did you review the chats in the more easily

15   readable ICQ viewer?

16   A.    Yes.

17   Q.    Who do they appear to be between?

18   A.    They appear to be between an individual who was identified

19   as Ken and a number of other ICQ users who in the contact list

20   was listed as user name Plamen, a user name -- I believe it was

21   pronounced Sergei, and another user named Anton.

22   Q.    How did you determine that there was a user named Ken, a

23   user named Plamen, et cetera?

24   A.    The ICQ viewer was able to export or present a contact

25   list, so all of your -- also known as a contact list, also

TUCKER - DIRECT EXAMINATION

1   known as sometimes, depending on the application, a buddy list.

2   It's -- so that the viewer was able to export the contact list

3   which contained ICQ user names that the user identified as Ken

4   added to their buddy list or their contact list.

5         I also read all of the chat messages and reviewed the

6   flow of the conversation, and a lot of messages would usually

7   begin with some sort of greeting, such as "Hi, Ken," or,

8   "Hello, Ken."  "Hello, Kenneth," or, "Hi, Plamen."

9   Q.   Mr. Tucker, if you could please take a look at what is --

10  should be in front of you and marked as Government Exhibit 608.

11  A.   Yes.

12  Q.   Have you seen Government Exhibit 608 before?

13  A.   Yes, I have.

14  Q.   What is it?

15  A.   It is the chat messages that were extracted from the ICQ

16  database file that we -- that I found on the Western Digital

17  external hard drive.

18  Q.   Is -- Government Exhibit 608, did you modify it in any way

19  from its original form?

20  A.   Once it was -- yes.  Once it was exported out of -- using

21  the tool, I exported the chat messages in the format here, and

22  in order to be able to better identify the sent and received

23  messages, I color coded the sent and received messages to

24  better -- I'm sorry, to better see visually which messages were

25  sent and received.  So I -- all the messages that were sent, I

TUCKER - DIRECT EXAMINATION

1  changed that -- those text messages to red, and all of the
2  received messages, meaning all the messages that were sent to
3  the user that was identified as Ken, will be in black.
4  Q.   When you say you color coded the sent and received
5  messages, do you mean that you personally determined which ones
6  were sent and which one were received and changed those
7  messages?
8  A.   No.  So within the ICQ chat application, you're able --
9  before it exports the messages out, you're able to tell the
10  application which color do you want it to show the sent
11  messages and which color do you want to represent the received
12  messages, and so I chose colors that were easier on the eyes,
13  easily to view with certain -- with a background.
14  Q.   This color coding process you've just described,
15  Mr. Tucker, is it fair to describe this as an automated
16  process?
17  A.   Yes.
18  Q.   All right.  Mr. Tucker, is Government Exhibit 608 -- other
19  than what you've -- the color coding process that you've just
20  described, is the content within Government Exhibit 608 a true
21  and correct copy of the messages within the ICQ database file
22  on Mr. Power's computer?
23  A.   Yes.
24  Q.   Excuse me, on his external hard drive?
25  A.   Yes.

TUCKER - DIRECT EXAMINATION

1   Q.   Did you change any of the content of any messages?

2   A.   No.

3   Q.   Did you change sent messages to received or vice versa?

4   A.   No.

5   Q.   Did you change anything other -- about this other than

6   what you've testified to today?

7   A.   No.

8             MR. REYNOLDS:  Your Honor, we'll offer Government

9   Exhibit 608 into evidence.

10            MR. KERR:  No objection.

11            THE COURT:  608 is received into evidence, may be

12  published to the jury.

13  BY MR. REYNOLDS:

14  Q.   Mr. Tucker, if you could take a look at what should be

15  before you marked as Government Exhibit 608A, please.

16  Mr. Tucker, have you seen Government Exhibit 608A before?

17  A.   I have.

18  Q.   What is it?

19  A.   This is some of the chat messages that were -- that I

20  identified or that were extracted from the ICQ database.

21  Q.   And when you say some of the chat messages, is this

22  identical in every respect to 608A -- or excuse me, 608?

23  A.   Not necessarily identical.  This is chat messages for some

24  of the users that the person identified as Ken was

25  communicating with.

TUCKER - DIRECT EXAMINATION

1   Q.   Is 608 in the nature of a selection of material from
2   Government Exhibit -- or excuse me, is 608A in the nature of a
3   selection of material from Government's 608?
4   A.   Yes.
5   Q.   Did you -- did you make any other alterations,
6   highlighting material, that sort of thing?
7   A.   Yes, I -- in this exhibit, 608A, I highlighted some
8   messages that I found interesting to pertain to the case.
9   Q.   And how did you highlight them?
10  A.   I used a -- within Adobe Acrobat application, I'm able to
11  box -- or put a border around certain messages, and so certain
12  messages that were -- that stood out to me or I found
13  interesting or to be digital evidence, I put the border, a
14  gold -- or kind of like a dark brown or gold border around
15  those messages.
16  Q.   Those borders were not in the original -- in the original
17  evidence, correct?
18  A.   Correct.
19          MR. REYNOLDS:  Your Honor, we offer Government
20  Exhibit 608A into evidence.
21          MR. KERR:  No objection.
22          THE COURT:  608A is received into evidence and may be
23  published to the jury.
24          MR. REYNOLDS:  If we can turn to page 1 of 608A?
25  BY MR. REYNOLDS:

TUCKER - DIRECT EXAMINATION

1   Q.   Mr. Tucker, can you describe what is just very briefly the
2   header or the top of the page 1 of Government's 608A?
3   A.   Yes, the header reads "Hit 3 for Anton DDD - 603012971
4   Top."
5   Q.   And what does Anton DDD refer to?
6   A.   It refers to a user that was -- that -- in communications
7   with Ken, a user identified as Ken.
8           MR. REYNOLDS:  All right.  And if we could take that
9   down and focus on the third box -- excuse me, the first box.
10  My apologies.
11  BY MR. REYNOLDS:
12  Q.   These boxes, Mr. Tucker, for example, that appear red
13  around the highlighted -- the first two messages that Ms. Davis
14  has highlighted, is that what you were referring to when you
15  described boxes or highlighting that you added?
16  A.   Yes.
17  Q.   All right.  Mr. Tucker, could you read these first two
18  messages into the record, please?
19  A.   Yes.  So the first message that appears in black is a
20  received message, meaning the message was sent to a user
21  named -- a user who is often identified as Ken.  That message
22  reads, "Hello -- hello, Ken."  Below that is a -- in the
23  message in red, which is a sent message, which means the user
24  identified as Ken sent that message to the user named Anton
25  DDD.  That message reads, "Hi."

TUCKER - DIRECT EXAMINATION

1  Q.   On the basis of this, Mr. Tucker, I think you've
2  already -- you may have already answered this, but just to be
3  clear, did you reach a conclusion as to whose messages appear
4  in red in Government Exhibit 608?
5  A.   Yes.
6  Q.   Who is that?
7  A.   The user who is identified as Ken.
8  Q.   I'm sorry, go ahead.
9  A.   Oh, user who is identified as Ken and oftentimes also
10 Kenneth.
11 Q.   And did you reach a conclusion as to whose messages appear
12 in black?
13 A.   Yes.
14 Q.   And who would that be?
15 A.   In this -- in this exhibit, the messages that appear in
16 black is a user named Anton DDD.
17        MR. REYNOLDS:  Would you highlight the second box on
18 Government's 608A?
19 BY MR. REYNOLDS:
20 Q.   Can you read those messages into the record too,
21 Mr. Tucker?
22 A.   Yes.  These two messages highlighted are sent messages,
23 and the first message reads, "I like ▆▆▆▆ too, if Plamen
24 agrees."  And there are several -- sometimes there are typos in
25 some of these messages, so I'm going to read it the best I can.

TUCKER - DIRECT EXAMINATION

1              The second message reads, "I like ▮▮▮▮ too.  If

2    Plamen likes it, I'll put sets there."

3    Q.   Thank you, Mr. Tucker.  And that's an important point.  If

4    I ask you to read something and it contains a misspelling, can

5    I ask you to just read what you believe that misspelling to

6    mean?

7    A.   Yes.

8    Q.   Thank you.  And then in the final box on page 1 of

9    Government Exhibit 608A.

10   A.   The message here which is -- shows -- which appears in

11   black is a received message, meaning the user Anton DDD sent

12   the message to the user Ken.  This message reads, "Plamen says

13   that she made $5,000 without updates for a year."

14   Q.   All right.  Mr. Tucker, in this back and forth on page 1

15   of Government Exhibit 608A, is it fair to say that both the

16   user identified as Ken and the user identified as Anton refer

17   to a person named Plamen by name?

18   A.   Yes.

19   Q.   And do they refer to him in the third person as if he's

20   not part of that conversation?

21   A.   Yes.

22   Q.   All right.  If we could go to page 2 of Government

23   Exhibit 608A, could you explain, just as you did before, the

24   information that appears at the top of page 2 of

25   Government's 608A?

TUCKER - DIRECT EXAMINATION

1  A.   Yes.  At the top of this exhibit, it reads, "History for
2  Plamen - 585708941 Top."
3  Q.   And below that, please?
4  A.   Yes.  The first -- there are several rows here.  In the
5  first box of this table, it reads "UIN" which is -- which
6  represents the -- this user's ICQ unique identifier number,
7  which is -- and that number is 585708941.  Next to that box is
8  the nickname box, which reads "Plamen", and the other boxes
9  here are not filled out.
10 Q.   And so, Mr. Tucker, we're on page 2 of 37 of Government
11 Exhibit 608A.  Does every other page -- other than page 1, does
12 every other page of Government Exhibit 608A fall below the line
13 that says nickname "Plamen" and "History for Plamen"?
14 A.   Yes.
15 Q.   And of all the pages that fall below "History for Plamen",
16 do the people who are speaking in this chat ever refer to
17 Plamen in the third person as if he's not present?
18 A.   No, not in this chat.
19 Q.   All right.
20        MR. REYNOLDS:  Could we jump ahead to page 13 of
21 Government Exhibit 608A?  And, Ms. Davis, if you could blow up
22 the box here.
23 BY MR. REYNOLDS:
24 Q.   All right.  Mr. Tucker, could you read the first line?
25 A.   Yes.  The first line is a received -- it's a received

TUCKER - DIRECT EXAMINATION

1  message, and it reads, "No, we don't need it.  There is an open
2  ticket there since May 1st.  Read it."
3  Q.   And then if you could go and read three lines from the
4  bottom.  Could you read those three lines?
5  A.   Three -- yes.  The lines -- the first line reads, "No, we
6  don't need it, as I already said above."  Below that reads,
7  "Plamen, 6:36 p.m.  No, we don't need it.  There is an open
8  ticket there since May 1st.  Read it."
9  Q.   Is that last line identical to the first line?
10 A.   Yes.
11 Q.   What -- what does it appear to you is going on here?
12 A.   Since both of these messages are received messages,
13 meaning the user who is identified as Plamen in this chat log,
14 since both of these messages are received messages, it appears
15 that the message -- the messages -- the last -- the last
16 message at the bottom was a copy and paste of the first message
17 due to the fact that the name Plamen and the time is listed
18 there.
19 Q.   So how do you -- do you have an understanding of the
20 significance of "Plamen 6:36 p.m." in the second to the last
21 line?
22 A.   Yes.
23 Q.   What is that?
24 A.   That shows that it's showing the user's who sent this
25 message ICQ name and the time that they sent that message.

TUCKER - DIRECT EXAMINATION

1    Q.   Does that appear to be part of the copy and paste that you
2    refer to?
3    A.   Yes.
4    Q.   And does that mean to you, Mr. Tucker, that the person who
5    Ken is communicating with is identified as Plamen on his own
6    computer screen?
7    A.   Yes.
8    Q.   Let me direct your attention to one more thing.  Are there
9    any -- was there anything in Government -- page 13 of
10   Government Exhibit 608A that appears to reflect a date?
11   A.   Yes.
12   Q.   Could you identify that date, please?
13   A.   So next to -- so on the far left-hand side of this exhibit
14   is, of course, the ICQ number for Ken.  Next to each of those
15   numbers -- or next to each message is a date and a time.  And
16   for this set of messages, the date appears to be in what's be
17   considered European date format, which is usually formatted
18   with the day of the month followed by the month, then year.  So
19   this would represent the 23rd day of May of 2017.
20   Q.   All right.  Mr. Tucker, I believe you testified that
21   Government Exhibit 608A contains selections from
22   Government's 608; is that correct?
23   A.   Yes.
24   Q.   Does every page of 608A depict a continuous conversation
25   from beginning to end?  When a page turns over from one page to

TUCKER - DIRECT EXAMINATION

1  another, does that necessary depict the same circumstance?

2  A.   Yes.

3  Q.   It necessarily does?

4  A.   This is all messages between Ken and Plamen.  This is a

5  continuation with each.

6  Q.   All right.  If we could turn to page 4 of Government

7  Exhibit 608A.  All right.  Mr. Tucker, could you read these

8  communications into the record, please?

9  A.   Could you repeat that for me, please?

10 Q.   I'm sorry.  Could you read -- I'm directing your attention

11 to page 4 of Government Exhibit 608A.  Could you read this

12 conversation -- this chat conversation into the record, please?

13 A.   Yes.  So the messages -- the first four messages are

14 received messages, and they read, "The latest videos are

15 prepped.  Very uninteresting.  Of all models, the same kind of

16 crap, the same outfit."

17        The user Ken sent the next message which reads,

18 "Well, I have 11, one at clip, so a mail will go out announcing

19 the new suit, and I'll put six up at site till we get more."

20 The next message, which is a -- which is an incoming message

21 reads, "Some stupid dress," followed by, "I have to send the

22 donation money.  I did try to tell Daniel.  Got no response.

23 It is like we got the same video multiplied like 20 times for

24 each model ordered lately, and it couldn't be worse as outfit

25 really.  Same shit skirt."  And the last message reads, "Does

TUCKER - DIRECT EXAMINATION

1   Anton have log in to get the -- to get the sets to make
2   designs?"
3   Q.   All right.  Mr. Tucker, turning to page 5 -- well, let me
4   ask you a question first.  Did you reach a conclusion as to --
5   from Government -- from pages 2 through the end of Government
6   Exhibit 608A, did you reach a conclusion as to whose
7   communications appear in black?
8   A.   Yes.
9   Q.   And who is that?
10  A.   The message that appear in black is the user -- these
11  are -- the messages that appear in black are received messages,
12  and so it's received from -- or sent by the user, who is
13  identified as Plamen.
14  Q.   Thank you.  And then turning to page 5 of Government
15  Exhibit 608A, the box at the top, is this a continuation of the
16  previous conversation that you just read?
17  A.   Yes.
18  Q.   All right.  Could you continue reading that into the
19  record, Mr. Tucker, please?
20  A.   Yes.  So these messages are -- the messages begin with,
21  "The same ugly skirt again and again with each model."  "Yes,
22  he does.  Yes, I try to tell him try to make the videos when
23  they are in bathing suits at least.  Well, a skirt is not a bad
24  thing, but the one -- but that one is ugly and shows nothing
25  really."

TUCKER - DIRECT EXAMINATION

1       And, again, the messages that are in black are

2   received messages, and the messages that are in red are sent

3   messages.

4   Q.   All right.  Mr. Tucker, turning to page 7 of Government

5   Exhibit 37.  Looking at the -- looking at the excerpt that is

6   enclosed in a box here, could you read the first two lines into

7   the record, please?  And identify the user that is sending

8   these messages.

9   A.   Yes.  So the messages here are all in black, so they were

10  sent -- yes, they were sent by the user identified as Plamen.

11  They read, "That � ▇ video is so boring that we will kill any

12  future sales of her.  Sorry, not ▇ but ▇  Other than

13  ▇ I have no idea which video or model will sell well.

14  ▇ which is a great model, her last video got sold only

15  five times for the last two days, so I am not sure that

16  ClipMonster is fine as well.  It may look -- it may look that

17  way, but the second video ▇ was sold twice less than the

18  first part, and the first part is very good and should convince

19  everyone to get the second part as well."

20      "Up until now, always the two parts of ▇ video

21  got equal sales, and most important is that the video before

22  ▇ got exactly the same level of sales.  Here are the

23  stats.  April 2017, Sweet ▇ Glamour HD, April 5th, 2017,

24  32, $638.40.  April 27, Sweet ▇ Glamour, April 5th" -- or

25  APR, which is I'm reading as April.  "2017, 3, $59.85."

TUCKER - DIRECT EXAMINATION

1  Q.   All right.  Mr. Tucker, if you could proceed to page 8, is
2  this a continuation of that same conversation?
3  A.   Yes.
4  Q.   You can keep reading.
5  A.   Okay.  At the top of the page, again, these are messages
6  sent -- the messages in black are sent messages by the user
7  Plamen.  The first message reads, "April" -- or "Apr 2017,
8  Sweet ████████ Monkey HD, April 8th, 017, 32, $608 --
9  $638.40."  "Apr 2017 Sweet ████████ Monkey Apr 8, 2017, 2,
10 $39.90."  "April -- or APR -- sorry, do you want me to read
11 it --
12 Q.   You can -- does there appear to be another reference to
13 April 2017 Sweet ████████ Monkey Part 2 HD?
14 A.   Yes.
15 Q.   And then if you could just read the last bit in this box,
16 please?
17 A.   Yes.  "As you can see, ██████ video got the same sales as
18 ████████ so clearly that video shows what the customer wants,
19 but we rarely have such kind of videos, and recently all the
20 clothes are including not what the customer wants."
21 Q.   Mr. Tucker, do you have an understanding on the previous
22 page, page 7, where it says, "April 2017, Sweet ██████ Glamour
23 HD," and then on page 8 where it says, "April 2017, Sweet
24 ██████ Monkey Part 2 HD," do you have an understanding what
25 that refers to?

TUCKER - DIRECT EXAMINATION

1   A.   Yes.

2   Q.   What does it refer to?

3   A.   Those refer to videos that were identified on the -- the

4   Newstar websites.

5        MR. REYNOLDS:  All right.  Ms. Davis, could we

6   publish what's been previously marked as Government

7   Exhibit 394?

8   BY MR. REYNOLDS:

9   Q.   Mr. Tucker, Mr. Ali testified about this yesterday.  Do

10  you see a video entitled "Sweet ███████ Glamour HD" on

11  Government Exhibit 394?

12  A.   Yes.

13  Q.   And do you also see a video entitled "Sweet ███████

14  Monkey Part 2 HD" on Government Exhibit 394?

15  A.   Yes.

16  Q.   All right.  Mr. Tucker, showing you what has been marked

17  as Government Exhibit 391, should be in front of you.

18  A.   Yes.

19  Q.   Could you take a look at that?

20  A.   391.

21  Q.   This is a previously admitted exhibit.  What does this

22  consist of?

23  A.   This -- Exhibit 391 consists of several images of a minor,

24  and at the top left corner of the images is the -- it would be

25  a watermark that reads Sweet██████.com.

TUCKER - DIRECT EXAMINATION

1   Q.   And the -- how old would you estimate the minor in those
2   screenshots to be?
3   A.   I would say this minor in the Exhibit 391 would be around
4   the age of 6 to 12, 7 to 12.
5   Q.   Could you describe what she's wearing in at least the
6   first page of Government Exhibit 391?
7   A.   Yes.  So in this exhibit, she is standing -- it appears
8   that she is standing with one leg bent upward.  She's wearing a
9   red -- I would say like a sequin or sparkly skirt, and it
10  appears to be hiked up a little.  She's also wearing some sort
11  of silver -- silver like bra top that's also pretty sparkly
12  with -- it has sparkles or sequins.
13          MR. REYNOLDS:  All right.  Your Honor, may we publish
14  the previously admitted Exhibit 391?
15          THE COURT:  Yes.
16          MR. REYNOLDS:  Three seconds, please, each page.
17          (Whereupon Government Exhibit 391 was published for
18          the jury.)
19  BY MR. REYNOLDS:
20  Q.   Mr. Tucker, do you have Government Exhibit 382 in front of
21  you?
22  A.   Yes.
23  Q.   Have you seen this before?
24  A.   Yes.
25  Q.   What is it?

TUCKER - DIRECT EXAMINATION

1   A.   This is screenshots of video file that were -- and it

2   has -- in this exhibit, it has the watermark Sweet████████.com

3   in the bottom right-hand corner.

4   Q.   Is there a person depicted in these screenshots?

5   A.   Yes.

6   Q.   Is she holding any prop?

7   A.   Yes.

8   Q.   What is it?

9   A.   It appears to be a monkey.

10  Q.   A real monkey?

11  A.   Sorry.  It's a stuffed animal, a stuffed animal monkey.

12  Q.   And, Mr. Tucker, could -- at least on the first page of

13  Government Exhibit 382, could you describe -- first of all, how

14  old would you say the person in those photographs is?

15  A.   She would -- I would say she's around 7 to 12 age frame as

16  well.

17  Q.   Could you describe what she's wearing?

18  A.   Yes.  She's wearing I would say cheetah or leopard print

19  panties and a purple and black shirt.

20       MR. REYNOLDS:  All right.  Ms. Davis -- Your Honor,

21  could we publish the previously admitted 382?

22       THE COURT:  Yes.

23       MR. REYNOLDS:  Ms. Davis, can you do three seconds

24  each, please?

25            (whereupon Government Exhibit 382 was published to

1          the jury.)

2     BY MR. REYNOLDS:

3     Q.   All right.  Going back to page 8 of Government

4     Exhibit 608A.  Mr. Tucker, in a portion of this chat that you

5     just read, that referred to "Sweet ███ Glamour HD" and

6     "Sweet ███ Monkey Part 2 HD."  Do you see the text, "So

7     clearly that video shows what the customer wants"?

8     A.   Yes.

9     Q.   And according to your review, which user sent that

10    message?

11    A.   These are received messages, so the user Plamen sent these

12    messages.

13    Q.   All right.  If we could turn to page 10 of Government

14    Exhibit 608A, please?  Mr. Tucker, in the box, could you read

15    the first two lines of the selected text identifying who the

16    sender of the message is, please?

17    A.   Yes.  So this exhibit begins with -- the messages that are

18    in black, the first two messages that are in black are messages

19    sent by Plamen, and they read, "I started to make the order on

20    April 23rd, so it was more than a week ago, in fact."

21    Q.   All right.  And then continuing downward a bit to a -- do

22    you see a line beginning with "███ is already"?

23    A.   Yes.

24    Q.   Could you read -- could you read that line and the lines

25    following, please?

TUCKER - DIRECT EXAMINATION

1  A.   Repeat -- can you repeat that for me, please?

2  Q.   I'm sorry.  Could you read that line beginning with

3  "███████ already" and the lines following?

4  A.   Yes.  Plamen -- regarding those three lines, Plamen sent

5  the message, "███████ is already ordered with 33 sets in the

6  last order.  I don't know how many are made.  Well, whatever

7  you think is best."

8  Q.   All right.  And then down below, are there a series of

9  messages starting with "new order"?

10 A.   Yes.

11 Q.   All right.  And turning the page to page 11 of Government

12 Exhibit 608A, Mr. Tucker, the text that appears in the box, is

13 that a continuation of the message exchange you were just

14 reading?

15 A.   Yes.

16 Q.   All right.  And do you see an entry in that box that reads

17 "New Order, ████████████," in parentheses 2223?

18 A.   Yes.

19 Q.   And, Mr. Tucker, have you heard the name ████████████

20 before?

21 A.   Yes.

22 Q.   Where have you heard it?

23 A.   That name was, again, mentioned in the previous exhibit we

24 talked about today, and in the document -- then the spreadsheet

25 00000NewModels.xls.

TUCKER - DIRECT EXAMINATION

1    Q.   And in what context was it referred to?

2    A.   It provided -- there was multiple columns in that

3    spreadsheet, and that spreadsheet documented the name ███████

4    ████████ and the associated -- that minor's associated Newstar

5    website.

6    Q.   All right.  Mr. Tucker, if we could proceed to page 14 of

7    Government Exhibit 608A.  And could you read the text in the

8    box identifying who is -- who is sending the message?

9    A.   Yes.  So the first two messages are in red, which means

10   that they're sent messages or messages that Ken sent to the

11   user Plamen, and those read, "Is your ID -- is your ID still

12   78.159.142.158 for the ftp?"  And Plamen replied with, "I need

13   your IP.  Yes."

14   Q.   And, Mr. Tucker, the IP address referred to in this

15   message, does that IP address begin with -- is the IP prefix

16   78.159?

17   A.   Yes.

18   Q.   All right.  Turning to the next page, page 15 of

19   Government Exhibit 608A, if you could read that last line.

20   Identify who's speaking, please.

21   A.   Yes.  The message that's in red, it reads -- the message

22   in red is a message sent by Ken, and it reads, "We have quite a

23   catalog of vids and photos since 2004 LOL."

24   Q.   And proceeding to page 16, is this a continuation of that

25   same conversation?

TUCKER - DIRECT EXAMINATION

1   A.   Yes.

2   Q.   Could you read the remaining lines in this box, please?

3   A.   Yes.  Plamen sent the message, "Yes."  And Ken replied

4   with the message, "What we built is world famous.  I still" --

5   I believe this next word is frack -- "when I think of all this

6   team has done."

7              MR. REYNOLDS:  Your Honor, may I have one moment to

8   confer with co-counsel?

9              THE COURT:  Yes.

10             MR. REYNOLDS:  Okay.

11                        (Pause.)

12             MR. REYNOLDS:  All right.  Thank you, Your Honor.

13  All right, Ms. Davis, if we could proceed to page 19 of

14  Government Exhibit 308A.

15  BY MR. REYNOLDS:

16  Q.   Mr. Tucker, if you could read that -- if you could read

17  that text within that box identified on page 19.

18  A.   Yes.  The user -- or Ken sent the message.

19  "HTTP://www.sweet-███████.com/images/banner18.gif.  I made

20  that banner today."  I'm sorry, I think I misspoke for a

21  second.  My apologies.  The user -- it's in black, so the user

22  Plamen sent the message, "HTTP://www.sweet███████.com/

23  images/banner18.gif.  I made that banner today.  Yes, he told

24  me yesterday that you made many sets."  Ken, which is in red,

25  replied with, "I like that banner, but always they flash too

TUCKER - DIRECT EXAMINATION

1    fast."  Plamen sent the message, "Well, I can make it flash
2    slower."
3    Q.   All right.  Proceeding to page 22 of Government Exhibit
4    608A.  All right, Mr. Tucker in the box you're seeing here, do
5    the first two lines read, "Do you want me to change the first
6    preview pictures, the ones that are looking the same?"
7    A.   Yes.
8    Q.   And who -- who is the sender of this message?
9    A.   They're in black, so Plamen.
10   Q.   Going down just a bit starting with the line, "Really," do
11   you see in black text the message, "Really, page 2 is the worst
12   preview page I ever saw.  6 out of 8 preview pages pictures
13   looking exactly the same.  This is nightmare."  And in red,
14   "Well, if you want to try and fix it, do."  Did I read that
15   correctly?
16   A.   Yes.
17   Q.   And, again, you've identified the black text as Plamen and
18   the red as Ken?
19   A.   Yes.
20   Q.   All right.  And then for the last three messages,
21   Mr. Tucker, the black text signifying a text by the user
22   Plamen.  "Maybe it's not only the preview photo.  Maybe they
23   need the set from TGP, but really looking at the preview photo,
24   I believe that it is exactly the preview photo that caused it.
25   I've seen that behavior before."  The user identified as Ken

1  says, "Well, I always try to put the best photo, and I think of

2  all people's fetish, the ones that like feet, the ones that

3  like stockings, I try to make photos to catch everyone," to

4  which the user Plamen replies, "Yes, but with ███████    there

5  is not easy choice, I know.  She is somehow nice model, tiny

6  and so on, but still her production is crap."  Did I read that

7  correctly?

8  A.   Yes.

9  Q.   Mr. Tucker, next page.  Could you read the contents of the

10  first box into the record, please?

11  A.   Yes.  Plamen sent the message, "Rohena keeps making videos

12  with skirts.  The only videos we get recently are only with

13  skirts like crap."  Ken sent, "Tell Anton to tell her only make

14  videos in bathing suits."  Plamen sent, "██████ video is the

15  same crap."  Ken sent, "He speaks with her always.  Please let

16  Anton know to tell her to use bathing suits or something better

17  for videos."  Plamen sent, "Well, at least the video of ██████

18  is not the same crap like the previous.  It is fine.  She shows

19  some panties."

20  Q.   All right.  Moving down to the next box on page 23,

21  Mr. Tucker, tell me if I've read this correctly.  User

22  identified as Ken says, "The newest castings from the school,"

23  to which the user identified as Plamen replies, "██████ is ugly.

24  ██████ is good."  Ken, "██████ should be made to replace

25  someone."

**TUCKER - DIRECT EXAMINATION**

1    Further down the last line reads, "▇▇▇▇▇▇▇ 8,"
2   in red text signifying Ken, and then turning to 24, page 24,
3   Mr. Tucker, is this a continuation of the same conversation?
4   A.   Yes.
5   Q.   All right.  Conversation continues.  The user Ken states,
6   "I remember you kide her -- called her the next ▇▇▇▇  God,
7   that entire town must inbreed.  Everybody looks the same."
8   Plamen replies, "I don't remember such a thing, but if you say
9   so, yes, we should go get her."  Ken, "▇▇▇▇▇▇▇▇▇."
10  Plamen, "▇▇▇▇  has mustache."  Ken, "Make a list of the ones
11  I send you.  Then we will go through sales and make some
12  changes.  We will also get her a can of Nair.  There are also a
13  lot of pretty ones that I can tell will get fat."  Plamen,
14  "Yes, it is easy seeing as they are fat even now."
15    Going down a few lines to the bottom, Ken, "We need
16  ▇▇▇  that red curly hair.  I'm so tired of Moldovan brown
17  hair on every model."  Plamen, "Yes, ▇▇▇ is good, but I think
18  that the new ▇▇▇ will pose better than her from what I see
19  from both castings."
20    Mr. Tucker, did I read that accurately?
21  A.   Yes.
22  Q.   All right.  Have you -- have you heard the name ▇▇▇
23  before?
24  A.   Yes.
25  Q.   What about ▇▇▇▇▇▇ 8?

TUCKER - DIRECT EXAMINATION

1   A.   Yes.

2   Q.   What about ███████████████?

3   A.   Yes.

4   Q.   Where have you heard those before?

5   A.   In the document file that I mentioned previously, and I

6   saw some of the folder names.

7   Q.   And do you recall where those were, the folder names?

8   A.   They were I believe in the "Casting" folder, within one of

9   the many "Casting" folders.

10  Q.   All right.  Mr. Tucker, I believe this is the last ICQ

11  message I'm going to direct your attention to.  Turning to

12  page 31 of Government Exhibit 608A, within the box, who have

13  you identified as speaking in this -- in this -- in this box?

14  A.   That -- that would be Plamen.

15  Q.   And can you please read this short message into the

16  record, please?

17  A.   Yes.  Plamen sent, "I'm just checking the old ██████

18  production, and I am completely blown.  Compared even to

19  ████████'s production, hers is like nuclear sexy.  It is hard

20  to believe."

21  Q.   All right, Mr. Tucker, I think we can put down Government

22  Exhibit 608A.

23        Now, at the beginning of your testimony, which I

24  recognize was several hours ago, you stated that you conducted

25  a forensic analysis of a Seagate hard drive that was retrieved

TUCKER - DIRECT EXAMINATION

1   from a computer tower in Mr. Power's home; is that correct?

2   A.   Yes.

3   Q.   And in conducting that forensic analysis, did you use

4   largely the same processes and tools that you used to analyze

5   the Sony VAIO All-in-One computer and the My Passport external

6   hard drive?

7   A.   Yes.

8   Q.   Mr. Tucker, are you familiar with a program called Skype?

9   A.   Yes.

10   Q.   What is Skype?

11   A.   Skype is another -- it's another messaging application.

12   It allows you to send texts, files, or make phone calls to

13   other users on the Skype network.

14   Q.   And when you analyzed the Seagate hard drive, did you find

15   any files that are associated with the program Skype?

16   A.   Yes.

17   Q.   What sorts of files?

18   A.   There were a number of files that relate to the

19   functionality of the Skype program, like configuration files

20   and just files that make the Skype program work properly.

21   There were -- there was also a database file within the Skype

22   folder as well.

23   Q.   Did the Seagate hard drive have the Skype program

24   installed on it?

25   A.   Yes.

TUCKER - DIRECT EXAMINATION

1    Q.   From the files that you analyzed, were you able to recover
2    messages from the Skype files?
3    A.   Yes.
4    Q.   All right.  When someone has a Skype account, do they have
5    a user name?
6    A.   They do.
7    Q.   And were you able to determine the user name associated
8    with the Skype program on the Seagate hard drive?
9    A.   Yes.
10   Q.   What was that?
11   A.   Starmaker 62.
12   Q.   How do you know this?
13   A.   For one, just based off of my personal experience,
14   professional and personal experience.  I know that Skype
15   creates a folder for each user account that logs into the Skype
16   application on a computer, and so there was a folder, a profile
17   folder under Skype named "Starmaker 62".  There was also within
18   that folder a database file named "main.db" which contained
19   Skype chat messages and contact list.
20   Q.   All right.  Mr. Tucker, if you could take a look at what
21   has been marked before you as Government Exhibit 609, please.
22   Have you seen this exhibit before?
23   A.   Yes, I have.
24   Q.   What is it?
25   A.   This is an exhibit showing the Skype contact list that was

TUCKER - DIRECT EXAMINATION

1  extracted from the "main.db" file, stored in the folder
2  "Starmaker 62."
3  **Q.**   And does Government Exhibit 609 truly and accurately
4  reflect the contact information that you extracted from the
5  Seagate hard drive related to the Skype program?
6  **A.**   Yes.
7         **MR. REYNOLDS:**  Your Honor, we offer Government's 609
8  into evidence.
9         **MR. KERR:**  No objection.
10        **THE COURT:**  609 is received into evidence, may be
11  published to the jury.
12  **BY MR. REYNOLDS:**
13  **Q.**   All right.  Mr. Tucker, very briefly can you explain what
14  appears on the screen?
15  **A.**   Yes.  This is a list of -- Skype contact list, names that
16  were extracted from the Skype contact list, and so in this
17  exhibit, there are several columns such as "Skype Name", "Full
18  Name", "Display Name", "Last Online Date and Time", "Birthday,"
19  "City" and "Country".
20  **Q.**   And --
21  **A.**   Oops.
22  **Q.**   I'm sorry, go ahead.  I interrupted you.
23  **A.**   And within each row are different Skype users' names that
24  was added.
25  **Q.**   In the first column, second from the bottom, do you see an

TUCKER - DIRECT EXAMINATION

1    entry that said Plaper 12?

2    A.    Yes.

3    Q.    What are the full name -- what's the full name and display

4    name associated with that, that entry?

5    A.    The full name and display names associated with the Plaper

6    12 Skype name is Plamen.

7    Q.    Both Plamen?

8    A.    Both -- both columns, full name and display name, contain

9    the name Plamen.

10   Q.    Does that row contain an entry for -- in the column marked

11   "Birthday"?

12   A.    Yes.

13   Q.    What is that information in that entry?

14   A.    It reads 8/9/1973.

15   Q.    Mr. Tucker, based on your understanding of how Skype

16   works, how would the information in the birthday column be

17   generated?

18   A.    So when you create a Skype account, you can update your

19   profile, edit your profile and include things like your city or

20   state or country, birthday, and any -- you can also include a

21   bio or any additional information, and so when a user adds you

22   as a friend on Skype, they're able to see the information that

23   you included in your profile.

24   Q.    Based on your understanding, is it fair to say that the

25   birthday information was likely inputted by the user of the

TUCKER - DIRECT EXAMINATION

1    Plaper 12 account?

2    A.    Yes.

3    Q.    All right.  Directing your attention to Government Exhibit

4    610, have you seen this document before?

5    A.    Yes, I have.

6    Q.    What is it?

7    A.    This is the text message -- or Skype messages that were

8    extracted from the main.db file.

9    Q.    Does it include all of the Skype messages the device owner

10   had with anyone?

11   A.    Yes.

12   Q.    All right.  Mr. Tucker, how was this document generated?

13   A.    This was generated using one of my forensics tools.  I'm

14   able to extract the Skype chat messages in multiple different

15   formats.  I can export the messages out in an Excel spreadsheet

16   or in PDF form, and this exhibit is showing the messages in an

17   Excel spreadsheet.

18   Q.    Does Government Exhibit 610 truly and correctly reflect

19   data that you extracted from the Skype files on the Seagate

20   hard drive?

21   A.    Yes.

22         MR. REYNOLDS:  Your Honor, we'd offer 610 into

23   evidence.

24         MR. KERR:  No objection.

25         THE COURT:  Yes, uh-huh.

153

TUCKER - DIRECT EXAMINATION

1        **MR. REYNOLDS:**  Thank you, Your Honor.

2   BY MR. REYNOLDS:

3   Q.   Mr. Tucker, showing you what's been marked as Government's

4   Exhibit 610A, have you seen this exhibit before?

5   A.   Yes.

6   Q.   What is it?

7   A.   This is an excerpt or selected messages that were

8   extracted from the previous exhibit.

9   Q.   Does 610A truly and accurately reflect chats that were

10  excerpted from Government Exhibit 610?

11  A.   Yes.

12       **MR. REYNOLDS:**  Your Honor, we offer Government

13  Exhibit 610A into evidence.

14       **MR. KERR:**  No objection.

15       **THE COURT:**  610A is received into evidence and may be

16  published to the jury.

17       **MR. REYNOLDS:**  Thank you, Your Honor.

18       **THE COURT:**  You're welcome.

19       **MR. REYNOLDS:**  Ms. Davis, will you put this on the

20  screen?

21  BY MR. REYNOLDS:

22  Q.   Mr. Tucker, I promise this is the last time I'm going to

23  ask you to do this.  Will you please read this chat into the

24  record, identifying the person who sent the message?

25  A.   Entire?  What was that?

TUCKER - DIRECT EXAMINATION

1   Q.    610A.

2   A.    Okay.  Yeah.  So at the very top of the -- at the very top

3   of this exhibit, there are several columns.  The first column

4   is the "Profile Name", which is stating the Skype account that

5   these messages were pulled from.

6          The second -- the next column is the "Author" column,

7   which will tell us who sent which -- who sent the message.

8          The next column, the third column is the "Recipient",

9   recipient's column, which tells us who received the message

10  sent.

11         The -- from the -- the next column, the fourth

12  column, is the "From Display Name" column which will show the

13  display name that was -- like I was speaking about earlier,

14  which is the display name is -- you can change in the bio or in

15  the Skype user profile.

16         The fifth column is the "Message Sent Date and Time,"

17  which will tell us the time and the date the message was sent.

18         And, of course, the last column is the "Message"

19  column.

20         So the first message has author as Starmaker 62.

21  Recipient is Plaper.  And that's -- the message is, "Our only

22  key to survive is make money from archive site and stop paying

23  $4,000 a month for updates on sites that make no profit."

24         "Plain and simple, American economy falls apart.

25  Companies that are 150 years old and sell more needed items

1    than us are closing," or that U.S. are closing maybe.  "We

2    are -- we are damn lucky to make what we do."  The user

3    identified as Plaper 12, also with a display name of Plamen,

4    sent the message, "Okay.  I got it.  I got it."

5            Starmaker 62 with a display name of KP sent the

6    messages, "Well, what we need to do is maximize profit.  Yeah,

7    do you also have -- do you also have -- how angry I am that you

8    insult my -- I believe advertising?"  Again, there's a few

9    typos, and I'm going to try to make it clear as possible.  The

10   next line reads, "To Martin, no less.  Who do you think drove

11   3,000 to 4,000 customers to each new site as they opened?"  The

12   user Plaper 12, also with a display name of Plamen, sent the

13   message, "You got it wrong.  We don't have the same advertising

14   as before, probably because you are more cautious, and we have

15   to be cautious."

16           The user Starmaker 62, also with a display name KP,

17   sent the messages, "We have the strongest advertising of any

18   child model sites that don't take affiliates.  If you look at

19   the sites, we have no choice to join to advertise on.  I would

20   not want to be seen on them."  The user Plamen -- the user with

21   the -- the Skype user with the display name Plamen sent the

22   message this -- "What we know very well.  The point was that

23   only risky advertisement can get us more sales."

24   Q.   Thank you, Mr. Tucker.  While you were reviewing Mr. --

25   the forensic images of devices seized from Mr. Power's home,

TUCKER - CROSS-EXAMINATION

1  did you see any Skype chats that refer to a person named Plamen

2  with a last name other than Velinov?

3  A.   No.

4  Q.   Did you see any ICQ chats that refer to a person named

5  Plamen with a last name other than Velinov?

6  A.   No.

7  Q.   Did you see any data of any kind on any device seized from

8  Mr. Power's home that referred to a person named Plamen with a

9  last name other than Velinov?

10 A.   No.

11          MR. REYNOLDS:  Thank you, Mr. Tucker.  We'll pass the

12 witness.

13          THE COURT:  All right.  Any cross-examination for

14 this witness?

15                    CROSS-EXAMINATION

16                    BY MR. KERR:

17 Q.   Good afternoon, Mr. Tucker.

18 A.   Good afternoon.

19 Q.   I just have a couple of questions.  About an hour ago --

20 or I forget when it was exactly, it might have been before

21 lunch -- you testified about a wire transfer to Plamen Georgiev

22 Velinov, and you were asked questions about that.  Do you

23 recall that?

24 A.   Yes.

25 Q.   And that was all in his true name, as far as you know his

TUCKER - CROSS-EXAMINATION

1    true bank account in his own name, Velinov's own name?

2    A.    As far as I know, yes.

3    Q.    And everything else on here -- you were asked questions

4    about this, but all the material and all the chats, they were

5    either Plamen or Plamen Velinov and on the Skype it had his

6    date of birth?

7    A.    Yes.

8    Q.    So it was nothing hidden about that?

9    A.    Correct.

10   Q.    And all of this material that you analyzed came from

11   Mr. Power's home, from a computer in Mr. Power's home in

12   Florida; is that right?

13   A.    The evidence came from multiple different items from the

14   Power residence, yes.

15   Q.    Okay.  Thank you.  And in all the images -- you testified

16   that you looked at a lot of the pictures; maybe not every one,

17   but you looked at a lot of the pictures on the Newstar website;

18   is that correct?

19   A.    Correct.

20   Q.    And you saw no nudity on the -- in the pictures?

21   A.    Correct.

22   Q.    And no explicit sex?

23   A.    Correct.

24   Q.    And no minors having sex?

25   A.    Correct.

TUCKER - CROSS-EXAMINATION

1        MR. KERR:  No further questions.  Thank you.

2        THE COURT:  Okay.  Thank you.  Any redirect for this

3  witness?

4        MR. REYNOLDS:  No, Your Honor.

5        THE COURT:  All right.  I'll excuse the witness.

6  Thank you.  We appreciate your having come in today to testify.

7                    (Witness excused.)

8        THE COURT:  And the Government can call its next

9  witness.

10        MS. VALDES:  Government calls Laura Ziegler.

11        MR. REYNOLDS:  Your Honor, may we return the monitor?

12        THE COURT:  Yes, of course.

13        MR. REYNOLDS:  Thank you.

14        MS. VALDES:  May I approach the witness stand, Your

15  Honor?

16        THE COURT:  Yes, uh-huh.

17        COURTROOM DEPUTY:  Good afternoon.  Please raise your

18  right hand.

19                    (Witness sworn.)

20        COURTROOM DEPUTY:  Thank you.  Please state and spell

21  your name for the record.

22        THE WITNESS:  Laura Ziegler, L-a-u-r-a,

23  Z-i-e-g-l-e-r.

24        COURTROOM DEPUTY:  Thank you.  You may take the

25  stand.

1          **THE COURT:**  All right.  Good afternoon.  You're going
2   to be asked some questions by the Assistant U.S. Attorney
3   assigned to this case, Ms. Valdes.  If you don't understand the
4   question, please say so, so she can state it a different way.
5   Wait until the question is finished before you begin answering
6   so we don't have two people speaking at the same time.  If you
7   have the tendency to speak quickly, slow down, and if you're
8   soft spoken, speak up so we can hear you, all right?
9          Okay.  You may proceed, Ms. Valdes.
10         **MS. VALDES:**  Thank you, Your Honor.
11                    **LAURA ZIEGLER,**
12  a witness called on behalf of the Government, being first duly
13  sworn, was examined and testified as follows:
14                 **DIRECT EXAMINATION**
15                 **BY MS. VALDES:**
16  **Q.**   Good afternoon.
17  **A.**   Good afternoon.
18  **Q.**   Could you please explain your educational background?
19  **A.**   Sure.  I have a bachelor's degrees in accounting and
20  anthropology and a master's in accounting, all from Penn State.
21  **Q.**   Do you have any special certifications?
22  **A.**   I'm a certified fraud examiner.
23  **Q.**   What is a certified fraud examiner?
24  **A.**   So it's someone with training in complex financial
25  transactions, investigations, and legal issues.  You have to

ZIEGLER - DIRECT EXAMINATION

1    pass a multiple part exam and do continuing education

2    requirements.

3    Q.   Do you have any other titles?

4    A.   I'm a forensic accountant.

5    Q.   And where do you work?

6    A.   I'm a manager at Deloitte.

7    Q.   What do you do as a forensic accountant for Deloitte?

8    A.   So I support federal law enforcement investigations into

9    complex financial investigations for money laundering.

10   Q.   And in particular, what kind of federal agencies do you

11   support?

12   A.   I'm assigned to Homeland Security Investigations.

13   Q.   And how long have you been working with HSI?

14   A.   Over five years.

15   Q.   How do you get paid?

16   A.   I'm a salaried employee.  Deloitte pays me.

17   Q.   Does your salary change at all based on the types of

18   investigations you work with?

19   A.   No.

20   Q.   Does it matter if a case you investigated leads to

21   criminal prosecution or doesn't lead to criminal prosecution?

22   A.   No.

23   Q.   Does that affect your salary in any way?

24   A.   No, it does not.

25   Q.   Are you getting paid more for testifying here today?

ZIEGLER - DIRECT EXAMINATION

1   A.   No.

2   Q.   Were you assigned the case regarding the Newstar

3   enterprise, specifically Plamen Velinov?

4   A.   Yes, I was.

5   Q.   And what were you asked to do on this case?

6   A.   I was asked to analyze bank accounts and financial and

7   business documents.

8   Q.   And how do you do that?

9   A.   So typically the case agent will provide me with the

10  documents.  I will bring the data into Excel so I'm able to

11  analyze it, and as I'm analyzing the data, I'm looking for

12  patterns, counter parties, so the sources and uses of funds,

13  who's receiving and sending the money.  I will follow the flow

14  of funds, seeing where it came from, where it went to, looking

15  at locations and other the various items of potential interest.

16  Q.   What types of financial information or data did you look

17  at in regards to the Newstar case?

18  A.   I was asked to analyze bank accounts, QuickBooks files.

19  Yeah, bank accounts, QuickBooks records.

20  Q.   Would you say that the data and information you looked at

21  in this case was a small amount of data or voluminous?

22  A.   So I looked at more than 16 bank accounts and more than

23  75,000 transactions.  And if I can back up, I also was asked to

24  look at other transaction data as well.

25  Q.   So a fair amount of information?

ZIEGLER - DIRECT EXAMINATION

1    A.    Yes.

2    Q.    And did you create based on the information you reviewed a

3    summary chart, something to help you in your testimony today in

4    explaining the analysis you did?

5    A.    Yes, I did.

6    Q.    In all that data and information that you reviewed, was

7    there some information that you discovered to be not part of

8    the Newstar enterprise, perhaps private accounts, things of

9    that nature?

10   A.    Yes.

11   Q.    And have you excluded that information for your purposes

12   today?

13   A.    Yes.

14   Q.    Meaning today, are you just testifying about the data that

15   was relevant to the Newstar enterprise, and in particular, the

16   Defendant, Mr. Plamen Velinov?

17   A.    Yes, that's correct.

18   Q.    You stated you reviewed bank records in this case,

19   correct?

20   A.    Yes.

21   Q.    Could you please take a look at Government's Exhibit 3?

22   Do you recognize it?

23   A.    I do.  I signed and dated.

24   Q.    Okay.  And what is it?

25   A.    This is a disk containing the bank account records that I

1   analyzed.

2   Q.   Did you review the contents of that disk and then sign and

3   date it after you reviewed it?

4   A.   Yes.

5   Q.   Is that how you are sure you reviewed it?

6   A.   Yes.

7   Q.   Does it create -- is it a fair and accurate collection --

8   does it depict fairly and accurately the bank accounts you

9   reviewed in this case in regards to the Newstar enterprise?

10  A.   I'm sorry.  Can you --

11  Q.   I'll rephrase.  Does the bank information on that disk, is

12  it a fair and accurate copy of the bank and data information

13  you reviewed as part of your analysis on this case?

14  A.   Yes.

15          MS. VALDES:  Government submits Exhibit 3 into

16  evidence, Your Honor.

17          MR. KERR:  No objection.

18          THE COURT:  All right.  3 is received into evidence,

19  may be published to the jury.

20  BY MS. VALDES:

21  Q.   In the course of working on the Newstar case, did you come

22  to learn a little bit about the investigation?

23  A.   Yes.

24  Q.   Did you learn, for example, the names of co-conspirators,

25  Newstar enterprise members?

ZIEGLER - DIRECT EXAMINATION

1    A.   Yes.

2    Q.   Did you learn a little bit about them, including their

3    names, date of birth, perhaps areas where they were located?

4    A.   Yes.

5    Q.   And in general their involvement in this case?

6    A.   Yes.

7    Q.   Did you review as part of your analysis Tatiana Power's

8    QuickBooks?

9    A.   I did.

10   Q.   Would you please take a look at Government's Exhibit 420

11   and 420 Sub Exhibits A through D?  What are those exhibits?

12   A.   They are the screenshots of how I exported data from

13   QuickBooks, the vendor list from QuickBooks, the checks for

14   CompuTech from QuickBooks, and the customer list from

15   QuickBooks as well as the income by customer exported from

16   QuickBooks.

17   Q.   Are they a fair and accurate copy of the QuickBooks data

18   that you reviewed in this case?

19   A.   Yes.

20        MS. VALDES:  Government submits into evidence

21   Government's 420 and 420A through D, Your Honor.

22        THE COURT:  420, 420A through D, no objection?

23   They're received into evidence, may be published to the jury.

24        MS. VALDES:  Thank you, Your Honor.

25        THE COURT:  You're welcome.

ZIEGLER - DIRECT EXAMINATION

```
 1   BY MS. VALDES:
 2   Q.   Did you also review Newstar website's server information?
 3   A.   Yes.
 4   Q.   Can you explain to the jury in particular what information
 5   you reviewed from those servers?
 6   A.   So I was provided data that was customer transaction
 7   information, so credit card transactions.
 8   Q.   And when you say customers, are you referring to customers
 9   that purchased things from the Newstar websites?
10   A.   Yes.
11   Q.   Did you create a -- based on all this information that you
12   just explained and laid out for us, did you create a summary
13   exhibit from that data?
14   A.   Yes.
15   Q.   And would that summary exhibit assist you in explaining
16   your financial analysis to the jury?
17   A.   Yes, it would.
18   Q.   Showing you -- if you could look at Government's 421,
19   please, do you recognize this?
20   A.   I do.
21   Q.   What is it?
22   A.   This is the summary I created.
23   Q.   That you created?
24   A.   Yes.
25   Q.   Is it a fair and accurate depiction of your summary
```

ZIEGLER - DIRECT EXAMINATION

1  exhibit?

2  A.   Yes.

3        MS. VALDES:  Government moves to enter Government's

4  421 into evidence, Your Honor.

5        THE COURT:  All right.

6        MR. KERR:  No objection.

7        THE COURT:  Thank you.  421 is received into evidence

8  and may be published to the jury.

9        MS. VALDES:  Thank you, Your Honor.  If we could

10  display it on the larger screen?

11  BY MS. VALDES:

12  Q.   Turning to your summary exhibit, Ms. Ziegler, can you

13  please explain what we're looking at generally speaking on this

14  first page?

15  A.   Yes, this is at a high level, a summary of how the funds

16  moved from CyberPay ClipMonster through bank accounts, Power

17  Trading, and brought it out to Mr. Velinov.

18  Q.   Just to be clear, when you say funds, are you referring to

19  the purchases made to the Newstar websites?

20  A.   Yes.

21  Q.   Thank you.  For what time period were you able to conduct

22  your analysis and why?

23  A.   Sure.  So I analyzed from the time period of April 2010

24  through February of 2020, and that date range is the earliest

25  date from the bank accounts through the latest date of the bank

ZIEGLER – DIRECT EXAMINATION

1    accounts, and not all of the accounts were open for that full

2    time period.  They differed, but that's the earliest and latest

3    date.

4    Q.   Looking at the five categories we have on this first page,

5    could you please take each one in turn and explain what they

6    mean?

7    A.   Sure.  So starting on the left-hand side, number 1,

8    purchases to access the Newstar websites, CyberPay and

9    ClipMonster, those are the two transaction files that I

10   analyzed.  Then I was able to follow the money through merchant

11   processor accounts, through three different accounts.  Then was

12   able to follow the money through bank accounts in various

13   names.  Next followed it through Power Trading Inc. and

14   ultimately to wire transfers to Mr. Velinov.

15   Q.   Looking at the second stage, the flow of money from the

16   Newstar websites to the merchant processors, are you familiar

17   with who owned these accounts?

18   A.   Yes.

19   Q.   How do you know that information?

20   A.   I reviewed the signature cards and opening documents.

21   Q.   What is a signature card?

22   A.   It's -- signature card for bank accounts is you have to

23   sign your name for the bank.  It's a -- it's a document, a

24   piece of paper.

25   Q.   When persons open an account, for example, would they sign

1    a signature card?

2    A.    Yes.

3    Q.    And who are the owners of these merchant processor

4    accounts?

5    A.    Hope Trans-Tech was Marylou Bjorkman.  Wilowski Management

6    Inc. was Patrice Wilowski.  WebMatrix LLC was Anthony Kendall.

7    Q.    And are all those persons that you've come to learn as

8    members of the Newstar enterprise?

9    A.    Yes.

10    Q.    Moving on to the third category, who owned these accounts

11    or had access to these accounts?

12    A.    The same individuals.  Marylou Bjorkman, Patrice Wilowski,

13    Anthony Kendall, as well as Mark Bjorkman.

14    Q.    Again, members of the Newstar enterprise?

15    A.    Yes.

16    Q.    Fourth category?

17    A.    Power Trading Inc. was Kenneth and Tatiana Power.

18    Q.    And finally, where did the money end up, or some of the

19    money end up?

20    A.    Mr. Velinov.

21    Q.    Go to page 2, please.  Can you explain the number figure

22    here and what we're looking at?

23    A.    Sure.  So the 3.3 million, more than 3.3 million is the

24    dollar amount that I was able to reconcile between the merchant

25    processor account data I had and the CyberPay and ClipMonster

1    transaction data.

2    Q.   Could you just explain what you mean by reconcile?

3    A.   Sure.  So you're essentially able to match the

4    transactions based on certain criteria.

5    Q.   And what is the number that you were able to determine

6    flowed through these accounts?

7    A.   More than 3.3 million.

8    Q.   Did you also -- in viewing the QuickBooks information, was

9    that -- did that assist you in your analysis in this case?

10   A.   It did.

11   Q.   Okay.  I want to return to that later.

12            Going to page 3, please.  What are we looking at

13   here?

14   A.   This is by level the transactions from the bank accounts,

15   Wilowski Management Inc., WebMatrix LLC, and multiple accounts

16   where Mark Bjorkman was the account signer.  We saw

17   transactions to other bank accounts where they were named Mark

18   Bjorkman, Anthony Kendall, Patrice Wilowski, as well as to --

19   transactions to overseas beneficiaries, including Plamen

20   Velinov and Daniel Luenberger.

21   Q.   Besides these accounts -- and, again, are these members of

22   the Newstar enterprise?

23   A.   To my knowledge, yes.

24   Q.   Did the money from the bank accounts also flow to a

25   different account, the fourth category?

ZIEGLER - DIRECT EXAMINATION

1    A.    Yes.

2    Q.    And if we could turn to page 4, this is where some of the

3    money ended up?

4    A.    Yes.

5    Q.    And where is that?

6    A.    Power Trading Inc.

7    Q.    And how much money flowed at this stage from the bank

8    accounts that you were able to follow to Power Trading Inc.?

9    A.    More than $1.2 million.

10   Q.    How did you know that 1.2 -- over $1.2 million flowed from

11   the bank accounts to Power Trading?  What information did you

12   use?

13   A.    For this amount, it was wire transfers, so based on the

14   bank account information and supporting documentation for those

15   wires.

16   Q.    And besides the wire transfers, were there -- was other

17   money deposited into this account by other means?

18   A.    Into which account?

19   Q.    Into Power Trading.  I'm sorry.

20   A.    Yes.

21   Q.    Turning to page 5, does this show that other amount for

22   the other -- the other money?

23   A.    So this is showing -- from the bank accounts that you see

24   on the left-hand side, there is more than 2.4 million in

25   withdrawals from the accounts.  And also based on analysis of

ZIEGLER - DIRECT EXAMINATION

1    the bank accounts for Power Trading, more than $2.7 million in
2    cash went to Power Trading.
3    Q.    Okay.  Going to page 6, did you then follow the money as
4    it went out of the Power Trading accounts?
5    A.    Yes, I did.
6    Q.    Where did it go?
7    A.    So more than 1.5 million went to overseas beneficiaries
8    that included Daniel Luenberger and Anton Klenin, more than 1.5
9    million went to Kenneth and Tatiana Power's accounts, and more
10   than $395,751 went to Mr. Velinov.
11   Q.    Turning to page 7, please, can you explain we're looking
12   at here?
13   A.    So this is a visual representation of the flow of funds
14   from CyberPay to a withdrawal from Wilowski Management Inc.  On
15   the same day, the same dollar amount, there was a cash deposit
16   to Power Trading, and I was asking to follow or trace two
17   purchases made by James Fossett on 9/21/2015.
18   Q.    Are you familiar with the James Fossett name and how it
19   was used in this case?
20   A.    Yes, I am.
21   Q.    And you were asked to follow this transaction?
22   A.    Yes.
23   Q.    Do you know why?
24   A.    My understanding were these were the undercover purchases.
25   Q.    Turning to page 8, can you explain what we're looking at

1   here?

2   A.   So this is another visual representation of how the money

3   flowed from CyberPay and ClipMonster.  This is for from

4   5/2/2018 to 5/9/2018, so for about a week, and it follows the

5   money from CyberPay through Wilowski Management's merchant

6   processing account bank account to Power Trading Inc., as well

7   as from ClipMonster through WebMatrix, Bjorkman Trans-Tech Inc.

8   to Power Trading and then ultimately to Mr. Velinov.

9   Q.   You say Mr. Velinov.  Was there a particular bank account

10  associated or in the name of Mr. Velinov?

11  A.   The DSK Bank account ending 8793.

12  Q.   How do you know that this was Mr. Velinov's bank account?

13  A.   Based on the wire supporting document from the bank.

14  Q.   Turning to page 9, is this an example of the wire

15  supporting document that you just testified to?

16  A.   Yes.

17  Q.   What is -- what is a wire transfer document or supporting

18  document?

19  A.   So the supporting document shows the originator, so who

20  sent the wire, as well as the beneficiary, who received -- who

21  the wire was sent to or who received the wire.  It will

22  sometimes show intermediary banks as well as other information.

23  Q.   Does this document show where the money came from in this

24  particular transaction?

25  A.   Yes, it does.

ZIEGLER - DIRECT EXAMINATION

1   Q.   Where did it come from?
2   A.   Power Trading Inc.'s SunTrust account ending in 5672.
3   Q.   And who received the money?
4   A.   Plamen Velinov, DSK Bank account ending in 6793.
5   Q.   Do you see the portion that starts with the letters BNF?
6   A.   Yes.
7   Q.   Is that the portion you just read?
8   A.   Yes.
9   Q.   What does BNF usually stand for in these types of
10  documents?
11  A.   Beneficiary.
12  Q.   Can you read the city and country associated with the
13  beneficiary Plamen Velinov?
14  A.   Sofia, Bulgaria.
15  Q.   And when was this wire sent?
16  A.   It was sent on May 9th, 2018.
17  Q.   How do you -- where is the send date?
18  A.   It's in the upper left hand -- it's SND date.
19  Q.   What was the amount of this wire?
20  A.   $2,825.
21  Q.   And what bank account did it go to?
22  A.   DSK Bank ending 8793.
23  Q.   Is this what a typical wire supporting document looks
24  like?
25  A.   For SunTrust.

174

ZIEGLER - DIRECT EXAMINATION

1   Q.   For SunTrust.  Do you see the part of the document that
2   starts with ORIG?
3   A.   Yes.
4   Q.   Do you know what that usually stands for?
5   A.   I'm sorry.  Are you asking the OR -- ORIG to BNF?
6   Q.   Yes.
7   A.   So it's originator to beneficiary information.  It's
8   similar to the memo section on a check.
9   Q.   Can you read the memo section on this wire supporting
10  document?
11  A.   "Consulting, hosting, and support scripts, miscellaneous."
12  Q.   And do you see the section that starts with SNDR reference
13  number?
14  A.   Yes.
15  Q.   What is the name -- or what is the phrase or name next to
16  that?
17  A.   CompuTech.
18  Q.   And what is that -- this -- these letters usually stand
19  for, SNDR REF NUM?
20  A.   Sender reference number.
21  Q.   Thank you.  Have you seen the name CompuTech elsewhere in
22  this investigation?
23  A.   Yes.
24  Q.   Where?
25  A.   In the Power Trading QuickBooks.

ZIEGLER - DIRECT EXAMINATION

1   Q.   And why did you analyze the QuickBook information?

2   A.   I was asked to.  I was asked to see if the QuickBooks and

3   the Power Trading bank accounts agreed or had the same or

4   similar information.

5   Q.   And did they agree?

6   A.   Yes, for the most part.

7   Q.   In fact, were you able to determine if there was a

8   connection, a direct connection with the bank accounts and the

9   QuickBooks?

10  A.   Yes.

11  Q.   What was their connection?

12  A.   So can you say that -- ask one more time?  Sorry.

13  Q.   Sure.  Was there any link or tie between Power Trading

14  Inc. accounts or one of the bank accounts and the QuickBooks?

15  A.   Yes.

16  Q.   And what was that?

17  A.   It appeared that the QuickBooks had the auto import of the

18  bank account into the QuickBooks file.

19  Q.   And does that mean that the QuickBooks could pull

20  information from the bank accounts or vice versa?

21  A.   It's my understanding the QuickBooks would upload the

22  transactions from the bank account.

23  Q.   Did analyzing the QuickBook records allow you to expand

24  your investigation time frame?

25  A.   Yes.

ZIEGLER - DIRECT EXAMINATION

1   Q.   Particularly when it came to the amount of money that went
2   to Plamen Velinov?
3   A.   Yes.
4   Q.   And what -- and how so?
5   A.   The QuickBooks records went back farther in time than the
6   bank accounts did, so that allowed me to go back farther.
7   Q.   Turn to page 10, circling back to the name CompuTech, from
8   the QuickBooks did you learn something about that name?
9   A.   Yes, CompuTech was listed as a vendor in the QuickBooks
10  file, and Mr. Velinov's name was also listed with CompuTech.
11  Q.   Were you able to isolate the payments made to Mr. Plamen
12  Velinov?
13  A.   Yes, I was.
14  Q.   I see you have a bar graph here.  Could you explain what
15  this represents?
16  A.   Yes.  So this is showing over time by year the sum of the
17  transactions that were identified as going to Mr. Velinov.  The
18  dark blue is from -- the data from the bank accounts, and the
19  gray is from the QuickBooks.
20  Q.   And the table?
21  A.   The table is the summary by year showing the dollar
22  amount.
23  Q.   And with the addition of the QuickBooks, were you able to
24  determine for at least a time period of 2009 to 2019 how much
25  Plamen Velinov benefited from the proceeds from the websites?

ZIEGLER - CROSS-EXAMINATION

```
 1   A.    Yes.
 2   Q.    How much?
 3   A.    $434,215.
 4         MS. VALDES:  No further questions.
 5         THE COURT:  Thank you.  Ready to begin
 6   cross-examination?  Do you need to -- does anybody need to take
 7   a break?  All right.  We'll move forward until -- maybe another
 8   10 or 15 minutes unless somebody needs to take a break now.
 9              Okay.  Go ahead.  You may proceed with your
10   cross-examination of the witness.
11         MR. KERR:  Thank you, Your Honor.
12                      CROSS-EXAMINATION
13                      BY MR. KERR:
14   Q.    Good afternoon, Ms. Ziegler.
15   A.    Good afternoon.
16   Q.    Just a couple of questions, and I'm going to focus on
17   Exhibit 421 that we just discussed.
18         MR. KERR:  Can you pull that up?  Yes, turning to the
19   first page of that exhibit.  Thank you.
20   BY MR. KERR:
21   Q.    Now, were you able to find any information that connected
22   Mr. Velinov with these other entities over here in the middle,
23   the Hope Trans-Tech Incorporated, Wilowski Management, or --
24   did the records show the transactions were between -- from
25   Power Trading straight to Mr. Velinov?
```

ZIEGLER - CROSS-EXAMINATION

1  A.   The transactions were from Power Trading to Mr. Velinov.

2  Q.   So there's -- was nothing in the records to show -- for

3  example, Ms. Tatiana Powers, I'm sure you're familiar with.

4  She testified that her money laundering offense involved

5  creation of false companies, and the money on this side -- I

6  guess you can't see that there, but I'm pointing to the left

7  side up there of the chart, of these companies that were

8  involved, Wilowski Management and so forth.  But there's

9  nothing to connect Mr. Velinov to his knowledge of any of those

10 transactions; is that correct?

11 A.   I analyzed the bank records.  I saw the transactions from

12 Power Trading Inc. to Mr. Velinov.  I did not see transactions

13 from the bank accounts, Hope Trans-Tech, Wilowski Management,

14 WebMatrix, or the accounts from Mr. Bjorkman.

15 Q.   So it was just so I'm clear on this, what you saw was

16 between Power Trading and Velinov?

17 A.   Correct.

18 Q.   And that was to -- those wire transfers were from Power

19 Trading to Mr. Velinov in his own name, a bank account in his

20 name?

21 A.   Correct, yes.

22 Q.   Okay.  Sorry, I have hearing trouble.  I apologize.

23      And did you also analyze -- I'm turning to the last

24 page here -- or the page -- page 10.  Thank you.

25      Now, of these amounts of money, did you analyze the

ZIEGLER - CROSS-EXAMINATION

1  account -- the DSK Bank account that belonged to Mr. Velinov?

2  A.   I did not.

3  Q.   You didn't look at that?

4  A.   No.

5  Q.   There were -- there was money paid out for servers and

6  that sort of thing.  You're not aware of that?

7  A.   I was not asked to analyze that account.

8  Q.   Okay.  So you're unaware of any payments that were made

9  for expenses for Mr. Velinov for the servers and for employees

10  and that sort of thing?

11  A.   No, I didn't analyze that account, no.

12         MR. KERR:  Okay.  That's all I have.  No further

13  questions.

14         THE COURT:  All right.  Thank you.  Any redirect for

15  the witness?

16         MS. VALDES:  No, Your Honor.

17         THE COURT:  All right.  I'll excuse the witness.

18  Thank you for having come in today to testify.

19                  (Witness excused.)

20         THE COURT:  Do you have another witness you can start

21  with?  Or we can take an early break.

22         MR. REYNOLDS:  Whatever the Court wishes.  This

23  witness will go more than a few minutes, but we can start.

24         THE COURT:  That's all right.  It's probably close

25  enough to when we would take our afternoon break, so we'll go

1    ahead and take our afternoon break.  We would normally stop

2    sometime between 4:15 and 4:30-ish, depending on when the

3    witness finishes her testimony.  So we'll take a 10-minute

4    break.  Please remember not to discuss the case or form any

5    opinions until you've heard all the evidence.

6              (Jury out at 2:39 p.m.)

7              THE COURT:  Thank you.  Just a couple of things so

8    can plan my own schedule.  Mr. Reynolds, after -- which witness

9    will you be calling next?

10             MR. REYNOLDS:  We'll be calling Mr. Angelov who will

11   be testifying through a translator.

12             THE COURT:  Okay.  So do you have witnesses scheduled

13   for tomorrow as well?

14             MR. REYNOLDS:  We anticipate calling three more,

15   including Investigator Angelov, and I anticipate that we will

16   probably finish our trial presentation sometime in the morning.

17             THE COURT:  Okay.  All right.  So I just need to know

18   so that I can be ready with the next step, and what takes us a

19   lot of time is the jury instructions, and since you don't know

20   what's going to happen until happens -- you know, things like

21   did the Defendant testify?  I don't know, other kinds of

22   instructions of that nature, you have to wait.  So, Mr. Kerr,

23   I'm not holding you to it.  Do you know if you will be

24   presenting any testimony or evidence?  Are you still thinking

25   about it?  I mean, if you know, fine.  If you don't know,

1    that's fine too.

2            **MR. KERR:**  Actually I need a little bit of time to

3    think about it.  After this last witness, I was expecting some

4    testimony about the payouts from the account.  That didn't

5    materialize.

6            **THE COURT:**  Okay.

7            **MR. KERR:**  So I don't know if I'll have to call a

8    witness to establish that or not.

9            **THE COURT:**  Okay.  All right.

10           **MR. KERR:**  And I don't know if Mr. Velinov yet will

11   testify.

12           **THE COURT:**  Okay.  And that's fine.  You know, I

13   don't mean to put you on the spot.  I'm just trying to plan my

14   schedule here.

15           So, you know, let's just say for the sake of

16   argument that you finish tomorrow morning, Friday morning, and

17   there are no defense witnesses.  I mean, I'd have to scramble

18   to get jury instructions ready, so that's why -- I always try

19   to be a step ahead.  I mean, it does take a little bit of time

20   put it together.  Yes, that's fine.  Uh-huh.

21           **MR. KERR:**  Your Honor, the defense -- speaking for

22   the defense, I would much prefer to just -- if the Government

23   does finish tomorrow and we don't put on witnesses, much prefer

24   to do the charging conference, whatever the Court wants to do

25   tomorrow, and then plan on finishing up Monday.

```
 1            THE COURT:  Uh-huh.

 2            MR. KERR:  Make a lot more sense to me.

 3            THE COURT:  Well, the charge conference normally

 4    doesn't take that long, so we'll see.  I'm just going to wait

 5    and see where we're at before committing to one thing or the

 6    other.  I don't think it's good for a case to go to the jury at

 7    4:00 p.m. on Friday.  I just don't think that's a good idea.

 8    So I would wait until Monday morning.  On the other hand, to do

 9    everything on Friday except the jury's deliberations, I don't

10    think that's good either.  I'd probably, you know, end early on

11    Friday and start it up on Monday.  But again, I don't know

12    until I see what time it is and what else is going on.

13                  So there's also a forfeiture here.  I think

14    there's some money at issue, if I'm not mistaken, right?  Isn't

15    there?

16            MS. VALDES:  Yes, Your Honor.  And since we're on

17    that topic, I do need to ask if the defense waives their right

18    to a forfeiture hearing.  There seems to be some confusion

19    about what's at issue for a forfeiture hearing.  So for

20    forfeiture purposes, the only thing we would have a hearing on

21    are the devices and if they would be handed over to the

22    Government.  The money itself is a sentencing issue that we

23    would deal with at sentencing, and I know there's been some

24    back and forth about the amounts of money, but that is not what

25    will be covered in an additional forfeiture hearing.  I didn't
```

1  have a chance to talk about -- you know, confer with Mr. Kerr
2  about this.  I know this has been an issue for his client, but
3  just wanted to put that on the record, and I am asking if they
4  want to waive a forfeiture hearing for just the devices or if
5  they would like to do a separate trial after this one for that
6  purpose.
7          THE COURT:  But it's the forfeitability of the
8  assets.  So, in other words, is the money subject to
9  forfeiture?
10         MS. VALDES:  So my understanding in talking to our
11  asset forfeiture attorneys, who are far smarter than I am in
12  this area, is that it would just apply to the physical devices
13  that were seized in the Defendant's home, and then the money
14  itself that Ms. Ziegler just testified to, that would be for
15  Your Honor to decide at sentencing how much we could ask for
16  for that purpose at sentencing.  And I have case law on that if
17  Your Honor would like to --
18         THE COURT:  Okay.  I'm usually used to a
19  determination needing to be made by somebody as to the
20  forfeitability of the asset.  Without something there, you
21  know -- so why don't you go back and talk to your forfeiture
22  people?  I mean, at one point I may have known -- not may.  I
23  did know a lot about forfeitures, but a lot of time has passed.
24         My understanding is that somebody has to decide
25  whether it's forfeitable.  You don't just make it a sentencing

1   hearing -- I mean, a sentencing issue.  You have to determine

2   if there's a nexus between the money that is sought for

3   forfeiture -- in other words, is this cash in a bank account,

4   right, or someplace?  It's cash, correct?

5           MS. VALDES:  The money that was received from the

6   websites, yes, Your Honor.

7           THE COURT:  Right.  It's cash.  So you've got to show

8   a nexus and forfeitability of the asset.  In other words, a

9   decision has to be made that it's a forfeitable -- that the

10  asset is subject to forfeiture.  It's not just a sentencing

11  issue without that decision having been made.  Now, if he

12  waives it, that's fine, but it's only if there's a conviction.

13  Do you want to think about that, Mr. Kerr?

14          MR. KERR:  Yes, I do believe it's a count for the

15  indictment, the forfeiture count.  Is there not a forfeiture

16  count --

17          THE COURT:  I'm sorry, what did you say, Mr. Kerr?

18          MR. KERR:  I believe there's a forfeiture count in

19  the indictment.

20          THE COURT:  Right.  Yeah, so what happens is if the

21  Defendant is convicted, then you tell the jury, "There's still

22  one more issue that you need to decide," because they're not

23  supposed to know, and that's why the indictment is redacted.

24              Let me go see one thing here.  I haven't looked

25  at what the Government has submitted on its forfeiture

1    information, but normally -- I mean, it's not -- he probably

2    doesn't have strong feelings about the other, I don't know,

3    computers as he would about cash.  I mean, generally speaking,

4    that's what people care about.  So you need -- I'm not used to

5    that solely being a sentencing issue.  You have to make a

6    determination that the asset is subject to forfeiture, and that

7    is normally done by the jury in a criminal case.

8              So anyway, you can go to your forfeiture people,

9    all right?  So we're in recess.  I'll see you back here in a

10   few minutes.

11             (Recess from 2:47 p.m. to 2:54 p.m.)

12             THE COURT:  Okay.  So let's see.  Please be seated.

13             So you finished with that witness.  Are you

14   ready with your next witness then?

15             MR. REYNOLDS:  We are, Your Honor, and the

16   interpreter is already set up.

17             THE COURT:  All right.  So it's a different

18   interpreter, so we will need to swear you in, but I'll do that

19   in front of the jury.

20             THE INTERPRETER:  I understand, yes.

21             THE COURT:  Okay.  Thank you.  So we'll bring the

22   jury in.

23             (Jury in at 3:00 p.m.)

24             THE COURT:  All right.  Welcome back, ladies and

25   gentlemen.

```
 1                    We're ready for your next witness.  We have an
 2      interpreter for that witness, but why don't we go ahead and
 3      swear in the interpreter now, Magaly, and then we'll bring in
 4      the witness, okay?
 5                    COURTROOM DEPUTY:  Perfect.
 6                         (Interpreter sworn.)
 7                    COURTROOM DEPUTY:  Can you state your name for the
 8      record?
 9                    THE INTERPRETER:  First name Daniel, D-a-n-i-e-l.
10      Last name capital B as in boy o-j-c-k-o-v as in Victor.
11                    THE COURT:  Thank you.
12                    COURTROOM DEPUTY:  You may be seated.
13                    THE COURT:  Ladies and gentlemen, I think you
14      remember the jury instruction that I read earlier to you
15      concerning translations.  Let me just find that.  So anyway,
16      I'll go ahead and read that jury instruction again.
17                    We seek a fair trial for all, regardless of what
18      language they speak.  We now have an interpreter assisting us
19      through the proceedings in addition to the other two
20      interpreters, and you should know what they can do and what
21      they cannot do.  Basically the interpreter is here only to help
22      us communicate during the proceedings.  The interpreter is not
23      a party in the case, has no interest in the case, and will be
24      completely neutral.  Accordingly, the interpreter is not
25      working for either party.  The interpreter's sole
```

1    responsibility is to enable us to communicate with each other.

2              Treat the interpreter of the witness's testimony

3    as if the witness had spoken English and no interpreter was

4    present.  Do not allow the fact that testimony is given in a

5    language other than English influence you in any way.

6              If any of you understand the language of the

7    witness, disregard completely what the witness says in their

8    language.  Consider as evidence only what is provided by the

9    interpreter in English.

10             If you think an interpreter has made a mistake,

11   you may bring it to the attention of the Court, but you should

12   make your deliberations on the basis of the official

13   interpretation.  All right?

14             So the Government can now call its next witness.

15             MR. REYNOLDS:  Your Honor, the United States calls

16   Chavdar Agelov.

17             COURTROOM DEPUTY:  Do you want to come closer to the

18   translator?  Please raise your right hand.

19                       (Witness sworn.)

20             COURTROOM DEPUTY:  Thank you.  Please state and spell

21   your name for the record.

22             THE WITNESS:  Chavdar Angelov.  Spelling for the

23   Court, first name capital C-h-a-v-d-a-r.  Last name capital

24   A-n-g-e-l as in Lee, o-v as in Victor.

25             COURTROOM DEPUTY:  Thank you.  You may take the

1    stand, and you may be seated.

2              THE COURT:  All right.  You may proceed,

3    Mr. Reynolds.

4                      CHAVDAR ANGELOV,

5    a witness called on behalf of the Government, being first duly

6    sworn, was examined and testified as follows:

7                      DIRECT EXAMINATION

8                      BY MR. REYNOLDS:

9    Q.   Good afternoon, sir.

10   A.   Good afternoon.

11   Q.   I know you've introduced yourself to the courtroom deputy,

12   but could you state your name for the jury as well, please?

13   A.   Yes, my name is Chavdar Stoyanov (phonetic) Angelov.

14   Q.   Where do you live?

15   A.   Sofia, Bulgaria.

16   Q.   Where do you work?

17   A.   National Investigative Services.

18   Q.   What is the National Investigative Services?

19   A.   The National Investigative Services is dealing with

20   criminal cases and composing the entire territory of the

21   country; also investigating criminal activities of the

22   Bulgarian citizens abroad.  Also including are judicial

23   assistance or legal assistance for other countries as well as

24   for arrests.

25   Q.   Is the National Investigative Services part of the

ANGELOV - DIRECT EXAMINATION

1    Bulgarian government?

2    A.    Yes, indeed.

3    Q.    Is it a law enforcement agency?

4    A.    Yes.

5    Q.    What is your title with the Bulgarian National

6    Investigative Services?

7    A.    I am investigator.

8    Q.    Investigator Angelov, how long have you been an

9    investigator with the Bulgarian National Investigative

10   Services?

11   A.    In this particular office, I'm third year.

12   Q.    Do you have any previous experience as an investigator for

13   the Bulgarian Government?

14   A.    Yes, I do additional 13 years as an investigator and 15

15   years as a General -- Attorney General.

16   Q.    Investigator Angelov, is Bulgarian your native language?

17   A.    Yes.

18   Q.    Do you understand some English?

19   A.    Yes.

20   Q.    Are you more comfortable communicating in Bulgarian or in

21   English?

22   A.    Bulgarian.

23   Q.    Investigator Angelov, at some point did the National

24   Investigative Services receive a request from the United States

25   Government for assistance for -- excuse me, for assistance with

ANGELOV - DIRECT EXAMINATION

1   an investigation into Plamen Georgiev Velinov?

2   A.   Yes.

3   Q.   Were you assigned to assist with that request?

4   A.   Yes, personally.

5   Q.   Were you the lead investigator from Bulgaria on that

6   request?

7   A.   Yes.

8   Q.   In the course of your assistance on that investigation,

9   did you identify Plamen Georgiev Velinov?

10  A.   Yes.

11  Q.   How did you identify him?

12  A.   A very standard procedure.  As soon as I receive the

13  inquiry regarding particular case, the very first thing we do

14  to identify the potential individual.  When we receive the

15  request for judicial assistance from the American side, there

16  was a sufficient data which we use to successfully identify

17  person Plamen Velinov.

18  Q.   In the course of your assistance on this investigation,

19  did you ever see Plamen Georgiev Velinov?

20  A.   Yes.

21  Q.   Did you ever speak with him?

22  A.   Yes.

23  Q.   Could you identify him if you saw him?

24  A.   Yes.

25  Q.   Investigator Angelov, do you see Plamen Georgiev Velinov

1   in the courtroom today?

2   A.   Yes.

3   Q.   Could you please identify him by where he is sitting and

4   what he's wearing?

5   A.   On the left-hand side of me in the first row in the middle

6   with a gray shirt.

7            MR. REYNOLDS:  Your Honor, may the record reflect

8   that the witness has identified the Defendant?

9            MR. KERR:  No objection.

10           THE COURT:  No objection?  The record will so

11   reflect.  Thank you.

12  BY MR. REYNOLDS:

13  Q.   Investigator Angelov, in Bulgaria, is every citizen

14  assigned a unique number by the Government?

15  A.   From the time of birth.

16  Q.   Could you explain a little more about what that number is

17  and what it's used for?

18  A.   Yes.  The first six number contain the year, the month,

19  and date of the birth.  The next four numbers are identifying

20  the city in which the individual is born.  Also regarding the

21  sex, whether it's a male or female, and how many doubles he has

22  in Bulgaria.

23  Q.   What do you mean by doubles?

24  A.   Identical by facial features.

25  Q.   In the course of your investigation, Investigator Angelov,

ANGELOV - DIRECT EXAMINATION

1    did you identify the unique identification number of Mr. Plamen
2    Velinov?
3    A.    Yes.
4    Q.    Investigator Angelov, have you heard of a bank called DSK
5    or Dessica (phonetic) Bank?
6    A.    Yes.
7    Q.    What is it?
8    A.    A private bank operating in the territory of Bulgaria, I
9    believe third or fourth largest bank in the country.
10   Q.    And in the course of your assistance on the investigation
11   of Mr. Velinov, did you obtain Mr. Velinov's bank records from
12   Dessica Bank?
13   A.    Yes.
14   Q.    How do you know they were the banking records of
15   Mr. Velinov?
16   A.    There are two ways under the Bulgarian law to find out
17   about the bank accounts to a particular individual.  Our
18   investigative services has a large database which includes bank
19   accounts and any other pertinent information to anyone in
20   country.  As soon as we know which bank the investigated person
21   banks, and if there is no -- if there's no ban regarding this
22   particular person to be investigated, then -- then we at our
23   services invite the individual voluntarily to give and -- give
24   us permission to access the bank record.
25         THE INTERPRETER:  If -- can I ask him to repeat the

ANGELOV - DIRECT EXAMINATION

1    last one?  Can you repeat, please?

2    A.   If there was a lien regarding this person not to give

3    access or -- or he doesn't cooperate, then we use the law in

4    which allows us to issue a warrant regarding this person and to

5    access that account, regardless of his position or permission.

6            In this particular case there was nothing regarding

7    Mr. Velinov not to be investigated.  I personally spoke with

8    him.  And at the front of me, he signed documents allowing our

9    services to give access to his bank accounts.

10           MR. REYNOLDS:  Your Honor, may I approach the

11   witness?

12           THE COURT:  You may.

13   BY MR. REYNOLDS:

14   Q.   Investigator Angelov, I've just handed you a stack of

15   exhibits.  Could you direct your attention to Government

16   Exhibit 806, please?

17   A.   Yes.

18   Q.   Have you seen Government Exhibit 806 before?

19   A.   Yes.

20   Q.   What is it?

21   A.   This is a contract to open checking account for

22   individual.

23   Q.   What individual?

24   A.   Yes, this is a request to open checking account to Plamen

25   Velinov -- interpreter correction, Plamen Georgiev Velinov to

1    open a checking account.

2    **Q.**   Is this a true and correct copy of a document you received

3    from DSK Bank?

4    **A.**   Yes.

5          **MR. REYNOLDS:**  Your Honor, we offer Government

6    Exhibit 806 into evidence and note that there is an 18 USC 3505

7    certificate on file under docket entry 105.

8          **THE COURT:**  Any objection?

9          **MR. KERR:**  No objection.

10          **THE COURT:**  It's received into evidence and may be

11    published to the jury.

12          **MR. REYNOLDS:**  May I have one moment confer with

13    co-counsel, please?

14          **THE COURT:**  You may do so.

15          **MR. REYNOLDS:**  Thank you.

16                    (Pause.)

17          **MR. REYNOLDS:**  Your Honor, we have what is marked as

18    Government Exhibit 11.  The witness does not have a copy.  It

19    is a stipulation.  May we publish it and put it on the screen?

20          **THE COURT:**  Yes, you may do so.  Any objection to

21    that, Mr. Kerr?

22          **MR. KERR:**  No.

23          **THE COURT:**  Okay.

24          **MR. REYNOLDS:**  And we'd like to offer it into

25    evidence too, Your Honor.

1          **THE COURT:**  Okay.  That would be fine.  Any objection

2     to it being received into evidence, Mr. Kerr?

3          **MR. KERR:**  None, Your Honor.

4          **THE COURT:**  It is received into evidence.

5          **MR. REYNOLDS:**  And may I read it to the jury?

6          **THE COURT:**  Yes, you may.

7          **MR. REYNOLDS:**  Thank you.  This can go up on the big

8     screen.  And would it be possible to dim the lights?

9          **COURTROOM DEPUTY:**  Yes.

10          **THE COURT:**  We will do that.

11          **MR. REYNOLDS:**  Thank you very much.  It is hereby

12     stipulated and agreed by and between the United States of

13     America, the Defendant, Plamen Georgiev Velinov, and his

14     attorney, Christophir Kerr, that the United States has

15     established the following facts beyond a reasonable doubt:

16               Government Exhibit 806 contains statements in

17     the Bulgarian language.  Government Exhibit 806T is a true and

18     correct translation of Government Exhibit 806.

19               Government Exhibit 807 contains statements in

20     the Bulgarian language.  Government Exhibit 807T is a true and

21     correct English translation of Government Exhibit 807.

22               Government Exhibit 808 contains statements in

23     the Bulgarian language.  Government Exhibit 808T is a true and

24     correct English translation of Government Exhibit 808.

25               Government Exhibit 809 contains statements in

ANGELOV - DIRECT EXAMINATION

1    the Bulgarian language.  Government Exhibit 809T is a true and
2    correct English translation of Government Exhibit 809.
3              Government Exhibit 810 contains statements in
4    the Bulgarian language.  Government Exhibit 810T is a true and
5    correct English translation of Government Exhibit 810.
6              Your Honor, in accordance with the stipulation,
7    we offer Government Exhibit 806T, 807T, 808T, 809T, and 810T
8    into evidence.
9              THE COURT:  All right.  Is there any objection?
10             MR. KERR:  No objection.
11             THE COURT:  It's received into evidence, may be
12   published to the jury.
13             MR. REYNOLDS:  Your Honor, would it be possible to --
14   would it be possible to publish the English version to the jury
15   while the witness examines the Bulgarian version?
16             THE COURT:  Any objection to that, Mr. Kerr?
17             MR. KERR:  No objection.
18             THE COURT:  That's what we will do then.
19             MR. REYNOLDS:  Ms. Davis, could you publishing 806T,
20   please?
21   BY MR. REYNOLDS:
22   Q.   Investigator Angelov, I'm going to ask you to review the
23   paper copy of Government 806.  A translation is being shown on
24   the screen.
25             Investigator Angelov, according to the paper copy of

ANGELOV - DIRECT EXAMINATION

1  Government Exhibit 806 that is before you, who opened this
2  account described in Government Exhibit 806?
3  A.   Looking at this document, the request for this opening the
4  account, it's Plamen Georgiev Velinov.
5  Q.   And according to this document, when was this account
6  opened?
7  A.   May 8, 2006.
8  Q.   Does the account number of the account in question appear
9  on this document?
10          THE INTERPRETER:  Can you repeat the question?
11 Q.   Does the account number of the account appear on this
12 document?
13 A.   Yes.
14 Q.   Does that account end in 12068793?
15 A.   Yes.
16 Q.   Investigator Angelov, what is the unit of currency in
17 Bulgaria?
18 A.   Lev, spelling for the Court, l-e-v.
19 Q.   Is this account opened in Bulgarian lev?
20 A.   No.
21 Q.   What currency is it opened in?
22 A.   U.S. dollars.
23 Q.   Investigator Angelov, near the top of the page next to the
24 name Plamen Georgiev Velinov, do you see a number?
25 A.   Yes, this is the Bulgarian identifying number that we talk

ANGELOV - DIRECT EXAMINATION

1   about.

2   Q.   And the number that appears on this document, is this the

3   unique Bulgarian identification number for Plamen Velinov who's

4   sitting in this courtroom today?

5   A.   Yes.

6   Q.   All right.  Investigator Angelov, could I ask you to look

7   at Government Exhibit 807, please?

8   A.   Yes.

9   Q.   Have you seen this document before?

10  A.   Yes.

11  Q.   What is it?

12  A.   Request for closing account to DSK Bank.

13  Q.   Is there a name on this document that appears to be the

14  account holder?

15  A.   Yes.

16  Q.   What name is that?

17  A.   Plamen Georgiev Velinov.

18  Q.   Investigator Angelov, is Government Exhibit 807 a true and

19  correct copy of a document you received from Dessica Bank?

20  A.   Yes.

21        MR. REYNOLDS:  Your Honor, we offer Government

22  Exhibit 807 into evidence.

23        THE COURT:  Okay.

24        MR. KERR:  No objection.

25        THE COURT:  Any objection -- let me just

ANGELOV - DIRECT EXAMINATION

1    double-check.  Any objection to that?

2            MR. KERR:  No objection.

3            THE COURT:  All right.  It is received into evidence

4    and may be published to the jury.

5            MR. REYNOLDS:  Your Honor, again, we may publish the

6    English version while he examines the Bulgarian version?

7            THE COURT:  Any objection to that, Mr. --

8            MR. KERR:  None, Your Honor.

9            THE COURT:  That's what we will do then.

10   BY MR. REYNOLDS:

11   Q.   Investigator Angelov, Government Exhibit 807, do you see

12   an account number that appears on this document?

13   A.   Yes, account number.

14   Q.   Is it the same -- is it the same account number I just --

15   I read to you previously, 12068793?

16   A.   Indeed.  This is the last eight numbers, the last eight

17   numbers of his account number with the bank.

18   Q.   And according to this document, when was this document

19   submitted?

20   A.   Yes.  Yes.  November 11th, 2019.

21   Q.   Does this document appear to be signed at the bottom?

22   A.   Yes, indeed.

23   Q.   Thank you.  Investigator Angelov, could I ask you to look

24   at Government Exhibit 808?  Have you seen this document before?

25   A.   Yes.

1   Q.   What is it?

2   A.   This is a survey from the DSK Bank to the physical

3   individual, to the person.

4   Q.   Whose account does this appear to relate to?

5   A.   Plamen Georgiev Velinov.

6   Q.   At the bottom -- does a date appear at the bottom of this

7   document?

8           THE INTERPRETER:  Can you repeat the question?

9   Q.   Does a date appear at the bottom of this document?

10          THE INTERPRETER:  Thank you.

11  A.   Yes, yes, there is.

12  Q.   What date is that?

13  A.   June 21st, 2019.

14  Q.   And does this document appear to be signed at the bottom?

15  A.   Yes.

16  Q.   Investigator Angelov, is Government Exhibit 808 a true and

17  correct copy of a document you received from Dessica Bank?

18  A.   Yes.

19          MR. REYNOLDS:  Your Honor, we offer Government

20  Exhibit 808 into evidence.

21          THE COURT:  808?

22          MR. KERR:  No objection.

23          THE COURT:  808 is received into evidence and may be

24  shown to the jury.

25  BY MR. REYNOLDS:

ANGELOV - DIRECT EXAMINATION

1    Q.   Investigator Angelov, can I ask you to look at Government
2    Exhibit 809?  Have you seen this document before?  I'm sorry.
3    Take your time.
4    A.   Yes.
5    Q.   What is it?
6    A.   Request from the said bank to issue a debit card for this
7    individual, DSK Bank.
8    Q.   Which individual?
9    A.   Judging on this document, Plamen Georgiev Velinov.
10   Q.   Is this a true and correct copy of a document you received
11   from Dessica Bank?
12   A.   Yes.
13        MR. REYNOLDS:  Your Honor, we offer Government
14   Exhibit 809 into evidence.
15        MR. KERR:  No objection.
16        THE COURT:  It's received into evidence, may be
17   published to the jury.
18        MR. REYNOLDS:  Ms. Davis, can we put the Bulgarian
19   version of 809 up on the screen, please?
20   BY MR. REYNOLDS:
21   Q.   Investigator Angelov, in boxes on the left side of the
22   screen in Government Exhibit 809, do you see a number that
23   appears to read 7308196402?
24   A.   Yes.
25   Q.   Do you recognize that number?

1    A.    Yeah, that's the personal identification number for the

2    Plamen Velinov Georgiev -- interpreter correction, Plamen

3    Georgiev Velinov.

4    Q.    In approximately the middle of the page of Government

5    Exhibit 809, there's a series of boxes.

6          MR. REYNOLDS:  Ms. Davis could you pull that up?

7    BY MR. REYNOLDS:

8    Q.    Investigator Angelov, the two sets of boxes at the bottom

9    of the screen, could you identify what those mean?

10   A.    Yes.

11   Q.    What are they?

12   A.    The first row is the name of Plamen Velinov spelled with

13   Latin alphabet, letters that is.  The -- below that, there is

14   also a code word which is also spelled with Latin letters.

15   Okay.  And if I have to read it, it reads Plaper.

16   Q.    Is Plaper a word in the Bulgarian language?

17   A.    No.

18   Q.    What is the purpose of this passcode?

19   A.    In the realm of the bank, when a bank communicates with

20   its own client, person who has an account with the bank by

21   phone, for whatever reason the client is not at the bank

22   physically, face to face, so to speak, and they're talking on

23   the phone, as soon as the client said this code word to the

24   bank, this code word is opening the door.  The bank recognize

25   this is the person who has account with the bank.  This code

ANGELOV - DIRECT EXAMINATION

1  word is exclusively in the knowledge of the bank and the
2  individual who has an account.
3  Q.   Does this document, Government Exhibit 809, appear to have
4  been signed at the bottom?
5  A.   Yes.
6  Q.   Thank you.  Could you take a look at Government
7  Exhibit 810, please?
8  A.   Yes.
9  Q.   Investigator Angelov, have you seen this item before?
10 A.   Yes.
11 Q.   What is it?
12 A.   This is a disk that contains information from the DSK
13 Bank.  Approximately there was 150 banking requests or banking
14 documents from the person Plamen Velinov.
15 Q.   How do you know that the records you just described are on
16 that CD?
17 A.   As you can see, there's my initials, the initials of my
18 name in cyric alphabet, my signature, and the date which I
19 verified the content of this disk.  And it's -- this is my own
20 handwriting.
21 Q.   Does Government Exhibit 810 contain true and correct
22 copies of documents you received from Dessica Bank?
23 A.   Yes.
24         MR. REYNOLDS:  Your Honor, we offer Government
25 Exhibit 810 into evidence.

ANGELOV – DIRECT EXAMINATION

1          THE COURT:  What was the number, 810?

2          MR. REYNOLDS:  810, yes.

3          THE COURT:  All right.  Any objection?

4          MR. KERR:  No.

5          THE COURT:  It's received into evidence, may be

6   published to the jury.

7          MR. REYNOLDS:  Thank you.

8   BY MR. REYNOLDS:

9   Q.   Investigator Angelov, could you look at Government

10  Exhibit 810A?

11  A.   Yes.

12  Q.   Have you seen these documents before?

13  A.   Yes.

14  Q.   What are they?

15  A.   Wire transfer of foreign currency.

16  Q.   Are these documents that were contained within Government

17  Exhibit 810?

18  A.   Yes.

19  Q.   And are -- is Government Exhibit 810A, does it contain

20  true and correct copies of documents you received from Dessica

21  Bank?

22  A.   Yes.

23          MR. REYNOLDS:  Your Honor, we offer Government

24  Exhibit 810A into evidence.

25          THE COURT:  All right.  810A?

ANGELOV - DIRECT EXAMINATION

1          MR. KERR:  No objection.

2          THE COURT:  Thank you.  810A received into evidence,

3   may be published to the jury.

4   BY MR. REYNOLDS:

5   Q.   Investigator Angelov, how many pages is Government

6   Exhibit 810A?

7   A.   Two.

8   Q.   As to the first wire transfer, who was the -- is it two?

9   A.   Total of four.  Total of four pages, of four different

10  transactions.

11  Q.   As to the first page, Investigator Angelov, could you

12  identify the sender of this wire transfer?

13  A.   Yes.

14  Q.   Who was it?

15  A.   Plamen Georgiev Velinov.

16  Q.   Do you see a bank account on page 1 that ends in 12068793?

17  A.   Yes.

18  Q.   Who is the recipient of this payment?

19  A.   It is written in Latin, and I read it as Leaseweb, one

20  word, BV.  Do you need spelling for the Court?  Thank you.

21  Q.   Investigator Angelov, again, do you have some ability to

22  read Latin or English characters?

23  A.   Yes.

24  Q.   And can you identify the amount of this payment in page 1

25  of Government Exhibit 810A?

ANGELOV - DIRECT EXAMINATION

1    A.   512.31 Euros.

2    Q.   As to page 2, Investigator Angelov, who was the sender of

3    this wire transfer?

4    A.   Plamen Georgiev Velinov.

5    Q.   Does this relate to that same account number ending in

6    12068793?

7    A.   Exactly, yes.

8    Q.   Who's the recipient of that wire transfer?

9    A.   Written in Latin, Anton Klenin.

10   Q.   How much is it for?

11   A.   2,200 U.S. dollars.

12   Q.   And is there a field that identifies the reason for the

13   transfer?

14   A.   Yes, there is a reason for the transfer.

15   Q.   What is listed?

16   A.   Again, it is written in Latin, and it says Power Trading

17   Inc.

18   Q.   All right.  The third page of Government Exhibit 810A,

19   Investigator Angelov, does this represent a payment from

20   Mr. Velinov to Mr. Klenin from that same account?

21   A.   Yes, in particular there is a U.S. dollar transfer for

22   $1,500 from Mr. Plamen Velinov's account to Klenin Anton

23   Iurevich.

24   Q.   What is listed as the reason for this transfer?

25   A.   Yes, there is.  Private payment.

1    Q.   All right.  The final page, same question, Investigator

2    Angelov.  Is this another wire transfer from Plamen Velinov to

3    Anton Iurevich Klenin?

4    A.   Yes.

5    Q.   What is listed as the reason for this payment?

6    A.   Here is slightly different.  And here is written also in

7    Latin, material aid.

8          MR. REYNOLDS:  Thank you.  Your Honor, we also offer

9    Exhibit 810AT into evidence which is the excerpt of 810T.

10          THE COURT:  810T.  Any objection?

11          MR. KERR:  No objection.

12          THE COURT:  All right.  It's received into evidence.

13    May be published to the jury.

14    BY MR. REYNOLDS:

15    Q.   Investigator Angelov, in the course of your investigation,

16    did you determine where Plamen Velinov lived?

17    A.   Yes.

18    Q.   How did you determine that?

19    A.   As I mentioned before, our services has a very large

20    database which includes address registration to every Bulgarian

21    citizen on the territory of Bulgaria.  Thanks to this database

22    and this system, along with other police methods, we were able

23    to find out -- we were able to find two red physical addresses

24    for Mr. Velinov and one address of his office.  And throughout

25    the whole investigation, which includes personal conversations

ANGELOV - DIRECT EXAMINATION

1    with Mr. Velinov, and in the course of conversation he revealed
2    a third address for which we didn't have any database, and this
3    stood out as -- this was actually his real residence.
4    Q.   What city and country was that real residence of
5    Mr. Velinov located in?
6    A.   Sofia, Bulgaria.
7    Q.   Investigator Angelov, I'd like to take you back to August
8    of 2021.
9    A.   Yes.
10   Q.   At that time, did Bulgarian law enforcement search
11   Mr. Velinov's apartment?
12   A.   To all of known addresses of his.
13   Q.   Were you present during the searches of all the known
14   addresses, including the apartment where he actually resided?
15   A.   Yes.
16   Q.   Were you in charge of those searches?
17   A.   Yes.
18   Q.   When you arrived at the address where Plamen Velinov
19   actually lived, was he present there with you?
20   A.   Yes.
21   Q.   Did you see him unlock the door to the apartment?
22   A.   Yes.
23   Q.   Were there documents in the apartment that had his name,
24   Plamen Velinov, on them?
25   A.   Yes.

ANGELOV - DIRECT EXAMINATION

1   Q.   Was there any other person living in that apartment?

2   A.   No.

3   Q.   Investigator Angelov, were you by yourself during this

4   search?

5            THE INTERPRETER:   Can you repeat the question?

6   Q.   Were you by yourself during that search?

7   A.   No.

8   Q.   Who was there with you?

9   A.   At this particular time, there was police officers

10  officially from the police; technical experts, specifically

11  computer specialists; and two -- I need help -- type of

12  witnesses, two additional witnesses.

13  Q.   Can you explain why these two additional witnesses were

14  present?

15  A.   According to the Bulgarian legislations, when there is

16  a -- this type of search, by law there should be two witnesses.

17  These two individuals, these two witnesses has absolutely no

18  relationship to that investigation.  Those two witnesses from

19  the time we enter to the time we exit, they witness our action.

20  They look carefully, closely our actions.  They also observe

21  the particular places of certain material facts, whether we

22  seize them, how do we seize them, how do we package them, how

23  we mark them as exhibits, and ultimately everything that we

24  seize is correctly reflected into the protocol of seizure.

25  Their signatures on the protocol as well as on the front of

1  each identifying tag of every single item, material evidence.

2  They, so to speak, guarantee that everything seized, there is

3  no way to be exchanged, falsified, unless the packages and the

4  tags and identifications are broken.

5  Q.   Investigator Angelov, when you and this team searched

6  Mr. Velinov's apartment, what were you looking for?

7  A.   We're looking, searching for any computer configurations,

8  anything that holds electronic informations, flash, hard disk

9  drives, CDs, DVDs, as well as documents for payments of money

10  to Mr. Velinov or from him to other individuals.  We are also

11  looking for photos, real photos, whether on paper or anything

12  of child pornography.

13  Q.   Could you please take a look at Government Exhibit 801

14  which should be in front of you?  Have you seen Government

15  Exhibit 801 before?

16  A.   Yes.

17  Q.   Very briefly, what does it depict?

18  A.   This photo shows part from the apartment in which

19  Mr. Velinov resides.

20  Q.   Were you in the apartment around the time -- in

21  Mr. Velinov's apartment around this time this photograph was

22  taken in Government Exhibit 801?

23  A.   Yes.

24  Q.   Does Government Exhibit 801 truly and accurately reflect

25  what Mr. Velinov's apartment looked like at the time you

ANGELOV - DIRECT EXAMINATION

1   searched it?

2   A.   Yes.

3          MR. REYNOLDS:  Your Honor, we offer Government

4   Exhibit 801 into evidence.

5          MR. KERR:  No objection.

6          THE COURT:  All right.  801 is received into

7   evidence, may be published to the jury.

8   BY MR. REYNOLDS:

9   Q.   Investigator Angelov, what is on the -- the white object

10  to the right of the monitor?

11  A.   Computer configuration.

12  Q.   Did you seize that computer configuration?

13  A.   Yes.

14  Q.   And what is on top of that computer configuration?

15  A.   This is external hard drive.

16  Q.   Showing you what's been marked as Government

17  Exhibit 804 --

18          THE COURT:  804?

19          MR. REYNOLDS:  804.

20  BY MR. REYNOLDS:

21  Q.   Have you seen this picture before?

22  A.   Yes.

23  Q.   What is it?

24  A.   This is the said hard disk that was on the top of the

25  computer.

ANGELOV - DIRECT EXAMINATION

1  Q.   Dos it truly and accurately depict that hard disk?

2  A.   Yes.

3         MR. REYNOLDS:  Your Honor, we offer Government

4  Exhibit 804 into evidence.

5         THE COURT:  All right.  804?  No objection?  It's

6  received into evidence, may be published to the jury.

7  BY MR. REYNOLDS:

8  Q.   Investigator Angelov, did you also seize this hard disk

9  that's depicted in Government Exhibit 804?

10  A.   Yes.

11  Q.   We saw a computer tower in Government Exhibit 801, and you

12  testified that you seized it.

13  A.   Yes.

14  Q.   At the time you seized it, did it have other hard drives

15  inside of it?

16  A.   Yes.

17  Q.   When you seized that computer tower, did you take those

18  other hard drives with you?

19  A.   Yes.

20  Q.   Investigator Angelov, is there an item on the table next

21  to you that is tagged Government Exhibit 805A?

22  A.   Yes.

23  Q.   Could you point to it clearly so the jury can identify

24  what you're looking at?

25  A.   This is the one.

ANGELOV - DIRECT EXAMINATION

1  Q.   What is that?

2  A.   This is the computer configuration that we found in the

3  apartment, and we -- eventually we seized.

4  Q.   And when you say the apartment, do you mean the apartment

5  of Mr. Plamen Velinov who's sitting in the Court today?

6  A.   Yes, indeed.

7  Q.   Investigator Angelov, is there an item on the stand next

8  to you marked Government Exhibit 805B?

9  A.   Yes, I do.

10  Q.   Would you mind holding it up so the jury can see it,

11  please?  What is that?

12  A.   External hard disk.

13  Q.   Is that the same hard disk we saw in the photograph of

14  Government Exhibit 804?

15  A.   No.

16  Q.   Is the hard disk you saw from Government Exhibit 804 on

17  the table in front of you?

18  A.   Yes.

19  Q.   What tag does it have?

20  A.   805E.  Correction.  805B, B as in boy.

21  Q.   Thank you.  Investigator Angelov, could you hold up 805B

22  for the jury, please?  Thank you.  Is that the hard drive that

23  you seized from Mr. Velinov's apartment?

24  A.   Yes.

25  Q.   Do you see Government Exhibits 805C and 805D on the stand

1   in front of you?

2   A.   Yes, I do.

3   Q.   What are they?

4   A.   Two hard disk.

5   Q.   Where do they come from?

6   A.   Those two were inside of this computer.

7   Q.   Could you hold those two items up for the jury so they can

8   see, please?

9           Last one, Investigator Angelov.  Is there an item

10  tagged 805E?

11  A.   Yes.

12  Q.   What is it?

13  A.   This is also a hard drive.  However, it's a model SSD.

14  Q.   Where did it come from?

15  A.   Also it was inside the computer.

16  Q.   Investigator Angelov, the items on the table in front of

17  you, Government Exhibits 805B -- excuse me, 805A, B, C, D, and

18  E, do they appear to be in substantially the same condition as

19  they were when you seized them from Mr. Velinov's apartment?

20  A.   Yes, exactly.

21          MR. REYNOLDS:  Your Honor, we offer Government

22  Exhibits 805A, B, C, D, and E into evidence.

23          MR. KERR:  No objection.

24          THE COURT:  All right.  They're all received into

25  evidence and may be published to the jury.

ANGELOV - CROSS-EXAMINATION

1  BY MR. REYNOLDS:

2  Q.   Investigator Angelov, what did you do with these items

3  after you seized them from Mr. Velinov's apartment?

4  A.   They were taken to our services.

5  Q.   And what do you mean by your services?

6  A.   National Investigative Services.

7  Q.   When you brought these items back to the National

8  Investigative Services, were there personnel from the U.S.

9  Department of Homeland Security there?

10 A.   Yes.

11        MR. REYNOLDS:  Thank you, Investigator Angelov.  Your

12 Honor, we'll pass the witness.

13        THE COURT:  All right.  Thank you.  Any

14 cross-examine, Mr. Kerr?

15        MR. KERR:  Yes, Your Honor.

16                    CROSS-EXAMINATION

17                    BY MR. KERR:

18 Q.   Good afternoon, sir.

19 A.   Hello.

20 Q.   If I heard you correctly, you have been an investigator

21 for 30 years?

22 A.   Yes.

23 Q.   Okay.  And you received this request from the U.S.

24 Government for assistance on this case in August of 2021?

25 A.   A little earlier.

ANGELOV - CROSS-EXAMINATION

1   Q.   Okay.  And you indicated that you searched your
2   identification records and located and identified Mr. Velinov?
3   A.   Yes.
4   Q.   And he's 49 years old about?  My question is you didn't
5   have any criminal records, he had never been arrested in
6   Bulgaria; is that right?
7   A.   I don't have clear recollection regarding this issue, but
8   during the investigation, there should be a data regarding this
9   question.
10  Q.   I'm sorry, I didn't understand.
11  A.   When we receive request for assistance from United States,
12  this request should have indication whether the person has a
13  criminal record in the past.  I personally right now don't have
14  recollections regarding this issue.
15  Q.   But in Bulgaria, you don't have criminal records for him,
16  for arrests in Bulgaria?
17  A.   Okay.  We responded to the request for legal assistance,
18  and in our response, they should get clear indication whether
19  the person has a criminal record and been arrested.
20  Q.   I'm sorry.  I'm having a language problem.  I apologize,
21  but my question is Mr. Velinov did not have an arrest record in
22  your country?
23  A.   I have no recollections.
24  Q.   Okay.  And the -- you indicated that he signed a consent
25  for his bank accounts?

ANGELOV - CROSS-EXAMINATION

1    A.    Yes.

2    Q.    Okay.  So he voluntarily submitted to that?

3    A.    Yes.

4    Q.    And when you called him and asked him to come in to your

5    office, he came in?

6    A.    Yes.

7    Q.    And he spoke to you for more than two hours; is that not

8    right?

9    A.    Yes, long time.

10   Q.    And you indicated that you obtained bank records that

11   showed that he opened his account in May of 2006?

12   A.    Yes, there is documents indicating that.

13   Q.    And he had that account from 2006 until it was closed in

14   2019?

15   A.    Yes.

16   Q.    And that account was in his true name with his true name

17   and identity?

18   A.    I have no reason, no datas for any other names.

19   Q.    And my question was he did use his true identity to get

20   the account?

21   A.    Yes.

22   Q.    And you were asked questions about wire transfers, three

23   or four, I believe it was Exhibit 810A, but those were --

24   correct me if I'm wrong.  Those were wire transfers from

25   Mr. Velinov to other persons, to the Leaseweb, the server --

1    I'm sorry, I spoke too long.

2    A.   Yes.

3    Q.   So that was money going out of Mr. Velinov's account to

4    other persons?

5    A.   Yes.

6    Q.   And you indicated that he was present and unlocked the

7    door to his apartment for his search -- the search?

8    A.   Yes.

9    Q.   And he was cooperative?

10   A.   Yes.

11   Q.   Offered no resistance?

12   A.   No.

13          MR. KERR:  No further questions.  Thank you.

14          MR. REYNOLDS:  Your Honor, we have no redirect.

15          THE COURT:  Okay.  All right.  Very good.  And

16   anything else at all for this witness from anybody?

17          MR. REYNOLDS:  Not from us, Your Honor.

18          THE COURT:  Anything else?  All right.  I will excuse

19   the witness.  Thank you.  All right.  We appreciate your being

20   here.

21                    (Witness excused.)

22          THE COURT:  You have another witness?  Do you have

23   somebody else you can present?

24          MS. VALDES:  We do, Your Honor.

25          THE COURT:  Okay.  If you can call your next witness,

1    please?

2          MS. VALDES:  The United States calls Justin Gaertner.

3    May I approach the witness box?

4          THE COURT:  Yes.

5                    (Witness sworn.)

6          COURTROOM DEPUTY:  Thank you.  Please state and spell

7    your name for the record.

8          THE WITNESS:  Justin Gaertner.  First name Justin,

9    J-u-s-t-i-n; last name Gaertner, G-a-e-r-t-n-e-r.

10         COURTROOM DEPUTY:  Thank you.  You may take the

11   stand.

12         THE COURT:  You're going to be asked some questions

13   by the Assistant United States Attorney assigned to this case.

14   If you don't understand it, please say so, so she can state it

15   differently.  Wait until the question is finished before you

16   begin answering so we don't have two people speaking at the

17   same time.

18              If you have the tendency to speak quickly, slow

19   down so that we can understand you, and if you're soft spoken,

20   speak up so we can hear you.

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  Okay.  Go ahead.

23                   JUSTIN GAERTNER,

24   a witness called on behalf of the Government, being first duly

25   sworn, was examined and testified as follows:

GAERTNER - DIRECT EXAMINATION

```
 1                    DIRECT EXAMINATION
 2                   BY MS. VALDES:
 3   Q.   Good afternoon.
 4   A.   Good afternoon.
 5   Q.   Where do you work?
 6   A.   Homeland Security Investigations here in Tampa.
 7   Q.   And what do you do for HSI?
 8   A.   I am a computer forensics analyst.
 9   Q.   How long have you been a computer forensics analyst?
10   A.   Approximately 10 years.
11   Q.   And what do you do?  What is your role as a computer
12   forensics analyst?
13   A.   As a CFA with HSI Tampa, I go out on search warrants,
14   arrest warrants, operations, preview devices on those warrants.
15   I analyze multiple devices that contain digital media such as
16   cellphones, computers, thumb drives, hard drives, CDs.
17   Q.   What types of -- do you assist in criminal investigations?
18   A.   Yes.
19   Q.   What type of criminal -- what types of criminal
20   investigations?
21   A.   I've worked on child exploitation cases, national security
22   cases, intellectual property rights, fraud, human trafficking,
23   drug trafficking, human smuggling.
24   Q.   How long have you investigated child exploitation cases?
25   A.   Ten years.
```

GAERTNER - DIRECT EXAMINATION

1   Q.   And what type of child exploitation cases have you
2   investigated or do you investigate?
3   A.   I've investigated possession of child pornography,
4   receipt, distribution, and production.
5   Q.   Have you testified in child exploitation cases before?
6   A.   Yes.
7   Q.   How many?  How many times?
8   A.   I would say approximately five.
9   Q.   And in those times that you've testified before, was it
10  for analyzing computer data?
11  A.   Yes.
12  Q.   Was it for your role as an HSI computer forensic expert?
13  A.   Yes.
14  Q.   Can you please explain the type of education and training
15  you have received to become a forensic analyst?
16  A.   I've received numerous certifications in the forensic
17  software used, such as EnCase, FDK, Cellebrite, to include
18  basic and advanced computer entry recovery training, basic and
19  advanced computer forensic cellphone courses, Til Technology's
20  reverse engineering and hacking courses, as well as online
21  BitTorrent and trial expectations investigations.
22  Q.   You mentioned earlier previewing devices.  What does that
23  mean?
24  A.   So preview is done typically on knock and talk or a search
25  warrant, and it's not -- it's like an in-field forensics

1  analyst.  It's not a full suite of applications with the tools
2  that I would typically have back in my forensics lab.
3  Q.   And what type of things do you -- when you're analyzing
4  some data, what are the steps that you take to analyze that
5  data?
6  A.   So if computers or desktops, if -- I guess it depends if
7  the computer is on or not or if I'm in the field or back in the
8  lab, but typically I would remove the hard drive from the
9  laptop or desktop, and then I would connect that hard drive or
10  external drive or thumb drive to what we call the write
11  blocker, and then I'd use a forensics application to make a
12  forensic copy of that device.
13  Q.   And I want to circle back to that, but going back to your
14  education and training, do you also teach any courses?
15  A.   Yes.
16  Q.   Can you explain that?
17  A.   For the HSI Tampa area of responsibility, or AOR, which is
18  most of the state of Florida, I am the Introduction to
19  Computers, Networks and Cybercrime instructor, and I also teach
20  courses to the Human Exploitation and Rescue Operative work
21  here with HERO Child-Rescue Corps, which is an internship for
22  combat wounded veterans.
23  Q.   When you're teaching those courses, what types of things
24  or techniques are you teaching them?
25  A.   So for -- as an ICNC instructor, I teach how to extract

GAERTNER - DIRECT EXAMINATION

1  and analyze devices using the forensics tools that I use.  For

2  the HERO Corps, it's mainly child exploitation cases, and I've

3  taught how to image hard drives as well as analyzing those

4  devices.

5  Q.   In your time as a computer forensic analyst for HSI, how

6  many devices or computers do you think that you have

7  forensically imaged and analyzed?

8  A.   Over a thousand.

9  Q.   Did you receive or -- did you receive specific training

10  regarding the forensic imaging of hard drives data, computer,

11  et cetera?

12  A.   Yes.

13  Q.   And can you please explain what forensic imaging is?

14  A.   So forensic imaging is making a forensic copy of the

15  suspect device.  So I would -- typically the setup would be I

16  would have a hard drive or a thumb drive or external drive.  I

17  would connect it to my write blocker which ensures that data

18  does not get written from my computer to the suspect device.

19  So that's the forensic technique that I use.

20         Then I use a forensics application on my computer

21  that makes a copy.  It's called an image, but it really is just

22  an exact copy of that data.

23  Q.   Can you explain what a write blocker is?

24  A.   Yeah, write blocker is just -- it's a hardware tool, and

25  there's multiple different types depending on the connection

GAERTNER - DIRECT EXAMINATION

1    you're using, whether it's USB, SATA, IDE, whatever the

2    connection to the hard drive or digital device is, and I

3    connect it to that device, and then another cable runs from the

4    write blocker to my forensic computer.  It just ensures that

5    I'm copying data from that device.  I'm not transferring data

6    to it.

7    Q.   When you say -- when looking at a forensic image on a

8    subject device, if you follow best practices including using a

9    write blocker, how close are the images?

10   A.   They're exact.

11   Q.   And are there best practices when it comes to making

12   forensic images of devices?

13   A.   Yes.  So once the image or forensic copy, the exact copy

14   of the device has been made, I run two different hash

15   algorithms, which is called MD5 and SHA1.  These algorithms or

16   hash values is -- I guess the best way to explain, it's like

17   DNA.  There's no chances of these two ever clashing with each

18   other.  So it ensures that I make -- I generate a hash value or

19   two hash values of the hard drive, and then I generate two hash

20   values of my copy or image to make sure we're --

21            MS. VALDES:  Your Honor, the Government tenders this

22   witness as an expert in computer forensic analysis.

23            THE COURT:  Do you wish to cross-examine, Mr. Kerr?

24            MR. KERR:  No, thank you, Your Honor.  No objection.

25            THE COURT:  All right.  I find that he is

GAERTNER - DIRECT EXAMINATION

```
 1    appropriately qualified as an expert in the field of computer
 2    forensic analyst -- or as a computer forensic analyst.  You may
 3    proceed.
 4              MS. VALDES:  Thank you, your Honor.
 5    BY MS. VALDES:
 6    Q.   Did you provide computer forensic support in the Newstar
 7    case?
 8    A.   Yes, I did.
 9    Q.   And specifically regarding the Defendant, Mr. Plamen
10    Velinov?
11    A.   Yes.
12    Q.   Did you travel internationally for this investigation?
13    A.   Yes.
14    Q.   Where?
15    A.   Sofia, Bulgaria.
16    Q.   Did you meet foreign law enforcement officers there?
17    A.   Yes.
18    Q.   Who did you meet with?
19    A.   The National Investigative Services, who are the police of
20    Bulgaria.
21    Q.   And where did you meet?
22    A.   At the NIS headquarters in Sofia, Bulgaria.
23    Q.   Now, Mr. Angelov just testified about a search warrant he
24    helped execute or led the execution of in Mr. Velinov's
25    apartment.  Were you part of that search warrant?
```

GAERTNER - DIRECT EXAMINATION

1   A.   No.

2   Q.   Were you at the headquarters or police NIS location when

3   the seized material arrived?

4   A.   Yes.

5   Q.   Did you see the computer that they seized from

6   Mr. Velinov's apartment?

7   A.   Yes.

8   Q.   And did you forensically image any hard drives from the

9   computer?

10  A.   Yes.

11  Q.   Which hard drive?

12  A.   The Seagate 8 terabyte hard drive.

13  Q.   Were there other hard drives not connected to the computer

14  that you forensically imaged?

15  A.   Yes.

16  Q.   Which ones?

17  A.   It was a Hitachi 3 terabyte hard drive and another Seagate

18  3 terabyte hard drive.

19  Q.   You previously discussed best practices when making

20  forensic images.  Did you follow those practices in this

21  case --

22  A.   Yes.

23  Q.   -- when you imaged all three hard drives?

24  A.   Yes.

25  Q.   And what tools did you use?

GAERTNER - DIRECT EXAMINATION

1   A.   I used a TX1, which is a form of hardware write blocker.
2   Q.   Did you image all the hard drives?
3   A.   No.
4   Q.   Who else imaged hard drives?
5   A.   The NIS analyst that was there with me.
6   Q.   And were you present when they imaged those hard drives?
7   A.   Yes, I was.
8   Q.   Did you see the tools they used?
9   A.   Yes.
10  Q.   What tools did they use?
11  A.   They used a TD2 write blocker, and they also used a
12  forensics application called EnCase.
13  Q.   As someone that is familiar with the area of forensic
14  imaging and teaches forensic imaging, do you believe that they
15  followed best practices when making those forensic images?
16  A.   Yes.
17  Q.   Do you believe that the forensic images they created were
18  accurate?
19  A.   Yes.
20  Q.   What hard drives did they image?
21  A.   Two HGST 2 terabyte hard drives.
22  Q.   Did you at some point gain custody of all the forensic
23  images?
24  A.   Yes.
25  Q.   What did you do with them?

1   A.   I transported them from Sofia, Bulgaria back to HSI Tampa.

2   Q.   Could you please take a look at Government's Exhibit 900?

3   Take your time and just look up at me when you're finished.  Do

4   you recognize this exhibit?

5   A.   I do.

6   Q.   What is it?

7   A.   This exhibit is -- are pictures that I took while I was in

8   Sofia, Bulgaria of the devices that were obtained from Plamen

9   Velinov's residence.

10  Q.   Are they a fair and accurate copy of the computer and hard

11  drives that you assisted in imaging when you were in -- when

12  you were in Bulgaria?

13  A.   Yes.

14        MS. VALDES:  Your Honor, the Government moves to

15  enter Government's 900 into evidence.

16        MR. KERR:  No objection.

17        THE COURT:  All right.  900 is received into

18  evidence, may be published to the jury.

19        MS. VALDES:  Thank you, Your Honor.  If you could

20  please display Government's 900?

21  BY MS. VALDES:

22  Q.   Mr. Gaertner, would you mind explaining what we're looking

23  at?

24  A.   This is the desktop computer that was seized from

25  Mr. Velinov's residence.

GAERTNER - DIRECT EXAMINATION

1  Q.   Is this also -- does it also contain the hard drives that
2  you assisted in imaging?
3  A.   Yes.
4  Q.   Were some of the hard drives that you assisted or watched
5  to be imaged, were they not connected to the computer?
6  A.   Yes.
7  Q.   Could you not analyze them?
8  A.   No, I could not.
9  Q.   Why not?
10 A.   Because they had full disk encryption.
11 Q.   And which hard drives had full disk encryption as you just
12 stated?
13 A.   They were the two 3 terabyte hard drives, which is the
14 Seagate 3 terabyte and a Hitachi 3 terabyte.
15          MS. VALDES:   If we could show pages 4 and 6 of
16 Government's 900?
17 BY MS. VALDES:
18 Q.   Are these the two hard drives that you just mentioned?
19 A.   Yes, they were.
20 Q.   Now, you said that they were encrypted.  Can you please
21 explain what that means?
22 A.   Encryption is a method used to protect data.  Cellphones
23 use encryption.  Most computers use encryption now, but there's
24 certain applications that you can use, such as TrueCrypt or
25 VeraCrypt, which is what I found that these drives used, and

GAERTNER - DIRECT EXAMINATION

1   pretty much they allow me to not view any of the data without a
2   user's password.
3   Q.   Were you ever able to obtain or figure out that password?
4   A.   No, I was not.
5   Q.   So to be clear, were you ever able to analyze the data
6   stored in these devices?
7   A.   No, I was not.
8   Q.   Were there other devices that were more challenging to
9   analyze?
10  A.   Yes.
11  Q.   Why?
12  A.   Two of the HGST 2 terabyte hard drives that were inside of
13  the desktop computer were both RAIDed.
14          MS. VALDES:  If you could please show Government's
15  900 pages 2 and 3?
16  BY MS. VALDES:
17  Q.   Are these the RAIDed devices?
18  A.   Yes.
19  Q.   Now, what does RAIDed mean?
20  A.   RAID stands for redundant array of independent disks.  So
21  for these two devices, I had discovered that just connecting
22  them to a computer -- well, the forensic copy, analyzing the
23  forensic copy, I could not see any of the data without knowing
24  that they were RAIDed.
25          MR. KERR:  Your Honor, I have an objection.  May we

GAERTNER - DIRECT EXAMINATION

1   approach?

2          THE COURT:  Sure.

3                 (At sidebar on the record.)

4          THE COURT:  I just realized what the time was.

5          MR. KERR:  The -- I'm concerned about this, because

6   we never received any request or notes about these encrypted

7   hard drives to my knowledge.

8          THE COURT:  Let's -- let me excuse the jury, and we

9   can talk about that, okay?

10                (End of discussion at sidebar.)

11         THE COURT:  Ladies and gentlemen.  We're going to

12  call it a day, so -- it's almost 4:30, so we're going to

13  adjourn for the day.  Please don't discuss the case or form any

14  opinions until you've heard all of the evidence.  As I said,

15  the case is moving at a clip, so it may even be before Tuesday,

16  maybe Monday when -- when we're finished.  Could be Tuesday,

17  but at least you know that we're moving forward quickly, all

18  right?  So have a nice evening.  We'll see you here tomorrow

19  morning at 9:00 a.m.

20                (Jury out at 4:25 p.m.)

21         THE COURT:  All right.  Everybody can go back to

22  their seats.  Thank you.

23                All right.  So I can hear your objection now.  I

24  can excuse the witness, or we could keep the witness here if we

25  need to.  Which do you prefer, Mr. Kerr?

```
1            MR. KERR:  It's fine with me if the witness stays.
2            THE COURT:  I think it's probably better in case
3    something comes up, so we'll just have the witness stay there.
4                       All right.  So, Mr. Kerr, what is your -- what
5    is your concern?
6            MR. KERR:  Well, I think that the jury will be
7    invited to draw some nefarious inferences from these encrypted
8    devices that were found in Mr. Velinov's possession apparently.
9    This is the -- now, I have to say the Government has been very
10   forthright with me and made all kinds of disclosures, and if
11   there's some disclosure there that I missed, I'm sorry.  Then
12   it's my fault, but I don't remember hearing any request for
13   cooperation.  I've never discussed with Mr. Velinov whether or
14   not we would offer to assist them in exploring these hard
15   drives that are encrypted apparently.  There may be information
16   on there helpful to the defense for all I know.  I didn't know
17   there was an issue not getting access to some of his devices.
18   At least I don't think I did.  There may be some letter, some
19   five-page letter that discloses this to me that I'm not aware
20   of, but I'm a little concerned about the -- you know, the
21   inferences that will be drawn from this against my client, and
22   he hasn't had an opportunity to cooperate or even discuss this
23   issue.
24           THE COURT:  Okay.  Let me hear a response from the
25   Government.
```

1          **MS. VALDES:**  Your Honor, in a letter we sent to

2    Mr. Kerr on June 21st, 2022, we noted that there's electronic

3    media and physical devices seized from the premises in Bulgaria

4    owned or occupied by or otherwise associated with the

5    Defendant.  We reached out multiple times and asked Mr. Kerr if

6    he would like to come to HSI and visit the -- review the

7    forensic images that we seized, the physical devices that we

8    seized.  We made ourselves available.  We made Special Agent

9    Tavey Garcia available.  It has been open for his review since

10   June.

11         **MR. KERR:**  Your Honor, I agree with that.  However, I

12   was never told that there was -- there were devices that they

13   couldn't access.  I was given access to what I thought was the

14   material that would be displayed at trial, but I was never -- I

15   was never asked, "Can your client help us get into these

16   devices?"  I was never told to my knowledge that there were any

17   devices that could not be accessed.

18         **THE COURT:**  Well, anything else?

19         **MS. VALDES:**  Yes, Your Honor.  It would infringe upon

20   the Defendant's Fifth Amendment rights for us to ask him for

21   the password and to be able to enter in his devices.  He did

22   not need to assist us in any way, and we did not ask that of

23   him.  Again, these devices have been available for Mr. Kerr and

24   any expert that he wanted to hire to review.  They just simply

25   did not.

1          **MR. KERR:**  Your Honor, I did hire an expert and put

2    him in touch with -- actually Mr. Gaertner about these devices,

3    and I was never informed by anybody that there was something

4    that they couldn't get into, and I would have -- and I can

5    represent that I -- I would have asked for Mr. Velinov's

6    agreement -- we have signed all kinds of stipulations.  I'm not

7    objecting to any exhibits.  We have been as cooperative as can

8    be to get to the fundamental issue in this case, and I think

9    there's at least a 99 percent chance that we would have given

10   them whatever passwords were required to get in.  There may

11   have been material in there that's <u>Brady</u> material for all I

12   know.

13          So I'm concerned about the jury taking the

14   inference that there's this hidden cache of child porn and all

15   kinds of stuff on there, and that's the inference that's being

16   suggested by this.

17          **MS. VALDES:**  Your Honor, may I respond?

18          **THE COURT:**  Sure.

19          **MS. VALDES:**  We would absolutely be -- we would agree

20   for Your Honor to instruct the jury that they are to make no

21   inferences and to not assume that anything nefarious or

22   otherwise is on these devices.  That would be fine with us, if

23   that addresses Mr. Kerr's concern.

24          **MR. KERR:**  I would like to have an opportunity to

25   discuss that with Mr. Velinov.

```
 1          THE COURT:  All right.  Why don't you do that?  Why
 2   don't you discuss it with the prosecutors?  I mean, it's just
 3   after 4:30, so you have time to do it this afternoon, and we'll
 4   try to keep the interpreters there so you can talk to him a
 5   little bit longer.  So that's fine.  We'll see if we can
 6   resolve it.
 7              A couple of other things.  Number 1, I looked at
 8   the forfeiture.  I looked at the indictment, and that's a
 9   general forfeiture clause as opposed to -- that's why I asked
10   you did you seize the money?  There's no money seized here.
11          MS. VALDES:  I'm sorry I was confusing, Your Honor.
12   I, again, spoke with asset forfeiture.  We'd be asking for an
13   order, but we don't have possession of the money.
14          THE COURT:  Those are two very different things.
15          MS. VALDES:  Yes, and I apologize.
16          THE COURT:  That's why I said, if you've got a seized
17   asset, the jury has to decide unless they waive.  And just a
18   generic forfeiture clause with the hope of getting a judgment
19   is a different story.
20              So -- but there were other minor assets, I
21   think, that have been -- like a computer or some other kind of
22   equipment.  Yeah.
23          MS. VALDES:  One's at the witness stand, Your Honor.
24          THE COURT:  Yeah.  So you can talk about that.  It
25   doesn't make any difference to me.  The jury can decide it, or
```

```
 1   the judge can decide it.  So whatever you want to do is fine,
 2   but you don't even need to tell me today.  You can tell me --
 3   Monday is good, too.
 4                 So -- oh, the last thing is -- let's see.  And I
 5   didn't get this whole thing.  I just want to be transparent
 6   here, but one of the interpreters asked to speak with the
 7   courtroom deputy, and I -- you know, I have to say, I didn't
 8   see the email because I'm here looking at what's going on, and
 9   I didn't check my email until the witness had left, but I think
10   the interpreter was concerned about the way something had been
11   translated.  So, you know, when I saw it, the person had
12   already finished their testimony.  This must be the gentleman
13   that was brought in, and another translator was translating.
14   So, you know, I -- I'm just telling you it was called to my
15   attention.  I don't know what it was that was concerned with
16   the translation.  I don't know if it was resolved
17   satisfactorily.  I don't know, but rather than my just sitting
18   on the information and not saying something, I felt like I
19   should say something.
20                 So maybe the translator can tell us in English
21   what your concern is, and then the other translator can
22   translate for the Defendant?  I don't know what the concern
23   was, if you feel that it was eventually resolved
24   satisfactorily?  I don't know.
25                 INTERPRETER IOVEVA:  Your Honor, the interpreter --
```

1          THE COURT:  Pull that microphone down, please.  Thank

2    you.

3          THE INTERPRETER:  He said only one word.  Actually he

4    missed one word.

5          THE COURT:  I am sorry.  You're going to have to

6    speak a little bit more clearly.  I can't -- I want to make

7    certain that I understand this important conversation, and I

8    can't quite understand you.  So just speak up a little bit.

9    Thank you.

10         INTERPRETER IOVEVA:  Better?  No?

11         COURT SECURITY OFFICER:  Speak up.

12         INTERPRETER IOVEVA:  Okay.  When Mr. Kerr asked the

13   question whether the Defendant had prior criminal record, the

14   interpreter missed interpreting one word that could have

15   stopped right away the continuation of -- of the questions that

16   followed by Mr. Kerr to the witness.  And what was this word?

17   This word was that the document that the Bulgarian NIS produces

18   upon -- upon the request by the American Government on behalf

19   of Mr. Velinov, usually it is the Bulgarian authorities that

20   enter data on the criminal record of -- of the person, and the

21   witness said that he -- "Not to my recollection."  What -- what

22   practically he was saying is that he does not remember what

23   is -- what was written into this document by the people who

24   fill out the data on the criminal record.  That was it.  Did

25   you understand what I say?  No?

1          THE COURT:  Well, I'm trying to understand how that

2     makes a difference.  That's all.

3          INTERPRETER IOVEVA:  Just ask Mr. Kerr whether he

4     found the answer to the criminal record status of the Defendant

5     by the testimony of the witness.  I think this would decide.

6          MR. KERR:  Your Honor, I understood the answer to be

7     that he was aware of no criminal record in Bulgaria.

8          INTERPRETER IOVEVA:  Then everything's fine.

9          THE COURT:  So I don't really see that it's a problem

10    then.  Okay.  All right.

11         INTERPRETER IOVEVA:  Thank you.

12         THE COURT:  Is everybody okay with that?  I think

13    that it's all right.  Does anybody have an issue with this?  I

14    would just as soon address it now rather than have it be an

15    issue a year from now or a day from now.  Is the Government

16    okay with this?

17         MR. REYNOLDS:  That's fine, Your Honor.

18         THE COURT:  Okay.  Mr. Kerr, are you okay with this?

19         MR. KERR:  Yes, Your Honor.  Thank you.

20         THE COURT:  All right.  Thank you.

21              All right.  Anything else to take up now?  Okay.

22    We will try to talk about this issue that you've raised and see

23    what you can resolve.  If there's a stipulation that you can

24    agree to, that's fine.  I'll read it to the jury.  If not, then

25    I'll figure out what to do.  But I'll see you tomorrow at 9:00

1    a.m.  All right.  We're in recess.  I'm just going to stay

2    here.  I need to finish something.  All right.

3                        (End of proceedings.)

4

5              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

6                    UNITED STATES DISTRICT COURT

7                    MIDDLE DISTRICT OF FLORIDA

8

9                    REPORTER TRANSCRIPT CERTIFICATE

10        I, Tana J. Hess, Official Court Reporter for the United
     States District Court, Middle District of Florida, certify,
11   pursuant to Section 753, Title 28, United States Code, that the
     foregoing is a true and correct transcription of the
12   stenographic notes taken by the undersigned in the
     above-entitled matter (Pages 1 through 239 inclusive) and that
13   the transcript page format is in conformance with the
     regulations of the Judicial Conference of the United States of
14   America.

15

16

17        Tana J. Hess, CRR, RMR, FCRR
          Official Court Reporter
18        United States District Court
          Middle District of Florida
19        Tampa Division
          Date:  August 16, 2023
20

21

22

23

24

25