IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
UNITED STATES OF AMERICA        \*
                                \*    Case No. 8:21-cr-342
vs.                             \*
                                \*    January 20, 2023
PLAMEN GEORGIEV VELINOV         \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


JURY TRIAL - DAY 3

Heard in Courtroom 14B
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
January 20, 2023


BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON

UNITED STATES DISTRICT JUDGE


Official Court Reporter:        Tana J. Hess, CRR, FCRR, RMR
                                U.S. District Court Reporter
                                Middle District of Florida
                                Tampa Division
                                801 N. Florida Avenue
                                Tampa, FL  33602
                                813.301.5207
                                tana_hess@flmd.uscourts.gov

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:


FOR THE GOVERNMENT:

        Kyle P. Reynolds
        U.S. Department of Justice, Criminal Division
        Child Exploitation and Obscenity Section
        1301 New York Ave. NW
        Washington, DC  20530
        202.616.2842
        kyle.reynolds@usdoj.gov

        Karyna Valdes
        U.S. Attorneys Office
        400 North Tampa Street
        Suite 3200
        Tampa,FL  33602
        813.274.6000
        karyna.valdes@usdoj.gov

FOR THE DEFENDANT:

        Christophir A. Kerr
        13801 Walsingham Road
        #A-154
        Largo, FL  33774
        727.492.2551
        christophirkerr@gmail.com

<u>**INDEX**</u>

<u>**NAME**</u>                                                           <u>**PAGE**</u>

Justin Gaertner

     Direct Examination by Ms. Valdes                 9

     Cross-Examination by Mr. Kerr                   26

Tavey Garcia

     Direct Examination by Ms. Valdes                29

     Cross-Examination by Mr. Kerr                   73

## EXHIBITS

| NUMBER | ADMITTED |
|--------|----------|
| Government Exhibit 5 | 49 |
| Government Exhibit 9 | 79 |
| Government Exhibit 422 | 45 |
| Government Exhibit 901 | 14 |
| Government Exhibit 901A | 14 |
| Government Exhibit 901B | 14 |
| Government Exhibit 901C | 14 |
| Government Exhibit 901D | 14 |
| Government Exhibit 901E | 14 |
| Government Exhibit 901F | 14 |
| Government Exhibit 901BT | 17 |
| Government Exhibit 902 | 15 |
| Government Exhibit 903 | 15 |
| Government Exhibit 904 | 15 |
| Government Exhibit 905 | 15 |
| Government Exhibit 1004A | 53 |
| Government Exhibit 1004G | 53 |
| Government Exhibit 1004H | 53 |
| Government Exhibit 1004I | 53 |
| Government Exhibit 1004J | 53 |
| Government Exhibit 1004O | 53 |
| Government Exhibit 1004N | 53 |
| Government Exhibit 1004Q | 53 |
| Government Exhibit 1005A | 53 |
| Government Exhibit 1005B | 53 |

| | | |
|---|---|---|
| 8:40AM | 1 | (Call to order of the Court.) |
| 8:57AM | 2 | **THE COURT:** I'm going to call court to order. We |
| 8:57AM | 3 | have the translator here. Let me just see if she's ready. You |
| 8:57AM | 4 | ready? Okay. All right. Very good. |
| 8:57AM | 5 | So good morning. Court's in session. I'm going |
| 8:57AM | 6 | to hand out proposed jury instructions. This is still early. |
| 8:58AM | 7 | We're probably not going to do this until this afternoon. I |
| 8:58AM | 8 | mean, we won't do it until this afternoon, but I wanted to go |
| 8:58AM | 9 | ahead and hand them out so you can start looking at them. It's |
| 8:58AM | 10 | just a draft. It doesn't mean anything. The fact that it's in |
| 8:58AM | 11 | there doesn't mean it'll be in a final product. It's just |
| 8:58AM | 12 | something to start discussing. Okay? So, Magaly, you can go |
| 8:58AM | 13 | ahead and hand out. Thank you. |
| 8:59AM | 14 | Thank you, Magaly, for that. And again, it's |
| 8:59AM | 15 | just a starting point subject to revisions, modifications as we |
| 8:59AM | 16 | all deem fit later on. |
| 8:59AM | 17 | All right. The court security officer has |
| 8:59AM | 18 | informed me that all the jurors are here. Good for them. They |
| 8:59AM | 19 | are punctual. It's 9:00 a.m. |
| 8:59AM | 20 | Yes, did you have something? |
| 8:59AM | 21 | **MS. VALDES:** Yes, Your Honor. Just to resolve the |
| 8:59AM | 22 | issue that was raised yesterday by Mr. Kerr about Justin |
| 8:59AM | 23 | Gaertner's testimony and the encrypted devices, I do have an |
| 8:59AM | 24 | update for the Court. |
| 8:59AM | 25 | **THE COURT:** Okay. |

8:59AM  1      **MS. VALDES:**  I looked back at our discovery

8:59AM  2  production, and I just want to clarify the record on what

8:59AM  3  happened.  So --

8:59AM  4      **THE COURT:**  Do we need to -- I guess we do need to do

8:59AM  5  this.  Gosh, okay.  I got all the jurors here, but anyway, go

9:00AM  6  ahead.  Uh-huh.

9:00AM  7      **MS. VALDES:**  So I looked back at the discovery

9:00AM  8  production.  As Your Honor is aware, we've said multiple times

9:00AM  9  this is a case with a lot of evidence, and I -- and we did turn

9:00AM  10 over and explain that two devices, the ones that Mr. Gaertner

9:00AM  11 identified on the stand, were encrypted in August of last year,

9:00AM  12 and like I said, it has been a while since this information was

9:00AM  13 turned over, so it makes sense that someone may have -- we had

9:00AM  14 forgotten that we turned over this information, but I'm

9:00AM  15 specifically referring to the seventh discovery production

9:00AM  16 Bates stamped number Velinov-75445, and I have a copy for the

9:00AM  17 Court, Your Honor, if you'd like to take a look.  I've provided

9:00AM  18 one to counsel.

9:00AM  19     **THE COURT:**  I don't need to look at it.

9:00AM  20     **MS. VALDES:**  Okay.

9:00AM  21     **THE COURT:**  Are you okay with that, Mr. Kerr?

9:00AM  22     **MR. KERR:**  Yes, Your Honor.

9:00AM  23     **THE COURT:**  So you turned it over, so it doesn't

9:00AM  24 sound like there's an issue.

9:00AM  25     **MS. VALDES:**  Yes, Your Honor.  And just because the

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
| 9:00AM | 1  | discovery potential issue was raised, I just want to place on   |
| 9:00AM | 2  | the record that we stated Mr. Gaertner authored a report, and   |
| 9:01AM | 3  | in the report he stated the Hitachi hard drive ending in serial |
| 9:01AM | 4  | number 1L5TA is encrypted.  He attempted to bypass this         |
| 9:01AM | 5  | encryption, was unsuccessful.                                   |
| 9:01AM | 6  |         And regarding the second hard drive ending in           |
| 9:01AM | 7  | serial number H2KP, same information.  It was encrypted.  He    |
| 9:01AM | 8  | attempted to bypass the encryption, was not successful.         |
| 9:01AM | 9  |         And then we turned over an additional ROI Bates         |
| 9:01AM | 10 | number Velinov-75449.  Mr. Gaertner offered his report.  He     |
| 9:01AM | 11 | stated that Mr. Kerr went down to Homeland Security here in     |
| 9:01AM | 12 | Tampa, Florida --                                               |
| 9:01AM | 13 |         THE COURT:  You're speaking -- poor court reporter.     |
| 9:01AM | 14 |         MS. VALDES:  I'm sorry, Judge.  I'm trying to balance   |
| 9:01AM | 15 | not holding the jurors up and getting it read into the record.  |
| 9:01AM | 16 | I'll slow it down.                                              |
| 9:01AM | 17 |         THE COURT:  It sounds like he doesn't have an issue     |
| 9:01AM | 18 | anymore.  Do you have an issue, Mr. Kerr?                       |
| 9:01AM | 19 |         MR. KERR:  Well, I think we've resolved it with a       |
| 9:01AM | 20 | stipulation.                                                    |
| 9:01AM | 21 |         THE COURT:  It's been resolved, so I don't think you    |
| 9:01AM | 22 | need to put that all on the record.  What's the stipulation?    |
| 9:02AM | 23 |         MS. VALDES:  The stipulation is that -- states the      |
| 9:02AM | 24 | fact the Defendant possessed encrypted hard drives does not     |
| 9:02AM | 25 | without more mean that those hard drives contain anything       |

```
9:02AM    1   illegal or illicit.
9:02AM    2              And I was -- just to finish up what I was
9:02AM    3   saying, Mr. Kerr went down to HSI on August 4th, and
9:02AM    4   Mr. Gaertner -- of 2022, and Mr. Gaertner made these two
9:02AM    5   encrypted devices available for his review.
9:02AM    6         THE COURT:  All right.  So you want to read that
9:02AM    7   into -- do you want to read that to the jury when they come
9:02AM    8   back?
9:02AM    9         MS. VALDES:  I absolutely can, Your Honor.  If I may
9:02AM   10   do it when I continue my direct examination.
9:02AM   11         THE COURT:  Sure.
9:02AM   12         MS. VALDES:  Thank you so much.
9:02AM   13         THE COURT:  We'll bring the jury in.  Thank you.
         14         (Jury in at 9:04 a.m.)
9:04AM   15         THE COURT:  All right.  Welcome back, ladies and
9:04AM   16   gentlemen.  I appreciate everybody being here early, on time on
9:04AM   17   our Friday morning.
9:04AM   18              All right.  I'll remind the witness, sir, you
9:04AM   19   are still under oath.  Do you understand that?
9:04AM   20         THE WITNESS:  Yes, Your Honor.
9:04AM   21         THE COURT:  All right.  And let's see.  Ms. -- I
9:05AM   22   forget where we were.  Were we -- had you finished -- I forget
9:05AM   23   if we had gone to cross or if we were still on direct.
9:05AM   24         MS. VALDES:  I'm still directing the witness, Your
9:05AM   25   Honor.
```

GAERTNER - DIRECT EXAMINATION

9:05AM  1           THE COURT:  So you're still on direct examination.  I

9:05AM  2  understand there's a stipulation you're going to read?

9:05AM  3           MS. VALDES:  Yes, Your Honor.  May I read it now?

9:05AM  4           THE COURT:  Yes, you may.

9:05AM  5           MS. VALDES:  Second stipulation of the parties.  It

9:05AM  6  is hereby stipulated and agreed by and between the United

9:05AM  7  States of America, the Defendant, Mr. Plamen Georgiev Velinov,

9:05AM  8  and his attorney, Christophir Kerr, that one, the fact that the

9:05AM  9  Defendant possessed encrypted hard drives does not without more

9:05AM 10  mean that those hard drives contain anything illegal or

9:05AM 11  illicit.

9:05AM 12           May I approach the witness box, Your Honor?

9:05AM 13           THE COURT:  Yes, you may.

9:05AM 14           MS. VALDES:  May I inquire?

9:06AM 15           THE COURT:  You may.

9:06AM 16           MS. VALDES:  Thank you, Your Honor.

9:06AM 17                     JUSTIN GAERTNER,

9:06AM 18  a witness called on behalf of the Government, being first duly

9:06AM 19  sworn, was examined and testified as follows:

9:06AM 20                    DIRECT EXAMINATION

9:06AM 21                    BY MS. VALDES:

9:06AM 22  Q.   Mr. Gaertner, I think we left off on Government 900,

9:06AM 23  pages 2 and 3.  Were these hard drives pages 2 and 3 located in

9:06AM 24  the Defendant's computer?

9:06AM 25  A.   Yes.

GAERTNER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:06AM | 1 | Q.   And were you able to access the data located on these hard |
| 9:06AM | 2 | drives? |
| 9:06AM | 3 | A.   Yes. |
| 9:06AM | 4 | Q.   Did you -- okay.  Did you have any difficulty initially |
| 9:06AM | 5 | accessing the data? |
| 9:06AM | 6 | A.   Yes, I did. |
| 9:06AM | 7 | Q.   How -- or why so? |
| 9:06AM | 8 | A.   The two drives were RAIDed with a RAID configuration of |
| 9:06AM | 9 | RAID zero. |
| 9:06AM | 10 | Q.   Can you explain what that means? |
| 9:06AM | 11 | A.   So RAID is -- stands for redundant array of independent |
| 9:06AM | 12 | disks.  A RAID is typically used for redundancy in performance |
| 9:07AM | 13 | in order to back up and store data.  Without knowing that these |
| 9:07AM | 14 | are RAIDed, they would almost appear to be like an encrypted |
| 9:07AM | 15 | drive.  So they require advanced forensic techniques. |
| 9:07AM | 16 | Q.   Were you eventually able to access the information in |
| 9:07AM | 17 | these devices? |
| 9:07AM | 18 | A.   Yes. |
| 9:07AM | 19 | Q.   How long have you been involved in the investigation |
| 9:07AM | 20 | regarding the Defendant, Plamen Velinov? |
| 9:07AM | 21 | A.   For the last year or two. |
| 9:07AM | 22 | Q.   And in that time, did you come to learn some of the facts |
| 9:07AM | 23 | in this case? |
| 9:07AM | 24 | A.   Yes. |
| 9:07AM | 25 | Q.   Did you speak to, for example, lead agent Tavey Garcia |

GAERTNER – DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:07AM | 1 | regarding the facts in this case? |
| 9:07AM | 2 | A.   Yes. |
| 9:07AM | 3 | Q.   Did you learn the name of Newstar enterprise members? |
| 9:07AM | 4 | A.   Yes. |
| 9:07AM | 5 | Q.   Did you learn things about them, such as their name, |
| 9:07AM | 6 | perhaps their date of birth, address, and their involvement in |
| 9:07AM | 7 | the Newstar enterprise? |
| 9:07AM | 8 | A.   Yes. |
| 9:08AM | 9 | Q.   And in learning that information, did you use that |
| 9:08AM | 10 | information to help you analyze these devices? |
| 9:08AM | 11 | A.   Yes, I did. |
| 9:08AM | 12 | Q.   Meaning did it help you determine what type of information |
| 9:08AM | 13 | you needed to find or discover on these devices? |
| 9:08AM | 14 | A.   Yes. |
| 9:08AM | 15 | Q.   What were the steps that you took to analyze the |
| 9:08AM | 16 | Defendant's computer? |
| 9:08AM | 17 | A.   So back in Sofia, Bulgaria, the first I proceeded to take |
| 9:08AM | 18 | apart the desktop computer, remove the hard drives, which was |
| 9:08AM | 19 | assisted by the NIS Bulgarian analyst.  We imaged those devices |
| 9:08AM | 20 | at the NIS headquarters.  I transported these forensic copies |
| 9:08AM | 21 | back to HSI Tampa and then used those forensic copies inside of |
| 9:08AM | 22 | multiple forensics applications to analyze the device. |
| 9:08AM | 23 | Q.   And what applications did you use? |
| 9:08AM | 24 | A.   FTK, EnCase, Forensics Explorer and AXIOM. |
| 9:09AM | 25 | Q.   Could you briefly explain what the purpose of these |

GAERTNER - DIRECT EXAMINATION

9:09AM   1   programs are, how they assist you in your analysis?

9:09AM   2   A.   So we use different forensic applications depending on the

9:09AM   3   type of device it is.  If it's a cellphone, there's a suite of

9:09AM   4   cellphone forensics I use.  If it's a thumb drive, external

9:09AM   5   hard drive, solid state drive, I use a different suite of

9:09AM   6   forensics tools.  So pretty much what they do is assist me in

9:09AM   7   putting back together the computer device that I had imaged and

9:09AM   8   lets me view it in a manner that it would appear to be what was

9:09AM   9   originally on the device.  And through that, we are able to

9:09AM   10  confirm that is the hash values we spoke of earlier.  I'm

9:09AM   11  allowed to look at the files -- at any files stored on that

9:09AM   12  device, whether hidden or deleted as well as allocated.  This

9:10AM   13  includes images, video, documents, internet history, any

9:10AM   14  digitally stored data.

9:10AM   15  Q.   Would you say that electronic devices such as hard drives

9:10AM   16  usually contain a lot of information on them?

9:10AM   17  A.   Yes.

9:10AM   18  Q.   Do these tools help you narrow that down?

9:10AM   19  A.   Yes.

9:10AM   20  Q.   Okay.  And did you use key word terms and searches to help

9:10AM   21  you also narrow down the volume of information you needed to

9:10AM   22  review?

9:10AM   23  A.   Yes.

9:10AM   24  Q.   Could you explain that a little bit?

9:10AM   25  A.   So in order to assist me in an investigation such as this,

GAERTNER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:10 AM | 1 | especially with the RAIDed drives, I used key word search terms |
| 9:10 AM | 2 | that were -- that I had gathered throughout the investigation |
| 9:10 AM | 3 | that were part of the Newstar enterprise, and I run those key |
| 9:10 AM | 4 | words through numerous forensic applications to see where they |
| 9:10 AM | 5 | hit on the drive. |
| 9:10 AM | 6 | Q.   And when they hit, as you said, what did you do? |
| 9:10 AM | 7 | A.   So depending on what they hit on, I'll bookmark that |
| 9:10 AM | 8 | specific file, whether it's an image, video, document, any -- |
| 9:11 AM | 9 | any digitally stored data that returns a key word hit, I will |
| 9:11 AM | 10 | bookmark it and save it for the case agent to review. |
| 9:11 AM | 11 | Q.   And did you pull some of those hits or bookmarks to create |
| 9:11 AM | 12 | exhibits for this case? |
| 9:11 AM | 13 | A.   Yes. |
| 9:11 AM | 14 | Q.   Can you please take a look at Government's Exhibit 901, |
| 9:11 AM | 15 | all the sub exhibits, which is A through F?  Generally |
| 9:12 AM | 16 | speaking, what are those exhibits? |
| 9:12 AM | 17 | A.   These are exhibits that I bookmarked throughout my |
| 9:12 AM | 18 | forensic analysis of the computer, and these are documents and |
| 9:12 AM | 19 | images of data files that I bookmarked throughout my |
| 9:12 AM | 20 | investigation. |
| 9:12 AM | 21 | Q.   Are they a fair and accurate copy of the bookmarks you |
| 9:12 AM | 22 | created and the exhibits you pulled for this case? |
| 9:12 AM | 23 | A.   Yes. |
| 9:12 AM | 24 |      MS. VALDES:  Your Honor, the Government requests to |
| 9:12 AM | 25 | enter into evidence Government Exhibits 901 and Sub |

GAERTNER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:12AM | 1 | Exhibits 901A through F. |
| 9:13AM | 2 | MR. KERR:  No objection. |
| 9:13AM | 3 | THE COURT:  All right.  They are received into |
| 9:13AM | 4 | evidence. |
| 9:13AM | 5 | MS. VALDES:  Thank you, Your Honor. |
| 9:13AM | 6 | THE COURT:  You're welcome. |
| 9:13AM | 7 | BY MS. VALDES: |
| 9:13AM | 8 | Q.  Could you please take a look at Government's 902 and Sub |
| 9:13AM | 9 | Exhibit 902A? |
| 9:13AM | 10 | A.  It appears I'm missing 902A. |
| 9:13AM | 11 | Q.  While Agent Garcia is looking for that, could you please |
| 9:13AM | 12 | take a look at 903, including Sub Exhibit 903A and 903B? |
| 9:14AM | 13 | A.  Same for this one too.  I just have 903. |
| 9:14AM | 14 | Q.  Okay.  And could you take a look at 904 and 905?  And you |
| 9:14AM | 15 | said that you did not see 902A or 903A and B? |
| 9:14AM | 16 | A.  Correct. |
| 9:14AM | 17 | Q.  Are the exhibits you pulled for 902A included in the |
| 9:14AM | 18 | larger exhibit that's Government's Exhibit 902? |
| 9:15AM | 19 | A.  Yes. |
| 9:15AM | 20 | Q.  And when I mentioned 903A and B, were those exhibits |
| 9:15AM | 21 | pulled from, again, the larger exhibit that is 903? |
| 9:15AM | 22 | A.  Yes. |
| 9:15AM | 23 | Q.  Generally speaking once again, can you please explain what |
| 9:15AM | 24 | these exhibits are? |
| 9:15AM | 25 | A.  These are files that I bookmarked and pulled for the case |

GAERTNER - DIRECT EXAMINATION

9:15AM   1   agent to review.

9:15AM   2   Q.   Are they a fair and accurate copy of the exhibits that you

9:15AM   3   pulled for this case?

9:15AM   4   A.   Yes.

9:15AM   5          MS. VALDES:   Your Honor, Government requests to enter

9:15AM   6   into evidence Government's Exhibit 902, 903, 904, and 905.

9:15AM   7          MR. KERR:   No objection.

9:15AM   8          THE COURT:   All right.   They're received into

9:15AM   9   evidence.

9:16AM  10          MS. VALDES:   Thank you, Your Honor.   Permission to

9:16AM  11   publish?

9:16AM  12          THE COURT:   Oh, yes.   That's fine.   Whenever it's

9:16AM  13   received, it's fine.   No problem at all.

9:16AM  14          MS. VALDES:   Thank you, Your Honor.

9:16AM  15   BY MS. VALDES:

9:16AM  16   Q.   If you could take a look at Government's 901, and if you

9:16AM  17   could page down through this exhibit.   Mr. Gaertner, we're

9:16AM  18   going to take a look at these each in turn, but generally

9:16AM  19   speaking, can you explain why you pulled this compiled exhibit?

9:16AM  20   A.   One of the first things that I perform as part of my

9:17AM  21   analysis is looking to confirm who that device belongs to.

9:17AM  22   Typically I call this user attribution.   I was looking for any

9:17AM  23   files, user accounts, documents, information that would tell me

9:17AM  24   who this computer may belong to.

9:17AM  25   Q.   And what are typical user attribution documents that you

GAERTNER – DIRECT EXAMINATION

9:17AM   1   look for in investigation?

9:17AM   2   A.   It would be their user account name for certain

9:17AM   3   applications, resumés, CVs, passports, identity cards that have

9:17AM   4   their name and/or picture contained within them.

9:17AM   5   Q.   Did you find those types of documents on the Defendant's

9:17AM   6   computer?

9:17AM   7   A.   Yes.

9:17AM   8   Q.   And what do those documents tell you about that computer?

9:17AM   9   A.   That they belong to Plamen Velinov.

9:17AM   10   Q.   Can you please pull up Government's 901A?  Why did you

9:17AM   11   pull this exhibit?

9:17AM   12   A.   This exhibit I pulled because it's a Bulgarian identity

9:18AM   13   card.

9:18AM   14   Q.   Could you please read the name of the person on this card,

9:18AM   15   the date of birth, and the origin of this card, the country?

9:18AM   16   A.   Yes.  So it's -- the origin of the country is Republic of

9:18AM   17   Bulgaria.  Name Plamen, surname Velinov, with a date of birth

9:18AM   18   of August 19th, 1973.

9:18AM   19   Q.   Can you please take a look at Government's 901B?  Why did

9:18AM   20   you label this document or select this document?  What stood

9:18AM   21   out to you?

9:18AM   22   A.   So this document stood out purely because of the file name

9:18AM   23   which was Plamen birthday certificate.

9:18AM   24        MS. VALDES:  Your Honor, the Government requests to

9:18AM   25   enter into evidence Government's Exhibit 901BT, which is a

GAERTNER - DIRECT EXAMINATION

|           |    |                                                          |
|-----------|----|----------------------------------------------------------|
| 9:19AM    | 1  | stipulated translation of Government's 901B.  It was filed |
| 9:19AM    | 2  | under docket number 112.                                 |
| 9:19AM    | 3  | MR. KERR:  No objection.                                 |
| 9:19AM    | 4  | THE COURT:  All right.  It's received into evidence.     |
| 9:19AM    | 5  | MS. VALDES:  Thank you, Your Honor.                      |
| 9:19AM    | 6  | THE COURT:  You're welcome.                              |
| 9:19AM    | 7  | MS. VALDES:  If we could please publish 901BT.           |
| 9:19AM    | 8  | BY MS. VALDES:                                           |
| 9:19AM    | 9  | Q.  Would you please read again the name, date of birth, and |
| 9:19AM    | 10 | country on this user attribution document?               |
| 9:19AM    | 11 | A.  Yes.  So it's the People's Republic of Bulgaria.  The |
| 9:19AM    | 12 | county is Sofia.  The name is Plamen Georgiev Velinov with a |
| 9:19AM    | 13 | date of birth or was born on August 19th of 1973.       |
| 9:19AM    | 14 | Q.  Thank you.  901C, same question.  Why select this   |
| 9:19AM    | 15 | document?                                                |
| 9:19AM    | 16 | A.  This document I bookmarked and tagged because it had the |
| 9:19AM    | 17 | file name of Plamen resumé.                              |
| 9:19AM    | 18 | Q.  Could you please read the name, date of birth and emails |
| 9:19AM    | 19 | on the header section of this resumé?                   |
| 9:20AM    | 20 | A.  Yes.  So the name is Plamen Georgiev Velinov with a date |
| 9:20AM    | 21 | of birth August 19th of 1973, and the emails are        |
| 9:20AM    | 22 | plamen@plaper.com as well as webmaster@balerinka.com.   |
| 9:20AM    | 23 | MS. VALDES:  If we could please bring up previously     |
| 9:20AM    | 24 | admitted Government's 506, and if we could expand the header |
| 9:20AM    | 25 | section -- or the entire -- that's great.              |

GAERTNER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:20AM | 1 | BY MS. VALDES: |
| 9:20AM | 2 | Q.   Does the email address for the sender match the first |
| 9:20AM | 3 | email you just read from the resumé document? |
| 9:20AM | 4 | A.   Yes. |
| 9:20AM | 5 | Q.   Who is this email addressed to? |
| 9:20AM | 6 | A.   This is addressed to markb@billingdirect.net. |
| 9:20AM | 7 | Q.   And when was this email sent? |
| 9:20AM | 8 | A.   September 21st of 2006. |
| 9:20AM | 9 | Q.   And can you see who signed off at the bottom of the email? |
| 9:20AM | 10 | A.   Yes, it's Plamen. |
| 9:21AM | 11 | Q.   Pulling up previous admitted Government's Exhibit 501, |
| 9:21AM | 12 | thank you very much.  Does the email address for the sender of |
| 9:21AM | 13 | this email match the second email you read from the resumé? |
| 9:21AM | 14 | A.   Yes. |
| 9:21AM | 15 | Q.   Who is this email addressed to? |
| 9:21AM | 16 | A.   It's addressed to markb@cyber-pay.net. |
| 9:21AM | 17 | Q.   And, again, who signs off at the bottom of this email? |
| 9:21AM | 18 | A.   Plamen Velinov. |
| 9:21AM | 19 | Q.   Turning back to Government's 901C, and paging down to |
| 9:21AM | 20 | page 3, please, please read the second resumé entry on this |
| 9:21AM | 21 | page. |
| 9:21AM | 22 | A.   Yes.  So it's -- the date for this is 1st of June, 2002 to |
| 9:21AM | 23 | 5th of June, 2002.  The company would be Plaper Technology |
| 9:22AM | 24 | located in Sofia, Bulgaria.  It has a project image for |
| 9:22AM | 25 | Balerinka Children's Choir with an expertise in new website |

9:22AM   1   design, PHP, and MySQL programming as well.

9:22AM   2   Q.   Could you also read the fifth entry?

9:22AM   3   A.   Yes.  So this one is dated for the 1st of April 2001 to

9:22AM   4   the 1st of May, 2001 with a company name of Plaper Technology

9:22AM   5   located in Sofia, Bulgaria.  The project that was -- work done

9:22AM   6   is web design, and it's also stated for the hyperlink with the

9:22AM   7   www.balerinka.com with complete web design, ASP, and SQL

9:22AM   8   programming.

9:22AM   9        MS. VALDES:  If we could go back to page one of the

9:22AM  10   resumé, and would it be possible to do a side by side with

9:22AM  11   901D?

9:23AM  12   BY MS. VALDES:

9:23AM  13   Q.   Let's talk a little bit about 901D.  Why did you select

9:23AM  14   this document?

9:23AM  15   A.   901D, because it was an image of Mr. Velinov.

9:23AM  16   Q.   And how does it relate to the job resumé 901C?

9:23AM  17   A.   It appears to be the exact same image.

9:23AM  18   Q.   Was 901D pulled from 901C, or was it a completely separate

9:23AM  19   document found on the Defendant's computer?

9:23AM  20   A.   Separate file.

9:23AM  21        MS. VALDES:  If you could go to 901F, please?

9:23AM  22   BY MS. VALDES:

9:23AM  23   Q.   What is the title -- it's a little blurry, but the title

9:23AM  24   at the top of this document?  Thank you.

9:23AM  25   A.   The title for this document is curriculum vitae.

GAERTNER - DIRECT EXAMINATION

9:23AM   1   Q.   And then back out to the full document.  Again, does the

9:23AM   2   name, date of birth, and country of origin match all the other

9:24AM   3   user attribution documents you just read into the record?

9:24AM   4   A.   Yes, they do.

9:24AM   5   Q.   Do you see the section titled "Work Experience" and the

9:24AM   6   section titled "Education and Training"?

9:24AM   7   A.   Yes.

9:24AM   8   Q.   Can you please read just the headers in those sections,

9:24AM   9   the two headers?

9:24AM   10   A.   Yes.  So the work experience is programmer and the

9:24AM   11   freelance programmer.  The education and training states that

9:24AM   12   this person has a magister degree in computer and software

9:24AM   13   engineering as well as a bachelor degree in computer and

9:24AM   14   software engineering.

9:24AM   15   Q.   If you could take a look at Government's 901E, why did you

9:24AM   16   label this document as user attribution?

9:24AM   17   A.   This also had a file name of Plamen resumé.  Next to it,

9:24AM   18   it said "old".

9:25AM   19   Q.   Same question.  Does the name, date of birth, country of

9:25AM   20   origin match all the other documents you just read into the

9:25AM   21   record?

9:25AM   22   A.   Yes.

9:25AM   23   Q.   Can you look at the work experience section, the first

9:25AM   24   entry?

9:25AM   25   A.   Yes.  It's -- you want me to read it?

GAERTNER – DIRECT EXAMINATION

9:25AM  1   Q.   Yes, please.

9:25AM  2   A.   It's dated for January 2004 to present days.  The place

9:25AM  3   for the workplace was Power Trading USA at Sofia, Bulgaria, and

9:25AM  4   the job or experience is customer support in English and PHP

9:25AM  5   programmer.

9:25AM  6   Q.   Turning to Government's Exhibit 902, can you please

9:25AM  7   explain what we're looking at here?

9:25AM  8   A.   So this is a forensic report or document I created from a

9:26AM  9   forensic application called Forensics Explorer.  This was

9:26AM  10  specifically pulled from the RAID or the two HGST hard drives,

9:26AM  11  and I bookmarked this because the Internet Explorer favorites

9:26AM  12  had a folder name of Webmaster.

9:26AM  13  Q.   Can you explain for those of us that don't know, when you

9:26AM  14  say Internet Explorer favorites, what are you talking about?

9:26AM  15  How would someone use that in their everyday life?

9:26AM  16  A.   So Internet Explorer is a -- like a website browser such

9:26AM  17  as Google or Yahoo, Bing, and within those web browsers, you

9:26AM  18  can -- well, in Google, it would be called bookmark.  So if you

9:26AM  19  have a favorite website, you would bookmark that website.

9:26AM  20  Within Internet Explorer, you would favorite that website.  So

9:26AM  21  this document would be all of the favorited or bookmarked

9:26AM  22  websites that the user had saved.

9:26AM  23  Q.   And what is the benefit of bookmarking a website?

9:27AM  24  A.   So that you don't have to type it in or look it up.  You

9:27AM  25  can just go straight to it.

22

GAERTNER - DIRECT EXAMINATION

9:27AM  1    Q.    You mentioned earlier in your testimony that you used key

9:27AM  2    word searches to conduct your analysis?

9:27AM  3    A.    Yes.

9:27AM  4    Q.    How many key word searches hit on this?

9:27AM  5    A.    Multiple.  Almost every one.

9:27AM  6    Q.    And looking at these web links, can you please read the

9:27AM  7    first entry?

9:27AM  8    A.    Yes.  So it's cyber-pay_0001, and then the actual URL or

9:27AM  9    hyperlink is CyberPay.htm.

9:27AM  10   Q.    And in the time you've been on this investigation and

9:27AM  11   become familiar with this case, did you learn what CyberPay is

9:27AM  12   or was?

9:27AM  13   A.    Yes.

9:27AM  14   Q.    What is it?

9:27AM  15   A.    It was a payment service for the Newstar enterprise.

9:27AM  16   Q.    Looking at the entry 29, can you please read this one out

9:27AM  17   loud?

9:27AM  18   A.    Yes.  So this is new██████adminarea_score0001, and the URL

9:28AM  19   or hyperlink associated to that is admin.new██████.net/admin.

9:28AM  20   Q.    What does admin area or /admin mean?

9:28AM  21   A.    So admin is short for administrator.  So what these

9:28AM  22   hyperlinks in the favorite is saying that for the

9:28AM  23   new██████.net, this user had administrative privileges to that

9:28AM  24   website.

9:28AM  25   Q.    So would a person that just is accessing the website,

GAERTNER - DIRECT EXAMINATION

9:28AM 1  viewing, trying to purchase from it, et cetera, would they have

9:28AM 2  access to the admin area?

9:28AM 3  A.   No, they would not.

9:28AM 4  Q.   Would this link allow someone to eventually get access to

9:28AM 5  the admin area?

9:28AM 6  A.   Yes.

9:28AM 7  Q.   If you can please look at Government's exhibit -- and I'm

9:28AM 8  sorry, were there more entries like this in the document you

9:28AM 9  found?

9:28AM 10  A.   Yes.

9:28AM 11  Q.   Government's Exhibit 903, what drew your attention to this

9:29AM 12  exhibit?

9:29AM 13  A.   I bookmarked this exhibit because of the title and name as

9:29AM 14  well as the key word search hit that hit within -- inside this

9:29AM 15  document.

9:29AM 16  Q.   Could you please read the title and name of the document?

9:29AM 17  A.   Yes, so it's -- the company is Leaseweb, and it's stated

9:29AM 18  for an agreement with Leaseweb.

9:29AM 19  Q.   And in your time that you were involved in the

9:29AM 20  investigation, did you come to learn what Leaseweb is or was?

9:29AM 21  A.   Yes.

9:29AM 22  Q.   What was it?

9:29AM 23  A.   So Leaseweb is a web hosting or internet service provider.

9:29AM 24  Specifically they store -- so if you have a website, you would

9:29AM 25  use someone like Leaseweb to hold that website on their servers

GAERTNER - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:29AM | 1 | or their network. |
| 9:29AM | 2 | Q.   And could you please read where it says on this agreement |
| 9:29AM | 3 | date, name, email, and comments? |
| 9:29AM | 4 | A.   Yes.  So starting with the date, September 10th, 2008. |
| 9:30AM | 5 | The name is Plamen Velinov.  The email is |
| 9:30AM | 6 | webmaster@tinymodel-█████.com, and the comments is, "This |
| 9:30AM | 7 | will be our backup server.  We need interconnection to our |
| 9:30AM | 8 | primary server." |
| 9:30AM | 9 | Q.   If you could look at Government's 904, if you could page |
| 9:30AM | 10 | through.  Mr. Gaertner, how many search terms hit on this |
| 9:30AM | 11 | document? |
| 9:30AM | 12 | A.   Numerous. |
| 9:30AM | 13 | Q.   And what does it appear to be a collection of? |
| 9:30AM | 14 | A.   So this document appears to be a collection of hyperlinks |
| 9:30AM | 15 | to Newstar enterprise websites, and it also appears that -- to |
| 9:31AM | 16 | the right of each website appears to be a user password to |
| 9:31AM | 17 | access that website. |
| 9:31AM | 18 | Q.   Starting on page 2, can you read just the first few lines? |
| 9:31AM | 19 | Start at -- stop at Newstar ████ |
| 9:31AM | 20 | A.   Yes.  So it's Newstar-██████ info, and then what |
| 9:31AM | 21 | appears to be a password.  Newstar-████████.net, password. |
| 9:31AM | 22 | Newstar-██████.com, password.  Newstar.███████.info, |
| 9:31AM | 23 | password.  Newstar-█████.com. |
| 9:31AM | 24 | Q.   Thank you.  Turning to Government's Exhibit 905, can you |
| 9:31AM | 25 | please read the title of this document? |

GAERTNER - DIRECT EXAMINATION

9:31AM 1    A.   Yes, it's KennySMS.text.

9:31AM 2    Q.   What is SMS, and what is text, txt?

9:32AM 3    A.   So SMS is short for -- abbreviation for short messaging

9:32AM 4    service, pretty much text messaging.  So when you text message

9:32AM 5    something it's stored in an SMS database, and the .txt is just

9:32AM 6    a file extension for a text document.

9:32AM 7    Q.   Mr. Gaertner, in the middle of the document, do you see an

9:32AM 8    address, a Lutz, Florida address?

9:32AM 9    A.   Yes.

9:32AM 10   Q.   In your time involved in the investigation, did you learn

9:32AM 11   about this address?

9:32AM 12   A.   Yes.

9:32AM 13   Q.   What did you learn about this address?

9:32AM 14   A.   This Lutz, Florida address belongs to Mr. Mark Bjorkman.

9:32AM 15   Q.   And would you mind reading that address into the record,

9:32AM 16   please?

9:32AM 17   A.   Yes, it's 18720 Chopin Drive, Lutz, Florida, 33558.

9:32AM 18   Q.   And could you also please read the names written in the

9:32AM 19   second paragraph of information here into the record?

9:32AM 20   A.   Yes, it's Kenny and Tania.

9:33AM 21   Q.   In reviewing the computer seized from the Defendant's

9:33AM 22   apartment, do you find any documents with the name Plamen that

9:33AM 23   was not associated with the last name Velinov?

9:33AM 24   A.   No, I did not.

9:33AM 25   Q.   Do these documents that you've analyzed also include

9:33AM   1   information related to the Newstar enterprise in general?

9:33AM   2   A.   Yes.

9:33AM   3   Q.   Do they include admin access to areas only administrators

9:33AM   4   to the Newstar websites could gain access to?

9:33AM   5   A.   Yes, yes.

9:33AM   6         MS. VALDES:  No further questions.

9:33AM   7         THE COURT:  All right.  Thank you.  Any

9:33AM   8   cross-examination for this witness?

9:33AM   9         MR. KERR:  Yes.  Thank you, Your Honor.

9:33AM  10         THE COURT:  You may proceed.

9:33AM  11                   CROSS-EXAMINATION

9:33AM  12                   BY MR. KERR:

9:33AM  13   Q.   Good morning, Mr. Gaertner.

9:33AM  14   A.   Good morning, sir.

9:33AM  15   Q.   We've met before in your office?

9:33AM  16   A.   Yes.

9:33AM  17   Q.   Spoken before?  Now, you testified that you traveled to

9:34AM  18   Bulgaria and worked somewhat with the Bulgarian officials?

9:34AM  19   A.   Yes.

9:34AM  20   Q.   Okay.  And then retrieved these devices and brought them

9:34AM  21   back here in your custody?

9:34AM  22   A.   Yes.

9:34AM  23   Q.   And did you meet the -- over in Bulgaria, did you meet the

9:34AM  24   Bulgarian investigator, Mr. Angelov, who was here?

9:34AM  25   A.   Yes.

GAERTNER - CROSS-EXAMINATION

| | | |
|---|---|---|
| 9:34AM | 1 | Q.   Okay.  So you're aware that -- that Mr. Velinov was |
| 9:34AM | 2 | cooperative with them, opened the door to the apartment and let |
| 9:34AM | 3 | them in to do their search? |
| 9:34AM | 4 | A.   Yes. |
| 9:34AM | 5 | Q.   Okay.  And gave consent to get his bank records and |
| 9:34AM | 6 | everything else? |
| 9:34AM | 7 | A.   I wasn't part of that investigation. |
| 9:34AM | 8 | Q.   Okay.  Now, were you -- were you present when these |
| 9:34AM | 9 | devices were actually seized initially? |
| 9:34AM | 10 | A.   No. |
| 9:34AM | 11 | Q.   And are you aware whether or not the hash values -- that's |
| 9:35AM | 12 | what identifies the content as being secure, right? |
| 9:35AM | 13 | A.   Correct. |
| 9:35AM | 14 | Q.   Okay.  So if the hash value is something at one point and |
| 9:35AM | 15 | the same at another point, that means the content is the same; |
| 9:35AM | 16 | do I understand that right? |
| 9:35AM | 17 | A.   I'm sorry, can you repeat that? |
| 9:35AM | 18 | Q.   If you get the hash value from a device like this at one |
| 9:35AM | 19 | point and you record that, and then you get a hash value at |
| 9:35AM | 20 | some other point and it's the exact same, that means that the |
| 9:35AM | 21 | content has not changed? |
| 9:35AM | 22 | A.   Correct. |
| 9:35AM | 23 | Q.   Okay.  Just so I understand. |
| 9:35AM | 24 | Do you know if they took -- the Bulgarians took a |
| 9:35AM | 25 | hash value measurement at the time the device was seized? |

GAERTNER - CROSS-EXAMINATION

| | | |
|---|---|---|
| 9:35AM | 1 | **A.**   Yes. |
| 9:35AM | 2 | **Q.**   They did? |
| 9:35AM | 3 | **A.**   Yes. |
| 9:35AM | 4 | **Q.**   Okay.  And you compared that with what you saw? |
| 9:35AM | 5 | **A.**   Yes. |
| 9:35AM | 6 | **Q.**   And it was the same? |
| 9:35AM | 7 | **A.**   Yes. |
| 9:36AM | 8 | **Q.**   Now, you met with me at your office, and we went through |
| 9:36AM | 9 | some of the discovery and everything.  Are you aware of any |
| 9:36AM | 10 | requests to the defense to access these encrypted devices? |
| 9:36AM | 11 | **A.**   I was not aware. |
| 9:36AM | 12 | **MR. KERR:**  No further questions. |
| 9:36AM | 13 | **THE COURT:**  Thank you.  Any redirect? |
| 9:36AM | 14 | **MS. VALDES:**  No, Your Honor. |
| 9:36AM | 15 | **THE COURT:**  All right.  The witness is excused. |
| 9:36AM | 16 | Thank you.  We appreciate your having come in to testify. |
| 9:36AM | 17 | (Witness excused.) |
| 9:36AM | 18 | **THE COURT:**  And the Government can call its next |
| 9:36AM | 19 | witness. |
| 9:36AM | 20 | **MS. VALDES:**  The Government calls Special Agent Tavey |
| 9:36AM | 21 | Garcia.  May I approach the witness box, Your Honor? |
| 9:36AM | 22 | **THE COURT:**  Yes. |
| 9:37AM | 23 | **COURTROOM DEPUTY:**  Good morning. |
| 9:37AM | 24 | (Witness sworn.) |
| 9:37AM | 25 | **COURTROOM DEPUTY:**  Thank you.  Please state and spell |

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:37AM | 1 | your name for the record. |
| 9:37AM | 2 | **THE WITNESS:**  Tavey Garcia.  T-a-v-e-y, G-a-r-c-i-a. |
| 9:37AM | 3 | **COURTROOM DEPUTY:**  Thank you.  You may take the |
| 9:37AM | 4 | stand. |
| 9:37AM | 5 | **THE WITNESS:**  Thank you. |
| 9:37AM | 6 | **THE COURT:**  So as the case agent, you've been here |
| 9:37AM | 7 | during the other testimony, and you've heard me say to the |
| 9:37AM | 8 | other witnesses about waiting until the question is finished, |
| 9:37AM | 9 | et cetera.  So I ask that you please comply with those |
| 9:37AM | 10 | requirements as well. |
| 9:37AM | 11 | **THE WITNESS:**  Yes, Your Honor. |
| 9:37AM | 12 | **THE COURT:**  Thank you.  You may proceed. |
| 9:37AM | 13 | **MS. VALDES:**  Thank you, Your Honor. |
| 9:37AM | 14 | **TAVEY GARCIA,** |
| 9:37AM | 15 | a witness called on behalf of the Government, being first duly |
| 9:37AM | 16 | sworn, was examined and testified as follows: |
| 9:37AM | 17 | **DIRECT EXAMINATION** |
| 9:37AM | 18 | **BY MS. VALDES:** |
| 9:37AM | 19 | **Q.**   Good morning. |
| 9:37AM | 20 | **A.**   Good morning. |
| 9:37AM | 21 | **Q.**   Where do you work? |
| 9:37AM | 22 | **A.**   I work at Homeland Security Investigations. |
| 9:37AM | 23 | **Q.**   And what do you do for HSI? |
| 9:37AM | 24 | **A.**   I am a special agent or a criminal investigator. |
| 9:37AM | 25 | **Q.**   Can you please explain your education and training as it |

GARCIA - DIRECT EXAMINATION

9:37AM   1   relates to your role as a special agent?

9:37AM   2   A.   Sure.  I have a bachelor's degree from the University of

9:38AM   3   Texas at San Antonio.  I completed the six-month training

9:38AM   4   course at the Federal Law Enforcement Training Center in

9:38AM   5   Glynco, Georgia, and I've participated in numerous ongoing

9:38AM   6   educational trainings.

9:38AM   7   Q.   How long have you been a special agent?

9:38AM   8   A.   I'm in my 13th year.

9:38AM   9   Q.   What do you do as a special agent?

9:38AM  10   A.   I investigate allegations of criminal activity.

9:38AM  11   Q.   How many investigations have you conducted?

9:38AM  12   A.   I average about 15 or so a year, so over a hundred.

9:38AM  13   Q.   Did you receive any specialized training related to the

9:38AM  14   investigation of child exploitation offenses?

9:38AM  15   A.   I have.

9:38AM  16   Q.   What types of training?

9:38AM  17   A.   AS I mentioned earlier, I was at the Federal Law

9:38AM  18   Enforcement Training Center at Glynco.  That covered a portion

9:38AM  19   of child exploitation.  When I began investigating child

9:38AM  20   exploitation related offenses, I participated in the Internet

9:38AM  21   Crimes Against Children Task Force in the Sun Coast Region.

9:38AM  22   Within that task force, we had ongoing training on all aspects

9:39AM  23   of child exploitation.

9:39AM  24   Q.   And how long have you been investigating specifically

9:39AM  25   child exploitation offenses?

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:39AM | 1 | **A.**   Since about 2014. |
| 9:39AM | 2 | **Q.**   Were you assigned to the Newstar case? |
| 9:39AM | 3 | **A.**   I was. |
| 9:39AM | 4 | **Q.**   And what is your role in the Newstar case? |
| 9:39AM | 5 | **A.**   I am the case agent, the lead case agent. |
| 9:39AM | 6 | **Q.**   How long have you been involved in the Newstar case? |
| 9:39AM | 7 | **A.**   Since 2019. |
| 9:39AM | 8 | **Q.**   And how long have you been the lead agent on the Newstar |
| 9:39AM | 9 | case? |
| 9:39AM | 10 | **A.**   Since 2019. |
| 9:39AM | 11 | **Q.**   What types of investigative steps have you taken in this |
| 9:39AM | 12 | case? |
| 9:39AM | 13 | **A.**   I reviewed previous records from previous case agents.  I |
| 9:39AM | 14 | served subpoenas for business records.  I participated in |
| 9:39AM | 15 | interviews.  I reviewed forensic reports as responsive |
| 9:39AM | 16 | information from some of the investigative activities.  I |
| 9:39AM | 17 | applied for, received, and executed both search and arrest |
| 9:39AM | 18 | warrants.  As a result of those, we received some devices that |
| 9:40AM | 19 | were analyzed.  I reviewed work product from those, chat |
| 9:40AM | 20 | messages, email communications, those types of forensic |
| 9:40AM | 21 | documents.  And, again, I participated in interviews.  I've |
| 9:40AM | 22 | done quite a bit of work. |
| 9:40AM | 23 | **Q.**   You've done a lot of work? |
| 9:40AM | 24 | **A.**   Yes. |
| 9:40AM | 25 | **Q.**   Okay.  Did your investigation into Newstar eventually lead |

| | | |
|---|---|---|
| 9:40AM | 1 | you to the Defendant, Plamen Velinov? |
| 9:40AM | 2 | A.   It did. |
| 9:40AM | 3 | Q.   Do you consider the Newstar case a typical child |
| 9:40AM | 4 | exploitation case? |
| 9:40AM | 5 | A.   No. |
| 9:40AM | 6 | Q.   Why not? |
| 9:40AM | 7 | A.   For various reasons, but this -- since I've been |
| 9:40AM | 8 | investigating child exploitation since 2014, this is the first |
| 9:40AM | 9 | time I -- |
| 9:40AM | 10 | A JUROR:  We can't hear her. |
| 9:40AM | 11 | THE WITNESS:  Is this better? |
| 9:40AM | 12 | MS. VALDES:  Having trouble hearing.  Some of the |
| 9:40AM | 13 | jurors have indicated that they're having trouble hearing. |
| 9:40AM | 14 | THE COURT:  Okay.  All right.  So I'm glad you said |
| 9:40AM | 15 | something.  Yes, can you speak into the microphone? |
| 9:40AM | 16 | A JUROR:  There we go.  It just came off.  It was off |
| 9:41AM | 17 | and on. |
| 9:41AM | 18 | THE COURT:  Oh, okay.  Is it better now? |
| 9:41AM | 19 | A JUROR:  Yes. |
| 9:41AM | 20 | MS. VALDES:  And since we're at a stopping point, her |
| 9:41AM | 21 | exhibits will be shown on the TV, not on the big monitor. |
| 9:41AM | 22 | COURTROOM DEPUTY:  Okay. |
| 9:41AM | 23 | MS. VALDES:  Thank you. |
| 9:41AM | 24 | THE COURT:  Okay.  Must be that the microphone was |
| 9:41AM | 25 | turned off or was not on full power, but I'm glad you said |

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 9:41AM | 1 | something.  Let me know if you still can't hear.  Okay.  Go |
| 9:41AM | 2 | ahead. |
| 9:41AM | 3 | MS. VALDES:  Thank you. |
| 9:41AM | 4 | BY MS. VALDES: |
| 9:41AM | 5 | Q.   I believe we were talking about what makes this case |
| 9:41AM | 6 | unique in comparison to the other child exploitation cases that |
| 9:41AM | 7 | you've been involved in investigating? |
| 9:41AM | 8 | A.   Right. |
| 9:41AM | 9 | Q.   Now it's too loud? |
| 9:41AM | 10 | A.   A typical -- is that better?  Still no.  Here? |
| 9:41AM | 11 | THE COURT:  I don't know what that is. |
| 9:41AM | 12 | COURT SECURITY OFFICER:  Get closer to it. |
| 9:41AM | 13 | THE WITNESS:  Is that better? |
| 9:41AM | 14 | THE COURT:  Yes, now it's fine. |
| 9:41AM | 15 | THE WITNESS:  Is that better? |
| 9:41AM | 16 | THE COURT:  It is better.  No?  Maybe I can hear, but |
| 9:42AM | 17 | you can't over there. |
| 9:42AM | 18 | COURTROOM DEPUTY:  It's on full power now, Your |
| 9:42AM | 19 | Honor. |
| 9:42AM | 20 | COURT SECURITY OFFICER:  Maybe the speakers over |
| 9:42AM | 21 | here -- |
| 9:42AM | 22 | THE COURT:  It must be the speaker there is it not |
| 9:42AM | 23 | properly working. |
| 9:42AM | 24 | COURTROOM DEPUTY:  I'll put in a D case, Your Honor. |
| 9:42AM | 25 | THE COURT:  All right.  We'll do it internally to try |

**GARCIA - DIRECT EXAMINATION**

9:42AM  1    to fix it, but in the meantime, the other solution is maybe a

9:42AM  2    handheld mic?

9:42AM  3               THE WITNESS:  I could try to speak up.

9:42AM  4               THE COURT:  Yes, and -- but, again, it's really

9:42AM  5    important the jury is able to hear you.  So try to come up with

9:42AM  6    another solution.

9:42AM  7               A JUROR:  It's when you moved the TV over.

9:42AM  8               THE COURT:  That microphone is working great.

9:42AM  9               THE WITNESS:  Testing.  Testing.

9:42AM  10              A JUROR:  It's all garbled now.  It's the speakers.

9:42AM  11   It's not the microphone.

9:42AM  12              THE COURT:  I'm sorry.  This courtroom has the worst

9:43AM  13   audio in the entire courthouse.  So I will continue to try to

9:43AM  14   get it fixed.  It's just very challenging.

9:43AM  15              A JUROR:  The circumstances occurred when we moved

9:43AM  16   the TV unit over.

9:43AM  17              THE COURT:  I'm sorry?

9:43AM  18              A JUROR:  The circumstances occurred with the

9:43AM  19   speakers going back when you moved that TV unit over.

9:43AM  20   Something shorted out.

9:43AM  21              THE COURT:  Maybe that's what -- we'll make

9:43AM  22   certain -- Magaly, when you send the D case, explain to them

9:43AM  23   that this is a continuing problem and what's happened with that

9:43AM  24   TV; that we're in a trial, and the jury can't hear.

9:43AM  25              COURTROOM DEPUTY:  Okay.

GARCIA - DIRECT EXAMINATION

9:43AM    1          THE COURT:  I mean, that's a serious issue.

9:43AM    2              Okay.  Thank you.  Hopefully you can hear now.

9:43AM    3    If you can't, please let me know.

9:43AM    4          THE WITNESS:  Testing.

9:43AM    5          THE COURT:  Now it's good.

9:43AM    6          MS. VALDES:  May I continue, Your Honor?

9:43AM    7          THE COURT:  Yes, you may.

9:43AM    8          MS. VALDES:  And if there's any audio issues, we can

9:43AM    9    stop.

9:43AM   10          THE COURT:  Right.  And I'll assume unless somebody

9:43AM   11    says something that you can all hear okay.  We can always try

9:44AM   12    something different, but anyway, please go ahead.

9:44AM   13    BY MS. VALDES:

9:44AM   14    Q.   Special Agent Garcia, you were explaining what makes this

9:44AM   15    case different from the other child exploitation cases you've

9:44AM   16    investigated.

9:44AM   17    A.   Right.  So there is no typical case, but in general, child

9:44AM   18    exploitation cases involve a single user who is sending,

9:44AM   19    receiving, or producing --

9:44AM   20          A JUROR:  I'm sorry.

9:44AM   21          THE COURT:  There's that back feed, yeah.  It's

9:44AM   22    horrible.  See if Magaly can work something there.

9:44AM   23          COURTROOM DEPUTY:  Can you try one more time?

9:44AM   24          THE WITNESS:  Testing, testing.

9:44AM   25          THE COURT:  I'm just going to ask somebody in my

GARCIA - DIRECT EXAMINATION

```
9:44AM   1   office if they can hear me to please call the tech people and
9:44AM   2   tell them to please come here as soon as possible.  Why don't
9:44AM   3   you keep on trying?  See if -- if not, we'll get the tech folks
9:45AM   4   in here.
9:45AM   5           THE WITNESS:  Would you like me to try to speak
9:45AM   6   louder?
9:45AM   7           THE COURT:  There's a back feed, which is very
9:45AM   8   distracting.  Let me see if I can -- let's just be in recess
9:45AM   9   for a minute, but we're all going to sit here.  Let me see if I
9:45AM  10   can reach one of the tech people myself.
9:45AM  11           COURTROOM DEPUTY:  I'm going to call, Your Honor,
9:45AM  12   right now.
9:45AM  13           THE COURT:  You can go to the restroom, of course.
9:45AM  14   We're in recess.
        15           (Recess from 9:45 a.m. to 9:55 a.m.)
9:55AM  16           THE COURT:  So let me go on the record then.  Court
9:55AM  17   reporter take this down.  We're going to take a break.  It's
9:55AM  18   going to take them a little bit of time, and rather than just
9:55AM  19   have you sit here, so ladies and gentlemen, hopefully it won't
9:55AM  20   be too long.  Please don't discuss the case or form any
9:55AM  21   opinions until you've heard all the evidence.  We will take
9:55AM  22   a --
9:55AM  23           A JUROR:  Now it's fine.  We're hearing you fine now.
9:56AM  24           THE COURT:  Let's see if the witness can -- okay.
9:56AM  25   Let's see if the witness can -- why don't you just say
```

GARCIA - DIRECT EXAMINATION

9:56AM  1    something so they can see if they can hear you?

9:56AM  2              THE WITNESS:  Is this working?

9:56AM  3              A JUROR:  Yes.

9:56AM  4              MS. VALDES:  Testing, testing.

9:56AM  5              A JUROR:  There we go.

9:56AM  6              THE COURT:  Okay.  All right.  No need for a break.

9:56AM  7    Whatever you did, it worked.

9:56AM  8                   All right.  Good.  Okay.  We will now not take

9:56AM  9    our break then since everything seems to be working, and you

9:56AM  10   can continue with your direct examination.  I don't know if you

9:56AM  11   want to ask anything else.  Go back to the beginning, whatever

9:56AM  12   you want to do is fine, whatever you feel comfortable with.

9:57AM  13             MS. VALDES:  Could we -- would Your Honor inquire of

9:57AM  14   the jury if they were able to hear the first set of questions I

9:57AM  15   asked?  We hadn't gone into this very much.

9:57AM  16             THE COURT:  No, we haven't.  You know what?  I'd just

9:57AM  17   go back to the beginning, just so there's no issue there, okay?

9:57AM  18             MS. VALDES:  All right.  Let's take it from the top.

9:57AM  19   BY MS. VALDES:

9:57AM  20   Q.   Where do you work?

9:57AM  21   A.   Homeland Security Investigations.

9:57AM  22   Q.   And what do you do for HSI?

9:57AM  23   A.   I am a special agent or criminal investigator.

9:57AM  24   Q.   How long have you been a special agent and criminal

9:57AM  25   investigator for HSI?

**GARCIA - DIRECT EXAMINATION**

9:57AM  1   A.    I'm in my 13th year.

9:57AM  2   Q.    What type of education and training have you received?

9:57AM  3   A.    I have a bachelor's degree from the University of Texas at

9:57AM  4   San Antonio.  I participated in the Federal Law Enforcement

9:57AM  5   Training Center training in Glynco for a special agent, and I

9:57AM  6   had ongoing training.

9:57AM  7   Q.    What do you do as a special agent?

9:57AM  8   A.    I investigate allegations of criminal activity.

9:58AM  9   Q.    And how many investigations have you been a part of or

9:58AM  10  conducted?

9:58AM  11  A.    I personally average about 15 cases a year, so over a

9:58AM  12  hundred.

9:58AM  13  Q.    Do you have any specialized training in child exploitation

9:58AM  14  cases?

9:58AM  15  A.    I do.

9:58AM  16  Q.    Could you explain?

9:58AM  17  A.    At the Federal Law Enforcement Training Center, we touched

9:58AM  18  on child exploitation related offenses, and when I began

9:58AM  19  investigating them in 2014, I became a member of the Internet

9:58AM  20  Crimes Against Children Task Force for the Sun Coast Region

9:58AM  21  where we participate in quarterly and ongoing training as it

9:58AM  22  relates to child exploitation.

9:58AM  23  Q.    Were you assigned to the Newstar case?

9:58AM  24  A.    I was.

9:58AM  25  Q.    What is your role in the Newstar case?

**GARCIA - DIRECT EXAMINATION**

9:58AM  1   A.   I am the lead case agent.

9:58AM  2   Q.   And how long have you been involved with the Newstar case?

9:58AM  3   A.   I began working this case in 2019.

9:58AM  4   Q.   What investigative steps have you taken in your time as

9:58AM  5   the lead agent of the Newstar case?

9:58AM  6   A.   I initially reviewed previous records from previous agents

9:59AM  7   and historical agents.  I served subpoenas for business

9:59AM  8   records.  I participated in interviews.  I applied for,

9:59AM  9   received, and executed both search and arrest warrants.  I

9:59AM  10  cooperated with agents, domestic and foreign, and then I

9:59AM  11  reviewed forensic extractions from evidence received like chat

9:59AM  12  messages, email messages, IP logs, bank records, a plethora of

9:59AM  13  data.

9:59AM  14  Q.   Were you the first agent on this case?

9:59AM  15  A.   I was not.

9:59AM  16  Q.   How many agents before you?

9:59AM  17  A.   In Florida, one.

9:59AM  18  Q.   Do you consider this to be a typical online child

9:59AM  19  exploitation case?

9:59AM  20  A.   No.

9:59AM  21  Q.   Why not?

9:59AM  22  A.   Well, first, there is no typical child exploitation case,

9:59AM  23  but generally speaking, most of our cases involve a single

9:59AM  24  individual who receives, sends, distributes, or produces child

10:00AM 25  exploitation material who's identified by a platform like

GARCIA - DIRECT EXAMINATION

10:00AM    1    Google or Dropbox or some sort of platform who provides a lead

10:00AM    2    or a tip for an investigation.  In this case, it was much more

10:00AM    3    broad than that.  Since 2014, this is the first server case

10:00AM    4    that I've ever taken the lead on.

10:00AM    5    Q.   You mentioned some of your cases involved Google, Dropbox,

10:00AM    6    things of that nature, correct?

10:00AM    7    A.   Correct.

10:00AM    8    Q.   Are those all things on the clear web?

10:00AM    9    A.   Yes.

10:00AM   10    Q.   So have you investigated cases on the clear web, child

10:00AM   11    exploitation cases?

10:00AM   12    A.   Investigative leads that come from open source entities,

10:00AM   13    yes.

10:00AM   14    Q.   What type of evidence did you collect and then review in

10:00AM   15    this case?

10:00AM   16    A.   We collected a lot of evidence.  Bank records, subscriber

10:00AM   17    information from various providers based on search warrants,

10:01AM   18    paper records, electronic devices, a lot of different records.

10:01AM   19    Q.   Did you also participate in interviews?

10:01AM   20    A.   I did.

10:01AM   21    Q.   Of who?

10:01AM   22    A.   I participated in interviews involving members of the

10:01AM   23    Newstar enterprise, and I participated in who we identified as

10:01AM   24    victim children from the Newstar enterprise.

10:01AM   25    Q.   I want to circle back to that.  How many hours do you

GARCIA - DIRECT EXAMINATION

10:01AM  1   think you've spent investigating the Newstar case?

10:01AM  2   A.   A lot.  Thousands over the years.

10:01AM  3   Q.   Going back to the interviews that you were a part of, you

10:01AM  4   stated you were present at the interviews of victims?

10:01AM  5   A.   Yes.

10:01AM  6   Q.   Who are the victims?

10:01AM  7   A.   We identified some of the victims in the Newstar

10:01AM  8   enterprise that were featured on the website.

10:01AM  9        MS. VALDES:  If you could publish on the TV screen

10:01AM  10  Government's Exhibit previously admitted 342, and if we could

10:02AM  11  turn to page 19.

10:02AM  12  BY MS. VALDES:

10:02AM  13  Q.   Was the child depicted in these pictures interviewed as

10:02AM  14  part of the Newstar investigation?

10:02AM  15  A.   She was.

10:02AM  16  Q.   Were you present at her interview?

10:02AM  17  A.   I was.

10:02AM  18  Q.   How old was she when she was interviewed?

10:02AM  19  A.   She was an adult.

10:02AM  20  Q.   Why was she interviewed as an adult?

10:02AM  21  A.   Due to the complexity of this investigation, as we found

10:02AM  22  evidence, it uncovered more -- more avenues that we needed to

10:02AM  23  explore.  In this case, after we exercised the search warrant

10:02AM  24  at the Power residence, when the forensic analysts were able to

10:02AM  25  get into the computer, they found documents.  I think the

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:02AM | 1 | digital forensic analyst Dero mentioned there was a document |
| 10:02AM | 2 | that we found, and it had names of we believed to be true names |
| 10:03AM | 3 | of children and what we thought were suspected ages of those |
| 10:03AM | 4 | children.  So from there, we did an open search -- open source |
| 10:03AM | 5 | research.  I subpoenaed for records, and we ultimately were |
| 10:03AM | 6 | able to identify some of the children, and we sought support |
| 10:03AM | 7 | from foreign entities to be able to interview them as children |
| 10:03AM | 8 | from these websites. |
| 10:03AM | 9 | Q.   By the time you discovered that information, had they |
| 10:03AM | 10 | grown up and were the adults at that time? |
| 10:03AM | 11 | A.   That's true. |
| 10:03AM | 12 | Q.   If we could page down to page 54, was the child depicted |
| 10:03AM | 13 | in these images interviewed as part of the Newstar |
| 10:03AM | 14 | investigation? |
| 10:03AM | 15 | A.   She was. |
| 10:03AM | 16 | Q.   Were you present at her interview? |
| 10:03AM | 17 | A.   I was. |
| 10:03AM | 18 | Q.   And how old was she when she was interviewed? |
| 10:03AM | 19 | A.   Also an adult. |
| 10:03AM | 20 | Q.   Was she an adult for the same reasons you just described |
| 10:03AM | 21 | for the first child? |
| 10:03AM | 22 | A.   Yes. |
| 10:03AM | 23 | Q.   Page 89.  Was the child depicted in these photographs |
| 10:04AM | 24 | interviewed as part of the Newstar investigation? |
| 10:04AM | 25 | A.   She was. |

GARCIA - DIRECT EXAMINATION

10:04AM    1    Q.   Were you present at that interview?

10:04AM    2    A.   I was.

10:04AM    3    Q.   Was she also an adult at that time?

10:04AM    4    A.   Yes.

10:04AM    5    Q.   Page 173.  Was the child depicted in these photographs

10:04AM    6    interviewed as part of the Newstar investigation?

10:04AM    7    A.   She was.

10:04AM    8    Q.   Were you present at her interview?

10:04AM    9    A.   Yes.

10:04AM   10    Q.   What was her age at that time?

10:04AM   11    A.   Also an adult.

10:04AM   12    Q.   Special Agent Garcia, you've already brought this up, but

10:04AM   13    were you present at digital investigative analyst Tucker --

10:04AM   14    sorry, Dero's testimony?

10:04AM   15    A.   Yes.

10:04AM   16    Q.   Do you recall him testifying about ICQ chats he recovered

10:04AM   17    from one of Ken Power's digital devices?

10:04AM   18    A.   Yes.

10:04AM   19    Q.   Have you read the full ICQ chats contained in Government's

10:04AM   20    Exhibit 608?

10:04AM   21    A.   I believe I did.

10:04AM   22    Q.   Do you recall DI Tucker testifying that chats identified

10:04AM   23    in Government's Exhibit 608A depicted a conversation between

10:05AM   24    the person named Ken and a person named Plamen?

10:05AM   25    A.   Yes.

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:05AM | 1 | Q.   Do you recall him testifying that Ken's chats appeared in |
| 10:05AM | 2 | red? |
| 10:05AM | 3 | A.   Yes. |
| 10:05AM | 4 | Q.   Do you recall what color Plamen's chats appeared in? |
| 10:05AM | 5 | A.   Black. |
| 10:05AM | 6 | Q.   Showing you previously admitted Government's 608A, page 6, |
| 10:05AM | 7 | could you please read the first two lines in the top box from |
| 10:05AM | 8 | the person identified as Ken? |
| 10:05AM | 9 | A.   Sure.  The date is 14/4/2017, and I believe that's the |
| 10:05AM | 10 | 14th day of April, 2017.  At 05:03:59, it reads, "I have sent |
| 10:05AM | 11 | you wire for 1100, $500 each.  Please send to Anton with the |
| 10:05AM | 12 | last 350, as I think he said he told you not to send it yet." |
| 10:05AM | 13 | Q.   Special Agent Garcia, can you please take a look at |
| 10:05AM | 14 | Government's Exhibit 422 placed in front of you?  Take your |
| 10:06AM | 15 | time, and when you've reviewed it, please look up at me.  What |
| 10:06AM | 16 | is it? |
| 10:06AM | 17 | A.   This is a document I created from the wire transfers that |
| 10:06AM | 18 | were identified in the QuickBooks, Tatiana Power's QuickBooks |
| 10:06AM | 19 | account. |
| 10:06AM | 20 | Q.   Why did you make this document? |
| 10:06AM | 21 | A.   I made this document -- when I was reviewing text messages |
| 10:06AM | 22 | or ICQ chat messages and emails and whatnot, I was trying to |
| 10:06AM | 23 | cooperate information, identities specifically, so when we |
| 10:06AM | 24 | found information that I could potentially try to tie back to |
| 10:06AM | 25 | verify identities I did.  So from the ICQ checks, there were |

GARCIA - DIRECT EXAMINATION

10:07AM   1   dollar amounts that one alleged to have sent to another.  So I
10:07AM   2   reviewed the bank records and then tried to make matches to
10:07AM   3   confirm Ken and Plamen as the sender/recipient of those chat
10:07AM   4   messages.
10:07AM   5   Q.   Is the exhibit that you just reviewed a fair and accurate
10:07AM   6   depiction of those wire transfer summaries you collected?
10:07AM   7   A.   Yes.
10:07AM   8        MS. VALDES:  Your Honor, Government offers
10:07AM   9   Government's 422 into evidence.
10:07AM  10        MR. KERR:  No objection.
10:07AM  11        THE COURT:  422 is received into evidence.
10:07AM  12        MS. VALDES:  Permission to publish?
10:07AM  13        THE COURT:  Yes.
10:07AM  14        MS. VALDES:  Thank you, Your Honor.  If you could
10:07AM  15   please display side by side with the previous exhibit, which is
10:07AM  16   608A, page 6, and Government's 422?
10:07AM  17   BY MS. VALDES:
10:07AM  18   Q.   Special Agent Garcia, can you please read the information
10:07AM  19   in the first box on Government's 422?
10:07AM  20   A.   Sure.  That's a summary of a wire transfer from Kenneth
10:07AM  21   and Tatiana Power's SunTrust Bank account in the name of Power
10:08AM  22   Trading Inc.  The date on that is April 13th, 2017.  It is an
10:08AM  23   outgoing wire in the amount of $1,100 made payable to Plamen
10:08AM  24   Georgiev Velinov at the DSK Bank.
10:08AM  25   Q.   And we have the ICQ chat that you just read earlier blown

GARCIA - DIRECT EXAMINATION

10:08AM  1    up right below that.  How do they relate to each other?

10:08AM  2    A.   The dates are consistent, and again in red was Ken

10:08AM  3    indicating he sent a wire for 1100.  In this wire transfer

10:08AM  4    supporting document, it was a wire that went out for that

10:08AM  5    amount to Plamen, who we believed was the recipient of those

10:08AM  6    ICQ chats in black.

10:08AM  7    Q.   If we could please pull up Government's 608A, page 9?  If

10:08AM  8    you could please read the first line in the box from Ken

10:08AM  9    starting with "how much more"?

10:09AM  10   A.   Sure.  That is on 04/05/2017.  Again, that's going to be

10:09AM  11   the 4th day of the 5th month 2017.  It reads -- I'm sorry, at

10:09AM  12   02:30:57, it reads, "How much more is need fro servers?  I sent

10:09AM  13   already $700."

10:09AM  14   Q.   Comparing it to box 2, Government's 422, could you please

10:09AM  15   read the information from that box and describe how they relate

10:09AM  16   to each other?

10:09AM  17   A.   Again, this is the same Kenneth and Tatiana Power's

10:09AM  18   SunTrust Bank account in the name of Power Trading.  An

10:09AM  19   outgoing wire was sent on April 21st, 2017 in the amount of

10:09AM  20   $700 made payable to Plamen Georgiev Velinov at his DSK Bank.

10:09AM  21   Q.   Take a look at Government's 608A, page 36, please.  If you

10:09AM  22   could read the first line in the box starting with "I sent

10:10AM  23   $1,250"?

10:10AM  24   A.   Sure.  That date is 19/05/2017, 19th day of May, 2017 at

10:10AM  25   01:21:17.  It reads, "I sent $1250.  Send Anton 600 please."

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:10AM | 1 | Q.   And what is the person identified in black, also |
| 10:10AM | 2 | identified as the user Plamen's, response? |
| 10:10AM | 3 | A.   "Yes, I know." |
| 10:10AM | 4 | Q.   If we could please look at the third box in |
| 10:10AM | 5 | Government's 422?  If you could read that information and |
| 10:10AM | 6 | explain how they relate to each other. |
| 10:10AM | 7 | A.   That is on -- again, this is the Ken and Tatiana's Power |
| 10:10AM | 8 | SunTrust bank account in the name of Power Trading.  This is an |
| 10:10AM | 9 | outgoing wire on May 18th, 2017, in the amount of $1,255 made |
| 10:10AM | 10 | payable to Plamen Georgiev Velinov at the DSK Bank. |
| 10:11AM | 11 | Q.   And finally 608A, page 37, if you could read the lines in |
| 10:11AM | 12 | the box. |
| 10:11AM | 13 | A.   This is 18/8/2017.  August 18th, 2017 at 07:42:52.  It |
| 10:11AM | 14 | reads, "I sent you 1575, 600 for this month, and the other 100 |
| 10:11AM | 15 | from last month, so Anton gets 700, plus I sent 100 more for |
| 10:11AM | 16 | servers with $75 for fees." |
| 10:11AM | 17 | Q.   And finally, if we can compare that to the fourth box in |
| 10:11AM | 18 | Government's 422. |
| 10:11AM | 19 | A.   Again, it is the same Power Trading SunTrust Bank account, |
| 10:11AM | 20 | an outgoing wire sent on August 17th, 2017, for $1,575 made |
| 10:11AM | 21 | payable to Plamen Georgiev Velinov at DSK Bank. |
| 10:11AM | 22 | Q.   Thank you.  Did your investigation lead you to the names |
| 10:12AM | 23 | of servers? |
| 10:12AM | 24 | A.   Yes. |
| 10:12AM | 25 | Q.   Which servers? |

**GARCIA - DIRECT EXAMINATION**

10:12AM 1   A.   We had servers in Texas, Washington, and the Netherlands.

10:12AM 2   Q.   Do you recall the names of these servers?

10:12AM 3   A.   SoftLayer, Enom, and Leaseweb and Novogara.  They were --

10:12AM 4   they were a little difficult because they were both hosted

10:12AM 5   overseas, but they were essentially one and the same.  They

10:12AM 6   were different but had the same information.

10:12AM 7   Q.   What did you learn about the contents of these servers?

10:12AM 8   A.   I learned that the SoftLayer server contained the

10:12AM 9   ClipMonster data and some email hosting, and the Enom server

10:12AM 10  contained emails that were associated to the SoftLayer server,

10:12AM 11  and the Leaseweb and Novogara servers contained the Newstar

10:12AM 12  content.

10:12AM 13  Q.   How did you learn about the Enom server?

10:12AM 14  A.   So, again, the complexity of this investigation, as we

10:13AM 15  were doing -- as we were investigating this activity, we did a

10:13AM 16  who is search, which is -- basically it's an open source search

10:13AM 17  for ClipMonster.net or.com.  I forget which.  I apologize, and

10:13AM 18  that came back to SoftLayer, and there's -- if you do a who is

10:13AM 19  when you're looking at an internet service provider, it will

10:13AM 20  give you if you want to record abuse, who to contact.  That

10:13AM 21  abuse report had AXX domain.  So when we did the who is search

10:13AM 22  on the AXX domain, it came back to Enom.  So we were just tying

10:13AM 23  the links between SoftLayer and Enom.

10:13AM 24  Q.   So when you drew those connections and it led you to the

10:13AM 25  Enom server, did you request any information from Enom?

GARCIA - DIRECT EXAMINATION

10:13AM   1   A.   I did.   I sent a request to Enom for subscriber

10:13AM   2   information related to both CyberPay and @axx.net.

10:13AM   3   Q.   What information did you request?

10:13AM   4   A.   I requested subscriber information initially.

10:13AM   5   Q.   Did they comply?

10:13AM   6   A.   They did.

10:14AM   7   Q.   Did they provide you that information?

10:14AM   8   A.   Yes.

10:14AM   9   Q.   What information did they provide you?

10:14AM  10   A.   They provided the subscriber information for the Enom

10:14AM  11   server, which was in the name of Mark Bjorkman, and I believe

10:14AM  12   it was Bjorkman Trans-Tech specifically.

10:14AM  13           MS. VALDES:   Your Honor, pursuant to Government's

10:14AM  14   902(11) business record filing, which is docket entry number

10:14AM  15   83, the Government requests to enter Exhibit 5 into evidence.

10:14AM  16           MR. KERR:   No objection.

10:14AM  17           THE COURT:   All right.   It's received into evidence.

10:14AM  18           MS. VALDES:   Permission to publish?

10:14AM  19           THE COURT:   Yes, and it's always okay to publish.

10:14AM  20           MS. VALDES:   Thank you, Your Honor.

10:14AM  21           THE COURT:   You're welcome.

10:14AM  22           MS. VALDES:   If you could display Government's 5.

10:14AM  23   BY MS. VALDES:

10:14AM  24   Q.   Is this the subscriber information you just explained for

10:14AM  25   the jury?

50

**GARCIA - DIRECT EXAMINATION**

10:14AM  1  A.   It is.

10:14AM  2  Q.   Can you please read the name and address associated with

10:14AM  3  the Enom account?

10:14AM  4  A.   The name is Bjorkman, Mark.  The address is the 3959

10:14AM  5  VanDyke Road, Number 285 in Lutz, Florida, 33558-8025 in the

10:14AM  6  United States.

10:15AM  7  Q.   Please take a -- and before we move on to what you pulled

10:15AM  8  out of the Enom server, what did this tell you about the emails

10:15AM  9  you reviewed from the Enom server?

10:15AM  10  A.   I'm sorry, can you rephrase?

10:15AM  11  Q.   That's okay.  I can rephrase.  So after receiving the

10:15AM  12  subscriber information, what type of follow up did you do?

10:15AM  13  A.   After receiving the subscriber information, we then

10:15AM  14  ultimately applied for, received, and executed a search warrant

10:15AM  15  at Enom.com for the email content that was inside that server.

10:15AM  16  Q.   And did you receive that email content?

10:15AM  17  A.   We did.

10:15AM  18  Q.   Could you please take a look at Government's 1004, all the

10:15AM  19  sub exhibits, and 1005, all the sub exhibits?  They're placed

10:15AM  20  at the witness table.

10:16AM  21  A.   I'm sorry.  Do you want me to go through 1005 as well or

10:16AM  22  just 1004?

10:16AM  23  Q.   1005 as well.  Thank you.  What are these exhibits?

10:17AM  24  A.   Those are some extractions from that Enom server, some

10:17AM  25  email extractions.

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:17AM | 1 | Q.   And is this the Enom server that you just testified was |
| 10:17AM | 2 | owned by Mark Bjorkman? |
| 10:17AM | 3 | A.   Yes. |
| 10:17AM | 4 | Q.   How many emails do you think you received from Enom? |
| 10:17AM | 5 | A.   A lot. |
| 10:17AM | 6 | Q.   When you say a lot, hundreds, thousands? |
| 10:17AM | 7 | A.   I couldn't even quantify. |
| 10:17AM | 8 | Q.   Did you read all the emails? |
| 10:17AM | 9 | A.   I did not. |
| 10:17AM | 10 | Q.   Did you read most of the emails? |
| 10:17AM | 11 | A.   I did not. |
| 10:17AM | 12 | Q.   How many emails do you think you read? |
| 10:17AM | 13 | A.   I -- because it was large, a lot of the emails didn't even |
| 10:17AM | 14 | pertain to the criminal activity, so those were -- we had to |
| 10:18AM | 15 | exclude them.  So we had to go through processes to determine |
| 10:18AM | 16 | which emails were relevant to the criminal investigation, and |
| 10:18AM | 17 | that process took a little while.  So once we excluded a large |
| 10:18AM | 18 | number of emails, then we could narrow down emails that were |
| 10:18AM | 19 | strictly related to the -- this Newstar investigation. |
| 10:18AM | 20 | Q.   Was that pared down section of emails still a significant |
| 10:18AM | 21 | amount of emails? |
| 10:18AM | 22 | A.   Yes. |
| 10:18AM | 23 | Q.   Did you read -- in reading these emails, did you come to |
| 10:18AM | 24 | learn or believe you know who was corresponding in these email |
| 10:18AM | 25 | exchanges? |

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:18AM | 1 | **A.**   Yes. |
| 10:18AM | 2 | **Q.**   And was it -- could you explain? |
| 10:18AM | 3 | **A.**   So the Enom server had a couple of different emails |
| 10:18AM | 4 | associated to Mark Bjorkman that related back to the Newstar |
| 10:18AM | 5 | enterprise.  So you had, of course, the axx.net, CyberPay, |
| 10:18AM | 6 | different billing email addresses that we know were related to |
| 10:18AM | 7 | the website, and then we had information from recipient emails |
| 10:19AM | 8 | that we -- from -- during the information that we were able to |
| 10:19AM | 9 | identify to other members of the Newstar enterprise.  So their |
| 10:19AM | 10 | email addresses were looped into the overall search, and then |
| 10:19AM | 11 | we just kind of pared down from there.  And in these |
| 10:19AM | 12 | extractions, we pulled out emails that were from two specific |
| 10:19AM | 13 | email addresses -- or multiple emails addresses associated with |
| 10:19AM | 14 | Mark Bjorkman, but a particular email address, |
| 10:19AM | 15 | webmaster@star-billing.com.  We looked at those individually. |
| 10:19AM | 16 | **Q.**   What did you learn about webmaster@star-billing.com? |
| 10:19AM | 17 | **A.**   What we believed about webmaster@star-billing.com is that |
| 10:19AM | 18 | email address and domain was utilized by at least two |
| 10:19AM | 19 | individuals, Ken Power and Plamen Velinov.  They appear to |
| 10:19AM | 20 | share that same email address. |
| 10:19AM | 21 |          **MS. VALDES:**  Your Honor, pursuant to the Government's |
| 10:19AM | 22 | 902(11) business record filing, which is docket entry number |
| 10:19AM | 23 | 83, the Government requests to enter into evidence Government's |
| 10:20AM | 24 | Exhibit 1005A, 1005B, 1004I, J, O, N, A, G, H, and Q. |
| 10:20AM | 25 |          **MR. KERR:**  No objection. |

**GARCIA - DIRECT EXAMINATION**

10:20AM   1          THE COURT:  All right.  They're received into

10:20AM   2    evidence.

10:20AM   3          MS. VALDES:  Thank you, Your Honor.  If you could

10:20AM   4    please display Government's 1005A?

10:20AM   5    BY MS. VALDES:

10:20AM   6    Q.   If you could explain to the jury who is communicating with

10:20AM   7    who in this exchange.

10:20AM   8    A.   This exchange is between webmaster@star-billing.com and

10:20AM   9    markb@paywide.com.

10:20AM  10    Q.   Could you please read where it starts at "on 2017" all the

10:20AM  11    way to K?

10:20AM  12    A.   Sure.  Thank you.  It reads on 2017-06-20 at 03:13,

10:21AM  13    webmaster@Starr billing.com wrote, "Please see if you can block

10:21AM  14    Ukraine Moldova from seeing ClipMonster.  We tried to block the

10:21AM  15    countries the models are from.  Also this guy wrote again.  Did

10:21AM  16    we white list him, or we decided against it?  Read below

10:21AM  17    emails.  Last thing, good luck tomorrow.  Holler if you need

10:21AM  18    anything.  K."

10:21AM  19    Q.   Could you please read the response above, including the

10:21AM  20    header?

10:21AM  21    A.   Sure.  The subject is RE billing, which is I understand to

10:21AM  22    mean regarding billing issues, and some countries to block,

10:21AM  23    from markb@paywide.com, date June 20th, 2017 at 1:51 p.m., to

10:21AM  24    webmaster@star-billing.com.  "Both countries are now blocked

10:21AM  25    from CM."

**GARCIA - DIRECT EXAMINATION**

10:21AM  1    Q.   Have you seen CM used in this email exchange before?

10:21AM  2    A.   Yes.

10:21AM  3    Q.   What does CM stand for?  What have you learned CM to mean?

10:22AM  4    A.   I've seen CM in multiple email exchanges, and we believe

10:22AM  5    that to be ClipMonster.

10:22AM  6    Q.   Looking at Government's 1005B, and in email correspondence

10:22AM  7    like this, Special Agent Garcia, do the communications start

10:22AM  8    from top to bottom or bottom to top?

10:22AM  9    A.   Bottom to top.

10:22AM  10   Q.   And starting at the bottom with "on 2017" to the end of

10:22AM  11   this page, could you please read for the jury?

10:22AM  12   A.   This is on 2017, 10/25, at 11:48 a.m.,

10:22AM  13   webmaster@star-billing.com wrote, "Are other child model sites

10:22AM  14   you bill sales going as bad as me?  I need to know.  I am

10:22AM  15   fighting day and night and working hard, and they still are

10:22AM  16   dropping.  I just need to know if others are as slow as me

10:22AM  17   right now, or is it just me?  It may help me think things out.

10:22AM  18   I don't need ecat figures.  Just if they were up zero or" --

10:23AM  19   and I'm going to read that as or -- "down as bad as me."

10:23AM  20   Q.   In your time you've spent in this investigation and the

10:23AM  21   emails you've read, who do you it believe drafted that email?

10:23AM  22   A.   I believe that email is drafted by Ken Power.

10:23AM  23   Q.   Would you please read the response above, including the

10:23AM  24   header and stopping at "profit now."

10:23AM  25   A.   Sure.  The subject line is RE, regarding, knowledge, from

**GARCIA - DIRECT EXAMINATION**

10:23 AM   1   webmaster@star-billing.com.  Date, October 25th, 2017 at 2:52

10:23 AM   2   p.m., to markb@paywide.com.  His reply to the same address,

10:23 AM   3   webmaster@star-billing.com.  It reads, "Okay.  Please recheck

10:23 AM   4   all merchant settings.  I opened three new sites in the last

10:23 AM   5   two months and still dropped sales like crazy.  What is the

10:23 AM   6   cause?  Are all the customers blocked now, or they are getting

10:23 AM   7   arrested?  I have to figure this out.  I may close all sites

10:23 AM   8   and just put everything at ClipMonster soon as I can't afford

10:24 AM   9   all the bills and paying people.  I have too many sites making

10:24 AM   10  100 a month profit now."

10:24 AM   11  Q.   Who drafted that message, and who received it?

10:24 AM   12  A.   Again, I believe this message is drafted by Ken Power, and

10:24 AM   13  it was received by Mark Bjorkman.

10:24 AM   14  Q.   1004I.  If you could read this entire chain including the

10:24 AM   15  header, please?

10:24 AM   16  A.   Sure.  Subject, "ClipMonster is either slow or down," from

10:24 AM   17  Webmaster@star-billing.com.  Date, November the 4th, 2018 at

10:24 AM   18  1:44 a.m., to markb@pay wide.com.  Reply to

10:24 AM   19  webmaster@star-billing.com.  "Hi.  I just got an email from a

10:24 AM   20  customer saying that ClipMonster is down.  I noticed that

10:24 AM   21  myself yesterday, but I found that the initial connection to

10:24 AM   22  the admin area is just very slow.  Now I see that the main

10:25 AM   23  store page for the public does not load.  So please take a look

10:25 AM   24  and fix it.  Kindest records, Plamen."

10:25 AM   25  Q.   1004J.  Would you please read this email, including the

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:25AM | 1 | header? |
| 10:25AM | 2 | A.   Sure.  The subject reads, "Can't connect to ClipMonsters |
| 10:25AM | 3 | ftp," from Webmaster@star-billing.com.  Date, February 24th, |
| 10:25AM | 4 | 2019 at 5:53 a.m., to markb@paywide.com.  Reply to |
| 10:25AM | 5 | webmaster@star-billing.com.  "Hi.  After the IP change, I |
| 10:25AM | 6 | cannot connect to ClipMonster via ftp it seems.  91.92.44.77 is |
| 10:25AM | 7 | my new IP.  My previous IP was 78.159.142.158.  Plamen." |
| 10:26AM | 8 | Q.   Special Agent Garcia, do you recall when digital |
| 10:26AM | 9 | investigative analyst Gibran Ali testified regarding IP access |
| 10:26AM | 10 | entries into the Newstar websites? |
| 10:26AM | 11 | A.   Yes. |
| 10:26AM | 12 |         MS. VALDES:  If you could please pull alongside of |
| 10:26AM | 13 | this exhibit Government's Exhibit 403? |
| 10:26AM | 14 | BY MS. VALDES: |
| 10:26AM | 15 | Q.   What does 403 show? |
| 10:26AM | 16 | A.   403 was the ClipMonster web access logs. |
| 10:26AM | 17 | Q.   Does it show what IP address accessed that area? |
| 10:26AM | 18 | A.   Yes.  This -- these access logs reflect 91.92.44.77. |
| 10:26AM | 19 | Q.   Does that match the first IP address you read in the email |
| 10:26AM | 20 | exchange signed by Plamen? |
| 10:26AM | 21 | A.   It does. |
| 10:26AM | 22 |         MS. VALDES:  If we could show Government's |
| 10:26AM | 23 | Exhibit 402, side by side with the email. |
| 10:26AM | 24 | BY MS. VALDES: |
| 10:26AM | 25 | Q.   Same questions.  What are we looking at here? |

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:26AM | 1 | A.   This is, again, ClipMonster web access logs for a |
| 10:27AM | 2 | different IP. |
| 10:27AM | 3 | Q.   And what is significant about the access logs and the IP |
| 10:27AM | 4 | address you just read, the second IP address you just read? |
| 10:27AM | 5 | A.   The second IP address was the previous one indicated in |
| 10:27AM | 6 | the email, which was 78.159.142.158. |
| 10:27AM | 7 | Q.   Looking at Government's 1004O, if you could page down to |
| 10:27AM | 8 | the last page, could you please read -- there's a lot of |
| 10:27AM | 9 | information here.  I'm going to direct to the areas I would |
| 10:27AM | 10 | like you to read out loud for the jury.  If you could please |
| 10:27AM | 11 | read where it starts at, "Hi, Ken," in the first line. |
| 10:27AM | 12 | A.   Sure.  It reads, "Hi, Ken.  I was at my bank today, and |
| 10:27AM | 13 | they gave me some papers to sign." |
| 10:27AM | 14 | Q.   Could you please read the line that starts with "so I am |
| 10:27AM | 15 | kindly"? |
| 10:27AM | 16 | A.   "So I am kindly asking you to think for a way to pay the |
| 10:28AM | 17 | servers and pay Anton directly because all of these money |
| 10:28AM | 18 | tomorrow I can be asked to pay tax fees just because I got |
| 10:28AM | 19 | them, no matter that they are -- that they were not meant for |
| 10:28AM | 20 | me." |
| 10:28AM | 21 | Q.   Can you please read where it starts at, "Paying Leaseweb," |
| 10:28AM | 22 | the -- that line and the line below, just below it? |
| 10:28AM | 23 | A.   "Paying Leaseweb should not be a problem because that |
| 10:28AM | 24 | server is not exposed and nobody knows about it.  Paying |
| 10:28AM | 25 | Novogara should not be a problem either because Mark is using |

**GARCIA - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 10:28AM | 1 | them for years.  Perhaps you can ask him to pay the invoices to |
| 10:28AM | 2 | them directly.  We can resend the invoices emails to him.  They |
| 10:28AM | 3 | usually give us more than two weeks to pay the invoices, so |
| 10:28AM | 4 | there is plenty of time to arrange something like that.  Also |
| 10:28AM | 5 | it means that there will be less bank fees in the whole |
| 10:28AM | 6 | process." |
| 10:28AM | 7 | Q.   Who signs off on this email? |
| 10:28AM | 8 | A.   The signature reads, "Thank you.  Plamen." |
| 10:29AM | 9 | Q.   If you can page up one, can you please read the header |
| 10:29AM | 10 | information under where it says "original message"? |
| 10:29AM | 11 | A.   It says subject, "RE bank wires, possible trouble with |
| 10:29AM | 12 | agencies," from webmaster@star-billing.com.  Date, Saturday, |
| 10:29AM | 13 | June 22nd, 2019, 21:24 to webmaster@star-billing.com. |
| 10:29AM | 14 | Q.   And at the bottom of this page, can you read the line that |
| 10:29AM | 15 | starts with "as for Anton"? |
| 10:29AM | 16 | A.   "As for Anton, I don't know what to do.  I too have fears, |
| 10:29AM | 17 | and my wife and family and freedom mean more to me that you or |
| 10:29AM | 18 | Anton." |
| 10:29AM | 19 | Q.   Who do you believe wrote that portion of the email? |
| 10:29AM | 20 | A.   I believe that portion of the email was from Ken Power. |
| 10:29AM | 21 | Q.   Was that a response to the prior email? |
| 10:29AM | 22 | A.   It was. |
| 10:29AM | 23 | Q.   And then finally looking at the top page, would you please |
| 10:30AM | 24 | read the header information and the body?  You can stop at the |
| 10:30AM | 25 | fourth line. |

GARCIA - DIRECT EXAMINATION

10:30AM  1   A.   The subject, "Forward regarding bank wires, possible

10:30AM  2   trouble with agencies," from webmaster@star-billing.com, date

10:30AM  3   June 23rd, 2019, at 3:19 a.m., to markb@paywide.com.  Reply to

10:30AM  4   Webmaster@star-billing.com.

10:30AM  5   Q.   And if you could read from, "Hi, Mark" to -- you can end

10:30AM  6   on "until today all the money".

10:30AM  7   A.   The text reads, "Hi, Mark.  I included my conversation

10:30AM  8   with Ken so you can read it.  We have two kind of servers.  Our

10:30AM  9   main server is at Leaseweb, and it is hidden behind proxies so

10:30AM  10  nobody knows about it.  We have five proxy servers located at

10:30AM  11  Novogara and paid via two different accounts there.  You use

10:31AM  12  Novogara as well, right?  Until today, all the money for

10:31AM  13  Leaseweb and Ecatel, Novogara in parentheses, were sent to me

10:31AM  14  by Ken, and I was paying them both."

10:31AM  15  Q.   Can you read the line that starts with "in our team"?

10:31AM  16  A.   "In our team, we have a great guy called Anton from Russia

10:31AM  17  who is our designer for the last 17 years."

10:31AM  18  Q.   And can you read the line that starts with the number 2?

10:31AM  19  A.   "Are you willing to pay our designer Anton?"

10:31AM  20  Q.   Can you read who signed off on this email?

10:31AM  21  A.   The signature is, "Kindest regards, Plamen."

10:31AM  22       MS. VALDES:  Will you please pull up previously

10:31AM  23  admitted Government's Exhibit 808T?

10:31AM  24  BY MS. VALDES:

10:31AM  25  Q.   Will you please remind the jury of this document and the

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:31AM | 1 | information it provides? |
| 10:32AM | 2 | A.   Would you mind just blowing up the -- this is a -- this |
| 10:32AM | 3 | appears to be a questionnaire for registration of an individual |
| 10:32AM | 4 | sole proprietor at DSK Bank EAD. |
| 10:32AM | 5 | Q.   Does it show the name of the client? |
| 10:32AM | 6 | A.   It does. |
| 10:32AM | 7 | Q.   And can we page down to page 3, third page?  Thank you. |
| 10:32AM | 8 | 1004N as in Nancy.  Can you please read this email, including |
| 10:32AM | 9 | the header information? |
| 10:32AM | 10 | A.   I'm sorry.  This email reads subject "ClipMonster space" |
| 10:32AM | 11 | from webmaster@star-billing.com.  Date April 20th, 2019, 6:34 |
| 10:33AM | 12 | p.m., to markb@paywide.com, reply to |
| 10:33AM | 13 | webmaster@star-billing.com. |
| 10:33AM | 14 | It reads, "Hi.  The more I think, the more I believe |
| 10:33AM | 15 | the best solution would be if you can get another one TB drive. |
| 10:33AM | 16 | The problem with the links is that they will be more time |
| 10:33AM | 17 | consuming to set up for each video, so if you could get that |
| 10:33AM | 18 | one TB drive added, it would be awesome.  Such drive should add |
| 10:33AM | 19 | enough space for the next five years.  Kindest regards, |
| 10:33AM | 20 | Plamen." |
| 10:33AM | 21 | Q.   Now, if we could turn to Government's Exhibit 1004A?  And |
| 10:33AM | 22 | if we could go to pages 4 and 5.  As the emails start from the |
| 10:33AM | 23 | bottom working up in terms of responses to emails, could you |
| 10:33AM | 24 | please start at the last line on page 4 and read what's on |
| 10:34AM | 25 | page 5? |

GARCIA - DIRECT EXAMINATION

10:34AM   1   A.   Sure.  On 2017, 07/09 at 11:22 a.m.,

10:34AM   2   webmaster@star-billing.com wrote, "Hi.  Yesterday I discovered

10:34AM   3   that I have one video left unpublished of a previous very

10:34AM   4   popular model, and when I say popular, I really mean popular --

10:34AM   5   at least two times more popular than the best model we have

10:34AM   6   now.  Since that video is long enough, I think about splitting

10:34AM   7   it in two parts, and yet I think that the usual price of 19.95

10:34AM   8   will be way too little for a video of model that is gone, and

10:34AM   9   this is the last chance to get something new.  I was thinking

10:34AM  10   for a price of $29.95 for each part, but unfortunately there

10:34AM  11   will be no way for me to set up such price.  Is there a way for

10:34AM  12   you to change that?  Thank you.  Kindest regards, Plamen."

10:34AM  13   Q.   Does someone respond?

10:34AM  14   A.   Yes.

10:34AM  15   Q.   Could you read that response?  I believe it starts on

10:35AM  16   2017.

10:35AM  17   A.   The response is -- at the clip just below that, it reads,

10:35AM  18   "Yeah, just let me know when you have everything set up, and

10:35AM  19   I'll change the price on them."

10:35AM  20   Q.   Could you read the information above that?

10:35AM  21   A.   Above that, on 2017, 07/09 at 4:38 p.m.

10:35AM  22   webmaster@star-billing.com wrote, "Okay.  That video is now

10:35AM  23   online.  There are two videos actually with different size.

10:35AM  24   HTTP:\\admin.ClipMonster.net\edit_ product.cgi?product_ID=4616.

10:35AM  25   Q.   Was there a similar link before that with a product ID

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:35AM | 1 | number at the end? |
| 10:36AM | 2 | A.   It's below that, yes, and it ends in 4617. |
| 10:36AM | 3 | Q.   Okay.  And based on your reading this email chain, who do |
| 10:36AM | 4 | you believe is responding with these product ID numbers? |
| 10:36AM | 5 | A.   The product ID numbers based on the email chain I believe |
| 10:36AM | 6 | is coming from Plamen. |
| 10:36AM | 7 | Q.   Then can you read the response to this email? |
| 10:36AM | 8 | A.   Yes.  It says, "Changed the prices to 29.95." |
| 10:36AM | 9 | Q.   And does Plamen respond to that email? |
| 10:36AM | 10 | A.   Yes. |
| 10:36AM | 11 | Q.   Would you please read that response? |
| 10:36AM | 12 | A.   On 2017, 07/09 at 05:38 p.m., webmaster@star-billing.com |
| 10:36AM | 13 | wrote, "I did reply, and then I saw that we got one sale |
| 10:36AM | 14 | already.  Was that sale for 22.95 or for 29.95?  Because the |
| 10:36AM | 15 | system shows 29.95, but I want to be sure.  Thank you. |
| 10:36AM | 16 | Plamen." |
| 10:36AM | 17 | Q.   Working up the chain, was there a response? |
| 10:36AM | 18 | A.   There was. |
| 10:36AM | 19 | Q.   Could you please read that response? |
| 10:37AM | 20 | A.   "I see three orders, and they are for 29.95 each." |
| 10:37AM | 21 | Q.   Is there a response from Plamen? |
| 10:37AM | 22 | A.   There was. |
| 10:37AM | 23 | Q.   Can you please read that response? |
| 10:37AM | 24 | A.   Sure.  On 2017, 07/10, at 11:42 a.m., |
| 10:37AM | 25 | webmaster@star-billing.com wrote, "Thanks.  Just as I thought, |

GARCIA - DIRECT EXAMINATION

10:37AM   1   the new price did not stop the people from buying it.  We got
10:37AM   2   22 sales already.  Much better than most of the other videos
10:37AM   3   sales, and they have no clue that a second part is coming."
10:37AM   4   And there's a -- an emoticon type text that would indicate a
10:37AM   5   smiley face.  Signed, Plamen.
10:37AM   6   Q.   Again, was there a response?
10:37AM   7   A.   There was.
10:37AM   8   Q.   Please read that response.
10:38AM   9   A.   I'm not sure if that's the --
10:38AM   10          THE COURT:  We need to find a breaking point.  Is
10:38AM   11   this a good breaking point or a little bit later?
10:38AM   12          MS. VALDES:  We're almost done with this email, and
10:38AM   13   then that would be a great breaking point, Your Honor.
10:38AM   14          THE COURT:  Okay.  Certainly.
10:38AM   15   BY MS. VALDES:
10:38AM   16   Q.   Was there a response to Plamen's email that ended with,
10:38AM   17   "They have no clue that a second part is coming"?  We can
10:38AM   18   expand back out if that helps.
10:38AM   19   A.   Yes.  Thank you.  Follow the chain again.  Okay.
10:38AM   20   Q.   If you could please read that response?
10:38AM   21   A.   "There is a guy asking when part 2 is coming out.  He says
10:38AM   22   the video ended in such a way that it looks like there should
10:38AM   23   be a part 2."  Do you know when you might be adding it?
10:38AM   24   Q.   And then finally at the very top of the email chain, is
10:38AM   25   there a response from the signee, who was Plamen?

GARCIA - DIRECT EXAMINATION

10:38AM  1   A.   Yes, you want me to read the whole thing or --

10:38AM  2   Q.   If you could also include the header information.

10:38AM  3   A.   Sure.  Subject RE higher prices for video from

10:38AM  4   webmaster@star-billing.com, date July 11th, 2017 at 1:12 p.m.,

10:39AM  5   to markb@paywide.com reply to webmaster@star-billing.com.  The

10:39AM  6   response is, "Yes, perhaps after three to four hours.  Plamen."

10:39AM  7   Q.   Were you able to further investigate the product ID

10:39AM  8   numbers that Plamen wrote in this email?

10:39AM  9   A.   Yes.

10:39AM  10          MS. VALDES:  This is a good stopping point, Your

10:39AM  11  Honor.

10:39AM  12          THE COURT:  Sounds good.  Ladies and gentlemen, we're

10:39AM  13  going to take a 10-minute morning break.  Please don't discuss

10:39AM  14  the case or form any opinions until you've heard all the

10:39AM  15  evidence.

         16          (Jury out at 10:39 a.m.)

10:40AM  17          THE COURT:  Thank you.  Well, it is your case agent,

10:40AM  18  but still we're in the middle of your testimony, so please

10:40AM  19  don't discuss your testimony with anybody, including the

10:40AM  20  prosecutors on the case.

10:40AM  21          THE WITNESS:  Yes, Your Honor.

10:40AM  22          THE COURT:  Okay.  We're in recess for 10 minutes.

10:40AM  23  I'm just going to stay here.

         24          (Recess from 10:40 a.m. to 10:51 a.m.)

10:51AM  25          THE COURT:  I think we're bringing in the jurors.  So

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:51AM | 1 | just hold on for a second.  We're good to go.  Thank you. |
| | 2 | (Jury in at 10:53 a.m.) |
| 10:53AM | 3 | THE COURT:  Welcome back, ladies and gentlemen. |
| 10:53AM | 4 | Let's see.  I remind the witness you're still |
| 10:53AM | 5 | under oath.  Do you understand that? |
| 10:53AM | 6 | THE WITNESS:  Yes, Your Honor. |
| 10:53AM | 7 | THE COURT:  Okay.  Very good.  You may proceed -- |
| 10:54AM | 8 | continue with your direct examination of the witness. |
| 10:54AM | 9 | MS. VALDES:  Thank you, Your Honor. |
| 10:54AM | 10 | BY MS. VALDES: |
| 10:54AM | 11 | Q.   Special Agent Garcia, we left off, you read the email |
| 10:54AM | 12 | chain in Government's Exhibit 104A, and we ended on page 4. |
| 10:54AM | 13 | Towards the bottom of the email chain, may I direct your |
| 10:54AM | 14 | attention to the links and the product ID numbers at the end of |
| 10:54AM | 15 | those links?  Did you further investigate this information? |
| 10:54AM | 16 | A.   Yes. |
| 10:54AM | 17 | Q.   What steps did you take? |
| 10:54AM | 18 | A.   So I reached out to the forensics portion of the team who |
| 10:54AM | 19 | had their hands, if you will, inside the servers, and I asked |
| 10:54AM | 20 | them if they could identify any content that would match those |
| 10:54AM | 21 | product IDs to confirm that they were, in fact, on the server. |
| 10:55AM | 22 | Q.   Why did you do that? |
| 10:55AM | 23 | A.   Because that link alone doesn't tell me what is depicted |
| 10:55AM | 24 | in that content, and because the correspondence between Plamen |
| 10:55AM | 25 | and Mark indicated that it's a video, and they wanted to, you |

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:55AM | 1 | know, increase prices and whatnot, I wanted to know what that |
| 10:55AM | 2 | video depicted so that I could assess it basically. |
| 10:55AM | 3 | Q.   And who -- just to clarify, who is the one that provided |
| 10:55AM | 4 | this -- these links, these product IDs in this email chain? |
| 10:55AM | 5 | A.   From Plamen. |
| 10:55AM | 6 | Q.   Do you recall digital investigative analyst Gibran Ali |
| 10:55AM | 7 | testifying regarding a products table? |
| 10:55AM | 8 | A.   Yes. |
| 10:55AM | 9 | Q.   What is a products table, and how does that relate to this |
| 10:55AM | 10 | email? |
| 10:55AM | 11 | A.   The product table, as I understand it, is what he was able |
| 10:55AM | 12 | to pull out from the server that had a product ID number, a |
| 10:55AM | 13 | name and a description, if you will, from what was on the |
| 10:55AM | 14 | server. |
| 10:55AM | 15 | Q.   Would it be a description of the product, of the content |
| 10:56AM | 16 | of the video or the image? |
| 10:56AM | 17 | A.   It was basically a descriptive title of the content, yes. |
| 10:56AM | 18 |    MS. VALDES:   Okay.  If you could display previously |
| 10:56AM | 19 | admitted Government's Exhibit 394.  And if we could display it |
| 10:56AM | 20 | side by side to 104A, page 4. |
| 10:56AM | 21 | BY MS. VALDES: |
| 10:56AM | 22 | Q.   What information is important here in looking at the |
| 10:56AM | 23 | email, the product ID, and this table? |
| 10:56AM | 24 | A.   So looking at these together, we were able to determine |
| 10:56AM | 25 | that product ID, at least 4616, had content that was still on |

**GARCIA - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 10:56AM | 1 | the server at the time, and 4616 went to the file name |
| 10:56AM | 2 | ████-015.avi, and the title of that was Sweet ████ Little |
| 10:56AM | 3 | Red Riding Hood HD, open parenthesis July 10th. |
| 10:57AM | 4 | Q.   Did you follow -- did you look at this product? |
| 10:57AM | 5 | A.   I did. |
| 10:57AM | 6 | Q.   What is it? |
| 10:57AM | 7 | A.   It's a video. |
| 10:57AM | 8 | Q.   What does it depict? |
| 10:57AM | 9 | A.   Do you mind if I look at my exhibit? |
| 10:57AM | 10 | Q.   Yes, and I'm referring to Exhibit 364. |
| 10:57AM | 11 | A.   Thank you.  I just want to make sure I identify the right |
| 10:57AM | 12 | video.  364? |
| 10:57AM | 13 | Q.   364.  Did you follow the product ID to a particular photo |
| 10:57AM | 14 | or video? |
| 10:57AM | 15 | A.   I did. |
| 10:57AM | 16 | Q.   And if we could enter in Government's previously admitted |
| 10:57AM | 17 | 364, what are we looking at here? |
| 10:57AM | 18 | A.   We are looking at screen captures from that video. |
| 10:57AM | 19 | Q.   And what do you mean by screen captures? |
| 10:57AM | 20 | A.   So the video -- it obviously played in the video, so for |
| 10:58AM | 21 | our purposes, we just took still images of that video for |
| 10:58AM | 22 | presentation so that we didn't need to play the entire video. |
| 10:58AM | 23 | Q.   And did you watch the entire video? |
| 10:58AM | 24 | A.   I did. |
| 10:58AM | 25 | Q.   And could you describe for the record and for the jury |

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:58AM | 1 | what the individual in the video is wearing, their |
| 10:58AM | 2 | approximately age, and their positioning? |
| 10:58AM | 3 | A.   Sure.  She is wearing a little gold sequins either |
| 10:58AM | 4 | bra/panties set or bikini with thigh high -- or excuse me, calf |
| 10:58AM | 5 | high boots, and she's posed in various poses in a prone |
| 10:58AM | 6 | position.  So she's kind of in various poses lying down. |
| 10:58AM | 7 | Q.   Can you describe the specific positioning of her genitals? |
| 10:58AM | 8 | A.   So she is in various positions because it's a video. |
| 10:58AM | 9 | She -- her legs are open.  Her genitals are displayed to the |
| 10:58AM | 10 | camera.  Her back is arched.  Her rear end is up.  Her |
| 10:59AM | 11 | shoulders are down.  Those types of poses. |
| 10:59AM | 12 | Q.   Thank you. |
| 10:59AM | 13 | MS. VALDES:  If we could look at Government's 1004G? |
| 10:59AM | 14 | BY MS. VALDES: |
| 10:59AM | 15 | Q.   Can you please read this email exchange, including the |
| 10:59AM | 16 | header? |
| 10:59AM | 17 | A.   The subject, "RE urgent.  Help needed with video price," |
| 10:59AM | 18 | from markb@paywide.com.  Date, 5/10/2018 at 7:57 p.m., to |
| 10:59AM | 19 | webmaster@star-billing.com.  It reads, "Price changed," and |
| 10:59AM | 20 | that was in response to the below email. |
| 10:59AM | 21 | Q.   Would you please read the below email? |
| 10:59AM | 22 | A.   The below email is on 2018, 05/10 at 04:34 p.m., |
| 10:59AM | 23 | webmaster@star-billing.com wrote, "Hi.  Can you please change |
| 10:59AM | 24 | the price for that video to 29.95?" |
| 11:00AM | 25 | Q.   Is there then a link below with a product ID number at the |

GARCIA - DIRECT EXAMINATION

| | | |
|--|--|--|
| 11:00AM | 1 | end? |
| 11:00AM | 2 | A.   There is a product ID number, ends in 5169. |
| 11:00AM | 3 | Q.   And who signs off on that email? |
| 11:00AM | 4 | A.   It closes, "Thank you.  Plamen." |
| 11:00AM | 5 | Q.   Again, did you take the same steps that you took with the |
| 11:00AM | 6 | first email and matched up to the content -- |
| 11:00AM | 7 | A.   I did. |
| 11:00AM | 8 | Q.   -- on the websites? |
| 11:00AM | 9 | A.   Yes. |
| 11:00AM | 10 | MS. VALDES:  If we could please bring up the products |
| 11:00AM | 11 | ID table again, 394? |
| 11:00AM | 12 | BY MS. VALDES: |
| 11:00AM | 13 | Q.   Can you please read out loud the product ID number that |
| 11:00AM | 14 | matches the email which is 5169? |
| 11:00AM | 15 | A.   Sure.  5169 is the file number-- the file name is |
| 11:00AM | 16 | ████-066.avi.  The title is "Tiny Model ████ Meshy 50FPS |
| 11:00AM | 17 | unpublished," in caps, open parenthesis, "May 11th." |
| 11:00AM | 18 | MS. VALDES:  Could we publish previously admitted |
| 11:00AM | 19 | Government's 388? |
| 11:00AM | 20 | BY MS. VALDES: |
| 11:00AM | 21 | Q.   Is this the content, the Newstar content that was product |
| 11:01AM | 22 | ID number 5169? |
| 11:01AM | 23 | A.   Again, this is screen captures from that content, yes. |
| 11:01AM | 24 | Q.   Would you please explain what the actual content was and |
| 11:01AM | 25 | what we're looking at? |

GARCIA - DIRECT EXAMINATION

| | |
|---|---|
| 11:01AM | 1 |
| 11:01AM | 2 |
| 11:01AM | 3 |
| 11:01AM | 4 |
| 11:01AM | 5 |

A.   The actual content was of a pre-pubescent female child wearing a mesh outfit.  In this outfit, her nipples are visible through the mesh.  She's wearing pink shorts, and the leggings of the outfit appear to be crotchless.

Q.   And was this a video, or are these a series of photos?

A.   This was a video.

Q.   Government's 1004H?  Would you please read this email, including the header?

A.   Yes.  The subject, "Urgent price change of video at ClipMonster," from webmaster@star-billing.com.  Date, 9/16/2018 at 2:08 p.m., to markb@paywide.com.  Reply to webmaster@star-billing.com.  It reads, "Hi.  Can you please urgently change the price for that video to 49.59, please?"  It has a hyperlink.  You want me to read the whole link?

Q.   If you could just read the product ID number at the end.

A.   Sure.  In regards to product ID 5468, and it closes, "Thank you.  Plamen."

Q.   As with the two previous emails, were you able to find the content?

A.   Yes.

Q.   Products table 394, please?  Can you please read the description for product ID 5468?

A.   Sure.  5468, the file name is ███████-078.avi.  The title is "Newstar ███████ and ███████ Nostalgia, unpublished," open parentheses, "September 17th."

GARCIA - DIRECT EXAMINATION

| | | |
|---|---|---|
| 11:03AM | 1 | MS. VALDES:  Would you please pull up Government's |
| 11:03AM | 2 | Exhibit 385? |
| 11:03AM | 3 | BY MS. VALDES: |
| 11:03AM | 4 | Q.   Are these screenshots from the product 5468? |
| 11:03AM | 5 | A.   Yes. |
| 11:03AM | 6 | Q.   Would you please describe the ages of the persons |
| 11:03AM | 7 | depicted, what they're wearing, their positioning, and as it |
| 11:03AM | 8 | relates to the positioning of their genitals and the camera? |
| 11:03AM | 9 | A.   Again, these are screen captures of a pre-pubescent female |
| 11:03AM | 10 | child and a post-pubescent female.  They are wearing bridal |
| 11:03AM | 11 | style or white, full white lingerie, and they are intertwined |
| 11:03AM | 12 | together, both standing and lying.  Their legs sometimes are |
| 11:04AM | 13 | open to the camera, sometimes not.  Their rear ends are exposed |
| 11:04AM | 14 | to the camera, sometimes not, but they were generally posed |
| 11:04AM | 15 | together commingled. |
| 11:04AM | 16 | Q.   And if you could look at 1004Q?  Would you please read the |
| 11:04AM | 17 | header information and then just two lines start with "a video" |
| 11:04AM | 18 | and "█████-008"? |
| 11:04AM | 19 | A.   The subject of this one is, "RE ClipMonster cleanup," from |
| 11:04AM | 20 | webmaster@star-billing.com.  Date, 6/30/2019 at 2:05 a.m., to |
| 11:04AM | 21 | markb@paywide.com.  Reply to webmaster@star-billing.com.  And |
| 11:04AM | 22 | at the bottom there, "A video that has only low resolution |
| 11:04AM | 23 | version █████-008.avi." |
| 11:05AM | 24 | Q.   And, again, who signs off on this email? |
| 11:05AM | 25 | A.   The signature is, "Thank you.  Plamen." |

**GARCIA - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 11:05AM | 1 | Q.   Pull up the products table.  If you could read the |
| 11:05AM | 2 | description for the product -- for the product ███-008? |
| 11:05AM | 3 | A.   Sure.  This one was different because it gave a file name |
| 11:05AM | 4 | instead of a product ID name.  The file name ███-008 related |
| 11:05AM | 5 | to product ID 168, and the title was Snow White. |
| 11:05AM | 6 | Q.   Did you review this video? |
| 11:05AM | 7 | A.   I did. |
| 11:05AM | 8 | Q.   Could you explain the contents of this video? |
| 11:05AM | 9 | A.   This video is of a prepubescent female child.  She is |
| 11:05AM | 10 | sitting on the sink in what I believe to be a bathroom, and she |
| 11:06AM | 11 | is wearing like a bikini type top or training bra type and |
| 11:06AM | 12 | panties, and she's -- and high heels, and she's rubbing lotion |
| 11:06AM | 13 | on her belly and her legs.  Her one leg is down, and one leg is |
| 11:06AM | 14 | up on the sink as she's rubbing lotion or appears to be rubbing |
| 11:06AM | 15 | something on herself. |
| 11:06AM | 16 | Q.   Did you create or assist in creating just a clip or an |
| 11:06AM | 17 | excerpt of this video? |
| 11:06AM | 18 | A.   I didn't create or assist in creating, but I know that the |
| 11:06AM | 19 | forensics individuals did create it at our request. |
| 11:06AM | 20 | Q.   Did you review it? |
| 11:06AM | 21 | A.   I did. |
| 11:06AM | 22 | MS. VALDES:  If you could please show Government's |
| 11:06AM | 23 | Exhibit 371. |
| 11:07AM | 24 | (Whereupon Government Exhibit 371 was published to |
| 11:07AM | 25 | the jury.) |

GARCIA - CROSS-EXAMINATION

11:07AM    1          MS. VALDES:  No further questions.

11:07AM    2          THE COURT:  All right.  Thank you.  Any

11:07AM    3    cross-examination for this witness?

11:07AM    4          MR. KERR:  Yes.  Thank you, Your Honor.

11:07AM    5                    CROSS-EXAMINATION

11:07AM    6                    BY MR. KERR:

11:07AM    7    Q.   Good morning, Special Agent Garcia.

11:07AM    8    A.   Good morning.

11:07AM    9    Q.   Now, we have spoken before?

11:07AM   10    A.   Yes.

11:07AM   11    Q.   You were the case agent on the parts of this investigation

11:08AM   12    involving Tatiana Power and Ken Power; is that right?

11:08AM   13    A.   Yes.

11:08AM   14    Q.   So you're familiar with -- in fact, you participated in a

11:08AM   15    lot of the interviews yourself; is that right?

11:08AM   16    A.   Yes.

11:08AM   17    Q.   Proffer sessions and that sort of thing.  And, for

11:08AM   18    example, Tatiana Power's bond hearing, you were present by Zoom

11:08AM   19    for that; weren't you?

11:08AM   20    A.   I'm sorry, could you speak up just a little bit?  I'm

11:08AM   21    getting feedback from the interpreter.

11:08AM   22    Q.   I'm sorry.  For the bond hearing for Tatiana Power, you

11:08AM   23    were present by Zoom as I recall for that hearing.  The AUSA

11:08AM   24    had you on standby in either his office or your office?  You're

11:08AM   25    familiar with that bond hearing?

GARCIA - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:08AM | 1 | A.   Yes. |
| 11:08AM | 2 | Q.   Okay. |
| 11:08AM | 3 | A.   I apologize.  I was waiting for a question. |
| 11:09AM | 4 | Q.   I'm allowed to lead.  It's cross-examination. |
| 11:09AM | 5 | A.   Sorry. |
| 11:09AM | 6 | Q.   The -- so it's true, what the Government said in the |
| 11:09AM | 7 | sentencing memorandum with reference to Tatiana Power to her |
| 11:09AM | 8 | judge that she lied many times during the investigation; is |
| 11:09AM | 9 | that correct? |
| 11:09AM | 10 | A.   Would you mind giving me a specific of what you're |
| 11:09AM | 11 | referencing in that? |
| 11:09AM | 12 | Q.   Well, for example, she lied to the judge at her bond |
| 11:09AM | 13 | hearing about not having foreign bank accounts. |
| 11:09AM | 14 | A.   So she indicated she did not have foreign bank accounts, |
| 11:09AM | 15 | and we had evidence contrary, reason to believe that she did, |
| 11:09AM | 16 | in fact, have a foreign bank account. |
| 11:09AM | 17 | Q.   So that was a lie? |
| 11:09AM | 18 | A.   That was a lie, yes, from Tatiana. |
| 11:09AM | 19 | Q.   Okay.  And she -- at that time, she wanted to get out of |
| 11:09AM | 20 | jail.  At the bond hearing, she wanted to get bond and be |
| 11:09AM | 21 | released; is that right? |
| 11:09AM | 22 | A.   Yes. |
| 11:09AM | 23 | Q.   I mean that as a question.  I'm sorry. |
| 11:09AM | 24 | A.   I apologize. |
| 11:09AM | 25 | Q.   Okay.  And you interviewed other -- other subjects in this |

| | | |
|---|---|---|
| 11:10AM | 1 | investigation, including Patrice Wilowski; is that right? |
| 11:10AM | 2 | A.   Yes. |
| 11:10AM | 3 | Q.   You were there for a proffer session with her and her |
| 11:10AM | 4 | attorney and the prosecutor? |
| 11:10AM | 5 | A.   Yes. |
| 11:10AM | 6 | Q.   And do you recall -- do you recall writing a report about |
| 11:10AM | 7 | that interview? |
| 11:10AM | 8 | A.   I'm sure I did, yes. |
| 11:10AM | 9 | Q.   Okay.  And during that proffer, she indicated, |
| 11:10AM | 10 | Ms. Wilowski, that she knew Tatiana Power and Ken Power very |
| 11:10AM | 11 | well; is that not right? |
| 11:10AM | 12 | A.   Yes. |
| 11:10AM | 13 | Q.   And it was her view that -- I'm quoting from your report, |
| 11:10AM | 14 | I think correctly -- that she thought that Tatiana was the |
| 11:10AM | 15 | mastermind behind this whole thing.  Do you recall that |
| 11:10AM | 16 | statement? |
| 11:10AM | 17 | A.   I don't recall that specific statement, but if I could see |
| 11:10AM | 18 | my report, I could probably refresh that, sure. |
| 11:11AM | 19 | MR. KERR:  May I approach, Your Honor? |
| 11:11AM | 20 | THE COURT:  Yes, you may. |
| 11:11AM | 21 | MS. VALDES:  May I see a copy? |
| 11:11AM | 22 | THE WITNESS:  Yes, that is what I wrote down. |
| 11:11AM | 23 | BY MR. KERR: |
| 11:11AM | 24 | Q.   Okay.  Excuse me.  And you testified in the grand jury on |
| 11:11AM | 25 | this case several times; is that not right? |

GARCIA - CROSS-EXAMINATION

11:11AM  1   A.   That is correct.

11:11AM  2   Q.   Okay.  And your -- on a number of occasions -- I've got a

11:11AM  3   transcript of your testimony, and I'm sure you've seen one,

11:11AM  4   too; have you not?

11:11AM  5   A.   I have, yes.

11:11AM  6   Q.   Okay.  You used the term "sexually suggestive" numerous

11:12AM  7   times during your testimony.  Do you recall that?

11:12AM  8   A.   Yes.

11:12AM  9   Q.   Okay.  And you would agree that sexually suggestive is

11:12AM 10   something different from sexually explicit; would you agree

11:12AM 11   with that?

11:12AM 12            MS. VALDES:  Objection, Your Honor.  May we approach?

11:12AM 13            THE COURT:  Okay.

11:12AM 14                 (At sidebar on the record.)

11:12AM 15            MS. VALDES:  This is, again, based on what somebody

11:12AM 16   said yesterday, sexually suggestive.  We've gone down this

11:12AM 17   route, and now we're doing it again.

11:12AM 18            MR. KERR:  It was her testimony before the grand jury

11:12AM 19   that there was sexually suggestive photos.  I'm asking her if

11:12AM 20   that's different from sexually explicit.  Suggestive or

11:12AM 21   explicit.

11:12AM 22            THE COURT:  It's inappropriate.  The objection is

11:12AM 23   sustained.  Next question.

11:12AM 24                 (End of discussion at sidebar.)

11:13AM 25            MR. KERR:  May I continue?

GARCIA - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:13AM | 1 | THE COURT:  Oh, yes, of course.  Uh-huh. |
| 11:13AM | 2 | BY MR. KERR: |
| 11:13AM | 3 | Q.   Now, a few minutes ago you were asked to identify some |
| 11:13AM | 4 | exhibits that had been admitted, some pictures of various |
| 11:13AM | 5 | models that were on the website, including -- I'm referring |
| 11:13AM | 6 | specifically to Exhibit 364, ██ the model ██ Do you recall |
| 11:13AM | 7 | that, in a green outfit, green bikini? |
| 11:13AM | 8 | A.   I apologize.  I've seen a lot of content. |
| 11:13AM | 9 | Q.   I'm sorry.  Okay.  Could we have 364, the first page? |
| 11:14AM | 10 | A.   I think I would describe it as gold, but yes.  Sorry. |
| 11:14AM | 11 | Q.   Now, it was your testimony that this -- this is very |
| 11:14AM | 12 | uncomfortable getting into this, but a man's life is at stake, |
| 11:14AM | 13 | so we need to get right down to the nitty-gritty.  You |
| 11:14AM | 14 | testified that -- that these photographs display this minor's |
| 11:14AM | 15 | genitals; is that right?  That's what you testified? |
| 11:14AM | 16 | A.   I believe I said her genitals were exposed -- and you're |
| 11:14AM | 17 | probably right.  I probably did say that, but what I meant to |
| 11:14AM | 18 | indicate is that her genital region is displayed towards the |
| 11:14AM | 19 | camera. |
| 11:14AM | 20 | Q.   Okay.  And in the grand jury, you testified that -- that |
| 11:15AM | 21 | Newstar was established around 2005; does that sound right? |
| 11:15AM | 22 | A.   Approximately, yes. |
| 11:15AM | 23 | Q.   Okay.  And it operated on the public internet or the clear |
| 11:15AM | 24 | web -- |
| 11:15AM | 25 | A.   It did. |

GARCIA - CROSS-EXAMINATION

11:15AM 1    Q.   -- for ten years until the undercover purchase 2015?

11:15AM 2    A.   That is my understanding, yes.

11:15AM 3    Q.   And then it was little more than four years until it was

11:15AM 4    shut down in November of 2019?

11:15AM 5    A.   That is correct.

11:15AM 6    Q.   At the request of our government, HSI, federal government?

11:15AM 7    A.   (Witness nodding head affirmatively.)

11:15AM 8    Q.   So for 14 years it operated on the clear web?

11:15AM 9    A.   That is my understanding, yes.

11:15AM 10   Q.   And the servers were in the Netherlands?

11:15AM 11   A.   Some of them, yes.

11:15AM 12   Q.   Okay.  The Newstar servers?

11:15AM 13   A.   The Newstar servers, yes.

11:15AM 14   Q.   And they also have the authority -- without us asking,

11:15AM 15   they have the authority to shut down websites?

11:16AM 16   A.   I'm confident based on my experience working cases that

11:16AM 17   servers like Google or Instagram, Kik, if they discover

11:16AM 18   content, then yes, they take steps to mitigate that.

11:16AM 19   Q.   And the Dutch did shut it down in November of 2019 when

11:16AM 20   you asked them to?

11:16AM 21   A.   In 2019 we executed search warrants and whatnot, and as a

11:16AM 22   result they were shut down.

11:16AM 23          MR. KERR:  Thank you.  I have no further questions.

11:16AM 24          THE COURT:  Okay.  Thank you.  Can we take down

11:16AM 25   the -- okay.  Good.

GARCIA - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:16AM | 1 | Do you have any redirect for this witness? |
| 11:16AM | 2 | MS. VALDES:  No, Your Honor. |
| 11:16AM | 3 | THE COURT:  Okay.  I'll excuse you.  You can go back |
| 11:16AM | 4 | to counsel table.  Thank you. |
| 11:16AM | 5 | THE WITNESS:  Thank you, Your Honor. |
| 11:16AM | 6 | (Witness excused.) |
| 11:16AM | 7 | THE COURT:  When you're ready with your next witness? |
| 11:16AM | 8 | MR. REYNOLDS:  Your Honor, at this time, may we read |
| 11:16AM | 9 | two more stipulations into the record? |
| 11:16AM | 10 | THE COURT:  Sure. |
| 11:17AM | 11 | MR. REYNOLDS:  Thank you.  We have the third |
| 11:17AM | 12 | stipulation of the parties, which is marked as Government's |
| 11:17AM | 13 | Exhibit 9.  We also have the fourth stipulation of the parties |
| 11:17AM | 14 | marked as Government Exhibit 10.  We offer these into evidence |
| 11:17AM | 15 | at this time, Your Honor. |
| 11:17AM | 16 | I apologize, Your Honor.  May we offer |
| 11:17AM | 17 | Government Exhibit 9 into evidence? |
| 11:17AM | 18 | THE COURT:  I'm just trying to see if there's any |
| 11:17AM | 19 | objection.  Any objection? |
| 11:17AM | 20 | MR. KERR:  No objection. |
| 11:17AM | 21 | THE COURT:  All right.  That's fine then, yes.  Most |
| 11:17AM | 22 | certainly.  If you want to read it also, you may do so. |
| 11:17AM | 23 | Whatever you prefer. |
| 11:17AM | 24 | MR. REYNOLDS:  Great.  Thank you.  Ms. Davis, can you |
| 11:17AM | 25 | put up Exhibit 9? |

|       |    |
|-------|----|
| 11:17AM | 1 |
| 11:17AM | 2 |
| 11:17AM | 3 |
| 11:17AM | 4 |
| 11:17AM | 5 |
| 11:17AM | 6 |
| 11:17AM | 7 |
| 11:18AM | 8 |
| 11:18AM | 9 |
| 11:18AM | 10 |
| 11:18AM | 11 |
| 11:18AM | 12 |
| 11:18AM | 13 |
| 11:18AM | 14 |
| 11:18AM | 15 |
| 11:18AM | 16 |
| 11:18AM | 17 |
| 11:18AM | 18 |
| 11:18AM | 19 |
| 11:18AM | 20 |
| 11:18AM | 21 |
| 11:18AM | 22 |
| 11:19AM | 23 |
| 11:19AM | 24 |
| 11:19AM | 25 |

Third stipulation of the parties reads as follows:  "It is hereby stipulated and agreed by and between the United States of America, the Defendant, Plamen Georgiev Velinov, and his attorney, Christophir Kerr, that the United States has established the following facts beyond a reasonable doubt:  Content on the following websites, including any images, texts, and videos, was distributed and transported using the internet, which is a means and facility of interstate and foreign commerce, and it was also transported in and affecting interstate and foreign commerce.  The websites are as follows:  Newstar-████.net.  Newstar-████.net. Newstar-████.com.  Newstar-██████.net.  Newstar-████.net. TinyModel████.com.  Sweet-█████.com.  Sweet-███████.com. Sweet-███████.com.  Sweet-█████.com.  Sweet-███████.com. ClipMonster.net.  TinyModel news.com."

Ms. Davis, could we have Government Exhibit 10, please?

The fourth stipulation of the parties reads as follows:  "It is hereby stipulated and agreed by and between the United States of America, the Defendant, Plamen Georgiev Velinov, and his attorney, Christophir Kerr, the venue in this case is proper in the Middle District of Florida."

Your Honor, with that, the United States rests its case in chief.

THE COURT:  All right.  Thank you.  The United States

|         |    |                                                            |
|---------|----|------------------------------------------------------------|
| 11:19AM | 1  | has rested its case.                                       |
| 11:19AM | 2  | Let's lake a short break here, ladies and                  |
| 11:19AM | 3  | gentlemen.  We shouldn't be that long.  So let's take about a |
| 11:19AM | 4  | 10-minute break.  Don't discuss the case or form any opinions |
| 11:19AM | 5  | until you've heard all the evidence.  We'll see you back here |
| 11:19AM | 6  | in 10 minutes.                                             |
|         | 7  | (Jury out at 11:19 a.m.)                                   |
| 11:20AM | 8  | THE COURT:  Please be seated.  Okay.  Government has       |
| 11:20AM | 9  | rested its case.  Are there any motions you would like to make |
| 11:20AM | 10 | Mr. Kerr?                                                  |
| 11:20AM | 11 | MR. KERR:  Yes, Your Honor.                                |
| 11:20AM | 12 | THE COURT:  I'll hear you now.                             |
| 11:20AM | 13 | MR. KERR:  Rule 29.  I'd like to file a motion for a       |
| 11:20AM | 14 | judgment of acquittal.  I don't believe that the Government has |
| 11:20AM | 15 | established that the images meet the requirements of the   |
| 11:20AM | 16 | statute under which the Defendant is charged in either count, |
| 11:20AM | 17 | in that it is not legally child pornography.  That's the basis |
| 11:20AM | 18 | of our motion.                                             |
| 11:20AM | 19 | THE COURT:  Thank you.  Do you wish to respond to          |
| 11:20AM | 20 | that, Mr. Reynolds?                                        |
| 11:20AM | 21 | MR. REYNOLDS:  Yes, Your Honor, briefly.  May I            |
| 11:20AM | 22 | approach the lectern?                                      |
| 11:20AM | 23 | THE COURT:  Yes, that would be fine.                       |
| 11:20AM | 24 | MR. REYNOLDS:  Your Honor, both of the statutes that       |
| 11:20AM | 25 | the Government has charged in the Indictment refer to visual |

11:20AM   1   depictions, the production of which involved the minors, minors
11:20AM   2   involved in sexually explicit conduct and the depictions are of
11:21AM   3   that conduct.  Under 18 USC 2256, sexually explicit conduct
11:21AM   4   includes the lascivious exhibition of the genitals or pubic
11:21AM   5   area of any person.  The Eleventh Circuit has held that
11:21AM   6   lascivious means exciting sexual desire or salacious.
11:21AM   7         THE COURT:  What case did they say that?
11:21AM   8         MR. REYNOLDS:  It's quoted in the Holmes case, and I
11:21AM   9   believe the Holmes case was quoting -- I'm not sure how to say
11:21AM  10   it.  I would say Grzybowicz.  I don't have the citations right
11:21AM  11   in front of me, but I can provide them to the Court.
11:21AM  12         We've also cited abundant case law, both from
11:21AM  13   the Eleventh Circuit and from circuits all over the country,
11:21AM  14   standing for the proposition that the phrase lascivious
11:21AM  15   exhibition of the genitals and pubic area does not require
11:21AM  16   nudity.  The flagship case for this proposition is the Knox
11:21AM  17   case out of the Third Circuit which held not only does this
11:21AM  18   phrase not require nudity, but it doesn't even require that the
11:22AM  19   outlines of the children's genitals be visible through their
11:22AM  20   clothing.
11:22AM  21         The Knox case took what I would call a deep dive
11:22AM  22   into the legislative history.  Some of the other cases, like
11:22AM  23   United States v. Price, didn't even go that far, United States
11:22AM  24   v. Price out of the Seventh Circuit, which is again cited in
11:22AM  25   our motion in limine.  United States v. Price, the Seventh

| | |
|---|---|
| 11:22AM | 1 |
| 11:22AM | 2 |
| 11:22AM | 3 |
| 11:22AM | 4 |

11:22AM 1 Circuit looked at the statutory language and said there is no

11:22AM 2 requirement here -- there is no requirement of nudity.

11:22AM 3 Congress knows how to require nudity.  Clear and appropriate

11:22AM 4 inference when construing the statute is that Congress did not

11:22AM 5 intend to exempt non-nude images from this definition so long

11:22AM 6 as they otherwise depict what is required under the statute,

11:22AM 7 which is lascivious exhibition of the genitals and pubic area

11:22AM 8 of a person.

11:22AM 9             We would submit, Your Honor, that the images

11:22AM 10 we've shown to the jury and the images that we've put into --

11:22AM 11 were put into evidence in this case include a very, very large

11:22AM 12 volume of material that is patently, plainly on its face

11:23AM 13 lascivious.  It is patently plainly on its face -- it's minors

11:23AM 14 displaying their barely clothed genitals and public areas to

11:23AM 15 the camera.  It is highly sexual.  It is salacious.  It is

11:23AM 16 intended to incite sexual desires.

11:23AM 17             We believe that we've gone far beyond what is

11:23AM 18 required even for a jury to find beyond a reasonable doubt,

11:23AM 19 which is well beyond what is required for a Rule 29 motion.

11:23AM 20             THE COURT:  Anything else?

11:23AM 21             MR. KERR:  May I respond briefly?

11:23AM 22             THE COURT:  Yes, of course.

11:23AM 23             MR. KERR:  Your Honor, I've researched the cases

11:23AM 24 also, and I believe that the cases cited by Mr. Reynolds can be

11:23AM 25 distinguished based on their facts from the one here, and I

|  |  |  |
|---|---|---|
| 11:24AM | 1 | believe that the material -- a lot of the material is not even |
| 11:24AM | 2 | unlawful, and the Government would even concede that, I |
| 11:24AM | 3 | believe.  The material that they -- that doesn't -- I |
| 11:24AM | 4 | understand that doesn't matter as long as there is some |
| 11:24AM | 5 | material that is unlawful that qualifies as child pornography. |
| 11:24AM | 6 | However, the facts here really and the images themselves show |
| 11:24AM | 7 | that this material is really, you know, as Special Agent Boos |
| 11:24AM | 8 | said 29 times, commercial child erotica, which under the case |
| 11:24AM | 9 | law is on the legal side of the line.  It's not child |
| 11:24AM | 10 | pornography. |
| 11:24AM | 11 | And I just want to read into the record the |
| 11:24AM | 12 | definition from the statute for child erotica from 18 USC 2256. |
| 11:25AM | 13 | One, defines a minor as any person under the age of 18.  We |
| 11:25AM | 14 | concede that there are pictures of minors in this material. |
| 11:25AM | 15 | That's not an issue, but it defines 2(b), sexually explicit |
| 11:25AM | 16 | conduct means actual or simulated sexual intercourse, including |
| 11:25AM | 17 | genital to genital, oral genital, anal genital, or oral anal |
| 11:25AM | 18 | between either persons of the same or opposite sex; 2, |
| 11:25AM | 19 | bestiality; 3, masturbation; 4, sadistic or masochistic abuse. |
| 11:25AM | 20 | And incidentally, I understand that nudity is |
| 11:25AM | 21 | not required, so, for example, if you had a minor, a child |
| 11:25AM | 22 | displayed involved in bestiality or masturbation and had |
| 11:25AM | 23 | clothing on, that would qualify as child pornography, no |
| 11:25AM | 24 | question about it, but the one that they're relying on is |
| 11:26AM | 25 | number 5, lascivious exhibition of the anus, genitals, or pubic |

11:26AM  1   area of any person.  And I submit that a child, even a child

11:26AM  2   with a bikini bottom on covering those areas does not

11:26AM  3   constitute an exhibition of the anus, genitals, or pubic area.

11:26AM  4   I don't think it meets the statute.  That's our -- that's our

11:26AM  5   motion.  Thank you.

11:26AM  6           THE COURT:  All right.  The motion is denied.  I

11:26AM  7   think there's sufficient there to move forward to the next

11:26AM  8   stage.  The Government has presented sufficient evidence, at

11:26AM  9   least to the Court's satisfaction.

11:26AM  10          All right.  Mr. Kerr, do you intend to present

11:26AM  11  any evidence?  Do you want me to inquire as to whether your

11:26AM  12  client wishes to testify, or do you want to just handle that

11:27AM  13  myself?

11:27AM  14          MR. KERR:  I would like to have a conversation with

11:27AM  15  him, maybe an hour or an hour and a half.

11:27AM  16          THE COURT:  It's 11:30.  Basically what you're asking

11:27AM  17  me to do is to just tell the jury to go home now, and we'll see

11:27AM  18  them Monday at 9:00 a.m.  That's why I kind of hunted when we

11:27AM  19  talked about this yesterday.  It's 11:30.  I think we can do a

11:27AM  20  charge conference now.  Let me just see.  How long would you --

11:27AM  21  how long -- Ms. Valdes or Mr. Reynolds, how long do you need

11:27AM  22  for closing argument?

11:27AM  23          MR. REYNOLDS:  I would say approximately one half

11:27AM  24  hour to one hour, but, Your Honor, may we be heard briefly on

11:27AM  25  this?

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 11:27AM | 1  | **THE COURT:**  What is it you wish to be heard on?  You |
| 11:27AM | 2  | want to do this on Monday instead of today? |
| 11:27AM | 3  | **MR. REYNOLDS:**  Well, as to the -- not as to the |
| 11:27AM | 4  | charge conference, not as to the Defendant's -- whether the |
| 11:27AM | 5  | Defendant is putting on a case.  What -- depending on the |
| 11:27AM | 6  | timing when things work out, when this conversation is |
| 11:27AM | 7  | finished, what the situation we'd like to avoid is doing |
| 11:28AM | 8  | closing argument on Friday afternoon, having the jury go home |
| 11:28AM | 9  | and then having them start deliberating Monday morning.  If |
| 11:28AM | 10 | that can be avoided, we're prepared to close today. |
| 11:28AM | 11 | **THE COURT:**  Well, that's why I asked how long you |
| 11:28AM | 12 | would need, because quite frankly, I have -- the jury |
| 11:28AM | 13 | instructions have been done, and they've been handed out.  So |
| 11:28AM | 14 | it's 11:30.  Let's just say for the sake of argument that we |
| 11:28AM | 15 | would resume at 1:00, and if you were to take just say an hour |
| 11:28AM | 16 | for closing argument, that brings you to 2:00.  The defense, |
| 11:28AM | 17 | how long do you think you would need, an hour or what?  Less? |
| 11:28AM | 18 | **MR. KERR:**  Probably -- no more than an hour for |
| 11:28AM | 19 | closing.  But, Your Honor, I would -- |
| 11:28AM | 20 | **THE COURT:**  That does start to make it a little bit |
| 11:28AM | 21 | late. |
| 11:28AM | 22 | **MR. KERR:**  With the language difficulties and other |
| 11:28AM | 23 | issues I've had in this case, I want to make sure that |
| 11:28AM | 24 | Mr. Velinov has enough time to make the decision on whether or |
| 11:29AM | 25 | not to testify.  The only defense case I would put on would be |

11:29AM  1    his testimony.

11:29AM  2              THE COURT:  Okay.  Then I'll tell you what.  I'm not

11:29AM  3    going to give you an hour and a half, because I've got the jury

11:29AM  4    here, and you're going to rest today.  One way or the other

11:29AM  5    you're going to rest.  So -- and then I'll see if the

11:29AM  6    Government has anything else, but we're going to close

11:29AM  7    testimony today -- I mean, the trial will be finished today

11:29AM  8    other than closing arguments and jury instructions.  I'll go

11:29AM  9    ahead and -- you can do that on Monday morning.  I mean, I

11:29AM 10    think we could have done it today, but it starts to get too

11:29AM 11    late in the day, and -- unless you can get it to them by, you

11:29AM 12    know, 2:00 or so, and there's no -- we're not going to be able

11:29AM 13    to do that.  So we will do closing arguments and jury

11:29AM 14    instructions Monday morning at 9:00, but we're going to finish

11:29AM 15    this today.  So I've got those jurors sitting there.  I will

11:29AM 16    give you, Mr. Kerr, 20 minutes to decide, 20 minutes with your

11:30AM 17    client to decide whether he wants to testify.  That's plenty of

11:30AM 18    time.  You've got the interpreter there, and we'll -- you know,

11:30AM 19    the jury is out there.  Just tell them it'll be a little bit

11:30AM 20    longer.  Actually, you know what?  Since their lunch is being

11:30AM 21    brought in at noon; is that right?

11:30AM 22              COURTROOM DEPUTY:  Yes, Your Honor.

11:30AM 23              THE COURT:  Their lunch is being brought in at noon,

11:30AM 24    so you've got until five to 12:00, so that I can then bring

11:30AM 25    them in, see if there's anything else.  You may -- your client

| | | |
|---|---|---|
| 11:30AM | 1 | may testify.  Okay.  Fair enough.  Anyway, you've got until |
| 11:30AM | 2 | five to 12:00.  Five to 12:00, you can tell me.  So tell the |
| 11:30AM | 3 | jury it'll be a little bit longer.  We'll let them know.  Tell |
| 11:30AM | 4 | them it'll probably be 15, 20 more minutes.  I don't want to |
| 11:30AM | 5 | say that.  That's not accurate.  Anyway, tell them it'll be |
| 11:30AM | 6 | sometime before 12:00; to just kind of sit tight, and then |
| 11:30AM | 7 | you've got until five to 12:00 to tell me what you want to do. |
| 11:31AM | 8 | All right? |
| 11:31AM | 9 | If your client wishes to testify, so that's the |
| 11:31AM | 10 | only -- that's the only evidence you would be presenting is |
| 11:31AM | 11 | your client? |
| 11:31AM | 12 | MR. KERR:  If he testified, there might be one |
| 11:31AM | 13 | stipulation that we've discussed, but the big issue is whether |
| 11:31AM | 14 | or not he's going to testify. |
| 11:31AM | 15 | THE COURT:  Okay. |
| 11:31AM | 16 | MR. KERR:  I need -- if I'm going to have a |
| 11:31AM | 17 | compressed time -- |
| 11:31AM | 18 | THE COURT:  It's not a compressed -- first of all, |
| 11:31AM | 19 | you've had a long time to think about this.  This didn't just |
| 11:31AM | 20 | spring on you five minutes ago.  You've had a very long time, |
| 11:31AM | 21 | so that's a very generous time line quite frankly.  But anyway, |
| 11:31AM | 22 | go ahead. |
| 11:31AM | 23 | MR. KERR:  I'm not complaining about that, Judge. |
| 11:31AM | 24 | What I'm asking is can we have some privacy to talk about this? |
| 11:31AM | 25 | THE COURT:  I don't know what accommodation can be |

11:31AM  1    made.  It's up to the Marshals Service.  It's not up to me.  So

11:31AM  2    I'm going to sit here.  It's up to the Marshals Service.

11:31AM  3    Anyway, you've got until five to 12:00.  If he decides to

11:31AM  4    testify, then we'll resume at 1:00 and -- you know, with his

11:31AM  5    testimony.  Okay?  So you got until -- you got five to 12:00.

11:31AM  6    It's up to the Marshals Service.  It's not my call.  You're in

11:32AM  7    recess.  You got to talk to the gentleman behind you.

8                    (Recess from 11:32 a.m. to 11:48 a.m.)

11:48AM  9            **THE COURT:**  So we're on the record.  Mr. Kerr, you

11:48AM  10   had the opportunity with the translator to talk to your client;

11:48AM  11   is that right?

11:48AM  12           **MR. KERR:**  Yes, Your Honor.

11:48AM  13           **THE COURT:**  Okay.  Will you be presenting any

11:48AM  14   evidence during your case in chief?

11:48AM  15           **MR. KERR:**  No, we will not, Your Honor.

11:48AM  16           **THE COURT:**  Okay.  Do you want me to make any inquiry

11:48AM  17   of your client?  Some lawyers like me to make inquiry.  Other

11:48AM  18   lawyers feel comfortable with just having discussed it with

11:48AM  19   their clients and don't require or ask that the judge inquire.

11:48AM  20   Do you have a position one way or the other?

11:48AM  21           **MR. KERR:**  You know, I think I would prefer that Your

11:48AM  22   Honor inquire.

11:48AM  23           **THE COURT:**  Okay.  All right.  Thank you.

11:48AM  24           So Mr. Velinov, we've come to the stage in the

11:48AM  25   proceedings -- we've come to the stage in the proceedings where

| | | |
|---|---|---|
| 11:49AM | 1 | it is your opportunity to present testimony.  I have asked your |
| 11:49AM | 2 | lawyer whether you will be presenting any testimony or any |
| 11:49AM | 3 | evidence, and he has told me that you will not be.  So I want |
| 11:49AM | 4 | to make certain that you understand your rights in this |
| 11:49AM | 5 | proceeding. |
| 11:49AM | 6 | As the Defendant, you have the right to testify, |
| 11:49AM | 7 | if you so desire.  You also have the right to maintain silence |
| 11:49AM | 8 | and not testify.  One of the instructions that I read to the |
| 11:49AM | 9 | jury is that if you choose to invoke the constitutional right |
| 11:49AM | 10 | of not testifying, the jury cannot hold that against you, and |
| 11:49AM | 11 | they can't draw a negative inference from your decision not to |
| 11:49AM | 12 | testify. |
| 11:49AM | 13 | Some defendants choose to testify.  Other |
| 11:49AM | 14 | Defendants choose to maintain silence. |
| 11:50AM | 15 | Have you had the opportunity to discuss this |
| 11:50AM | 16 | matter with your lawyer, Mr. Kerr? |
| 11:50AM | 17 | THE DEFENDANT:  Yes. |
| 11:50AM | 18 | THE COURT:  And is it your decision today not to |
| 11:50AM | 19 | testify? |
| 11:50AM | 20 | THE DEFENDANT:  Yes. |
| 11:50AM | 21 | THE COURT:  And you have reached that decision after |
| 11:50AM | 22 | consulting with your lawyer? |
| 11:50AM | 23 | THE DEFENDANT:  Yes. |
| 11:50AM | 24 | THE COURT:  And you're satisfied with the information |
| 11:50AM | 25 | you've received and with the counsel you've received in making |

| | | |
|---|---|---|
| 11:50AM | 1 | that decision? |
| 11:50AM | 2 | **THE DEFENDANT:**  Yes, absolutely. |
| 11:50AM | 3 | **THE COURT:**  Okay.  Thank you very much.  You may be |
| 11:50AM | 4 | seated.  I don't have any other questions then. |
| 11:50AM | 5 | So what I'm going to do is I'm going to bring |
| 11:50AM | 6 | the jury back in.  I'm going to ask you, Mr. Kerr, if you have |
| 11:51AM | 7 | any evidence to present, and you can say whatever you wish to |
| 11:51AM | 8 | say, that the defense rests its case.  Then obviously the |
| 11:51AM | 9 | Government won't have any rebuttal, so I'll tell them that the |
| 11:51AM | 10 | trial in the matter has concluded.  However, that they will |
| 11:51AM | 11 | need to come back on Monday -- Monday morning.  That's not what |
| 11:51AM | 12 | I'll -- I won't say they have to come back.  I'll say we will |
| 11:51AM | 13 | conclude for the day, and that we will resume with closing |
| 11:51AM | 14 | arguments and with jury instructions on Monday morning at |
| 11:51AM | 15 | 9:00 a.m.  That's what we'll do, all right?  Okay.  So we'll |
| 11:51AM | 16 | bring the jury in. |
| 11:51AM | 17 | **MR. REYNOLDS:**  Your Honor, may I add one more thing |
| 11:51AM | 18 | for the record, please? |
| 11:51AM | 19 | **THE COURT:**  Sure. |
| 11:51AM | 20 | **MR. REYNOLDS:**  I wanted to state that furthers my |
| 11:51AM | 21 | comment at the beginning of trial regarding the work that |
| 11:51AM | 22 | Mr. Kerr had done, the parties had agreed that if Mr. Velinov |
| 11:51AM | 23 | did testify, the Government would have agreed to a stipulation |
| 11:51AM | 24 | as to character testimony as a witness who was not -- who was |
| 11:51AM | 25 | not available to enter the United States.  That character |

| | |
|---|---|
| 11:51AM | 1 |
| 11:52AM | 2 |
| 11:52AM | 3 |
| 11:52AM | 4 |
| 11:52AM | 5 |
| 11:52AM | 6 |

1 testimony won't be introduced because Mr. Velinov did not
2 testify.  I just want to make clear on the record that this is
3 something else Mr. Kerr did that is not reflected on the
4 docket, persuaded the United States to agree to stipulate to
5 character testimony for a witness who otherwise would not have
6 been able to attend trial.
7            THE COURT:  Okay.  So we'll bring the jury in.  Thank
8 you.
9                 I will hear -- even though you're not presenting
10 any evidence, Mr. Kerr, after the jury leaves, I will hear a
11 renewed motion, but I'm going to do it after the jury leaves.
12 Even though I closed the case, it's still open for receipt of
13 that motion.
14            MR. KERR:  Thank you, Your Honor.
15            THE COURT:  Okay.
16            MR. KERR:  Do you instruct the jury before closings?
17            THE COURT:  No.  I instruct them after closing.
18            (Jury in at 11:54 a.m.)
19            THE COURT:  All right.  Welcome back, ladies and
20 gentlemen.
21                 The Government has rested its case.  I now turn
22 to the defense.  Mr. Kerr, is there anything that you would
23 like to present to the Court at this juncture?
24            MR. KERR:  Your Honor, the defense also rests.
25            THE COURT:  All right.  Thank you, Mr. Kerr.  The

11:54 AM   1   defense has rested its case.  Is there anything else from the

11:54 AM   2   Government?

11:54 AM   3            **MR. REYNOLDS:**  No, Your Honor.

11:54 AM   4            **THE COURT:**  Okay.  Anything else from the defense?

11:54 AM   5            **MR. KERR:**  Nothing, Your Honor.

11:54 AM   6            **THE COURT:**  Okay.  Thank you.

11:54 AM   7            So, ladies and gentlemen of the jury, both sides

11:55 AM   8   have rested their case.

11:55 AM   9            I'm going to ask you to please come back on

11:55 AM  10   Monday morning.  We won't have enough time this afternoon to do

11:55 AM  11   what we need to do.  What needs to happen is closing arguments

11:55 AM  12   need to be made and jury instructions need to be given, and

11:55 AM  13   normally we've got to accomplish that by a certain hour so that

11:55 AM  14   it's not going to the jury too late in the day on a Friday

11:55 AM  15   afternoon.

11:55 AM  16            So I've made the decision to finish the

11:55 AM  17   proceedings for the day and to have you come back on Monday

11:55 AM  18   morning, all right?

11:55 AM  19            So we're going to go into the last phase of the

11:55 AM  20   proceedings Monday morning.  We'll begin at 9:00 a.m.  The

11:55 AM  21   first thing that you will hear is closing arguments.  The

11:55 AM  22   Government will go first, and then the defense, and because the

11:55 AM  23   Government always has the burden of proof, I allow them to make

11:55 AM  24   a rebuttal closing argument.  That will probably take in

11:56 AM  25   total -- I don't know -- a couple of hours, hour and a half.  I

| | | |
|---|---|---|
| 11:56AM | 1 | don't know exactly how long the lawyers will need.  I will then |
| 11:56AM | 2 | read to you jury instructions, which are substantive.  These |
| 11:56AM | 3 | are substantive jury instructions, and I will give you each a |
| 11:56AM | 4 | copy of the jury instructions so you can read and follow along |
| 11:56AM | 5 | with me as I read that.  That will probably take, you know, 45 |
| 11:56AM | 6 | minutes, close to an hour as well.  So you will probably be |
| 11:56AM | 7 | getting the case to begin your deliberations sometime late in |
| 11:56AM | 8 | the morning, and lunch will also be brought in for you on |
| 11:56AM | 9 | Monday, and you can then begin your deliberations on Monday |
| 11:56AM | 10 | after you've been instructed and after closing arguments have |
| 11:56AM | 11 | been made.  All right.  So that's what will happen. |
| 11:56AM | 12 | Obviously lunch is there.  I just have to bring |
| 11:56AM | 13 | you in so that you could hear the defense rest and that the |
| 11:56AM | 14 | Government and the defense don't have anything else to say. |
| 11:57AM | 15 | These are just procedures and requirements that I have to go |
| 11:57AM | 16 | through, so I wasn't trying to waste your time here bringing |
| 11:57AM | 17 | you in and out.  It's just the way it has to be. |
| 11:57AM | 18 | So the lunch is there.  You can take your lunch |
| 11:57AM | 19 | to go.  You can eat there, if you'd like.  Whatever your |
| 11:57AM | 20 | preference is, but we are adjourned for the day, and we will |
| 11:57AM | 21 | finish this on Monday.  Monday we will be finished.  All right? |
| 11:57AM | 22 | So thank you for your patience. |
| 11:57AM | 23 | Please remember, it's really tempting over the |
| 11:57AM | 24 | weekend to do independent research, to talk about it.  Please |
| 11:57AM | 25 | don't do it, especially the internet.  I mean, it's just so |

11:57AM   1    second nature to us when we don't know the answer to something

11:57AM   2    to look it up.  Please don't do that.  I'm just asking you to

11:57AM   3    follow my instructions and to not do that.

11:57AM   4          All right.  Very good.  I'll see you back here

11:57AM   5    at 9:00 a.m. on Monday morning.

       6          (Jury out at 11:57 a.m.)

11:58AM   7         **THE COURT:**  All right.  Thank you.  Let me hear any

11:58AM   8    renewed motions at this time, Mr. Kerr, before I forget to do

11:58AM   9    it.  I mean, I'm not certain, to tell you the truth, that you

11:58AM  10    really need to since you didn't present any evidence, but I

11:58AM  11    always feel out of an abundance of caution I got to do these

11:58AM  12    things just so that in case there's any issue, it's been

11:58AM  13    covered.  So I'll hear your renewed motion at this time.

11:58AM  14         **MR. KERR:**  Thank you, Your Honor.  I renew my motion

11:58AM  15    for judgment of acquittal under Rule 29 on the same grounds as

11:59AM  16    expressed earlier.

11:59AM  17         **THE COURT:**  Okay.  Thank you.  And your response from

11:59AM  18    the Government?

11:59AM  19         **MR. REYNOLDS:**  Your Honor, we adopt the same response

11:59AM  20    from earlier.

11:59AM  21         **THE COURT:**  Okay.  Well, I'll deny it.  I'll deny

11:59AM  22    Mr. Kerr's reason -- I mean, I'm sorry.  I'll deny Mr. Kerr's

11:59AM  23    motion for the same reasons I said earlier.  I believe that

11:59AM  24    there's enough evidence that has been put forth for this matter

11:59AM  25    to go to the jury.  So that's my ruling.

| | | |
|---|---|---|
| 11:59AM | 1 | All right.  So now that the trial is concluded, |
| 11:59AM | 2 | I will ask you what you would like to do.  If you need take a |
| 11:59AM | 3 | break, we can take, you know, a one-hour lunch break.  You can |
| 11:59AM | 4 | look at the jury instructions, or we can move forward now.  My |
| 11:59AM | 5 | preference is to move forward and be done with this.  On the |
| 11:59AM | 6 | other hand, you know, I'm happy to take a break.  So what does |
| 11:59AM | 7 | the Government prefer to do? |
| 11:59AM | 8 | MR. REYNOLDS:  Your Honor, may I inquire?  We haven't |
| 11:59AM | 9 | had a great deal of time to review this, but if I'm recalling |
| 12:00PM | 10 | correctly, there was only one contested portion of the joint |
| 12:00PM | 11 | jury instructions we submitted.  Is Your Honor in a position to |
| 12:00PM | 12 | tell us whether anything non-contested has been altered?  I |
| 12:00PM | 13 | think we don't have anything -- we obviously don't have |
| 12:00PM | 14 | anything to add to the uncontested portions that we submitted |
| 12:00PM | 15 | to the Court last week. |
| 12:00PM | 16 | THE COURT:  Give me one second here.  We updated some |
| 12:00PM | 17 | things, but I don't think it was anything very substantive. |
| 12:00PM | 18 | Let's see here.  We've got alternates that you've been given, |
| 12:00PM | 19 | because we didn't know if the Defendant would be testifying |
| 12:00PM | 20 | until now.  Let's see.  We can go through it in a minute and |
| 12:00PM | 21 | tell you exactly what I did.  I'm just looking to see -- I'll |
| 12:00PM | 22 | tell you exactly what I did. |
| 12:01PM | 23 | This is going to take a little bit of time, so |
| 12:01PM | 24 | if you feel you need lunch, we can break for lunch.  I don't |
| 12:01PM | 25 | want anybody to be here feeling like they need to keel over |

| | | |
|---|---|---|
| 12:01PM | 1 | because they haven't eaten.  Mr. Kerr? |
| 12:01PM | 2 | **MR. KERR:**  A five-minute break would be enough for |
| 12:01PM | 3 | me, but I'll do what the Government wants. |
| 12:01PM | 4 | **THE COURT:**  Okay.  Mr. Kerr just needs a five-minute |
| 12:01PM | 5 | break.  I mean, there are some changes -- there's some issues |
| 12:01PM | 6 | here.  There's some modifications. |
| 12:01PM | 7 | **MR. REYNOLDS:**  Your Honor, I don't mean to extend |
| 12:01PM | 8 | something unnecessarily.  I think having thought about it, I |
| 12:01PM | 9 | think we would feel we need to do our due diligence. |
| 12:01PM | 10 | **THE COURT:**  So we'll take a one-hour break for lunch. |
| 12:01PM | 11 | That's fine. |
| 12:01PM | 12 | **MR. REYNOLDS:**  Thank you. |
| 12:01PM | 13 | **THE COURT:**  It's 12:00.  We'll be back here at 1:00. |
| 12:01PM | 14 | So we're in recess until 1:00.  I'm just going to stay here for |
| 12:01PM | 15 | a minute.  We'll see you back here at 1:00. |
| | 16 | (Recess from 12:01 p.m. to 1:03 p.m.) |
| 1:03PM | 17 | **THE COURT:**  All right.  Thank you.  So we're here for |
| 1:03PM | 18 | the charge conference.  Just give me a second to log into my |
| 1:03PM | 19 | computer. |
| 1:04PM | 20 | All right.  So you've been handed an early |
| 1:04PM | 21 | version of the jury instructions that we went through, so |
| 1:04PM | 22 | certainly happy to make any changes to it, and we'll go through |
| 1:04PM | 23 | them. |
| 1:04PM | 24 | I also see that -- let's see.  Mr. Kerr has |
| 1:04PM | 25 | handed up a proposed jury instruction that says "child |

1:04 PM  1   erotica."  Here's what he wants to add or potentially wants to

1:04 PM  2   add.

1:04 PM  3            "During the trial, you heard testimony referring

1:04 PM  4   to child erotica."  It's got a footnote one.  "See e.g., United

1:04 PM  5   States v. Williams, 444 F.3d 1286, 1304, Eleventh Circuit 2006,

1:04 PM  6   distinguishing between child erotica and unlawful child

1:04 PM  7   pornography.  See also United States v. Thomas, 818 F.3d 1230,

1:05 PM  8   1234, Eleventh Circuit, 2016; United States v. Love, number

1:05 PM  9   16-12095, Eleventh Circuit, June 6th, 2017, unpublished."

1:05 PM 10            "It is your duty to follow the Court's

1:05 PM 11   instructions on the law to determine whether the images in

1:05 PM 12   evidence here are unlawful.  However, you are instructed that

1:05 PM 13   the term 'child erotica' refers to legal images of children."

1:05 PM 14            Okay.  That's what Mr. Kerr proposes.

1:05 PM 15            So I'm going to get to that later.  Let's go

1:05 PM 16   through some of the easier parts first, and then also -- let's

1:05 PM 17   see.  I've got the verdict form as well.

1:05 PM 18            So you both have -- so both sides have the

1:05 PM 19   Court's instructions, the draft?

1:05 PM 20            MR. REYNOLDS:  We do, Your Honor.

1:05 PM 21            THE COURT:  Okay.  Very good.  So let's go through

1:05 PM 22   it.

1:05 PM 23            Instruction number 1.  There shouldn't be an

1:05 PM 24   issue there.  And I'm sorry, he did not testify, so we're not

1:06 PM 25   going to use this instruction number 1.  We'll use another

| | | |
|---|---|---|
| 1:06PM | 1 | version because he did not testify. |
| 1:06PM | 2 | So the new instruction number 1 would be basic |
| 1:06PM | 3 | 2.2, right?  2.2.  So that would be our instruction number 1. |
| 1:06PM | 4 | Instruction number 2, that's basic 3, definition |
| 1:06PM | 5 | of reasonable doubt.  And if you don't speak up, I'm going to |
| 1:06PM | 6 | assume no issues.  I mean, I wouldn't expect any here.  This is |
| 1:06PM | 7 | are all pretty straightforward. |
| 1:06PM | 8 | Instruction number 3 is basic 4. |
| 1:06PM | 9 | Instruction number 4 is the role of the |
| 1:06PM | 10 | interpreter T4.  It's just using the past tense as opposed to |
| 1:06PM | 11 | the present tense which is what I used earlier. |
| 1:06PM | 12 | Instruction number 5 is basic 5. |
| 1:06PM | 13 | Instruction number 6 is basic 6.2.  It's |
| 1:07PM | 14 | impeachment of witnesses because of the felony conviction or |
| 1:07PM | 15 | any inconsistent statements that may have been made.  Okay? |
| 1:07PM | 16 | Then we're not going to use basic 6.5 since the |
| 1:07PM | 17 | Defendant did not testify.  So instruction number 6 will be |
| 1:07PM | 18 | basic 6.2.  And basic 6.5 will not be used. |
| 1:07PM | 19 | Okay.  Instruction number 7, basic 7, expert |
| 1:07PM | 20 | witness.  That's okay. |
| 1:07PM | 21 | Instruction number 8, it's just been modified |
| 1:07PM | 22 | slightly.  We have two conspiracy -- right?  Two conspiracy |
| 1:07PM | 23 | charges, no substantive charges.  So basic 8, instruction |
| 1:07PM | 24 | number 8. |
| 1:07PM | 25 | Then we have instruction number 9, which is |

| | | |
|---|---|---|
| 1:07PM | 1 | basic 10.2, single defendant, multiple counts. |
| 1:08PM | 2 | Then we have instruction number 10, which is |
| 1:08PM | 3 | basic 8.1, conjunctively charged counts. |
| 1:08PM | 4 | Then we have instruction number 11, which is |
| 1:08PM | 5 | basic 9.2.  You've added a phrase to it.  I think you've added |
| 1:08PM | 6 | "or in or about a particular month or year," and that's fine |
| 1:08PM | 7 | with me, but if anybody has a problem with it, speak up. |
| 1:08PM | 8 | Okay.  Next we have instruction number 12, |
| 1:08PM | 9 | special 3, identification testimony. |
| 1:08PM | 10 | Then we have instruction number 13, special 1.2. |
| 1:08PM | 11 | The language was slightly modified here because these |
| 1:08PM | 12 | individuals were not co-defendants, defendants in their own |
| 1:08PM | 13 | cases.  So it was changed to the other defendant.  All right. |
| 1:08PM | 14 | So that's instruction number 13. |
| 1:09PM | 15 | Instruction number 14.  We kept them separate |
| 1:09PM | 16 | even though it is a bit repetitive.  That way it's cleaner to |
| 1:09PM | 17 | keep them as two separate instructions.  So that's instruction |
| 1:09PM | 18 | number 14, special 1.1. |
| 1:09PM | 19 | Okay.  Then let's see.  The 404(b) evidence. |
| 1:09PM | 20 | What says the Government about instruction number 15? |
| 1:09PM | 21 | **MR. REYNOLDS:**  Your Honor, our position is that |
| 1:09PM | 22 | instruction number 15 can be struck.  We filed a 404(b) notice. |
| 1:09PM | 23 | The document that we referred to in our 404(b) notice was |
| 1:09PM | 24 | entered into evidence, but we didn't ender it as 404(b), |
| 1:09PM | 25 | because the portion of the document that we considered to be |

| | | |
|---|---|---|
| 1:09 PM | 1 | 404(b), we did not read it to the jury.  We're not relying on |
| 1:09 PM | 2 | it.  We're not going to argue a permitted 404(b) purpose. |
| 1:10 PM | 3 | We're going to be relying on that for other purposes. |
| 1:10 PM | 4 | THE COURT:  Okay.  So are you okay, Mr. Kerr, with |
| 1:10 PM | 5 | deleting proposed instruction number 15, special 4.1 and |
| 1:10 PM | 6 | special 4.2? |
| 1:10 PM | 7 | MR. KERR:  No objection. |
| 1:10 PM | 8 | THE COURT:  Okay.  So instruction number 15 will be |
| 1:10 PM | 9 | deleted. |
| 1:10 PM | 10 | Instruction number 16.  It's offense 13.1. |
| 1:10 PM | 11 | There were a few modifications by the Government.  The |
| 1:10 PM | 12 | modifications appear to remove the overt act requirement |
| 1:10 PM | 13 | language since there's no overt requirement in the statute the |
| 1:10 PM | 14 | defendant is charged with violating. |
| 1:10 PM | 15 | You did -- there are modifications here.  But it |
| 1:10 PM | 16 | looked -- generally speaking looked okay to me.  So, Mr. Kerr, |
| 1:11 PM | 17 | are you okay with that one? |
| 1:11 PM | 18 | MR. KERR:  Yes, Your Honor. |
| 1:11 PM | 19 | THE COURT:  Okay.  So then we will use instruction |
| 1:11 PM | 20 | number 16, offense 13.1, as modified. |
| 1:11 PM | 21 | All right.  Next we have instruction number 17, |
| 1:11 PM | 22 | offense 82.1.  It's been modified to reflect that the described |
| 1:11 PM | 23 | offense is charged as the object of the conspiracy, and that it |
| 1:11 PM | 24 | has not been charged as a substantive offense.  So this is |
| 1:11 PM | 25 | what -- how the Government I believe has modified it.  I know |

1:11PM  1  the defense has a proposed instruction.  We'll get to it, but

1:11PM  2  anyway, I'm here on the Government's one right now.  And the

1:11PM  3  rest of instruction number 17, the language has been modified

1:12PM  4  to reflect that these are elements of the substantive offense

1:12PM  5  underlying the conspiracy, not the conspiracy charge's

1:12PM  6  elements.  So I see that.  Then the Government has also added a

1:12PM  7  couple of sentences on Count 1.  Let's see what else?  They've

1:12PM  8  also -- okay.

1:12PM  9          So Mr. Kerr has proposed -- and I'll get -- as I

1:12PM  10  said, I would get to it in a moment, and I'll get to it now.

1:12PM  11  Mr. Kerr has proposed an additional paragraph.  It seems to be

1:12PM  12  a modified version, albeit a slight modification, of a quote

1:12PM  13  from United States v. Williams.  I wonder if it is -- looks

1:13PM  14  like it's a little bit different than what you've given me now,

1:13PM  15  Mr. Kerr.  In any event -- and it's the same quote from the

1:13PM  16  annotations and comments to pattern instruction offense 82.1,

1:13PM  17  and that is what exactly constitutes a forbidden lascivious

1:13PM  18  exhibition of the genitals or pubic area and how that differs

1:13PM  19  from an innocuous photograph of a naked child, e.g., a family

1:13PM  20  photograph of a child taking a bath or an artistic masterpiece

1:13PM  21  portraying a naked child model is not concrete.  While the

1:13PM  22  pictures needn't always be quote-unquote dirty or even nude

1:13PM  23  depictions to qualify, screening materials through the eyes of

1:13PM  24  the neutral fact finder limit the potential universe of

1:13PM  25  objectionable images.

1:13 PM    1         The Government is objecting to the inclusion of
1:14 PM    2    this language.  Again, we'll talk about that in a minute.
1:14 PM    3         The Government also added a paragraph towards
1:14 PM    4    the bottom there on page 23.  I don't think the Government -- I
1:14 PM    5    mean, I don't think the defense objects to it.
1:14 PM    6         The first and last sentence of the paragraph are
1:14 PM    7    taken from offense 83.2.  The second sentence appears to be a
1:14 PM    8    legally correct statement.  Nudity is not required, and I also
1:14 PM    9    addressed that on the motion in limine.  Also Defendant
1:14 PM   10    acknowledged in the motion in limine briefing that nudity is
1:14 PM   11    not required.
1:14 PM   12         Finally, let's see.
1:14 PM   13         MR. KERR:  Excuse me, Your Honor.  I'm unclear on
1:14 PM   14    what they added.
1:14 PM   15         THE COURT:  Well, they did add -- let me go back.
1:14 PM   16    Okay.  It is -- I think they've added the paragraph that
1:14 PM   17    begins -- and maybe I'm wrong -- to decide -- where it says
1:15 PM   18    "factors you may consider include."  I think that --
1:15 PM   19         MR. KERR:  Thank you.
1:15 PM   20         THE COURT:  Let's see.  Or -- it was either that or
1:15 PM   21    maybe not every exposure is a lascivious exhibition.  I think
1:15 PM   22    that that was added as well.
1:15 PM   23         MR. REYNOLDS:  Your Honor, may I address that?
1:15 PM   24         THE COURT:  Yes, uh-huh.
1:15 PM   25         MR. REYNOLDS:  So from the language "to decide

1:15PM  1   whether" until the end of the instruction, this was really just
1:15PM  2   a copy and paste job from offense instruction 83.2.  They use
1:15PM  3   the same definitions.  They seem -- they use the same terms.
1:15PM  4   I'm not quite sure why, but some of those terms are defined in
1:15PM  5   83.2, but not 82.1, so we thought it was appropriate for them
1:15PM  6   to appear in both.  And then as Your Honor pointed out, we
1:15PM  7   included the correct statement about the law.
1:15PM  8           THE COURT:  Okay.
1:15PM  9           MR. REYNOLDS:  But everything else is a straight copy
1:15PM  10  and paste from the distribution instruction.
1:15PM  11          THE COURT:  Okay.  So let's go back now that I've
1:16PM  12  gone through everything.  There was one more thing that I
1:16PM  13  wanted to go through, and then we'll go back.
1:16PM  14          The Government also added a sentence:  "A visual
1:16PM  15  depiction need not have all these factors to be a lascivious
1:16PM  16  exhibition."  And that was also taken from -- excuse me.
1:16PM  17  Sorry.
1:16PM  18          COURTROOM DEPUTY:  Bless you.
1:16PM  19          THE COURT:  Thank you.  Offense 83.2.
1:16PM  20          So let's start at this beginning then.  I don't
1:16PM  21  think I have a problem with anything on the first page on the
1:16PM  22  modifications.  I'm sorry.  I have to sneeze again.
1:16PM  23          COURTROOM DEPUTY:  Bless you.
1:16PM  24          THE COURT:  Okay.  I don't have any problem with
1:16PM  25  anything on the first page.

| | | |
|---|---|---|
| 1:16 PM | 1 | Moving forward.  I don't think I have any |
| 1:16 PM | 2 | problem with anything on the second page, but it's the third |
| 1:16 PM | 3 | page here, and it's Mr. -- the language Mr. Kerr wishes to add, |
| 1:17 PM | 4 | and the Government is objecting to the inclusion of the |
| 1:17 PM | 5 | language.  So let's take it apart. |
| 1:17 PM | 6 | The first sentence is what exactly constitutes a |
| 1:17 PM | 7 | forbidden lascivious exhibition of the genitals or pubic area |
| 1:17 PM | 8 | and how that differs from an innocuous photograph of a naked |
| 1:17 PM | 9 | child, e.g., family photograph of a child taking a bath or an |
| 1:17 PM | 10 | artistic masterpiece portraying a naked child model is not |
| 1:17 PM | 11 | concrete. |
| 1:17 PM | 12 | Okay.  That is a quote from an Eleventh Circuit |
| 1:17 PM | 13 | case, and, I mean, the defense -- basically I think their |
| 1:17 PM | 14 | defense is that the photos don't rise to the level of |
| 1:17 PM | 15 | lascivious.  Isn't that in essence the defense? |
| 1:17 PM | 16 | **MR. KERR:**  Yes, Your Honor. |
| 1:18 PM | 17 | **THE COURT:**  As opposed to being art photos.  He's |
| 1:18 PM | 18 | saying it doesn't rise to that level. |
| 1:18 PM | 19 | So why do you object, Government, to that first |
| 1:18 PM | 20 | sentence, which is almost a direct verbatim quote from an |
| 1:18 PM | 21 | Eleventh Circuit case? |
| 1:18 PM | 22 | **MR. REYNOLDS:**  Your Honor, we certainly don't dispute |
| 1:18 PM | 23 | that it's a quotation from an Eleventh Circuit case.  What we |
| 1:18 PM | 24 | would say is this appears to be in the nature of commentary on |
| 1:18 PM | 25 | the law and not the kind of straightforward legal instruction |

1:18 PM    1    that is appropriate to give a jury.  And that is, it might be

1:18 PM    2    the case that what distinguishes illegal images from legal

1:18 PM    3    images is not concrete.  A Court, taking in, looking at all the

1:18 PM    4    factors, looking at the Dost test, looking at the different

1:18 PM    5    ways that Courts have approached this, may reasonably reach

1:18 PM    6    that conclusion.  I think instructing the jury that way is

1:18 PM    7    telling them that their burden is higher than it needs to be.

1:19 PM    8    I think this would be the equivalent of -- Your Honor could

1:19 PM    9    imagine if the Eleventh Circuit was ruling on a ERISA case or

1:19 PM   10    some kind of complex securities law case, it wouldn't be out of

1:19 PM   11    the ordinary for the Eleventh Circuit to make a comment along

1:19 PM   12    the lines of, "This area of law is highly complicated," but

1:19 PM   13    that wouldn't be appropriate to instruct the jury on, and I

1:19 PM   14    think instructing the jury on that would potentially mislead

1:19 PM   15    them as to what their burden is.

1:19 PM   16          I think what we would propose is that the Court

1:19 PM   17    instructs the jury on what the legal standards are.  The jury

1:19 PM   18    will determine whether it's met or whether it's not met.  They

1:19 PM   19    can make that determination on the basis of the facts.  I think

1:19 PM   20    providing them with commentary about the distinction between

1:19 PM   21    guilty and not guilty in this case is quote "not concrete" I

1:19 PM   22    think will confuse the jury and muddies the analysis.  I don't

1:19 PM   23    think when the Eleventh Circuit wrote this, they intended this

1:19 PM   24    to be copied and pasted to jury instructions.

1:19 PM   25          THE COURT:  I think it's okay to have that first

1:19PM   1   sentence in there.  So the first sentence is going to remain.

1:20PM   2   The second sentence, though, I'm not certain

1:20PM   3   about.  The second sentence says, "While the pictures needn't

1:20PM   4   always be dirty or even nude depictions to qualify, screening

1:20PM   5   materials through the eyes of the jury limits the potential

1:20PM   6   universe of objectionable images."  What's that all about,

1:20PM   7   Mr. Kerr?

1:20PM   8   MR. KERR:  Well, I believe that it's -- it indicates

1:20PM   9   that the jury in essence is judging whether or not under the

1:20PM   10  community standards here they consider this to be pornography,

1:20PM   11  and that the Court is making a reference to the fact that this

1:20PM   12  is a check on overzealous prosecution of pictures that should

1:20PM   13  not be prosecuted.  We have presented to a jury, and they make

1:21PM   14  the decision.

1:21PM   15  THE COURT:  I don't know about this language in here.

1:21PM   16  MR. REYNOLDS:  May I respond to that, Your Honor?

1:21PM   17  THE COURT:  Yes, uh-huh.

1:21PM   18  MR. REYNOLDS:  Thank you.  First of all, I just want

1:21PM   19  to say the concept of community standards is a concept that

1:21PM   20  arises from the obscenity case law.  It has absolutely no

1:21PM   21  application in the area of child pornography and this kind of

1:21PM   22  visual depiction of children being exploited.  Juries are not

1:21PM   23  permitted to consider community standards in making these

1:21PM   24  determinations.  What is illegal in Florida must be the same as

1:21PM   25  what is illegal in Hattiesburg, Mississippi or San Francisco.

1:21 PM   1   The law is absolutely clear on that.  So I think to the extent

1:21 PM   2   that this goes to that issue, it's not only misleading, but

1:21 PM   3   it's an incorrect statement of the law.

1:21 PM   4           THE COURT:  Yeah, I agree.  The second sentence is

1:21 PM   5   not staying in.

1:21 PM   6               So it will -- I will allow the first sentence to

1:21 PM   7   remain over the Government's objection.  The second sentence is

1:21 PM   8   going to be removed, the sentence that begins, "While the

1:22 PM   9   pictures needn't always be dirty," that sentence is going to be

1:22 PM  10   removed.

1:22 PM  11               I'm okay with the rest of it, I think, on that

1:22 PM  12   page.  I'm okay with the rest of it.  Anybody else wish to be

1:22 PM  13   heard on anything that you haven't already raised?  Okay.

1:22 PM  14           MR. KERR:  Your Honor --

1:22 PM  15           THE COURT:  Yes.

1:22 PM  16           MR. KERR:  -- just on this instruction, if I'm

1:22 PM  17   following things correctly, which is always a question, the

1:22 PM  18   Dost factors were added in, and they are not in the pattern

1:22 PM  19   jury instructions.

1:22 PM  20           THE COURT:  Oh, gosh let me see.  Okay.

1:22 PM  21           MR. REYNOLDS:  Yes, Your Honor.  This is what I was

1:22 PM  22   referring when I was talking about the cut and paste job.

1:22 PM  23           THE COURT:  Okay.  That's the paragraph that they

1:22 PM  24   added.  They were taken from offense 83.2, right?  Maybe not.

1:23 PM  25           MR. REYNOLDS:  Yes, Your Honor.

1:23PM  1          **THE COURT:**  Yeah, 83.2.  That's what I thought, yeah.

1:23PM  2  So they were modified, but it is from offense 83.2.

1:23PM  3          **MR. REYNOLDS:**  Correct.

1:23PM  4          **THE COURT:**  I think it's okay here.

1:23PM  5          **MR. REYNOLDS:**  And the -- just for the sake of the

1:23PM  6  record, the Dost factors apply to the phrase "lascivious

1:23PM  7  exhibition" which is equally applicable to both facets.

1:23PM  8          **THE COURT:**  It's to decide whether a visual depiction

1:23PM  9  is a lascivious exhibition, so I think it's okay to leave it in

1:23PM 10  there.

1:23PM 11          All right.  Let's move forward.  So we're now on

1:23PM 12  jury instruction number 18.  It's been modified to reflect the

1:23PM 13  offenses charged is the object of a conspiracy, and that it's

1:23PM 14  not been charged as a substantive offense.  Government modified

1:23PM 15  this language to cover additional jurisdictional basis for the

1:23PM 16  offense that appear in 18 United States Code, Section

1:24PM 17  2252(a)(2) and in the Indictment, but are not in the pattern

1:24PM 18  jury instruction.  So that's why there's a modification there.

1:24PM 19  The language modified to reflect that there were elements of

1:24PM 20  the substantive offense underlying the conspiracy, the

1:24PM 21  conspiracy charges elements.  So they've added a couple of

1:24PM 22  sentences in there.  I think it's fine under the circumstances

1:24PM 23  the way this was charged so far.

1:24PM 24          Let's move forward then.  On page at least 27 of

1:24PM 25  my version, Mr. Kerr wants the same language from the Williams

| | | |
|---|---|---|
| 1:24 PM | 1 | case that he also wanted it included in the previous |
| 1:24 PM | 2 | instruction.  The Government objects to this language.  I |
| 1:25 PM | 3 | don't -- I could probably -- you know, I would leave in the |
| 1:25 PM | 4 | first sentence of that paragraph where it begins, "What exactly |
| 1:25 PM | 5 | constitutes a forbidden lascivious exhibition," et cetera, and |
| 1:25 PM | 6 | I would take out, "while the pictures needn't always be dirty |
| 1:25 PM | 7 | or even nude."  So I would do here exactly what I did on the |
| 1:25 PM | 8 | other one, all right? |
| 1:25 PM | 9 | Then moving forward, the Government added a sentence. |
| 1:25 PM | 10 | "Visual depictions do not need to be nude depictions to qualify |
| 1:25 PM | 11 | as lascivious exhibition of the genitals or pubic area of any |
| 1:25 PM | 12 | person."  It's legally correct, so I don't have a problem with |
| 1:25 PM | 13 | that coming in there. |
| 1:25 PM | 14 | That's basically it.  I would treat this just as I |
| 1:25 PM | 15 | did the other one.  I'm fine with the changes the Government |
| 1:25 PM | 16 | proposes on page 27.  I'm fine with the first sentence of the |
| 1:26 PM | 17 | paragraph that Mr. Kerr wants.  I would delete the second |
| 1:26 PM | 18 | sentence just as I did in the other instruction. |
| 1:26 PM | 19 | Anything else that anybody wishes to say with respect |
| 1:26 PM | 20 | to that?  Okay. |
| 1:26 PM | 21 | **MR. REYNOLDS:**  Not from us, Your Honor. |
| 1:26 PM | 22 | **THE COURT:**  Okay.  Then moving forward, let's see. |
| 1:26 PM | 23 | We've got jury instruction number 19, note taking.  So that's |
| 1:26 PM | 24 | special 5. |
| 1:26 PM | 25 | Instruction number 20, basic 11, duty to |

| | | |
|---|---|---|
| 1:26PM | 1 | deliberate. |
| 1:26PM | 2 | Instruction 21, basic 12 verdict. |
| 1:26PM | 3 | Now, let's turn to -- and then we'll go back to |
| 1:26PM | 4 | see if anything on the verdict form. |
| 1:26PM | 5 | We've got now Mr. Kerr's instruction that |
| 1:26PM | 6 | proposes child erotica.  So why don't you tell me about that, |
| 1:26PM | 7 | Mr. Kerr?  Why you would like this jury instruction in there? |
| 1:26PM | 8 | MR. KERR:  The -- you know, I intend to argue that |
| 1:27PM | 9 | the case agent -- or not the case agent, the undercover agent |
| 1:27PM | 10 | who started -- launched this whole investigation referred to |
| 1:27PM | 11 | this, like, 29 times in her reports as commercial child |
| 1:27PM | 12 | erotica.  The Eleventh Circuit cases, you can't find a |
| 1:27PM | 13 | reference to child erotica in the Eleventh Circuit that doesn't |
| 1:27PM | 14 | use that to distinguish legal pictures of children from |
| 1:27PM | 15 | unlawful child pornography.  So essentially what she said 29 |
| 1:27PM | 16 | times, and I think that the jury should be allowed to hear that |
| 1:27PM | 17 | the agent reported that this was legal material 29 times. |
| 1:27PM | 18 | That's what that terms means.  And the Government's well aware |
| 1:27PM | 19 | that that term does mean legal material and distinguishes legal |
| 1:27PM | 20 | material from unlawful material, and that's -- you know, I'm |
| 1:27PM | 21 | trying to do the best I can here to defend Mr. Velinov, and I |
| 1:28PM | 22 | think it's important that the jury at least be able to |
| 1:28PM | 23 | understand that that one single point, that that reference |
| 1:28PM | 24 | means -- now they're free to argue that that agent is not a |
| 1:28PM | 25 | lawyer.  She's not the one making a decision in this case. |

1:28PM   1   She's reporting her early impression of her initial undercover

1:28PM   2   purchase or whatever they want to say, but I -- I think that

1:28PM   3   the jury should at least -- it should be clear to them, that

1:28PM   4   that reference, that term, that phrase means lawful pictures.

1:28PM   5          And I just -- you know, the Government has

1:28PM   6   resisted me in trying to just get this in in other ways, but I

1:28PM   7   do think that the testimony was given, and it's -- it is an

1:28PM   8   important point that I want to make in his defense.

1:28PM   9          THE COURT:  All right.  So let me ask the Government.

1:28PM  10   There were references in the trial to child erotica.  Is there

1:29PM  11   some kind of language that you could agree to so that the jury

1:29PM  12   understands the difference between child erotica and child

1:29PM  13   pornography?

1:29PM  14          MR. REYNOLDS:  Yes, Your Honor.  It is exactly the

1:29PM  15   language that is contained within the pattern jury instructions

1:29PM  16   and that the parties have already agreed to in instructions

1:29PM  17   82.1, and 83.2, which lays out the distinction between what

1:29PM  18   meets the legal standard and what does not meet the legal

1:29PM  19   standard.  That is the only determination that the jury is

1:29PM  20   being asked in this case.

1:29PM  21          The term child erotica is not a legal term.  It

1:29PM  22   is not defined in Chapter 110 of the United States Code.  It is

1:29PM  23   a conceptual term that is sometimes useful for discussing

1:29PM  24   sexual images of children that do not meet the standards that

1:29PM  25   are set forth in these -- in these jury instructions, but the

| | |
|---|---|
| 1:29PM | 1 |
| 1:30PM | 2 |
| 1:30PM | 3 |
| 1:30PM | 4 |
| 1:30PM | 5 |
| 1:30PM | 6 |
| 1:30PM | 7 |
| 1:30PM | 8 |
| 1:30PM | 9 |
| 1:30PM | 10 |
| 1:30PM | 11 |
| 1:30PM | 12 |
| 1:30PM | 13 |
| 1:30PM | 14 |
| 1:30PM | 15 |
| 1:30PM | 16 |
| 1:30PM | 17 |
| 1:31PM | 18 |
| 1:31PM | 19 |
| 1:31PM | 20 |
| 1:31PM | 21 |
| 1:31PM | 22 |
| 1:31PM | 23 |
| 1:31PM | 24 |
| 1:31PM | 25 |

jury instructions articulate the difference between what is legal and what is not legal.

From our position, it's not appropriate to instruct the jury on different categories of things that don't meet the legal instructions, number 1. Number 2, is it's inappropriate to ask witnesses to provide legal conclusions during the course of the trial. During this trial, Your Honor has repeatedly sustained objections to trying to ask witnesses to opine on the legal status of the material. It is only the jury's province to make. This instruction is ensuring that in the jury instructions.

Special Agent -- to argue to the jury that Special Agent Boos made a determination that this is the legal or illegal, it's first entirely irrelevant, and 2, absolutely false. And I think this goes beyond allowing us to argue that, "Oh, you know, she -- maybe it was in a report. Maybe she's not a lawyer." I think it's misleading and prejudicial to argue falsely that an agent who is not a lawyer and did not make legal determinations has described -- has used some term that is being misconstrued to suggest that she determined that this was not lawful. This is not a legal definition. The Court presides over child pornography cases every day. This is not an exotic charge. If this were necessary, it would be in the pattern instructions. I've never seen an instruction on this in any circuit, and I would say it's for precisely this

1:31PM   1   reason.  It's not a legal concept.  It's inappropriate, Your

1:31PM   2   Honor.

1:31PM   3          THE COURT:  All right.  So there isn't anything that

1:31PM   4   you would agree to or that you could come up with other than

1:31PM   5   what you've already described, what's in offense 82.1, 82.2?

1:31PM   6          MR. REYNOLDS:  I think we would be willing to say

1:31PM   7   that -- I think that we would be willing to say that --

1:31PM   8   looking, for example, on page 22 of the document that the Court

1:31PM   9   handed out.

1:31PM  10          THE COURT:  Uh-huh.

1:32PM  11          MR. REYNOLDS:  The term sexually explicit conduct is

1:32PM  12   defined in certain categories that straddle those lines.  I

1:32PM  13   think we'd be willing to agree to -- to the idea that an image

1:32PM  14   of a child that is sexually suggestive but does not otherwise

1:32PM  15   meet this definition is it not illegal.  I don't think it's

1:32PM  16   necessary, because I think the Court's instructions make that

1:32PM  17   absolutely clear, but if Your Honor is inclined to putting

1:32PM  18   something in there, I think that would be okay with the

1:32PM  19   Government.  I think putting in a separate instruction that

1:32PM  20   defines a category that I would say is ill defined by the law,

1:32PM  21   is not defined by statute, is not the solution in this

1:32PM  22   situation.

1:32PM  23          THE COURT:  Mr. Kerr, let me do this.  Why don't you

1:32PM  24   take a few minutes to see if you can come up with something.

1:32PM  25   If you can't, that's fine.  Just -- then I'll come in and make

1:32 PM 1    a decision on this.  Just see if you can come up with something

1:32 PM 2    that's satisfactory to both sides.  Okay.  But if you'd like to

1:33 PM 3    say something now, that's fine.

1:33 PM 4             MR. KERR:  Just one quick point, is that if I think

1:33 PM 5    if you would search the term "child erotica" in all the

1:33 PM 6    Eleventh Circuit cases, any other circuit will find that it is

1:33 PM 7    employed in decisions to make a distinction between legal

1:33 PM 8    pictures of children and unlawful pictures, and usually it's

1:33 PM 9    a -- usually from what I've found, what my research is, a

1:33 PM 10   defendant who's claimed that they didn't get a fair trial

1:33 PM 11   because the Government was allowed to introduce some child

1:33 PM 12   erotica found on their computer along with child pornography,

1:33 PM 13   and, of course, they lose their appeal on that, but the Court

1:33 PM 14   is making a distinction that, yeah, that doesn't matter, but

1:33 PM 15   we're not -- those are two different things.

1:33 PM 16            THE COURT:  Okay.  I'm inclined to think that it

1:33 PM 17   should not being in some instruction.  Maybe something could be

1:33 PM 18   added at page 22.  Obviously, Mr. Kerr, you would preserve your

1:34 PM 19   rights here, that you wanted some separate instruction, what

1:34 PM 20   you've given me, and I've read that into the record, but I

1:34 PM 21   don't think it's appropriate to get its own instruction, but

1:34 PM 22   maybe a sentence clarifying or giving additional information

1:34 PM 23   around page 22 saying that sometimes people say child erotica

1:34 PM 24   to refer to legal but sexually suggestive images.  I don't

1:34 PM 25   know.  I'm just throwing that out there.  I'd like you two to

1:34 PM  1    sit down for a few minutes or the three of you to sit down for

1:34 PM  2    a few minutes and see if you can come up with something that is

1:34 PM  3    satisfactory, even though it is not what Mr. Kerr has asked me

1:34 PM  4    to do, just to see if we can come up with a compromise here.

1:34 PM  5            All right.  So -- it -- I mean, it's -- the jury

1:34 PM  6    has heard the term child erotica.  They have heard it.  So I

1:35 PM  7    understand Mr. Velinov's defense here.  You know, in essence,

1:35 PM  8    the -- the Government didn't think it was illegal for a few

1:35 PM  9    years there.  I mean, I don't know.  It sounds to me like

1:35 PM  10   that's what you've been saying there --

1:35 PM  11           **MR. KERR:**  Yes, Your Honor.

1:35 PM  12           **THE COURT:**  -- Mr. Kerr.

1:35 PM  13           **MR. KERR:**  Yeah.  We want to investigate this, but

1:35 PM  14   they're calling it commercial child erotica, so commercial

1:35 PM  15   legal pictures.  We're taking a look.  We're downloading it and

1:35 PM  16   we're going to investigate it.  That can be explained away --

1:35 PM  17   the -- Mr. Reynolds has just demonstrated all of the different

1:35 PM  18   things that they can say to rebut that -- you know, that point,

1:35 PM  19   and they're obviously free to -- you know, they get the last

1:35 PM  20   shot at the jury, so I take the risk when I bring it up in

1:36 PM  21   closing, but I think they should know that that term -- they

1:36 PM  22   can discount it as much as they want to, but that term means

1:36 PM  23   what it means.  The instructions are full of things where the

1:36 PM  24   Court is explaining to the jury what terms mean.

1:36 PM  25           **THE COURT:**  Why don't you try to see if you can come

| | |
|---|---|
| 1:36 PM | 1 |
| 1:36 PM | 2 |
| 1:36 PM | 3 |
| 1:36 PM | 4 |
| | 5 |
| 1:44 PM | 6 |
| 1:44 PM | 7 |
| 1:44 PM | 8 |
| 1:44 PM | 9 |
| 1:44 PM | 10 |
| 1:44 PM | 11 |
| 1:44 PM | 12 |
| 1:44 PM | 13 |
| 1:44 PM | 14 |
| 1:44 PM | 15 |
| 1:45 PM | 16 |
| 1:45 PM | 17 |
| 1:45 PM | 18 |
| 1:45 PM | 19 |
| 1:45 PM | 20 |
| 1:45 PM | 21 |
| 1:45 PM | 22 |
| 1:45 PM | 23 |
| 1:45 PM | 24 |
| 1:45 PM | 25 |

up with something, all right?  Just take a few minutes.  We'll
go off the record.  We'll take a recess.  See if you can come
up with something.  So I'm just going to stay up here.  You let
me know when you've spent enough time on it.

          (Recess from 1:36 p.m. to 1:44 p.m.)

          THE COURT:  All right.  We're back on the record.
Mr. Kerr and Mr. Reynolds, did you have the opportunity to
discuss the issue with respect to adding some language to the
jury instruction that's on page 22?  I've already denied
Mr. Kerr's request to have it a separate instruction and to
include the language that I read earlier during this hearing.
I don't think that's appropriate or necessary, but I'm now
considering whether we could add something.

          MR. REYNOLDS:  Yes, Your Honor.  Mr. Kerr made clear
to us that he preserves his objections.  He wants to make sure
that that's preserved for the record.

          THE COURT:  It is.

          MR. REYNOLDS:  Which Your Honor has already done so.
What we're proposing and I believe Mr. Kerr would agree to
is -- let me make sure I've got the right one.  After the
definition of sexually explicit conduct --

          THE COURT:  Okay.  Hold on.  Okay.  Right.  After the
definition, goes on page 22, and it finishes there on page 23,
and the next paragraph begins, "What exactly constitutes a
forbidden lascivious exhibition?"

| | |
|---|---|
| 1:45 PM | 1 |

          **MR. REYNOLDS:**  Yes.  Immediately before "what exactly
constitutes" --

          **THE COURT:**  Yes.

          **MR. REYNOLDS:**  We propose the following language:

          "Sexually explicit conduct requires more than
images of children that are sexually suggestive.  Images and
videos must include depictions that otherwise meet this
definition of sexually explicit conduct to qualify as sexually
explicit conduct."  What the Government would submit, Your
Honor, is this captures what Mr. Kerr is trying to convey to
the jury, which it is true and it is the law, that not every
sexual image of a child is illegal, and that in order to be
illegal, it's not just that it has to be sexual, but it has to
meet this definition of sexually explicit conduct as Your Honor
has put in the jury instructions.

          And, of course, we would agree to the insertion
of this -- of this sentence in both offense instruction 17 and
18, where I think it equally applies.

          **THE COURT:**  Okay.  Give me a second to make certain
I've got everything.  Okay.  Let's see if we've got this.

          So this would go after where it says D and E,
right, on the top of page 23?  And before "what exactly
constitutes a forbidden lascivious exhibition," et cetera.  And
it would read -- hopefully I've gotten this down.  "Sexually
explicit conduct requires more than images of children that are

1:49PM  1   sexually suggestive.  Images and videos must include depictions
1:49PM  2   that otherwise meet this definition of sexually explicit
1:49PM  3   conduct to qualify as special -- I'm sorry, to qualify as
1:49PM  4   sexually explicit conduct."  Am I missing a word, or is that
1:49PM  5   it?
1:49PM  6           MR. REYNOLDS:  No, sexually explicit conduct.  That's
1:49PM  7   what we talked about.
1:49PM  8           THE COURT:  All right.  Mr. Kerr?
1:49PM  9           MR. KERR:  That's fine, Your Honor.  I just noticed
1:49PM  10  in looking at this that -- this is a minor thing, but in the
1:49PM  11  other offense instruction, the -- the statute provisions just
1:49PM  12  have dots.  They don't have A, B, C, D, E.  They might as well
1:49PM  13  match.
1:49PM  14          THE COURT:  Okay.  Let's see.
1:50PM  15          MR. KERR:  So where you pointed out E, lower case E,
1:50PM  16  lascivious exhibition, and then this insert goes, on the first
1:50PM  17  instruction when I look at the next instruction in the same
1:50PM  18  spot, the -- those little --
1:50PM  19          THE COURT:  Let me find that.
1:50PM  20          MR. KERR:  There aren't letters for the
1:50PM  21  subparagraphs.
1:50PM  22          THE COURT:  No problem.  Let's see.
1:50PM  23          MR. KERR:  Page 27 -- wait, no.  Excuse me, 26.  The
1:50PM  24  term sexually explicit conduct at the bottom of 26 means actual
1:50PM  25  or simulated, and it should be A, B, C --

1:50 PM   1          THE COURT:  Oh, yeah.  I see that.  It's dots as

1:50 PM   2   opposed to -- you're right.  All right.  So we can put dots

1:50 PM   3   on -- either dots.  I don't know.  One has dots and one has A,

1:50 PM   4   B, C, D, and E.  We'll be consistent on both.

1:51 PM   5          MR. KERR:  At least the record will show we're

1:51 PM   6   reading this stuff.

1:51 PM   7          THE COURT:  All right.  So the phrase child erotica

1:51 PM   8   is not going to be mentioned then?  You couldn't -- I mean,

1:51 PM   9   that was --

1:51 PM  10          MR. KERR:  We can't agree on that, and I'll just

1:51 PM  11   preserve my objection.  I mean, as an instruction, it's not

1:51 PM  12   going to be mentioned.

1:51 PM  13          THE COURT:  Well, that was your whole concern there,

1:51 PM  14   Mr. Kerr.

1:51 PM  15          MR. KERR:  Right.  I mean, I'll argue what I can

1:51 PM  16   argue in closing, but, you know, I'll just have to preserve my

1:51 PM  17   objection.  I would have preferred to have it in there

1:51 PM  18   somewhere, that term.

1:51 PM  19          THE COURT:  Well, something.

1:51 PM  20          MR. KERR:  But I -- they won't agree to it.  Just a

1:51 PM  21   reference to child erotica does not meet this definition,

1:52 PM  22   something like that.

1:52 PM  23          THE COURT:  Are you saying -- so this language on

1:52 PM  24   both -- on both jury instructions, this additional language you

1:52 PM  25   folks came up with --

1:52PM  1        **MR. KERR:**  I'm not opposing it, and --

1:52PM  2        **THE COURT:**  No, I understand.  It's your fallback.

1:52PM  3   What you want is what you gave me.

1:52PM  4        **MR. KERR:**  Right.

1:52PM  5        **THE COURT:**  I was just hoping that you could come up

1:52PM  6   with something a little bit more here.  I don't know.  I'll

1:52PM  7   have to quite frankly think about it some more.

1:52PM  8        **MR. KERR:**  Unless we put a line at the end of what

1:52PM  9   Mr. Reynolds has written that just says, "Child erotica is

1:52PM  10  material that does not meet the definition of sexually explicit

1:52PM  11  conduct," something like that, one line at the end of it.

1:52PM  12       **MR. REYNOLDS:**  Your Honor, may I just make a comment

1:52PM  13  on that?

1:52PM  14       **THE COURT:**  How about something like this?  "Merely

1:53PM  15  sexually suggestive images of children are sometimes referred

1:53PM  16  to as child erotica."

1:53PM  17       **MR. KERR:**  That would be acceptable to us.

1:53PM  18       **THE COURT:**  What would be wrong with that?  Add it

1:53PM  19  after the sentence that ends sexually suggestive.

1:53PM  20       **MR. REYNOLDS:**  Your Honor, part of our concern here

1:53PM  21  is that it's not necessarily the language of the -- what we

1:53PM  22  propose to the Court is the definition of child erotica.  This

1:53PM  23  is what Courts are talking about when they use the term child

1:53PM  24  erotica.  So to the extent that there's content of this word

1:53PM  25  that Mr. Kerr believes should be conveyed to the jury, it is

| | | |
|---|---|---|
| 1:53 PM | 1 | fully and completely conveyed by the language we just proposed. |
| 1:53 PM | 2 | Our concern with this, which is our concern as |
| 1:53 PM | 3 | we repeatedly made clear to Your Honor during this trial, is |
| 1:53 PM | 4 | it's not appropriate to try to turn a lay witness into |
| 1:54 PM | 5 | providing a legal conclusion as to the character of the |
| 1:54 PM | 6 | materials.  It's the jury's determination and the jury's only. |
| 1:54 PM | 7 | And I fear based on what's happened both on and off the record |
| 1:54 PM | 8 | that Mr. Velinov's insistence on including the term child |
| 1:54 PM | 9 | erotica is exactly for this improper prohibited purpose, to |
| 1:54 PM | 10 | argue that a digital analyst with the Department of Justice has |
| 1:54 PM | 11 | somehow -- who has no law degree, who is not a judge, has |
| 1:54 PM | 12 | somehow made a pronouncement on the legal status of materials. |
| 1:54 PM | 13 | By the way, without foundation as to what her training and |
| 1:54 PM | 14 | experience is with regard to the law, without foundation as to |
| 1:54 PM | 15 | whether she'd ever been asked to do so, without foundation as |
| 1:54 PM | 16 | to exactly what she meant by child erotica.  None of that is in |
| 1:54 PM | 17 | the record, and we are acting out of an abundance of caution |
| 1:54 PM | 18 | that the defense will argue to the jury that the Department of |
| 1:54 PM | 19 | Justice has made some kind of determination that this is not |
| 1:55 PM | 20 | illegal.  That's just not true.  There's not an evidentiary |
| 1:55 PM | 21 | basis, and our resistance to the inclusion of the term child |
| 1:55 PM | 22 | erotica is we are trying to prevent this from being used for an |
| 1:55 PM | 23 | improper purpose before the jury, which appears to be what is |
| 1:55 PM | 24 | happening. |
| 1:55 PM | 25 | THE COURT:  Can't you shut that down in your closing |

1:55PM   1   arguments?

1:55PM   2                 MR. REYNOLDS:  Your Honor --

1:55PM   3                 THE COURT:  Can't you address that?

1:55PM   4                 MR. REYNOLDS:  Your Honor, if -- if we thought that

1:55PM   5   Mr. Kerr was going to be allowed to argue to the jury that

1:55PM   6   Special Agent Boos had made a legal determination, we would

1:55PM   7   have laid a foundation about her background, that she is not

1:55PM   8   the person within the department -- she's not the Attorney

1:55PM   9   General.  She's not a lawyer supervisor.  She's not a person

1:55PM  10   within the Department of Justice who makes these

1:55PM  11   determinations.  We didn't feel like we needed to make that --

1:55PM  12   to lay that foundation because it's improper to try to elicit a

1:55PM  13   legal conclusion from a lay witness, from a low ranking

1:56PM  14   Department of Justice employee and then argue that that

1:56PM  15   supposed legal determination is binding on the United States

1:56PM  16   Government.  If we had known that that would happen, we would

1:56PM  17   have handled that differently, but I feel like this is getting

1:56PM  18   into the weeds and confusing the jury about exactly what

1:56PM  19   Special Agent Boos' authority was within the Department of

1:56PM  20   Justice on the basis of one thing she said and then copied and

1:56PM  21   pasted in a status report.

1:56PM  22                 THE COURT:  I hear what you're saying.  On the other

1:56PM  23   hand, you know, it's my job here to be fair to both sides, and

1:56PM  24   I think that I've got to have something there with the -- some

1:56PM  25   kind of --

1:56PM 1          **MR. KERR:**  Your Honor, I was an agent for 26 years.

1:56PM 2   I can't tell you how many times my mistakes were thrown in my

1:56PM 3   face.  If I called something the wrong thing, it was used in

1:56PM 4   many trials against me.

1:56PM 5          **THE COURT:**  What agency were you with?

1:56PM 6          **MR. KERR:**  FBI.

1:56PM 7          **THE COURT:**  Oh, you were an FBI agent?

1:57PM 8          **MR. KERR:**  Yes.

1:57PM 9          **THE COURT:**  If I knew it, I forgot that.  So anyway,

1:57PM 10  well, you know, look.  I think -- I think it's okay to have

1:57PM 11  somewhere in there a definition of it.  I know that's not what

1:57PM 12  you want, Mr. Reynolds.  I'm going to add the sentence in

1:57PM 13  there.  I don't think it's fair to not have that in there.  In

1:57PM 14  other words, to be fair, I have to include that sentence in

1:57PM 15  there.  I think that's all there is to it.

1:57PM 16          So I'm going to go ahead and put something along

1:57PM 17  the lines of, "Merely sexually suggestive images of children

1:57PM 18  are sometimes referred to as child erotica," and I would put it

1:57PM 19  after the sentence that ends "sexually suggestive."  I just

1:57PM 20  think that's fair.  I think to not have it in there, it's not

1:58PM 21  fair to Mr. Velinov, and it's my job to try to ensure that the

1:58PM 22  jury instructions are fair to his defense.  That's what I'm

1:58PM 23  going to do.  If you want to take what -- probably won't take

1:58PM 24  us very long to come up with another draft of this.  If you

1:58PM 25  want to -- I think we should probably wait, look at it, in case

| | | |
|---|---|---|
| 1:58PM | 1 | there's another mistake -- or a mistake.  I shouldn't say |
| 1:58PM | 2 | another mistake.  In case there's a mistake, we can catch it, |
| 1:58PM | 3 | and we're not scrambling at 9:00 on Monday morning.  Are you |
| 1:58PM | 4 | okay hanging out a little bit longer then?  I don't think it'll |
| 1:58PM | 5 | take more than 15 or 20 minutes at most.  All right.  So let's |
| 1:58PM | 6 | go off the record and in recess. |
| | 7 | (Recess from 1:58 p.m. to 2:08 p.m.) |
| 2:08PM | 8 | THE COURT:  All right.  We are on the record, and |
| 2:08PM | 9 | this is a draft, again, of the revised jury instructions that |
| 2:09PM | 10 | you're being handed, that are being handed out to you.  I'm |
| 2:09PM | 11 | going to look at them too as you go through them and focus on |
| 2:09PM | 12 | the ones that we made substantive changes to, and let me know |
| 2:09PM | 13 | if you see anything that you have not already preserved or |
| 2:09PM | 14 | anything that you know -- that you wished to call to my |
| 2:09PM | 15 | attention.  Any issues, this is your opportunity. |
| 2:17PM | 16 | MS. VALDES:  Your Honor, may I be briefly excused to |
| 2:17PM | 17 | use the restroom? |
| 2:17PM | 18 | THE COURT:  Sure.  And then whenever you're ready, |
| 2:17PM | 19 | everybody should let me know. |
| 2:17PM | 20 | MS. VALDES:  Thank you, Your Honor. |
| 2:17PM | 21 | (Pause.) |
| 2:20PM | 22 | THE COURT:  All right.  We're back on the record |
| 2:20PM | 23 | then.  I had handed out the instructions, and I'll begin. |
| 2:20PM | 24 | Mr. Reynolds, did you have any changes or corrections? |
| 2:20PM | 25 | MR. REYNOLDS:  Your Honor, we have one suggestion. |

2:21PM   1          THE COURT:  Okay.

2:21PM   2          MR. REYNOLDS:  It's for clarity and not substance.

2:21PM   3          THE COURT:  Okay.

2:21PM   4          MR. REYNOLDS:  In the new paragraph on the top of

2:21PM   5   page 20 that we just discussed that contains the term child

2:21PM   6   pornography -- excuse me, child erotica, the second sentence

2:21PM   7   reads, "Merely suggestive images of children are sometimes

2:21PM   8   referred to as child erotica," and the third sentence reads,

2:21PM   9   "Images and videos must include depictions that otherwise meet

2:21PM  10   this definition of sexually explicit conduct."  The phrase this

2:21PM  11   definition is supposed to refer to comes at the bottom of page

2:21PM  12   19, but because a definition now comes in the previous

2:21PM  13   sentence, I think it's a little bit confusing.

2:21PM  14          THE COURT:  Yeah.

2:21PM  15          MR. REYNOLDS:  Our proposed solution is to take the

2:21PM  16   third sentence, strike out the word otherwise and just make

2:21PM  17   that the first sentence in that paragraph.  I'll let Mr. Kerr

2:21PM  18   speak for himself, but I ran it by him, and he seemed to

2:21PM  19   express agreement.

2:22PM  20          THE COURT:  Okay.  Mr. Kerr?

2:22PM  21          MR. KERR:  Yes, Your Honor, that makes sense to us.

2:22PM  22          THE COURT:  All right.  We can -- we can do that

2:22PM  23   then.

2:22PM  24              Okay.  Anything else?

2:22PM  25          MR. REYNOLDS:  Your Honor, just the conforming

| | | |
|---|---|---|
| 2:22 PM | 1 | changes in the following instruction to this. |
| 2:22 PM | 2 | THE COURT:  Okay.  Then the verdict form, did you |
| 2:22 PM | 3 | take a look at the verdict form?  Any changes on that?  And |
| 2:22 PM | 4 | this is pretty standard quite frankly. |
| 2:22 PM | 5 | MR. REYNOLDS:  Not from the Government, Your Honor. |
| 2:23 PM | 6 | THE COURT:  I wouldn't think so. |
| 2:23 PM | 7 | MR. KERR:  None from the defense. |
| 2:23 PM | 8 | THE COURT:  Okay.  So what we'll do is we will a make |
| 2:23 PM | 9 | that change.  I think that's a good suggestion there, |
| 2:23 PM | 10 | Mr. Reynolds, and we'll have copies on Monday morning for |
| 2:23 PM | 11 | everybody.  You're free to use the jury instructions in your |
| 2:23 PM | 12 | closing arguments.  You're free to use the verdict form in your |
| 2:23 PM | 13 | closing arguments.  I mean, they tend to do that much more in |
| 2:23 PM | 14 | civil cases where they'll write in the number of the damages. |
| 2:23 PM | 15 | So they love to do that.  They'll put like $1 million or |
| 2:23 PM | 16 | whatever damages they're seeking in their civil case.  So -- |
| 2:23 PM | 17 | but anyway, you're free to use that all you want.  You're free |
| 2:23 PM | 18 | to use any exhibit that has been received into evidence.  You |
| 2:23 PM | 19 | are free to display it.  You don't need to ask me or talk to me |
| 2:23 PM | 20 | about it.  Since it's closing argument, I don't have a problem |
| 2:23 PM | 21 | with any -- with any of that. |
| 2:23 PM | 22 | I mean, I'll tell you what.  I would give you up |
| 2:24 PM | 23 | to 45 minutes.  I don't think either of you is going to take 45 |
| 2:24 PM | 24 | minutes, but I will give you up to 45 minutes for closing |
| 2:24 PM | 25 | argument. |

| | | |
|---|---|---|
| 2:24 PM | 1 | I will allow you to reserve, Mr. Reynolds, up to |
| 2:24 PM | 2 | 15 minutes, if you'll be making -- who will be making the |
| 2:24 PM | 3 | closing argument?  You will be? |
| 2:24 PM | 4 | MR. REYNOLDS:  I will, Your Honor. |
| 2:24 PM | 5 | THE COURT:  Okay.  I will allow you to reserve up to |
| 2:24 PM | 6 | 15 minutes for a rebuttal closing argument.  So you have in |
| 2:24 PM | 7 | total 45 minutes, and out of that 45 minutes, you can reserve |
| 2:24 PM | 8 | up to 15 minutes. |
| 2:24 PM | 9 | If you're like a lot of us, you start talking |
| 2:24 PM | 10 | and don't realize how much time has passed and you use 32 |
| 2:24 PM | 11 | minutes, then you won't have the full 15 minutes for your |
| 2:24 PM | 12 | rebuttal closing argument.  It will be taken from that, okay? |
| 2:24 PM | 13 | So if you just use 30 minutes, then you'll have 15 minutes. |
| 2:24 PM | 14 | But if you use 31 minutes, you know, you'll have 14 minutes and |
| 2:24 PM | 15 | so on.  I've had some people that have -- even though we stand |
| 2:25 PM | 16 | up and try to tell them they use up their entire time and, you |
| 2:25 PM | 17 | know, have 30 seconds left for rebuttal closing argument. |
| 2:25 PM | 18 | MR. REYNOLDS:  Thanks for that clarification.  Do I |
| 2:25 PM | 19 | need to specify how many I'm reserving? |
| 2:25 PM | 20 | THE COURT:  You'll get 15 minutes.  Magaly will let |
| 2:25 PM | 21 | you know when you have 5 minutes left from the first 30 |
| 2:25 PM | 22 | minutes.  After that, you'll just have to judge yourself.  If |
| 2:25 PM | 23 | you use more than 5 minutes, it'll be deducted from the 15. |
| 2:25 PM | 24 | MR. REYNOLDS:  Understood.  Thank you. |
| 2:25 PM | 25 | THE COURT:  Is that okay?  Is that okay time?  Do you |

2:25PM   1   feel you need an hour?  Because I -- you know, if you feel you

2:25PM   2   needed an hour, I could -- you know, for -- usually I give

2:25PM   3   people what they want on closing arguments.  So I would give

2:25PM   4   you an hour and same thing, probably let you reserve 15 or 20

2:25PM   5   minutes for -- maybe 20 minutes for a rebuttal.

2:25PM   6            MR. REYNOLDS:  Your Honor, we'd ask for an hour.

2:25PM   7            THE COURT:  Okay.  I'll give you up to an hour then

2:25PM   8   and let you reserve up to 20 minutes.  So whatever you don't

2:26PM   9   use up to 20 minutes, you'll have for rebuttal closing

2:26PM  10   argument.

2:26PM  11            MR. REYNOLDS:  Great.  Thank you.

2:26PM  12            THE COURT:  And, Mr. Kerr, you'll have 20 -- I'm

2:26PM  13   sorry, you'll have an hour.  I almost gave you 20 minutes

2:26PM  14   there.  You'll have an hour for your closing argument with

2:26PM  15   obviously no rebuttal.

2:26PM  16            So let's see.  One hour.  Two hours.  I know you

2:26PM  17   won't take the full time.  It'll take me under an hour to read

2:26PM  18   the jury instructions.  So my goal is to give it to them by

2:26PM  19   noon.  I've asked for lunch to come in around 11:30, and

2:26PM  20   they're getting a cold lunch.  They're getting either

2:26PM  21   sandwiches or salad so that it can be delivered at 11:30.

2:26PM  22            The two alternates will be just excused then,

2:26PM  23   but I'll let them take their lunch.  There will be lunch for

2:26PM  24   them.  So just so you know, they'll get lunch, and they'll have

2:26PM  25   to take it to go because I'm too afraid that they'll start

2:27PM  1    talking about the case with the alternates.

2:27PM  2              You know, I never quite know what to do with

2:27PM  3    phones after that incident.  Were you here when we had the

2:27PM  4    people using the phone?  You know, I think that after that

2:27PM  5    happened to me with the person using the phone to check what a

2:27PM  6    witness had said, it was -- I can't think of the guy's name.

2:27PM  7    Boggs.  Jackson Boggs' case where they used the phone to check

2:27PM  8    the distance between two points.  Were you here, Magaly?

2:27PM  9              COURTROOM DEPUTY:  Yes, Your Honor.

2:27PM  10             THE COURT:  I had to try that one over again.  I

2:27PM  11   think what I'm going to say is during jury deliberations they

2:27PM  12   need to keep their phones -- I think they need to keep them

2:27PM  13   locked up.  I don't really want to be bitten twice with the

2:27PM  14   same thing happening to me.  So, you know, granted, if somebody

2:27PM  15   is going to look something up, they can look it up, and there's

2:27PM  16   not much that I can do except keep them on the honor system,

2:27PM  17   but at least when they're here in the courthouse, we have a

2:28PM  18   little bit of control.  So I'm going to have the jurors after

2:28PM  19   they go to begin their deliberations and the two alternates are

2:28PM  20   excused, tell them that during deliberations they need to keep

2:28PM  21   their phones locked up on -- whatever -- is that the third

2:28PM  22   floor?  Wherever it is, the third floor.  But if somebody tells

2:28PM  23   me, "Oh, my child needs to reach me," or, "My husband needs to

2:28PM  24   reach me," or, "My father needs to reach me," you know, they

2:28PM  25   can keep their phone.  They just have to, you know, keep it

| | |
|---|---|
| 2:28 PM | 1 |
| 2:28 PM | 2 |
| 2:28 PM | 3 |

2:28 PM 1    turned off or do something.  I don't want to -- you know, I

2:28 PM 2    don't want somebody their worried that their child can't talk

2:28 PM 3    to them.

2:28 PM 4                Let's see.  What else?  I guess I don't have

2:28 PM 5    anything else.  The exhibits.  I agree with you.  I think

2:28 PM 6    having looked at these -- not all of them.  I looked at some of

2:28 PM 7    them from a distance.  They should go to the jury.  I agree

2:28 PM 8    with you on that.

2:29 PM 9                So I'm going to send -- these are exhibits

2:29 PM 10   received into evidence.  They should go to the jury.  So that's

2:29 PM 11   my ruling on that.

2:29 PM 12               We'll have to have this all set up so they can

2:29 PM 13   look at that.  That's all set up now, isn't it?  We've gone

2:29 PM 14   back and forth on these things.  That's all set up so they can

2:29 PM 15   look at it.

2:29 PM 16               Please make certain you sit down with Magaly.  I

2:29 PM 17   don't want to have happen -- it didn't happen here.  It

2:29 PM 18   happened to another judge where an exhibit that was not

2:29 PM 19   received into evidence went back to the jury, and that was also

2:29 PM 20   a mistrial.  So I want to try to avoid mistrials at all costs.

2:29 PM 21   So please, please review that.  I expect the agent to work with

2:29 PM 22   the prosecutors on this.

2:29 PM 23               **SPECIAL AGENT GARCIA:**  Yes, Your Honor.

2:29 PM 24               **THE COURT:**  And make certain it's only those items

2:29 PM 25   that have been received into evidence that go back.

2:30PM   1              I'm trying to think if there's anything else.

2:30PM   2              MR. REYNOLDS:  May I use a PowerPoint during my

2:30PM   3      closing?

2:30PM   4              THE COURT:  Absolutely.

2:30PM   5              MR. REYNOLDS:  And will this monitor be available

2:30PM   6      during closing?

2:30PM   7              THE COURT:  I believe so.

2:30PM   8              COURTROOM DEPUTY:  Yes.

2:30PM   9              THE COURT:  I only have an issue with opening

2:30PM   10     statements when people use it, because we don't know what's

2:30PM   11     going to be admitted.  Even if the other side agrees to it,

2:30PM   12     until the judge admits it, it's not admitted.  So I have a

2:30PM   13     problem with opening statements, but closing arguments,

2:30PM   14     whatever you want is fine.

2:30PM   15              Anything over here, Mr. Kerr?  Do you have

2:30PM   16     anything?

2:30PM   17              MR. KERR:  Nothing, Your Honor.

2:30PM   18              THE COURT:  Okay.  Well, if there's nothing else, I

2:30PM   19     will see you Monday morning at 9:00 a.m.  All right.  Thank

2:30PM   20     you.  We're in recess.

2:30PM   21                       (End of proceedings.)

22

23

24

25

* * * * * * * * * * * * * * * * * * * *

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA


REPORTER TRANSCRIPT CERTIFICATE

     I, Tana J. Hess, Official Court Reporter for the United
States District Court, Middle District of Florida, certify,
pursuant to Section 753, Title 28, United States Code, that the
foregoing is a true and correct transcription of the
stenographic notes taken by the undersigned in the
above-entitled matter (Pages 1 through 133 inclusive) and that
the transcript page format is in conformance with the
regulations of the Judicial Conference of the United States of
America.




                         _____
                         Tana J. Hess, CRR, RMR, FCRR
                         Official Court Reporter
                         United States District Court
                         Middle District of Florida
                         Tampa Division
                         Date: